XAVIER BECERRA
Attorney General of California
NICKLAS A. AKERS
Senior Assistant Attorney General
MICHELE VAN GELDEREN (SBN 171931)
Supervising Deputy Attorney General
TINA CHAROENPONG (SBN 242024)
DEVIN W. MAUNEY (SBN 294634)
Deputy Attorneys General
 1515 Clay St., 20th Floor
 Oakland, CA 94612
 Tel: (510) 879-0814
 Fax: (510) 622-2270
 Email: devin.mauney@doj.ca.gov

*Attorneys for Plaintiff the People of the State of California*

[See signature page for the complete list of parties represented. Civ. L.R. 3-4(a)(1).]

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **PEOPLE OF THE STATE OF CALIFORNIA** *ex rel.* Xavier Becerra, Attorney General of California; **DISTRICT OF COLUMBIA**, by its Attorney General Karl A. Racine; **PEOPLE OF THE STATE OF ILLINOIS** *ex rel.* Kwame Raoul, Attorney General of Illinois; **COMMONWEALTH OF MASSACHUSETTS** *ex rel.* Maurey Healey, Attorney General of Massachusetts; **STATE OF MINNESOTA**, by its Attorney General Keith Ellison; **STATE OF NEW JERSEY**, by its Attorney General Gurbir S. Grewal; **PEOPLE OF THE STATE OF NEW YORK** *ex rel.* Letitia James, Attorney General of New York; and **STATE OF NORTH CAROLINA** *ex rel.* Joshua H. Stein, Attorney General of North Carolina,<br><br>                Plaintiffs,<br><br>        v.<br><br>**THE FEDERAL DEPOSIT INSURANCE CORPORATION**,<br><br>                Defendant. | Case No. 20-5860<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>**ADMINISTRATIVE PROCEDURE ACT CASE** |

1

**INTRODUCTION**

1.     This is a case about federal overreach. States have long used interest-rate caps to protect consumers, business owners, and scrupulous creditors from the harms of predatory lending. The Federal Deposit Insurance Act ("FDIA") exempts federally insured, state-chartered banks and insured branches of foreign banks ("FDIC Banks") from these caps. The Federal Deposit Insurance Corporation ("FDIC"), a federal bank regulator, has issued a rule, after a divided vote of its Board of Directors, that would dramatically expand preemption of state interest-rate caps, allowing not just FDIC Banks but *any* entity that buys their loans to charge interest in excess of rates permitted by state law. This provision of the rule is beyond the FDIC's power to issue, is contrary to statute, and would facilitate predatory lending through sham "rent-a-bank" partnerships designed to evade state law. Additionally, in undertaking this rulemaking, the FDIC failed to follow the procedures set forth by Congress, ignored the potential for regulatory evasion, and failed to explain its rejection of evidence contrary to its proposal.

2.     To protect consumers and business owners from the debt traps posed by high-interest loans, many states, including California, the District of Columbia, Illinois, Massachusetts, Minnesota, New Jersey, New York, and North Carolina (together, the "States"), rely on maximum interest-rate caps (also known as "usury laws," "usury caps," or simply "rate caps"). These caps are necessary to prevent lenders from charging excessive interest rates that make it difficult or impossible for many borrowers to repay their loans in full, which in turn causes borrowers to fall deeper into debt. Moreover, predatory lenders that trap consumers in a cycle of debt impose significant costs on states because these consumers are more likely to require government assistance to meet their basic needs. For example, according to one study, the high interest rates associated with payday loans can cause individuals to be more likely to require food assistance and less likely to meet their child-support obligations.[1] These are real, concrete costs

---

[1] Brian T. Melzer, *Spillovers from Costly Credit* 4-6 (U.S. Census Bureau Ctr. for Econ. Stud., Working Paper No. CES-WP-11, Dec. 2016), https://brianmelzer.com/wp-content/uploads/2016/12/Spillovers_final_wp.pdf. Other studies show a relationship between consumer debt and physical and mental health problems. *E.g.*, Elizabeth Sweet *et al.*, *Short-Term Lending: Payday Loans As Risk Factors for Anxiety, Inflammation and Poor Health* 1, 5 SSM-

imposed on states and ultimately borne by taxpayers.

3.      To prevent predatory lending and thereby protect consumers and taxpayers, states like the plaintiff States prohibit lenders from charging excessive rates on consumer loans. For example, California has a graduated rate cap on most consumer loans under $2,500 and prohibits charging interest greater than 36% plus the Federal Funds Rate on most consumer loans between $2,500 and $10,000.[2] New York law prohibits charging interest in excess of 16% for most consumer loans and criminalizes charging interest above 25%.[3] Similarly, North Carolina law has a graduated rate cap on consumer loans of $15,000 or less and prohibits charging interest in excess of 30% on loans made by licensed lenders and in excess of 16% on loans by unlicensed lenders.[4] Massachusetts criminalizes charging interest above 20% per year on any loan and limits interest to 12% per year on loans of $6,000 or less.[5] Interest-rate caps also protect other creditors (like landlords, suppliers, and mortgage or auto lenders) who face the threat of non-payment if their debtors take on high-interest loans and become insolvent.

4.      Under the FDIA, FDIC Banks are exempt from state interest-rate caps and are subject only to the limits Congress established, as set forth in 12 U.S.C. § 1831d (often referred to as "Section 27 of the FDIA"). A number of motives explain this special treatment—the comprehensive regulatory regime to which FDIC Banks must submit; Congress's desire to achieve parity between state-chartered banks and federally chartered national banks, which under federal law are exempt from state interest-rate caps; and the role of federal regulation and

---

Population Health (2018), https://doi.org/10.1016/j.ssmph.2018.05.009 (noting that "studies are increasingly finding links between debt and poor health across a range of outcomes, including depression and depressive symptoms, anxiety, poor psychological well-being, and other mental disorders, poor self-rated health, high blood pressure, obesity, child behavior problems, lower life expectancy, and foregone medical care or care non-adherence") (internal citations omitted).

[2] Cal. Fin. Code §§ 22303, 22304, 22304.5.

[3] N.Y. Gen. Oblig. Law §§ 5-501, 5-511; N.Y. Banking Law § 14-a; N.Y. Penal Law §§ 190.40, 190.42.

[4] N.C. Gen. Stat. §§ 53-176(a), (b), 24-1.1(a), (c). The 16% maximum interest rate applies to all loans between $15,000 and $25,000 regardless of licensing status. *Id.*

[5] M.G.L. c. 271 § 49 (criminalizing charging interest on a loan in excess of 20% per year in Massachusetts); M.G.L. c. 140 § 96 (criminalizing charging interest in excess of 12% per year on a loan of $6,000 or less in Massachusetts).

oversight over the activities of FDIC Banks. None of these motives apply to non-banks, and for that reason, Congress carefully selected the language of § 1831d to apply exclusively to FDIC Banks.

5.      As one federal court recently explained, § 1831d "governs what charges a 'State bank' may impose, but . . . does not on its face regulate interest or charges that may be imposed by a non-bank, including one which later acquires or is assigned a loan made or originated by a state bank."[6]

6.      Nevertheless, the FDIC recently issued a final rule, the Federal Interest Rate Authority Rule ("FDIC Rule" or "Rule"),[7] containing a provision that would extend this preemption of state-law rate caps beyond FDIC Banks to *any* entity—including non-banks—that purchases a loan from an FDIC Bank. This key provision (the "Non-bank Interest Provision") provides, in part, that "[i]nterest on a loan that is permissible under section 27 of the Federal Deposit Insurance Act [12 U.S.C. § 1831d] shall not be affected by . . . the sale, assignment, or other transfer of the loan, in whole or in part."[8]

7.      The FDIC is a federal agency that manages the federal deposit insurance fund and has regulatory authority over federally insured state-chartered banks, insured branches of foreign banks, and other insured depository institutions.[9] However, the FDIC Rule's Non-bank Interest Provision applies not to these institutions but to entities far beyond the FDIC's jurisdiction—that is, anyone who buys loans from an FDIC Bank. The Rule drastically alters the statutory and regulatory regime that Congress established by unlawfully extending federal law in order to preempt state rate caps that would otherwise apply to those non-bank entities. The Rule is

---

[6] *Meade v. Avant of Colorado, LLC*, 307 F. Supp. 3d 1134, 1145 (D. Colo. 2018).

[7] FDIC, *Federal Interest Rate Authority*, 85 Fed. Reg. 44,146-58 (July 22, 2020) (to be codified at 12 C.F.R. §§ 331.1-331.4).

[8] 85 Fed. Reg. at 44,158 ("(e) *Determination of interest permissible under section 27*. Whether interest on a loan is permissible under section 27 of the Federal Deposit Insurance Act is determined as of the date the loan was made. Interest on a loan that is permissible under section 27 of the Federal Deposit Insurance Act shall not be affected by a change in State law, a change in the relevant commercial paper rate after the loan was made, or the sale, assignment, or other transfer of the loan, in whole or in part.") (to be codified at 12 C.F.R. § 331.4(e)).

[9] *See* 12 U.S.C. §§ 1811, 1813, 1814, 1820.

4

contrary to the plain language of § 1831d and to the statutory scheme Congress enacted. The FDIC fails to account for elements of the statutory scheme that conflict with its interpretation and relies on statutory provisions that offer no support for its view.

8.     The Rule also contravenes the judgment of Congress, which limited the preemption of state interest-rate caps to FDIC Banks in § 1831d and declined to extend that preemption to non-banks. The Non-bank Interest Provision impermissibly preempts state law by extending § 1831d's protection against state-law rate caps to *any* entity that purchases a loan from an FDIC Bank. This is contrary to Congress's clear and manifest intent and invades the traditional sovereign authority of state governments to protect consumers, business owners, and the lending marketplace within their borders.

9.     The FDIC also lacks authority to promulgate the Non-bank Interest Provision because it does not have jurisdiction over what non-banks may do and because it cannot contravene previous court rulings that federal interest-rate preemption does not extend to non-banks.

10.     Expansion of state rate-cap preemption to any non-bank that purchases loans from an FDIC Bank also conflicts with the FDIC's long-held stance that it "view[s] unfavorably entities that partner with  [an FDIC Bank] with the sole goal of evading a lower interest rate established under [state law]."[10] Partnerships between FDIC Banks and non-banks for the sole purpose of evading state rate caps are the foreseeable if not intended result of the Non-bank Interest Provision.

11.     In practice, the Non-bank Interest Provision's sweeping extension of preemption will facilitate evasion of state law by enabling "rent-a-bank" schemes, in which banks not subject to interest-rate caps act as a mere pass-through for loans that, in substance, are issued by non-bank lenders. "Rent-a-bank" schemes in various forms have long troubled state law-enforcement

---

[10] 85 Fed. Reg. at 44,146-47; see also *Statement by FDIC Chairman Jelena McWilliams on the Notice of Proposed Rulemaking: Federal Interest Rate Authority*, FDIC Board Meeting (Nov. 19, 2019), https://www.fdic.gov/news/news/speeches/spnov1919.pdf.

efforts, and comments in the administrative record alerted the FDIC to this "important aspect"[11] of the FDIC's then-proposed rule. By extending rate-cap preemption to all purchasers of loans initially made by FDIC Banks, the Rule invites precisely this form of sham arrangement. Yet the FDIC failed to consider this and other important aspects of the Rule.

12. Even with respect to aspects of the Rule the FDIC chose to address, its analysis is incomplete. The agency claims its Non-bank Interest Provision is necessary to reduce market uncertainty and provide FDIC Banks with liquidity, but the FDIC fails to substantiate these claims with evidence. Moreover, significant evidence in the administrative record conflicts with the FDIC's claims, but the agency failed to address that evidence.

13. For all of these reasons, and those that follow below, the Non-bank Interest Provision of the FDIC Rule is arbitrary and capricious, an abuse of discretion, and not in accordance with law; it is in excess of statutory jurisdiction, authority, and limitations, and short of statutory right; and it is taken without observance of procedure required by law.[12]

## JURISDICTION AND VENUE

14. This action arises under the Administrative Procedure Act ("APA").[13] Because the FDIC Rule is a final rule issued by an executive agency, the Rule is a final agency action, and is reviewable under 5 U.S.C. § 704.

15. This Court has subject-matter jurisdiction over this action because it is a case arising under federal law.[14]

16. An actual, present, and justiciable controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a). This Court has authority to grant declaratory and injunctive relief under 28 U.S.C. §§ 2201 and 2202 and 5 U.S.C. §§ 701-706.

17. Venue is proper in this judicial district under 28 U.S.C. § 1391(e)(1) and 5 U.S.C. § 703 because the People of the State of California reside in this district, no real property is

---

[11] *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (agency action must be invalidated if the agency "entirely failed to consider an important aspect of the problem").
[12] 5 U.S.C. § 706(2).
[13] 5 U.S.C. §§ 551-559, 701-706.
[14] 28 U.S.C. § 1331.

1    involved in this action, and this is a court of competent jurisdiction.

2                              **INTRADISTRICT ASSIGNMENT**

3          18.    Assignment to the Oakland Division is appropriate because a substantial part of

4    the events or omissions giving rise to the claims in this Complaint occurred in the County of

5    Alameda in that, among other things, the Rule would preempt California law applicable to

6    corporate and natural persons doing business in the County and the People of the State of

7    California maintain an office in the Oakland Division.

8                                        **PARTIES**

9          19.    Plaintiff the People of the State of California ("California") bring this action by

10   and through their Attorney General, Xavier Becerra, California's chief law officer.[15]

11         20.    Plaintiff the District of Columbia (the "District") is a sovereign municipal

12   corporation organized under the Constitution of the United States. It is empowered to sue and be

13   sued, and it is the local government for the territory constituting the permanent seat of the federal

14   government. The District is represented by and through its chief legal officer, the Attorney

15   General for the District of Columbia, Karl A. Racine. The Attorney General has general charge

16   and conduct of all legal business of the District and all suits initiated by and against the District

17   and is responsible for upholding the public interest.[16]

18         21.    Plaintiff the State of Illinois ("Illinois") is represented by its Attorney General,

19   Kwame Raoul, as its chief law-enforcement officer.[17] Attorney General Raoul has broad statutory

20   and common law authority to act in the interests of the State of Illinois and its citizens in matters

21   of public concern, health, and welfare.[18]

22         22.    Plaintiff the Commonwealth of Massachusetts ("Massachusetts"), represented by

23   and through Attorney General Maura Healey, is a sovereign state of the United States of America.

24   Attorney General Healey is the Commonwealth's chief law-enforcement officer and brings this

25   challenge pursuant to her independent constitutional, statutory, and common-law authority.

26   _____

27         [15] Cal. Const. art. V, § 13.
           [16] D.C. Code. § 1-301.81.
28         [17] Ill. Const. art. V, § 15.
           [18] 15 Ill. Comp. Stat. 205/4.

23.     Plaintiff the State of Minnesota ("Minnesota") brings this action by and through its Attorney General, Keith Ellison. Attorney General Ellison is the chief law officer of Minnesota and, pursuant to common law and statutory authority, may institute and maintain all such actions and proceedings as necessary for the enforcement of Minnesota's laws, the preservation of order, and the protection of Minnesota's legal and sovereign rights.[19]

24.     Plaintiff the State of New Jersey ("New Jersey") is a sovereign state of the United States of America. This action is brought on behalf of the State of New Jersey by Attorney General Gurbir S. Grewal, the State of New Jersey's chief legal officer.[20]

25.     Plaintiff the State of New York ("New York") is a sovereign state of the United States of America. New York is represented by Attorney General Letitia James, New York's chief law-enforcement officer.[21] As a body politic and a sovereign entity, New York brings this action on behalf of itself and as trustee, guardian, and representative of all residents and citizens of New York.

26.     Plaintiff the State of North Carolina, represented by and through Attorney General Joshua H. Stein, is a sovereign state of the United States of America. Attorney General Stein is the State of North Carolina's chief law-enforcement officer and brings this challenge pursuant to his independent constitutional, statutory, and common-law authority.

27.     Defendant the Federal Deposit Insurance Corporation is an executive agency of the United States government. The FDIC's principal address is 550 17th Street, NW, Washington, D.C. 20429.

## ALLEGATIONS

## I.    FEDERAL BANKING LAW AND STATE-LAW PREEMPTION

28.     Since 1864, the United States has had a dual-charter banking system in which both the federal and state governments issue bank charters. Before the Civil War, the chartering and

---

[19] *Head v. Special School District No. 1*, 182 N.W.2d 887, 892 (Minn. 1970); Minn. Stat. ch. 8.

[20] N.J. Stat. Ann. § 52:17A-4(e), (g).

[21] N.Y. Executive Law § 63.

regulation of banks was, except for two short-lived experiments in federal banking, the province of the states. However, in the latter part of President Lincoln's first term, Congress passed the National Bank Act ("NBA"), which authorized the creation of federally chartered "national banks" and endowed them with certain statutory privileges, in part to help the Union finance the Civil War.[22] Understandably concerned with preserving the federal financial system during a time of state insurrection,[23] Congress chose to place national banks in the position of most-favored lender, preempting state law to allow these federally chartered entities to charge as much or more interest than the state-chartered banks against which they compete.[24]

29.     This imbalance in the prerogatives of state-chartered banks and their national-bank competitors persisted for over a century, but in 1980, Congress amended the Federal Deposit Insurance Act to place all FDIC Banks and national banks on equal footing with respect to permissible interest rates.[25] "In order to prevent discrimination against State-chartered insured depository institutions [FDIC Banks]," Congress "preempted" state law to establish the interest rates chargeable by all FDIC Banks in § 1831d.[26]

30.     The FDIC has long taken the position that § 1831d, the provision by which Congress sought to impose parity between national banks and FDIC Banks, must be interpreted "*in pari materia* with [12 U.S.C.] section 85," the Civil War-era NBA provision preempting state-law rate caps for national banks.[27]

31.     Under § 1831d, FDIC Banks may charge the greater of a) a floating rate tied to the "discount rate on ninety-day commercial paper" set by the regional Federal Reserve Banks, to which national banks had long had access, or b) the highest rate permitted by the state in which the FDIC Bank is "located":

---

[22] Stephen G. Stroup, *Smiley v. Citibank (South Dakota), N.A.: Charging Toward Deregulation in the Credit Card Industry*, 22 Del. J. Corp. L. 601, 603 (1997).
[23] *See id.*
[24] 12 U.S.C. § 85.
[25] Depository Institutional Deregulation and Monetary Control Act of 1980 ("DIDMCA"), Pub. L. No. 96–221 (HR 4986), 94 Stat 132 (1980).
[26] 12 U.S.C. § 1831d.
[27] *E.g.*, 85 Fed. Reg. at 44,147.

9

In order to prevent discrimination against State-chartered insured depository institutions, including insured savings banks, or insured branches of foreign banks [*i.e.*, FDIC Banks] with respect to interest rates, if the applicable rate prescribed in this subsection exceeds the rate such State bank or insured branch of a foreign bank would be permitted to charge in the absence of this subsection, such State bank or such insured branch of a foreign bank may, notwithstanding any State constitution or statute which is hereby preempted for the purposes of this section, take, receive, reserve, and charge on any loan or discount made, or upon any note, bill of exchange, or other evidence of debt, interest [1] at a rate of not more than 1 per centum in excess of the discount rate on ninety-day commercial paper in effect at the Federal Reserve bank in the Federal Reserve district where such State bank or such insured branch of a foreign bank is located or [2] at the rate allowed by the laws of the State, territory, or district where the bank is located, whichever may be greater.[28]

32.     In recent decades, it is the second option—permitting "the rate allowed by the laws of the State . . . where the bank is located"[29]—that governs in practice.

33.     FDIC Banks are generally "located" in the state where they are chartered, and at first blush, it is not obvious why federal preemption is necessary to permit the charging of interest already allowed by the bank's chartering state. However, FDIC Banks can conduct business outside the states where they are "located"; thus, the ability to charge interest at rates permitted in their home states—regardless of the law applicable to other lenders in the state where the borrowers live—is a valuable federal privilege.[30] In our era, a bank's "location" is a strategic asset used to "export" high-cost loans to borrowers in states that cap interest rates.

34.     The "exportation" of high-interest-rate loans from states with permissive rate caps to borrowers in more protective states has become increasingly common.

35.     The trend started with national banks in the wake of the Supreme Court's 1978 opinion in *Marquette Nat'l Bank of Minneapolis v. First of Omaha Serv. Corp.*, which held that a national bank could not be "deprived of [its] location merely because it is extending credit to residents of a foreign State."[31] *Marquette*'s holding—that a national bank could offer loans to borrowers outside the state of the bank's "location" that would ordinarily violate the rate caps of

---

[28] 12 U.S.C. § 1831d(a).
[29] *Id.*
[30] *See Greenwood Trust Co. v. Massachusetts*, 971 F.2d 818, 827 (1st Cir. 1992).
[31] *Marquette Nat'l Bank of Minneapolis v. First of Omaha Serv. Corp.*, 439 U.S. 299, 310 (1978).

the borrowers' state—set off a race to the bottom. National banks were incentivized to "locate" themselves strategically in states without interest-rate caps. For example, banking behemoths Citibank and Wells Fargo Bank are conspicuously "located" in South Dakota,[32] a state that imposes no cap on the interest rates banks may charge.[33] When Citibank and Wells Fargo issue credit cards to consumers across the nation, they rely on federal preemption under § 85 of the NBA (informed by South Dakota's permissive interest-rate law) to charge interest in excess of the rates permitted under otherwise applicable law in the many states where they do business.

36.     *Marquette* exacerbated the competitive imbalance between national banks and state-chartered banks, which remained bound by the law of any states where they did business under ordinary choice-of-law rules, regardless of those banks' "location." Congress reacted by passing § 1831d in 1980, which granted the same interest-rate preemption and concomitant rate-exportation powers to FDIC Banks.[34]

37.     FDIC Banks have used their interest-rate-exportation powers similarly to their national-bank counterparts. For example, a number of FDIC Banks located in Utah, which imposes no cap on the rates banks may charge when the parties execute a written contract,[35] have business practices aimed at "exporting" loans to borrowers in states that cap interest rates.[36]

38.     Pursuant to § 1831d, FDIC Banks may charge interest in excess of rate caps applicable in the states where they do business. However, this right is limited to FDIC Banks and does not extend to *non-banks* that buy loans originated by FDIC Banks.[37] Section 1831d states, a

---

[32] OCC, *National Banks & Federal Branches and Agencies Active as of 7/31/2020*, https://www.occ.treas.gov/topics/charters-and-licensing/financial-institution-lists/national-by-state.pdf.

[33] S.D. Codified Laws §§ 54-3-1.1 (titled "Rate of interest set by written agreement--No maximum or usury restriction"), 54-3-13 (titled "Regulated lenders exempt from interest rate limitations and usury statutes"), 54-3-14 (defining "regulated lenders" to include FDIC Banks).

[34] DIDMCA, Pub. L. No. 96–221 (HR 4986), 94 Stat 132 (1980).

[35] Utah Code Ann. § 15-1-1 (1).

[36] Comment of Center for Responsible Lending 30, 32-33, 35, 38, 41, App'x A. (Feb. 4, 2020); Comment of Adam J. Levitin 15 (Jan. 5, 2020). Citations to comments refer to comments submitted to the FDIC in response to its proposed rulemaking for its Rule and are available at https://www.fdic.gov/regulations/laws/federal/2019/2019-federal-interest-rate-authority-3064-af21.html.

[37] *See Madden v. Midland Funding, LLC*, 786 F.3d 246 (2d Cir. 2015), *cert. denied*, 136

---

11

"*State bank or such insured branch of a foreign bank* [*i.e.*, FDIC Bank] may, notwithstanding any State constitution or statute which is hereby preempted for the purposes of this section, take, receive, reserve, and charge on any loan . . . interest" at the allowed rates.[38] Congress has not preempted state interest-rate caps as to non-banks. Non-banks must abide by state interest-rate caps and cannot, by virtue of federal law, charge interest in excess of those caps on loans they purchase from banks.[39]

## II.   THE FDIC RULE'S NON-BANK INTEREST PROVISION

### A.   The FDIC's Rulemaking

39.    The FDIC issued its notice of proposed rulemaking on December 6, 2019,[40] and its Board of Directors adopted the Final Rule by a divided 3-1 vote on June 25, 2020. FDIC Director Gruenberg issued a dissenting statement.[41]

40.    The FDIC published its final Rule in the Federal Register on July 22, 2020, and set August 21, 2020 as the Rule's effective date.[42]

41.    The FDIC Rule trails a similar rule (the "OCC Rule") by the Office of the Comptroller of the Currency ("OCC"), which regulates national banks.[43] The OCC Rule is nearly identical in substance to the FDIC Rule's Non-bank Interest Provision except that it applies to purchasers of loans issued by federally chartered national banks and federal savings associations.[44] The OCC recently characterized its rule as a "*Madden*-fix rule."[45]

---

S. Ct. 2505 (2016) (construing NBA provision, 12 U.S.C. § 85, which FDIC contends must be interpreted *in pari materia* with § 1831d).

[38] 12 U.S.C. § 1831d (emphasis added).

[39] *See Madden*, 786 F.3d at 249-52.

[40] 84 Fed. Reg. 66,845.

[41] Martin J. Gruenberg, Member, FDIC Bd. of Dirs., *Statement on Final Rule on Federal Interest Rate Authority* (June 25, 2020), https://www.fdic.gov/news/speeches/spjun2520e.html.

[42] 85 Fed. Reg. 44,146.

[43] OCC, *Permissible Interest on Loans That Are Sold, Assigned, or Otherwise Transferred*, 85 Fed. Reg. 33,530-36 (June 2, 2020) (to be codified at 12 C.F.R. §§ 7.40001(e) and 160.110(d)).

[44] Several States recently sued the OCC to invalidate the OCC Rule. *California v. OCC*, Case No. 4:20-cv-05200-JSW (N.D. Cal.). Many of the arguments made in that lawsuit apply with equal force to the Non-bank Interest Rate Provision.

[45] *See* OCC, *National Banks and Federal Savings Associations as Lenders*, 85 Fed. Reg. 44,223, 44,227 (July 22, 2020) (to be codified at 12 C.F.R. § 7.1031).

42.     The FDIC Rule is a "rule" under 5 U.S.C. § 551(4) because, among other reasons, it is "an agency statement of general . . . applicability and future effect designed to implement, interpret, or prescribe law or policy . . . and includes the approval or prescription for the future of rates . . . [or] prices"[46] chargeable by entities that acquire loans from FDIC Banks.

43.     Because the Rule will become effective on August 21, 2020, unless revoked by the FDIC or set aside by the Court, and is neither a "preliminary, procedural, or intermediate agency action" nor a "ruling not directly reviewable,"[47] it is a final agency action reviewable under 5 U.S.C. § 704.

44.     The FDIC Rule addresses some topics that are not the direct subject of this challenge, like the application of state law to a branch of a state-chartered bank located in a "host" state outside that bank's "home" state.[48]

45.     The Non-bank Interest Provision this suit challenges falls within a provision of the Rule the FDIC has codified at 12 C.F.R. § 331.4(e):

> *Determination of interest permissible under section 27*. Whether interest on a loan is permissible under section 27 of the Federal Deposit Insurance Act [12 U.S.C. § 1831d] is determined as of the date the loan was made. Interest on a loan that is permissible under section 27 of the Federal Deposit Insurance Act shall not be affected by a change in State law, a change in the relevant commercial paper rate after the loan was made, or the sale, assignment, or other transfer of the loan, in whole or in part.[49]

46.     While this provision purports to answer a single question—*when* the "interest on a loan . . . permissible under section 27 [§ 1831d] . . . is determined"—in fact, it elides two distinct questions: First, do changes "in State law" or the "relevant commercial paper rate" retroactively alter the interest rate FDIC Banks may take, receive, reserve, and charge under § 1831d? Second, does preemption of state law under § 1831d extend to *non*-banks to which a "sale, assignment, or other transfer of the loan" is made?[50]

---

[46] 5 U.S.C. § 551(4).
[47] 5 U.S.C. § 704.
[48] 85 Fed. Reg. at 44,158.
[49] *Id.*
[50] Put differently, the FDIC treats both issues as a question of "when"—when is the permissible rate under § 1831d fixed? In fact, the second inquiry is a matter of "who"—who benefits from the state-law preemption provided under § 1831d?

47.     The FDIC answers this second question in the affirmative. It is wrong. Section 1831d, by its plain language, preempts otherwise applicable state rate caps *only* as applied to FDIC Banks and no one else.

48.     The FDIC's Non-bank Interest Provision would dramatically and unilaterally expand federal preemption of state-law interest-rate caps to *any* entity that purchases a loan from an FDIC Bank. Put differently, the Non-bank Interest Provision would transform the state-law preemption Congress granted specifically to FDIC Banks into a salable asset, available to any buyers willing to pay FDIC Banks for the privilege of charging interest in excess of state law.

## B.     *Madden v. Midland Funding, LLC*

49.     The Non-bank Interest Provision's explicit purpose is to overturn the Second Circuit's holding in *Madden v. Midland Funding, LLC* that the interest-rate exemption in § 85 of the NBA—which the FDIC believes guides the interpretation of § 1831d—applies only to banks.[51]

50.     *Madden* concerned a credit-card debt originated by a national bank and subsequently sold to an unaffiliated third-party debt collector. The debt collector sent the plaintiff, a New York resident, a collection notice seeking to recover the debt at an interest rate of 27%, which violates New York's usury cap. The plaintiff sued the debt collector, arguing that its attempt to collect interest that is usurious in New York violated federal and state debt-collection statutes. The debt collector argued that, even though it was not a national bank, the plaintiff's claims were preempted by § 85 because the debt was originated by a national bank.[52]

51.     As the Second Circuit explained in rejecting that argument, § 85 extends to

---

[51] *Madden*, 786 F.3d at 249-52; *see also, e.g.*, 85 Fed. Reg. at 44,146 ("While *Madden* concerned the assignment of a loan by a national bank, the Federal statutory provision governing State banks' authority with respect to interest rates is patterned after and interpreted in the same manner as section 85. *Madden* therefore helped highlight the need to issue clarifying regulations addressing the legal ambiguity in section 27."); *id.* at 44,149 (describing FDIC's policy objections to the "*Madden* decision, as it stands"); *id.* at 44,151 (arguing *Madden* "does not preclude the FDIC from adopting a different interpretation"); *id.* at 44,156 (listing "[t]he Second Circuit's *Madden* decision" and the uncertainty it purportedly created as the primary entry under heading "Reason Why This Action Is Being Considered").

[52] *Madden*, 786 F.3d at 247-48.

*national banks* the privilege of charging interest in excess of what is permitted in the states where they do business, in part because national banks have submitted to comprehensive regulatory oversight by federal banking regulators.[53]

52.     The Court noted that state laws limiting the interest chargeable by non-banks that buy loans originated by national banks do not significantly interfere with a national bank's own exercise of powers under the NBA.[54] To wit, regulating what non-banks may charge does not inhibit national banks' power to charge and collect interest permitted under § 85, nor does it affect their power to make loans or interfere with the sale of those loans to bank and non-bank buyers. At most, ordinary application of state law to non-banks could reduce the price that non-bank purchasers might be willing to pay national banks for their loans.[55]

53.     By contrast, the Court held, "extending those protections [of § 85] to third parties would create an end-run around usury laws for non-national bank entities . . . ."[56]

54.     The FDIC purportedly issued its Rule to resolve the "uncertainty" created by the *Madden* decision.[57] But *Madden* did not create any legal uncertainty because no Court of Appeals has ever held that the interest-rate preemption provided in §§ 85 (which applies to national banks) and 1831d (which applies to FDIC Banks) extends to loan purchasers. Indeed, the other Court of Appeals to opine has adopted a view consistent with *Madden*.[58]

55.     Nevertheless, the FDIC speculated that the "uncertainty" created by the *Madden*

---

[53] *Id.* at 250-52 (also stating that applying state law to non-banks that purchase loans from national banks would only limit the activities of debt buyers "which are otherwise subject to state control . . . and which are not protected by federal banking law or subject to OCC oversight" (internal citation and quotation marks omitted)).

[54] *Id.* at 251.

[55] *See id.* ("Here, however, state usury laws would not prevent consumer debt sales by national banks to third parties. Although it is possible that usury laws might decrease the amount a national bank could charge for its consumer debt in certain states (*i.e.*, those with firm usury limits, like New York), such an effect would not 'significantly interfere' with the exercise of a national bank power.").

[56] *Id.* at 252.

[57] 85 Fed. Reg. at 44,149, 44,150, 44,152, 44,155.

[58] *In re Cmty. Bank of N. Va.*, 418 F.3d 277, 296 (3d Cir. 2005) ("Sections 85 and 86 of the NBA and Section 521 of the DIDA [*i.e.*, 12 U.S.C. § 1831d] apply only to national and state chartered banks, not to non-bank purchasers of second mortgage loans . . . .")

1  decision could "reduce overall liquidity in loan markets," "chill State banks' willingness to make

2  [certain] types of loans," "reduc[e] . . . the availability of credit," and "discourage the origination

3  and sale of loan products . . . ."[59] These fears about the disruption that would be caused by

4  *Madden* echo the financial industry's dire warnings. The defendants in *Madden* predicted

5  "catastrophic consequences for secondary markets that are essential to the operation of the

6  national banking system and the availability of consumer credit,"[60] and financial-industry trade

7  groups warned that *Madden* "threatens to cause significant harm to [credit] markets, the banking

8  industry, and the millions of families and businesses they serve."[61]

9       56.    Contrary to these predictions, there has been no disruption to lending as a result of

10  *Madden*.

11       57.    The loans at issue in *Madden* were credit-card debt, issued by a national bank and

12  sold to non-bank buyers. But the case's outcome did not affect the profitability of credit-card

13  lending by national banks, which "reported blockbuster 2019 profit[.]"[62]

14       58.    The FDIC's sister regulator, the OCC, testified to Congress in December 2019,

15  nearly five years after *Madden*, that the U.S.'s then-economic expansion was "the longest in U.S.

16  history, which ha[d] benefited banks' overall financial performance and banks ha[d] helped

17  maintain that momentum." [63] "Capital and liquidity," in *Madden*'s wake, were "near historic

18

19       [59] *E.g.*, 85 Fed. Reg. at 44,149, 44,155, 44,156.

20       [60] Petition for a Writ of Certiorari at 3, *Midland Funding, LLC v. Madden*, 136 S.Ct. 2505 (2016) (No. 15-610), 2015 WL 7008804.

21       [61] Brief of the Clearing House Association LLC, Financial Services Roundtable, Consumer Bankers Association, and Loan Syndications and Trading Association as Amici Curiae

22  in Support of Rehearing and Rehearing En Banc at 1, *Madden v. Midland Funding, LLC*, 786 F.3d 246 (2d Cir. 2015) (No. 14-2131-cv), 2015 WL 4153963.

23       [62] Renae Merle, *Banks Reported Blockbuster 2019 Profit With the Help of Consumers' Credit Card Debt*, Wash. Post, Jan. 15, 2020, https://www.washingtonpost.com/business/

24  2020/01/15/banks-reported-blockbuster-2019-profit-with-help-consumers-credit-card-debt/. The article notes that interest rates on credit cards are at near record highs, despite several interest-rate

25  cuts by the Federal Reserve, bolstering industry profits. *Id.*

26       [63] *Oversight of Prudential Regulators: Ensuring the Safety, Soundness, Diversity, and Accountability of Depository Institutions: Hearing Before the H. Comm. on Fin. Servs.*, 116th

27  Cong. 3 (2019) (statement of Joseph M. Otting, Comptroller of the Currency), https://financialservices.house.gov/uploadedfiles/hhrg-116-ba00-wstate-ottingj-20191204.pdf.

28

1   highs."[64]

2   59.   The FDIC itself has similarly admitted that it is "not aware of *any* widespread or

3   significant negative effects on credit availability or securitization markets having occurred to this

4   point as a result of the *Madden* decision."[65]

5   **C.    The Non-bank Interest Provision Appears To Rely on a "Doctrine" That Is Invalid**

6

7   60.   At the heart of the FDIC Rule's Non-bank Interest Provision is the claim that

8   *Madden*'s holding conflicts with generally accepted banking law and practice, but the FDIC's

9   rulemaking record fails to show *Madden* was anything other than a straightforward application of

10  clear law to common facts. Neither when the Second Circuit issued its decision in *Madden* nor

11  since has any federal Court of Appeals *ever* held that §§ 85 or 1831d's interest-rate preemption

12  applies to entities other than national or state-chartered banks.[66]

13  61.   Nevertheless, federal regulators and the financial industry, since 2015, have

14  steadfastly claimed that *Madden* conflicts with a supposedly longstanding common-law

15  "principle" that they have concocted and named "valid-when-made."

16  62.   According to proponents of the "valid-when-made" theory, including the OCC,

17  loan buyers should be exempt from state usury laws (and may charge any rate authorized by

18  contract) as long as the originator of the loan was itself exempt from state usury laws. Put

19  differently, the theory rests on the idea that preemption of state usury laws is salable—when

20  Congress exempts FDIC Banks from state usury law, those FDIC Banks may sell, by way of

21  _____

22  [64] *Id.*

    [65] 85 Fed. Reg. at 44,156 (emphasis added).

23  [66] *See* Brief for the United States as Amicus Curiae at 13-14, *Midland Funding, LLC v. Madden*, 136 S.Ct. 2505 (2016) (No. 15-610), 2016 WL 2997343; *see also In re Cmty. Bank of N. Va.*, 418 F.3d at 296 (agreeing that §§ 85 and 1831d "apply only to national and state-chartered banks, not to non-bank purchasers"). The only decision to disagree with *Madden*'s interpretation of § 85 was issued by a bankruptcy court in Colorado. *In re Rent-Rite Superkegs W., Ltd.*, 603 B.R. 41, 67 n.57 (Bankr. D. Colo. 2019). On appeal from the Bankruptcy Court, the U.S. District Court stated its agreement with *Madden* and declined to endorse "valid-when-made," but ultimately applied the OCC's Non-bank Interest Rule, which had not been promulgated at the time of the litigants' briefing and so had not been challenged by the litigants before the Court. *In re Rent-Rite Superkegs W., Ltd.*, __ F. Supp. _d. __, __ (D. Colo. 2020).

24

25

26

27

28

selling loans they originate, that congressionally conferred right to charge interest in excess of state law to any buyers they wish.

63.     The FDIC appears, at times, to rely on this "valid-when-made" theory for its Non-bank Interest Provision. The Chair of the FDIC's Board of Directors, who voted in favor of issuing the FDIC Rule, described the Rule as "reaffirming and codifying in regulation the valid-when-made doctrine" both in her announcement of the agency's proposed rulemaking and announcing the final Rule.[67] The Rule itself states that the Non-bank Interest Provision is "consistent with state banking powers and common law doctrines such as the 'valid when made' and 'stand-in-the shoes' rules"; describes the version of "valid-when-made" described above; and concludes on that basis that "[a] loan that was not usurious under section 27 [§ 1831d] when made would thus not become usurious upon assignment."[68]

64.     But in response to a series of critical comments, the FDIC asserts that its interpretation of § 1831d is not "based on Federal common law or the valid-when-made rule, as some comments have argued."[69] And, perhaps attempting to distance itself from the dubious "valid-when-made" theory, the FDIC has also coined a new term, "stand-in-the-shoes rules," to describe the same idea.[70]

65.     The FDIC's conflicting statements that alternately adopt then disclaim the "valid-when-made" theory as a basis for the Non-bank Interest Provision render the Rule arbitrary and capricious.

66.     The FDIC's statement disclaiming the "valid-when-made" theory as a basis for the Non-bank Interest Provision also conflicts with its longstanding position that § 1831d must be

---

[67] *Statement by FDIC Chairman Jelena McWilliams on the Notice of Proposed Rulemaking: Federal Interest Rate Authority*, FDIC Board Meeting (Nov. 19, 2019), https://www.fdic.gov/news/news/speeches/spnov1919.pdf; *Statement by FDIC Chairman Jelena McWilliams on the Final Rule: Federal Interest Rate Authority* (June 25, 2020), https://www.fdic.gov/news/news/speeches/spjun2520b.html.

[68] 85 Fed. Reg. at 44,149.

[69] *Id.* at 44,151.

[70] *E.g.*, *id.* at 44,149.

interpreted *in pari materia* with § 85.[71] In issuing the near-identical OCC Rule, the OCC expressly relied on the "valid-when-made" theory in interpreting § 85 to extend rate-cap preemption to buyers of loans originated by federally chartered banks.[72] The FDIC's claim that its interpretation of § 1831d is not based on the "valid-when-made" theory runs counter to the OCC's interpretation of its parallel statute and thus is in conflict with the FDIC's position that the two statutes should be construed *in pari materia*. These conflicting lines of logic further render the Rule arbitrary and capricious.

67.     The "valid-when-made" theory of § 1831d cited in the FDIC Rule conflicts with the plain text of § 1831d, which exempts only FDIC Banks from state rate caps.

68.     The supposed "valid-when-made" "principle" is also implausible in that it departs markedly from how law ordinarily operates with respect to licensed and highly regulated activities, like banking. In highly regulated fields, the transfer of property does not imply the transfer of all rights that the licensed seller holds relating to that property. For example, Congress has exempted from federal income taxation the interest credit unions earn on their loans,[73] but the *buyer* of a credit union's assets receives no such exemption—*non*-credit unions must pay their taxes. A licensed driver may sell her car, but the buyer must have his own license to drive it.[74] That is to say, property (a loan or a car) may pass from one party to another, but certain rights (to avoid taxation or to drive) are not salable and must be conferred separately by license or statute. The FDIC's supposed "valid-when-made" "principle" ignores this common feature of American law.

69.     The FDIC states, "It is well settled that an assignee succeeds to all the assignor's rights in a contract, standing in the shoes of the assignor."[75] But the right to charge interest *in excess of state rate caps* is conferred by statute, not contract. FDIC Banks may sell their loans to non-banks; but without an act of Congress exempting them from state rate-cap laws, non-banks

---

[71] *Id.* at 44,147.
[72] 85 Fed. Reg. at 33,532 (citing "valid-when-made" as "tenets of common law that inform its . . . interpretation of section 85").
[73] 26 U.S.C. § 501(c)(14)(A).
[74] *E.g.*, Cal. Veh. Code § 12500.
[75] 85 Fed. Reg. at 44,149.

must charge and collect interest in accordance with state law.

70.     Furthermore, "valid-when-made's" historical bona fides are anything but. Case law and historical treatises are devoid of anything resembling the FDIC and OCC's theory; in fact, the first articulation of the "valid-when-made" theory of §§ 85 and 1831d appears in a 2015 brief asking the Second Circuit to reconsider *Madden*.[76]

71.     Although a "well-settled" principle of banking law (as the FDIC considers "valid-when-made")[77] should appear in banking and usury treatises predating the financial industry's 2015 *Madden* brief, "valid-when-made" is "entirely unknown to historical treatise writers," according to legal scholar and historian Adam Levitin.[78] "Nothing even approaching the 'valid-when-made' doctrine in which the assignment of a loan from an originator to an assignee subject to a different state usury law appears in any 19th or 20th century usury treatise. No prior reference to 'valid-when-made' can be found in *any* banking or usury treatise."[79]

72.     Moreover, none of the cases the FDIC cites regarding the supposed "valid-when-made" "principle" support the proposition that the state-law exemptions conferred on FDIC Banks by § 1831d should pass to non-banks upon the sale of a loan.

73.     To support its analysis, the FDIC relies on a misreading of old law. Following the lead of several industry briefs and publications since *Madden*, the FDIC cites Supreme Court cases from the early 1800s for the proposition that "a contract, which, in its inception, is unaffected by usury, can never be invalidated by any subsequent usurious transaction."[80] The FDIC's reliance on this quote to conclude that non-banks are exempt from state usury laws when

---

[76] Comment of Adam J. Levitin (Jan. 5, 2020), Attachment 1, *Amicus Curiae* Brief of Professor Adam J. Levitin in Support of Plaintiff at 12-13, 26-31, *Rent-Rite Super Kegs W., Ltd. v. World Business Lenders, LLC*, No. 19-cv-01552 (D. Colo. Sept. 19, 2019) (describing the paucity of historical evidence for federal regulators' "valid-when-made" theory and distinguishing the few cases that bear any likeness to it).

[77] 85 Fed. Reg. at 44,149.

[78] Comment of Adam J. Levitin (Jan. 5, 2020), Attachment 1, *Amicus Curiae* Brief of Professor Adam J. Levitin in Support of Plaintiff at 26, *Rent-Rite Super Kegs W., Ltd. v. World Business Lenders, LLC*, No. 19-cv-01552 (D. Colo. Sept. 19, 2019).

[79] *Id.* (emphasis in original).

[80] 85 Fed. Reg. at 44,149 n.33 (quoting *Nichols v. Fearson,* 32 U.S. 103, 109 (1833) and citing *Gaither v. Farmers' & Mechs' Bank of Georgetown,* 26 U.S. 37, 43 (1828)).

they purchase loans from FDIC Banks is misplaced. *Nichols v. Fearson* and *Gaither v. Farmers & Mechanics Bank of Georgetown*, the supercentenarian cases the FDIC cites, concern the now-obsolete law of transferable notes, which were often traded multiple times at discount. None of these cases involved statutes exempting any party from state interest-rate caps, and all were decided before Congress granted national banks or FDIC Banks such privileges in the NBA and the FDIA. Thus, the Court in *Nichols* and *Gaither* could not have contemplated that the usurious nature of a loan could turn on whether the loan was held by an entity statutorily protected from state rate caps or a non-protected assignee, and its holdings in those cases do not have any bearing on "valid-when-made" or the FDIC's Non-bank Interest Provision.[81]

74.     These cases merely hold that if a lender originates a loan at an interest rate lower than the relevant rate cap and then sells the loan for less than the original loan amount, the loan does not become usurious just because the total amount owed constitutes a percentage that would exceed the rate cap if calculated based on the discounted-sale price rather than on the original loan amount. In other words, whether the interest rate is usurious is correctly calculated based on the rate the borrower must pay in relation to the principal amount borrowed, not based on the rate of return realized by an assignee in relation to the cost it invests to purchase the loan.

75.     This archaic legal issue may be difficult for modern readers to understand. An example makes it concrete: A lender in a state with a 36% rate cap gives a borrower a $100 loan and requires the borrower to repay $110 in one year; this amounts to a 10% interest rate and is permissible under the state rate cap. That original lender, which soon finds itself in need of immediate cash, then sells the loan to a discount buyer for just $55; this means that the buyer can collect the $110 owed by the borrower when the loan is due. From the borrower's perspective, the borrower is still paying a 10% rate on the loan. But from the perspective of the discount buyer, who is getting $110 back from its $55 payment, it may appear as if the "interest" rate is 100%, which would be well over the state rate cap. *Nichols* and *Gaither* hold that in determining whether

---

[81] *See* Comment of Adam J. Levitin (Jan. 5, 2020), Attachment 1, *Amicus Curiae* Brief of Professor Adam J. Levitin in Support of Plaintiff at 16, *Rent-Rite Super Kegs W., Ltd. v. World Business Lenders, LLC*, No. 19-cv-01552 (D. Colo. Sept. 19, 2019).

a loan's interest rate is usurious, the effective interest rate should be calculated based on the original loan amount, not on whatever discounted price a buyer paid to the original lender for the loan. The borrower cannot invalidate a loan on the basis that it is usurious simply because the original lender sold the loan at a deep discount. In other words, "a contract, which, in its inception, is unaffected by usury, can never be invalidated by any subsequent usurious transaction."[82]

76. These cases have nothing to do with the interest rates non-banks may charge when they buy loans issued by FDIC Banks. Nor do these cases hold that a loan buyer has the inalienable right to continue charging the same interest rate as the loan seller.

77. Additionally, the FDIC cannot rely on a "common law" principle of "valid-when-made" to expand the scope of federal law and displace state law because the Supreme Court has made clear since its 1938 decision in *Erie v. Tompkins* that "[t]here is no federal general common law."[83] The statute the FDIC invokes is straightforwardly limited to FDIC Banks; the agency may not rely on "common law" to expand its reach.

### D. The FDIC's Non-bank Interest Provision Gives the Financial Industry What It Failed To Wrest from the Courts or Congress

78. The FDIC Rule's Non-bank Interest Provision is a boon to the financial-services industry, which has vigorously lobbied against state-law rate caps.[84]

79. For years, the financial-services industry tried unsuccessfully to achieve preemption of state-law rate caps, first through the courts and then through Congress. Financial-industry trade groups—including the American Bankers Association, the Financial Services

---

[82] *Nichols*, 32 U.S. at 109.

[83] *O'Melveny & Myers v. FDIC*, 512 U.S. 79, 83 (1994) (quoting *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938)); *see also* Comment of Arthur E. Wilmarth, Jr. Ex. A at 10-13 (Jan. 17, 2020).

[84] For example, when South Dakota voted on an interest-rate cap applicable to non-banks in 2016, the payday-loan industry spent over a million dollars lobbying against the rate cap, which was ultimately approved by an overwhelming 76% of voters. Bart Pfankuch, *Payday Loans Gone, But Need for Quick Cash Remains*, Capital Journal (Pierre, S.D.), Mar. 23, 2018, https://www.capjournal.com/news/payday-loans-gone-but-need-for-quick-cash-remains/article_4b3b74de-2e5e-11e8-8dc5-c7f64085e760.html.

Roundtable, the Structured Finance Industry Group, the Loan Syndications and Trading Association, and others—launched an *amicus* campaign to convince the federal courts that § 85's (and by extension, § 1831d's) state-law preemption applies not just to national banks, but extends to *all buyers* of national banks' loans.[85] The FDIC (along with the OCC) soon joined in, filing *amicus* briefs in matters ordinarily too mundane to catch the notice of a federal regulator, like a small-business bankruptcy.[86] But that campaign largely failed. The Second Circuit declined to reconsider *Madden*, the Supreme Court denied *certiorari*, a state court recently rejected the FDIC's theory of § 1831d, and no circuit split has emerged.[87]

80.    Moreover, Congress recently declined to enact legislation substantively identical to the FDIC's Non-bank Interest Provision. The Protecting Consumers' Access to Credit Act of 2017, a bill introduced following *Madden* but before the FDIC proposed its Rule, would have extended § 1831d's exemption from state rate caps beyond FDIC Banks to third parties that are

---

[85] *E.g.,* Brief of the Clearing House Association LLC, Financial Services Roundtable, Consumer Bankers Association, and Loan Syndications and Trading Association as Amici Curiae in Support of Rehearing and Rehearing En Banc at 5-9, *Madden v. Midland Funding, LLC*, 786 F.3d 246 (2d Cir. 2015) (No. 14-2131-cv), 2015 WL 4153963; Brief of the Structured Finance Industry Group, Inc., and the Securities Industry and Financial Markets Association as Amici Curiae in Support of Defendants-Appellees' Petition for Rehearing and Suggestion for Rehearing En Banc at 8-10, *Madden v. Midland Funding, LLC*, 786 F.3d 246 (2d Cir. 2015) (No. 14-2131-cv), 2015 WL 4153964; Brief of Amici Curiae The American Bankers Association, The California Bankers Association, and The Utah Bankers Association in Support of Petitioners at 5-7, *Midland Funding, LLC v. Madden*, 136 S.Ct. 2505 (2016) (No. 15-610), 2015 WL 8959419.

[86] *E.g.,* Amicus Brief of the Federal Deposit Insurance Corporation and the Office of the Comptroller of the Currency in Support of Affirmance and Appellee at 9-20, *Rent-Rite Super Kegs West Ltd. v. World Business Lenders, LLC*, No. 19-cv-01552 (D. Colo. Sept. 10, 2019).

[87] *Midland Funding, LLC v. Madden*, 136 S. Ct. 2505 (2016) (denying cert.); Order Denying Petition for Rehearing *En Banc*, *Madden v. Midland Funding, LLC*, 14-2131-cv (2d Cir. Aug. 12, 2015); Order Regarding Plaintiff's Motion for Determination of Law, slip op. at 6-7, *Fulford, Administrator v. Marlette Funding, LLC*, No. 2017-cv-30376 (Denver Dist. Ct. June 9, 2020) (following *Madden*), https://www.nclc.org/images/pdf/unreported/Order_Regarding_Plaintiff_Motion_Determination_Law.pdf. Only a single Bankruptcy Court has accepted the OCC's view. *See In re Rent-Rite Superkegs W., Ltd.*, 603 B.R. at 67 n.57. On appeal from the Bankruptcy Court, the U.S. District Court stated its agreement with *Madden* and declined to endorse "valid-when-made," but ultimately applied the OCC's Non-bank Interest Rule, which had not been promulgated at the time of the litigants' briefing and so had not been challenged by the litigants before the Court. *In re Rent-Rite Superkegs W., Ltd.*, __ F. Supp. _d. __, __ (D. Colo. 2020).

assigned loans originated by FDIC Banks. The bill used language very similar to that contained in the FDIC Rule's Non-bank Interest Provision:

> A loan that is valid when made as to its maximum rate of interest in accordance with this section [12 U.S.C. § 1831d] shall remain valid with respect to such rate regardless of whether the loan is subsequently sold, assigned, or otherwise transferred to a third party, and may be enforced by such third party notwithstanding any State law to the contrary.[88]

81.     Following the House's passage of the proposed legislation, the Senate took no action, allowing it to expire at the close of the 115th Congress.[89]

82.     Congress knows how to preempt state interest rate caps when it wants to. For example, in the same bill as § 1831d, Congress enacted law stating that preemption of state interest-rate caps in the *mortgage* context travels with the loan even after sale of a first-lien mortgage loan.[90] But Congress declined to take similar action with respect to non-mortgage loans.

83.     Unsuccessful before Congress and the Judiciary, the industry then turned to the only branch left. In the FDIC (and the OCC, which issued a near-identical rule with respect to national banks and federal savings associations), the financial-services industry found an ally that issued a rule granting precisely what Congress and the courts had denied: preemption of state laws protecting consumers from usurious loans.

## III.   THE STATES HAVE STANDING TO CHALLENGE THE FDIC RULE

84.     The FDIC Rule injures concrete and distinct interests of the plaintiff States, including the States' sovereign, quasi-sovereign, and fiscal interests, any one of which is sufficient to support the States' standing to bring this APA action.

### A.     The FDIC Rule's Non-bank Interest Provision Harms the States' Sovereign Interests

85.     Each of the States has a sovereign interest in the protection and enforcement of its

---

[88] H.R. 3299, 115th Cong. (2017-2018), https://www.congress.gov/bill/115th-congress/house-bill/3299/text.

[89] *See* S. 1642, 115th Cong. (2017-2018), https://www.congress.gov/bill/115th-congress/senate-bill/1642/actions?q=%7B%22search%22%3A%5B%22S1642%22%5D%7D&r=2&s=1 (only recorded Senate action on bill is introduction on July 27, 2017).

[90] 12 U.S.C. § 1735f-7a; *see also* Comment of Adam J. Levitin 4 (Jan. 5, 2020).

laws that, as discussed below, carefully regulate the interest that may be charged on consumer loans. These sovereign interests are concretely and particularly harmed by the FDIC Rule because its Non-bank Interest Provision would preempt the States' enforcement of their laws against non-banks that buy loans from FDIC Banks. These harms to the States' interests are directly traceable to the FDIC Rule, and an order setting aside the Rule's Non-bank Interest Provision would redress the States' injuries.

86.     Among the most significant powers of a state is the "exercise of sovereign power over individuals and entities," which "involves the power to create and enforce a legal code, both civil and criminal."[91] Enforcing state law is one of the "quintessential functions of a State."[92] This interest is unique to sovereign entities, like the States, because they alone are "entitled to create a legal code" and thus they have the most "direct stake . . . in defending the standards embodied in that code."[93] Thus, states "have an interest, as sovereigns, in exercising 'the power to create and enforce a legal code.'"[94] States have standing to sue the federal government where a federal law or federal action with the force of law impairs the states' legitimate, sovereign interest in the continued enforceability of their own statutes.[95]

87.     The FDIC Rule invokes the States' sovereign interests because it would allow entities that would otherwise be subject to the States' rate caps or anti-evasion laws to charge interest rates much higher than allowed by the States. By allowing loan purchasers to continue to charge any interest rate chargeable by FDIC Banks under § 1831d, the Rule preempts state law that limits the interest rates that these entities may charge. The Rule would also render ineffective the States' anti-evasion provisions as to those entities.

---

[91] *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 601 (1982).
[92] *Diamond v. Charles*, 476 U.S. 54, 65 (1986).
[93] *Id.* (internal quotations omitted).
[94] *State of Alaska v. U.S. Dep't of Transp.*, 868 F.2d 441, 443 (D.C. Cir. 1989) (quoting *Alfred L. Snapp & Son*, 458 U.S. at 601).
[95] *See, e.g.*, *California v. Trump*, 963 F.3d 926, 936-37 (9th Cir. 2020) (states have standing to challenge federal action to vindicate states' "sovereign interests in enforcing their environmental laws"); *Wyoming ex rel. Crank v. United States*, 539 F.3d 1236, 1239-40 (10th Cir. 2008) ("[f]ederal regulatory action that preempts state law creates a sufficient injury-in-fact to" demonstrate state standing).

88.     The Rule's Non-bank Interest Provision would also harm the States' sovereign interests in enforcing their laws by facilitating "rent-a-bank" schemes between FDIC Banks "located" outside of the States and lenders that would otherwise be subject to the States' laws. In these "partnerships," the FDIC Bank ostensibly originates all loans so that the loans arguably are not subject to the States' rate caps, and then consistently sells them, by agreement or understanding, to the non-bank lender so that the non-bank lender can charge interest in excess of state law. These "partnerships" are known as "rent-a-bank" schemes because they frequently require little to no financial risk or substantive involvement by the participating FDIC Bank.

89.     Some FDIC Banks already engage in these "rent-a-bank" schemes. For example, because Utah imposes no cap on the rates banks may charge when the parties execute a written contract,[96] FinWise Bank, a Utah-chartered bank insured by the FDIC, has made a business practice of partnering with non-banks, including Elevate Credit, Inc. (d/b/a Rise) and OppLoans, to evade the otherwise-applicable rate caps of the borrower's home state.[97] FinWise assists non-banks in evading the laws of 25 jurisdictions, including California, the District of Columbia, and Minnesota.[98] Capital Community Bank, another Utah-chartered bank insured by the FDIC, similarly relies on Utah's permissive interest-rate laws to export high-cost loans to other states, including California, the District of Columbia, and Illinois.[99]

90.     The Rule's Non-bank Interest Provision would facilitate "rent-a-bank" schemes by allowing non-bank entities to purchase loans from FDIC Banks and thus charge, collect, and receive interest at rates that exceed the caps set forth in the States' laws.[100] Put differently, the Rule would preempt state-law limitations on the rates of interest non-bank entities may receive when the interest received derives from loans purchased from FDIC Banks.

91.     The limited language of § 1831d demonstrates Congress's intent that states may

---

[96] Utah Code Ann. § 15-1-1 (1).
[97] Comment of Adam J. Levitin 15 (Jan. 5, 2020); Comment of Center for Responsible Lending 30, 32, 35, 38, 41, App'x A (Feb. 4, 2020).
[98] Comment of Center for Responsible Lending 30, 32, 35, 38, 41, App'x A. (Feb. 4, 2020).
[99] *Id.* at 33, 35, 41-42.
[100] *E.g.*, Cal. Fin. Code §§ 22303, 22304, 22304.5.

vindicate their interests. States are the primary beneficiaries of that section's close tailoring, which exempts only "State bank[s] or insured branch[es] of a foreign bank" from state-law interest rate caps.[101] It does so for the narrow and explicit purpose of "prevent[ing] discrimination against State-chartered insured depository institutions, including insured savings banks, or insured branches of foreign banks with respect to interest rates . . . ."[102] But Congress was careful to preserve the states' authority to regulate the interest rates chargeable by non-banks, demonstrating that protection of their sovereign and quasi-sovereign interests was among Congress's statutory objectives.

### 1.    California's Rate Caps and Anti-Evasion Laws

92.    California has two statutory schemes, the California Financing Law ("CFL") and the California Deferred Deposit Transaction Law ("CDDTL"), that, among other things, regulate the interest rate that may be charged on consumer loans.[103]

93.    The CFL requires finance lenders and brokers to be licensed by the California Department of Business Oversight ("DBO"),[104] a state agency charged with regulating and overseeing the activities of payday lenders, finance lenders and brokers, state-licensed banks and savings associations, and other entities.[105]

94.    The CFL caps the interest rates state-licensed lenders may "contract for" or "receive" on consumers loans under $10,000. For loans under $2,500, the CFL imposes a graduated rate cap.[106] For loans between $2,500 and $9,999, the CFL prohibits interest rates exceeding an annual simple interest rate of 36% per year plus the Federal Funds Rate.[107]

---

[101] 12 U.S.C. § 1831d.

[102] *Id.*

[103] In addition to these statutory schemes, the California Supreme Court has held that loans not violating the state's rate caps, but nonetheless charging rates of interest that are excessive under the circumstances, may be deemed "unconscionable" and thus unlawful and actionable under the state's Unfair Competition Law (California Business and Professions Code § 17200). *See generally De La Torre v. CashCall, Inc.*, 5 Cal. 5th 966 (2018). Like the CFL and CDDTL, California's unconscionability jurisprudence could be affected by the FDIC Rule.

[104] Cal. Fin. Code §§ 22009, 22100.

[105] Cal. Fin. Code § 300.

[106] Cal. Fin. Code §§ 22303, 22304, 22306.

[107] Cal. Fin. Code §§ 22304.5, 22306.

95.     Before 2019, the CFL had provided a graduated rate cap only for loans of less than $2,500.[108] However, many lenders evaded this cap by offering high-interest loans just above $2,500.[109] For example, in 2018, less than 3% (fewer than 46,000) of all CFL-covered loans were for between $2,000 and $2,499, while nearly 36% (nearly 600,000) of all CFL-covered loans were for between $2,500 and $4,999.[110] Fifty-five percent of those latter loans charged an annual percentage rate of 100% or more.[111]

96.     To protect consumers from high-cost, predatory loans, the California Legislature enacted legislation in October 2019 that limits the interest rate for loans of at least $2,500 and under $10,000.[112]

97.     The California Legislature was well-attuned to the potential for scheming by regulated entities to evade the law and sought to prevent evasion. To prevent lenders from evading the CFL's rate caps by artificially increasing the size of a loan, the CFL establishes whether and which rate caps apply based on a loan's "bona fide principal amount."[113] The "bona fide principal amount" excludes loan amounts in excess of what the borrower applies for if the borrower is, "by prearrangement or understanding," to make a substantial repayment to the lender "within a short time after the making of the loan" and specified conditions are met.[114] Thus, for example, lenders may not evade the CFL's rate caps by lending $11,000 to a borrower seeking only $9,000 with the understanding that the borrower will immediately return the excess $2,000.

98.     The CDDTL likewise limits the interest chargeable on short-term deferred deposit

---

[108] Cal. Fin. Code §§ 22303, 22304.

[109] *See, e.g.*, *De La Torre*, 5 Cal. 5th 966; Cal. Leg. Asm. Comm. On Banking and Finance, Analysis of A.B. 538 (Limón) 3-5, *Legislative Counsel's Digest* (Mar. 28, 2019), https://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml?bill_id=201920200AB539.

[110] California Department of Business Oversight, *California Department of Business Oversight Annual Report* 9 (June 2018), https://dbo.ca.gov/wp-content/uploads/sites/296/2019/08/CFL-Annual-Report-2018-FINAL-8-8-19.pdf.

[111] *Id.* at 13.

[112] Cal. Leg., A.B. 539 (Oct. 10, 2019), https://leginfo.legislature.ca.gov/faces/billNavClient.xhtml?bill_id=201920200AB539 (chaptered at Cal. Fin. Code § 22304.5).

[113] Cal. Fin. Code §§ 22303, 22304, 22304.5.

[114] Cal. Fin. Code § 22251.

transactions, commonly known as payday loans.[115] The CDDTL also contains several provisions aimed at preventing lenders from evading California law through partnerships with out-of-state entities.[116] For example, it provides that loans made out of state are enforceable in California only "to the extent of but not to exceed the unpaid principal balance and the aggregate amount of interest . . . and all other charges permitted" by California law.[117] That is, non-bank entities seeking to enforce loans in California may not collect interest at rates above what is permitted under California law. The CDDTL applies to "[a]ny person" that seeks to collect, in California, interest and unpaid balances on deferred deposit transactions[118] and "[a]ny person" who arranges, in California, the making of a deferred deposit transaction outside of the state for the purpose of evading the CDDTL.[119]

99.     The threat to California's enforcement of its laws posed by the Rule's facilitation of "rent-a-bank" schemes is apparent and immediate. Even before the passage of California's 36% rate cap, several state-licensed lenders publicly announced their intention to evade California's interest-rate restrictions by partnering with FDIC Banks.[120] For example, the CEO of Elevate (which is licensed and does business in California as "Rise") stated on a July 29, 2019 earnings call that in response to California's then-proposed 36% rate cap, the company expected "to be able to continue to serve California consumers via bank sponsors that are not subject to the same proposed state rate limitations."[121] Several other lenders have likewise announced plans to pursue partnerships with banks to evade California's rate caps, including Curo Holdings Corp. (d/b/a Speedy Cash) and Enova (d/b/a NetCredit, CashNetUSA).[122]

---

[115] Cal. Fin. Code §§ 23001 *et seq.*, 23036(a).

[116] The CDDTL allows state-licensed lenders to participate in certain partnership arrangements with banks that are not subject to the CDDTL but requires state licensees to comply with all provisions of the CDDTL "not preempted by other state and federal laws." Cal. Fin. Code § 23037(i).

[117] Cal. Fin. Code § 22322; *see also id.* at § 22323.

[118] Cal. Fin. Code § 22323.

[119] Cal. Fin. Code § 22324.

[120] *See, e.g.*, Comment of Sens. Brown et al. 3-4 (Nov. 21, 2019); *see also* Comment of Rep. Porter 1-2 (Dec. 20, 2019).

[121] Comment of Sens. Brown et al. 3-4 (Nov. 21, 2019).

[122] *Id.* at 4.

100.   According to evidence in the administrative record, after the FDIC proposed its Rule, an investor advisor wrote in its investment notes that Enova "received a strong endorsement from banking regulators in support of its bank partnership model, which is a key aspect of its California growth strategy moving forward[.]"[123]

101.   FinWise Bank and Community Capital Bank, two FDIC Banks chartered and "located" in Utah, are already engaged in rent-a-bank "partnerships" with OppLoans and LoanMart, respectively, which lend to California borrowers.[124]

102.   The FDIC Rule's Non-bank Interest Provision will further incent and enable such state-law evasion. The Rule will facilitate "rent-a-bank" schemes by lending federal support to the claim that non-banks can evade state-law rate caps by entering into purchase agreements with FDIC Banks. As their announcements have already made clear, many non-bank lenders will rely on the Rule to argue they are exempt from otherwise applicable state law.

103.   The State of California also has a sovereign interest in licensing and governing the activities of lenders and other financial entities operating in California in order to protect California consumers. However, lenders involved in "rent-a-bank" schemes have claimed that they are not subject to applicable state oversight or licensing requirements.[125] By facilitating such schemes, the Rule will undermine California's licensing regime, which is a fundamental element of the state's lending law.

104.   By purporting to exempt entities that purchase loans originated by FDIC Banks from California state rate caps, and by encouraging "rent-a-bank" schemes, the FDIC Rule undermines California's sovereign interests.

### 2.   The District of Columbia's Usury Cap and Accompanying Regulations

105.   The District of Columbia (the "District") has strict usury caps in order to prevent sophisticated entities from preying upon the District's most vulnerable residents. The District's

---

[123] *See* Comment of Center for Responsible Lending 31 (Feb. 4, 2020).
[124] *Id.* at 32-33, 35, 41, App'x A; *see also* Comment of Rep. Porter 1-2 (Dec. 20, 2019).
[125] Comment of the Conference of State Bank Supervisors 5 (Feb. 4, 2020).

usury cap for most loans in which the interest rate is expressed in the contract is 24%.[126] The District's usury cap for loans without an express interest rate is 6%.[127]

106.     Additionally, entities that offer loans in the District at any interest rate are required to obtain a money-lending license.[128]

107.     Violations of the usury cap and licensing requirement are enforceable through the Consumer Protection Procedures Act ("CPPA").[129] The Attorney General for the District of Columbia is specifically authorized to bring actions on behalf of the District against such violators "[n]otwithstanding any provision of law to the contrary."[130]

108.     Indeed, the District has recently filed exactly such an action against an entity that it accuses of abusing this "rent-a-bank" scheme.[131] There, the District has accused the defendant of violating both the District's usury cap and the District's money-lending license requirement.

### 3.     Illinois' Regulations Governing Low-Dollar, High-Cost Loans

109.     The State of Illinois has two statutes that regulate interest rates and other requirements for low-dollar, high-cost loans: the Consumer Installment Loan Act ("CILA")[132] and the Payday Loan Reform Act ("PLRA").[133]

110.     Low-dollar, high-cost loans were largely unregulated in Illinois prior to 2005. Most of these loans were offered pursuant to CILA before 2005. In 2005, the Illinois legislature passed the PLRA to protect consumers against long-term cycles of debt associated with low-dollar, high-cost payday loans.

111.     The purpose of the PLRA is to "protect consumers who enter into payday loans and to regulate the lenders of payday loans. [The PLRA] shall be construed as a consumer

---

[126] D.C. Code § 28–3301(a).
[127] D.C. Code § 28–3302(a).
[128] D.C. Code §§ 26–901, *et seq.*; 16 DCMR § 201.1.
[129] D.C. Code §§ 28–3901, *et seq.*
[130] D.C. Code § 28–3909.
[131] *District of Columbia v. Elevate Credit, Inc.*, No. 1:20-cv-01809-EGS (D.D.C. 2020); Press Release, *AG Racine Sues Predatory Online Lender For Illegal High-Interest Loans To District Consumers*, June 5, 2020, https://oag.dc.gov/release/ag-racine-sues-predatory-online-lender-illegal.
[132] 205 Ill. Comp. Stat. 670/1 *et seq.*
[133] 815 Ill. Comp. Stat. 122/1 *et seq.*

protection law for all purposes. This Act shall be liberally construed to effectuate its purpose."[134]

112.    The PLRA requires any entity acting as a payday lender in Illinois to be licensed by the Department of Financial and Professional Regulation ("IDFPR").[135] The PLRA defines a payday lender as "any person or entity . . . that offers or makes a payday loan, buys a whole or partial interest in a payday loan, arranges a payday loan for a third party, or acts as an agent for a third party in making a payday loan, regardless of whether approval, acceptance, or ratification by the third party is necessary to create a legal obligation for the third party, and includes any other person or entity if the Department determines that the person or entity is engaged in a transaction that is in substance a disguised payday loan or a subterfuge for the purpose of avoiding this Act."[136]

113.    Under the PLRA, a lender licensed by the IDFPR cannot charge more than $15.50 per $100 loaned on any payday loan over the term of the loan.[137]

114.    In Illinois, the PLRA defines a "payday loan" as a loan with a finance charge exceeding an annual percentage rate of 36% and with a term that does not exceed 120 days.[138]

115.    However, after the enactment of the PLRA, many lenders continued to offer low-dollar, high-cost loans under CILA as installment loans. At the time, CILA offered few consumer protections. Therefore, in 2010, the Illinois legislature took action and amended CILA to add further consumer protections.

116.    The 2010 amendments to CILA, which took effect in 2011, created a new "small consumer loan" defined as "a loan upon which interest is charged at an annual percentage rate exceeding 36% and with an amount financed of $4,000 or less."[139]

117.    Under CILA, small consumer loans must be fully amortizing, payable in equal monthly installments, and, most importantly, have interest rates capped at 99%.[140]

---

[134] *Id.* at 122/1-5.
[135] *Id.* at 122/3-3.
[136] *Id.* at 122/1-10.
[137] *Id.* at 122/2-5(e-5).
[138] *Id.* at 122/1-10.
[139] 205 Ill. Comp. Stat. 670/15(b).
[140] *Id.* at 670/17.2, 17.3.

118.    Similar to the PLRA, a lender extending loans under CILA must be licensed by the IDFPR. If a lender is licensed under CILA, it cannot be licensed under the PLRA, and *vice versa*. This limits the debt cycle for Illinois borrowers because it prohibits lenders from flipping borrowers from a CILA small consumer loan to a payday loan or *vice versa*.

119.    A CILA-licensed lender can make certain types of loans under the Illinois Financial Services Development Act ("FSDA")[141], which relates to revolving lines of credit products. When the Illinois legislature amended CILA in 2010, it also amended FSDA to cap the interest rate on revolving line of credit products offered by CILA licensees at 36%.[142]

120.    These laws in Illinois create a system that protects consumers of high-cost small-dollar loans from an endless cycle of debt and from paying more than the statutorily allowed interest caps.

121.    Under section 2Z of the Illinois Consumer Fraud and Deceptive Business Practices Act ("Consumer Fraud Act"), "Any person who knowingly violates the . . . Payday Loan Reform Act . . . commits an unlawful practice within the meaning of the [Consumer Fraud Act]."[143] Further, the Illinois Attorney General has authority to file enforcement actions for violations of the PLRA as those violations are also violations of the Consumer Fraud Act.[144]

122.    What is more, the PLRA explicitly acknowledges how lenders have attempted to avoid Illinois lending laws in the past and states, "The provisions of this Act apply to any person or entity that seeks to evade its applicability by any device, subterfuge, or pretense whatsoever."[145]

123.    The FDIC Rule's Non-bank Interest Provision will incentivize evasion of these Illinois consumer-protection laws. The Rule will enable "rent-a-bank" schemes by lending federal support to the claim that non-banks can evade state-law rate caps by entering into purchase

---

[141] *Id.* at 670/12(b)(4).
[142] 205 Ill. Comp. Stat. 675/3.
[143] 815 Ill. Comp. Stat. 505/2Z, *see also* PLRA, 815 Ill. Comp. Stat. 122/4-10(b) ("Any material violation of this Act, including the commission of an act prohibited under Section 4-5, constitutes a violation of the [Consumer Fraud Act].").
[144] 815 Ill. Comp. Stat. 505/2Z, 505/7.
[145] 815 Ill. Comp. Stat. 122/1-15(b).

33

agreements with FDIC Banks. Many non-bank lenders will rely on the Rule to shield them from otherwise applicable state law.

124.     The State of Illinois also has a sovereign interest in licensing and governing the activities of lenders and other financial entities operating in Illinois in order to protect Illinois consumers. However, lenders involved in "rent-a-bank" schemes have claimed that they are not subject to state oversight or licensing requirements.[146] By facilitating such schemes, the Rule will undermine Illinois' licensing regime, which is a fundamental element of the state's lending laws.

125.     By purporting to exempt entities that purchase loans originated by FDIC Banks from Illinois state rate caps, and by encouraging "rent-a-bank" schemes, the FDIC Rule undermines Illinois' sovereign interests.

### 4.     Massachusetts' Criminal Usury and Small-Dollar-Loan Laws

126.     Mass. Gen. Law c. 271, § 49 establishes that it is unlawful in Massachusetts to hold a loan contract that requires an interest rate in excess of 20% per year, punishable by imprisonment for up to 10 years and fines of up to $10,000.

127.     Mass. Gen. Law c. 140, §§ 96 through 114A. inclusive, requires persons or entities to be licensed by the Commissioner of Banks if they are engaged, directly or indirectly, in the business of making loans for primarily personal, family or household purposes of $6,000 or less, and the interest and expenses on the loan exceed 12% in the aggregate per year.

128.     Specifically, Mass. Gen. Law c. 140, § 96 states:

> No person shall directly or indirectly engage in the business of making loans of six thousand dollars or less, if the amount to be paid on any such loan for interest and expenses exceeds in the aggregate an amount equivalent to twelve per cent per annum upon the sum loaned . . . The buying or endorsing of notes or the furnishing of guarantee or security for compensation shall be considered to be engaging in the business of making small loans within said sections[.]

129.     Small loans made without proper license are punishable by a fine of up to $10,000 and void under the law. Specifically, Mass. Gen. Law c. 140, § 110 states, in pertinent part:

> Whoever, not being duly licensed . . . engages in or carries on, directly or indirectly, either separately or in connection with or as a part of any other

---

[146] Comment of the Conference of State Bank Supervisors 5 (Feb. 4, 2020).

business, the business of making loans or buying notes or furnishing endorsements or guarantees, to which sections ninety-six to one hundred and eleven, inclusive, apply, shall be punished by imprisonment in the state prison for not more than ten years or in a jail or house of correction for not more than two and one half years, or by a fine of not more than ten thousand dollar, or by both such fine and imprisonment. Any loan made or note purchased or endorsement or guarantee furnished by an unlicensed person in violation of said sections shall be void.

130.    As the chief law-enforcement officer of the Commonwealth, the Attorney General of Massachusetts is authorized to enforce Massachusetts' usury laws by statute and common law.[147]

131.    By purporting to exempt entities that purchase loans originated by FDIC Banks from Massachusetts' usury laws, and by encouraging "rent-a-bank" schemes, the FDIC's Rule undermines Massachusetts' sovereign interests.

**5.    Minnesota's Statutory Scheme for Regulation of Interest Rates and Consumer Lending**

132.    Since statehood, the Minnesota Legislature has maintained a general usury cap that today generally prohibits the charging and collection of annual interest on written loans above 8% and on non-written loans above 6%.[148]

133.    Minnesota's general usury statute does not apply, however, to certain "financial institutions," such as banks, credit unions, and industrial loan and thrift companies.[149] Other entities may be exempt from the general usury law when operating as a licensed lender under the supervision of the Minnesota Department of Commerce.[150] Many loans issued by state-supervised financial institutions are capped at an "annual percentage rate" of 21.75%.[151] Additional exemptions are set forth throughout Minnesota's banking and finance laws.[152]

134.    As stated above, nonbanks that wish to engage in the business of making loans

---

[147] M.G.L. c. 12, § 10; *see also, e.g.,* M.G.L. c. 93A, § 2.
[148] Minn. Stat. § 334.01, subd. 1.
[149] Minn. Stat. § 334.03; Minn. Stat. § 45.59.
[150] Minn. Stat. ch. 56.
[151] Minn. Stat. § 47.59, subd. 3.
[152] *See, e.g.,* Minn. Stat. § 47.59, subd. 4 (providing rates and charges for credit sales); Minn. Stat. § 47.59, subd. 4a (providing finance charges for motor vehicle retail installment sales); Minn. Stat. § 47.60 (allowing certain service charges for short-term, nonrenewal loans).

(from $1,000 to $100,000) must obtain a license if they wish to lend above the baseline usury limits set forth in Minnesota's usury statute. The Minnesota Regulated Loan Act provides for examination and supervisory authority of these entities by the Minnesota Department of Commerce, limits fees and interest rates that can be charged by such lenders to that allowed for other state-regulated financial institutions, and prohibits unlicensed lending as a gross misdemeanor.[153]

135.    The Minnesota Legislature has also created an important regulatory scheme for "consumer small loans," "consumer short-term loans," and "motor vehicle title loans." Minnesota statutes limit fees and interest on these traditionally high-risk credit products while requiring that lenders obtain a license before they extend such credit to Minnesota consumers.[154]

136.    For nonexempt entities that violate Minnesota's usury and lender-licensing laws, Minnesota statutes provide for penalties and remedies that serve important deterrent and remedial interests.[155] Consumer loans in excess of the usury rate can be declared void and unenforceable, with all amounts paid returned to the borrower.[156] Loans made by lenders that do not obtain a required license or comply with regulations governing payday and other high-risk consumer lending are void, with all amounts paid returned to borrowers.[157] Additional civil penalties can also be awarded based on various factors.[158]

137.    The FDIC Rule's Non-bank Interest Provision attempts to generally foreclose application of Minnesota's usury laws to non-banks that charge and collect interest on loans purchased from FDIC Banks chartered in other states. In doing so, and by encouraging "rent-a-

---

[153] Minn. Stat. ch. 56.
[154] Minn. Stat. §§ 47.60-.602.
[155] *State by Ellison v. Minn. Sch. of Bus., Inc.*, No. A18-1761, 2019 WL 2333921, at *9 (Minn. App. June 3, 2019) (stating that Minnesota's usury and lender-licensing statutes "are remedial statutes and that consumer protection statutes are generally broadly construed to protect consumers and to remediate violations of those laws"), *review denied* (Aug. 20, 2019).
[156] Minn. Stat. §§ 334.03, 334.05; *Midland Loan Finance Co. v. Lorentz*, 296 N.W. 911, 915 (Minn. 1941) ("As we have here a usurious contract, void under the statute, it follows that the one guilty of usurious exaction must bear the legal consequences flowing from such violation. As such he must lose not only the interest on the money risked, but also the principal, including as well all security given to secure performance.").
[157] Minn. Stat. § 56.19, subd. 3; Minn. Stat. § 47.601, subd. 6.
[158] Minn. Stat. § 47.601, subd. 6; Minn. Stat. § 8.31, subd. 3; *Minn. Sch. of Bus.*, 2019 WL 2333921, at *7-10.

36

bank" schemes that exist for the purpose of evading state consumer-protection laws, the FDIC Rule undermines Minnesota's sovereign interests in protecting its consumers from exploitative and abusive interest rates and other illegal lending practices.

138.    Minnesota also has a sovereign interest in licensing and supervising the activities of lenders operating in Minnesota. Lenders involved in "rent-a-bank" schemes and who purchase loans from exempt entities, however, have claimed that they are not subject to state oversight or lender-licensing requirements. By facilitating such schemes, the Rule will undermine Minnesota's licensing regime, which is a fundamental aspect of state consumer-protection law.

### 6.    New Jersey's Usury Laws

139.    New Jersey enforces civil and criminal usury rates. New Jersey's civil usury rate is set at 6% interest per year, or 16% interest per year where a written contract specifies the interest rate.[159] The criminal usury rate is set at 30% interest per year for loans to individuals and 50% interest per year for loans to corporations, limited liability corporations, and limited liability partnerships.[160]

140.    New Jersey regulates lenders pursuant to the New Jersey Consumer Finance Licensing Act ("NJCFLA").[161] The NJCFLA governs, among other things, "consumer loans," which are defined as a loan of $50,000 or less made by a consumer lender payable in installments, excluding residential mortgages.[162] Such "consumer loans" are not subject to the civil usury rate, and are subject only to the criminal usury rates set forth in N.J. Stat. Ann. § 2C:21-19.[163] All other loans—that is, all loans above $50,000 made by New Jersey-licensed lenders, as well as all loans made by non-licensed lenders—are subject to the civil usury rate of 6% interest per year (or 16% interest per year where a written contract specifies the interest rate), as well as the criminal usury rates.[164]

141.    The FDIC Rule will enable non-banks to evade New Jersey's civil and criminal

---

[159] N.J. Admin. Code § 3:1-1.1(a); N.J. Stat. Ann. § 31:1-1.
[160] N.J. Stat. Ann. § 2C:21-19.
[161] N.J. Stat. Ann. § 17:11C-1 *et seq.*
[162] N.J. Stat. Ann. § 17:11C-2.
[163] N.J. Stat. Ann. § 17:11C-32(a).
[164] N.J. Admin. Code § 3:1-1.1(a); N.J. Stat. Ann. § 31:1-1; *id.* § 2C:21-19.

37

usury laws by entering into purchase agreements with FDIC Banks and will undermine New Jersey's enforcement of its usury laws and its ability to protect consumers through those laws. Further, by incentivizing New Jersey-licensed lenders to charge interest rates that would otherwise be considered usurious under New Jersey law, the FDIC Rule may undermine New Jersey's comprehensive lender licensing scheme.

### 7.   New York's Usury Laws

142.   New York has both a civil usury rate, set at 16% interest per year, and a criminal usury rate, set at 25% interest per year.[165] With the exception of loans by lenders licensed by New York, loans under $250,000 are considered usurious if the interest rate exceeds 16%, while loans in excess of $250,000 are considered usurious if the interest rate exceeds 25%. Lenders licensed by New York can engage in the business of making personal loans of $25,000 or less to consumers in New York, or loans of $50,000 or less to businesses, and can charge, contract for, or receive a rate of interest above 16%, but in no event can they charge more than 25%.[166]

143.   New York has prohibited usurious interest rates for centuries[167] as a fundamental public policy of the State,[168] and state regulators have "aggressively enforced those laws in order to protect desperately poor people from the consequences of their own desperation."[169]

144.   New York's status as the nation's financial capital and one of its most populous states has consistently attracted unscrupulous companies eager to increase their profits by lending money to New Yorkers at triple-digit interest rates.

145.   The New York Attorney General, as New York's chief law-enforcement officer,

---

[165] N.Y. Gen. Oblig. Law §§ 5-501, 5-511; N.Y. Banking Law § 14-a; N.Y. Penal Law §§ 190.40, 190.42.

[166] *See* N.Y. Banking Law §§ 340, 356.

[167] *See Madden v. Midland Funding, LLC*, 237 F. Supp. 3d 130, 150 (S.D.N.Y. 2017) ("New York's usury prohibition is not a creature of recent statute, but rather one that reflects a deep-rooted tradition of the common weal." (internal citation and quotation marks omitted)).

[168] *See Power Up Lending Grp., Ltd. v. All. Bioenergy Plus, Inc.*, Case No. 18-CV-3601, 2019 WL 1322621, at *5 (E.D.N.Y. Feb. 28, 2019) (gathering cases for the proposition that "New York's usury prohibition constitutes a fundamental public policy").

[169] *Otoe-Missouria Tribe of Indians v. New York State Dep't of Fin. Servs.*, 769 F.3d 105, 108 (2d Cir. 2014) (internal citation and quotation marks omitted).

enforces the usury cap pursuant to its authority under New York Executive Law § 63(12), which prohibits "repeated fraudulent or illegal acts . . . in the carrying on, conducting or transaction of business."

146.   The New York Attorney General has repeatedly taken action to enforce the usury cap.[170] In one case, the New York Attorney General obtained a $5.2 million settlement from a Delaware-based bank and non-bank lender that entered into a "rent-a-bank" scheme to offer illegal payday loans to New Yorkers.[171] The New York Attorney General is also aware of potentially usurious loans made to New York borrowers by World Business Lenders, LLC, a California-based participant in an alleged "rent-a-bank" scheme with a savings association called Axos Bank.[172]

147.   The usury cap is also enforced by the New York Department of Financial Services ("DFS"), which licenses, regulates, and supervises state and international banks, insurance companies, and non-bank financial services firms with approximately $7 trillion in assets.[173]

148.   The non-bank entities supervised by DFS include licensed lenders, real-estate lenders, mortgage servicers, sales and premium finance companies, pre-paid card issuers, money

---

[170] *See, e.g.*, *Consumer Fin. Prot. Bureau v. RD Legal Funding, LLC*, 332 F. Supp. 3d 729, 780 (S.D.N.Y. 2018); *People v. County Bank of Rehoboth Beach, Del.*, 45 A.D.3d 1136, 1137-38 (3d Dep't 2007); *People v. JAG NY, LLC*, 18 A.D.3d 950, 951-53 (3d Dep't 2005).

[171] *See* Press Release, *Attorney General Cuomo Announces Distribution Of $5.2 Million Settlement In "Rent-A-Bank" Payday Lending Scheme*, Nov. 17, 2009, https://ag.ny.gov/press-release/2009/attorney-general-cuomo-announces-distribution-52-million-settlement-rent-bank.

[172] *See* Comment of Center for Responsible Lending 33 (Feb. 4, 2020).

[173] *See* N.Y. Fin. Servs. Law §§ 101 *et seq.*; N.Y. Banking Law § 14-a. DFS is statutorily mandated to, *inter alia*: "establish a modern system of regulation, rule making and adjudication that is responsive to the needs of the banking and insurance industries and to the needs of the state's consumers and residents," "provide for the effective and efficient enforcement of the banking and insurance laws," "provide for the regulation of new financial services products," "promote the prudent and continued availability of credit, insurance and financial products and services at affordable costs to New York citizens, businesses and consumers," "ensure the continued safety and soundness of New York's banking, insurance and financial services industries, as well as the prudent conduct of the providers of financial products and services, through responsible regulation and supervision," "protect the public interest and the interests of depositors, creditors, policyholders, underwriters, shareholders and stockholders," and "promote the reduction and elimination of fraud, criminal abuse and unethical conduct by, and with respect to, banking, insurance and other financial services institutions and their customers." N.Y. Fin. Servs. Law § 102.

---

transmitters, virtual-currency businesses, check cashers, and budget planners.[174]

### 8.  North Carolina's Usury and Small-Dollar-Loan Laws

149.   The usury laws of North Carolina unequivocally state that protecting North Carolina borrowers from illegal, usurious loans is a "paramount public policy" of the state.[175]

150.   North Carolina's usury laws apply to North Carolina residents "regardless of the situs of the contract."[176] They also cover lenders that make a "solicitation or communication to lend, oral or written, originating outside of" North Carolina when "forwarded to and received in [North Carolina] by a borrower who is a resident."[177]

151.   The maximum interest rate that North Carolina's usury laws allow for contract loans of $25,000 or less is 16% per annum unless another law provides for a higher rate.[178]

152.   Under the North Carolina Consumer Finance Act ("CFA"), the maximum interest rate that may be charged by a lender licensed by the North Carolina Commissioner of Banks on personal loans of up to $15,000 ranges between 18% and 30% per annum, depending on the size of the loan, plus a fee of between $25 and $40, charged no more than twice per year.[179]

153.   Under the CFA, loans made to North Carolina borrowers are governed by North Carolina law—regardless of any language used in the loan documents—when any aspect of the loan transaction occurs within North Carolina; and any such loans made in violation of North Carolina law are unenforceable.[180] Additionally, the prohibitions found in the CFA "apply to any person who seeks to avoid its application by any device, subterfuge, or pretense whatsoever."[181]

154.   Lenders that violate North Carolina's usury laws or the CFA face substantial consequences, including losing the right to collect or retain any interest charges on illegal

---

[174] *See* N.Y. Fin. Servs. Law §§ 101 *et seq*.
[175] N.C. Gen. Stat. § 24-2.1(g) ("It is the paramount public policy of North Carolina to protect North Carolina resident borrowers through the application of North Carolina interest laws.").
[176] N.C. Gen. Stat. § 24-2.1(a).
[177] N.C. Gen. Stat. § 24-2.1(b).
[178] N.C. Gen. Stat. § 24-1.1(a), (c).
[179] N.C. Gen. Stat. § 53-176(a), (b).
[180] N.C. Gen. Stat. § 53-190(a).
[181] N.C. Gen. Stat. § 53-166(b).

loans.[182]

155.    The North Carolina Attorney General, as North Carolina's chief law-enforcement officer, is authorized to enforce North Carolina's usury laws and the CFA pursuant to his independent constitutional, statutory, and common-law authority.[183]

156.    Due to the high interest rates on payday loans, patterns of repeat borrowing, and other potential for abuse, in 2001, North Carolina allowed the authorization for payday lending to sunset, and the state has not subsequently reauthorized any form of payday lending.

157.    After the sunset, most payday lenders closed their doors. However, others looked for ways to circumvent North Carolina law through, for example, the "rent-a-bank" model under which the payday lenders claimed that they were not making the loans themselves, but were merely the "marketing, processing, and servicing" agents of national banks and out-of-state state-chartered banks. The North Carolina Attorney General and the North Carolina Office of the Commissioner of Banks brought numerous enforcement actions against these lenders, which ultimately stopped doing business in the state.

158.    The FDIC Rule's Non-bank Interest Provision will incentivize a return to these attempts by non-bank lenders to evade North Carolina's usury laws and the CFA. The Rule will enable "rent-a-bank" schemes by lending federal support to the claim that non-banks can evade North Carolina's rate caps by entering into purchase agreements with FDIC Banks. Many non-bank lenders will rely on the Rule to attempt to shield them from otherwise applicable state law.

159.    The State of North Carolina also has a sovereign interest in licensing and governing the activities of lenders and other financial entities operating in North Carolina in order to protect North Carolina consumers. However, lenders involved in "rent-a-bank" schemes have claimed that they are not subject to oversight and licensing by the North Carolina Commissioner of Banks as required by the CFA.[184] By facilitating such schemes, the Rule will undermine North

---

[182] N.C. Gen. Stat. §§ 24-2, 53-166(d).

[183] *See, e.g.*, N.C. Gen. Stat. §§ 75-14, -15.1, -15.2 (authorizing the North Carolina Attorney General to obtain various forms of monetary and injunctive relief against entities that engage in "unfair or deceptive acts or practices in or affecting commerce").

[184] *See, e.g., Goleta Nat'l Bank v. Lingerfelt*, 211 F. Supp. 2d 711 (E.D.N.C. 2002); *In re Advance Am.*, No. 05:008:CF (N.C. Comm'r of Banks Dec. 22, 2005).

Carolina's licensing regime provided by the CFA, which is a fundamental element of the state's lending laws.

160.     By purporting to exempt entities that purchase loans originated by FDIC Banks from North Carolina's usury laws and the CFA, and by encouraging "rent-a-bank" schemes, the FDIC Rule undermines North Carolina's sovereign interests.

**B.    The FDIC Rule Harms the States' Quasi-Sovereign Interests**

161.     The Rule's Non-bank Interest Provision also harms the States' quasi-sovereign interests in promoting a fair lending marketplace that ensures borrowers in the States are not overburdened by unsustainable interest rates, that law-abiding lenders in the States are not undercut by competitors who operate in the States but evade their laws, that other creditors (like landlords, suppliers, and mortgage or auto lenders) in the States are not faced with non-payment if their debtors take on high-interest loans and become insolvent, and that taxpayers are not left with the tab for costs the States incur when consumers trapped in a cycle of debt are unable to provide for their basic needs and require assistance from the States to do so.

162.     States have historically exercised significant regulatory and enforcement authority in the area of consumer protection. Each State "has a quasi-sovereign interest in the health and well-being—both physical and economic—of its residents in general."[185] States have long counted among their "police powers" the authority to cap rates charged to their residents,[186] and courts have repeatedly held that a state's interest in protecting consumers within its borders is itself quasi-sovereign in nature.[187]

---

[185] *Alfred L. Snapp & Son*, 458 U.S. at 607; *also, e.g.*, *Missouri v. Illinois*, 180 U.S. 208, 241 (1901) ("[I]f the health and comfort of the inhabitants of a state are threatened, the state is the proper party to represent and defend them.").

[186] *Griffith v. Connecticut*, 218 U.S. 563, 569 (1910) ("It is elementary that the subject of the maximum amount to be charged by persons or corporations subject to the jurisdiction of a state for the use of money loaned within the jurisdiction of the state is one within the police power of such state.").

[187] *See, e.g.*, *New York v. Citibank, N.A.*, 537 F. Supp. 1192, 1197 (S.D.N.Y 1982) ("The state has a 'quasi-sovereign' interest in protecting the welfare of its citizens . . . and that interest includes protection of its citizens from fraudulent and deceptive practices" (quotation and citation omitted)).

163.    The Rule's Non-bank Interest Provision harms the States' quasi-sovereign interests by injuring borrowers in the States: as those consumers pay interest not permissible under state law, they will face an increased risk of falling into a vicious and destructive cycle of continuously taking out new high-interest, short-term loans to cover prior ones.[188] As described above, in California, a number of lenders have already announced plans to shift from direct lending in compliance with California law to "rent-a-bank" arrangements to evade California law. This Rule will facilitate that transition.

164.    The Rule also harms the States' quasi-sovereign interests by imposing costs on taxpayers in the States who have not taken out usurious loans. Consumers trapped in a cycle of debt are often unable to provide for their basic needs and may need public assistance.[189] Studies have shown, for example, that consumers who take out short-term, high-interest loans are more likely to end up requiring food assistance and less likely to remain current on child support.[190] The costs of providing these services are ultimately borne by taxpayers in the form of higher tax bills.

165.    The Rule will also injure lenders in the States that comply with state law. In California, for example, as of 2018, 3,493 entities held CFL licenses.[191] Non-bank lenders that comply with California law (rather than evade it, as the Rule facilitates) will be at a competitive disadvantage to lenders in "rent-a-bank" partnerships that, according to the Rule, are not subject to state rate caps.

166.    The States' quasi-sovereign interests are separate and distinct from the interests of individual borrowers and lenders. Lending occurs in a marketplace that the States and federal law jointly facilitate. As the Conference of State Bank Supervisors, which represents the interests of

---

[188] *E.g.*, Comment of Center for Responsible Lending 46-60 (Feb. 4, 2020).
[189] *See, e.g.*, Anne Fleming, *The Public Interest in the Private Law of the Poor*, 14 Harv. L. & Pol'y Rev. 159, 178-79 (2019), https://harvardlpr.com/wp-content/uploads/sites/20/2020/03/Fleming.pdf.
[190] *See* Melzer, *supra*, at 4-6.
[191] California Department of Business Oversight, *California Department of Business Oversight Annual Report* 1 (June 2018), https://dbo.ca.gov/wp-content/uploads/sites/296/2019/08/CFL-Annual-Report-2018-FINAL-8-8-19.pdf.

43

state bank and financial regulators, noted in its comment on the Rule, retaining the applicability of state rate caps to non-banks is vital because "[a]llowing a nonbank to evade otherwise applicable interest rate caps interferes with the ability of consumers, *as citizens*, to strike the desired balance between credit access and affordability."[192] The States have a quasi-sovereign interest in ensuring that their lending marketplace is fair, is competitive, and supports the state's economy.

167.    The States do not dispute that the FDIA applies to their residents. Rather, the States are asserting their rights as *parens patriae* under federal law to vindicate Congress's will that interest-rate preemption under § 1831d extend only to FDIC Banks.[193] Indeed, Congress has recognized this interest through its choice of language limiting preemption under § 1831d to FDIC Banks.

168.    The States' quasi-sovereign interest in protecting the economic health of their residents and the strength of their lending marketplace is further injured by the FDIC Rule because it is not clear whether there would remain *any* remedy if a non-bank that purchases a loan issued by an FDIC Bank charges higher interest rates than permitted by federal law. Because § 1831d's interest-rate provision applies only to FDIC Banks, the language of the provision setting forth remedies for its violation explicitly refers only to FDIC Banks that violate federal rate laws.[194] It is unclear whether the FDIC intends this remedial provision to apply to the buyers of loans issued by FDIC Banks, including buyers engaged in "rent-a-bank" arrangements. The FDIC Rule creates uncertainty about what, if any, remedies apply if non-banks violate the terms of § 1831d and thus harms the States' interest in fostering a competitive and fair lending marketplace for the benefit of their residents and economies.

## C.    The FDIC Rule Harms the States' Fiscal Interests

169.    The Rule's Non-bank Interest Provision also causes direct harm to the States

---

[192] Comment of the Conference of State Bank Supervisors 3 (Feb. 4, 2020) (emphasis added).

[193] *See Massachusetts v. EPA*, 549 U.S. 497, 520 n.17 (2007).

[194] 12 U.S.C. § 1831d(b) (a person who paid an interest rate exceeding that allowed by § 1831d(a) may recover twice the amount of interest paid "from such State bank or such insured branch of a foreign bank taking, receiving, reserving, or charging such interest.").

44

because it will injure the States' fiscal interests through the loss of licensing fees and by increasing the cost and difficulty of enforcing the States' laws. The States' laws, as discussed above, provide a comprehensive regime for licensing, regulating, and supervising the activities of non-bank lenders operating in the States. Each of the States—through its primary financial regulator or Attorney General, as the state's chief law-enforcement officer—allocates substantial resources to maintaining compliance with their state lending laws. The Conference of State Bank Supervisors noted in its comment on the Rule that the Rule will likely facilitate attempts to evade licensing requirements, which will result in a loss of licensing fees to the States and impose additional costs on state regulators:

> Along with seeking to evade state usury laws, nonbanks have relied on partnerships with banks in an attempt to avoid applicable state licensing requirements. State regulators devote significant resources to policing unlicensed activity . . . .[195]

170.    Even before the FDIC issued the Rule, lenders involved in "rent-a-bank" schemes have claimed that they are not subject to state licensing or oversight. By facilitating these schemes, the Rule will foreseeably decrease licensing fees received by the States and increase the cost and burden of future supervisory, investigative, and law-enforcement efforts by the States.

171.    The Rule will also injure the States' fiscal interests because the States will be required to provide financial assistance to consumers who fall into a cycle of debt and are unable to provide for their basic needs.[196] The States will also have to devote money and other resources to assisting these consumers who, as a result of predatory loans, may no longer be able to afford basic necessities such as food, shelter, and medical treatment.

## IV.    THE FDIC'S NON-BANK INTEREST PROVISION IS LEGALLY, PROCEDURALLY, AND SUBSTANTIVELY UNSOUND

### A.    The FDIC Rule's Non-bank Interest Provision Is Contrary to the Plain Language of § 1831d

172.    Courts have consistently held that the rulemaking authority of federal agencies is

---

[195] Comment of the Conference of State Bank Supervisors 5 (Feb. 4, 2020).
[196] Melzer, *supra*.

constrained by the statutory language Congress chose to enact. "An agency's 'power to promulgate legislative regulations is limited to the authority delegated' to it by Congress."[197] An agency has no authority to alter the regulatory landscape if "Congress has supplied a clear and unambiguous answer to the interpretive question at hand."[198] "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."[199]

173.    The FDIC states that it relies solely on § 1831d for the purported authority to extend the interest-rate provisions applicable to FDIC Banks to other entities.[200] Section 1831d is clear and unambiguous. It provides the maximum interest rates chargeable by "State-chartered insured depository institutions, including insured savings banks, or insured branches of foreign banks" and preempts otherwise applicable state law. That is, it preempts state interest-rate caps as applied to FDIC Banks—and no one else.

174.    Section 1831d does not govern the interest rates chargeable by assignees, transferees, or purchasers of loans originated by FDIC Banks. Congress did not preempt state law as to these non-bank entities. As one court recently explained, § 1831d "governs what charges a 'State bank' may impose, but . . . does not on its face regulate interest or charges that may be imposed by a non-bank, including one which later acquires or is assigned a loan made or originated by a state bank."[201]

175.    The Rule's Non-bank Interest Provision would effectively amend the statutory

[197] *Amalgamated Transit Union v. Skinner*, 894 F.2d 1362, 1368 (D.C. Cir. 1990) (quoting *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988)).
[198] *Pereira v. Sessions*, 138 S. Ct. 2105, 2113 (2018).
[199] *Id.* (quoting *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984)).
[200] *E.g.*, 85 Fed. Reg. at 44,149 ("The FDIC's proposal, addressing the two statutory gaps in section 27 [§1831d] in a manner that carries out the goals of the Federal statute, is based on Federal law. Specifically, the rule is based on the meaning of the text of the statute"); *id.* at 44,151 ("The FDIC's authority to issue the rule . . . is not based on State law. Rather, it is based on section 27 [§ 1831d]"; "[T]he FDIC's authority to issue the proposed rule arises under section 27 rather than common law."); *id.* at 44,154 ("Section 331.4 of the final rule implements section 27 of the FDI Act").
[201] *Meade*, 307 F. Supp. 3d at 1144-45.

46

language Congress chose, essentially adding the following bracketed and italicized terms to § 1831d: "such State bank or such insured branch of a foreign bank [*or the buyer, assignee, or transferee of any loan made by such State bank*] may, notwithstanding any State constitution or statute which is hereby preempted for the purposes of this section, take, receive, reserve, and charge on any loan . . . interest at the rate . . . allowed by the laws of the State, territory, or district where the bank is located[.]"[202] As detailed below, this drastically alters the statutory scheme Congress enacted.

176.    The FDIC repeats multiple times in its Rule that it "would not regulate non-banks through the proposed rule[.]"[203] It claims, "[t]he proposed rule does not purport to allow State banks to assign the ability to preempt State law interest rate limits under section 27 [§ 1831d]. Instead, the proposed rule would allow State banks to assign loans at their contractual interest rates. This is not the same as assigning the authority to preempt State law interest rate limits."[204]

177.    This is a distinction without a difference. If the FDIC Rule permits assignees of loans issued by FDIC Banks to take on the protection of § 1831d and charge interest in excess of state law, as the Rule does, then it regulates the interest chargeable by non-banks. This allows FDIC Banks to assign to non-banks the ability to preempt state-law interest-rate limits through the purchase of their loans.

178.    Indeed, in a section of the Rule discussing its benefit for small businesses, the FDIC admits, "The small State-chartered banks that are affected [by the Rule] would benefit from the ability to sell such loans *while assigning to the buyer the right to enforce the contractual loan interest rate,*"[205] meaning the rate authorized by § 1831d, which preempts the interest rate permitted by state law.

179.    Elsewhere in its Rule the FDIC reiterates that it really does mean to extend § 1831d to non-banks: The Non-Bank Interest Provision "clarifies that interest on a loan

---

[202] 12 U.S.C. § 1831d.

[203] 85 Fed. Reg. at 44,150; *id.* ("The regulation would not become a regulation of assignees simply because it would have an indirect effect on assignees.").

[204] *Id.* at 44,151.

[205] *Id.* at 44,157 (emphasis added).

47

permissible under section 27 shall not be affected by . . . the sale, assignment, or other transfer of the loan, in whole or in part. *An assignee can enforce the loan's interest-rate terms to the same extent as the assignor*."[206] That is, a non-bank can charge the same rates as an entity covered by § 1831d if it bought the privilege of doing so from an FDIC Bank through the purchase of loans originated by an FDIC Bank.

180.     Administrative agencies have authority to construe statutes only to the extent of any statutory ambiguity. But the FDIC identifies no ambiguity as to whom § 1831d applies. That is because there is none. It applies to FDIC Banks and nobody else.

181.     Indeed, Congress went so far as to explain precisely why it chose to preempt state interest rate caps for those banks: "In order to prevent discrimination against State-chartered insured depository institutions, including insured savings banks, or insured branches of foreign banks with respect to interest rates,"[207] which had, until 1980, not benefitted from the state-law preemption traditionally enjoyed by national banks under § 85 of the NBA. As one court lucidly explained, § 1831d "does not, on its face, state any purpose with regard to institutions other than federally-insured banks."[208]

182.     The FDIC attempts to create the appearance of ambiguity by conflating two issues: 1) whether subsequent changes in law, such as state rate caps, have retroactive effect (the "retroactivity question") and 2) to whom § 1831d applies if a loan originated by an FDIC Bank is sold (the "identity question"). The FDIC explains:

> Section 27 [§ 1831d] does not state at what point in time the validity of the interest rate should be determined in order to assess whether a State bank is taking or receiving interest in accordance with section 27. Situations may arise when the usury laws of the State where the bank is located change after a loan is made (but before the loan has been paid in full), and a loan's rate may be non-usurious under the old law but usurious under the new law. To fill this statutory gap and carry out the purpose of section 27, the FDIC proposed regulations in November 2019 that would provide that the permissibility of interest under section 27 must be determined when the loan is made, and shall not be affected by a change in State law, a change in the relevant commercial paper rate, or the sale, assignment, or

---

[206] *Id.* at 44,155 (emphasis added).
[207] 12 U.S.C. § 1831d.
[208] *Meade*, 307 F. Supp. 3d at 1144.

1    other transfer of the loan.[209]

2    183.    The FDIC's conflation of the distinct retroactivity and identity questions into a

3    single inquiry about the "point in time the validity of the interest rates should be determined"

4    under § 1831d is an attempt to obscure just how straightforward the answers are.

5    184.    Although it is not the subject of this challenge, the retroactivity question is

6    uncontroversial: changes in state law generally do not retroactively alter contractual

7    obligations.[210] The FDIC fails to show there is actually any ambiguity as to whether permissibility

8    of interest rates under § 1831d would be affected retroactively by subsequent changes in state

9    usury law. It points to no case law holding that there would be a retroactive effect.

10   185.    The identity question is separate and is answered in the statute itself. As described

11   above, the text of § 1831d declares that it applies only to FDIC Banks. Section 1831d does not

12   apply when a loan is sold to a non-bank.

13   186.    No statutory ambiguity exists with respect to either issue, and the FDIC's

14   conflation of the two issues is insufficient to create any ambiguity.

15   187.    In the Rule's Non-bank Interest Provision, the FDIC seeks to rewrite § 1831d to

16   achieve its own, rather than Congress's, policy goals. This is impermissible. As the Supreme

17   Court has reaffirmed as a "core administrative-law principle," an administrative agency "may not

18   rewrite clear statutory terms to suit its own sense of how the statute should operate."[211] Congress

---

[209] 85 Fed. Reg. at 44,146.

[210] *Covey v. Hollydale Mobilehome Estates*, 116 F.3d 830, 835 (9th Cir. 1997), *opinion amended on denial of reh'g*, 125 F.3d 1281 (9th Cir. 1997) ("Cases involving settled contract and property rights, for example, require predictability and stability and are generally inappropriate candidates for statutory retroactivity. Similarly, the courts presumptively should not apply statutes affecting substantive rights, liabilities, or duties to conduct arising before their enactment." (internal citation and quotation marks omitted)); *see also Landgraf v. USI Film Prod.*, 511 U.S. 244, 265 (1994) ("the presumption against retroactive legislation is deeply rooted in our jurisprudence, and embodies a legal doctrine centuries older than our Republic"); *Smith v. Mercer*, 172 S.E.2d 489, 494 (N.C. 1970) ("Ordinarily, an intention to give a statute a retroactive operation will not be inferred. . . . It is especially true that the statute or amendment will be regarded as operating prospectively only, . . . where the effect of giving it a retroactive operation would be to interfere with an existing contract . . . ." (internal citation and quotation marks omitted)).

[211] *Util. Air Reg. Grp. v. EPA*, 573 U.S. 302, 328 (2014).

has "directly spoken to the precise question at issue"[212] and explicitly limited the reach of preemption under § 1831d to FDIC Banks. And as the Supreme Court recently affirmed in *Bostock v. Clayton County*, "When the express terms of a statute give us one answer and extratextual considerations suggest another, it's no contest. Only the written word is the law, and all persons are entitled to its benefit."[213]

188.    Because the Rule's Non-bank Interest Provision is contrary to the language Congress chose, it is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law, as well as in excess of statutory jurisdiction, authority, and limitations, and short of statutory right, and thus violates the APA.[214]

**B.    The FDIC's Non-bank Interest Provision Is Contrary to the Statutory Framework Congress Enacted**

**1.    The Rule's Non-bank Interest Provision Ignores Federal Law Showing That § 1831d Applies Only to FDIC Banks**

189.    An agency's "reasonable statutory interpretation must account for both 'the specific context in which . . . language is used' and 'the broader context of the statute as a whole.'"[215]

190.    The FDIC's Non-bank Interest Rule fails to account for other federal statutes that demonstrate that preemption of state interest-rate caps under § 1831d applies only to FDIC Banks.

191.    The FDIC states that "the Federal statutory provision governing State banks' authority with respect to interest rates [§ 1831d] is patterned after and interpreted in the same

---

[212] *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2124 (2016); *see also Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637-38 (1952) (Jackson, J. concurring) ("When the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb, for then he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter. Courts can sustain exclusive Presidential control in such a case only be disabling the Congress from acting upon the subject. Presidential claim to a power at once so conclusive and preclusive must be scrutinized with caution, for what is at stake is the equilibrium established by our constitutional system").
[213] *Bostock v. Clayton Cty.*, 140 S. Ct. 1731, 1737 (2020).
[214] 5 U.S.C. § 706(2).
[215] *Util. Air Reg. Grp.*, 573 U.S. at 321 (quoting *Robinson v. Shell Oil Co.,* 519 U.S. 337, 341 (1997)).

1    manner as section 85[,]" which preempts state interest-rate caps for national banks.[216]

2         192.    But the link between § 1831d and § 85 only further demonstrates that preemption

3    flows only to banks. Like § 1831d, § 85 applies only to the interest rates "[a]ny association [*i.e.*,

4    any national bank] may take receive, reserve, and charge . . . ." Like § 1831d, § 85 makes no

5    mention of interest rates chargeable by non-banks. Moreover, Congress has recently reaffirmed

6    that the benefits of federal preemption provided by § 85 accrue *only* to national banks. In

7    provisions of the 2010 Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-

8    Frank Act")[217] codified at 12 U.S.C. § 25b, Congress stated—in three separate subsections—that

9    the NBA, which includes § 85, does not preempt state law as to subsidiaries, affiliates, or agents

10   of national banks and that state consumer financial laws apply to those entities.[218] Thus, by

11   Congress's explicit command, subsidiaries, affiliates, and agents of national banks cannot benefit

12   from § 85's preemption of state usury caps.

13        193.    These limitations cast doubt on the proposition (as embodied in the OCC Rule that

14   is parallel to the FDIC's Non-bank Interest Provision) that the benefits of § 85 could extend to

15   non-banks that are unaffiliated with a bank and that merely purchase loans originated by a bank.

16        194.    By the FDIC's own logic, § 1831d likewise must be interpreted to extend no

17   further than FDIC Banks.

18        195.    Section 1831d(b), which provides penalties for FDIC Banks that charge interest in

19   excess of that permitted by § 1831d, further demonstrates that § 1831d preemption applies only to

20   FDIC Banks. Section 1831d(b) focuses exclusively on FDIC Banks that violate § 1831d(a). The

---

21        [216] 85 Fed. Reg. at 44,146; *id.* at 44,147 ("As stated above, section 27(a) of the FDI Act

22   was patterned after section 85. Because section 27 was patterned after section 85 and uses similar
     language, courts and the FDIC have consistently construed section 27 *in pari materia* with section

23   85.").
          [217] Pub. L. No. 111-203, 124 Stat. 1376 (2010).

24        [218] *See* 12 U.S.C. §§ 25b(b)(2), (e), (h)(2). The Dodd-Frank Act also provides that certain
     amendments it made to the NBA do not alter "the authority conferred by section 85 of this title

25   for the charging of interest *by a national bank* at the rate allowed by the laws of the State,
     territory, or district where the bank is located[.]" 12 U.S.C. § 25b(f) (emphasis added). That is,

26   while the Dodd-Frank Act does not alter national banks' exemption from state usury laws, its
     language reiterates § 85's scope: It applies only to the charging of interest "by a national bank,"

27   not by third-party assignees.

28

1   penalty imposed is "twice the amount of the interest . . . from such State bank or such insured

2   branch of a foreign bank [*i.e.*, FDIC Bank] taking, receiving, reserving, or charging such

3   interest."[219]

4          196.    The FDIC fails to account for these statutory provisions that make clear that

5   § 1831d's preemption of state interest-rate caps applies only to FDIC Banks. This not only is

6   unlawful under the APA but also irreconcilable with the statutory scheme, especially the

7   enforcement provisions in § 1831d(b). Because § 1831d applies only to FDIC Banks, there is no

8   obvious statutory provision providing penalties for non-banks that violate § 1831d's rate caps,

9   and the FDIC did not issue any rule stating that § 1831d(b)—despite its clear language—should

10  somehow be read to extend to the buyers of loans issued by FDIC Banks. The FDIC failed to

11  consider this key question.

12         197.    Moreover, Congress knew how to preempt state-law rate-caps for loan purchasers

13  when it wanted to. Indeed, in the very same act that adopted § 1831d, Congress did so with

14  respect to first-lien mortgage loans.[220] Unlike the language of § 1831d, which grants the privilege

15  of preemption specifically to FDIC Banks, that provision preempts state interest-rate caps as to

16  first-lien mortgage loans and specifically contemplates that preemption would travel with a first-

17  lien mortgage loan assigned under § 1735f-7a(a)(1)(C)(v).[221] The contrasting language Congress

18  chose in two sections *of the same act* demonstrates that § 1831d means what it plainly says in

19  preempting state law only as to FDIC Banks.

20         198.    The Non-bank Interest Provision is contrary to the statutory scheme Congress

21  enacted, the FDIC has failed to account for statutory provisions that are contrary to its chosen

22

23         [219] 12 U.S.C. § 1831d(b).
       [220] 12 U.S.C. § 1735f-7a, enacted as § 501 of DIDMCA, Pub. L. No. 96–221, 94 Stat 132
24  (1980).
       [221] The text of § 1735f-7a itself demonstrates a different intent than § 1831d, and the
25  legislative history states it as well. *See* 85 Fed. Reg. at 44,151 n.47 (citing Committee Report
    regarding DIDMCA §501, which was codified as § 1735f-7a, stating "it is the Committee's intent
26  that loans originated under *this* usury exemption will not be subject to claims of usury even if
    they are later sold to an investor who is not exempt under *this* section." (emphases added)). The
27  FDIC cites no similar legislative history regarding § 1831d.

28

interpretation, and the FDIC has ignored whether remedies for violations of § 1831d extend to non-banks. For these reasons, the FDIC's Non-bank Interest Provision is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law, as well as in excess of statutory jurisdiction, authority, and limitations, and short of statutory right, and thus violates the APA.[222]

## 2. The FDIC's Non-bank Interest Provision Is Unsupported by the Law the FDIC Cites

199.    While ignoring statutory provisions that conflict with its Rule's Non-bank Interest Provision, the FDIC reads into § 1831d a variety of suppositions that are unmoored from the reality of banking law.

200.    As state-chartered institutions, FDIC Banks rely primarily on state law for their existence and operating authorities, including the powers to make and sell loans.[223] Federal law, like § 1831d, engages in only limited intervention regarding the activities of FDIC Banks, which are chartered and incorporated as creatures of state law.

201.    The FDIC's rulemaking powers do not extend to the interpretation of state law and are limited to the statutes the agency administers.[224] Thus, in order to justify its authority to issue the Non-bank Interest Provision, the FDIC must read into some statute it administers (here, § 1831d) *all* of the banking powers it hopes to construe in its Rule.

202.    In its Proposed Rule, the FDIC reasoned as follows:

> Banks' power to make loans implicitly carries with it the power to assign loans, and thus, a State bank's [FDIC Bank's] statutory authority under section 27 [§ 1831d] to make loans at particular rates necessarily includes the power to assign the loans at those rates. Denying an assignee the right to enforce a loan's terms would effectively prohibit assignment and render the power to make the loan at the rate provided by the statute illusory.[225]

The final Rule reprises this argument at several points.[226]

---

[222] 5 U.S.C. § 706(2).

[223] 85 Fed. Reg. at 44,149 n.36 (citing N.Y Banking Law § 961(1), which grants FDIC Banks chartered by the State of New York the power to "discount, purchase and negotiate promissory notes" and "lend money on real or personal security," among other things).

[224] 12 U.S.C. §§ 1819(a), 1820(g).

[225] 84 Fed. Reg. at 66,848.

[226] *E.g.*, 85 Fed. Reg. at 44,149, 44,150, 44,151.

53

203.    But the FDIC's syllogism (state law permits banks to make and assign loans, and federal law permits banks to charge interest at particular rates; therefore, the FDIC may issue a rule allowing *non-banks* to charge interest in excess of state law) simply does not follow. The state-law power of FDIC Banks to issue and assign loans sheds no light on whether the FDIC may exempt new classes of entities from compliance with state law. Indeed, the FDIC has no authority to issue regulations construing powers granted to FDIC Banks under state law.

204.    Even if the FDIC had authority to construe FDIC Banks' state-law power of sale, that power has nothing to do with the interest chargeable by non-bank assignees. As the Second Circuit explained in *Madden*, "state usury laws would not prevent consumer debt sales by national banks to third parties."[227] At most, they "might decrease the amount a national bank could charge for its consumer debt in certain states[.]"[228] The same is true for FDIC Banks. State interest-rate caps do not interfere with FDIC Banks' state-law powers to make contracts or lend money. Indeed, more restrictive state interest-rate caps applicable only to non-banks place FDIC Banks in a superior position to make high-interest-rate loans.

205.    Nor do state interest-rate caps interfere with FDIC Banks' power to sell loan contracts they have entered. As the administrative record demonstrates,

> Banks may always sell loans to other banks. There are over 5,200 federally insured depositories, so there is a robust market for State bank loans simply from other State banks and national banks, none of which are subject to state usury laws. Nowhere in the Proposed Rule is this enormous market for bank loans ever mentioned.[229]

206.    Moreover, the FDIC ignores that state interest-rate caps do not actually prevent the sale of loans issued by FDIC Banks. Non-banks that purchase bank loans carrying rates above the state-law cap must simply follow state law and forgo collection of interest in excess of the cap. Because non-banks are constrained by state law, it is possible that FDIC Banks that choose to sell loans to non-banks may not be able to charge as much for their loans in states with usury limits, but as the Second Circuit held in *Madden*, a mere decrease in sale price does not substantially

---

[227] *Madden*, 786 F.3d at 251.
[228] *Id.*
[229] Comment of Adam J. Levitin 8 (Jan. 5, 2020).

interfere with national banks' power to make and sell loans.[230]

207.   The FDIC gestures toward FDIC Banks' powers to contract and make and sell loans as being important to the federal statutory scheme, but "[i]nvoking some brooding federal interest or appealing to a judicial policy preference" is not enough to displace state law like interest-rate caps.[231] Rather, one "must point specifically to 'a constitutional text or a federal statute' that does the displacing or conflicts with state law."[232] The only provision of law the FDIC cites as the basis for its Non-bank Interest Provision is § 1831d, and that section simply will not bear the FDIC's construction.

208.   Because the FDIC's Non-bank Interest Provision relies on statutory grounds that do not support its decision, it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[233]

### C.   The FDIC's Non-bank Interest Provision Impermissibly Preempts State Law

209.   Section 1831d explicitly "preempt[s]" "any State constitution or statute" that would prohibit an FDIC Bank from charging a rate permitted by § 1831d. The Non-bank Interest Provision further preempts state law by extending this interest-rate privilege to non-bank loan assignees, transferees, or purchasers that would otherwise be subject to state interest-rate caps.

210.   When addressing preemption, courts start with "the assumption that the historic police powers of the States [are] not to be superseded by [federal law] unless that was the clear and manifest purpose of Congress."[234]

211.   Consumer-protection laws like interest-rate caps are among those historic police

---

[230] *Madden*, 786 F.3d at 251.

[231] *Va. Uranium, Inc. v. Warren*, 139 S. Ct. 1894, 1901 (2019).

[232] *Id.* (quoting *P.R. Dep't of Consumer Affairs v. ISLA Petroleum Corp.*, 485 U.S. 495, 503 (1988)).

[233] 5 U.S.C. § 706(2)(A).

[234] *Altria Grp., Inc. v. Good*, 555 U.S. 70, 77 (2008) (first brackets in original) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)); *see also id.* (presumption against preemption "applies with particular force when Congress has legislated in a field traditionally occupied by the States. Thus, when the text of a pre-emption clause is susceptible of more than one plausible reading, courts ordinarily accept the reading that disfavors pre-emption.").

powers held by the states.[235] Despite the federal government's regulatory involvement with FDIC Banks, state law still provides the background rules for state-chartered depository institutions.[236] There is no indication that Congress intended to preempt state consumer-protection law as to non-banks, and it has explicitly affirmed that even the law governing *federally* chartered banks "does not occupy the field in any area of State law."[237]

212.    Moreover, because the Rule's Non-bank Interest Provision applies not to FDIC Banks but to non-bank entities that lack any connection to federal oversight, it is a new incursion into an area in which states have traditionally exercised their police powers. Thus, the strong presumption against preemption applies to the Rule's Non-bank Interest Provision.

213.    The FDIC interprets § 1831d to preempt state law as to non-banks. Even if that were one of several reasonable interpretations of § 1831d—which it is not—that interpretation must yield to the reasonable non-preemptive interpretation that those sections apply only to interest chargeable by FDIC Banks. Accordingly, the Non-bank Interest Provision is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law, as well as in excess of statutory jurisdiction, authority, and limitations, and short of statutory right, and thus is in violation of the APA.[238]

### D.    The FDIC Lacks Authority To Issue the Non-bank Interest Provision and Overturn *Madden*

214.    Under 12 U.S.C. §§ 1819(a) and 1820(g), the FDIC has authority to issue "regulations to carry out" the provisions of the FDIA. But the FDIA does not regulate non-banks, and for this reason, the Rule's Non-bank Interest Provision is beyond the FDIC's power to promulgate. Moreover, FDIC Banks' "power to sell or transfer loans," on which the Rule's Non-

---

[235] *Griffith*, 218 U.S. at 569 ("It is elementary that the subject of the maximum amount to be charged by persons or corporations subject to the jurisdiction of a state for the use of money loaned within the jurisdiction of the state is one within the police power of such state.").

[236] *See* 84 Fed. Reg. at 66,848 (describing state-law grants of power to State Banks); *cf. Atherton v. FDIC*, 519 U.S. 213, 224-25 (1997) (bank management's fiduciary duties are established by state, rather than federal, common law).

[237] 12 U.S.C. § 25b(b)(4).

[238] 5 U.S.C. § 706(2).

bank Interest Rule is based, emanates from *state*—not *federal*—law,[239] which the FDIC has no power to interpret through binding regulations.

215. Furthermore, judicial construction of a statute trumps a subsequent agency interpretation of that statute when the court's construction "follows from the unambiguous terms of the statute and thus leaves no room for agency discretion."[240] That is the case here, as the Second Circuit has construed the unambiguous terms of § 85 in *Madden*,[241] and the FDIC insists § 1831d must be given the same interpretation as § 85.[242]

216. There is no ambiguity as to which entities § 1831d applies—the statute lists them: "State-chartered insured depository institutions, including insured savings banks, or insured branches of foreign banks." Accordingly, the FDIC lacks authority to reverse the Second Circuit's statutory construction.

217. The FDIC Rule's Non-bank Interest Provision purports to regulate the activities of entities beyond the agency's jurisdiction and seeks to overturn the statutory construction of a federal court. For these reasons, it is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right"[243] and "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[244]

### E. The Rule's Non-bank Interest Provision Conflicts with Federal Regulators' Longstanding Interpretations of Federal Law

218. Prior to the FDIC's rulemaking and the OCC's nearly identical proposal, federal regulators had consistently held that the preemptive power of §§ 1831d and 85 accrues only to banks and that extending such power to non-banks would raise safety and soundness concerns.

---

[239] *See*, *e.g.*, 85 Fed. Reg. at 44,149 (describing "State banking laws, which typically grant State banks the power to sell or transfer loans" and citing specific New York *state* statutes granting these authorities).

[240] *Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 982 (2005); *see also Texas v. Alabama-Coushatta Tribe of Texas*, 918 F.3d 440, 447-49 (5th Cir. 2019).

[241] *Madden*, 786 F.3d at 250-51.

[242] *E.g.*, 85 Fed. Reg. at 44,147 ("courts and the FDIC have consistently construed section 27 [§ 1831d] *in pari materia* with section 85").

[243] 5 U.S.C. § 706(2)(C).

[244] 5 U.S.C. § 706(2)(A).

219.    As the OCC explained in 2002,

> The benefit that national banks enjoy by reason of [state-law preemption] cannot be treated as a piece of disposable property that a bank may rent out to a third party that is not a national bank. Preemption is not like excess space in a bank-owned office building. It is an inalienable right of the bank itself.[245]

The OCC specifically expressed concern about so-called "rent-a-bank" schemes, in which heavily regulated banks enter into relationships with largely unregulated non-bank entities for the sole purpose of allowing non-banks to evade state interest-rate caps. The agency emphasized that such schemes are "an abuse of the national charter" and give rise to "safety and soundness problems at the bank."[246]

220.    The FDIC has repeated its commitment to these same policy views—that it "view[s] unfavorably entities that partner with a [FDIC Bank] with the sole goal of evading a lower interest rate established [by state law]"—including in its Notice of Proposed Rulemaking and its final Rule.[247] But the Non-bank Interest Rule conflicts with the agency's view that banks may not rent out their charters to assist non-banks' evasion of state law. The FDIC has failed to explain why it has adopted a Rule that stands at odds with the policy stance that both it and the OCC have long shared. The Rule's Non-bank Interest Provision will facilitate "rent-a-bank" arrangements designed to evade state interest-rate caps. The FDIC has failed to consider the Non-

---

[245] John D. Hawke, Jr., Comptroller of the Currency, *Remarks Before the Women in Housing and Finance* 10 (Feb. 12, 2002), https://www.occ.gov/news-issuances/speeches/2002/pub-speech-2002-10.pdf.

[246] *Id.*; *see also* OCC Bulletin 2001-47, *Third-Party Relationships* 3-4 (Nov. 1, 2001), https://ithandbook.ffiec.gov/media/resources/3557/occ-bul_2001_47_third_party_relationships.pdf; OCC Bulletin 2018-14, *Installment Lending: Core Lending Principles for Short-Term, Small-Dollar Installment Lending* at 3-4 (May 23, 2018), https://www.occ.gov/static/rescinded-bulletins/bulletin-2018-14.pdf (rescinded by OCC Bulletin 2020-54, *Small-Dollar Lending: Interagency Lending Principles for Offering Responsible Small-Dollar Loans* (May 20, 2020)).

[247] 85 Fed. Reg. at 44,146-47; 84 Fed. Reg. at 66,846; *Statement by FDIC Chairman Jelena McWilliams on the Notice of Proposed Rulemaking: Federal Interest Rate Authority*, FDIC Board Meeting (Nov. 19, 2019), https://www.fdic.gov/news/news/speeches/spnov1919.pdf; *see also* FDIC, FIL-14-2005 (March 1, 2005), https://www.fdic.gov/news/financial-institution-letters/2005/fil1405.html (imposing stringent limits on acceptable third-party arrangements between FDIC Banks and payday lenders).

bank Interest Provision's facilitation of these arrangements and has not explained why its stance

toward such arrangements has changed. When an agency departs from agency precedent without

explanation, as the FDIC has here, its action is "arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with law."[248]

### F.   The FDIC's Statement That States May Avoid the Rule's Negative Effects by Opting Out of § 1831d Coverage Is Misleading Because States Would Still Be Harmed by the FDIC Rule

221.   As discussed above, the FDIC's Non-bank Interest Provision would facilitate and

encourage rent-a-bank arrangements by extending § 1831d's preemption to nonbanks.

222.   The FDIC brushes these concerns aside by noting that states have the right to opt

out of § 1831d,[249] but this opt-out right offers no meaningful protection against rent-a-bank

schemes.

223.   Section 525 of the Depository Institutions Deregulation and Monetary Control Act

of 1980 permits states to "override section 27 [§ 1831d]" by enacting a state law "stating

explicitly that the State does not want section 27 to apply with respect to loans made in such

State."[250] Any relief provided by this opt-out provision is wholly illusory, however, because the

opt-out provision only applies to loans deemed to be *made in the state* seeking to opt out.[251] The

FDIC has previously held that a loan can be deemed to be "made" by a bank located in one state

to a borrower located in another state, and therefore subject to the usury laws of the state where

---

[248] 5 U.S.C. § 706(2)(A).

[249] 85 Fed. Reg. at 44,153 ("[I]f States have concerns that nonbank lenders are using partnerships with out-of-State banks to circumvent State law interest rate limits, States are expressly authorized to opt out of section 27.").

[250] *Id.* As the Rule notes, only Iowa and Puerto Rico have opted out in this manner. *See id.* at 44,147-48.

[251] Section 525 provides that the opt-out extends to any state that "adopts a law or certifies that the voters of such State have voted in favor of any provision, constitutional or otherwise, which states explicitly and by its terms that such State does not want this section to apply *with respect to loans made in such State* . . . ." 12 U.S.C. § 1831d (note entitled "Effective Date") (emphasis added). Similarly, the Rule states that "if a State opts out of section 27 [§ 1831d], State banks *making loans in that State* could not charge interest at a rate exceeding the limit set by the State's laws, even if the law of the State where the State bank is located would permit a higher rate." 85 Fed. Reg. at 44,153 (emphasis added).

the bank, not the borrower, is located.[252] For this reason, most banks that regularly "export" high-interest rate loans are located in states with lax or nonexistent usury laws and take the necessary steps outlined by the FDIC to ensure all loans are deemed "made" in that state.

224.    Thus, even if a state exercises the right to opt out of § 1831d, that would not prevent a bank located in Utah, South Dakota, or any other state with no interest-rate caps from making a predatory loan to a borrower in the state that opted out. The Non-bank Interest Provision would permit any non-bank buyer of such a loan to charge interest in excess of lower rates caps in states like New York even if that buyer conducted its business *entirely in the state of New York*. Opting out of § 1831d would have no effect on the Non-bank Interest Provision's application to a loan made by an FDIC Bank in a no-rate-cap state like Utah and sold to a non-bank in a low-rate-cap state, like New York. Under the FDIC Rule, the buyer would remain exempt from New York's rate cap regardless of whether New York opted out of § 1831d. The opt-out therefore provides no meaningful relief for States interested in protecting consumers from predatory "rent-a-bank" partnerships between banks and non-bank lenders.

225.    Moreover, the FDIC's opt-opt theory puts to states an unwarranted Hobson's choice: accept the FDIC's unreasonable interpretation of § 1831d or deprive home-state FDIC Banks of § 1831d's benefits entirely.

226.    The FDIC's erroneous analysis of, and reliance on, the opt-out provision makes the Rule "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[253]

### G.    The FDIC Failed To Consider the Rule's Facilitation of Predatory "Rent-a-Bank" Schemes and Other Important Aspects of the "Problem"

#### 1.    The FDIC's Non-Bank Interest Provision Ignores the Problem of "Rent-a-Bank" Schemes

227.    Agency action is lawful only if it rests on "a consideration of the relevant factors"

---

[252] 85 Fed. Reg. at 44,148. According to the FDIC, a loan is deemed made "where three non-ministerial functions involved in making the loan occur—loan approval, disbursal of the loan proceeds, and communication of the decision to lend." *See id.* If all three of these functions are performed in the bank's home state, then the law of the bank's home state will apply.

[253] 5 U.S.C. § 706(2)(A).

and must be invalidated if the agency "entirely failed to consider an important aspect of the problem . . . ."[254] The core concern the Rule seeks to address is the applicability of state interest-rate caps to non-banks that purchase loans from FDIC Banks.

228.    "Rent-a-bank" schemes rely on precisely the type of transaction covered by the Rule: origination of a loan by a bank and sale of that loan to the "partner" non-bank. Whether the Rule will facilitate state-law evasion through "rent-a-bank" schemes is an important aspect of the problem at hand.

229.    As discussed above, at least three non-bank lenders operating in California and seeking to evade the state's interest-rate caps have announced plans to seek partnerships with banks, and one savings association located in California has already partnered with a non-bank lender in order to evade interest-rate caps and licensing rules applicable to non-bank lenders.

230.    Several comments described the danger that the FDIC Rule poses to consumers. For example,

    a.  AARP noted that the Non-bank Interest Rule "is likely to permit the growth of high-cost lending practices—such as payday loans, auto title loans, and installment loans—in states where they are presently restricted" and that "AARP is concerned that older borrowers who fall into a cycle of debt from high-cost lending have even fewer options to return to a solid financial footing, such as returning to work or taking on more hours." It also described how the Rule "opens the door more widely for high-interest nonbank lenders to operate in ways that contravene state protections for borrowers," expressed concern that it would facilitate the evasion of interest-rate caps in 33 states and the District of Columbia, and cited the announcements of several lenders planning to use "bank partnerships" to evade state rate caps.[255]

    b.  George Washington University Law School Professor Arthur E. Wilmarth, Jr.

---

[254] *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.
[255] Comment of AARP 1, 2 (Jan. 31, 2020).

cited research stating that the Rule "could encourage 'rent-a-bank' schemes where payday and other high-cost lenders launder their loans through banks in order to make loans up to 160% APR in states where those high rates are illegal."[256]

c.  Even a bankers' interest group, the Community Bankers Association of Illinois, acknowledged "some financial institutions and service providers seek to use a 'rent-a-bank' scheme to unjustifiably avoid state usury laws" and, in light of the Rule's facilitation of such schemes, urged the FDIC "to be vigilant, closely examine, and not permit such schemes that abuse financial services, to harm consumers and small businesses."[257]

d.  The Center for Responsible Lending's comment extensively detailed the financial situation of borrowers who have been targeted in "rent-a-bank" schemes and are likely to be harmed by the FDIC Rule. As the comment described, "A fundamental, perverse reality drives the high-cost loan market: Borrowers meeting this profile are not likely to have the ability to repay the loans high-cost lenders make to them; lenders know this and depend on it, as the interest rates are so high that they make money anyway." The comment provided numerous specific examples of individuals and families, many from California, Illinois, and North Carolina, harmed by the very lenders who have announced their intentions to evade state law interest-rate caps through the sort of "rent-a-bank" partnerships the Rule's Non-bank Interest Provision will facilitate but the FDIC failed to consider.[258]

231.  Despite receiving numerous comments regarding the Rule's facilitation of "rent-a-bank" schemes by predatory lenders, the FDIC failed to give meaningful consideration of this factor in the analysis provided with its Rule. The Rule's Non-bank Interest Provision will

---

[256] Comment of Arthur E. Wilmarth, Jr., Ex. A at 13 (Jan. 17, 2020) (quoting National Consumer Law Center, "FDIC/OCC Proposal Would Encourage Rent-a-Bank Predatory Lending" (Dec. 2019)).
[257] Comment of Community Bankers Association of Illinois 2 (Jan. 31, 2020).
[258] Comment of Center for Responsible Lending 47, 50-60 (Feb. 4, 2020).

facilitate these schemes by allowing predatory lenders to evade state law by partnering with an FDIC Bank to originate loans exempt from state interest-rate caps and selling those loans to the predatory lender. In the absence of the FDIC Rule, non-bank lenders would remain subject to state interest-rate caps.

> **2.     The Rule Fails To Address the Applicability of the True-Lender Doctrine and Ignores Evidence That It Would Give Rise to a Regulatory Vacuum in the Lending Market**

232.     In its rulemaking, the FDIC also ignored the "true lender" doctrine and its applicability to schemes designed to take advantage of the Rule's Non-bank Interest Provision to evade state law. The true-lender doctrine asks whether the entity claiming exemption from state interest-rate caps (usually a bank) is merely a pass-through that takes on no substantial financial risk. Under the true-lender doctrine, courts have rejected the applicability of rate-cap exemptions when the primary purpose of a bank's involvement in a lending scheme is the avoidance of state law.

233.     The extent to which the true-lender doctrine would apply to transactions designed to take advantage of the Non-bank Interest Provision is an "important aspect of the problem" that the FDIC expressly declined to consider.[259]

234.     Several comments suggested the Rule's facilitation of "rent-a-bank" schemes could be mitigated with FDIC guidance aimed at determining when the bank is the true lender.[260] But rather than consider the merits of such a proposal, the FDIC responded only that it "believes" whether a non-bank is the "true lender" and whether preemption under § 1831d extends to non-banks "are not so intertwined that they must be addressed simultaneously by rulemaking."[261] This

---

[259] *E.g.*, Comment of Adam J. Levitin 10-11 (Jan. 5, 2020); 85 Fed. Reg. at 44,146, 44,152.

[260] *E.g.*, Comment of Arthur E. Wilmarth, Jr. 3 (Jan. 17, 2020); Comment of National Association of Consumer Credit Administrators 2 (Feb. 4, 2020); Comment of Conference of State Bank Supervisors 3-5 (Feb. 4, 2020); *see also* 85 Fed. Reg. at 44,152.

[261] 85 Fed. Reg. at 44,152. On July 22, 2020, the OCC issued a proposed rule regarding the "true lender" doctrine, which courts use to determine which party is the actual lender of a loan. *See* OCC, *National Banks and Federal Savings Associations as Lenders*, 85 Fed. Reg.

is no answer. Because section § 1831d applies only to FDIC Banks, determining whether the FDIC Bank is the "true lender" in necessary for determining whether state interest-rate caps apply—the core issue the FDIC Rule seeks to address. In order to avoid issuing an arbitrary and capricious rule, the FDIC must consider the important aspects of the problem; it cannot simply ignore difficult elements of the problems its Rule seeks to address.

235.     "True lender" and "rent-a-bank" issues are "important aspect[s] of the problem" of the transferability of rate-cap exemptions, which the FDIC was duty-bound to consider.[262]

236.     The FDIC also failed to consider that its Rule would create a regulatory vacuum, leading to an absence of reasonable regulation and enforcement. FDIC Banks are permitted the privilege of interest-rate cap preemption because they are subject to a comprehensive regulatory regime that includes regular reporting requirements as well as supervisory visits by the FDIC and other federal regulators. The Rule's Non-bank Interest Provision, however, would extend that privilege to *any* buyer of loans issued by an FDIC Bank, regulated or not.

237.     For example, as noted above, the FDIC has not even considered whether provisions providing penalties for banks that charge interest in excess of that allowed by § 1831d(a) would apply to loan buyers pursuant to the Non-bank Interest Provision. The agency has failed to consider even the most basic aspects of regulation and enforcement implicated by its Rule.

238.     Because the FDIC entirely failed to consider important aspects of the problem its Non-bank Interest Provision seeks to address, the Non-bank Interest Provision is "arbitrary,

---

44,223, 44,224 n.17, 44,227 (July 22, 2020) (to be codified at 12 C.F.R. § 7.1031). In public remarks, the FDIC Chair stated she expects the FDIC to issue its own "true lender" rule at some point in the future. *See* Manatt, OCC Proposes Rule to Define the 'True Lender' Financial Services Law, https://www.manatt.com/insights/newsletters/financial-services-law/occ-proposes-rule-to-define-the (July 27, 2020) ("Federal Deposit Insurance Corporation Chair Jelena McWilliams stated during the board meeting on June 25, 2020, that the FDIC would address the true lender doctrine in a rulemaking."). Neither the OCC's "true lender" proposal nor the FDIC's apparently anticipated proposal is at issue in this lawsuit, and neither has bearing on whether the FDIC complied with its statutory obligations when it issued its present Rule.

[262] *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.

capricious, an abuse of discretion, or otherwise not in accordance with law."[263]

**H.     The FDIC Considered Matters Congress Did Not Intend It To Consider**

239.     In its final Rule, the FDIC emphasizes that the Non-bank Interest Provision will enable the FDIC to receive the highest price possible for loans it sells when it takes over the assets of failed banks.[264] The FDIC notes it has a "statutory obligation to maximize the net present value return from the sale or disposition of . . . assets [of failed banks held in FDIC-receivership] and minimize the amount of any loss . . . ."[265] Allowing non-banks to charge interest rates in excess of state law is good policy, the FDIC claims in its final Rule, because it will allow the agency itself to fetch higher prices for the bank loans it sells.

240.     However, this justification was entirely absent from the FDIC's Proposed Rule, denying the public the opportunity to comment on it. Indeed, the Proposed Rule never mentions the FDIC's role as receiver of failed banks, the Deposit Insurance Fund, or loan sales made by the FDIC itself.[266] The FDIC's reliance on a *post hoc* justification upon which there was no opportunity to comment alone is enough to render its Rule arbitrary and capricious.[267]

241.     Moreover, the FDIC failed to explain the facts that support its *post hoc* justification. Importantly, it never explains whether and to what extent state interest-rate caps actually affect the prices for loans the FDIC acquires from failed banks. These are facts known to the FDIC that undergird its justification, and the FDIC must explain the relationship between them and its decision to issue the Non-bank Interest Provision.

242.     Additionally, the FDIC's invocation of the Federal Deposit Insurance Fund as a justification for the Non-bank Interest Provision is not an acceptable basis for its Rule because

---

[263] 5 U.S.C. § 706(2)(A).
[264] 85 Fed. Reg. at 44,149; *see also Statement by FDIC Chairman Jelena McWilliams on the Final Rule: Federal Interest Rate Authority* 2 (June 25, 2020), https://www.fdic.gov/news/ speeches/spjun2520b.html ("The FDIC cannot maximize the return on sales of failed bank assets if the ability of banks to sell loans on the secondary market is undermined.").
[265] 85 Fed. Reg. at 44,149.
[266] 84 Fed. Reg. at 66,845-46 (setting forth the "Policy Objectives" of the Proposed Rule).
[267] 5 U.S.C. § 706(2)(A).

this is a factor "which Congress has not intended it to consider[.]"[268] Congress explicitly stated its purpose in exempting FDIC Banks from state-law interest rate caps: "to prevent discrimination against State-chartered insured depository institutions, including insured savings banks, or insured branches of foreign banks with respect to interest rates[.]"[269] Congress did not list among its objectives enabling the FDIC itself to sell loans to non-banks at higher prices. The statute does not describe the sale of loans by FDIC Banks themselves, much less by the FDIC as receiver. This concern, which the FDIC relies upon *post hoc* for the Non-bank Interest Provision, is far afield of the relevant statute and of the matters Congress intended the agency to consider in issuing rules under this statute.

243.    The FDIC similarly cites concern for bank "safety and soundness" as a reason underlying its Rule.[270] Like the agency's invocation of the Federal Deposit Insurance Fund, bank safety and soundness is a factor "which Congress has not intended it to consider"[271] in issuing rules under § 1831d. Even if it were, it is difficult to imagine how a rule that facilitates predatory lending and the evasion of state law is a safe and sound practice.

244.    The FDIC's *post hoc* reliance on factors Congress did not intend for it to consider render the Rule's Non-bank Interest Provision "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"[272] and "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."[273]

**I.    The FDIC Has Offered an Explanation for Its Decision That Is Counter to the Evidence and Failed To Explain How Evidence Supports Its Decision, To Examine the Relevant Data, and To Explain the Connection Between the Facts Found and the Choice Made**

245.    To support its Rule, the FDIC repeatedly emphasizes the importance of loan sales from FDIC Banks to non-banks as "central to the stability and liquidity of the domestic loan

---

[268] *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.
[269] 12 U.S.C. § 1831d.
[270] 85 Fed. Reg. at 44,152.
[271] *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.
[272] 5 U.S.C. § 706(2)(A).
[273] 5 U.S.C. § 706(2)(C).

markets."[274] The agency explains that "there is considerable evidence of uncertainty following the *Madden* decision"[275] and that that Rule will "address [this] uncertainty" and "mitigate the potential for future disruption to the markets for loan sales and securitizations . . . and a resulting contraction in availability of consumer credit."[276] But this explanation runs counter to the evidence before the agency, as the FDIC itself elsewhere acknowledges.

246.     In another section of its Rule, though, the FDIC affirmed, "While several commenters cited to studies discussing the adverse effects of *Madden* in the Second Circuit, as well as anecdotal evidence of increased difficulty selling loans made to borrowers in the Second Circuit post-*Madden*, the FDIC is not aware of any widespread or significant negative effects on credit availability or securitization markets having occurred to this point as a result of the *Madden* decision."[277] Accordingly, it "does not expect immediate widespread effects on credit availability" arising from its Rule.[278]

247.     The FDIC cannot have it both ways: it cannot both claim that the Rule will rectify the disruption to credit markets caused by *Madden* and state that it is unaware of any evidence of disruption and expects the Rule to have little effect on credit markets. Its equivocal stance on the facts and predictions underlying its Rule render the Rule arbitrary and capricious.

248.     Even ignoring the FDIC's own conflicting positions, its Rule is unsupported by the evidence in the record. As one comment put it, "the FDIC has presented no evidence that the sale of debt obligations with interest rates that exceed state usury caps is a material source of liquidity for any bank, much less for banks in general."[279] Banks primarily obtain liquidity through other means and do not generally rely on sales of non-mortgage loans for liquidity.[280] The FDIC's

---

[274] 85 Fed. Reg. at 44,149; *see also id.* at 44,151 ("State banks need the ability to sell loans in order to properly maintain their capital and liquidity.").
[275] *Id.* at 44,152.
[276] *Id.* at 44,155.
[277] *Id.* at 44,156.
[278] *Id.* at 44,155.
[279] Comment of Adam J. Levitin 7 (Jan. 5, 2020).
[280] *Id.*

1    explanation for its Rule is, thus, contrary to the evidence before it.[281]

2         249.    FDIC Banks may already sell their loans to any of the more than 5,200 other

3    FDIC-insured banks in the United States, all of which benefit from the state-law preemption

4    provisions of § 1831d or parallel provisions in the NBA, Home Owners' Loan Act, and other

5    federal banking laws.[282]

6         250.    The FDIC has likewise not shown that sales of loans to non-banks have been

7    significantly inhibited by *Madden*. If a non-bank buyer cannot charge the same rate of interest as

8    the selling bank, bank loans may be sold for a discounted purchase price, but the FDIC has not

9    shown that any such discount would materially interfere with any power granted by Congress.

10        251.    The FDIC touts the importance of FDIC Banks' transfer of loans to non-banks,

11   calling "securitizations, loan sales, and sales of participation interests in loans" "crucial to the

12   safety and soundness of these banks' operations."[283] It specifically cites "[s]ecuritizations" as "an

13   example of banks' reliance on the loan sale market to non-banks for liquidity."[284] But the FDIC's

14   claims about the importance of securitization and other loan transfers to non-banks are

15   misleading. As one commenter noted:

16          While banks of all sizes engage in residential *mortgage* securitization, most
            mortgage loans are already exempt from state usury laws. Only a handful of the
17          very largest banks engage in securitization of any other asset class. Other than
            securitization, banks rarely assign loans to non-banks other than selling charged-
18          off debts (for pennies on the dollar) or as part of rent-a-bank partnerships in which
            banks originate loans according to a non-bank's specifications for sale to a non-
19          bank.[285]

20        252.    The two empirical studies briefly mentioned in the FDIC Rule do not sufficiently

21   support the sweeping preemption of state usury caps, and the agency has not explained how they

22

23   _____

24       [281] *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.
         [282] Comment of Adam J. Levitin 8, 12 (Jan. 5, 2020); *see also, e.g.*, 12 U.S.C. § 85(a)
25   (preempting state-law interest-rate caps as applied to national banks); *id.* § 1463(g)(1) (same with
     respect to federal savings associations).
26       [283] 85 Fed. Reg. at 44,150.
         [284] *Id.* at 44,152.
27       [285] Comment of Adam J. Levitin, Attachment 3 at 8-9 (Jan. 5, 2020) (emphasis in
     original).
28

relate to its conclusions.[286] One of these studies relies on non-public proprietary data from three "marketplace-lending platforms," which are relatively novel players in the lending market and are not likely to be representative of the ordinary bank-loan programs (like credit cards) that were at issue in *Madden* and are directly affected by this Rule.[287]

253.   The other study cited in the Rule attempts to create a causal chain between the *Madden* decision and the number of bankruptcies later occurring in the Second Circuit.[288] Contrary evidence in the record demonstrates that consumers and small businesses are harmed by high interest-rate loans, and thus that *Madden* is likely to have been beneficial rather than harmful.[289] The FDIC never explains how or whether it considered the conflict between this study and other evidence in the record.

254.   The Rule provides no discussion of the methods used in these two studies, their results, or the substantive role, if any, they played in the FDIC's consideration of its Rule and regulatory comments,[290] rendering the agency's reliance on them arbitrary and capricious.[291]

255.   The FDIC repeatedly emphasizes that the "Administrative Procedure Act does not require an agency to produce empirical evidence in rulemaking[.]"[292] It states instead that that empirical evidence is unnecessary where, as here, the "agency's decision is primarily predictive."[293] But whatever the merits of this position, the FDIC "must," at the very least, "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made."[294] That requirement is satisfied when the agency's explanation is clear enough that its "path may reasonably be discerned."[295] But

---

[286] 85 Fed. Reg. at 44,155.
[287] *See generally* Comment of Colleen Honigsberg (Jan. 14, 2020).
[288] *See generally* Piotr Danisewicz and Ilaf Elard, "The Real Effects of Financial Technology: Marketplace Lending and Personal Bankruptcy" (July 5, 2018), http://dx.doi.org/10.2139/ssrn.3208908.
[289] *E.g.*, Comment of Center for Responsible Lending 50-60 (Feb. 4, 2020).
[290] 85 Fed. Reg. at 44,155.
[291] 5 U.S.C. § 706(2)(A).
[292] 85 Fed. Reg. at 44,152.
[293] *Id.* (quotation and citation omitted).
[294] *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (internal quotation and citation omitted).
[295] *Id.* (internal quotation and citation omitted).

where an agency "has failed to provide even that minimal level of analysis, its action is arbitrary and capricious and so cannot carry the force of law."[296] Moreover, an agency may not rely on "an explanation for its decision that runs counter to the evidence before [it]."[297]

256.    For the reasons stated above, the FDIC did not carry its burden here, rendering the Non-bank Interest Provision arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law.[298]

## CLAIM 1

## AGENCY ACTION THAT IS ARBITRARY, CAPRICIOUS, AN ABUSE OF DISCRETION, AND OTHERWISE NOT IN ACCORDANCE WITH LAW

257.    The States incorporate by reference the foregoing paragraphs.

258.    Under the APA, a reviewing court shall set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[299]

259.    Among other things, the FDIC Rule

    a.    is contrary to the plain statutory language of § 1831d that it purports to interpret;

    b.    ignores elements of the statutory scheme contrary to the FDIC's interpretation;

    c.    relies on statutory provisions that provide no support to the agency's view;

    d.    is contrary to the express will of Congress and the presumption against preemption;

    e.    conflicts with the FDIC and other federal bank regulators' longstanding interpretation of the reach of federal preemption under § 1831d and other equivalently interpreted statutes;

    f.    exceeds the agency's statutory authority and impermissibly seeks to overturn a federal court's construction of an unambiguous statute;

    g.    fails to consider important aspects of the problem, including the Rule's facilitation of "rent-a-bank" schemes, the applicability of the true-lender doctrine, and the

---

[296] *Encino Motorcars*, 136 S. Ct. at 2125.
[297] *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.
[298] 5 U.S.C. § 706(2)(A).
[299] *Id.*

Rule's creation of a regulatory vacuum, effectively exempting some market participants from both state and federal oversight;

h.  rests on factors Congress did not intend the FDIC to consider; and

i.  is contrary to the evidence that the sales of loans to non-banks are not an important source of liquidity for FDIC Banks and fails to explain whether and how the facts in the administrative record support the FDIC's decision.

260.   Thus, for the many reasons stated above, the FDIC Rule is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law, and the Court should set it aside under 5 U.S.C. § 706(2)(A).

### CLAIM 2

**AGENCY ACTION IN EXCESS OF STATUTORY JURISDICTION, AUTHORITY, OR LIMITATIONS, OR SHORT OF STATUTORY RIGHT**

261.   The States incorporate by reference the foregoing paragraphs.

262.   Under the APA, a reviewing court shall set aside agency action "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."[300]

263.   Among other things, the FDIC Rule

a.  is contrary to the plain statutory language of § 1831d that it purports to interpret;

b.  ignores elements of the statutory scheme contrary to the FDIC's interpretation;

c.  is contrary to the express will of Congress and the presumption against preemption; and

d.  exceeds the agency's statutory authority and impermissibly seeks to overturn a federal court's construction of an unambiguous statute.

264.   Thus, for the many reasons stated above, the FDIC Rule is in excess of statutory jurisdiction, authority, or limitations, and short of statutory right, and the Court should set it aside under 5 U.S.C. § 706(2)(C).

### DEMAND FOR RELIEF

265.   The States respectfully request that this Court enter a judgment in their favor and

---

[300] 5 U.S.C. § 706(2)(C).

grant the following relief:

        A.     Declare that the FDIC violated the APA because its Rule is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

        B.     Declare that the FDIC violated the APA because its Rule is in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

        C.     Declare that the FDIC violated the APA because its Rule constitutes agency action taken without procedure required by law;

        D.     Hold unlawful and set aside the FDIC Rule's Non-bank Interest Provision, codified at 12 C.F.R. § 331.4(e); and

        E.     Grant other relief as the Court deems just and proper.

Dated: August 20, 2020                 Respectfully submitted,

                                XAVIER BECERRA
                                Attorney General of California
                                NICKLAS A. AKERS
                                Senior Assistant Attorney General

                                */s/ Devin W. Mauney*
                                DEVIN W. MAUNEY
                                Deputy Attorney General

                                  Office of Attorney General
                                Consumer Protection Section
                                1515 Clay St., 20th Floor
                                Oakland, California 94612
                                Phone: (510) 879-0814
                                Fax: (510) 622-2270
                                Email: devin.mauney@doj.ca.gov

                                *Attorneys for Plaintiff*
                                *the People of the State of California*

                                KARL A. RACINE
                                Attorney General

                                */s/ Benjamin M. Wiseman*

BENJAMIN M. WISEMAN*
Director, Office of Consumer Protection

Attorney General for the District of Columbia
400 6th St. N.W., 10th Floor
Washington, D.C. 20001
Phone: (202) 741-5226
Email: Benjamin.wiseman@dc.gov

*Attorneys for Plaintiff the District of Columbia*


KWAME RAOUL
Attorney General of Illinois
GREG GRZESKIEWICZ
Bureau Chief

 */s/ Erin Grotheer*
ERIN GROTHEER*
Assistant Attorney General

Office of the Illinois Attorney General
Consumer Fraud Bureau
100 W. Randolph St., 12th Floor
Chicago, Illinois 60601
Phone: (312) 814-4424
Email: egrotheer@atg.state.il.us

*Attorneys for Plaintiff*
*the People of the State of Illinois*


MAURA HEALEY
Attorney General of the
Commonwealth of Massachusetts

 */s/ Brendan T. Jarboe*
BRENDAN T. JARBOE*
Assistant Attorney General

Consumer Protection Division
Office of Attorney General Maura Healey
One Ashburton Place
Boston, MA 02108
Phone: (617) 727-2200

\* Not yet admitted to the Bar of this Court.

1    Email: brendan.jarboe@mass.gov

2    *Attorneys for Plaintiff*
     *the Commonwealth of Massachusetts*
3

4
     KEITH ELLISON
5    Attorney General of Minnesota

6     /s/ Adam Welle
7    ADAM WELLE*
     Assistant Attorney General
8
     Minnesota Attorney General's Office
9    Bremer Tower, Suite 1200
     445 Minnesota Street
10   St. Paul, MN 55101
     Phone: (651_ 757-1425
11   Email: adam.welle@ag.state.mn.us

12
     *Attorneys for Plaintiff the State of Minnesota*
13

14
     GURBIR S. GREWAL
15   Attorney General of New Jersey

16    /s/ Tim Sheehan
17   TIM SHEEHAN*
     Deputy Attorney General
18   New Jersey Office of the Attorney General
     25 Market Street
19   Trenton, New Jersey 08625
     Phone: (609) 815-2604
20   Email:
     tim.sheehan@law.njoag.gov
21

22   *Attorneys for Plaintiff the State of New Jersey*

23
     LETITIA JAMES
24   Attorney General of New York
     JANE M. AZIA
25   Bureau Chief

26    /s/ Christopher L. McCall
27   CHRISTOPHER L. MCCALL*
     Assistant Attorney General
28

74

Office of the New York State Attorney General
Consumer Frauds & Protection Bureau
28 Liberty Street
New York, New York 10005
Phone: (212) 416-8303
Email: christopher.mccall@ag.ny.gov

*Attorneys for Plaintiff*
*the People of the State of New York*


JOSHUA H. STEIN
Attorney General of North Carolina
KEVIN ANDERSON
Division Director

 /s/ Daniel P. Mosteller
DANIEL P. MOSTELLER*
Special Deputy Attorney General

North Carolina Attorney General Office
Consumer Protection Division
114 W. Edenton Street
P.O. Box 629
Raleigh, North Carolina 27602
Phone: (919) 716-6000
Email: dmosteller@ncdoj.gov

*Attorneys for Plaintiff*
*the State of North Carolina*

Complaint for Declaratory and Injunctive Relief – Case No. 20-5860