Seth E. Mermin (CA SBN 189194)
Eliza J. Duggan (CA SBN 312621)
UC BERKELEY CENTER FOR
CONSUMER LAW & ECONOMIC JUSTICE
University of California, Berkeley
School of Law
Berkeley, CA 94720-7200
Email: tmermin@law.berkeley.edu
Telephone: (510) 393-8254
Facsimile: (510) 849-1536

*Counsel for* Amicus Curiae *Professor Adam J. Levitin*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

| | |
|---|---|
| PEOPLE OF THE STATE OF CALIFORNIA *ex rel.* Xavier Becerra, Attorney General of California; DISTRICT OF COLUMBIA, by its Attorney General Karl A. Rice; PEOPLE OF THE STATE OF ILLINOIS *ex rel.* Kwame Raoul, Attorney General of Illinois, COMMONWEALTH OF MASSACHUSETTS *ex rel.* Maura Healey, Attorney General of Massachusetts; STATE OF MINNESOTA, by its Attorney General Keith Ellison; STATE OF NEW JERSEY, by its Attorney General Gurbir S. Grewal; PEOPLE OF THE STATE OF NEW YORK *ex rel.* Letitia James, Attorney General of New York; and STATE OF NORTH CAROLINA *ex rel.* Joshua H. Stein, Attorney General of North Carolina<br><br>Plaintiffs,<br><br>v.<br><br>THE FEDERAL DEPOSIT INSURANCE CORPORATION,<br><br>Defendant. | Case No. 20-cv-5860-JSW<br><br>**BRIEF OF PROFESSOR ADAM J. LEVITIN AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**<br><br>Date:   August 6, 2021<br>Time:   9:00 a.m.<br>Judge: Hon. Jeffrey S. White<br>Crtrm: Courtroom 5, 2nd Floor<br>        1301 Clay Street<br>        Oakland, CA 94612 |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iii

INTRODUCTION ............................................................................................................ 1

INTEREST OF AMICUS CURIAE ................................................................................ 3

ARGUMENT .................................................................................................................. 4

I.   The Rule Is Inconsistent with the Common Law Incorporated into the Federal Deposit Insurance Act ............................................................................................................. 6

    A.   The common law incorporated into the National Bank Act includes a strong anti-evasion doctrine that is contrary to the Rule and that the FDIC failed to address ......................... 8

    B.   The "valid-when-made" doctrine is a 21st century invention and was not part of the common law background of the National Bank Act of 1864 ........................................... 11

        1.   The "valid-when-made" doctrine could not have pre-dated and been incorporated into the National Bank Act because it addresses a problem created by the National Bank Act .................................................................................................................. 11

        2.   The 19th century cases the FDIC relies upon for the "valid-when-made" doctrine have nothing to do with the effect of assignment on usury ................................................. 12

        3.   The only court ever to consider whether valid-when-made was part of the common law background of the National Bank Act rejected the doctrine's supposed historicity ... 17

    B.   The common law of assignments is irrelevant because interest rate exportation is a non-assignable personal privilege of a State Bank, not a feature of a note ............................. 18

II.  The FDIC's Claims About the Rule's Impact on Bank Liquidity Are Unsupported ............. 19

    A.   The FDIC presents no evidence that the *Madden* decision impacted bank liquidity ........ 19

    B.   The Rule has not historically been necessary to ensure bank liquidity ........................... 21

    C.   State usury laws are already pre-empted for most loans in the main secondary market for bank loans .................................................................................................................. 21

    D.   When banks need emergency liquidity, they go to the Fed's discount window instead of engaging in a lengthy process of trying to sell loans in the open market ......................... 21

    E.   Even without the Rule, banks seeking liquidity from loan sales can always turn to a secondary market of over 5,000 other banks that are not subject to usury laws ............... 23

    F.   The Rule is not protecting bank liquidity, but the price at which banks can sell loans .... 25

CONCLUSION ............................................................................................................... 25

APPENDIX A ................................................................................................................. 27

APPENDIX B ................................................................................................................. 122

APPENDIX C ................................................................................................................. 135

APPENDIX D ................................................................................................................. 146

i

APPENDIX E ............................................................................................ 162

APPENDIX F ............................................................................................ 272

APPENDIX G ........................................................................................... 278

Brief of Professor Adam J. Levitin
as *Amicus Curiae*
Case No. 20-cv-5860-JSW

# TABLE OF AUTHORITIES

**Reported Cases**

*Anderson v. Hershey*
    17 F.2d 884 (6th Cir. 1942) ..................................................9

*Andrews v. Pond*,
    38 U.S. 65 (1839)..................................................................8

*Astoria Fed. Sav. & Loan Ass'n v. Solimino*,
    501 U.S. 104 (1991)...........................................................5, 7

*Bank of Lumpkin v. Farmers' State Bank*,
    161 Ga. 801 (Ga. 1926) ......................................................9

*Barry v. Paranto*,
    97 Minn. 265 (Minn. 1906) .................................................9

*Beacham v. Carr*,
    122 Fla. 736 (Fla. 1936) ...................................................10

*Coral Gables First Nat'l Bank v. Constructors of Fla., Inc.*,
    119 So. 2d 741(Fla. Dist. Ct. App. 1960) .........................16

*Cram v. Hendricks*,
    7 Wend. 569 (N.Y. Ct. for the Correction of Errors 1831)...................................15

*Crim v. Post*,
    41 W.Va. 397 (W.V. 1895) .................................................9

*Daniel v. First Nat'l Bank of Birmingham*,
    227 F.2d 353 (5th Cir. 1956) .............................................10

*De Wolf v. Johnson*,
    23 U.S. 367 (1825)..............................................................8

*Evans v. Nat'l Bank of Savannah*,
    251 U.S. 108 (1919)...........................................................13

*FDIC v. Lattimore Land Corporation*,
    656 F.2d 139 (5th Cir. 1981) ...................................... 15-16

*FDIC v. Tito Castro Constr.*,
    548 F. Supp. 1224 (D.P.R. 1982)......................................16

*Fidelity Sec. Corp. v. Brugman*,
    137 Ore. 38 (Ore. 1931) ........................................................................9

*First Nat'l Bank v. Phares*,
    174 P. 519 (Okla. 1918) .......................................................................9

*Gaither v. Farmers' & Mechanics' Bank of Georgetown*,
    26 U.S. (1 Pet.) 37 (1828) ........................................................13, 14, 15

*Highway Equip. & Supply Co. v. Jones*,
    153 N.W.2d 859 (Neb. 1967)................................................................16

*Hoffman v. Key Federal Sav. and Loan Ass'n*,
    416 A.2d 1265 (Md. 1979) ...................................................................16

*Huntsman v. Longwell*,
    4 F.2d 105 (5th Cir. 1925) ............................................................... 15-16

*Isbrandtsen Co.* v. *Johnson*,
    343 U.S. 779, 783 (1952) .....................................................................7

*Knights v. Putnam*,
    20 Mass. 184, 185 (Mass. 1825) .........................................................15

*Madden v. Midland Funding LLC*,
    786 F.3d 246 (2d Cir. 2015)...............................................19, 20, 21, 23, 25

*Missouri, Kansas & Texas Trust Co. v. Krumseig*,
    172 U.S. 351 (1899) .............................................................................9

*Milana v. Credit Discount Co.*,
    27 Cal. 2d 335 (Cal. 1945) .................................................................10

*Miller v. Tiffany*,
    68 U.S. 298 (1864)...............................................................................9

*Motor Vehicle Mfrs. Ass'n v. State Farm Ins.*,
    463 U.S. 29 (1983)..............................................................................10

*Munn v. Comm'n Co.*,
    15 Johns. 44 (N.Y. Sup. Ct. 1818) .......................................................15

*Nat'l Bank of Gloversville v. Johnson*,
    104 U.S. 271 (1881)............................................................................13

iv

*Nichols v. Fearson*,
   32 U.S. (7 Pet.) 103 (1833) ................................................13, 14, 15

*Olvera v. Blitt & Gaines, P.C.*,
   431 F.3d 285 (7th Cir. 2005) ...............................................19

*Pope v. Marshall*,
   78 Ga. 635 (Ga. 1887) ..........................................................9

*Rangen, Inc. v. Valley Trout Farms, Inc.*,
   658 P.2d 955, 959 (Id. 1983) ...............................................16

*Rent-Rite SuperKegs W., Ltd. v. World Bus. Lenders, LLC*
   *(In re Rent-Rite SuperKegs W., Ltd.)*,
   603 B.R. 41 (Bankr. D. Colo. 2019) ....................................17

*Sachs v. Ginsberg*,
   87 F.2d 28, 30 (D.C. Cir. 1936) ...........................................9

*Samantar v. Yousuf*,
   560 U.S. 305, 320 (2010) ......................................................7

*Saul v. Midlantic Nat'l Bank*,
   572 A.2d 650 (N.J. App. Div. 1990).....................................16

*Scott v. Lloyd*,
   34 U.S. 418 (1835)................................................................8

*Seeman v. Phila. Warehouse Co.*,
   274 U.S. 403, 408 (1927) ......................................................9

*Southwest Concrete Products. v. Gosh Construction Corp.*,
   51 Cal.3d 701 (Cal. 1990).....................................................16

*Strike v. Trans-West Discount Corp.*,
   92 Cal.App.3d 735 (Cal. Ct. App. 1979) .........................11, 12

*Tate v. Wellings*,
   100 Eng. Rep. 716 (K.B. 1790) .............................................16

*Taylor v. Bruce*,
   21 Va. 42 (Va. 1820).............................................................15

*Tuttle v. Clark*,
   4 Conn. 153 (Conn. 1822)......................................................15

v

*United States v. Tex.*,
    507 U.S. 529, 534 (1993) .................................................................7

*Unity Plan Finance Co. v. Green*,
    155 So. 900 (La. 1934) ................................................................16

*Voisine v. United States*,
    136 S. Ct. 2272, 2286 (2016) ...................................................5, 6

*Waggener v. Holt Chew Motor Co.*,
    274 P.2d 968 (Colo. 1954) ...........................................................16

*Wetmore v. Brien & Bradley*,
    40 Tenn. 723 (Tenn. 1859) ...........................................................8

*Whitworth & Yancey v. Adams*,
    26 Va. 333 (Va. 1827)...................................................................8

*Zang v. Schumann*,
    262 Wisc. 570 (Wisc. 1952) .......................................................16


**Unreported Decisions**

Order on Bankruptcy Court's Determination, *In re: Rent-Rite Superkegs West Ltd.*,
    No. 19-cv-01552 (D. Colo. Aug. 12, 2020)..........................17, 18


**Other Litigation**

*Meade, Uniform Consumer Credit Code Administrator v. Marlette Funding, LLC*,
    No. 17-30376 (Colo. Dist. Ct.) ....................................................3

*Meade, Uniform Consumer Credit Code Administrator v. Avant of Colorado LLC*,
    No. 17-cv-30377 (Colo. Dist. Ct.) ...............................................3


**Codified Federal Statutory Provisions**

5 U.S.C. § 706 ................................................................4, 7, 10 ,11, 19, 20, 25
12 U.S.C. § 85............................................................... 4, 5, 7, 8, 10, 13
12 U.S.C. § 1735f-7 ..............................................................21, 22
12 U.S.C. § 1735f-7a ............................................................21, 22
12 U.S.C. § 1831d (FDIA § 27) ...................................................... *passim*
12 U.S.C. § 2901................................................................................1

vi

**Federal Register**

Final Rule, "Federal Interest Rate Authority,"
  85 Fed. Reg. 44146 (July 22, 2020)............................................................... *passim*

Final Rule, "Permissible Interest on Loans That Are Sold, Assigned, or
  Otherwise Transferred,"
  85 Fed. Reg. 33530 (June 2, 2020) ....................................................................5, 7

Proposed Rule, "Federal Interest Rate Authority,"
  84 Fed. Reg. 66845 (Dec. 6, 2019) ...........................................................7, 11, 18

Proposed Rule, "Permissible Interest on Loans That Are Sold, Assigned, or Otherwise
  Transferred," 84 Fed. Reg. 64229 (Nov. 21, 2019) ................................................7

**Other Federal Agency Materials**

Board of Governors of the Federal Reserve System (US),
  Total Assets, All Commercial Banks......................................................................24

FDIC, *Statistics at a Glance*, Dec. 30, 2020.......................................................6, 23

Statement by FDIC Chairman Jelena McWilliams on the Notice of Proposed Rulemaking:
Federal Interest Rate Authority, FDIC Board Meeting,
  (Nov. 19 2019) ....................................................................................................7, 12

**Federal Legislative Materials**

*Transparency in Small Business Lending*,
  Hearing Before the H. Comm. on Small Business, 116th Cong. (Sept. 9, 2020)
  (statement of Professor Adam J. Levitin) ...............................................................3

*Examining Opportunities and Challenges in the Financial Technology ("Fintech")
  Marketplace*, Hearing Before the H. Fin. Servs. Comm., Subcommittee on
  Financial Institutions and Consumer Credit, 115th Cong. (Jan. 30, 2018)
  (testimony of Professor Adam J. Levitin)...............................................................4

**State Constitutions**

CAL. CONST. Art. XV, sec. 1 ...............................................................................23

1

**State Statutes**

2

ARIZ. REV. STAT. 44-1201 ...............................................................................23

3

D.C. CODE § 26-1401.08 ...............................................................................23

4

205 ILL. COMP. STAT. 5/5 ...............................................................................23

5

6

MASS. GEN. L. chs. 167F ...............................................................................23

7

MINN. STAT. § 48.61 ...............................................................................23

8

N.Y. BANKING L. § 12-a ...............................................................................23

9

N.J. STAT. ANN. § 17:9A-25.5 ...............................................................................23

10

11

**State Regulatory Materials**

12

Iowa Division of Banking,
        Number of Banks ...............................................................................24

13

14

Iowa Division on Banking, Iowa State Chartered Banks: Net Loans and Leases,
        Total Deposits, and Total Assets ...............................................................................24

15

16

17

**Uniform State Laws**

18

Uniform Commercial Code, § 3-415 ...............................................................................14

19

20

**Amicus Briefs in Other Litigation**

21

*Amicus Curiae* Brief of the Federal Deposit Insurance Corporation and the Office
        of the Comptroller of the Currency in Support of Affirmance and Appellee,
        *Rent-Rite Super Kegs West, Ltd., v. World Business Lenders, LLC*,
        No. 1:19-cv-01552-REB (D. Colo.) ...............................................................12, 17

22

23

24

*Amicus Curiae* Brief of Professor Adam J. Levitin in Support of Appellant,
        *Rent-Rite Super Kegs West, Ltd. v. World Business Lenders, LLC*,
        1:19-cv-01552-REB (D. Colo.) ............................................................... 17

25

26

*Amicus Curiae* Brief for the United States,
        *Midland Funding, LLC v. Madden*,
        136 S. Ct. 1484 (No. 15-160) ...............................................................12

27

28

viii

**Comments on the Rule**

Comment of AARP (Jan. 31, 2020)...................................................................10

Comment of the Center for Responsible Lending *et al*. (Feb. 4, 2020)...........10

Comment of Professor Adam J. Levitin (Jan. 5, 2020) ...............................10, 20

Comment of Senator Sherrod Brown *et al*. (Nov. 21, 2019) .............................10

Comment of the Structured Finance Association and Bank Policy Institute
        (Feb. 4, 2020) ...............................................................................12, 14

**Miscellaneous Authorities**

James M. Ackerman*, Interest Rates and the Law: A History of Usury*,
        1981 ARIZ. ST. L.J. 61 (1981) .................................................................1

BLACKSTONE's *COMMENTARIES ON THE LAWS OF ENGLAND* (1838 ed.)...............12

Adam J. Levitin, *Hydraulic Regulation: Regulating Credit Markets Upstream*,
        26 YALE J. REG. 145 (2009)......................................................................4

Adam J. Levitin, *"Madden Fix" Bills Are a Recipe for Predatory Lending*,
        AMERICAN BANKER (Aug. 28, 2017) ..........................................................4

Adam J. Levitin, *Rent-a-Bank: Bank Partnerships and the Evasion of State
        Usury Laws*, 71 DUKE L.J. (forthcoming)...........................................4, 17

NAT'L CONS. L. CTR., CONSUMER CREDIT REGULATION (2020)  ......................24

National Consumer Law Center, *High-Cost Rent-a-Bank Loan Watch List* (2020)............3

RESTATEMENT (2D) OF THE LAW, CONTRACTS ..................................................18

RULING CASE LAW (1920)  .............................................................................10

John J. Schroeder, *"Duel" Banking System? State Bank Parity Laws: An Examination of
Regulatory Practice, Constitutional Issues, and Philosophical Questions*,
        36 IND. L. REV. 197, 203 (2003) .............................................................23

WILLISTON ON CONTRACTS (4th ed.)  ..............................................................18

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# INTRODUCTION

The Federal Deposit Insurance Corporation ("FDIC") has undertaken a rulemaking that if upheld will create a regulatory vacuum in which high-cost nonbank lenders will be free to prey upon consumers without regard for either state usury laws or federal regulation. Not only is the rulemaking bad policy, but it is also patently illegal under the Administrative Procedures Act because it is contrary to law and is unsupported by evidence. The Court should strike down the FDIC's ill-advised rule.

State usury laws have served as the cornerstone of consumer credit regulation since colonial times. *See* James M. Ackerman, *Interest Rates and the Law: A History of Usury*, 1981 ARIZ. ST. L.J. 61, 85 (1981). State usury laws continue to bind all manner of lenders, including state-chartered banks with federal deposit insurance ("State Banks"), although state banks are subject to a special federal choice of law rule. Section 27 of the Federal Deposit Insurance Act ("FDIA"), 12 U.S.C. § 1831d, provides that State Banks are subject to the usury law of their chartering state, rather than the usury law of the borrower's state. Section 27 enables State Banks to "export" the usury law of their home state to other states. Thus, if a State Bank is chartered in a state with a high usury cap, it is the chartering state's cap that applies to the bank, even when the bank lends in a state with a lower usury cap. The right of interest rate exportation is part of a bundle of privileges and burdens that come with federal deposit insurance. For example, only federally insured depositaries are subject to supervisory oversight by the FDIC or other federal banking regulators or are subject to the requirements of the Community Reinvestment Act, 12 U.S.C. §§ 2901 *et seq*.

It is beyond peradventure that the privileges of federal deposit insurance do not extend beyond the State Bank. Maintenance of the strict distinction between State Banks and all other entities—even those closely affiliated with them—is fundamental to the FDIA because only State Banks are subject to the full panoply of FDIC regulation. Allowing the privileges of federal deposit insurance to spill over to entities not regulated as State Banks would undo Congress's carefully drawn regulatory boundaries and undermine the balance of privileges and obligations that attend federal deposit insurance.

1

The instant litigation has arisen because the FDIC, the regulatory agency charged with oversight of State Banks, seeks to puncture the legislative membrane separating state-chartered insured banks and all other entities, enabling the privileges—but not the obligations—of State Banks to seep out to entities that are outside the scope of the FDIC's regulatory ambit. Specifically, the FDIC has promulgated a final rule on "Federal Interest Rate Authority," 85 Fed. Reg. 44146-58 (July 22, 2020) (to be codified at 12 C.F.R. §§ 331.1-331.4) (the "Rule"). The Rule provides that:

> Whether interest on a loan is permissible under section 27 of the Federal Deposit Insurance Act is determined as of the date the loan was made. Interest on a loan that is permissible under section 27 of the Federal Deposit Insurance Act shall not be affected by a change in State law, a change in the relevant commercial paper rate after the loan was made, or the sale, assignment, or other transfer of the loan, in whole or in part.

85 Fed. Reg. 44158 (to be codified at 12 C.F.R. §§ 331.4(e)).

The Rule extends section 27 to *nonbank* assignees of State Banks, even though these assignees are beyond the scope of the FDIA or FDIC regulation. Under the Rule, a State Bank's statutory privilege of interest rate exportation is in effect deemed to be a provision of any loan made by the bank. The result is that the usury cap applicable to the bank by virtue of section 27 of the FDIA travels with the loan when it is assigned to nonbanks, even though the nonbank would not be entitled to charge the same interest rate if it had made the loan itself.

At stake with the choice of law question addressed by the Rule is the ability of states to protect their residents from predatory lending. The Rule would enable heavily regulated state-chartered insured banks to transfer a statutory privilege—but not the concomitant statutory responsibilities—to nonbanks that are otherwise subject to the usury laws of the states in which they do business. While the FDIC claims that the Rule is merely a "clarification" of the statutory privilege given to State Banks, 85 Fed. Reg. 44146, the Rule is in fact a regulation governing the application of state usury laws to *nonbanks* and thus wholly outside the scope of the FDIC's regulatory authority.

The Rule provides nonbanks with a ready method of evading state regulation, enabling the nonbank lenders to do indirectly that which they cannot do directly. Under the Rule, a nonbank

2

would be exempt from state usury law for a loan that it purchased from a state-chartered insured bank, even if state usury law would cover an identical loan that the nonbank made itself.

Nonbanks have long attempted to exploit this sort of "shelter" argument to evade state usury laws. In particular, the Rule is an invitation for nonbanks to partner with banks to evade usury laws ("rent-a-bank partnerships"). In a rent-a-bank partnership, a nonbank lender partners with a complicit bank to originate high interest rate loans for it on spec. The nonbank then purchases the loans from the bank and claims shelter from state usury laws by virtue of the bank having originated the loan.

This type of rent-a-bank scheme has previously been used extensively by payday lenders,[1] and is still utilized by marketplace lenders[2] and subprime small business lenders,[3] including with the involvement of FDIC regulated institutions.[4] If upheld, the Rule would enable nonbank lenders to evade state regulation without subjecting them to an alternative federal regulatory system; there is no general federal regulation prohibiting "high cost" or "predatory" lending. The result is a regulatory vacuum that is a recipe for abuse of consumer borrowers.

If the Rule is allowed to stand, it will eviscerate the oldest and most fundamental form of consumer financial protection and unleash a wave of predatory lending on American consumers.

## INTEREST OF AMICUS CURIAE

*Amicus curiae* Adam J. Levitin is the Anne Fleming Research Professor and Professor of Law at Georgetown University Law Center in Washington, D.C. Professor Levitin's scholarship

---

[1] The FDIC took action nearly twenty years ago to shut down payday lending rent-a-bank arrangements, *See* FDIC, Guidelines for Payday Lending, FIL-14-2005; *In the Matter of First Bank of Delaware*, FDIC-07-256b and FDIC-07-257k (2008), but has not subsequently acted to shut down non-payday subprime rent-a-bank lending.

[2] *See, e.g.*, *Meade, Uniform Consumer Credit Code Administrator v. Marlette Funding, LLC*, No. 17-30376 (Colo. Dist. Ct.); *Meade, Uniform Consumer Credit Code Administrator v. Avant of Colorado LLC*, No. 17-cv-30377 (Colo. Dist. Ct.).

[3] *See Transparency in Small Business Lending: Hearing Before the H. Comm. on Small Business*, 116th Cong. (Sept. 9, 2020) (statement of Professor Adam J. Levitin).

[4] National Consumer Law Center, *High-Cost Rent-a-Bank Loan Watch List*, https://bit.ly/3gOJ2lf (last visited Apr. 25, 2021 at 12:12am) (listing five FDIC-supervised institutions: Community Capital Bank, FinWise Bank, First Electronic Bank, Republic Bank & Trust (Kentucky), and TAB Bank, as involved in high-cost rent-a-bank lending).

3

and teaching focuses on consumer finance regulation and commercial law, including the law of usury and the law of negotiable instruments.

Professor Levitin has previously written about the origins of the "valid-when-made" doctrine and the effects of preemption of state consumer protection laws in rent-a-bank transactions. *See* Adam J. Levitin, *Rent-a-Bank: Bank Partnerships and the Evasion of State Usury Laws*, 71 DUKE L.J. (forthcoming), *available at* https://ssrn.com/abstract=3684244) (attached as Appendix A); Adam J. Levitin, *"Madden Fix" Bills Are a Recipe for Predatory Lending*, AMERICAN BANKER, Aug. 28, 2017; Adam J. Levitin, *Hydraulic Regulation: Regulating Credit Markets Upstream*, 26 YALE J. REG. 145 (2009). He has also testified before Congress over thirty times, including at a hearing specifically addressing the "valid-when-made" doctrine. *Examining Opportunities and Challenges in the Financial Technology ("Fintech") Marketplace*, Hearing Before the H. Fin. Servs. Comm., Subcommittee on Financial Institutions and Consumer Credit, 115th Cong., Jan. 30, 2018 (testimony of Professor Adam J. Levitin). In 2008, Professor Levitin served as an expert witness for the FDIC in litigation against three state-chartered insured banks that were engaged in rent-a-bank schemes.

Professor Levitin believes that his expertise regarding the history of usury regulation in the United States will be helpful to the Court, particularly regarding the FDIC's claims about the consistency of the Rule with common law. Professor Levitin also believes that his expertise in consumer finance and bank regulation generally will be helpful to the Court in understanding the implications of the Rule for both bank safety-and-soundness and consumer protection concerns.

Professor Levitin has authored and funded his brief entirely himself. He has no financial stake in the litigation.

## ARGUMENT

The Rule must be set aside under the Administrative Procedures Act ("APA") because it is "not in accordance with law," "arbitrary and capricious," "in excess of statutory …authority," and "without observance of procedure required by law." 5 U.S.C. § 706(2).

The Rule is "not in accordance with law" because it is contrary to the common law in 1864 that was incorporated into the FDIA. FDIA section 27 was enacted in 1980. Section 27 is modeled

4

on section 85 of the National Bank Act of 1864 and is construed *in pari materia* with section 85. 85 Fed. Reg. 44147. The National Bank Act incorporates the common law of contracts and usury as it existed in 1864. Therefore both the NBA and section 27 of the FDIA must be interpreted consistently with that common law. *E.g., Voisine v. United States*, 136 S. Ct. 2272, 2286 (2016) ("we presume that Congress legislates against the backdrop of the common law"); *Astoria Fed. Sav. & Loan Ass'n* v. *Solimino,* 501 U.S. 104, 108 (1991) ("Congress is understood to legislate against a background of common law"). Indeed, the Office of the Comptroller of the Currency, which administers the National Bank Act, has stated "Because Congress is presumed to legislate with knowledge of, and incorporate, common law, it is reasonable to interpret section 85 in light of these tenets." 85 Fed. Reg. 33530, 33532 (June 2, 2020).

The rulemaking incorrectly characterizes the common law background of the National Bank Act in three ways. First, the FDIC ignores a key feature of the common law that existed in 1864, namely usury law's clearly articulated anti-evasion doctrine. The National Bank Act—and thus section 27 of the FDIA—must be interpreted consistently with the anti-evasion doctrine. The Rule, however, not only fails to include anti-evasion protections, but paves the way for evasion of usury laws. The rulemaking failed to consider the anti-evasion doctrine when interpreting section 27, and the Rule does not attempt to distinguish between evasive and non-evasive transactions.

Second, the FDIC claims that the rule is "consistent with" the "valid-when-made" doctrine, which it alleges to be a long-standing historical doctrine. *See* 85 Fed. Reg. 44419; 84 Fed. Reg. 66848. The "valid-when-made" doctrine, however, is a modern invention. It was not part of the common law background of the National Bank Act and thus not part of the common law background of section 27 of the FDIA, a provision enacted in 1980. Nothing approaching the "valid-when-made" doctrine as described by the FDIC can be found in cases, treatises, or scholarly articles prior to 1979, and there is not even a reported case referring to the doctrine by name until 2019. The doctrine's supposed historical pedigree stands on selective and out-of-context quotations from 19th century cases dealing with an entirely different issue than the "valid-when-made" doctrine supposedly addresses.

Third, the FDIC errs in applying the common law of assignments. The FDIC claims that

Brief of Professor Adam J. Levitin
as *Amicus Curiae*
Case No. 20-cv-5860-JSW

the rule is "consistent with" the "stand in the shoes" principle of the common law of assignment. 85 Fed. Reg. 44149. The common law of assignment, however, relates to the assignment *of rights under a contract*. In other words, it only addresses alienable property rights. It does not have any bearing on the question of alienability of statutory privileges like interest rate exportation. The idea of a bank being able to sell its statutory privileges—much less without the concomitant statutory responsibilities—is absurd. It would undermine the entire bank regulation system, which carefully limits who can obtain the benefits of a banking charter, whether by issue of a *de novo* charter or the sale of a bank to new owners. The Rule would not merely let nonbank assignees stand in the assignor's shoes—they would give it the assignor's very feet.

Additionally, the Rule's claims about its impact on bank liquidity are unsupported. The FDIC states that the rulemaking is supported by safety-and-soundness considerations, namely banks' "need to sell their loans to satisfy their liquidity needs in a crisis." 85 Fed. Reg. 44146. The Rule thus supposedly promotes the safety-and-soundness of State Banks by ensuring the liquidity of their loan portfolios. 85 Fed. Reg. 44151, 44155.

Yet the FDIC presented no evidence in the rulemaking that the Rule is likely to have any meaningful impact on State Bank liquidity. Additionally, the argument that bank liquidity would be at risk without the Rule is hard to square with (1) the adequacy of bank liquidity for over a century and a half in the absence of the Rule, (2) the existence of the Federal Reserve's discount window for borrowing by solvent banks, which provides a much faster source of liquidity than a loan sale, (3) the exemption of most mortgage loans from usury laws, and (4) the existence of a potential secondary market of over 5,000 insured depository institutions that are not subject to state usury laws. FDIC, *Statistics at a Glance*, Dec. 30, 2020, *at* https://bit.ly/3sPD08v. Put another way, at most the Rule affects the size of the secondary market and the price at which banks can sell loans; it does not affect their fundamental ability to sell loans or ability to obtain liquidity in a crisis.

## I.     THE RULE IS INCONSISTENT WITH THE COMMON LAW INCORPORATED INTO THE FEDERAL DEPOSIT INSURANCE ACT

Congress is presumed to legislate against the backdrop of the common law. *E.g., Voisine v. United States*, 136 S. Ct. 2272, 2286 (2016) ("we presume that Congress legislates against the

6

backdrop of the common law"); *Astoria Fed. Sav. & Loan Ass'n* v. *Solimino,* 501 U.S. 104, 108 (1991). Accordingly, "statutes which invade the common law . . . are to be read with a presumption favoring the retention of long-established and familiar principles, except when a statutory purpose to the contrary is evident." *Isbrandtsen Co.* v. *Johnson*, 343 U.S. 779, 783 (1952). In such cases, "to abrogate a common-law principle, the statute must 'speak directly' to the question addressed by the common law." *United States v. Tex.*, 507 U.S. 529, 534 (1993). Accordingly, the Supreme Court has instructed courts to follow "The canon of construction that statutes should be interpreted consistently with the common law [to] interpret a statute that clearly covers a field formerly governed by the common law." *Samantar v. Yousuf*, 560 U.S. 305, 320 (2010).

Section 27 of the FDIA is modeled on section 85 of the National Bank Act of 1864. The two provisions are construed *in pari materia*. 85 Fed. Reg. 44147. Section 85 of the National Bank Act—and therefore section 27 of the FDICA—incorporates the common law of contracts and usury as it existed in 1864.

Section 27 of the FDIA must, therefore, be interpreted consistently with that common law. The Rule fails to do so and therefore was promulgated in violation of the Administrative Procedures Act because it is "not in accordance with law". 5 U.S.C. § 706(2)(A).

The FDIC does not claim that the Rule is based on *any* common law doctrine. Instead, the FDIC claims that the rule is merely "consistent with" two common law doctrines, namely the "valid-when-made" doctrine and the "stand in the shoes" principle of the common law of assignments. *See* 85 Fed. Reg. 44149, 44151; 84 Fed. Reg. 66848. The FDIC's claim that the rule is not based on these doctrines, however, is belied by the statement of FDIC Chair Jelena McWilliams that the Rule is "reaffirming and codifying in regulation the valid-when-made doctrine".[5] The FDIC's claim that its Rule is not based on these doctrines is also inconsistent with the position taken by the Office of the Comptroller of the Currency in its parallel rulemaking, where the OCC claimed that the doctrines were in fact part of the common law background of the National Bank Act. 85 Fed. Reg. 33532. *See also* 84 Fed. Reg. 64229, 64231 (Nov. 21, 2019).

---

[5] Statement by FDIC Chairman Jelena McWilliams on the Notice of Proposed Rulemaking: Federal Interest Rate Authority, FDIC Board Meeting, Nov. 19, 2019, *at* https://bit.ly/3gCyeIM.

7

Irrespective of whether these common law doctrines are part of the basis for the rule, neither doctrine is claimed by the FDIC to be part of the common law background of section 27 of the FDIA or section 85 of the National Bank Act. This points to three problems with the Rule.

First, the FDIC failed to consider the relevant common law background in the rulemaking. The common law background of section 85 of the National Bank Act—and thus of section 27 of the FDIA—includes an important doctrine that is affirmatively contrary to the Rule. Second, the FDIC's claims about the historicity of the "valid-when-made" doctrine are incorrect. The doctrine is not part of the common law background of the National Bank Act or section 27 of the FDIA. And third, the FDIC description of the "stand in the shoes" doctrine is patently wrong; the doctrine only addresses assignable rights, and FDIA preemption is not an assignable right.

## A. The common law incorporated into the National Bank Act includes a strong anti-evasion doctrine that is contrary to the Rule and that the FDIC failed to address

A key part of the common law of usury in 1864, when the National Bank Act was enacted, was the "anti-evasion doctrine" that held that courts would look past the form of a transaction to its substance when analyzing a claim of usury. As of 1864, this doctrine had been affirmed no fewer than four times by the United States Supreme Court,[6] as well as by state supreme courts.[7]

---

[6] *See, e.g.*, *De Wolf v. Johnson*, 23 U.S. 367 (1825) ("no subterfuge shall be permitted to conceal [usury] from the eye of the law."); *Scott v. Lloyd*, 34 U.S. 418, 419 (1835) ("The ingenuity of lenders has devised many contrivances by which, under forms sanctioned by law, the statute may be evaded….Yet it is apparent that if giving this form to the contract will afford a cover which conceals it from judicial investigation, the statute would become a dead letter. Courts, therefore, perceived the necessity of disregarding the form, and examining into the real nature of the transaction. If that be in fact a loan, no shift or device will protect it."); *Andrews v. Pond*, 38 U.S. 65, 76 (1839) ("But although the transaction, as exhibited in the account, appears on the face of it to have been free from the taint of usury, yet if the ten per cent. charged as exchange, or any part of it, was intended as a cover for usurious interest, the form in which it was done, and the name under which it was taken, will not protect the bill from the consequences of usurious agreements…"); *Miller v. Tiffany*, 68 U.S. 298, 310 (Jan. 11, 1864).

[7] *See also, e.g.*, *Whitworth & Yancey v. Adams*, 26 Va. 333, 337-338 (Va. 1827) ("the only question in all [usury] cases like the present is, what is the real substance of the transaction, not what is the colour and form."); *Wetmore v. Brien & Bradley*, 40 Tenn. 723, 727 (Tenn. 1859) ("But if the note were made for the purpose of being sold, to raise money, or as an artifice to evade the usury laws, under the color of a sale and purchase of the paper, this will not avail; and the purchaser, under such circumstances, with knowledge of the facts, either actual, or inferable from the facts of the case, will be held guilty of usury, if the discount shall have been greater than the

Indeed, just months before the passage of the National Bank Act on June 3, 1864, the Supreme Court of the United States noted that its holding in a usury decision was "subject to the qualification, that the parties act in good faith, and that the form of the transaction is not adopted to disguise its real character." *Miller v. Tiffany*, 68 U.S. 298, 310 (Jan. 11, 1864). Subsequent to the enactment of the National Bank Act (but prior to the enactment of section 27 of the FDIA in 1980), federal and state courts continued to consistently apply the anti-evasion principle.[8] As the

---

legal rate of interest.").

[8] *Missouri, Kansas & Texas Trust Co. v. Krumseig*, 172 U.S. 351, 355-356 (1899) ("[T]he question always is whether it was or was not a subterfuge to evade the laws against usury."); *Seeman v. Phila. Warehouse Co.*, 274 U.S. 403, 408 (1927) ("the form of the transaction must not 'disguise its real character.'"); *Sachs v. Ginsberg*, 87 F.2d 28, 30 (D.C. Cir. 1936) ("It was the duty of the trial court to look beyond the form of the contract and to determine the exact nature of the transaction, and, if found to be a loan and usurious, to bring it within the terms of the statute, no matter how righteous the cloak of formality which was used to conceal its real character."); *Pope v. Marshall*, 78 Ga. 635, 640 (Ga. 1887) ("No disguise of language can avail for covering up usury, or glossing over an usurious contract. The theory that a contract will be usurious or not according to the kind of paper bag it is put up in, or according to the more or less ingenious phrases made use of in negotiating it, is altogether erroneous. The law intends that a search for usury shall penetrate to the substance."); *Crim v. Post*, 41 W.Va. 397 (W.V. 1895) (syllabus by the Court) ("The usury statute contemplates that a search for usury shall not stop at the mere form of the bargains and contracts relative to such loan, but that all shifts and devices intended to cover a usurious loan or forbearance shall be pushed aside, and the transaction shall be dealt with as usurious if it be such in fact."); *Barry v. Paranto*, 97 Minn. 265, 267 (Minn. 1906) ("It is elementary that no device or scheme intended for the purpose of evading the laws against usury will prevent the courts from giving force to the statute and declaring contracts made in violation thereof null and void."); *First Nat'l Bank v. Phares*, 174 P. 519, 521 (Okla. 1918) ("In deciding whether any given transaction is usurious or not, the courts will disregard the form which it may take, and look only to the substance of the transaction in order to determine whether all the requisites of usury are present…. If all these requisites are found to be present, the transaction will be condemned as usurious, whatever form it may assume and despite any disguise it may wear."); *Bank of Lumpkin v. Farmers' State Bank*, 161 Ga. 801, 807 (Ga. 1926) (syllabus by the Court) ("The ingenuity of man has not devised a contrivance by which usury can be legalized . . . . [F]or the name by which the transaction is denominated is altogether immaterial if it appears that a loan of money was the foundation and basis of agreement which is under consideration."); *Fidelity Sec. Corp. v. Brugman*, 137 Ore. 38, 50 (Ore. 1931) ("The courts do not permit any shift or subterfuge to evade the law against usury. The form into which parties place their transaction is unimportant. Disguises are brushed aside and the law peers behind the innocent appearing cloaks in quest for the truth."); *Anderson v. Hershey*, 127 F.2d 884, 886 (6th Cir. 1942) (finding district court sitting in diversity jurisdiction correctly determined that bank's requirement that plaintiff "purchase the non-interest-bearing certificate of deposit was a device on the part of the bank to collect usury …. The courts of Kentucky in usury cases look behind the form of the transaction to its substance (*Hurt v. Crystal Ice & Cold Storage Co.*, 215 Ky. 739, 286 S.W. 1055)"); *Beacham v. Carr*, 122

9

*Ruling Case Law* treatise summarized in 1920:

> The cupidity of lenders, and the willingness of borrowers to concede whatever may be demanded or to promise whatever may be exacted in order to obtain temporary relief from financial embarrassment, as would naturally be expected, have resulted in a great variety of devices to evade the usury laws; and to frustrate such evasions the courts have been compelled to look beyond the form of transaction to its substance, and they have laid it down as an inflexible rule that mere form is immaterial, but that it is the substance which must be considered.[9]

The FDIC's Rule entirely ignores the well-established anti-evasion doctrine that was part of the legal background for both section 85 of the National Bank Act and section 27 of the FDIA. Indeed, the Rule is entirely inconsistent with the anti-evasion doctrine because it facilitates a well-known method for evasion of state usury laws: the rent-a-bank partnership, an issue raised in numerous comment letters. *See, e.g.*, Comment of Professor Adam J. Levitin (Jan. 5, 2020), (included as Appendix D), Comment of the Center for Responsible Lending *et al*. (Feb. 4, 2020) (included as Appendix E), Comment of Senator Sherrod Brown *et al*. (Nov. 21, 2019) (included as Appendix F); Comment of AARP (Jan. 31, 2020) (included as Appendix G). As such the Rule is "not in accordance with law" and "in excess of statutory … authority", 5 U.S.C. § 706(2)(A), (C), and therefore must be struck down under the APA.

Additionally, for an agency's rulemaking to be legal, the agency must consider all "relevant factors." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42-43 (1983). If an agency "entirely failed to consider an important aspect of the problem," *id.*, the rulemaking must be struck down as being "arbitrary and capricious" in violation of the APA. 5 U.S.C. § 706(2)(A). The FDIC failed to give any consideration of the anti-evasion doctrine in the rulemaking. Accordingly, the Rule must also be struck down as "arbitrary and capricious."

---

Fla. 736, 742-743 (Fla. 1936) (quoting 27 RULING CASE LAW. 211); *Milana v. Credit Discount Co.*, 27 Cal. 2d 335, 340 (Cal. 1945) ("The courts have been alert to pierce the veil of any plan designed to evade the usury law and in doing so to disregard the form and consider the substance."); *Daniel v. First Nat'l Bank of Birmingham*, 227 F.2d 353, 355, 357 (5th Cir. 1956) ("Usurious contracts are condemned by public policy both state and national Code of Alabama …. That public policy cannot be defeated by the simple expedient of a written contract, but the real substance of the transaction must be searched out.").

[9] 27 RULING CASE LAW 211 (1920).

10

### B. The "valid-when-made" doctrine is a 21st century invention and was not part of the common law background of the National Bank Act of 1864

According to the FDIC, the "valid-when-made" doctrine means that "if the loan was not usurious at inception, the loan cannot become usurious at a later time, such as upon assignment, and the assignee may lawfully charge interest at the rate contained in the transferred loan." 84 Fed. Reg. 66848. While this doctrine can be observed in some recent decisions, it was wholly unknown prior to the 21st century. There is not a single case consistent with the "valid-when-made" doctrine to be found prior to the enactment of the National Bank Act. Indeed, there is only a single case consistent with the doctrine that pre-dates the enactment in 1980 of section 27 of the FDIA.[10]

The doctrine is entirely a modern invention that emerges in a handful of the 21st century decisions that stand on a misreading of older cases with unfamiliar transactional situations. The valid-when-made doctrine was not part of the common law background of the National Bank Act or section 27 of the FDIA. As a historical matter, the doctrine is not valid, but made-up. To the extent that the Rule is in fact based on the doctrine, the Rule is "not in accordance with law," 5 U.S.C. § 706(2)(A), because it completely misconstrues the doctrine and therefore must be struck down under the APA.

#### 1. The "valid-when-made" doctrine could not have pre-dated and been incorporated into the National Bank Act because it addresses a problem created by the National Bank Act

The most obvious flaw with the supposed historicity of the valid-when-made doctrine is that the issue addressed by the doctrine—whether a note originated by a party that is exempt from the state usury statute is usurious in the hands of a non-exempt assignee—*could not* have arisen prior to the enactment of the National Bank Act in 1864. Prior to the National Bank Act, state usury laws applied to all entities equally. Therefore, it was not possible prior to 1864 for a loan to be non-usurious in the hands of an original lender and subsequently become usurious in the hands of an assignee; there was no situation in which the "valid-when-made" issue could even have arisen. It could not, therefore, have been part of the common law background law of the National

---

[10] *Strike* v. *Trans-West Discount Corp.,* 92 Cal. App. 3d 735, 745 (Cal. Ct. App. 4th Dist. 1979).

Brief of Professor Adam J. Levitin
as *Amicus Curiae*
Case No. 20-cv-5860-JSW

Bank Act and thus could not have been part of the common law background of section 27 of the FDIA.

### 2. The 19th century cases the FDIC relies upon for the "valid-when-made" doctrine have nothing to do with the effect of assignment on usury

Despite supposedly being based on "over one-hundred years of Supreme Court precedent regarding the sanctity of contracts,"[11] the "valid-when-made" doctrine is nowhere to be found in *any* 19th or early 20th century usury and banking law treatises or scholarly articles.[12] Likewise, there is not a single mention of the "valid-when-made" doctrine in *any* reported case until 2019.[13]

All in all, there are only a handful of reported cases that are consistent with the doctrine. The first of these consistent cases is from 1979,[14] over a century after the enactment of the National Bank Act. There is no other case consistent with the doctrine that pre-dates section 27 of the FDIA, much less the National Bank Act. Most of the other consistent cases are from the 21st century.

Nonetheless, in recent years the "valid-when-made" doctrine has been taken as gospel by the FDIC,[15] the OCC,[16] and the Solicitor General's Office,[17] as well as by trade associations commenting in support of the Rule,[18] and even by a number of scholarly articles.[19] These various

---

[11] Statement by FDIC Chairman Jelena McWilliams on the Notice of Proposed Rulemaking: Federal Interest Rate Authority, FDIC Board Meeting, Nov. 19, 2019, *at* https://bit.ly/3gCyeIM.

[12] An annotator's footnote to an 1838 edition of BLACKSTONE's *COMMENTARIES ON THE LAWS OF ENGLAND* is sometimes cited for support for the doctrine, but an examination of the English cases cited shows that they have no relation to valid-when-made. *See* Levitin, *Rent-a-Bank*, Appendix A, at 78, n.283.

[13] Rent-Rite SuperKegs W., Ltd. v. World Bus. Lenders, LLC (*In re* Rent-Rite SuperKegs W., Ltd.), 603 B.R. 41, 66 (Bankr. D. Colo. 2019).

[14] *Strike*, 92 Cal.App.3d at 745.

[15] *Id.*

[16] *Amicus Curiae* of the Federal Deposit Insurance Corporation and the Office of the Comptroller of the Currency in Support of Affirmance and Appellee, *Rent-Rite Super Kegs West, Ltd., v. World Business Lenders, LLC*, No. 1:19-cv-01552-REB (D. Colo.).

[17] Brief for the United States as Amicus Curiae, *Midland Funding, LLC v. Madden*, 136 S. Ct. 1484 (No. 15-160) at 8 (opposing petition for Petition for Writ of Certiorari).

[18] *E.g.*, Comment of the Structured Finance Association and Bank Policy Institute, Feb. 4, 2020, at 4, n.15 (see Appendix C).

[19] See Levitin, *Rent-a-Bank*, Appendix A, at 14-15, nn. 44-45 (detailing the initial uncritical scholarly embrace and more recent scholarly skepticism of the historicity of "valid-when-made").

disciples of "valid-when-made" support their claim of the doctrine's historicity by citing to selectively lifted decontextualized quotations from various 18th and 19th century cases.

A closer examination of the cases cited as support for the doctrine shows that they are all dealing with entirely different legal issues. For example, consider *Gaither v. Farmers' & Mechanics' Bank of Georgetown*, 26 U.S. 37 (1828), and *Nichols v. Fearson*, 32 U.S. 103 (1833), the two 19th century Supreme Court cases cited by the FDIC in the rulemaking. 85 Fed. Reg. 44149 n.33.

*Gaither* involved a non-usurious note that was pledged by the payee as collateral for an unrelated, usurious loan. 26 U.S. at 41. The Supreme Court observed that "the rule cannot be doubted, that if the note be free from usury, in its origin, no *subsequent usurious transactions respecting it*, can affect it with the taint of usury." *Id.* at 43 (emphasis added). The key point to note here is that *Gaither* is not does not say "no subsequent transactions," but no "subsequent *usurious* transactions." This distinction is important because *Gaither* involved a situation in which there were *two* credit transactions—the making of a non-usurious note and the making of a usurious loan. The issue was whether the usurious interest from the second transaction could be imputed to the first transaction.

In contrast, the "valid-when-made" situation addressed by the Rule deals with a *single* loan that is assigned. There is no "subsequent usurious transaction" to speak of in the "valid-when-made" context. *Gaither* did not involve an assignment and says nothing about the "valid-when-made" situation addressed by the Rule.

*Nichols v. Fearson* is similarly inapposite. *Nichols* involved a discounted sale of a note indorsed by the defendant. 32 U.S. 103 (1833). When a note is sold at a discount from face, the discount can be treated as imputed pre-paid interest. *Nat'l Bank of Gloversville v. Johnson*, 104 U.S. 271, 276-277 (1881); *Evans v. Nat'l Bank of Savannah*, 251 U.S. 108, 114 (1919). Thus, section 85 of the National Bank Act and section 27 of the FDIA both expressly cover not only interest on loans, but also interest on discounts.

When the defendant in *Nichols* indorsed the note, the defendant became jointly liable for

13

the full face amount of the note, just as if it were the maker of the note.[20] The defendant then attempted to wriggle out of its obligation by raising a defense of usury on the basis that the stated interest rate on the note plus the additional implied interest rate from the discounting made the note usurious. The Supreme Court held that the usurious discounting did not void the original note, 32 U.S. at 110, 112, observing that among the "cardinal rules of the doctrine of usury…[is] that a contract which in its inception is unaffected by usury can never be invalidated by any *subsequent usurious transaction*." *Id.* at 109 (emphasis added). *See also id.* at 106 ("the rule of law is everywhere acknowledged that a contract free from usury in its inception shall not be invalidated by any *subsequent usurious transactions upon it*.") (emphasis added).

Again, the key point to note is that the Supreme Court did not use the phrase "any subsequent transaction," but "any subsequent *usurious* transaction." As with *Gaither*, *Nichols* involved a situation in which there were *two* credit transactions—the making of a non-usurious note and a usurious discounting (effectively a second loan). All *Nichols* holds is that the interest from the second transaction (the discounting) may not be imputed to the first transaction (the note). *Nichols* has nothing to do with the question of whether a State Bank can transfer its statutory interest rate exportation privilege to an assignee to allow the assignee to purchase and enforce a loan that the assignee could not legally make itself.

While the FDIC cited to no other cases that pre-date section 27 of the FDIA in support of the doctrine in the rulemaking, it has done so in an *amicus* brief,[21] as have some comments in support of the rulemaking.[22] The doctrine described by the FDIC is nowhere to be found in any of those other cases, however—only more decontextualized quotations. Again, these cases are dealing with entirely different legal questions than valid-when-made. Many are similar to *Nichols* and address the effect of a discounted assignment on the calculation of the interest rate on the

---

[20] *Cf.* UCC § 3-415(a) (modern statutory analog).

[21] *Amicus Curiae* of the Federal Deposit Insurance Corporation and the Office of the Comptroller of the Currency in Support of Affirmance and Appellee, *Rent-Rite Super Kegs West, Ltd., v. World Business Lenders, LLC*, No. 1:19-cv-01552-REB (D. Colo.).

[22] *E.g.*, Comment of the Structured Finance Association & Bank Policy Institute, Feb. 4, 2020, at 4, n.15 (see Appendix C).

14

loan.[23] As with *Nichols*, the question in these cases is whether the discounted price paid by the assignee may be treated as imputed interest on the loan and thus added to the loan's stated interest rate when determining if the loan is usurious.

Besides *Gaither* and *Nichols,* the FDIC cites to only two other cases as supporting the "valid-when-made" doctrine. Both cases decided *after* the enactment of section 27 of the FDIA and therefore tell us nothing about the common law background of section 27. One of those cases is *FDIC v. Lattimore Land Corporation*, 656 F.2d 139 (5th Cir. 1981). *Lattimore* was not dealing with a valid-when-made situation, in which a bank assigns a loan to a nonbank, but with a choice of law question regarding which state's law applied to the bank assignee of a loan made by a nonbank. *Id.* at 148-49. The FDIC notes that *Lattimore* stated that "The non-usurious character of a note should not change when the note changes hands",[24] but *Lattimore* supported this statement with a citation to *Nichols v. Fearson*, *id.* at 149, n.17, which is in fact addressing a completely different issue.[25]

---

[23] *See, e.g.*, *Munn v. Comm'n Co.*, 15 Johns. 44, 55 (N.Y. Sup. Ct. 1818) ("The principle is too well settled to be questioned, that a bill, free from usury, in its concoction, may be sold at a discount, by allowing the purchaser to pay less for it than it would amount to at the legal rate of interest, for the time the bill has to run. The reason is obvious: as the bill was free from usury, between the immediate parties to it, no after transaction with another person can, as respects those parties, invalidate it."); *Taylor v. Bruce*, 21 Va. 42, 90 (Va. 1820) ("it is settled, that a bill or note which is free from usury, in its concoction, may be sold at an usurious discount, for that as it was free from usury between the original parties, no after transaction can, as to these parties, invalidate it"); *Tuttle v. Clark*, 4 Conn. 153, 157 (Conn. 1822) (the note "not being usurious in its original concoction, did not become so, by the subsequent [discounted] sale to the plaintiffs"); *Knights v. Putnam*, 20 Mass. 184, 185 (Mass. 1825) ("a note, valid in its inception, may be recovered against the maker, by an indorsee, although discounted by him at a rate exceeding legal interest. It is a well established principle, that if a note or security is valid when made, no usurious transaction afterwards between the parties or privies will affect its validity."); *Cram v. Hendricks*, 7 Wend. 569, 572 (N.Y. Ct. for the Correction of Errors 1831) ("The principle is too well settled to be questioned, that a bill free from usury in its concoction may be sold at a discount; because, as it was free from usury between the original parties to it, no subsequent transaction with another person can, as it respects those parties, invalidate it.").

[24] *Id.* at 148-49.

[25] The Fifth Circuit also cited to an older 5th Circuit case, *Huntsman v. Longwell*, 4 F.2d 105, 106 (5th Cir. 1925), dealing with a similar fact pattern to *Nichols*, that paraphrased the holding in *Nichols* as relating to "any subsequent transaction" rather than to "any subsequent usurious transaction." In *Huntsman* itself, that omission was of no consequence because it followed the same broad pattern as *Nichols*. *Lattimore*, however, failed to understand that *Huntsman* and

The final case the FDIC cites in the Rule in support of the doctrine, *FDIC v. Tito Castro Constr.*, 548 F. Supp. 1224 (D.P.R. 1982), falls squarely in to this paradigm. *Tito Castro Construction* dealt with a situation in which the borrower chose not to timely repay demand notes, which had the effect of pushing up the interest rate on the notes. As the court noted, "it was only as a consequence of defendant's election to delay in repaying the principal amount of those [demand] notes that an effective rate of interest in excess of the Puerto Rico statutory ceiling may have resulted." *Id.* at 1227.

*Tito Castro Construction* is representative of a second group of supposed "valid-when-made" cases. The cases in this group deal with the effect of the exercise of a payment option—including opting to pay late, as in *Tito Castro Construction* by the borrower on the calculation of the interest rate on a loan.[26] These cases do not even necessarily involve an assignment, underscoring that they in no way concern the valid-when-made issue.

Finally, there are a few cases sometimes cited in support of "valid-when-made" that deal with the effect of a valid assignment on a usurious loan.[27] This "cleansing assignment" pattern is the reverse transaction of what is at stake with valid-when-made. In the event that the Court wishes

---

*Nichols* stood for a very limited point, and nearly all of the subsequent cases 21ˢᵗ century valid-when-made cases rely on *Lattimore*'s misreading as their foundational authority.

[26] *See, e.g.*, *Tate* v. *Wellings* 100 Eng. Rep. 716, 721 (K.B. 1790) (Buller, J., seriatim) (effect on the usury calculation of a loan of stock that was repayable in stock or cash at the borrower's option); *Unity Plan Finance Co. v. Green* 155 So. 900, 905 (La. 1934) (effect on the calculation of the interest from the acceleration of a debt that the debtor had failed to repay on time); *Rangen, Inc. v. Valley Trout Farms, Inc.*, 658 P.2d 955, 959 (Id. 1983) (effect on usury calculation of a fee for late payment option); *Southwest Concrete Products. v. Gosh Construction Corp.*, 51 Cal.3d 701, 708 (Cal. 1990) ("a transaction that was not usurious at its inception cannot become usurious by virtue the debtor's voluntary default."); *Zang v. Schumann*, 262 Wis. 570, 577-579 (Wisc. 1952) (borrower's exercise of an option to pay an extra premium to be relieved from a lease was not to be considered in the calculation of the interest rate); *Saul v. Midlantic Nat'l Bank*, 572 A.2d 650, 658 (N.J. App. Div. 1990) (whether the value of a non-optional discounted stock sale accompanying the loan should be included in the interest for the loan); *Hoffman v. Key Federal Sav. and Loan Ass'n*, 416 A.2d 1265, 1269 (Md. 1979) (whether an optional prepayment should affect the calculation of the interest rate) ("[t]he virtually universal rule is that a contract legal at its inception will not be rendered usurious by voluntary prepayment.").

[27] *Highway Equip. & Supply Co. v. Jones*, 153 N.W.2d 859, 863 (Neb. 1967); *Coral Gables First Nat'l Bank v. Constructors of Fla., Inc.*, 119 So. 2d 741, 746 (Fla. Dist. Ct. App. 1960); *Waggener v. Holt Chew Motor Co.*, 274 P.2d 968, 971 (Colo. 1954).

16

to indulge the impulse of antiquarian curiosity, these cases are addressed in detail in a forthcoming *Duke Law Journal* article by Professor Levitin, a publicly available draft of which is attached as Appendix A.

### 3. The only court ever to consider whether valid-when-made was part of the common law background of the National Bank Act rejected the doctrine's supposed historicity

The only court to ever address the historicity of the valid-when-made doctrine has squarely rejected the FDIC's claim in that litigation (from which the FDIC has backed away slightly in the Rule) that the doctrine was part of the common law background of the National Bank Act or section 27 of the FDIA.

The District Court for the District of Colorado rejected the historicity of the valid-when-made doctrine in *Rent-Rite SuperKegs W., Ltd. v. World Bus. Lenders, LLC*, No. 1:19-cv-01552-REB (D. Colo.), an appeal of a Bankruptcy Court decision. The Bankruptcy Court had raised the valid-when-made doctrine *sua sponte* in its opinion as grounds for denying the debtor's usury defense against a rent-a-bank lender. 603 B.R. 41, 66 (Bankr. D. Colo. 2019). The issue was only briefed in the appeal to the District Court. The FDIC and Office of the Comptroller of the Currency filed an *amicus* brief with the District Court arguing for confirmation of the Bankruptcy Court's decision on the basis of the valid-when-made doctrine. *Amici Curiae* Brief of the Federal Deposit Insurance Corporation and the Office of the Comptroller of the Currency in Support of Affirmance and Appellee, *Rent-Rite Super Kegs West, Ltd., v. World Business Lenders, LLC*, No. 1:19-cv-01552-REB (D. Colo.). Professor Levitin filed an *amicus* brief with the District Court arguing that the valid-when-made doctrine was utterly lacking in historical roots. *Amicus Curiae* Brief of Professor Adam J. Levitin in Support of Appellant, *Rent-Rite Super Kegs West, Ltd., v. World Business Lenders, LLC*, No. 1:19-cv-01552-REB (D. Colo.).

The District Court rejected the FDIC's argument, stated that it was "convinced" by Professor Levitin's "compelling counterargument", and reversed and remanded the case to the Bankruptcy Court. Order on Bankruptcy Court's Determination, *In re: Rent-Rite Superkegs West Ltd.,* No. 19-cv-01552 (D. Colo. Aug. 12, 2020) at 9 (attached as Appendix B). The District Court's ruling on the historicity of the doctrine is based on a factual finding, namely that the doctrine did

17

not exist in 1864.

The *Rent-Rite* district court is the only court to ever address the historicity of the valid-when-made doctrine following briefing by the parties (and, in this case, *amici,* including the FDIC), and it rejected the supposed historicity of the doctrine.

**B. The common law of assignments is irrelevant because interest rate exportation is a non-assignable personal privilege of a State Bank, not a feature of a note**

The Rule also purports to be "consistent with" the common law of assignments. It is not. The common law of assignments has no bearing on the Rule because interest rate exportation is a non-assignable personal privilege of a State Bank, not an assignable contract right.

In the rulemaking, the FDIC stated that:

> It is well settled that an assignee succeeds to all the assignor's rights in a contract, standing in the shoes of the assignor. This includes the right to receive the consideration agreed upon in the contract, which for a loan includes the interest agreed upon by the parties. Under this "stand-in-the-shoes" rule, the non-usurious character of a loan would not change when the loan changes hands, because the assignee is merely enforcing the rights of the assignor and stands in the assignor's shoes. A loan that was not usurious under section 27 when made would thus not become usurious upon assignment.

85 Fed. Reg. 44149. *See also* 84 Fed. Reg. 66848. The common law of assignments relates solely to the assignment of rights under a contract or property rights, not an assignment of inalienable personal privileges. It is axiomatic that under the common law of contracts, an assignee takes all of the rights of the assignor under the contract. *See* RESTATEMENT (2D) OF THE LAW, CONTRACTS, § 317(2) ("A *contractual* right can be assigned....") (emphasis added); 29 WILLISTON ON CONTRACTS § 74:10 (4th ed.) ("Generally, all *contract* rights may be assigned....) (emphasis added). An assignee does not, however, assume the assignor's other rights extraneous to the contract, such as rights under personal licenses or from status. While the assignee "steps into the shoes" of the assignor, it does not step into the assignor's "feet".

For example, if I sell my car, the buyer gets whatever property rights are appurtenant to the car, but does not also get my driver's license, the benefits of my American Automobile Association membership, my license to practice law, or my parental or spousal rights. Similarly, if a credit union sells a loan, the buyer does not assume the credit union's statutory tax-exempt status. And

18

if a bank sells a loan to a nonbank, the nonbank does not accede to the bank's federal deposit insurance coverage. Indeed, if these privileges were freely assignable, there would be no point in having a special bank licensing and deposit insurance regime because regulators would not exercise control over who ultimately gained the privileges attached to the license or deposit insurance.

State Banks' interest rate exportation right under FDIA section 27 is a statutory right; it is not a contractual term in a loan agreement. The section 27 exportation right is not an alienable property right. It is a personal and non-transferrable privilege that is part of a regulatory scheme that applies only to State Banks. Thus, the common law of assignment has no bearing on a transfer of federal statutory status or privileges, because those are neither contract nor property rights, but unassignable qualities.[28] As such, the Rule is not consistent with the common law of assignments.

## II.   THE FDIC'S CLAIMS ABOUT THE RULE'S IMPACT ON BANK LIQUIDITY ARE UNSUPPORTED.

The Rule must additionally be struck down because it claims that it protects bank liquidity without any supporting evidence. Such an unsupported claim is "arbitrary and capricious," so the Rule must be set aside under the APA. 5 U.S.C. § 706(2)(A).

The FDIC argues that the Rule is important for protecting the liquidity of State Banks because it preserves their power to sell higher interest rate loans. 85 Fed. Reg. 44155. This claim is entirely unsupported. The FDIC presents no evidence that the Rule—or lack thereof—affects bank liquidity. Moreover, the FDIC failed to adequately address comments presenting evidence that bank liquidity would not be affected due to the structure and regulation of the banking market.

### A.   The FDIC presents no evidence that the *Madden* decision impacted bank liquidity

The FDIC states that it undertook the rulemaking to address the "uncertainty as to the ability of an assignee to enforce the interest rate provisions of a loan originated by a bank" that resulted from the Second Circuit's decision in *Madden v. Midland Funding LLC*, 786 F.3d 246 (2d

---

[28] The Seventh Circuit simply erred in this regard in *Olvera v. Blitt & Gaines, P.C.*, 431 F.3d 285 (7th Cir. 2005). In any event, the Seventh Circuit's pronouncements on state common law of contracts are not controlling here.

19

Cir. 2015). 85 Fed. Reg. 44156. *Madden* held that a nonbank purchaser of loans from a national bank was not entitled to shelter in the bank's exemption from New York's usury law.

The FDIC, however, presented no evidence about the impact of the *Madden* decision on bank liquidity. Indeed, the FDIC admitted that it is "not aware of any widespread or significant negative effects on credit availability or securitization markets having occurred to this point as a result of the *Madden* decision." 85 Fed. Reg. 44156. At most, the FDIC observed that some studies suggested that the *Madden* decision *could* result in a curtailment of *nonbank* credit to riskier borrowers through rent-a-bank arrangements, 85 Fed. Reg. 44155, but the FDIC provided no analysis whatsoever of any of these studies, including of the magnitude of the curtailment of credit. Nor did the FDIC attempt to weigh the curtailment of credit to a subset of borrowers with the risk to these borrowers' net welfare from high-cost credit, which is what state usury laws are aimed to address. Indeed, the FDIC did not indicate in what way—if at all—it relied on studies in the rulemaking. Instead, the FDIC merely noted that the *Madden* ruling "has the *potential* to chill State banks' willingness to make the types of loans affected by the final rule. 85 Fed. Reg. 44155 (emphasis added). In short, the FDIC is speculating about the impact of the *Madden* decision, both in terms of whether it is likely to have an impact and about the materiality of its magnitude.

Such unfounded speculation is necessarily "arbitrary and capricious," rendering the Rule in violation of the Administrative Procedures Act. *See* 5 U.S.C. § 706(2)(A). As the Supreme Court has stated, it is not "sufficient for an agency to merely recite the terms 'substantial uncertainty' as a justification for its actions." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 52. Instead, "the agency must explain the evidence which is available, and must offer a 'rational connection between the facts found and the choice made.'" *Id.*

Not only did the FDIC fail to adduce any evidence about the effect of *Madden*—or the Rule, sometimes called the "*Madden*-Fix" rule—on bank liquidity, but a consideration of some basic features of the secondary market in bank loans suggests that no such evidence exists because the Rule would not likely have a material impact on bank liquidity. These features were raised in comments to the FDIC on the Rule, *see, e.g.*, Comment of Professor Adam J. Levitin (Jan. 5, 2020) (see Appendix D).

### B.  The Rule has not historically been necessary to ensure bank liquidity

State-chartered banks—and secondary credit markets—have operated since the founding of the Republic without the protection of the Rule. The FDIC claims that the valid-when-made doctrine operated as an equivalent to the Rule prior to the uncertainty created by *Madden*. As noted above, however, that doctrine did not even begin to emerge in case law until the late 20th century. Bank liquidity and secondary markets have never depended upon valid-when-made. Because of both credit risk and reputational risk, banks have generally avoided making high interest-rate loans that would (if made by nonbanks) violate state usury laws. In any event, a concerned secondary market purchaser can always seek indemnification from the seller, a standard buyer protection in many secondary markets. Banks have not needed doctrinal shields to protect their ability to sell loans.

### C.  State usury laws are already pre-empted for most loans in the main secondary market for bank loans

The FDIC ignores that banks' assignees are already not subject to state usury laws in the principal secondary market for bank loans—the secondary market in home mortgage loans. State usury laws are specifically preempted for most mortgages, regardless of what entity holds them. 12 U.S.C. §§ 1735f-7, 1735f-7a. Accordingly, the Rule has no effect on the liquidity of a major category of bank assets. This means that the Rule is not necessary to protect bank liquidity, as it is already protected for a major asset class by another federal statute. (Moreover, the negative implication of the home mortgage interest rate pre-emption statutes—enacted in the same legislation as FDIA section 27—is that no such broad pre-emption authority exists regarding other types of loans.)

### D.  When banks need emergency liquidity, they go to the Fed's discount window instead of engaging in a lengthy process of trying to sell loans in the open market

The FDIC also ignores the dynamics of bank emergency liquidity provision. Simply put, when banks are in a crisis, they do not sell their loans to nonbanks. When a bank faces a liquidity crisis, it goes to the Federal Reserve System's discount window or the Federal Home Loan Bank System's discount window. These discount windows ensure that a solvent bank can always borrow

21

against its illiquid assets. The FDIC identifies no short-comings in the current liquidity provision system and makes no attempt to account for the primary means of bank emergency liquidity provision in its rulemaking.

Indeed, the FDIC has adduced no evidence that banks in fact rely on the ability to sell their loans to *nonbanks* for liquidity purposes. The sole source the FDIC cites regarding the use of loan sales to provide for bank liquidity is an 1848 Supreme Court decision, written in a completely different era of financial markets prior to the existence of the Federal Reserve System. 85 Fed. Reg. 44151, n. 44 (citing *Planters' Bank v. Sharp,* 47 U.S. 301, 323 (1848)).

In the published rule—which is the sole basis on which this Court must rule, not representations made by the FDIC as part of the litigation—the FDIC does not even go so far as to claim its own regulatory experience as authority, because it cannot. The closest the FDIC comes to invoking its own experience is to note in a footnote that "In the FDIC's experience, some of these sources of liquidity may be unavailable in a financial stress scenario." 85 Fed. Reg. 44152, n.58. No further details are provided. Which sources? How long will the unavailability last? Can substitutes be found? How material will any of this be to the safety-and-soundness of the financial system? To be sure, the FDIC is broadly correct that liquidity sources can be limited when there is financial distress, but the FDIC neglects to mention that those liquidity sources will only be unavailable because the bank is insolvent and should properly be placed in receivership.

The reason the FDIC does not cite to its own regulatory experience is that there is not a single example the FDIC can adduce of a bank—of any size—relying on the sale of its non-mortgage receivables to a nonbank to relieve a liquidity crisis.[29] When there is a financial crisis, banks turn to the Federal Reserve's discount window for liquidity provision, not to secondary markets. Borrowing from the Fed can be undertaken near instantaneously. In contrast, the sale of a loan portfolio takes time to negotiate, diligence, and document, and that is time that a bank does not have when it is facing a liquidity crisis. To the extent that banks rely on loan sales to relieve liquidity problems (and rarely in crisis situations), it is sales of performing loan portfolios to other

---

[29] As noted above, mortgage receivables are already subject to their own special pre-emption statute, 12 U.S.C. §§ 1735f-7, 1735f-7a, and are so unaffected by the Rule.

22

banks. Only defaulted receivables are likely to be sold to nonbanks (as in the *Madden* case), but those defaulted receivables sell at such a heavy discount—generally 1¢-3¢ on the dollar—that they do not provide material liquidity relief. Simply put, the claimed importance of loan sales to nonbanks for liquidity is unsupported by any evidence.

### E.   Even without the Rule, banks seeking liquidity from loan sales can always turn to a secondary market of over 5,000 other banks that are not subject to usury laws

The FDIC further ignores the existence of a potential secondary market of over 5,000 insured depository institutions that are not subject to state usury laws. FDIC, *Statistics at a Glance*, Dec. 30, 2020, *at* https://bit.ly/3sPD08v. The presence of these institutions means that there is no liquidity threat to banks that the Rule must address—banks can already sell their loans to thousands of other banks without regard to state usury laws.

Professor Levitin made this point in his comments to the FDIC. The FDIC responded in the final rule with two disingenuous and misleading observations, neither of which is in any way an answer to the criticism.

First, the FDIC noted that "not all 5,200 banks in the United States would be able to enforce the interest terms of an assigned loan. Only banks located in States that would permit the loan's contractual interest rate would be able to enforce the interest rate term of the loan." 85 Fed. Reg. 44152. This statement ignores that every state except Iowa either:

(1) allows all loans at any rate agreed upon by contract;[30]

(2) exempts all banks from usury laws;[31] or

(3) has a bank parity statute that explicitly or effectively allows the banks chartered by a state to charge the highest rate allowed to a bank with a charter from another state or a federal charter.[32]

---

[30] *E.g.*, ARIZ. REV. STAT. 44-1201(A).

[31] *E.g.*, CAL. CONST. Art. XV, sec. 1.

[32] *See e.g.*, D.C. CODE § 26-1401.08; 205 ILL. COMP. STAT. 5/5(11); MASS. GEN. L. chs. 167F § 2(31); MINN. STAT. § 48.61, subdiv. 8; N.Y. BANKING L. § 12-a; N.J. STAT. ANN. § 17:9A-25.5(B). *See also* John J. Schroeder, *"Duel" Banking System? State Bank Parity Laws: An Examination of Regulatory Practice, Constitutional Issues, and Philosophical Questions*, 36 IND. L. REV. 197, 203 (2003) (noting that all but two states had parity laws in 2003, one of which has

In other words, only Iowa's State Banks are not capable of purchasing all loans from other state-chartered banks, irrespective of the interest rate on the loan. Iowa has 249 state-chartered banks,[33] which collectively hold less than 0.5% of all assets in the US banking system.[34] Excluding the 249 Iowa banks still leaves 4,951 other State Insured Banks.

As a regulator of State Banks, the FDIC surely knows about the existence of these parity statutes as well as state usury law exemptions of banks and that they encompass almost all state-chartered banks. Yet the FDIC's response in the final Rule pretends that these statutes do not exist.

Putting pretenses to the side, the FDIC's response boils down to the preposterous claim that there is a material difference between the liquidity in a market consisting of 4,951 institutions, rather than 5,200 institutions, when the differential consists is of less than half of a percentage of the total assets in the US banking system. The FDIC has to be coy in its final Rule, however, as it is beyond peradventure that the 4,951 banks that are already potential buyers of every loan made by a State Bank represent a robust enough secondary market to allay concerns about liquidity without the need for the Rule. This sort of disingenuousness should be a red flag for the court that the FDIC did not undertake the rulemaking in good faith.

The FDIC's second response is that other banks cannot be relied on as a source of liquidity in a systemic crisis. 85 Fed. Reg. 44152. Again, the FDIC is being disingenuous. While it is true that banks cease to be a reliable source of liquidity for each other in a systemic crisis, the key lesson of 2008 is that systemic financial crises are hardly limited to banks. In the event of a widespread bank liquidity crisis it is extremely unlikely that nonbank financial institutions would be flush with liquidity for the simple reason that nonbanks rely on the banking sector for liquidity.

---

since adopted a parity law); NAT'L CONS. L. CTR., CONSUMER CREDIT REGULATION § 3.7.1 n. 672 (listing parity statutes).

[33] *See* Iowa Division of Banking, Number of Banks, *at* https://bit.ly/3b4eiLY (249 state-chartered banks as of end of the third quarter of 2020).

[34] *See* Iowa Division on Banking, Iowa State Chartered Banks: Net Loans and Leases, Total Deposits, and Total Assets, *at* https://bit.ly/3kBiwxy ($91 billion of total assets as of end of third quarter of 2020); Bd. of Gov. of the Fed. Res. Sys. (US), Total Assets, All Commercial Banks [TLAACBW027SBOG], retrieved from FRED, Fed. Res. Bank of St. Louis; https://bit.ly/2Pl0bK5, Mar. 1, 2021 (total commercial banking assets of $20.23 trillion as of Sept. 23, 2020).

Brief of Professor Adam J. Levitin
as *Amicus Curiae*
Case No. 20-cv-5860-JSW

When liquidity contracts in the banking sector, it contracts throughout the economy. The FDIC's systemic risk argument does not hold water. In the event of a true systemic crisis, the Rule will provide no protection to banks whatsoever.

### F.     The Rule is not protecting bank liquidity, but the price at which banks can sell loans

In sum, the FDIC presents no legitimate argument about the Rule protecting bank liquidity, much less one supported by evidence. At most, the Rule affects the size of the secondary market and the price at which State Banks can sell loans, but not their fundamental ability to sell loans. The Rule is not protecting bank *liquidity* but merely the price at which State Banks can sell loans. Section 27 of the FDIA, however, is not a minimum resale price guaranty for State banks. *See Madden*, 786 F.3d at 251 ("Although it is possible that usury laws might decrease the amount a [] bank could charge for its consumer debt in certain states…such an effect would not 'significantly interfere' with the exercise of a national bank power."). Indeed, the FDIC itself recognizes this, noting that "Depository institutions will likely see a reduction in their ability to sell loans … due to significant pricing adjustments in the secondary market." 85 Fed. Reg. 44155. In other words, banks might decide not to sell certain loans because the offer price will be reduced. But a lower sale price for certain loans is not a significant interference with the powers of State Banks. It is merely a change in market pricing, and the choice of whether to sell remains with the bank.

The Rule should be struck down as violating the APA because it is "arbitrary and capricious." 5 U.S.C. § 706(2)(A). The FDIC failed to present *any* evidence about the Rule's impact on bank liquidity, despite that being a major policy justification for the Rule. Moreover, the FDIC failed to address evidence indicating that bank liquidity would not be affected as a result of the structure and regulation of the banking market.

## CONCLUSION

Contrary to the FDIC's claims, the Rule does not comport with the common law as incorporated in the FDIA through the National Bank Act, and is not supported by evidence. Accordingly, under the Administrative Procedures Act, 5 U.S.C. § 706(2), the Rule must be struck down.

DATED: April 29, 2021

By: /s/ *Seth E. Mermin*
Seth E. Mermin
Eliza J. Duggan
UC BERKELEY CENTER FOR CONSUMER LAW
& ECONOMIC JUSTICE
225 Bancroft Way
Berkeley, CA 94720-7200
(510) 393-8254
tmermin@law.berkeley.edu

Counsel for *amicus curiae*
Professor Adam J. Levitin

26

**APPENDIX A**

Adam J. Levitin, *Rent-a-Bank: Bank Partnerships and the Evasion of Usury Laws*

71 DUKE L.J. (forthcoming)

27

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**APPENDIX B**

Order on Bankruptcy Court's Determination

*In re: Rent-Rite Superkegs West Ltd.,* No. 19-cv-01552 (D. Colo. Aug. 12, 2020)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**APPENDIX C**

Comment of the Structured Finance Association and Bank Policy Institute (Feb. 4, 2020)

135

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# APPENDIX D

Comment of Professor Adam J. Levitin (Jan. 5, 2020)

[Attachments to Comment omitted.]

1

2

**APPENDIX E**

3

Comment of the Center for Responsible Lending *et al*. (Feb. 4, 2020)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

162

**APPENDIX F**

Comment of Senator Sherrod Brown *et al.* (Nov. 21, 2019)

1

**APPENDIX G**

2

3

Comment of AARP (Jan. 31, 2020)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Rent-a-Bank

Forthcoming 71 Duke Law Journal (2021)
April 6, 2021 draft

## Rent-a-Bank:

## Bank Partnerships and the Evasion of Usury Laws

Adam J. Levitin[*]

"Rent-a-bank" arrangements are the vehicle of choice for subprime lenders seeking to avoid state consumer protection laws. In a rent-a-bank arrangement, a nonbank lender contracts with a bank to make loans per its specifications and then buys the loans from the bank. The nonbank lender then claims to shelter in the bank's federal statutory exemptions from state regulation. The validity of these arrangements is the most bitterly contested legal question in consumer finance.

The rent-a-bank phenomenon is a function of a binary, entity-based regulatory approach that treats banks differently than nonbanks and that treats bank safety-and-soundness regulation as a substitute for consumer protection laws. The entity-based regulatory system is based on the dated assumption that transactions align with entities, such that a single entity will perform an entire transaction. Consumer lending, however, has become "disaggregated," so the discrete parts of lending—marketing, underwriting, funding, servicing, and holding of risk—are frequently split up among multiple, unaffiliated entities.

The binary, entity-based regulatory system is a mismatch for disaggregated transactions involving a mosaic of bank and non-bank entities. The mismatch facilitates regulatory arbitrage of consumer protection laws through rent-a-bank arrangements, as nonbanks claim favorable regulatory treatment by virtue of the involvement of a bank in parts of a transaction.

The vitality of rent-a-bank arrangements depends on legal doctrine. This Article shows that the "valid-when-made" doctrine used to support rent-a-bank arrangements, is not, as claimed, a well-established, centuries old, "cardinal rule" of banking law, but a modern fabrication. The doctrine is not valid, but made up. Because the doctrine never existed historically, it cannot be essential for the smooth functioning of credit markets.

This Article argues that the better approach to disaggregated transactions is a presumption that bank regulation does not extend beyond banks, coupled with an anti-evasion principle that looks to substance over form. Such an approach would create greater certainty about the legality of transactions, while effectuating both state consumer protection laws and federal bank regulation policy.

[*] Anne Fleming Research Professor & Professor of Law, Georgetown University Law Center. This Article is based in part on Congressional testimony before the House Financial Services Committee and House Small Business Committee on rent-a-banks and on an amicus brief submitted in rent-a-bank litigation. It has benefited from a presentation at the National Consumer Law Center's Consumer Litigation Rights Conference and a panel hosted by the Columbia Law and Political Economy Society. Thank you to Anna Gelpern and Bill Bratton for helpful comments and to Aliya Brown and Mitchell Mengden for research assistance.

© 2021, Adam J. Levitin

INTRODUCTION ...................................................................... 4
I.    THE DISAGGREGATION OF CONSUMER LENDING ................. 19
      A.   Functions of Usury Laws ........................................ 19
      B.   Marquette and the Race to the Bottom ................... 21
      C.   The Changing Institutional Landscape of Consumer Credit 23
      D.   Disaggregation of Consumer Lending .................... 24
      E.   Disaggregated Lending's Effect on Consumer Protection .... 28
II.   RENT-A-BANK ARRANGEMENTS .................................... 30
      A.   Rent-a-Bank Distinguished from Outsourced Production ... 31
      B.   Payday Lending ...................................................... 35
      C.   Regulatory Pushback on Payday Rent-a-Bank ......... 37
      D.   The Incomplete Regulatory Pushback .................... 40
III.  CASE STUDY OF ELEVATE CREDIT, INC. ....................... 41
      A.   ThinkCash's Rent-a-Bank Model ........................... 41
      B.   Think Finance's Rent-a-Tribe Model ...................... 44
      C.   Elevate Credit, Inc. .............................................. 47
      D.   Elevate's Rent-a-Bank Nexus of Contracts ............ 49
           1.   The Joint Marketing Agreements ................... 51
           2.   Technology License Agreement ..................... 53
           3.   Participation Agreement ............................... 54
           4.   The Funding Agreements .............................. 56
      E.   Contractual Doublespeak ....................................... 57
IV.   THREE COMPETING DOCTRINAL APPROACHES ................. 60
      A.   The "Valid-When-Made" Doctrine ........................... 60
      B.   The Madden Rule ................................................... 62
      C.   "True Lender" Doctrine .......................................... 64
           1.   "True Lender" as an Application of Usury's Anti-Evasion Doctrine 64
           2.   "True Lender" Doctrine's Application to Disaggregated Lending .. 68
      D.   Taking Stock of the Doctrinal Landscape ................ 71
V.    THE SPURIOUS PEDIGREE OF "VALID-WHEN-MADE" ............. 72
      A.   The Purported Historicity of Valid-When-Made ......... 72
      B.   Impossibility of Valid-When-Made Before 1864 ......... 73
      C.   The Absence of "Valid-When-Made" in Pre-1979 Cases ...... 74
      D.   The Absence of "Valid-When-Made" in Historical Treatises 77
      E.   The Erroneous Basis of Modern "Valid-When-Made" Decisions ...................................................... 78
      F.   "Valid-When-Made" Doctrine's Irrelevance for Bank Liquidity ............................................................ 82

© 2021, Adam J. Levitin

VI.    Avoiding Regulatory Vacuums ..........................................85
    A.    "Valid-When-Made" Produces a Regulatory Vacuum ...........85
    B.    Benefits of the <u>Madden</u> Rule....................................................85
    C.    Disclosure Requirements to Prevent Evasion .......................87
    D.    Bringing True Lender Doctrine Up-to-Date .........................89
        1.    *Disaggregation as Evasion*....................................90
        2.    *Process as Evasion* ................................................91
    E.    The OCC and FDIC Rulemakings ...........................................92
    Conclusion ..........................................................................................93

© 2021, Adam J. Levitin

4                                    *LEVITIN*

## INTRODUCTION

How did a small business end up paying over 122% interest on a loan? Homes by DeRamo, a small, family-owned Sarasota, Florida, construction business, needed cash in 2015 for operating expenses.[1] An outfit called World Business Lenders, LLC,[2] offered a $400,000 loan, but required the business's owners, Vincent and Tracy DeRamo, to personally guaranty the loan and pledge their home as collateral.[3] Florida's usury law caps interest charges at an 18% annual rate.[4] So how was World Business Lenders able to charge over 122% annually?[5] Because World Business Lenders had "rented" a bank.

Banks are effectively exempt from state usury laws.[6] Usury laws, which prevent high-cost lending, still apply to nonbank entities like World Business Lenders.[7] High-cost nonbank lenders engage in a range of transactional devices to evade state usury laws,[8] but their

---

[1] Complaint, *DeRamo v. World Bus. Lenders, LLC*, 2017-CA-2438-NC (Sarasota County, Fla. Circuit Court, June 16, 2017) at ¶ 7 (hereinafter "*DeRamo* Complaint").

[2] For background on World Business Lenders, *see* Zeke Faux, *Wall Street Finds New Subprime With 125% Business Loans*, BLOOMBERG, May 22, 2014.

[3] *DeRamo* Complaint at ¶ 8. The DeRamos took out an initial 300-day loan, refinanced it with another 300-day World Business Lenders loan (paying a 15% prepayment penalty), and then took out a supplementary loan from World Business Lenders.

[4] 39 FLA. STAT. § 687.02.

[5] The loan documents, included as attachments the complaint, all provide for a daily interest rate of between 0.331513939726% and 0.335945205479%. *DeRamo* Complaint at pp. 13, 55, 158. On an annualized simple interest basis with a 365-day year, this is between 121% and 122.6%. The DeRamos' loans were only for 300 days, however, so in their pleadings they annualized the ratio of finance charges to principal, which resulted in rates between 72% and 74% interest. *DeRamo* Complaint at ¶ 26.

[6] Federal law does not exempt banks from state usury laws so much as provide a choice of law rule that enables banks to "export" the usury cap from their home state to other states. *See* 12 U.S.C. §§ 85, 1463(g), 1831d. This means that a bank based in a state with no usury cap is not subject to other states' usury caps when it does business in those states. Florida law also specifically exempts banks from its usury laws. 39 Fla. Stat. § 687.12.

[7] States often have different usury limits for certain types of state-licensed lenders. Unlicensed lenders, however, like World Business Lenders, are subject to general usury laws.

[8] Examples of other devices include high cost lenders basing themselves offshore and claiming that foreign usury limits apply, *see* First Amended Complaint, *Consumer Fin. Protection Bur. v. NDG Financial Corp.*, No. 15-cv-5211 (S.D.N.Y., Dec. 11, 2015), or partnering with native American tribes or tribal members and sheltering in tribal immunity, *see infra* note 106; Complaint, *FTC v. AMG Services, Inc.*, No. 2:12-cv-00536 (D. Nev. Apr. 2, 2012); First Amended Complaint, *CFPB v. CashCall, Inc.*, No. 1:13-cv-13167 (D. Mass. Mar. 21, 2014).

© 2021, Adam J. Levitin

preferred mechanism is to partner with a bank in a "rent-a-bank" arrangement.[9] That is precisely what World Business Lenders did.

In a rent-a-bank arrangement, a nonbank contracts to buy loans that a bank has made for it on spec. The nonbank then claims to shelter in the bank's exemption from state usury laws and other consumer protection laws, as well as the benefit of the choice-of-law provisions applicable to the bank. And because the loan is not directly made by the nonbank, the nonbank claims that it is exempt from state licensure requirements for nonbank lenders. In exchange for renting out its regulatory privileges, the bank collects a fee.

In the case of Homes by DeRamo, the loan terms were negotiated by World Business Lenders, but the loan was formally made by Bank of Lake Mills, a tiny two-branch community bank in Wisconsin with no presence in Florida. Within weeks of making the loans to the DeRamos' business, Bank of Lake Mills assigned the loans to World Business Lenders.[10] The assignment was signed on behalf of the bank by a Vice President of World Business Lenders with a Power of Attorney for the bank.[11] The documentation of the DeRamos' loan

---

[9] Financial services firms refer to these relationships solely as "bank partnership" relationships. Critics use the term "rent-a-bank" to describe the relationship. Neither is a neutral term. "Rent-a-bank" may seem inflammatory, but the anodyne "bank partnership" terminology masks the true nature of the relationship and effectively accedes to these arrangements' legitimacy as a policy matter. Moreover, the contractual documents for these relationships often explicitly disclaim the existence of a partnership. *See, e.g.,* Participation agreement, dated July 1, 2015, by and between Elastic SPV, Ltd. and Republic Bank & Trust Company https://bit.ly/3nlXwuJ (hereinafter "Elastic Participation Agreement") § 18 ("This Agreement is not intended to constitute, and shall not be construed to establish, a partnership or joint venture among any of the Parties."), § 19.a ("This Agreement will not create a joint venture, partnership or other formal business relationship or entity of any kind, or an obligation to form any such relationship or entity."); Participation Interest Purchase and Sale Agreement, dated August 1, 2019, by and between EF SPV, LTD, and FinWise Bank, *at* https://bit.ly/2Ljn0vc (hereinafter "Rise Participation Agreement") ("§ 4.02 Intent of the Parties. This Agreement will not create a joint venture, partnership or other formal business relationship or entity of any kind, or an obligation to form any such relationship or entity.").

Recognizing the absence of neutral terminology, this Article uses both terms, but generally uses the "rent-a-bank" terminology because it more accurately captures the true nature of the relationship, in which the bank effectively rents out its special regulatory privileges to a non-bank.

[10] *DeRamo* Complaint at pp. 152, 182. World Business Lenders, LLC subsequently assigned the loans to a securitization vehicle called WBL SPE II, LLC. *id.* at pp. 184, 187, a wholly owned subsidiary of World Business Lenders, LLC, that World Business Lenders uses to obtain financing. Verified Petition, *World Business Lenders, LLC v. Arena Limited SPV, LLC,* No. 653229/2019 (N.Y. Sup. Ct. N.Y. County, May 31, 2019), ¶¶ 2, 6.

[11] *DeRamo* Complaint at ¶ 24.

© 2021, Adam J. Levitin

bears indicia that World Business Lenders was the intended assignee
from the get-go: World Business Lenders' address appears in
numerous places in the loan documentation, [12] and the loan
documentation even provides for venue and enforcement in New
York, where World Business Lenders was located at the time.[13]

The DeRamo case follows a pattern of other transactions
undertaken by World Business Lenders with Bank of Lake Mills and
pair of other banks.[14] In other words, Bank of Lake Mills was little
more than a front for World Business Lenders to evade state
regulation.

The DeRamos challenged the loans as usurious.[15] Because of the
involvement of the Bank of Lake Mills, World Business Lenders was

---

[12] See, e.g., id. at pp. 13, 31.

[13] Id. at p. 17.

[14] See, e.g., Class Action Complaint, *Quantum-Mac Int'l, Inc. v. World Bus. Lenders, LLC*, No 1:20-cv-02353 (N.D. Ga. June 2, 2020) (Axos Bank, former BOFI Federal Bank, as rent-a-bank partner for World Business Lenders); Kaur v. World Bus. Lenders, LLC, 440 F. Supp. 3d 111, 116 (D. Mass. 2020) (BOFI Federal Bank as World Business Lenders' rent-a-bank partner); World Bus. Lenders, LLC v. 526-528 North Main St., LLC, 197 Conn. App. 269, 270-271 (2020) (120% interest rate loan made by Bank of Lake Mills and assigned to World Business Lenders); Complaint, *World Business Lenders, LLC v. Cloud & Willis, LLC*, No. 19-ev-007125 (Fulton County State Court, Ga., Dec. 27, 2019), ¶ 5 (noting that "Shortly after the Loan documents were signed, the Loan [made by Bank of Lake Mills] was sold and assigned to World Business Lenders."); Complaint, *B&S Medical Supply, Inc., N.Y. v. World Business Lenders, LLC*, No. 17-cv-03234-RMB (S.D.N.Y. 2017) (Liberty Bank, Utah, as rent-a-bank partner for World Business Lenders); Verified Complaint, WBL SPE I, LLC as Assignee of World Bus. Lenders, LLC and of Bank of Lake Mills vs. Jo Juice and Salad Bar, LLC, No. 32642/2017E (N.Y. Sup. Ct., Bronx Cnty, Oct. 26, 2017) (loan made by Bank of Lake Mills on October 20, 2016, and sold to World Business Lenders on December 2, 2014); Verified Complaint, *World Bus. Lenders, LLC v. Queens Medical Services, P.C.*, No. 600802/2016 (N.Y. Sup. Ct. Nassau Cnty, Feb. 5, 2016) (loan made by Bank of Lake Mills on March 10, 2015, sold to World Business Lenders on March 16, 2015); Verified Complaint, *World Bus. Lenders, LLC v. Michael's Landscaping Construction, LLC*, No. 611675/2016 (N.Y. Sup. Ct. Suffolk Cnty, July 26, 2016) (loan made by Bank of Lake Mills on December 9, 2015, and sold to World Business Lenders on December 14, 2015); Verified Complaint, *World Bus. Lenders, LLC v. ML Seafood Corp.*, No. 511151/2016 (N.Y Sup. Ct. Kings County, June 30, 2016) (loan made by Bank of Lake Mills on April 30, 2015, and sold to World Business Lenders on May 6, 2015)Verified Complaint, *World Bus. Lenders, LLC v. PM Recycling LLC*, No. 509595/2016 (N.Y. Sup. Ct., Kings Cnty, June 6, 2016) (loan made by Bank of Lake Mills on November 26, 2014, and sold to World Business Lenders on December 2, 2014).

[15] The DeRamos allege that they were also told that their refinancing of the loan and a subsequent additional loan would be at 15%. *DeRamo* Complaint at ¶¶ 14, 22. The only 15% figure in the loan documents is for the prepayment premium. *Id.* at Exhibit 1 (p.13). While the interest rate was in fact disclosed in the DeRamo's actual loan agreement, it was in the form of a miniscule daily rate with twelve decimal places. On the term sheet for the transaction,

© 2021, Adam J. Levitin

able to respond that (1) the loans' documentation provided that they would be governed by Wisconsin law, which has no usury rate for business loans, rather than Florida law, and (2) as the bank's assignee it could shelter in the bank's exemption from state usury laws.[16] What's more, because the DeRamos had defaulted on the loan, World Business Lenders sought to foreclose on their home in a counterclaim.[17]

The DeRamos' case ultimately settled privately, but it is illustrative of a larger phenomenon in subprime lending. Rent-a-bank arrangements are common in on-line payday lending, consumer installment lending, "marketplace lending," and subprime small business lending. Moreover, rent-a-bank lending appears likely to expand in response to the tightening of state usury laws,[18] new federal regulations, and signals that federal banking regulators will tolerate rent-a-bank relationships.

---

entitled "Business Loan Summary," no interest rate was quoted, only a total dollar figure for the interest charges. The only number given as a percentage on the term sheet was the prepayment penalty—15%. No annual percentage rate was ever given because as a business loan, the Truth in Lending Act's requirement of disclosure of the annual percentage rate, 15 U.S.C. § 1632, did not apply.

[16] Defendants, World Business Lenders, LLC's and WBL SPE II, LLC's Answer, Defenses, and Counterclaims, *DeRamo v. World Bus. Lenders, LLC*, 2017-CA-2438-NC (Sarasota County, Fla. Circuit Court, June 16, 2017) at pp. 6-7.

[17] *Id.* at pp. 9-14.

[18] On October 10, 2019, California enacted the Fair Access to Credit Act (A.B. 539), which created a rate cap of 36% on loans between $2500 and $10,000. Previously no rate cap had applied. In response, three nonbank fintech lenders, CURO, Elevate, and ENOVA, each indicated in an investor call that it were considering moving to the bank partnership model to avoid the usury cap. Elevate Credit, Inc., Q3 2019 Earnings Call, Nov. 4, 2019, https://yhoo.it/3hNXTwL ("...California passed a law that caps interest rates on personal loans between $2,500 and $10,000. …As a result, we will stop originating loans through a direct lending channel in California once the law goes into effect. However, we do not believe that it'll have a material impact on our business due to our diversified operating model and additional opportunities. One of those opportunities is to expand our underwriting and technology licensing to our 3 existing FDIC-regulated bank partners in new geographies. In addition, we are continuously looking for additional banks that share our commitment to providing innovative consumer-focused products."); Enova International (ENVA) Q3 2019 Earnings Call, Oct. 24, 2019, https://bit.ly/3rSLg8l ("And instead of originating near-prime loans, we plan to market and provide underwriting services for national banks originating in California."); CURO Group Holdings Corp. (CURO) Q3 2019 Earnings Call Transcript, Oct. 25, 2019, https://bit.ly/3pSHlXn ("Hugh Miller -- *Buckingham − Analyst*: …So I guess assuming that you are successful at some point in potentially creating a substitute product with the bank in California, can you just give us a sense of kind of how we should think about the start-up process for that type of initiative?...

Don Gayhardt -- *President & Chief Executive Officer*: …we do have a signed agreement….").

© 2021, Adam J. Levitin

The potential expansion of rent-a-bank lending threatens to gut state consumer protection laws, such that one consumer group has called it "the biggest threat in decades to states' historic power to prevent predatory lending".[19] Yet rent-a-bank lending stands on an uncertain and contested legal foundation. A critical legal question remains unresolved: can a nonbank that acquires a loan from a bank shelter in the bank's exemption from state regulation? While this question applies first and foremost to usury laws, it also applies to other state laws regulating the substantive terms of loans and requiring nonbank lenders to be licensed and subject to state supervision.

When nonbank makes a loan itself, it is subject to state regulations. But what if the nonbank instead acquires an otherwise identical loan from a bank? Is the bank's exemption from state regulation laws entity-based and personal to a bank? Or is the exemption asset-based, such that it travels with a loan?

Courts have split on the issue, which has arisen primarily in the context of usury laws. Some have followed the "valid-when-made rule" that holds the nonbank can shelter in the bank's usury law exemption if the bank was itself the original lender.[20] Others follow the "*Madden* rule," from the Second Circuit's 2015 decision in *Madden v. Midland Funding, LLC*.[21] The *Madden* rule holds that the exemption is strictly limited to banks and not transferrable to nonbanks. Yet others apply "true lender" doctrine, which looks to whether the bank or the nonbank was the real party in interest in the transaction.[22]

---

[19] Testimony of Lauren Saunders, National Consumer Law Center on behalf of its low income clients Before the House Financial Services Committee on Rent-A-Bank Schemes and New Debt Traps: Assessing Efforts to Evade State Consumer Protections and Interest Rate Caps Feb. 5, 2020, at 2, *at* https://bit.ly/2JJcDAx.

[20] *See, e.g.*, Hudson v. ACE Cash Express, Inc., 2002 U.S. Dist. LEXIS 11226 (S.D. Ind. 2002); Olvera v. Blitt & Gaines, PC, 431 F.3d 285 (7th Cir. 2005); Phipps v. FDIC, 417, F.3d 1006 (8th Cir. 2005); Krispin v. May Dep't Stores, 218 F.3d 919 (8th Cir. 2000); Munoz v. Pipestone Fin., LLC, 513 F.Supp.2d 1076 (D. Minn. 2007); Sawyer v. Bill Me Later, Inc., 23 F. Supp. 3d 1359 (D. Utah 2014); *In re* Rent-Rite Superkegs West, Ltd., 603 B.R. 41 (Bankr. D. Colo. 2019). None of the cases prior to *Rent-Rite* actually invoked the valid-when-made rule. While some of these cases were addressing the question of complete preemption in the context of removal from state court, while others were addressing substantive preemption in a merits context, but there is no indication that the analysis would be materially different.

[21] Madden v. Midland Funding, LLC, 786 F.3d 246 (2d Cir. 2015).

[22] *See, e.g.*, Order on Bankruptcy Court's Determination, *In re: Rent-Rite Superkegs West Ltd.*,

© 2021, Adam J. Levitin

Adding to the confusion, two federal banking regulators have issued non-identical rules that aim to codify "valid-when-made,"[23] and one of these regulators issued a rule that would overrule true lender doctrine by deeming a bank to be the lender for the purpose of usury laws for any loans it initially makes or funds.[24] Further complicating the debate is that the doctrines affecting rent-a-bank relationships

---

No. 19-cv-01552 (Aug. 12, 2020) (remanding for true lender determination); Dep't of Ins. & Fin'l Svcs. v. Comdata Network, Inc., 2019 WL 3857904 (Mich. Dep't of Ins. & Fin'l Svcs. Aug. 7, 2019) (finding that nonbank was the true issuer of credit card program so bank exception to state licensing requirement did not apply), *aff'd in part, rev'd in part by* Comdata Network, Inc. v. Mich. Dep't of Ins. & Fin. Serv. No. 19-747-AV (Mich. Inghan Cty., 30th Jud'l Cir. Ct. May 19, 2020); Fulford v. Marlette Funding, LLC, No. 2017-CV-30376), 2019 WL 4451038 (D. Colo. June 5, 2019); Meade v. Avant of Colorado, L.L.C., 307 F. Supp. 3d 1134, 1150–1152 (D. Colo. 2018); Consumer Fin. Prot. Bureau v. CashCall, Inc., No. CV-15-7522-JFW, 2016 WL 4820635 (C.D. Cal. Aug. 31, 2016); CashCall, Inc. v. Md. Comm'r of Fin. Regulation, 448 Md. 412, 436, 139 A.3d 990, 1005, 2016 Md. LEXIS 371, *36 (Md. Ct. App. 2016) (holding a party that was the de facto lender was a "credit services business" subject to Maryland usury law); Eul v. Transworld Sys., 2017 WL 1178537 (N.D. Ill. Mar. 30, 2017); Commonwealth v. Think Fin., Inc., 2016 WL 183289 (E.D. Pa. Jan. 14, 2016); Community State Bank v. Knox, 523 Fed. Appx. 925 (4th Cir. 2013) (state-law usury claims not completely preempted by the FDIA merely because a state-chartered bank was the named lender); Ubaldi v. SLM Corp., 852 F. Supp. 2d 1190, 1196 (N.D. Cal. 2012) (noting that, "where a plaintiff has alleged that a national bank is the lender in name only, courts have generally looked to the real nature of the loan to determine whether a non-bank entity is the de facto lender"); CashCall, Inc. v. Morrisey, No. 12-1274, 2014 WL 2404300, at *1, *7 (W.Va. May 30, 2014); West Virginia v. CashCall, Inc., 605 F. Supp. 2d 781, 783 (S.D.W. Va. 2009); Discover Bank v. Vaden, 489 F.3d 594, 601, 603 n.9, 606 (4th Cir. 2007), *rev'd on other grounds*, 556 U.S. 49 (2009) (noting that the FDIA would apply only if the bank were the "real party of interest"); Spitzer v. County Bank of Rehoboth, 846 N.Y.S.2d 436 (N.Y. App. Div. 2007); BankWest, Inc. v. Baker, 411 F.3d 1289 (11th Cir. 2005) (upholding Georgia statute deeming a purported agent of a bank to be the de facto lender if it has the predominant economic interest), *reh'g granted, op. vacated*, 433 F.3d 1344 (11th Cir. 2005) (en banc), *op. vacated due to mootness*, 446 F.3d 1358 (11th Cir. 2006); Easter v. Am. West Fin., 381 F.3d 948, 957-959 (9th Cir. 2004) (applying true lender doctrine under Washington State law); Krispin v. May Dept. Stores, 218 F.3d 919 (8th Cir. 2000) (explaining that close relationship between bank and department store made the bank the real party in interest); Glaire v. La Lanne-Paris Health Spa, Inc., 528 P.2d 357, 363 (Cal. 1974); Dillard v. First Nat'l Bank of Birmingham, 227 F.2d 353, 355 (5th Cir. 1955), *reh'g denied with* opinion, 228 F.2d 803 (5th Cir. 1956). *See also* Fed. Deposit Ins. Corp. v. Lattimore Land Corp., 656 F.2d 139, 148, n.15 (5th Cir. 1981) (noting that there was no allegation that the assignee was the true lender and suggesting that analysis would be different if there were such an allegation).

[23] 85 Fed. Reg. 33530 (June 2, 2020) (OCC final rule on Permissible Interest on Loans That Are Sold, Assigned, or Otherwise Transferred); 85 Fed. Reg. 44146 (July 22, 2020) (FDIC final rule on Federal Interest Rate Authority). There are serious questions about the bank regulators' authority to prescribe rules governing nonbanks, as well about the procedural validity of these particular rules, but these administrative law questions are beyond the scope of this Article.

[24] 85 Fed. Reg. 68742 (Oct. 30, 2020) (OCC final rule on "National Banks and Federal Savings Associations as Lenders").

© 2021, Adam J. Levitin

affect other transactions in which banks sell loans to nonbanks, particularly bank sales of defaulted loans to debt buyers and securitization.

This Article shows how the rent-a-bank issue is a function of two features of the design of the financial regulatory system: (1) the entity-based nature of the system, which has left it vulnerable to regulatory arbitrage and (2) the absence of a general usury law for banks, which has made regulatory arbitrage inviting.

Key parts of the financial regulatory system are entity-based. The entity-based system is binary: either an entity is a bank and subject to the pervasive oversight of bank regulation or it is not. Such a binary system makes sense when the regulated economic activity corresponds neatly to entity type, but that is frequently no longer the case in consumer lending.

Lending involves several discrete activities: designing a credit product; marketing it and prospecting for borrowers; underwriting borrowers; funding the loan; servicing the loan; and holding the credit risk and interest rate risk. Historically, these activities were all aggregated in the same institution, such that a bank would design, market, underwrite, fund, service, and hold a loan until maturity. The bank would not only be the "nexus of contracts" for the production of loans,[25] but all factors of production would be internal to the bank, rather than outsourced. The complete lending cycle existed in the bank.[26]

Over the past few decades, however, a new phenomenon has emerged in consumer lending: the different components of the lending cycle are split up and performed by multiple institutions, rather than

---

[25] *See* Michael C. Jensen & William H. Meckling, *Theory of the Firm: Managerial Behavior, Agency Costs, and Ownership Structure,* 3 J. Fin. Econ. 305 (1976) (theory of the firm as a "nexus of contracts"). *See also* William W. Bratton, Jr., *The "Nexus of Contracts" Corporation: A Critical Appraisal,* 74 Cornell L. Rev. 407, 415 (1989) (defining the "nexus of contracts" approach as "the firm is a legal fiction that serves as a nexus for a set of contracting relations among individual factors of production"); Frank H. Easterbrook & Daniel R. Fischel, *The Corporate Contract,* 89 Colum. L. Rev. 1416, 1426 (1989) (describing the nexus of contracts theory as "a shorthand for the complex arrangements of many sorts that those who associate voluntarily in the corporation will work out among themselves").

[26] The bank might farm out some functions to affiliated entities, but they were all within the same firm. *See* Marquette Nat'l Bank v. First of Omaha Service Corp., 262 N.W.2d 358, 359-360 (Minn. 1977) (describing role played by bank affiliate in soliciting applications for credit card lending).

© 2021, Adam J. Levitin

by a single "lender." [27] In this system, banks often play only a supporting role. While a bank might provide the initial funding for a loan, the underwriting, the servicing, and the holding of risk might all be performed by other entities, or the bank might perform some of these functions not as a principal in its own capacity, but as the agent for another party.

Sometimes, this disaggregation reflects the outcome of a make-or-buy decision for banks. The efficiency of outsourced production may exceed in-house production, such that vertical integration of production may not be optimal for a firm.[28] It may be cheaper, for example, for a bank to pay for a third-party to provide a service than for the bank to produce the service itself. For example, it may make economic sense for a bank to hire a third-party to market its loans.

Yet disaggregation may not merely reflect a bank outsourcing factors of production and thus acting as a "buyer" of externally produced factors of production. Instead, when lending is disaggregated, it may reflect a *nonbank* outsourcing factors of production and buying them from the bank, such that the bank is acting as a "seller" of regulatory privileges to the nonbank.

Either way, the upshot of "disaggregation" of lending is that lending transactions often involve a mosaic of firms, some bank and some nonbank. The regulatory system, however, persists in a binary approach to regulation that enables transactions to claim "bank" treatment even when a bank is only minimally involved in a transaction. The entity-based regulatory system is thus vulnerable to regulatory arbitrages like rent-a-bank because of the same type of

---

[27] "Disaggregation" of the lending function is a different phenomenon than the much-noted "disintermediation". Disintermediation refers to the shift from relying on banks to intermediate between sources of capital and borrowers to other funding channels, such as securitization and money market mutual funds. *See, e.g.*, Steven L. Schwarcz, *Regulating Shadow Banking*, 31 Rev. Banking & Fin. L. 619, 624-625 (2012); Zachary J. Gubler, *Regulating in the Shadows: Systemic Moral Hazard and the Problem of the Twenty-First Century Bank Run*, 63 Ala. L. Rev. 221, 271 (2012); Steven L. Schwarcz, *Securitization, Structured Finance, and Covered Bonds*, 39 Iowa J. Corp. L. 129, 131-132 (2013). Disintermediation is concerned solely with the funding channel. Disaggregation, in contrast refers to a division of the components in the lending cycle. These components include the source of funding, but also marketing, underwriting, and servicing.

[28] The classic explorations of make-versus-buy are Ronald H. Coase, *Nature of the Firm*, 4 Economica 386 (1937) and Oliver Williamson, *The Vertical Integration of Production: Market Failure Considerations*, 61 Am. Econ. Ass'n Papers & Proceedings 112 (1971).

© 2021, Adam J. Levitin

transactions can be performed through a range of entities and entity combinations.

The rent-a-bank arbitrage is particularly appealing to subprime lenders because federal law effectively exempts banks from state usury laws without substituting an equivalent federal law. Federal law provides that banks are subject only to the usury law of their home state, no matter where they operate,[29] but banks have substantial ability to choose their "home" state, such that by picking a favorable home state that allows bank loans to be at the contractually agreed upon rate, such as Delaware,[30] Nevada,[31] South Dakota,[32] or Utah,[33] a bank can functionally be exempt from usury laws, no matter where it operates. Unlike for credit unions,[34] there is no general federal usury law applicable to banks.[35] Federal law lacks a generally applicable usury limitation, and the Consumer Financial Protection Bureau is expressly forbidden from promulgating a federal usury regulation.[36]

The conceit behind the special treatment for banks is that they should not be saddled with the burden of complying with inconsistent state usury laws because they are already subject to a strict, bank-specific regulatory regime focused on ensuring the bank's safety-and-soundness. A key feature of the bank regulation is regulators' exercise of "soft power" through supervisory pressure. Regulators can use informal moral suasion through the oversight process to ensure that banks will not make excessively risky loans[37] and can, if potentially,

---

[29] Marquette Nat'l Bank v. First of Omaha Serv. Corp., 439 U.S. 299 (1978); 12 U.S.C. §§ 85, 1463(g)(1), 1831(d).

[30] 5 Del. Code §§ 943, 953, 963, 965, 973.

[31] Nev. Rev. Stat. § 99.50.

[32] S.D. Cod. L. § 54-3-1.1.

[33] Utah Code § 15-1-1 ("The parties to a lawful written, verbal, or implied contract may agree upon any rate of interest for the contract, including a contract for services, a loan or forbearance of any money, goods, or services, or a claim for breach of contract.").

[34] 12 U.S.C. § 1757(5)(A)(vi) (15% limit, temporarily raisable via regulation).

[35] The Military Lending Act does cap the interest rate on certain loans made to military members and their dependents. 10 U.S.C. § 987(b) (36% military APR limit). Federal credit unions are also subject to a usury cap. 12 U.S.C. § 1757(5)(A)(vi) (15% usury cap, extendable by regulation).

[36] 12 U.S.C. § 5517(o).

[37] This supervisory guidance is not formally legally binding, but functionally it operates as "law" in that banks will almost always follow the guidance lest they antagonize their regulator. *See Guidance, Supervisory Expectations, and the Rule of Law: How Do the Banking Agencies Regulate and Supervise Institutions?* Hearing Before the Senate Committee on Banking, Housing, and Urban Affairs (written testimony of Margaret E. Tahyar), Apr. 30, 2019, at 13.

© 2021, Adam J. Levitin

back up such suasion with cease and desist orders for unsafe banking practices.[38] Riskier loans generally have high interest rates to compensate for the risk.[39] Thus, by preventing banks from making risky (and therefore high-cost) loans, the bank regulatory system is assumed to compensate or substitute for usury laws.[40]

The problem with this assumption is that even if borrower default rates are high, they can be offset by recoveries from high interest rates, such that a diversified portfolio of high risk/high rate loans can be profitable and therefore actually enhance bank safety-and-soundness. Thus, banking regulators are unlikely to use their soft supervisory power to stop high cost lending solely on the basis of it's the price of the loans. Diversification, however, mitigates the risk on high cost loans to the bank, but not to individual borrowers. By definition, a set of consumers will default and the losses from those defaults will be offset by the higher charges paid by other borrowers, meaning that both groups of borrowers suffer: one from the consequences of default, the other from higher borrowing costs. Consumer protection and safety-and-soundness are thus actually in tension, as limiting high cost lending can limit bank profitability.

This Article relates to two separate areas of the financial regulation literature. First is the literature about the problems that have arisen from federal preemption of state consumer financial protection laws, particularly state usury laws.[41] Most of the preemption literature pre-

---

[38] 12 U.S.C. § 1818(b)-(c).

[39] *See, e.g.,* Wendy Edelberg, *Risk-Based Pricing of Interest Rates for Consumer Loans,* 53 J. MONETARY ECON. 2283, 2284-85 (2006).

[40] *See, e.g.,* 85 Fed. Reg. 44223, 442227 (July 22, 2020) (listing a range of other federal regulations unrelated to the cost of a loan as allaying concerns about predatory lending).

[41] *See, e.g.,* Roderick M. Hills, Jr., *Exorcising McCulloch: The Conflict-Ridden history of American Banking Nationalism and Dodd-Frank Preemption,* 161 U. PA. L. REV. 1235 (2013); Carliss N. Chatman, *HOLA Preemption and the Original Intent of Congress: Are Federal Thrifts Necessary to Stabilize the Housing Market?* 18 FORDHAM J. CORP. & FIN. L. 565 (2013); Raymond Natter & Katie Wechsler, *Dodd-Frank Act and National Bank Preemption: Much Ado About Nothing,* 7 VA. L. & BUS. REV. 301 (2012); Adam J. Levitin, *Hydraulic Regulation: Regulating Credit Markets Upstream,* 26 YALE J. ON REG. 143 (2009); Christopher L. Peterson, *Usury Law, Payday Loans, and Statutory Sleight of Hand: Salience Distortion in American Credit Pricing Limits,* 92 MINN. L. REV. 1110 (2008); Howell E. Jackson & Stacy A. Anderson, *Can States Tax National Banks to Educate Consumers About Predatory Lending Practices?* 30 HARV. J.L. & PUB. POL'Y 831 (2007); Christopher L. Peterson, *Federalism and Predatory Lending: Unmasking the Deregulatory Agenda,* 78 TEMP. L. REV. 1 (2005); Elizabeth R. Schiltz, *The Amazing, Elastic, Ever-Expanding Exportation Doctrine and Its Effect on Predatory Lending Regulation,* 88 MINN. L. REV. 518 (2004); Creola Johnson, *Payday Loans:*

© 2021, Adam J. Levitin

dates the 2010 Dodd-Frank Wall Street Reform and Consumer Protection Act, which substantially transferred legal standards for preemption,[42] but a sizeable literature has since emerged specifically focused on the *Madden* case.

*Madden* sent shockwaves through the financial services world because the Second Circuit Court of Appeals unambiguously rejected the "valid-when-made" doctrine that proponents claim is a "cardinal rule" of banking law that is required for banks to maintain liquidity and exercise their statutory powers to charge interest and sell loans.[43] Unfortunately, much of the scholarly writing about the *Madden* decision has taken for granted the doctrine's supposed historicity and therefore importance for bank liquidity.[44] More recent scholarship

---

*Shrewd Business or Predatory Lending?* 87 Minn. L. Rev. 1 (2002); Lynn Drysdale & Kathleen Keest, *The Two-Tiered Consumer Financial Services Marketplace: The Fringe Banking System and its Challenge to Current Thinking About the Role of Usury Laws in Today's Society*, 51 S.C. L. Rev. 589 (2000).

[42] Pub. L. 111-203, § 1045, 124 Stat. 1376 (July 21, 2010), *codified at* 12 U.S.C. § 25b.

[43] *See, e.g.*, 85 Fed. Reg. 33530, 33532 (June 2, 2020) ("Even in the mid-nineteenth century, the ability to transfer loans was recognized as an important tool to manage liquidity and enhance safety and soundness.").

[44] *See* John Hannon, Note, *The True Lender Doctrine: Function Over Form as a Reasonable Constraint on the Exportation of Interest Rates*, 67 Duke L.J. 1261 (2018) (agreeing with, and even extolling, the historicity of valid-when-made); Lenore Palladino, *Small Business Fintech Lending: The Need for Comprehensive Regulation*, 24 Fordham J. Corp. & Fin. L. 77 (2018) (agreeing, in footnotes, with the historicity of the valid-when-made doctrine); Piotr Danisewicz & Ilaf Elard, *The Real Effects of Financial Technology: Marketplace Lending and Personal Bankruptcy* (July 5, 2018), *available at* https://ssrn.com/abstract=3208908 (empirical study on impact of the *Madden* decision credit availability and bankruptcy filings); Daniel Kaplan, Note, *Madden v. Midland Funding, LLC, 786 F.3d 246 (2d Cir. 2015): The Second Circuit Threatens to Disrupt Capital Markets*, 8 Neb. L. Rev. Bull. 1 (2017) (agreeing with the historicity of valid-when-made); Colleen Honigsberg, Robert J. Jackson, Jr., & Richard Squire, *How Does Legal Enforceability Affect Consumer Lending? Evidence from a Natural Experiment*, 60 J. L. & Econ. 673 (2017) (empirical study on the impact of the *Madden* decision on credit availability); Brian Knight, *Federalism and Federalization on the Fintech Frontier*, 20 Vand. J. Ent. & Tech. L. 129 (2017) (agreeing with the historicity of the valid-when-made doctrine, describing it as, "one of the cardinal rules in the doctrine of usury"); Charles M. Horn & Melissa R.H. Hall, *The Curious Case of Madden v. Midland Funding and the Survival of the Valid-When-Made Doctrine*, 21 N.C. Banking Inst. 1 (2017) (accepting of the historicity of valid-when-made, describing it as a valid and dependable legal principle for loan origination, sales, and securitization markets); Angel Rzeslawski, Note, *The National Bank Act and the Demise of State Consumer Laws*, 68 Hastings L.J. 1421, 1437 (2017) (accepting the valid-when-made doctrine while suggesting that other circuits follow the Second Circuit's lead in *Madden*); Andrew Silvia, Note, *Madden v. Midland Funding LLC: Uprooting the National Bank Act's Power of Preemption*, 92 Chi.-Kent L. Rev. 653 (2017) (agreeing with, and extolling, the historicity of valid-when-made as a cardinal rule of usury law); Zachary Adams Mason, Note, *Online Loans Across State Lines: Protecting Peer-to-Peer Lending Through the Exportation Doctrine*, 105 Geo. L.J. 217 (2016) (agreeing with the

© 2021, Adam J. Levitin

about the *Madden* decision[45] has been more skeptical about the doctrine's historicity based on some of my previous writings on the topic in the form of Congressional testimony,[46] an amicus brief,[47] and an op-ed.[48] This Article presents a full and complete critical analysis of the underlying doctrinal and policy claims at stake in this critical decision and shows that valid-when-made is completely lacking in historical roots such that it could never have been essential for the operation of banking markets.

The other related literature is about the regulation of "shadow banks"—nonbank entities that perform the same functions as banks,

---

historicity of valid-when-made); Michael Marvin, Note, *Interest Exportation and Preemption: Madden's impact on National Banks, the Secondary Credit Market and P2P Lending*, 116 COLUM. L. REV. 1807, 1832-35 (2016) (claiming that *Madden* ignores Supreme Court precedent on valid-when-made); Kevin Petrasic et al., *Solicitor General in* Madden *Supports, But Fails to Ensure, the Application of Federal Preemption Doctrine to the Secondary Loan Market and Fate of "Valid-When-Made" Principle*, 29 J. TAX'N F. INST. 41 (2016) (agreeing with the historicity of valid-when-made, describing it as "long-established"); Kirby M. Smith, Comment, *Banking on Preemption: Allowing National Bank Act Preemption for Third-Party Sales*, 83 U. CHI. L. REV. 1631, 1669-1671(2016) (accepting valid-when-made as a historical doctrine, but stating that context makes older cases merely persuasive, not binding).

[45] *See* Christopher K. Odinet, *Securitizing Digital Debts*, 52 ARIZ. ST. L.J. 477, 532 n.356 (2020) (agreeing with the historicity and "vital importance" of valid-when-made for Fintech companies); Abbye Atkinson, *Rethinking Credit as Social Provision*, 71 STAN. L. REV. 1093, 1115 n.114 (2019) (taking a neutral position on the historicity of the valid-when-made doctrine while noting the detrimental effects it can have on low-income consumer loan customers); Jayne Munger, Note, *Crossing State Lines: The Trojan Horse Invasion of Rent-a-Bank and Rent-a-Tribe Schemes in Modern Usury Law*, 87 GEO. WASH. L. REV. 468, 488 n.132 (2019) (disagreeing with the acceptance and application of the valid-when-made doctrine as expressed by *Madden*); Christopher Baiamonte, Note, *Stopping Third-Party Debt Buyers From Using National Bank Act Preemption to Dodge State Usury Laws*, 69 SYRACUSE L. REV. 127 (2019) (questioning relevance of valid-when-made because of transactional dissimilarities and the *Erie* doctrine disavowing general federal common law).

[46] *Examining Opportunities and Challenges in the Financial Technology ("Fintech") Marketplace Before the Subcomm. on Fin. Inst. & Consumer Credit of the H. Comm. on Fin. Servs.*, 115th Cong. 7–8 (2018) (written testimony of Adam J. Levitin, Professor, Georgetown Univ. Law Center), https://bit.ly/38eYdBI. .

[47] Amicus Curiae Brief of Professor Adam J. Levitin in Support of Appellant at 4–5, *Rent-Rite Super Kegs West, Ltd. v. World Business Lenders*, LLC, No. 1:19-cv-01552-REB (Appeal from Bankruptcy Adversary Proceeding No. 18-1099-TBM) (D. Colo. Sept. 19, 2019), https://bit.ly/2LnRa0c (position adopted by court in Order on Bankruptcy Court's Determination, *In re: Rent-Rite Superkegs West Ltd.,* No. 19-cv-01552 (Aug. 12, 2020). *See also* Kaur v. World Bus. Lenders, LLC, 440 F. Supp. 3d 111, 121 (D. Mass. 2020) (citing Levitin amicus brief submitted in *Rent-Rite Super Kegs West, Ltd. v. World Business Lenders, LLC*).

[48] Adam J. Levitin, *"Madden Fix" Bills Are a Recipe for Predatory Lending*, AM. BANKER, Aug. 28, 2017, *at* https://bit.ly/3b7PRh2.

© 2021, Adam J. Levitin

but outside the bank regulatory regime.[49] As bank-type activities have expanded outside of the confines of the bank-based regulatory system, the result has been unregulated financial markets that reproduce the very risks that bank regulation is meant to shield against. The shadow banking literature, which emerged after the 2008 financial crisis, has focused on wholesale markets such as money market mutual funds, repos, credit derivatives, and securitization and is primarily concerned with the systemic risks shadow banking poses to the overall financial system.[50]

This Article extends the shadow banking literature into the retail markets of consumer finance. In retail markets the risk posed by shadow banking is primarily not to systemic stability, but to consumer protection laws through abuse of federal preemption of state law. In consumer finance, however, shadow banking operates with a twist. Instead of nonbanks avoiding federal banking regulation while performing bank functions, in consumer finance, nonbanks also pretend to be banks to evade state regulation.[51]

The Article proceeds in six parts. Part I reviews the status of banks and nonbanks under state usury laws. It shows how banks have been effectively exempted from state usury laws, whereas nonbanks remain subject to them. It also shows how consumer lending has become disaggregated over the past several decades. In disaggregated lending,

---

[49] *See, e.g.*, MORGAN RICKS, *THE MONEY PROBLEM: RETHINKING FINANCIAL REGULATION* (Univ. of Chicago Press 2016); David Min, *Housing Finance Reform and the Shadow Money Supply*, 43 IOWA J. CORP. L. 899 (2018); Kathryn Judge, *Information Gaps and Shadow Banking*, 103 VA. L. REV. 411 (2017); Iris H-Y Chiu, *Transcending Regulatory Fragmentation and the Construction of an Economy-Society Discourse: Implications for Regulatory Policy Derived from a Functional Approach to Understanding Shadow Banking*, 42 IOWA J. CORP. L. 327 (2016); Anna Gelpern & Erik F. Gerding, *Inside Safe Assets*, 33 YALE J. ON REG. (2016); Adam J. Levitin, *Safe Banking: Finance and Democracy*, 83 U. CHI. L. REV. 357 (2016);; David Min, *Understanding the Failures of Market Discipline*, 92 WASH. U. L. REV. 1421 (2015); Chrystin Ondersma, *Shadow Banking and Financial Distress: The Treatment of "Money-Claims" in Bankruptcy*, 2013 COLUM. BUS. L. REV. 79; Jonathan Macey, *It's All Shadow Banking, Actually*, 31 REV. BANKING & FIN. L. 593 (2012); Morgan Ricks, *Money and (Shadow) Banking: a Thought Experiment*, 31 REV. BANKING & FIN. L. 731 (2012); Stephen L. Schwarcz, *Regulating Shadow Banking*, 31 REV. BANKING & FIN. L. 619 (2012); Erik F. Gerding, *The Shadow Banking System and Its Legal Origins,* (January 24, 2012) *at* https://ssrn.com/abstract=1990816.

[50] *See, e.g.*, MORGAN RICKS, *supra* note 49; Anna Gelpern & Erik F. Gerding, *Inside Safe Assets*, 33 YALE J. ON REG. (2016).

[51] Other methods of achieving similar ends are obtaining an industrial loan company charter or the new "fintech" charter offered by the Office of Comptroller of the Currency. These methods both bring with them federal safety-and-soundness regulation.

© 2021, Adam J. Levitin

nonbanks often work in tandem with bank but that the regulatory system is still based on the binary bank vs. nonbank division.

Part II turns to the phenomenon of rent-a-banks. It explains how rent-a-banks work and how they differ from mere outsourcing of production by banks. This part also reviews the evolution of rent-a-bank arrangements and the incomplete nature of past regulatory efforts to address the issue.

Part III presents a case study of the state-of-the-art rent-a-bank arrangements used by Elevate Credit, Inc., a subprime "fintech" lender. This section is the first detailed profile of a fintech lender in the scholarly literature.[52] The case study underscores the replication of the firm via contract in rent-a-bank schemes, the high level of transactional sophistication used for little purpose other than evasion of usury laws, and the ability for non-public firms to entirely mask the existence of a rent-a-bank arrangement simply by using derivative contracts rather than outright loan sales.

The remainder of the Article turns to the hotly contested doctrinal status of rent-a-bank transactions. Part IV lays the ground by reviewing the *Madden* litigation where the issue came to a head. It presents the *Madden* rule, the "valid-when-made" doctrine, and "true lender" doctrine as three different approaches to the question taken by courts and regulatory agencies.

The Article then turns to a close inspection of the "valid-when-made" doctrine, which is used to defend rent-a-bank arrangements. The valid-when-made doctrine's claim to legitimacy rests primarily on

---

[52] A small literature has emerged about fintech in the consumer finance space, but it does not include a detailed examination of the contractual structure of any fintech lending operation. *See, e.g.*, Matthew A. Bruckner, *Preventing Predation and Encouraging Innovation in Fintech Lending*, 72 CONS. FIN. L.Q. REP. 370 (2019); Matthew Adam Bruckner, *The Promise and Perils of Algorithmic Lenders' Use of Big Data*, 93 CHI. KENT L. REV. 3, 37 (2018); Matthew A. Bruckner, *Regulating Fintech Lending*, 37 BANKING & FIN. SERV. POL'Y REP. 1 (2018); Christopher K. Odinet, *Consumer Bitcredit and Fintech Lending*, 69 ALA. L. REV. (2018); Rory Van Loo, *Making Innovation More Competitive: The Case of Fintech*, 65 UCLA L. REV. 232 (2018); Robert P. Bartlett et al., *Consumer-Lending Discrimination in the Fintech Era*, NBER working paper No. w25943; Anupam Chander, *The Racist Algorithm?*, 115 MICH. L. REV. (2017); Frank Pasquale, *Democratizing Higher Education: Defending & Extending Income Based Repayment Programs*, 28 LOY. CONSUMER L. REV. 1 (2015). A contemporary article by Christopher K. Odinet, *Predatory Fintech and the Politics of Banking*, IOWA L. REV. (forthcoming 2021), contains an extended consideration of the structure of rent-a-banks, including a high-level case study of Elevate Credit that relies on Elevate's 10-K, rather than the underlying contracts and does not track the evolution of Elevate from an on-line payday lender into a "fintech."

© 2021, Adam J. Levitin

its supposed historicity and incorporation in the National Bank Act of 1864 as part of its common law background. The doctrine's proponents argue that it is a well-established doctrine, endorsed by early 19th century Supreme Court cases, and the "bedrock" of banking law. This supposed historicity is the basis of the claim that the doctrine is essential for maintaining bank liquidity and therefore safety-and-soundness.

In fact, as Part V shows, the valid-when-made doctrine is utterly lacking in a historical basis. Despite claims that the doctrine is "centuries" old,[53] there is actually not a single case consistent with the doctrine or other indication of the doctrine's existence until 1979. Instead, the supposed support for the doctrine comes from decontextualized quotations pulled from historical cases about the calculation of the interest rates for usury purposes. Simply put, the doctrine is not valid, but made up. The doctrine's lack of historicity undermines the claim that it is critical for protecting bank liquidity; banks have in fact operated without difficulty for centuries in the absence of the doctrine.

Part VI turns to a consideration of the policy trade-offs among the doctrinal approaches. The Article argues that the best approach as a matter of consumer protection policy and as bank regulatory policy is the *Madden* rule, buttressed by the anti-evasion principle evinced by true lender doctrine. The *Madden* rule prevents a regulatory vacuum, has substantial administrability and certainty benefits, while the anti-evasion principle protects against sophisticated transactional attempts to evade the *Madden* rule through derivative transactions such as those illustrated by the Elevate Credit case study. In order to effectuate application of the anti-evasion principle, banks seeking to enforce loans in court should be required to disclose any transfer of an economic interest in such loans to nonbanks. A conclusion considers

---

[53] *See, e.g.*, Sullivan & Cromwell LLP, *OCC Proposes a Rule to Establish When a Bank Is the "True Lender" of a Loan*, July 24, 2020, https://bit.ly/3b229aG ("For centuries—predating the enactment of the NBA in 1864—caselaw and market practice had established that an interest rate valid at the origination of the loan remained valid even after the originator (whether or not a bank) sold or assigned the loan to another party (whether or not a bank)."); Davis Polk, *Federal Banking Regulators Can and Should Resolve Madden and True Lender Developments*, white paper, Aug. 14, 2018, *at* https://bit.ly/3n7cSD6 ("A long-settled legal principle known as the "valid-when-made" doctrine has served for almost two centuries as the bedrock for bank lending.").

© 2021, Adam J. Levitin

the effects of recent regulations on the doctrinal debate and shows that they do not resolve the issue.

## I.   THE DISAGGREGATION OF CONSUMER LENDING

Usury laws have been the cornerstone of consumer financial protection in America since colonial times.[54] Every state has a usury statute of some sort that caps the level of charges on a loan. These statutes vary considerably in their design and application, with some covering only "interest," and others extending to various types of loan charges.[55] Frequently states have different limitations for different types of loan products or different types of lenders and borrowers. Thus, the permitted rate on payday loans or other small dollar loans might be different than that for auto loans or for installment loans, or the permitted rate might be different for banks than for nonbanks, or the permitted rate might be different for consumers and businesses. This Part briefly reviews the function of usury laws as a borrower protection, before turning to a history of the unraveling of usury laws for banks in the United States. It then considers how the disaggregation of consumer lending has interfaced with the entity-based structure of usury laws.

### A.   *Functions of Usury Laws*

Usury laws are fundamentally a borrower protection, even though they can protect a reckless lender as well. Usury laws involve a paternalistic intervention into freedom of contract by creating an irrebuttable presumption that the conditions necessary for efficient Coasean bargaining could not have existed if the interest rate in a contract is above the specified usury level. This presumption protects borrowers from lender market power and informational asymmetries, and it helps prevent negative externalities from overindebtedness.

---

[54] *See* Drysdale & Keest, *supra* note 40, at 604 ("Usury laws are, at core, the earliest form of consumer protection law.").

[55] For purposes of this Article, I refer to all manner of regulated charges on a loan as "interest." State laws vary considerably in how they define such charges. Some refer to "interest," which is not always defined. Others use the federal Truth-in-Lending Act terminology of "finance charge," while others include charges that lie outside that of the TILA "finance charge," but which might be within the ambit of the federal Military Lending Act's broader definition of "finance charge."

© 2021, Adam J. Levitin

First, usury laws shield borrowers from situations in which the lender has market power. Such market power might be due to limited or imperfect competition in a market.[56] Alternatively, the lender's market power might also stem from the consumer's financial duress or consumer's misperception of limited credit options. If a consumer needs funds immediately or if a consumer thinks that he is such a poor credit risk that he is lucky that anyone will lend to him, then the consumer might simply take the first offer available and not shop for better terms.

Second, usury laws protect consumers from lenders taking advantage of informational asymmetries and behavioral biases. A consumer might fail to understand a deal, either because she is misinformed or because of a cognitive limitation. Or a consumer might simply be unduly optimistic about repayment possibilities.

Finally, usury laws protect not just consumers themselves, but also third parties from negative externalities of over-indebtedness. To the extent that a usurious interest rate leads a consumer to get stuck in a debt trap, such that the consumer is spending all disposable income on debt service, rather than on other investments, it may harm the consumer's dependents and ultimately the public fisc if it results in the consumer becoming a public charge.[57]

While usury laws prevent lenders from exploiting market power or informational and cognitive problems and may also reduce negative externalities of over-indebtedness, they also restrict credit to a subset of borrowers who because of their riskiness cannot obtain credit at non-usurious rates. Indeed, the typical neoclassic economic analysis of usury regulations is that they merely cut riskier borrowers out of the market, which may actually be detrimental to those would-be

---

[56] Such limited competition might be a function of market structure, such as situations where lenders compete for a loan broker's business, not the borrower's business directly. That is the situation in indirect auto lending, Adam J. Levitin, *The Fast and Usurious: Putting the Brakes on Auto Lending Abuses*, 108 GEO. L.J. 1257 (2020), online lending through lead generators, Adam J. Levitin, *Led Down the Financial Garden Path*, working paper 2020, and was historically the situation with mortgage loan brokers and yield spread premium compensation. Laurie Burlingame & Howell E. Jackson, *Kickbacks or Compensation: The Case of Yield Spread Premiums*, 12 STAN. J. L. BUS. & FIN. 289 (2007).

[57] Eric A. Posner, *Contract Law in the Welfare State: A Defense of the Unconscionability Doctrine, Usury Laws, and Related Limitations on the Freedom to Contract*, 24 J. LEGAL STUD. 283 (1995).

© 2021, Adam J. Levitin

borrowers' welfare.[58] Usury laws might also fairly be critiqued as arbitrary in regard to the specific interest rate that triggers the presumption of unreasonable advantage taking and as poorly tailored, given that they are one-size-fits-all for all consumers. Some consumers may be able to responsibly assume greater risk than others because of their greater resources or sophistication.

The point here is not the ultimate policy merits of usury laws in general, much less any specific statute, but that they reflect a legitimate consumer protection concern that certain loans may reflect fundamentally unfair contracting conditions and that repayment would be sufficiently deleterious to the welfare of borrowers that it should not be required.

### B. *Marquette and the Race to the Bottom*

While state usury laws were the traditional bulwark of consumer credit protection, they were substantially undermined in the 1970s and 1980s by a Supreme Court decision that set off a legislative "race to the bottom." Usury deregulation started with banks. Banks are either federally chartered (national banks) or state chartered (state banks) and are governed by different laws. In 1978, in *Marquette National Bank v. First of Omaha Service Corporation*, the Supreme Court held that under section 85 of the National Bank Act,[59] a national bank was allowed to export the interest rate allowed in its "home" state to other states in which it did business.[60] Thus, when a Nebraska-based national bank made loans in Minnesota, it was still subject to the Nebraska usury cap

---

[58] *See, e.g.*, Rudolph C. Blitz & Millard F. Long, *The Economics of Usury Regulation*, 73 J. POL. ECON. 608, 613 (1965) ("While the oft-stated purpose of usury legislation is to help that class of debtors which includes the landless peasants, poor urbanites, and very small businessmen, maximum rates are likely to affect them adversely by excluding them from the market.").

[59] 12 U.S.C. § 85.

[60] 439 U.S. 299 (1978). Technically, banks can export the greater of the maximum rate allowed in the state in which the bank is "located" or 1% of the applicable Federal Reserve 90-day commercial paper rate. 12 U.S.C. § 85. Subsequent OCC opinion letters interpreted the "location" of a national bank for the purposes of section 85 as being the state of whatever branch of the bank had the closest nexus to the loan, rather than being the state where the national bank is located on its charter certificate or where its main office is located. *See* OCC Interpretive Letter 686 (Sept. 11, 1995) *reprinted in* [1995-96 Transfer Binder] Fed. Banking L. Rep. (CCH) P81-001; OCC Interpretive Letter 707 (Jan. 31, 1996), reprinted in [1995-1996 Transfer Binder] Fed. Banking L. Rep. (CCH) P81-022; OCC Interpretive Letter 782 (May 21, 1997), *at* https://bit.ly/2X68JVk; OCC Interpretive Letter 822 (Feb. 17, 1998), *at* https://bit.ly/356JxCu ("For purposes of section 85 a national bank may be located in both its home state and its host states"); OCC Interpretive Letter 1171 (June 1, 2020), https://bit.ly/2LelbQd.

© 2021, Adam J. Levitin

rather than the lower Minnesota usury cap. *Marquette* did not void state usury laws, but created a federal choice-of-law rule regarding which state's usury law would apply to a national bank doing out-of-state business.

National banks' newfound ability to "export" their home state's usury rate to other states gave national banks a substantial competitive advantage over state-chartered banks, particularly in the high interest rate environment of the late 1970s and early 1980s, when prime interest rates veered close to or even over state usury caps. Among the highest rate bank credit products are credit cards, so not surprisingly national banks with major credit card lending operations began to relocate to states with no or lax usury laws to take advantage of the *Marquette* decision. These banks relocated (or created credit-card issuing national bank subsidiaries) to Delaware, South Dakota, Utah, and Nevada—states that permitted whatever interest rate the parties agreed to by contract.[61] By 1988, 18 states had removed interest rate ceilings for bank transactions.[62]

*Marquette* governs only national banks, but in 1980, Congress passed a federal parity statute that gave parity to all state banks equal treatment with national banks, unless a state chose to opt out of the provision.[63] The federal parity law only allowed state banks to export their home state's usury limit, not to match the "imported" limit allowed to out-of-state banks. To wit, if Illinois had an 8% usury limit, an Illinois-chartered bank could charge 8% in Illinois or in Michigan, even if Michigan had a 6% usury rate. But a national bank based in Indiana, which has a 12% usury limit, could charge 12% in either

---

[61] *See supra* notes 29-32. *See also* Robin Stein, *The Ascendancy of the Credit Card Industry*, https://to.pbs.org/3rRU5iK.

[62] Randall S. Kroszner & Philip E. Strahan, *Regulation and Deregulation of the US Banking Industry: Causes, Consequences, and Implications for the Future,* in Economic Regulation and Its Reform: What Have We Learned? (Nancy L. Rose, ed.) 485, 503 (2014).

[63] Depository Institutions Deregulation and Monetary Control Act of 1980 ("DIDMCA"), Pub. L. No. 96-221, § 527, 94 Stat. 132, 167 (Mar. 31, 1980), *codified at* 12 U.S.C. § 1831d (parity). 12 U.S.C. § 1831u(f) separately addresses usury caps in state constitutions. The DIDMCA parity provision allows state-chartered, FDIC-insured banks to charge the greater of the maximum rate allowed in the state in which the bank is located or 1% above the Federal Reserve 90-day commercial paper discount rate for the applicable Federal Reserve District. The opt-out provision, § 527 of DIDMCA is not currently codified; it was previously codified at 12 U.S.C. § 1730g (note). Puerto Rico and Iowa have opted out of the federal parity statute. Catherine M. Brennan & Nora R. Udell, *What's Old Is New Again: The Future of Bank Partnership Programs from Small Dollar Installment Loans to Mortgages to Everything*, 72:4 Conf. on Consumer Fin. L. Q. Rep. 425, 430 (2018).

© 2021, Adam J. Levitin

Illinois or Michigan. Thus, under the federal parity statute, the Illinois state bank would remain at a competitive disadvantage to the Indiana-based national bank.

States responded to protect their state-chartered institutions' competitive equality with state parity laws permitted state banks to charge the maximum rate that could be charged by a national bank doing business in the state. Accordingly, in the above example, the Illinois chartered bank would be able to charge 12% in Illinois because an Indiana-based national bank could export the 12% Indiana rate into Illinois. When combined with the federal parity statute, this meant that the Illinois chartered bank could also export the Indiana 12% rate into Michigan. Given that several states have no usury limit for bank loans when there is a written loan agreement, bank usury law largely became a matter of the lowest common denominator—the contractually agreed-upon rate.

The *Marquette* decision thus set off a race-to-the-bottom among states with the result that state usury laws were effectively gutted *for banks*. Notably, the erosion of state usury laws in the wake of *Marquette* did not extend to *nonbanks*. While states lost the ability to control pricing of consumer credit issued by banks, their ability to regulate nonbanks remained intact.

### C. The Changing Institutional Landscape of Consumer Credit

In 1978, when *Marquette* was decided, the fact that it only directly affected banks seemed of little importance, because banks comprised the substantial majority of the non-mortgage consumer credit market.[64] Indeed, in 1978, banks and other depositories made up 73% of the US consumer credit market in terms of receivables outstanding.[65] At that time, nonbank lenders consisted primarily of finance companies, pawn shops, and retailers (including auto dealers) offering store credit. Thus, the most immediate impact of *Marquette* was in the credit card market because most other types of standard bank loan products—mortgages, auto loans, and student loans—have lower interest rates than credit

---

[64] Separate usury laws have often applied to mortgages, and federal law preempts state usury laws for virtually all first lien mortgages. 12 U.S.C §§ 1735f-7, 1735f-7a.

[65] Bd. of Gov. of the Fed. Reserve Sys., Financial Accounts of the United States, Statistical Release Z.1, table L.222.

© 2021, Adam J. Levitin

cards, such that usury caps would rarely be an issue except in periods of extremely high market interest rates.

Yet 1978 also happened to be the highwater mark for banks' role in consumer credit. In particular, by the 1990s, securitization began to play a major role in financing non-mortgage consumer credit, rising to a third of the market by the early 2000s. By 2008, banks' share of non-mortgage consumer credit outstanding had fallen from its 1978 height of 73% to just 43%.[66] Subsequent changes to account rules render later data noncomparable.[67]

### D.  *Disaggregation of Consumer Lending*

The shift in that occurred in the consumer finance market place was not simply one of nonbanks replacing banks. Instead, it also involved a disaggregation of the consumer lending cycle.

The financial regulation literature has long focused on securitization as one of the exemplar forms of financial "disintermediation," meaning a shift away from bank intermediation between sources of capital and borrowers.[68] But securitization is not just an example of financial of disintermediation. It is also a type of "disaggregated" consumer lending, as the following section explains, because securitization structures inherently split the lending function into discrete functions played by separate entities. While banks are often still involved in consumer lending, many of the key activities in the lending cycle are performed by nonbanks.

Consumer lending consists of a set of separate activities. First, a credit product must be designed—how will the product operate and be priced? Then the product must be marketed and potential borrowers identified and wooed. Once actual borrowers apply for the product, they must be "underwritten," meaning that they must be qualified and priced according to their risk profile. If the borrower qualifies and agrees to the loan, the loan must be funded, meaning that the borrower will receive the money. After the loan is made, it must still be serviced—billing statements must be sent out and payments collected, as well as other ministerial tasks, and any defaults must be

---

[66] *Id.*

[67] *See* SFAS 167 (effective 2010) (resulting in numerous securitization exposures being brought back on bank balance sheets).

[68] *See, e.g.,* Schwarcz, *supra* note 27.

© 2021, Adam J. Levitin

managed. And someone must hold both the credit risk and interest rate risk on the loan.

Historically, the entire lending cycle was conducted by the same institution—often a bank—that would design, market, underwrite, fund, service, and hold the loan. Nothing, however, requires that the entire lending cycle be conducted in a single institution. Thus, the consumer lending cycle can be disaggregated and different functions spread among different parties that are joined by a web of contracts.

Today, consumer lending is increasingly disaggregated. Securitization, a financing technique that funds most mortgages in the United States,[69] represents a classic example of disaggregation in consumer lending. While securitization transactions can be quite complex, the basic idea is straightforward. A financial institution (bank or nonbank) that "sponsors" the securitization owns a pool of loans that it either made itself or purchased. The sponsor then sells the loans to a special purpose entity (SPE) it has set up. The SPE engages in no business other than owning the loans. The purpose of the SPE is to insulate the loans from all risks other than those inherent in the loans themselves, including operational risks and competing creditors. The SPE then issues bonds that are to be repaid solely from the collections on the loans. The SPE uses the proceeds of the bond issuance to pay the sponsor for the loans. The loans have thus been effectively funded by the bond investors, not the sponsor.

One of the attractions of a securitization transaction is that it enables investors to invest solely in the risks related to the securitized loans—whether they will prepay or default—and not have to worry about all of the risks of the sponsor as an operating entity. If the bonds were issued by the sponsor itself, the investors would be exposed to the total picture of the sponsor's finances—all of its assets and all competing liabilities, including involuntary liabilities like tort and tax

---

[69] Bd. of Gov. of the Fed. Res. Sys., *Financial Accounts of the United States, Statistical Release Z.1*, table L.218. Securitization historically also funded a large share of the credit card market, but today no longer does so both because of a change in accounting rules, SFAS 166 and 167, that went into effect in 2010. These new accounting changing the treatment of variable interest entities, such as securitization vehicles. Additionally, securitization-dependent monoline card issuer have largely disappeared, having either failed (Advanta), been purchased by a full service bank (MBNA, purchased by Bank of America) or become full service retail banks with a deposit funding base, such that they do not need to rely on capital markets funding (Capital One).

© 2021, Adam J. Levitin

creditors. Because the SPE carries on no business and is nothing more than a "box" to hold the loans, the investors are taking on solely the risks associated with the loans, but not the risks associated with an operating entity that might engage in other types of business, commit torts, etc. The SPE's only obligations should be contractual and knowable in advance, so investors can price for the risk of competing demands on the SPE's assets.

By separating the loans from the sponsor, the securitization structure inherently separates the front-end of the lending process—designing a loan product, marketing it, underwriting borrowers, and providing the initial funding for the loan—from the back-end of the lending process—holding the economic exposure (credit risk and interest rate risk) on the loan. The sponsor handles the front-end of the process, while the bond investors handle the back-end.

On the back-end, securitization also further separates the economic exposure to the loan from legal title to the loan; the bond investors have the economic exposure, while the SPE has legal title. Additionally, someone has to manage the loan—invoices must be sent out, payments collected, defaults managed, etc. The SPE cannot do this work itself because the whole point of the transaction is to isolate the economic risk on the securitized loan from operational risks. Therefore, the SPE has to hire an agent called a servicer to manage the loan. The servicer is typically compensated with some of the collections from the loan. The servicer might be an affiliate of the sponsor or it might be an unaffiliated entity. Either way, the need for a servicer further disaggregates the lending process. The result is that the front end is split off from the legal title to the loans, which is split from practical control over the loans, which is split from economic exposure to the loans. Securitization disaggregates lending.

Both the front-end and back-end exposure can be further split, as can the servicing. The sponsor can handle the entire front-end itself, but it might have purchased the loans from another entity. And it might have underwritten the loans using automated underwriting software provided by a third-party. Indeed, that is how most mortgage lending works, with lenders using Fannie Mae and Freddie Mac's automated underwriting platforms and underwriting to Fannie and Freddie's underwriting criteria—which his required for selling loans to Fannie and Freddie—rather than to their own.

© 2021, Adam J. Levitin

On the back-end, securitization structures commonly divide interest rate (prepayment) risk from credit risk and allocate them differently, with credit risk frequently being assumed by a guarantor (that may or may not be affiliated with the sponsor). And servicing rights are sometimes divided, such that one entity services performing loans, while another one handles defaulted loans. The variation, if not endless, is extensive.

Disaggregation exists outside of securitization too. For example, even without securitization, both the initial funding and economic exposure might ultimately be provided by a party other than the nominal lender. For example, most auto loans are "indirect loans" in which the consumer enters into a retail installment sale contract with the dealer, who then sells the contract to a financial institution.[70] Depending on the timing of the sale to the financial institution, the funding may be coming from the dealer (who floats the loan initially) or from the loans' purchaser. Likewise, many online payday and installment loans operate through lead generators that advertise the loans and collect loan applications, which are then auctioned off to prospective funders. Various types of "fintech" firms present another type of disaggregation.[71]

Disaggregation presents an application of Jensen and Meckling's theory of the firm as a "nexus of contracts."[72] Jensen and Meckling understood the "firm" as a single entity or set of affiliated entities, with all of the contracts occurring implicitly within the entity or among affiliated entities bound by corporate control. This arrangement enabled corporate agents to fill in omitted terms in incomplete and implicit contracts, now occurs with explicit contracts among unaffiliated entities.[73] Disaggregation means that the firm now consists of a set of formally unaffiliated entities, bound together by contract

---

[70] *See* Levitin, *The Fast and the Usurious*, *supra* note 55 (explaining structure of indirect auto lending market).

[71] *See* Chris Brummer & Yesha Yadav, *Fintech and the Innovation Trilemma*, 107 GEO. L.J. 235, 242, 276 (2019) (describing fintech's role in the "fragmentation" of the "financial supply chain").

[72] *See* Jensen & Meckling, *supra* note 25.

[73] *See* William W. Bratton & Adam J. Levitin, *A Transactional Genealogy of Scandal: from Michael Milken to Enron to Goldman Sachs*, 86 S. CAL. L. REV. 783, 825, 859, 865, (2013) (describing collateralized debt obligations as the "apotheosis" of the nexus of contracts firm); Anna Gelpern & Adam J. Levitin, *Rewriting Frankenstein Contracts: Workout Prohibitions in Residential Mortgage-Backed Securities*, 82 S. CAL. L. REV. 1075, 1121-22 (2009) (describing securitization as an attempt to create a contractually complete firm).

© 2021, Adam J. Levitin

such that they operate as a single unit. Disaggregated lending produces a disembodied nexus of contracts that is not formally a "firm," consisting of corporate affiliates, even if it functions as one.

### E.  *Disaggregated Lending's Effect on Consumer Protection*

Rent-a-bank arrangements represent yet another version of the disaggregation of the lending cycle. Typically, the bank provides only the initial funding of the loan and perhaps some servicing support. The regulatory problem presented by rent-a-banks is a function of disaggregated lending, which replaces the formal "firm" with a disembodied nexus of contracts, colliding with an entity-based approach to financial regulation. The mismatch creates an opportunity for regulatory arbitrage, and the differential treatment of banks and nonbanks for usury purposes (as well as for state licensure and other consumer protections) creates a motive for engaging in the regulatory arbitrage.

The financial regulatory system is a mix of entity-based and activity-based regulation. For example, there are regulatory regimes specific to consumer credit, such as Truth in Lending Act disclosures, that apply irrespective of entity type. But other parts of the regulatory regime are specific to particular entity types, such as banks or money transmitters, because of the special functions these entities play in the financial system and the types of activities in which they are presumed to engage. Thus, banks are the only type of entity allowed to hold insured demand deposits, an activity that necessitates regulation of the risk of bank lending to ensure that the bank will be able to honor its deposit liabilities: if the bank's loans go bad, it will not be able to repay the depositors.

Entity-based regulation presents a risk of a mismatch if there is an expansion of the type of entity performing an activity. The limitations of entity-based regulation are precisely why "shadow banking" has raised so much regulatory concern in wholesale financial markets. Shadow banking refers to the various institutions and transactions that replicate the financing functions traditionally provided by banks.[74] Because prudential regulation—regulation to ensure the safety-and-soundness of financial institutions—is an entity-based regulatory

---

[74] *See, e.g.*, Steven L. Schwarcz, *Regulating Shadow Banking*, 31 REV. BANKING & FIN. L. 619, 624-625 (2012).

© 2021, Adam J. Levitin

system, the rise of shadow banking has posed a major challenge to regulators ability to guaranty the safety-and-soundness of the financial system and to protect against system risk.[75]

Disaggregation of consumer lending has led to a parallel problem in consumer protection. The banks are treated differently than other entities for purposes of usury laws. The unstated logic behind the different treatment is that banks, which can operate nationwide, should not be saddled with compliance with inconsistent state usury laws because the federal bank regulatory ensures that they will not make excessively risky—and thus high-cost—loans. Riskier loans generally have higher interest rates to compensate for the risk. Thus, by preventing banks from making risky loans, the bank regulatory system is presumed to also prevent loans with excessively high cost, effectively substituting for usury laws.

To be sure, nothing in the federal bank regulatory expressly prohibits banks from making high cost loans. Rather, the federal regulatory system relies on the "soft" tools of bank supervision to dissuade banks from engaging in practices deemed excessively risky.[76] Herein lies the first flaw in the idea that federal bank regulation is a substitute for usury laws: there is no guaranty that a bank regulator will actually use these tools. Indeed, a regulator is unlikely to take action if it disagrees philosophically with usury laws as an interference with "freedom" of contract. Whereas usury laws can be raised as a defense or even as a private rights of action, consumers cannot force bank regulators to use their supervisory powers.

Even aside from discretion regarding supervisory actions, there is a bigger flaw in the logic of federal preemption. Federal bank regulator supervision is not a substitute for usury laws because the key bank regulatory concern is not about *consumer* protection. Instead, it is about *bank* protection—protecting the safety-and-soundness of the *bank*.

Bank safety-and-soundness is not synonymous with consumer protection. Among other things, banks can diversify their risks in a way consumers cannot. If a bank makes thousands of high-cost loans knowing that a percentage will default, the revenue on those that perform (or perform for a while) may outweigh the losses from

---

[75] *Id.*
[76] *See* Tahyar testimony, *supra* note 36.

© 2021, Adam J. Levitin

defaults. Indeed, high-cost lending might be profitable. It is hard for a regulator concerned with safety-and-soundness to tell a bank to cease engaging in a profitable activity because a bank is only safe-and-sound if it is profitable.

From a consumer protection perspective, however, diversification is irrelevant. If a consumer's loan is the one that defaults because of an excessively high cost, it does not matter to the consumer that other consumers were able to pay off the loan. The welfare loss of one consumer cannot be offset by another consumer's welfare gain. In this regard, consumer protection resembles Pareto efficiency, not Kaldor-Hicks efficiency. Simply put, supervision by federal bank regulators is not a substitute for usury laws.

## II.    RENT-A-BANK ARRANGEMENTS

The disparate treatment of banks and nonbanks under usury laws creates a motivation to exploit the regulatory arbitrage set up by the mismatch between disaggregated consumer lending transactions and the binary, entity-based regulatory system. In this arbitrage, nonbanks attempt to shelter in banks' exemption from usury laws. That is precisely what the rent-a-bank structure is about.

This Part considers the bank contours of rent-a-bank relationships and provides a history of their development as a response to regulation of payday loans, and the subsequent and incomplete regulatory pushback against rent-a-bank relationships. It also examines the structure of rent-a-bank arrangements in detail through a case study of Elevate Credit, Inc., which has perhaps the most sophisticated and publicly observable rent-a-bank arrangements in the market at present.

The basic design of a rent-a-bank transaction is straightforward. A nonbank lender contracts with a bank to (1) make loans according to the nonbank lender's specifications and then (2) sell the loans to the nonbank lender. Typically, the nonbank will market and service the loans, although the allocation of marketing and servicing is not essential to rent-a-bank arrangements. Instead, the key features are the bank taking its underwriting marching orders from the nonbank and the nonbank acquiring the lion's share of financial exposure on the loans.

The precise details of rent-a-bank arrangements can vary substantially, but the variations are often driven by a desire to make it look as if the bank actually has greater involvement in the transaction that it does. For example, the bank might maintain nominal control over underwriting decisions, but in practice, the bank is unlikely to ever second-guess the nonbank, lest the nonbank decline to purchase the loans and leave the bank holding a bunch of loans that it would never have made on its own account.

Similarly, it is common in rent-a-bank arrangements for the bank not to sell *all* of the loans to the nonbank lender. The bank might retain $1 million exposure on the loans. Or it might sell the loans only after holding them for a limited time period—perhaps only two days.[77] Or a bank may sell only a derivative interest (or partial derivative interest) in the loans. The idea is that a partial or delayed or derivative sale strengthens the claim that the bank is the real lender in the transaction. Yet the bank's retained *de minimis* exposure or a *de minimis* holding period would seem to underscores the sham nature of the transaction: what is its purpose other than to enable the bank to claim that it is the true lender?

### A.  *Rent-a-Bank Distinguished from Outsourced Production*

It is important to distinguish rent-a-bank relationships from run-of-the-mill outsourced production. Banks are no different than other businesses in that they face a buy-or-make decision regarding any particular good or service they use. The efficiency of vertical integration versus outsourcing will depend on myriad factors. For example, banks require various types of computer software to operate their businesses, such as loan servicing software that enables them to keep track of balances and payments and legal notices for particular borrowers. A bank could have its own employees code the software or it could purchase the software from a third-party that specializes in writing such software production or the bank could contract with a third-party to handle all the loan servicing, leaving the software issue up to that third-party. If the third-party can provide the software or handle the servicing more efficiently than the bank, the bank will likely opt for third-party provision.

---

[77] *See, e.g.,* Sawyer v. Bill Me Later, Inc., 23 F. Supp. 3d 1359, 1360 (D. Utah 2014).

© 2021, Adam J. Levitin

From an economic standpoint, the choice of internal versus external production is irrelevant. What matters from an economic standpoint is that the bank is the nexus of contracts among the various factors of production.[78] Those contracts may be either explicit contracts with outsourced providers or implicit ones within the firm.

From a regulatory standpoint, however, things look different. Banks are distinct from regular businesses. Whereas a regular business corporation can be created more or less as a matter of right, the issuance of a banking charter is discretionary to the chartering authority and requires consideration of various factors, including the public interest.

The issuance of banking charters is regulated because the charter carries with it privileges not granted to regular businesses, most notably the right to take money deposits, pay checks from deposits, and lend money.[79] While nonbanks engage in lending and payments, they require a special license to engage in these activities,[80] and, more importantly, they are not permitted to combine the activities: nonbank lenders cannot accept deposits, and nonbank money transmitters cannot make loans. The combination of deposit taking, payments, and lending activities is of particular regulatory concern because of the risks they pose to the monetary system and to the economy writ large—because banks fund loans with deposits, the possibility of losses on the loans poses a risk to deposits and to the payment system on which the economy depends. Restricting the set of institutions that are allowed to engage in the combination of core banking activities facilitates regulatory oversight because it defines the set of institutions on which regulators must focus their supervisory efforts. If wildcat banking were permitted, regulators would not even know which businesses to supervise.

The difference between internal and external production matters from a regulatory standpoint because of the regulatory concern about keeping the entire "business of banking" within the four corners of

---

[78] *See generally* Coase, *supra* note 28; Williamson, *supra* note 28; Jensen & Meckling, *supra* note 25.

[79] OCC, *Exploring Special Purpose National Bank Charters for Fintech Companies*, Dec. 2016 at 3 (identifying "three core banking functions: receiving deposits, paying checks, or lending money.").

[80] *See,* 18 U.S.C. § 1960 (criminal prohibition of unlicensed money transmission). Lending is licensed under a range of state statutory regimes varying by the type of loan.

© 2021, Adam J. Levitin

regulatory oversight. To the extent that external production shifts the business of banking outside the scope of regulatory vision and authority, it undermines the regulatory system. To this end, from a regulatory perspective it is important which factors of production are internal versus external at a bank. If all factors of production are external, and the bank merely coordinates among them—literally serving as the nexus of contracts—the entire regulatory regime's design is undermined. Regulators would still be focused on the bank, but the coordination role played by the bank does not itself pose any particular regulatory concern, whereas the areas of that should be of regulatory concern shift outside the ambit of bank regulatory authority.

This is not to say that bank regulation cannot tolerate external production. But it requires that the bank be the entity ultimately answerable for the product, meaning that the bank must be acting as the principal in the production relationship, rather than the agent.[81]

Likewise, the nature and extent of outsourcing also matter from a regulatory perspective. Some activities are so fundamental to the business of banking that their outsourcing begs the question of what is left for the bank to do. In particular, the design and underwriting of loans, the taking of deposits, and the payment of checks are so fundamental, that the outsourcing of these activities by a bank undermines banking as a regulatory category. It does not matter that nonbanks may engage in any one of these activities. Instead, the point is that if the bank has been licensed to perform these activities, the license is granted with the expectation that it is the bank—and not some other party—that will be performing the activity, as the license is personal to the bank. Relatedly, this suggests that the extent of outsourcing matters. For example, banks regularly rely on credit scores purchased from third parties as part of their underwriting, but this is different from outsourcing the pricing of the product or the applicable credit score cutoffs or determination of what other factors should be considered in underwriting.

---

[81] Banks are, of course, permitted to act as agents for nonbanks, but when they do, their powers are limited to those of the principal, as they are acting on its behalf. For example, when a bank services loans on behalf of a nonbank, the nonbank is not entitled to federal interest rate exportation merely by virtue of having hiring a bank as a servicing agent.

© 2021, Adam J. Levitin

The forgoing discussion points to four ways in which rent-a-bank relationships differ from mere outsourcing of factors of production. In rent-a-bank relationships there is:

(1) a loan product design is proposed by a nonbank to the bank;

(2) an outsourcing of all or nearly all factors of production of loans (marketing, underwriting, funding, servicing);

(3) an outsourcing of the various factors of production of loans to a single nonbank or its affiliates; and

(4) the transfer of most or all of the credit risk on the loans either to the nonbank and its affiliates or to third-parties through a transaction arranged or facilitated by the nonbank.

In other words, in a rent-a-bank relationship, a single nonbank and its affiliates initiate the relationship, propose the outsourcing, provide all or nearly all of the factors necessary to make the loans and either acquire most of the economic exposure to the loans or facilitate the transfer of the economic exposure to a third-party.

The first point emphasizes that the bank is not the true nexus of contracts in the rent-a-bank relationship. Rather than the bank being the entity that outsources production to various vendors, it is the nonbank that outsources parts of the production of its own loan product. It is the nonbank that sponsors the transaction and serves as the hub for the various contractual relationships. The nonbank is always the party that approaches the bank with the idea for the partnership and that coordinates exactly who will provide what service in production process. This is a completely different situation than a bank that devises a loan product and contracts with an advertising firm to provide marketing services and with a technology provider for a software made to the bank's specifications, and then separately transfers some or all of the risk on the loans to investors. Instead, in a rent-a-bank situation, the non-bank approaches the bank with a proposed loan product and a turnkey solution for the product—marketing, underwriting, servicing, and possibly funding.

The second and third points emphasize that in the rent-a-bank situation, the nonbank and its affiliates provides all or nearly all of the factors of production. The bank typically does little other than provide the initial funding for the loan, and sometimes not even that, although

© 2021, Adam J. Levitin

sometimes the bank retains nominal approval over external factors of production. Instead, in a rent-a-bank arrangement, the factors of production come nearly entirely from the nonbank and its affiliates. That indicates that the bank is not simply outsourcing based on searching for the best external solution for any particular factor of production, but is instead buying an entire loan product from the nonbank, such that the nonbank is the real lender. In other words, the bank is adding little or nothing to the production itself other than the privileges that come with its charter. If the bank's only material contribution to the lending process is the privileges of its charter or initial funding (but with a near immediate and substantial shift in economic exposure), the transaction should be deemed an attempt to evade usury laws.

The final point emphasizes that in the rent-a-bank situation, the bank always transfers most or all of the economic risk on the loans to other parties. While banks frequently engage in risk transfers in non-rent-a-bank situations, it is the combination of outsourced production and risk transfer is the hallmark of rent-a-banking. This is particularly obvious when the risk is transferred to a party affiliated with the nonbank. When the risk is transferred to an unaffiliated third party the situation is more complicated, but if that risk transfer has been arranged or facilitated by the nonbank, it should not matter other than in terms of the question of which entity—the nonbank or the third-party investor—should be deemed the "true lender" in the relationship. What is clear is that the bank's involvement is minimal and the bank is involved only because of the regulatory arbitrage benefits.

### B.  Payday Lending

Rent-a-bank partnerships first emerged in the context of payday lending. Payday lending involves making short-term, small-dollar loans with maturity dates designed to coincide with the borrower's payday or government benefit distribution date. The idea is that on payday the borrower will have an influx of funds that can be used to repay the lender. Payday loans typically have a maturity of between one week and one month, although some payday loans are longer-term, installment

© 2021, Adam J. Levitin

loans with periodic payments scheduled to align with the borrower's payday.[82]

Payday loans are unsecured, but because the lender either takes post-dated check from the borrower (dated for the borrower's payday) or gets an automated clearing house (ACH) authorization from the borrower.[83]  If the borrower fails to repay voluntarily, the lender can then exercise its right to draw on the borrower's bank account, which it hopes will be replenished with funds on payday. A payday loan thus gives the lender accelerated repayment ability through a self-help right against the borrower's bank account, rather than having to first get a judgment and then a writ of execution or garnishment to collect.

Payday loans first emerged as a product in the mid-1990s.[84] They developed out of the informal practice of some check cashers of purchasing a consumer's personal check, rather than a check from a third party, and agreeing to hold it for a period of time before cashing it. This process was known as "deferred presentment" or "check holding." Typically, check cashers would agree to hold the check until the borrower's next payday in exchange for a fee. By calling the transactions check cashing, rather than lending, payday lenders sought to evade state usury and other consumer credit laws, but eventually some states legitimized the practice and allowed regulated "deferred presentment" transactions.

Payday loans are effectively or expressly prohibited in sixteen states and the District of Columbia.[85] In other states, payday loans are a highly regulated product. In states that allow payday lending, regulations vary considerably, but they generally require payday lenders to obtain a license from the state, be subject to state examination, and make certain disclosures to borrowers. State payday lending regulations restrict the terms of products, particularly the types, amounts, and frequency of fees, the length of loan maturities, and the frequency of

---

[82] *See* CFPB, Payday, Vehicle Title, and Certain High-Cost Installment Loans, 81 Fed. Reg. 47911, 47927, July 22, 2016.

[83] *Id.* 47872.

[84] Gary Rivlin, *BROKE, USA: From Pawnshops to Poverty, Inc.—How the Working Poor Became Big Business* 73 (2011).

[85] *See* Pew Charitable Trusts, *State Payday Loan Regulation and Usage Rates, at* https://bit.ly/3n9qzS5. A rate caps enacted in Nebraska effectively prohibited payday lending in 2020, Nebraska Initiative 428 (36% APR limit for payday loans). Illinois passed a similar rate cap in 2021. Ill. SB 1792 (36% APR limit for all consumer loans).

© 2021, Adam J. Levitin

loan renewals. Thus, even in states that allow payday lending, there are usury caps specific to the payday loans.

This regulatory landscape set the scene for rent-a-bank partnerships because payday lenders that did not want to be subject to state regulations sought out bank partners that were not subject to state usury laws. Banks have never had much interest in making payday loans themselves both because of skepticism about the profitability of the product except at extremely high interest rates that would trigger reputational risk and regulatory animosity.[86] A number of (generally small) banks, however, have been willing to partner with payday lenders on terms that turn a tidy profit for the bank with little investment or effort. The first instance of a rent-a-bank arrangement is not clear, but such arrangements began to appear by 1997.[87] While rent-a-bank arrangements were most common for payday lending, they also appeared in their first phase in the early 2000s with nonbank subprime credit card issuers and tax refund anticipation lenders.[88]

### C.  *Regulatory Pushback on Payday Rent-a-Bank*

The original wave of rent-a-bank arrangements met with substantial pushback from both state and federal regulators. A number of states sued rent-a-bank lenders,[89] as did private litigants.[90] More significantly, federal bank regulators acted to discourage banks from partnering with payday lenders. The actions by the federal bank regulators did not occur in concert; the Office of the Comptroller of the Currency (OCC) acted first and most strongly, while the Federal

---

[86] *See* Sheila Bair, *Low-Cost Payday Loans: Opportunities and Obstacles*, Report Prepared for The Annie E. Casey Foundation, June 2005, at https://bit.ly/3oqsd2Q.

[87] Decision and Order, NY v. County Bank of Rehoboth Beach, No. 6046-03 (N.Y Sup. Ct. Albany Cty, Jan. 2, 2007) at 4, *at* https://bit.ly/3b8kXF2, *aff'd Matter of People of State of New York v. County Bank of Rehoboth Beach, Del.*, 45 A.D.3d 1136, 1138 (N.Y. App. Div. 3d Dept. 2007).

[88] Complaint, *FTC v. CompuCredit Corp.*, No. 1:08-cv-1976 (N.D. Ga. Jun 10, 2008) at ¶ 11 (subprime credit card loans); Anderson v. H & R Block, Inc., 287 F.3d 1038, 1040-1041 (11th Cir. 2002), *rev'd sub nom.* Ben. Nat'l Bank v. Anderson, 539 U.S. 1 (2003) (tax refund anticipation loans).

[89] *See* Jean Anne Fox, *Unsafe and Unsound: Payday Lenders Hide Behind FDIC Bank Charters to Peddle Usury,*" Consumer Federation of America, Mar. 30 2004, *at* https://bit.ly/2JHoA9J, at 12, 25-28 (listing state enforcement actions).

[90] Ironically, one upshot of these suits was a Supreme Court decision clarifying that no state law usury claim could stand against a national bank that was a partner in a rent-a-bank arrangement. *See* Anderson v. H & R Block, Inc., 287 F.3d 1038, 1040-1041 (11th Cir. 2002), *rev'd sub nom.* Ben. Nat'l Bank v. Anderson, 539 U.S. 1 (2003).

© 2021, Adam J. Levitin

Deposit Insurance Corporation (FDIC) acted later and hesitantly, and the Federal Reserve Board never took any formal action at all.[91]

In 2000, the OCC issued an Advisory Letter highlighting its concerns about rent-a-bank relationships, noting that it would closely review bank activities in this regard, and explaining its expectations for how banks would responsibly structure payday lending activities.[92] The next year, the OCC issued a Bulletin regarding third-party relationships that emphasized proper risk-management and oversight of third-party lending programs.[93] Critically, both the Advisory letter and the Bulletin emphasized the safety-and-soundness concerns rent-a-bank lending poses to a bank, rather than the consumer protection concerns.

Neither of these non-binding documents ever forbade payday rent-a-bank relationships outright, much less non-payday rent-a-bank relationships. Instead of prohibiting payday rent-a-banking expressly, the OCC acted through "soft power," making clear its expectations of banks not through the formal notice-and-comment rulemaking process, but through non-binding guidance and supervisory actions. Thus, in January of 2002, on the heels of the Bulletin, the OCC ordered a national bank to cease its rent-a-bank payday lending program out of safety-and-soundness concerns.[94] The next month, the Comptroller gave a speech directly addressing rent-a-bank relationships. He noted:

> Let me raise one other caution about preemption. The benefit that national banks enjoy by reason of this important constitutional doctrine cannot be treated as a piece of disposable property that a bank may rent out to a third party that is not a national bank. Preemption is not like excess space in a bank-owned office building. It is an inalienable right of the bank itself.[95]

After detailing the problem of rent-a-bank arrangements, the Comptroller went on to state that:

---

[91] One large partnering bank left the Federal Reserve System to avoid scrutiny. Ronald J. Mann & Jim Hawkins, *Just Until Payday*, 54 UCLA L. REV. 855, 872 (2007).

[92] OCC Advisory Letter AL 2000-10, Nov. 27, 2000.

[93] OCC Bulletin OCC 2001-47, Nov. 1, 2001.

[94] Press Release, "OCC Orders Eagle to Cease Payday Lending Program," January 3, 2002, NR 2002-01.

[95] John Hawke, OCC speech given February 12, 2002, available at https://bit.ly/38UykpO.

© 2021, Adam J. Levitin

> Not only do these arrangements constitute an abuse of the national charter, but they are highly conducive to the creation of safety and soundness problems at the bank, which may not have the capacity to manage effectively a multi-state loan origination operation that is in reality the business of the payday lender.[96]

Over the following year, the OCC brought supervisory actions against another three national banks for rent-a-bank payday lending.[97] By 2003, the OCC could brag in its Annual Report that:

> All national banks with known payday lending activities through third-party vendors were ordered in FY 2003 to exit the payday lending business. By undertaking enforcement actions against those banks, the OCC addressed safety and soundness concerns about the management of these payday loan programs, and ended significant consumer protection violations.[98]

The FDIC moved more slowly. The FDIC Chair expressed concerns about rent-a-bank in 2000, noting, "It may be legal—but I don't like it."[99] The FDIC, however, took no action until 2003, when it FDIC issued examination guidelines for state-chartered banks partnering with payday lenders.[100] The guidelines required that payday loan portfolios be classified as substandard for regulatory risk management, and loan loss reserving purposes and subjected them to higher capital requirements (up to dollar for dollar capital). Yet the bark was much worse than the bite: the requirements only applied to loans on the bank's books. If the bank were selling the loans regularly, such as on a daily basis, the impact would be negligible. In 2005, however, the FDIC issued stronger guidelines, which limited the number of frequency of loan rollovers, making it more difficult for

---

[96] *Id.*

[97] Office of Comptroller of the Currency, Notice of Charges for Issuance of an Order to Cease and Desist, *In the Matter of Peoples National Bank, Paris, TX*, AA-EC-02-03, May 17, 2002; Press Release, "OCC Takes Action Against ACE Cash Express, Inc. and Goleta National Bank," October 29, 2002, NR 2002-85; Press Release, "Peoples National Bank to Pay $175,000 Civil Money Penalty and End Payday Lending Relationship with Advance America," January 31, 2003, NR 2003-06.

[98] OCC Annual Report, 2003, p. 17.

[99] FDIC, *Chairman Tanoue Denounces "Charter Renting" as a Means of Funding Predatory Payday Lenders*, June 14, 2000, PR-41-2000.

[100] FDIC Examination Guidance for Payday Lending, PR-70-2003.

© 2021, Adam J. Levitin

state-chartered banks to engage in payday rent-a-bank relationships.[101] This guidance combined with enforcement actions in 2007,[102] ended most payday rent-a-bank arrangements.

### D.   *The Incomplete Regulatory Pushback*

Like the OCC, the FDIC it did not outright forbid payday rent-a-bank arrangements, much less rent-a-bank relationships for things like installment loans, which are not implicated by the rollover limitations. Nonetheless, as a practical matter, the FDIC shut down most rent-a-bank operations by state-chartered banks, such that two scholars, writing in 2007 observed that, "by early 2006, the 'rent-a-charter' era had come to an end."[103]

These scholars wrote prematurely, however. Not only did some rent-a-bank payday lending persist after 2006,[104] but the rent-a-bank model was ultimately adopted by other types of subprime lenders: "marketplace lenders," [105] subprime installment lenders, [106] and subprime small business lenders.[107] At most, the FDIC ended an era of payday-focused rent-a-banking. The model then shifted to other sectors of the subprime lending market.

The following section presents a deep dive into a rent-a-bank arrangement that traces a lender from origins as a rent-a-bank payday lender through a rent-a-tribe model and into its reinvention as a "fintech" installment lender with a new rent-a-bank structure. The story illustrates the Whak-a-Mole nature of states' attempts to address rent-a-bank via litigation.

---

[101] FDIC, Guidelines for Payday Lending, FIL-14-2005.

[102] *See In the Matter of First Bank of Delaware*, FDIC-07-256b and FDIC-07-257k (2008).

[103] Hawkins & Mann, *supra* note 91, at 873.

[104] *See infra* section II.D.1.

[105] *See, e.g.*, Fulford v. Marlette Funding, LLC, No. 2017-CV-30376), 2019 WL 4451038 (D. Colo. June 5, 2019); Meade v. Avant of Colorado, LLC, 307 F. Supp. 3d 1134, 1150-1151 (D. Colo. 2018); Meade v. Marlette Funding LLC, 2018 U.S. Dist. LEXIS 46814, *8-9, 2018 WL 1417706 (D. Colo. Mar. 21, 2018).

[106] *See infra* section II.D.3.

[107] *See infra* Introduction (discussing World Business Lenders, LLC, and its rent-a-bank relationships with Bank of Lake Mills, Wisconsin and Axos Bank).

© 2021, Adam J. Levitin

### III.   CASE STUDY OF ELEVATE CREDIT, INC.

Elevate Credit, Inc. ("Elevate") is a nonbank "fintech" firm that specializes in subprime lending represents the state-of-the-art in rent-a-bank arrangements. A close examination of Elevate's business is instructive for understanding the how sophisticated rent-a-bank arrangements can be and the challenges posed to an entity-based regulatory system.

Critically, the case study of Elevate is possible only because it is a reporting company under the Securities Act. If Elevate were not a reporting company it would be impossible to discern the details of its relationship with its bank partners or even that such a relationship existed.

### A.   *ThinkCash's Rent-a-Bank Model*

Elevate is a publicly-traded Delaware corporation,[108] that was spun-off in 2014 from a privately held entity called Think Finance, Inc. ("Think"). The company's history is itself instructive, as it presents a study of the cat-and-mouse dynamic of regulation and its circumvention.

Think started off around 2001 as PayDay One Holdings, LLC, an internet payday lender based in Fort Worth, Texas.[109] In 2005, PayDay One Holdings changed its name to PayDay One Holdings, Inc.[110] In 2007 it changed its name yet again to ThinkCash Inc, and then once more in 2010 to Think Finance.[111]

Prior to 2007, Think made only direct payday loans.[112] Starting in 2007, however, Think began to engage in indirect lending in states where usury laws were a binding constraint using a rent-a-bank arrangement through both Urban Trust Bank FSB (now renamed

---

[108] Second Amended and Restated Certificate of Incorporation of Elevate Credit, Inc., https://bit.ly/3rUNbt9.

[109] Statement of Undisputed Facts in Support of the Plaintiff's Motion for Partial Summary Judgment Against Defendants Kenneth Rees and National Credit Adjusters, LLC, *Commonwealth v. Think Finance, Inc.*, Case No. 2-14-cv-07139 (E.D. Pa. Aug. 14, 2019) at ¶¶ 1, 4 (hereinafter "Think Finance Undisputed Facts").

[110] Plaintiff's Motion for Partial Summary Judgment Against Defendants Kenneth Rees and National Credit Adjusters, LLC, *Commonwealth v. Think Finance, Inc.*, Case No. 2-14-cv-07139 (E.D. Pa. Aug. 14, 2019) at Exh. A, Table of Disputes, at 1.

[111] Think Finance Undisputed Facts at ¶ 2.

[112] *Id.* at ¶¶ 4, 6.

© 2021, Adam J. Levitin

Axiom Bank) and First Bank of Delaware.[113] The details of the Urban Trust Bank relationship are not public other than the name of the product—Elastic—which is still one of Elevate's main products and is discussed in detail below. In contrast, the details of the First Bank of Delaware product, known as "Think Cash" are public as the result of litigation brought against Think by the Commonwealth of Pennsylvania.

For the Think Cash product, different Think affiliates entered into three related contracts with the First Bank of Delaware: (1) a marketing and servicing agreement; (2) a master participation agreement; and (3) a guaranty agreement. Pursuant to the marketing and servicing agreement, a Think subsidiary marketed the Think Cash product, using First Bank of Delaware's name and trademarks, took loan applications from consumers, and serviced the loans in exchange for a $100/loan fee for each funded loan from First Bank of Delaware.[114] The loans were formally made and funded by First Bank of Delaware, but marketing, underwriting, and technology platform were all provided by Think.[115]

Under the master participation agreement, another Think subsidiary agreed to purchase on a daily basis a 99% participation interest in each "ThinkCash" loan made by First Bank of Delaware.[116] In exchange, Think was obligated to pay a monthly participation fee of $100/loan plus a percentage of the revenue generated by the 99% participation interests to First Bank of Delaware.[117] Additionally, Think was required to maintain a reserve account at First Bank of

---

[113] *Id.* at ¶¶ 6-8, 11, 25.

[114] *Id.* at ¶ 33.

[115] *Id.* at ¶ 6.

[116] *Id.* at ¶ 34. A participation is a type of a derivative interest. ADAM J. LEVITIN, *BUSINESS BANKRUPTCY: FINANCIAL RESTRUCTURING AND MODERN COMMERCIAL MARKETS* 113-14 (2nd ed. 2018). In a participation, the participation seller owns a loan and sells off an undivided fractional economic interest in the loan, but retains complete legal title to the loan. This means that the purchaser of a participation interest is economically exposed to the performance of the loan, but does not have contractual privity with the borrower on the loan. Instead, its only contractual privity is with the seller of the participation interest, such that its remedies in the event of non-performance on the loan would lie solely against the seller, not the borrower.

The use of participation interests, rather than outright sales of loans can be found even in the earliest days of rent-a-bank arrangements. *See Goleta Nat'l Bank v. O'Donnell,* 239 F. Supp. 2d 745, 747 -78 (S.D. Ohio 2002) (noting that Goleta National Bank would sell payday lender ACE Cash Express, Inc. a 90% participation in each loan).

[117] Think Finance Undisputed Facts at ¶ 35.

© 2021, Adam J. Levitin

Delaware that could be used to offset its obligations.[118] Think later reduced its participation purchase percentage to 90%, but indemnified First Bank of Delaware for any losses that exceeded 2.5% of the loan balance.[119] Finally, under the guaranty agreement, Think's holding company guarantied the obligations of its subsidiaries under the other contracts.[120] Because Think was not the formal lender on the loans—it did not fund them nor was it the creditor of record—Think claimed that it was merely a servicing agent of First Bank of Delaware.

In 2008, the FDIC initiated an enforcement action against First Bank of Delaware for its unsafe and unsound third-party lending activity, including with Think.[121] First Bank of Delaware entered into a consent order with the FDIC in which it agreed to discontinue its various rent-a-bank relationships.[122] Nevertheless, First Bank of Delaware continued to work with Think until 2011, albeit through a restructured program. Specifically, a pair of new Think subsidiaries began to provide the marketing, underwriting, technology platform and loan servicing to First Bank of Delaware, while the participation interests were purchased by a newly created special purpose vehicle, Universal Finance II, LLC, that was funded by outside investors.[123]

Universal Finance promised its investors a 17% annual return, guaranteed by Think Finance.[124] Think Finance also agreed to purchase from Universal Finance interest in any defaulted loans in exchange for receiving all residual net income after the 17% paid to investors as an "administrative fee".[125] Additionally, pursuant to an administrative agency agreement, a Think Finance entity managed Universal Finance.[126]

---

[118] *Id.* at ¶ 36.
[119] *Id.* at ¶ 38.
[120] *Id.* at ¶ 37.
[121] *See In the Matter of First Bank of Delaware*, FDIC-07-256b and FDIC-07-257k (2008). I served as an expert witness for the FDIC in this matter. First Bank of Delaware dissolved in 2012. Complaint, *Commonwealth v. Think Finance, Inc.*, Case No. 2-14-cv-07139 (E.D. Pa. Dec. 17, 2014) at ¶ 43 (hereinafter "Think Finance Complaint").
[122] Think Finance Undisputed Facts at ¶ At 40.
[123] *Id.* at ¶¶ 42-43. Universal Finance II, LLC's owner and managing member was the brother of a First Bank of Delaware director. *Id.* at ¶ 45.
[124] *Id.* at ¶ 44, 51.
[125] *Id.* at ¶ 51.
[126] *Id.* at ¶ 52.

© 2021, Adam J. Levitin

As its business expanded, Think Finance found itself needing an additional source of funding for the loans. In the summer of 2010, Think contracted with a Chicago-based private equity firm called Victory Park Capital to provide the funding for the loans. Victory Park Capital purchased the right to purchase up to $90 million in participation interests in various Think Finance products from Universal Finance, with Think Finance guarantying Victory Park Capital a 20% return.[127]

In October 2010, however, the FDIC ordered First Bank of Delaware to cease its relationship with Think.[128] Desperate to find a new partner to replace First Bank of Delaware, Think unsuccessfully contacted 80 banks[129] before it embarked on a new strategy for evading state usury laws: rent-a-tribe.

### B.   *Think Finance's Rent-a-Tribe Model*

As the rent-a-bank model collapsed in the face of federal regulatory pressure, Think Finance shifted to partnering with Native American tribes.[130] Native American tribes are themselves not subject to state usury laws because of sovereign immunity; tribal members and tribal commercial entities may be, however.[131]

Think formed partnerships with three tribes. In these "rent-a-tribe" partnerships,[132] Think again provided the complete turnkey infrastructure for marketing, underwriting, funding, and collecting the loans, including provision of customer leads, a technology platform, investors to fund the loans, and payment-processing and collection platforms.[133] Think also trained customer service agents to handle calls, drafted call scripts, drafted and administered contracts, hosted

---

[127] *Id.* at ¶¶ 58-60.

[128] *Id.* at ¶ 62.

[129] *Id.* at ¶ 65.

[130] *Id;* Think Finance Complaint at ¶ 47.

[131] *Cf.* Otoe-Missouria Tribe of Indians v. New York State Dep't of Fin. Servs., 769 F.3d 105 (2d Cir. 2014) (upholding denial of motion for preliminary injunction against state regulators from interfering with tribal lending business allegedly taking place off tribal lands); Williams v. Big Picture Loans, LLC, 929 F.3d 170 (4th Cir. 2019) (dismissing suit because 6lending entities affiliated with Native American tribe were entitled to sovereign immunity as "arms of the tribe").

[132] *See generally* Nathalie Martin & Joshua Schwartz, *The Alliance Between Payday Lenders and Tribes: Are Both Tribal Sovereignty and Consumer Protection at Risk?* 69 WASH. & LEE L. REV. 751 (2012).

[133] Think Finance Complaint at ¶ 48.

© 2021, Adam J. Levitin

websites, monitored tribal employees, identified third party collection agencies, and facilitated the sale of delinquent accounts.[134]

When consumers obtained credit through the rent-a-tribe arrangement, the loan agreements purported to be loan agreements with the tribes and to be subject solely to tribal law and jurisdiction. Yet the tribes maintained only a minimal economic interest in the loans. Instead, a Cayman Islands company called GPL Servicing Ltd., which was controlled by Victory Park Capital,[135] would purchase a participation interest of between 90% and 99%.[136] In exchange for the participation interest, the tribes were paid a fee based on the gross revenue from the enterprise.[137] The arrangement depended on the tribe, with one tribe getting 4%, another 4.5%, and the third a graduated amount.[138]

GPL Servicing was structured so that Victory Park exercised all of the voting shares and thus all of the management rights. The non-voting shares were held by various investors, including a Think affiliate.[139] As with the previous Universal Finance arrangement, Think guaranteed a 20% annual return for GPL Servicing investors return.[140] Any return above the 20% went to Think.[141] In other words, Victory Park was simply providing the funding through a structure that imitated a loan, while Think held the equity interest in the venture.

---

[134] Complaint, *CFPB v. Think Finance, LLC*, Case No. 4-17-cv-00127 (D. Mont. Nov. 15, 2017), at ¶ 30 (hereinafter "CFPB Complaint").

[135] Disclosure Statement Accompanying Second Modified First Amended Joint Chapter 11 Plan of Reorganization of Think Finance LLC and Its Subsidiary Debtors and Debtors in Possession, *In re Think Finance LLC*, No. 17-33964 (Bankr. N.D. Tex. Sept. 26, 2019), at 4 (hereinafter "Think Finance Disclosure Statement"). GPL stands for Great Plains Lending, the first of the tribal lending entities with which Think Finance partnered. Second Amended Think Finance Complaint at ¶ 94. GLP Servicing, Ltd. was originally named VPC/TF Fund II Ltd. *Id.*

[136] Complaint, *CFPB v. Think Finance, LLC*, at ¶ 45.

[137] Second Amended Complaint, *Commonwealth v. Think Finance, Inc.*, Case No. 2-14-cv-07139 (E.D. Pa. Dec. 21, 2017) at ¶¶ 101, 103, 104.d (hereinafter "Second Amended Think Finance Complaint"); CFPB Complaint at ¶ 46. For a period of time, the tribes' expenses were also reimbursed. *Id.* at ¶ 47.

[138] Second Amended Think Finance Complaint at ¶¶ 101, 103, 104.d.

[139] Think Finance Disclosure Statement at 4-5.

[140] Second Amended Think Finance Complaint at ¶¶ 90.a-b-91 (hereinafter "Second Amended Think Finance Complaint"); CFPB Complaint at ¶ 48 (listing an 18% guarantied return).

[141] Second Amended Think Finance Complaint at ¶¶ 90.a-91. *See also* CFPB Complaint at ¶ 49.

© 2021, Adam J. Levitin

Think flew high for a while. In 2013, Forbes ranked it as number two on its list of America's Most Promising Companies,[142] and from 2010-2015 it was on the Inc. 5000 List of List of Fastest Growing Companies.[143] Think even bragged that it was the original "fintech," noting that "Before the term 'fintech' was coined, Think Finance was an established leader and innovator in the marketplace for online lending."[144]

Think's days were numbered, however. In 2013, the Department of Justice commenced Operation Choke Point, an anti-consumer fraud operation that targeted banks that provided automated clearinghouse processing for consumer fraudsters.[145] While the Department of Justice brought only a handful of prosecutions as part of Operation Choke Point, it spooked the banking industry. As a result, during the summer of 2013, many banks cut ties with payday lenders and high-cost installment lenders. Think found it difficult to find banks to continue processing payments for the tribal lending entities,[146] and had to eventually turn to a Canadian payments processor.[147]

Around the same time, the State of New York sent a cease-and-desist letter to one of Think's tribal partners, which responded with a lawsuit, funded by Think,[148] seeking an injunction against the State.[149] The District Court denied the request for a preliminary injunction in an opinion that cast doubt on tribe's claim of sovereign immunity.[150]

As a result of Operation Choke Point and the New York litigation, Victory Park Capital started to get cold feet about its arrangement with Think.[151] As consumer class actions and state and federal enforcement actions against Think piled up, Victory Park eventually pulled the plug

---

[142] Think Finance Disclosure Statement at 3.

[143] *Id.*

[144] *Id.*

[145] *Guilty Until Proven Innocent? A Study of the Propriety and Legal Authority for the Justice Department's* Operation Choke Point, *Before the Subcomm. on Regulatory Reform, Commercial, and Antitrust Law of the H. Comm. on the Judiciary.*, 113th Cong. 7–8 (July 17, 2014) (written testimony of Adam J. Levitin, Professor, Georgetown University Law Center).

[146] Second Amended Think Finance Complaint at ¶¶ 110-112.

[147] Think Finance Undisputed Facts at ¶ 129.

[148] Think Finance Undisputed Facts at ¶ 213.

[149] Second Amended Think Finance Complaint at ¶ 112.

[150] Otoe-Missouria Tribe of Indians v. New York State Dep't of Fin. Servs., 974 F. Supp. 2d 353 (S.D.N.Y. 2013), aff'd Otoe-Missouria Tribe of Indians v. New York State Dep't of Fin. Servs., 769 F.3d 105 (2d Cir. 2014).

[151] Second Amended Think Finance Complaint at ¶¶ 111-113.

on Think's financing, precipitating Think's bankruptcy filing in October of 2017.[152]

Around the time that Think's troubles with the ACH system were emerging, Think undertook two important developments. First, it developed an installment loan product called "Rise" that it would offer directly in states in which usury caps were not a binding constraint.[153] Rise was a replacement of Think's original PayDay One product.[154]

Second, in May 2014, Think, apparently with Victory Park Capital's support, spun off its both its direct lending (Rise) and branded consumer products portfolio into a new, independent company called Elevate Credit, Inc.[155] Elevate had the same shareholder as Think. The rump business left in the Think entity continued to provide technology and administrative services to the tribal lenders up until its 2017 bankruptcy. In the face of a new regulatory environment. Elevate— Think's real successor— moved back to a revamped version of Think's original rent-a-bank model. The remainder of this section examines the current Elevate rent-a-bank model in detail.

### C. *Elevate Credit, Inc.*

Elevate operates as a state-licensed lender making loans directly itself in several states. It operates primarily, however, through bank partnerships with two small state-chartered, FDIC-regulated banks, Republic Bank & Trust Company of Kentucky ($6.4 billion in total assets, 1,094 employees), and FinWise Bank of Utah ($267 million in total assets, 89 employees).[156] Not coincidentally, both Kentucky and

---

[152] Think Finance Disclosure Statement at 6-7.

[153] Second Amendment Think Finance Complaint at ¶ 115.

[154] Think Finance Undisputed Facts s, ¶ 18.

[155] Think Finance Disclosure Statement at 3; Think Statement of Undisputed Facts ¶ 224. The spin-off has subsequently been challenged as a fraudulent transfer While the complaint was filed under seal, the court order granting the sealed filing motion inadvertently gives away the nature of the suit. *See* Order Granting Emergency Motion to For Leave to File Complaint Under Seal, Think Finance Litig. Trust v. Elevate Credit, Inc., *In re Think Finance, LLC*, No. 17-33964 (Bankr. N.D. Tex. Aug. 13, 2020) ("The Clerk of Court's Office is directed to accept as filed under seal the Trust's Complaint to Avoid and Recover Transfers Pursuant to 11 U.S.C. §§ 544, 548 and 550, and §§ 24.001 et seq. of the Texas Uniform Fraudulent Transfer Act.").

[156] FDIC, Statistics on Depository Institutions, https://www7.fdic.gov/sdi/main.asp (data as of June 30, 2019).

© 2021, Adam J. Levitin

Utah allow for unlimited interest on smaller contractual loans.[157] The fact that Elevate makes the loans itself in states where there the usury cap does not present an obstacle underscores that its relationship with the banks is solely about evasion of state usury laws and not because of any other value the banks bring to the enterprise.

Elevate lends to non-prime consumers and consumers with thin credit files or no credit scores. It offers two credit products, Elastic and Rise, in the United States.[158] Elastic is a line of credit product for loans between $500 and $3,500 for up to 10 months.[159] Elastic is offered in some 40 states, solely through a bank partnership with Republic Bank. The weighted average effective APR on Elastic loans is 98%,[160] well above most states' usury caps.

The Rise product varies by state—it is sometimes an installment loan product and sometimes a line of credit product. Elevate is a licensed nonbank lender in several states, where it offers Rise directly, and it also offers Rise through a credit services organization in one state,[161] but in 19 states it offers Rise through a partnership with FinWise bank.[162] The partnership Rise product is for a loan between $500 and $6, with a maturity of 7-26 months.[163] The weighted average effective APR on the Rise loans is 129%,[164] again, well above most states' usury caps.

Elevate's "secret sauce" for all of its products is its proprietary underwriting technology platform. Elevate boasts that:

> Our proprietary risk analytics infrastructure utilizes a massive (approximately 80+ terabyte) Hadoop database composed of

---

[157] KY. REV. STAT. § 286.3-214 ("Notwithstanding the provisions of any other law, a bank may take, receive, reserve, and charge on money due or to become due on any contract or other obligation in writing, where the original principal amount is fifteen thousand dollars ($15,000) or less, interest at any rate allowed national banking associations by the laws of the United States of America."); UTAH CODE § 15-1-1 ("The parties to a lawful written, verbal, or implied contract may agree upon any rate of interest for the contract, including a contract for services, a loan or forbearance of any money, goods, or services, or a claim for breach of contract.").

[158] Elevate Credit, Inc., Form 10-K (2019) at 7.

[159] *Id.* at 15.

[160] *Id.*.

[161] This is another, Texas-specific method of evading state usury and licensure laws.

[162] *Id.* at 14.

[163] *Id.*

[164] *Id.*

© 2021, Adam J. Levitin

more than ten thousand potential data variables related to each of the 2.4 million customers we have served and about 8.6 million applications that we have processed. Our team of over 50 data scientists uses our proprietary technology to build and test scores and strategies across the entire underwriting process, including segmented credit scores, fraud scores, affordability scores and former customer scores. We use a variety of analytical techniques from traditional multivariate regression to machine learning and artificial intelligence to continue to enhance our underwriting accuracy while complying with applicable US and UK lending laws and regulations.[165]

In other words, Elevate represents something beyond a run-of-the-mill storefront payday lender (and it is not actually a payday lender). Instead, it is a cutting edge fintech firm that uses a massive database and team of data scientists to extend credit to borrowers who might not otherwise be well-served by the financial system because of their credit profiles.

### D.  Elevate's Rent-a-Bank Nexus of Contracts

Elevate has separate, but similar rent-a-bank arrangements for both its Elastic and Rise products. The arrangements differ primarily in the identity of the partner bank and the extent of the partner bank's retained interest in the loans, but are otherwise materially the same.

Elevate's relationships with Republic and FinWise each consists of three contracts (and amendments thereto): (1) a joint marketing agreement;[166] (2) a technology license and support agreement;[167] and (3) a participation interest purchase and sale agreement.[168] Notably,

---

[165] *Id.* at 8.

[166] Amended and Restated Joint Marketing Agreement, dated July 1, 2015, by and between Republic Bank & Trust Company and Elevate@Work, LLC, https://bit.ly/2LnRJak (hereinafter "Elastic Joint Marketing Agreement"); Joint Marketing Agreement, dated October 15, 2018, by and between FinWise Bank and EF Marketing, LLC (hereinafter "Rise Joint Marketing Agreement").

[167] Amended and Restated License and Support Agreement, dated July 1, 205, by and between Republic Bank & Trust Company and Elevate Decision Sciences, LLC, https://bit.ly/356ghvS (hereinafter "Elastic Technology License Agreement"); Technology and Support Agreement, dated October 15, 2018, by and between FinWise Bank and Elevate Decision Sciences, LLC (hereinafter "Rise Technology License Agreement").

[168] Elastic Participation Agreement, *supra* note 9; Rise Participation Agreement, *supra* note 9.

© 2021, Adam J. Levitin

while the bank is a party on each of the agreements, a different Elevate-affiliated entity is the counterparty:

- The joint marketing agreements have either Elevate@Work, LLC, or EF Marketing, LLC, as the Elevate parties.[169] Both are single-member LLCs, the sole member of which is another Elevate entity (Elastic Financial, LLC, or EF Financial, LLC, respectively), which is itself a single-member LLC, with Elevate Credit, Inc., as the sole member.)[170]

- The technology license agreements are between the banks and an Elevate Credit, Inc., subsidiary called Elevate Decision Sciences, LLC.[171] Elevate Decision Sciences is another single-member LLC, with Elevate Credit, Inc., again as the sole member.[172]

- The participation interest purchase and sale agreements are between the banks and special purpose vehicles (SPVs) structured as Cayman Island exempted companies, Elastic SPV, Ltd., and EF SPV, Ltd., respectively.[173] The SPVs are not formally part of Elevate Credit, Inc.'s corporate group; their nominal equity is held in trust, but they carry on no business other than facilitating Elevate's financing of Elastic and Rise loans and are consolidated for financial reporting purposes.[174] Elevate provides the all management services for the SPVs through administrative services agreements with the SPVs.[175]

---

[169] Elevate@Work, LLC, subsequently changed its name to Elastic Marketing, LLC.

[170] Schedule D to Financing Agreement, dated Feb. 7, 2019, by and among EF SPV, Ltd. the Guarantors thereto, the Lenders, and Victory Park Management, LLC as Agent (attached to Elevate Credit, Inc. 10-K at p.325); Exhibit H (Victory Park-Elevate Credit, Inc. Fifth Amended and Restated Elevate Transaction, Feb. 7, 2019), Schedule 7.7 (attached to Elevate Credit, Inc. 10-K).

[171] Schedule D to Financing Agreement, dated Feb. 7, 2019, by and among EF SPV, Ltd. the Guarantors thereto, the Lenders, and Victory Park Management, LLC as Agent (attached to Elevate Credit, Inc. 10-K at p.325).

[172] Schedule D to Financing Agreement, dated Feb. 7, 2019, by and among EF SPV, Ltd. the Guarantors thereto, the Lenders, and Victory Park Management, LLC as Agent (attached to Elevate Credit, Inc. 10-K at p.325).

[173] Elevate Credit, Inc., Form 10-K (2019) at 41, 77. The ownership of Cayman Island exempted companies is not public, but Cayman Islands SPVs are generally "orphan" SPVs with the equity held by a charitable or purpose trust. *See* Conyers, Dill & Pearman, *Securitisation in the Cayman Islands* 4, https://bit.ly/358CqK2 (explaining orphan SPV structures).

[174] Elevate Credit, Inc., Form 10-K (2019) at 87.

[175] Administrative Services Agreement, dated July 1, 2015 between EF SPV, Ltd. and EF

© 2021, Adam J. Levitin

### 1. The Joint Marketing Agreements

The joint marketing agreements are the lynchpin of the relationship between Elevate and its partner banks. The joint marketing agreements set forth Elevate's responsibility to design and market the loans, but give the banks the right to approve the terms of the loan. For example, the joint marketing agreement with FinWise Bank provides that FinWise may offer loans who apply:

> at one or more websites, direct mail or other marketing channels operated or identified by [EF Marketing, LLC] and approved by FB who meet applicable credit standards and other qualifications established by [FinWise Bank]. [FinWise Bank] may change the terms, and conditions applicable to the Loans, fees charged to Borrowers, maximum amount of credit lines, the Program Guidelines, the Credit Policy, the Credit Model Policies and the Underwriting Criteria.[176]

At first blush it would seem, then, that FinWise controls the terms of the loans and the underwriting criteria, but an inspection of the definitions for the contract shows that the arrangement is more complex. "Program Guidelines" are defined as:

> guidelines proposed by [EF Marketing, LLC] and approved by [FinWise Bank]…including…the Credit Policy or Underwriting Criteria…[and] the Credit Model Policies….[177]

In other words, the entire design of the Rise product, including the underwriting guidelines, are created and proposed by Elevate. While FinWise does have to ultimately sign off on the product, it is not the product's designer, and presumably FinWise would not have entered into the joint marketing agreement with Elevate without having a good idea about what the Rise product would look like.

How the contractual relationship has played out in fact is not clear. For example, has FinWise has ever refused a proposal from Elevate? Has FinWise ever sought to change the program's terms? The contract contemplates the possibility that the answer to both questions could be no, with FinWise merely rubber stamping Elevate's proposals.

---

Financial, LLC (10-K at 739); Administrative Services Agreement, dated July 1, 2015 between Elastic SPV, Ltd. and Elevate@Work, LLC, https://bit.ly/3pImHZG.

[176] Rise Joint Marketing Agreement, § 1(a) (10-K at 679).

[177] *Id.* at App. A (10-K at 701).

© 2021, Adam J. Levitin

Indeed, if Elevate is the entity with the expertise in the lending with the enormous database and team of data scientists who almost outnumber FinWise's entire workforce, it is hard to see how FinWise could possibly exercise any material input on the terms of the lending. Elevate's agreement with Republic Bank for Elastic is materially similar.[178]

Elevate subsidiary EF Marketing, LLC, has some obligations itself under the joint marketing agreement. Not only is EF Marketing to propose all the guidelines for administration of the program, but it is also obligated to "perform services reasonably required to market the Program," including:

> (A) acquiring, scrubbing and managing lead lists, (B) preparing and distributing product offerings and associated marketing materials, including pre-qualified offers, as approved by FB, (C) developing and placing internet, print media, radio and television advertising, (D) designing and developing websites, (E) compensating third parties that provide marketing services in relation to the Program, (F) subject to FB's approval, delivering all notices and disclosures required by applicable Law with each solicitation, and (G) contracting with mutually agreed third parties to offer the Program to their clients.[179]

In exchange for these services, FinWise pays EF Marketing a marketing fee for each new loan that is made.[180] As we will see, this fee is offset by other fees paid by Elevate entities to FinWise. Thus, pursuant to the joint marketing agreement, Elevate proposes the design of the loan product and the underwriting criteria and handles all the marketing of the loan in exchange for a fee from FinWise. The

---

[178] Elastic Joint Marketing Agreement §§ 1(a), App. A ("'Program Guidelines' shall mean those guidelines established by RB for the administration of the Program, including, but not limited to, underwriting standards for the Accounts (which shall include, without limitation, specific criteria for evaluating an Applicant's ability to repay the Account, including the Initial Advance and all Subsequent Advances thereunder), the credit, charge-off and collection policies for the Accounts, and all other operating procedures for the Accounts, as such guidelines may be amended, modified or supplemented from time to time by RB in accordance with the terms of this Agreement.").

[179] Rise Joint Marketing Agreement, § 2(a) (10-K at 680).

[180] Id. at § 2(d) (10-K at 682).

© 2021, Adam J. Levitin

terms of Elevate's agreement with Republic Bank for Elastic are materially similar.[181]

### 2. Technology License Agreement

The technology license agreements are licenses for the banks to use Elevate's software in exchange for a per-loan fee. The software is described as "an internet-based consumer credit platform that permits the collection, verification, scoring, evaluation, funding, and account management of installment loans" and includes "an internet website landing page," and "an accounting and loan tracking system" to ensure compliance with all applicable laws, "internet-based financial wellness materials for Borrowers."[182] It also generates credit bureau reporting files in the standard Metro II format.[183] The software is hosted on hardware located in a data center under contract with Elevate.[184]

For Elastic, the software also enables automatic draws on the borrower's bank account.[185] The software automates virtually the entire loan process from the time a consumer applies for a loan to the underwriting, funding, and servicing of the loan. All the bank needs to do is press "go."

The Rise technology license requires Elevate to provide the bank with "reasonable access to its Technical Information, credit and business models underlying the Credit Model Policy, including all pricing, credit, and underwriting assumptions thereto and the Credit Model Documentation", and the bank has a right to test and validate the information.[186] The Elastic license merely requires Elevate to provide "reasonable cooperation" in connection with Republic Bank's testing and validation of the software.[187] Republic Bank does not have

---

[181] Elastic Joint Marketing Agreement §§ 2(a), 2(d).

[182] Rise License Agreement, Exhibit A, § A (10-K at 719); Elevate License Agreement, Exhibit A, § A. First Amendment to Amended and Restated License and Support Agreement, dated July 18, 2018, at https://bit.ly/3b7iLOn, § 4.

[183] Rise License Agreement, Exhibit A, § A (10-K at 719); Elevate License Agreement, Exhibit A, § A. First Amendment to Amended and Restated License and Support Agreement, dated July 18, 2018, at https://bit.ly/3b7iLOn, § 4.

[184] Rise License Agreement, at Exhibit A, § A (10-K at 707) (for Rise, this was Amazon Web Services as of the contract date. See id., at § 2.2(b)); Elastic License Agreement, Exhibit A, § A.

[185] First Amendment to Amended and Restated License and Support Agreement, dated July 18, 2018, at https://bit.ly/2X98WHp, § 4.

[186] Rise License Agreement, Exhibit A, § E (10-K at 721).

[187] Elastic License Agreement, Exhibit A, § D.

© 2021, Adam J. Levitin

a contractual right to access to the underlying software's coding, etc. for Elastic.

It is unclear whether the banks have ever in fact exercised their access, testing and validation rights under the contract. Given that Elevate is the party with the technical expertise, it is not clear that the partner banks would even have the wherewithal to test and validate the software. Notably, the reasonable access provision is at odds with another provision of the technology license, which forbids the bank to look under the hood at the software's code.[188] The structure of the license agreement means that the loans are made using software that can remain a black box to the bank, such that the bank does not actually understand the underwriting decisions.

The technology license agreement also includes an account servicing provision in which Elevate undertakes to perform most of the loan servicing duties, including maintaining account information, providing initial account opening disclosures, periodic billing statements, posting payments to borrowers' accounts, and producing reports on the accounts.[189]

### 3. *Participation Agreement*

The third leg of Elevate's contractual rent-a-bank nexus is the participation purchase and sale agreement. Elevate's participation purchase and sale agreements are technically option contracts that give Elastic SPV and EF SPV an option, but not an obligation, to purchase participation interests in the loans made by Republic Bank and FinWise Bank respectively. Specifically, Elastic SPV has the option to purchase a 90% participation interest from Republic, while EF SPV has the option to purchase a 96% participation interest from

---

[188] Amended and Restated License and Support Agreement, dated July 1, 205, by and between Republic Bank & Trust Company and Elevate Decision Sciences, LLC, § 4, https://bit.ly/3rO8MDz ("Licensee shall not itself, or through any parent, subsidiary, Affiliate or any other third party: (a) modify, decode, decompile, disassemble, reverse engineer or otherwise translate the Software, Documentation or Tools, in whole or in part…"); Technology and Support Agreement, § 4 ("FB shall not itself, or through any parent, subsidiary, Affiliate or any other third party: (a) modify, decode, decompile, disassemble, reverse engineer or otherwise translate the Software, Documentation or Tools, in whole or in part….") (p.708 of 10-K).

[189] Elastic License Agreement, Exhibit A, § D; Rise License Agreement, Exhibit A, § D. The Elastic Participation Agreement says that Republic will service loans or arrange for a third party to service the loans. Elastic Participation Agreement § 3(a).

FinWise.[190] The purchase price is equal to the outstanding principal amount of the loan times the participation percentage plus a purchase premium and a participation fee.[191] This fee offsets the marketing the technology license fees paid to the banks by the Elevate entities.

The Elastic participation agreement mean that Republic Bank retains the Elastic loans on its books and is outwardly the legal party in interest in the loans, even though it only has a 10% economic interest in the loans. The Rise participation agreement means that FinWise Bank retains the Rise loans on its books and is outwardly the legal party in interest in the loans, even though it only has a 4% economic interest in the loans.[192]

By structuring the participation purchases as options, it would appear that Republic Bank and FinWise Bank could find themselves in a position where they make Elastic or Rise loans, only to discover that they are holding 100% of the economic exposure on those loans because the Elevate entities have elected not to exercise their purchase option. A closer look at the participation agreements, however, shows that there is virtually no chance that Elevate will not exercise the option.

Using the Elastic participation agreement as the paradigm, we see that Elastic SPV's "option" is to purchase a participation interest in any advance funded at least three business days prior.[193] But Elastic SPV must notify Republic of its election to purchase "no less than three (3) Business Days prior to the related Purchase Date."[194] In other words, Elastic SPV must notify Republic at the time of origination if it will be purchasing the loans. While the actual purchase does not happen for three days,[195] Elastic SPV is already contractually obligated

---

[190] Elevate Credit, Inc., Form 10-K (2019) at 76, 77; Elastic Participation Agreement, § 2(b).

[191] Elevate Credit, Inc., Form 10-K (2019) at 76, 77; Elastic Participation Agreement, § 2(b).

[192] Elevate Credit, Inc., Form 10-K (2019) at 76, 77.

[193] Elastic Participation Agreement, § 2(a).

[194] *Id.* at § 2(b).

[195] Part of the purchase price is paid on the purchase date (the principal balance times the participation percentage), with the participation fee and purchase premium paid within 10 business days of the end of each calendar month. Elastic Participation Agreement, § 2(b). In other words, the *funding* of the loan comes from the Elastic SPV within three business days of the loan being made, while the payment to Republic Bank for participating the partnership is made on a monthly basis.

© 2021, Adam J. Levitin

for the purchase, and the purchase obligation is collateralized with an account at the bank. This means that Republic never has to loan without knowing if Elastic SPV will buy the participation interest. Moreover, if ESPV has purchased an interest in an initial advance to a borrower, it deemed to have agreed to purchase an interest in any Subsequent Advance.[196] For a revolving line of credit, this means that once $1 is advanced, Elastic will buy all subsequent advances. The original Rise participation agreement is not publicly available, only amendments thereto, but presumably it has similar terms.

### 4. The Funding Agreements

The final piece of Elevate's rent-a-bank structure involves the source of the funding for the loans. While the banks are the nominal lenders, the purchase of the participation interests makes the SPVs the real funders of the loans. Where do the SPVs get their money?

The SPVs are themselves nothing more than pass-through conduits used for bankruptcy remoteness purposes so that the investors in the SPV will not have to compete with Elevate's other creditors for rights in the participation interests in the event of Elevate's bankruptcy (hardly an impossibility in light of Think Finance's fate). The funding for the SPVs comes through a credit agreement with none other than the same entity that funded Think Finance—the Victory Park Capital hedge fund family. Specifically, Elastic SPV and EF SPV each have a loan facility with Victory Park Capital (multiple Victory Park Capital funds are lenders to each SPV). Those loan facilities are guaranteed by Elevate Credit, Inc., through a credit default protection agreement, such that any credit losses on the loans fall on Elevate Credit, Inc., in exchange for a fee.[197] In other words, the funding comes from Victory Park Capital, but Victory Park Capital is taking on the credit risk of Elevate as a going concern, not the Elastic loans themselves. The SPV is just functioning to provide the investors with priority for the participation interest collateral through entity structuring. The funding of the SPVs is effectively a securitization of the participation interests in the subprime consumer loans done through a set of privately-placed notes.

---

[196] Elastic Participation Agreement, § 2(a).
[197] Elevate Credit, Inc., Form 10-K (2019) at 135.

© 2021, Adam J. Levitin

### E.  Contractual Doublespeak

Looking at the entirety of Elevate's relationships with Republic Bank and FinWise Bank, it is impossible to conclude that the banks play any meaningful role in the lending process. To be sure, they nominally retain the entire loan, but the sale of the participation interest shifts almost all of the credit risk to the Elevate SPVs. The banks play no meaningful role in the design of the products, in their marketing, in the underwriting of borrowers, or in the servicing of the loans. Instead, the only purpose of the banks in the products appears to be facilitation of evasion of state usury laws. This is particularly clear with the Rise product, because Elevate offers the product directly in states where it can do so without running afoul of the state's usury laws. There is no obvious efficiency from adding in FinWise bank to the mix. To the contrary, adding in the bank partner only adds transaction costs and operational inefficiencies.

Elevate is clearly aware of the issue. In both the contracts and its annual report, Elevate takes pain to insist that that its bank partners maintain control over the entire product, even though it provides the marketing, the website, the technology platform, and the underwriting, funding, and servicing of the loans.[198] For example, Elevate states in its annual report:

> Under the terms of our agreement with Republic Bank, we provide them with marketing services related to the Elastic program and license them our website, technology platform and proprietary credit and fraud scoring models to originate and service Elastic customers. However, as originator of the Elastic lines of credit, Republic Bank reviews and approves all marketing materials and campaigns and determines the underwriting strategies and score cutoffs used in processing applications. In addition, Republic Bank defines all program

---

[198] *See, e.g.*, Elastic Participation Agreement, § 19(e) ("RB and ESPV each acknowledge and agree that it is the intention of the Parties that RB is the sole lender with respect to the Accounts and the Receivables, and ESPV shall not assert that it is the lender of the Accounts and the Receivables in connection with any litigation, regulatory purpose or any other purpose."); Elevate Credit, Inc., 2019 10-K at 43. ("We do not originate and do not ultimately control the pricing or functionality of Elastic lines of credit originated by Republic Bank, Rise loans originated by FinWise Bank ('FinWise') and the Today Card originated by Capital Community Bank ('CCB') (collectively the 'Bank-Originated Products' and the 'Bank Partners' or the 'Banks')").

© 2021, Adam J. Levitin

parameters and provides full compliance oversight over all aspects of the program.[199]

This claim is hard to square with the automated nature of the underwriting and the black box nature of the underwriting software. Elevate brags that:

> Credit and fraud determinations are made in seconds and approximately 94% of loan applications for all products are fully automated with no manual review required, based on our proprietary credit and fraud scoring models and affordability assessments. Once approved, the customer is provided the loan amount and relevant terms of credit being offered. Of the approximately 6% of loan applications requiring manual review, in the US the majority require further documentation, which can be provided via scanning, fax, email or mail, others may have failed a fraud rule in the applicable underwriting methodology, and are managed based on the rule failed, and others are reviewed to address "know your customer" and/or [Office of Foreign Asset Control] requirements.[200]

This means that for 94% of loans, the bank has no real involvement in the underwriting decision. As we have seen, the underwriting criteria are proposed by Elevate (subject to the bank's approval), and the actual underwriting done automatically in almost all cases by the software licensed by Elevate to the bank. While that software should reflect the agreed-upon criteria, the software is contractually a black box to the bank.[201] As for the other 6% of cases, the underwriting is still automated through the black box software, but with manual document

---

[199] Elevate Credit, Inc., Form 10-K (2019) at 16 (Elastic, but also with parallel language regarding FinWise Bank and Rise).

[200] Elevate Credit, Inc., Form 10-K (2019) at 19. "As a result of our proprietary technology and risk analytics, approximately 94% of loan applications are automatically decisioned in seconds with no manual review required." *Id.* at 8.

[201] Amended and Restated License and Support Agreement, dated July 1, 205, by and between Republic Bank & Trust Company and Elevate Decision Sciences, LLC, § 4, https://bit.ly/394dapr ("Licensee shall not itself, or through any parent, subsidiary, Affiliate or any other third party: (a) modify, decode, decompile, disassemble, reverse engineer or otherwise translate the Software, Documentation or Tools, in whole or in part…"); Technology and Support Agreement, § 4 ("FB shall not itself, or through any parent, subsidiary, Affiliate or any other third party: (a) modify, decode, decompile, disassemble, reverse engineer or otherwise translate the Software, Documentation or Tools, in whole or in part….") (p.708 of 10-K).

© 2021, Adam J. Levitin

collection and data input. In other words, for all intents and purposes, the underwriting is all done by Elevate, even if it is the bank that presses the "go" button.

Likewise, the structuring of the transactions as sales of participation interests seems designed to give Elevate a stronger basis for claiming that the banks are in fact the lender—after all, the loans remain on the banks' books the entire time. Indeed, from a consumer perspective, this arrangement seems potentially deceptive because the consumer might reasonably believe that the bank was the real party in interest on the loans (and therefore that the applicable usury law was the one applicable to the bank, not to Elevate entities).

There is no obvious reason why Elevate would in fact choose to use a participation purchase structure rather than an outright sale other than to strengthen its claim to shelter in the banks' regulatory status. A purchase of a participation interest in inherently a riskier investment than a purchase of a loan outright in part because the holder of the participation interest lacks the ability to control the loan completely. Elevate largely side steps these risks via contract, but that is the point— the only reason to go to so much trouble creating an ersatz loan purchase is because an actual loan purchase would reduce Elevate's claim that the bank is the actual lender. Whether Elevate's state-of-the-art rent-a-bank structure holds up remains to be seen; Elevate has been sued by the District of Columbia for violation of the District's usury laws.[202]

There are two key take-aways here. First, this case study underscores the sophistication and deliberate design of rent-a-bank structures that have been undertaken with an eye to insulating the structures from legal challenges. And second, but for Elevate being a public reporting company, the details of its rent-a-bank arrangements, and even their very existence, could not be known from the outside. The use of a sale of participation interests, rather than a sale of the loans outright, makes Elevate's involvement in the loans all but

---

[202] Complaint, District of Columbia v. Elevate Credit, Inc., 2020-CA-002697 (D.C. Sup. Ct., June 5, 2020).  The District of Columbia has also sued Opportunity Financial (OppFi), another nonbank lender that partners with a bank (again, FinWise Bank, one of Elevate's partner banks) for violation of the District's usury and lending licensing laws.  Complaint for Violations of the Consumer Protection Procedures Act, District of Columbia v. Opportunity Financial, LLC, 2021-CA-_____ (D.C. Sup. Ct. April 5, 2021).

© 2021, Adam J. Levitin

invisible. We will return to the significance of this point in the conclusion of the Article.

## IV.   THREE COMPETING DOCTRINAL APPROACHES

Rent-a-bank transactions are all premised on the idea that the nonbank can shelter in the bank's exemption from state usury laws by virtue of being the bank's transferee by assignment or participation. Whether the nonbank transferee of a loan from a bank can in fact step into the shoes of the bank for usury law purposes is a sharply disputed doctrinal question. It is a question that affects rent-a-bank transactions, but also potentially other transactions, particularly securitization, where loans are sold by bank sponsors to non-bank SPVs, and sales of defaulted debt from bank originators to nonbanks debt buyers.

This Part reviews the three different doctrinal approaches courts have taken to these transactions: (1) the valid-when-made rule, which holds that if a loan was not usurious in the hands of its originator, it cannot become usurious in the hands of a transferee; (2) the *Madden* rule, which holds that a nonbank transferee may not shelter in the bank's exemption from state usury laws; and (3) "true lender" doctrine, which applies the usury law to the party deemed the real lender in the circumstances of the transaction.

### A.  The "Valid-When-Made" Doctrine

The legal viability of rent-a-bank schemes is premised on a doctrine called "valid-when-made." This doctrine holds that if a loan was not subject to a state usury law when it was made, it can never subsequently become so upon transfer. Thus, if a loan is made by a bank that is exempt from state usury laws by virtue of the National Bank Act of 1864 (NBA) or Federal Deposit Insurance Act (FDIA), the loan will remain exempt from state usury laws in the hands of a nonbank transferee that is not itself exempt from state usury laws.

Proponents of "valid-when-made" argue that it is a "well-established" common law doctrine that it is a "cardinal rule" of banking law and essential for the functioning of banking markets.[203]

---

[203] Petition for Panel Rehearing and Rehearing *en Banc* by Defendant-Appellees, *Madden v. Midland Funding, LLC,* No. 14-12131-cv (2nd Cir. 2015) at 7-9; Brief of the Clearing House

Specifically, they argue that the doctrine is necessary to protect bank liquidity[204] and to vindicate banks' powers to both charge interest and to sell loans.[205] Without the doctrine, its proponents argue, there is uncertainty about whether higher rate loans sellable, and the uncertainty can lead to inefficient pricing in secondary markets.[206]

Valid-when-made proponents further argue that the doctrine was incorporated into section 85 the NBA,[207] the interest rate exportation provision for national banks, because it was part of the common law background against which that statute was written.[208] They further claim that it is incorporated into section 1831d of the FDIA,[209] enacted in 1980,[210] which preempts state usury laws for state-chartered banks, because FDIA section 1831d is patterned on section 85 the NBA and is read *in pari materia* with the NBA.[211]

Proponents of valid-when-made also argue that the doctrine follows from the common law of contracts because the assignee of a contract takes all the contractual rights of an assignor, so that a nonbank transferee merely steps into the shoes of a bank from which

Association, L.L.C., Financial Services Roundtable, Consumer Bankers Association, and Loan Syndication and Trading Association, as *Amici Curiae* in Support of Rehearing and Rehearing *en Banc, Madden v. Midland Funding, LLC,* No. 14-12131-cv (2ⁿᵈ Cir. 2015) at 5-6; Brief of the Structure Finance Industry Group, Inc. and the Securities Industry and Financial Markets Association as *Amici Curiae* in Support of Defendants-Appellees' Petition for Rehearing and Suggestion for Rehearing *en Banc, Madden v. Midland Funding, LLC,* No. 14-12131-cv (2ⁿᵈ Cir. 2015) at 8-9.

[204] *See, e.g.,* 85 Fed. Reg. 33530, 33532-33 (Jun 2, 2020); 85 Fed. Reg. 44146, 44149, 44151 (July 22, 2020).

[205] Reply in Support of Motion to Dismiss by Defendants Chase Card Funding LLC, Chase Issuance Trust, and Wilmington Trust Company, Petersen v. Chase Card Funding, LLC, No. 19-cv-00741 (W.D.N.Y. Oct. 8, 2019) at 8.

[206] *See, e.g.,* Marvin, *supra* note at 43 at 1839-40.

[207] 12 U.S.C. § 85.

[208] *See* 85 Fed. Reg. 33530, 33532 (June 2, 2020); Structured Finance Association and Bank Policy Institute, Comment Letter to FDIC on Proposed Rule on Federal Interest Rate Authority, RIN 3064-AF21, Feb. 4, 2020, *at* https://bit.ly/393X1iy, at 4. *See also* Astoria Fed. Sav. & Loan Ass'n v. Solimino, 501 U.S. 104, 108 (1991) (noting a presumption that Congress legislates in light of the common law); SCA Hygiene Prods. Aktiebolag v. First Quality Baby Prods., LLC, 137 S. Ct. 954, 966 (2017) (discussing the "presumption that Congress legislates against the background of general common-law principles").

[209] 12 U.S.C. § 1831d.

[210] P.L. 96-221, § 521.

[211] *See* Greenwood Trust Co. v. Massachusetts, 971 F.2d 818, 827 (1st Cir. 1992); Brief Amicus Curiae of the FDIC and the OCC, *In re Rent-Rite Superkegs West Ltd. v. World Business Lenders, LLC,* 2019 WL 4569774 (D. Colo. Sept. 10, 2019) at 5-6 (hereinafter "FDIC/OCC Amicus Brief").

© 2021, Adam J. Levitin

it acquires a loan and accedes to all the bank's rights and privileges, including exemption from state usury laws.[212]

The "valid-when-made" doctrine was endorsed by the Solicitor General's office and the OCC in a brief opposing granting a writ of *certiorari* litigation.[213] The doctrine was subsequently endorsed by OCC and FDIC in another amicus brief.[214] In 2020, the OCC and FDIC codified the doctrine in a pair of non-uniform rulemakings.[215]

The OCC rule provides that "interest on a loan that is permissible under [the National Bank Act] shall not be affected by the sale, assignment, or other transfer of the loan."[216] In other words, for national banks, the OCC rule provides that section 85 of the National Bank Act applies to a loan even if it has been transferred to a non-bank.

The FDIC rule in contrast, purports to clarify the timing for evaluating an interest rate for purposes of the FDIA by providing that whether interest on a loan is permissible under the FDIA "is determined as of the date the loan was made" and is not affected by "the sale, assignment or other transfer of the loan, in whole or in part."[217] Both the OCC and FDIC rules have been challenged by state attorneys general.[218]

## B.   *The* __Madden__ *Rule*

An alternative approach to the application of state usury laws to a nonbank assignees of a bank emerged in 2015 in the Second Circuit's decision in *Madden v. Midland Funding*.[219] *Madden* involved a putative class action brought against a nonbank debt buyer, Midland Funding,

---

[212] FDIC/OCC Amicus Brief, *supra* note 211, at 14-16.

[213] The Solicitor General opposed a grant of certiorari on the grounds that the case was not a good vehicle, but still held that it was wrongly decided. Brief for the United States as Amicus Curiae, *Midland Funding, LLC v. Madden*, 2016 WL 2997343 (S. Ct. 2016) (jointly filed by the Solicitor General and the Office of the Comptroller of the Currency)

[214] FDIC/OCC Amicus Brief, *supra* note 211.

[215] 85 Fed. Reg. 33530 (June 2, 2020) (OCC final rule on Permissible Interest on Loans That Are Sold, Assigned, or Otherwise Transferred); 85 Fed. Reg. 44146 (July 22, 2020) (FDIC final rule on Federal Interest Rate Authority).

[216] 12 C.F.R. § 7.4001(e). *See also* 12 C.F.R. § 160.110(d) (identical regulation for federal savings associations).

[217] 12 C.F.R. § 331.4(e).

[218] Complaint, California *ex rel.* Becerra v. FDIC, No. 20-5860 (N.D. Cal. Aug. 20, 2020); Complaint, California *ex rel.* Becerra v. OCC, No. 20-5200 (N.D. Cal. July 29, 2020).

[219] 786 F.3d 246 (2d Cir. 2015).

© 2021, Adam J. Levitin

for violation of New York's usury law.[220] Midland had purchased the defaulted credit card debt of named plaintiff Saliha Madden from FIA Card Services, N.A., a national bank subsidiary of Bank of American, N.A., another national bank.[221] Madden was a New York resident.[222] The debt had an annual interest rate of 27% and purported to be governed by Delaware law.[223] Delaware allows credit card debt to have whatever interest rate is agreed upon contractually,[224] whereas New York has a 16% usury cap.[225] After Midland attempted to collect the debt of approximately $5,000 from Madden, she brought suit for violation of New York's usury law and the federal Fair Debt Collection Practices Act.[226]

The District Court held that the National Bank Act would preempt any usury claim against Midland, the nonbank debt buyer,[227] but on appeal, the Second Circuit reversed:[228]

> [b]ecause neither defendant is a national bank nor a subsidiary or agent of a national bank, or is otherwise acting on behalf of a national bank, and because application of the state law on which Madden's claim relies would not significantly interfere with any national bank's ability to exercise its powers under the NBA….[229]

For NBA preemption to apply to a non-national bank the Second Circuit held, the application of state law must "significantly interfere with a national bank's ability to exercise its power under the NBA."[230] This "significantly interfere" standard comes from the Supreme Court's decision in *Barnett Bank of Marion County, N.A. v. Nelson,*[231] which was subsequently codified by the Dodd-Frank Wall Street

---

[220] *Id.* at 247.
[221] *Id.* at 248.
[222] *Id.* at 247.
[223] *Id.* at 248.
[224] 5 DEL. CODE § 943.
[225] The Second Circuit cites New York's 25% annual rate for criminal usury. *Id.* (citing N.Y. PENAL L. § 190.40). The civil usury rate applicable to a bank in New York is 16% annually. N.Y. GEN. OBLIG. L. 5-501; N.Y. BANKING L. 14-A.
[226] 786 F.3d at 248.
[227] *Id.* at 247.
[228] *Id.*
[229] *Id.* at 247.
[230] *Id.* at 249, 250.
[231] 517 U.S. 25 (1996).

© 2021, Adam J. Levitin

Reform and Consumer Protection Act of 2010.[232] While "it is possible that usury laws might decrease the amount a national bank could charge for its consumer debt in certain states", the Second Circuit held that such an effect was not a significant interference with national bank powers.[233]

### C.   "True Lender" Doctrine

#### 1.   "True Lender" as an Application of Usury's Anti-Evasion Doctrine

The valid-when-made rule and the *Madden* rule are both bright line rules. Whereas valid-when-made looks solely at the originator of the loan, *Madden* looks instead to the identity of the party holding the loan. Many courts, however, have eschewed such bright line rules and instead adopted a standard known as "true lender" doctrine that determines the application of usury law based on which party has the real economic interest in the loan.

True lender doctrine has its roots in a long-standing anti-evasion principle in usury law. Historically, courts have looked through the form of a transaction to its substance to determine if the form is but a mere contrivance to evade usury laws.[234] As the Supreme Court noted in 1835:

---

[232] Pub. L. 111-203, § 1045, 124 Stat. 1376 (July 21, 2010), *codified at* 12 U.S.C. § 25b(b)(1)(B).

[233] 786 F.3d at 251.

[234] *See, e.g.,* Whitworth & Yancey v. Adams, 26 Va. 333, 337-338 (Va. 1827) ("the only question in all [usury] cases like the present is, what is the real substance of the transaction, not what is the colour and form."); Scott v. Lloyd, 34 U.S. 418, 419 (1835); Andrews v. Pond, 38 U.S. 65, 76 (1839) ("But although the transaction, as exhibited in the account, appears on the face of it to have been free from the taint of usury, yet if the ten per cent. charged as exchange, or any part of it, was intended as a cover for usurious interest, the form in which it was done, and the name under which it was taken, will not protect the bill from the consequences of usurious agreements…"); Wetmore v. Brien & Bradley, 40 Tenn. 723, 727 (Tenn. 1859) (" But if the note were made for the purpose of being sold, to raise money, or as an artifice to evade the usury laws, under the color of a sale and purchase of the paper, this will not avail; and the purchaser, under such circumstances, with knowledge of the facts, either actual, or inferable from the facts of the case, will be held guilty of usury, if the discount shall have been greater than the legal rate of interest."); Missouri, Kansas & Texas Trust Co. v. Krumseig, 172 U.S. 351, 355-356 (1899) ("[T]he question always is whether it was or was not a subterfuge to evade the laws against usury."); Seeman v. Phila. Warehouse Co., 274 U.S. 403, 408 (1927) ("the form of the transaction must not 'disguise its real character.'"); Sachs v. Ginsberg, 87 F.2d 28, 30 (D.C. Cir. 1936) ("It was the duty of the trial court to look beyond the form of the contract and to determine the exact nature of the transaction, and, if found to be a loan and usurious, to bring it within the terms of the statute, no matter how righteous the cloak of formality which was used to conceal its real character.").

© 2021, Adam J. Levitin

> The ingenuity of lenders has devised many contrivances by which, under forms sanctioned by law, the statute may be evaded….Yet it is apparent that if giving this form to the contract will afford a cover which conceals it from judicial investigation, the statute would become a dead letter. Courts, therefore, perceived the necessity of disregarding the form, and examining into the real nature of the transaction. If that be in fact a loan, no shift or device will protect it.[235]

Likewise, the Georgia Supreme Court noted in 1887:

> No disguise of language can avail for covering up usury, or glossing over an usurious contract. The theory that a contract will be usurious or not according to the kind of paper bag it is put up in, or according to the more or less ingenious phrases made use of in negotiating it, is altogether erroneous. The law intends that a search for usury shall penetrate to the substance.[236]

As the *Ruling Case Law* treatise summarized:

> The cupidity of lenders, and the willingness of borrowers to concede whatever may be demanded or to promise whatever

---

[235] Scott v. Lloyd, 34 U.S. 418, 419 (1835).

[236] Pope v. Marshall, 78 Ga. 635, 640 (Ga. 1887). *See also* Crim v. Post, 41 W.Va. 397 (W.V. 1895) (syllabus by the Court) ("The usury statute contemplates that a search for usury shall not stop at the mere form of the bargains and contracts relative to such loan, but that all shifts and devices intended to cover a usurious loan or forbearance shall be pushed aside, and the transaction shall be dealt with as usurious if it be such in fact."); First Nat'l Bank v. Phares, 174 P. 519, 521 (Okla. 1918) ("In deciding whether any given transaction is usurious or not, the courts will disregard the form which it may take, and look only to the substance of the transaction in order to determine whether all the requisites of usury are present…. If all these requisites are found to be present, the transaction will be condemned as usurious, whatever form it may assume and despite any disguise it may wear."); Bank of Lumpkin v. Farmers' State Bank, 161 Ga. 801, 807 (Ga. 1926) (syllabus by the Court) ("The ingenuity of man has not devised a contrivance by which usury can be legalized . . . . [F]or the name by which the transaction is denominated is altogether immaterial if it appears that a loan of money was the foundation and basis of agreement which is under consideration."); Anderson v. Hershey, 127 F.2d 884, 886 (6th Cir. 1942) (finding district court correctly determined that bank's requirement that plaintiff "purchase the non-interest-bearing certificate of deposit was a device on the part of the bank to collect usury …. The courts of Kentucky in usury cases look behind the form of the transaction to its substance (*Hurt v. Crystal Ice & Cold Storage Co.*, 215 Ky. 739, 286 S.W. 1055)"); Jackson v. Comm. Credit Corp., 90 Ga. App. 352, 355 (Ga. Ct. App. 1954); Daniel v. First Nat'l Bank of Birmingham, 227 F.2d 353, 355, 357 (5th Cir. 1956) ("Usurious contracts are condemned by public policy both state and national Code of Alabama …. That public policy cannot be defeated by the simple expedient of a written contract, but the real substance of the transaction must be searched out.").

© 2021, Adam J. Levitin

> may be exacted in order to obtain temporary relief from financial embarrassment, as would naturally be expected, have resulted in a great variety of devices to evade the usury laws; and to frustrate such evasions the courts have been compelled to look beyond the form of transaction to its substance, and they have laid it down as an inflexible that mere form is immaterial, but that it is the substance which must be considered.[237]

Numerous state supreme courts have adopted similar statements.[238]

This anti-evasion principle has been reanimated in a string of modern cases dealing with rent-a-bank or rent-a-tribe situations under the name of "true lender" doctrine, in that these cases attempt to determine which entity was the "true lender" for the purposes of determining which usury laws apply.[239]

The anti-evasion principle was codified in the 2004 Georgia Payday Lending Act, which, responding to rent-a-bank payday lending[240] included a provision that prohibited:

> Any arrangement by which a de facto lender purports to act as the agent for an exempt entity. A purported agent shall be considered a de facto lender if the entire circumstances of the transaction show that the purported agent holds, acquires, or

---

[237] 27 RULING CASE LAW 211 (1920).

[238] *See, e.g.*, Barry v. Paranto, 97 Minn. 265, 267 (Minn. 1906) ("It is elementary that no device or scheme intended for the purpose of evading the laws against usury will prevent the courts from giving force to the statute and declaring contracts made in violation thereof null and void."); Fidelity Sec. Corp. v. Brugman, 137 Ore. 38, 50 (Ore. 1931) ("The courts do not permit any shift or subterfuge to evade the law against usury. The form into which parties place their transaction is unimportant. Disguises are brushed aside and the law peers behind the innocent appearing cloaks in quest for the truth.") Beacham v. Carr, 122 Fla. 736, 742-743 (Fla. 1936) (quoting 27 R.C.L. 211) Milana v. Credit Discount Co., 27 Cal. 2d 335, 340 (Cal. 1945) ("The courts have been alert to pierce the veil of any plan designed to evade the usury law and in doing so to disregard the form and consider the substance."); Austin v. Ala. Check Cashers Ass'n, 936 So. 2d 1014, 1031 (Ala. 2005) (quoting *Hurt v. Crystal Ice & Cold Storage Co.*, 215 Ky. 739, 286 S.W. 1055, 1056-57 (Ky. Ct. App. 1926), which in turn cited 27 R.C.L. 211).

[239] Goleta Nat'l Bank v. O'Donnell, 239 F. Supp. 2d 745 (S.D. Ohio 2002); Goleta Nat'l Bank v. Lingerfelt, 211 F. Supp. 2d 711 (E.D.N.C. 2002).

[240] OCGA § 16-17-1(c) (noting "The General Assembly has determined that various payday lenders have created certain schemes and methods in order to attempt to disguise these transactions or to cause these transactions to appear to be "loans" made by a national or state bank chartered in another state in which this type of lending is unregulated, even though the majority of the revenues in this lending method are paid to the payday lender.").

© 2021, Adam J. Levitin

maintains a predominant economic interest in the revenues generated by the loan.[241]

The Georgia Court of Appeals subsequently held that a payday lender could be liable for violating the usury laws through a rent-a-bank transaction.[242] Subsequently, numerous courts have adopted a similar position, whether in the context of a complete preemption analysis for removal purposes or substantive preemption in a merits ruling.[243] Thus, when determining whether New York law applied to a payday lender in a rent-a-bank arrangement, the New York Supreme Court's Appellate Division noted that:

> we must look to the reality of the arrangement and not the written characterization that the parties seek to give it, much like Frank Lloyd Wright's aphorism that "form follows function." Thus, an examination of the totality of the circumstances surrounding this type of business association must be used to determine who is the "true lender," with the key factor being "who had the predominant economic interest" in the transactions.[244]

While "true lender" is often defined with reference to predominant economic interest, it is ultimately a totality-of-the-circumstances inquiry about which party is the serving as the lender, and no court has attempted to articulate an exclusive list of factors or their weights, much less whether any particular factor is determinative.

---

[241] OCGA § 16-17-2(b)(4), *upheld by* BankWest, Inc. v. Baker, 411 F.3d 1289, 1293 (11th Cir. 2005), *vacated and appeal dismissed as moot*, 446 F.3d 1358 (11th Cir. 2006) (per curiam). Some have claimed that the true lender doctrine originates with the Georgia statute, John D. Skees, *Comment: The Resurrection of Historic Usury Principles for Consumption Loans in a Federal Banking System*, 55 CATH. U.L. REV. 1131, 1154 (2006); John Hannon, *Note: The True Lender Doctrine: Function over Form as a Reasonable Constraint on the Exportation of Interest Rates*, 67 DUKE L.J. 1261, 1280 (2018), the existence of a pair of true lender cases from two years prior to the statute, *see supra* note 207, plus Georgia's well developed jurisprudence on disguised usury, *see supra* note 204, suggests that the statute was reflective of an established doctrine, rather than the origin of the doctrine. Indeed, the Georgia court of appeals applied the doctrine to a transaction that took place before the enactment of the statute, implying a common law "true lender" doctrine that had merely been codified. Ga. Cash Am. v. Greene, 318 Ga. App. 355, 361-362 (Ga. Ct. App. 2012).

[242] *Id.*.

[243] *See supra* note 22 (listing cases).

[244] *Matter of People of State of New York v. County Bank of Rehoboth Beach, Del.*, 45 A.D.3d 1136, 1138 (N.Y. App. Div. 3d Dept. 2007).

© 2021, Adam J. Levitin

Notably, only a few courts have outright rejected true lender doctrine. [245] Even some of the modern cases that are cited as supporting the "valid-when-made" doctrine indicate that the analysis would be different if a true lender allegation had been made.[246] Indeed, a key case often cited as support for "valid-when-made" actually engages in something akin to a true lender analysis.[247]

### 2.   *"True Lender" Doctrine's Application to Disaggregated Lending*

Yet it is also worth noting that no court has yet attempted to apply a true lender analysis to a state-of-the-art rent-a-bank arrangement. Applying true lender analysis to a structure such as Elevate's requires first disregarding the corporate separateness of the various affiliated Elevate entities, as well as the unaffiliated SPV.

For the Elevate entities, collapsing corporate separateness is a straightforward enough step, as they are all under common control. The Elastic SPV or Rise SPV presents a slightly more complicated situation, as the equity interest in the SPV is not held by an Elevate-affiliated entity. Yet it is hard to see the SPVs as anything other than creatures controlled by Elevate: they were was created for undertaking the Elevate transactions, carry on no other business, have no employees of their own, and all of their economic risk is transferred to Elevate through Elevate's guaranties of the SPVs' obligations. Notably, Elevate is required to consolidate the SPVs for accounting purposes.[248] The accounting consolidation is based on an economic reality test that looks to whether the Elevate has both control and significant economic exposure to the SPVs.[249] In other words, the use of the SPV is in part contrivance to create a legal "cut out" to separate Elevate (and its funder, Victory Park Capital) from the transaction's legal risks.

Even after the various Elevate entities and the SPVs are consolidated for the purposes of true lender analysis, there is still the

---

[245] *Beechum v. Navient Solutions, Inc.*, 2016 U.S. Dist. LEXIS 129782, at *18 (C.D. Cal. Dec. 20, 2016); *Sawyer v. Bill Me Later, Inc.*, 23 F. Supp. 3d 1359 (D.Utah 2014); *Hudson v. ACE Cash Express, Inc.*, 2002 U.S. Dist. LEXIS 11226 (S.D. Ind. 2002).

[246] *See* Nichols v. Fearson, 32 U.S. 103, 106 (1833); Federal Deposit Ins. Corp. v. Lattimore Land Corp., 656 F.2d 139, 148 n.15 (5th Cir. 1981).

[247] *Krispin v. May Dep't Stores Co.*, 218 F.3d 919, 924 (8th Cir. 2000).

[248] Elevate Credit, Inc., Form 10-K (2019) at 87.

[249] SFAS 167.

© 2021, Adam J. Levitin

issue that a bank is the lender of record for both Elastic and Rise and that the loans remain on the banks' balance sheets because it is only a partial participation interest that is sold, not the loans themselves. Again, the nature of the arrangement should make readily clear that it is nothing more than a contrivance to evade usury laws—all of the loans' terms are proposed by Elevate; the banks do not make similar loans otherwise (or even market the loans to their other customers); the participation interest sales are nearly of 100% exposure; and the banks' have purchased every element of the lending process from Elevate—marketing, underwriting, servicing, and almost all of the funding. The fact that the bank retains nominal control of the underwriting standards should again be beside the point if the bank does not engage in this sort of collaboration on underwriting standards for its credit products generally (excluding other rent-a-bank style transactions). Thus, there should be little difficulty in concluding that Elevate is the true lender on both Elastic and Rise products, no matter the nominal involvement of the banks as lender of record.

While the application of true lender doctrine to Elevate's products is fairly straightforward, it is less so for marketplace lenders that truly transfer the majority of the credit risk to unaffiliated capital market investors. Elevate's guaranties of the SPVs meant that the economic exposure on the loans circled right back to Elevate through a chain of contracts. How does true lender doctrine apply, however, when the economic exposure on the loans is separated from the design and production of the loans?

Consider Avant, a marketplace lender that makes loans at rates under 36% APR.[250] Avant makes the loans directly in states in which the usury caps is not a binding constraint, but in handful of states where the usury cap is below 36%, Avant partners with WebBank, a Utah-chartered industrial bank.[251] One of those states is Colorado, which has a 21% usury cap.[252] Based on this Colorado sued Avant and another marketplace lender, Marlette, for violating its usury statute.[253]

---

[250] Avant, Personal Loans, *at* https://www.avant.com/personal-loans/ (last viewed Jan. 3, 2021 at 9:54 pm) ("APRs ranging from 9.95%-35.99%").

[251] Second Amended Complaint, Zavislan v. Avant of Colorado LLC, No. 2017-cv-30377 (Dist. Ct., City and County of Denver, Colo. Nov. 30, 2018), ¶¶ 28, 57.

[252] Colo. Rev. Stat. § 5-2-501.

[253] Second Amended Complaint, Zavislan v. Avant of Colorado LLC, No. 2017-cv-

© 2021, Adam J. Levitin

Colorado alleged that WebBank would serve as the initial funder and lender of record on the loans.[254] WebBank, however, would allegedly sell without recourse the receivables on the loans—but not the account relationship—within two business days to an Avant-affiliated entity.[255] Avant allegedly handled all marketing, paid the costs of underwriting, decided which loan applicants would receive loans under the agreed-upon underwriting criteria, handled all servicing and compliance, indemnified WebBank for all claims arising from the partnership, and also paid all of WebBank's legal fees associated with the program.[256] Moreover, if a consumer was declined for a loan, only Avant allegedly had a right to solicit the consumer for other products; WebBank had no right to contact the would-be customers.[257] Avant and WebBank allegedly shared in the profit on the loans, but WebBank's share was allegedly only around 1% of the total profit.[258]

Thus far, the description of the Avant program does not differ significantly from that of Elevate's arrangements: the bank serves as a front for a loan product designed, marketed, underwritten, and serviced by the nonbank that is precluded by usury laws from making the loans itself directly. Avant, however, adds in a twist in the way it financed the loans. Avant retained some of the loans on its own balance sheet—a situation not much different from Elevate after its guaranties of the SPVs' obligations to Victory Park Capital are considered. Avant, however, also shifted some of the exposure on the loans to third-party investors.

Avant sold some of the receivables to institutional investors and securitized others, with Avant continuing to act as servicer for the securitization vehicles.[259] Avant does not seem to guaranty the asset-backed securities issued against the receivables generated through its

---

30377 (Dist. Ct., City and County of Denver, Colo. Nov. 30, 2018); Second Amended Complaint, Meade v. Marlette Funding, LLC, No. 2017-cv-30376 (Dist. Ct., City and County of Denver, Colo. Nov. 30, 2018).

[254] Second Amended Complaint, Zavislan v. Avant of Colorado LLC, No. 2017-cv-30377 (Dist. Ct., City and County of Denver, Colo. Nov. 30, 2018) at ¶ 30.

[255] Id. at ¶¶ 31, 51.

[256] Id. at ¶¶ 37-46, 52.

[257] Id. at ¶ 47.

[258] Id. at ¶ 55.

[259] Id. at ¶¶ 53, 59-60. Curiously, Victory Park Capital has been involved in at least some Avant securitizations. Victory Park Capital, KKR Lead $175MM Securitization of Avant Consumer Loans, ABLAdvisor, Nov. 20, 2015, at https://bit.ly/3nlVwCJ.

© 2021, Adam J. Levitin

program with WebBank.[260] In other words, the economic exposure on the securitized receivables has truly shifted to third-party investors.

So who is the true lender in the Avant situation?

- Is it the third-party securitization investors or securitization vehicles hold the predominant economic interest in the receivables? The investors have the economic exposure to the loans, but they did not make the loans. Instead, they merely bought the receivables in the secondary market.

- Is it WebBank, which owns the loan accounts? WebBank has almost no economic interest in the loans nor does it have much of a role in lending process, as it does not design, market, underwrite, or service the loans.

- Is it Avant, which designed, marketed, underwrote, and serviced the loans? Avant does not hold an on-going economic interest in the securitized loans.

The point is that there is no single party that neatly fits the bill of being the true lender because control is divided from economic exposure. Avant has more truly disaggregated the lending process than Elevate. While it is easy to predict how true lender analysis should apply to Elevate, it is less clear with Avant. Although Colorado sued both Avant and the securitization vehicles that purchased the receivables under a true lender theory, the issue was never resolved, as the case settled.[261] Uncertainty about the application of true lender doctrine to this novel fact pattern likely contributed to Colorado's willingness to settle.

### D. *Taking Stock of the Doctrinal Landscape*

To summarize the doctrinal lay of the land, under valid-when-made, usury laws do not apply to nonbanks in rent-a-bank

---

[260] Avant's securitization deals are all Rule 144A unregistered transactions, so the deal documents are not publicly available. Avant's securitizations, however, appear to be without recourse, but to have credit enhancements including senior-subordinate tranching, excess spread, overcollateralization, and pre-funded reserve accounts. *See, e.g., Kroll Bond Rating Agency Assigns Preliminary Ratings to Avant Loans Funding Trust 2016-A*, BUS. WIRE, Feb. 08, 2016, *at* https://bwnews.pr/35a2vbl. For explanation of these different types of credit enhancements, *see* Adam J. Levitin & Susan M. Wachter, *Explaining the Housing Bubble*, 100 GEO. L.J. 1177, 1191 n.44-1192 n.47 (2012).

[261] Assurance of Discontinuation, *In the Matter of Avant of Colorado, LLC, and Marlette Funding, LLC*, Aug. 7, 2020, *at* https://bit.ly/3b7h43t.

© 2021, Adam J. Levitin

transactions. In contrast, under the *Madden* rule, the nonbank would be subject to state usury laws only if it purchased the loans outright. Under true lender doctrine the nonbank would be subject to state usury laws irrespective of how the transaction were structured if it were deemed the real party in interest. Yet it is unclear how true lender doctrine would actually apply to more complex transactions that disaggregate the various interests in the loan among numerous unaffiliated parties.

## V.    THE SPURIOUS PEDIGREE OF "VALID-WHEN-MADE"

### A.  *The Purported Historicity of Valid-When-Made*

The legal viability of rent-a-bank transactions stands on the valid-when-made doctrine. A central claim made by proponents of the "valid-when-made" doctrine is that it is a "well-established and widely accepted" common law doctrine that is a "cardinal rule" of banking law endorsed by multiple Supreme Court decisions.[262] By virtue of being part of the common law, the doctrine was supposedly incorporated into section 85 of the National Bank Act of 1864 and thus again into section 1831d of the Federal Deposit Insurance Act, which was enacted in 1980, because that provision is patterned on the National Bank Act.

The valid-when-made doctrine's supposed historicity is critical for the claim that the doctrine is essential to the smooth functioning of credit markets and bank liquidity, as well as claims of justified reliance on the doctrine in secondary market pricing. The doctrine's deep historical roots have been claimed by the Solicitor General's Office,[263]

---

[262] *See, e.g.,* FDIC/OCC Amicus Brief, *supra* note 211, at 10. It is also worth noting that the "valid when made" doctrine is a federal common law. This would seem to create a problem for the doctrine. The Supreme Court made clear in *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938), federal courts lack a judicial power to create general federal common law regarding state law claims when sitting in diversity jurisdiction. Usury claims are state law claims, so to the extent that jurisdiction exists based on diversity, there is no basis for federal courts extending a common law rule. Jurisdiction might be federal question jurisdiction based on section 85 the National Bank Act of 1864 (NBA), 12 U.S.C. § 85, and section 1831d the Depository Institutions Deregulation and Monetary Control Act of 1980 (DIDMCA), 12 U.S.C. § 1831d, but neither statute can support as broad of a doctrine as "valid-when-made". Instead, any federal common law under either statute would have to be confined to the scope of the statute.

[263] *See supra* note 181.

© 2021, Adam J. Levitin

the OCC and FDIC,[264] as well as law firms representing major financial institutions,[265] and trade associations.[266] The doctrine's historical basis has been endorsed *sua sponte* by a federal bankruptcy court, as well as accepted by much of the scholarly literature.[267]

The doctrine's supposed historicity, however, has never actually been probed. An examination of the cases and other sources cited as support for the doctrine shows that the valid-when-made doctrine is utterly lacking in historical roots. The doctrine was unknown to American law until the 21st century. The historical sources that supposedly support the doctrine are in fact dealing with an entirely different transactional issue that is unfamiliar to most contemporary lawyers, who have relied on decontextualized quotations from historical cases to claim a historical pedigree for a doctrine that fits their policy preferences.

### B.  Impossibility of Valid-When-Made Before 1864

As an initial matter, the claim that valid-when-made was part of the common law background of the National Bank Act runs into the problem that the doctrine could not possibly have existed prior to the enactment of the NBA in 1864 because there was no situation in which it could have arisen. Prior to the NBA, state usury laws applied to all entities equally, with choice of law rules limited by an anti-evasion principle.[268] Therefore, it was not possible prior to 1864 for a loan to be non-usurious in the hands of a bank, yet be usurious in the hands of a nonbank assignee merely by virtue of an assignment. This alone should indicate that all of the *antebellum* cases on which the doctrine supposedly rests (considered in more detail in the next section) in fact have nothing to do with the issue and that the "valid-when-made" doctrine could not be background law against which the NBA was enacted.

---

[264] *See* FDIC/OCC Amicus Brief, *supra* note 211.

[265] *See, e.g.*, Sullivan & Cromwell LLP, *supra* note 52; Davis Polk, *supra* note 52;

[266] *See, e.g.*, Marketplace Lenders Association, Comment Letter to OCC on "Permissible Interest on Loans That Are Sold, Assigned, or Otherwise Transferred," Docket ID No. OCC-2019-0027; RIN 1557-AE73 at 2 (undated), *at* https://bit.ly/2Lfwfwu; Structured Finance Association and Bank Policy Institute, Comment Letter to FDIC on "Federal Interest Rate Authority," RIN 3064-AF21, Feb. 4, 2020, https://bit.ly/2XmDbed, at 3 (noting "centuries-old fundamental market expectations").

[267] *See supra* note 43.

[268] Miller v. Tiffany, 68 U.S. 298, 308 (1864).

© 2021, Adam J. Levitin

### C.  The Absence of "Valid-When-Made" in Pre-1979 Cases

The valid-when-made doctrine is not actually mentioned as such in any case until 2019.[269] The first case even consistent with the doctrine only appears in 1979,[270] but it qualifies itself with an anti-evasion principle. Cases clearly consistent with a valid-when-made doctrine can only begin to be observed in the 2000s. In other words, cases clearly consistent with the doctrine do not emerge until twenty years after the enactment of the FDIA's interest rate exportation provision and 140 years after the NBA's interest rate exportation provision.

So what are the historical cases claimed to support the doctrine actually about? The historical cases address three distinct issue patterns, none of which have anything to do with "valid-when-made." Instead, they are dealing with three different problems in the law of usury that relate to the question of how to calculate the interest rate on a loan, not the question of which state's usury law applies to the loan. These cases are dragooned into supporting "valid-when-made" and the associated deregulatory policy agenda through selective, decontextualized quotations, but when seen in context, none of the historical cases support the claimed doctrine.

The first set of historical cases falls into a "discounted assignment" pattern.[271] This pattern of case deals with the effect of a discounted

---

[269] Rent-Rite SuperKegs W., Ltd. v. World Bus. Lenders, LLC (*In re* Rent-Rite SuperKegs W., Ltd.), 603 B.R. 41, 66 (Bankr. D. Colo. 2019).

[270] Strike v. Trans-West Discount Corp., 92 Cal.App.3d 735, 745 (Cal. Ct. App. 4th Dist. 1979).

[271] *See, e.g.,* Munn v. Comm'n Co., 15 Johns. 44, 55 (N.Y. Sup. Ct. 1818) ("The principle is too well settled to be questioned, that a bill, free from usury, in its concoction, may be sold at a discount, by allowing the purchaser to pay less for it than it would amount to at the legal rate of interest, for the time the bill has to run. The reason is obvious: as the bill was free from usury, between the immediate parties to it, no after transaction with another person can, as respects those parties, invalidate it."); Taylor v. Bruce, 21 Va. 42, 90 (Va. 1820) ("it is settled, that a bill or note which is free from usury, in its concoction, may be sold at an usurious discount, for that as it was free from usury between the original parties, no after transaction can, as to these parties, invalidate it"); Tuttle v. Clark, 4 Conn. 153, 157 (1822) (the note "not being usurious in its original concoction, did not become so, by the subsequent [discounted] sale to the plaintiffs"); Knights v. Putnam, 20 Mass. 184, 185 (Mass. 1825) ("a note, valid in its inception, may be recovered against the maker, by an indorsee, although discounted by him at a rate exceeding legal interest. It is a well established principle, that if a note or security is valid when made, no usurious transaction afterwards between the parties or privies will affect its validity."); Cram v. Hendricks, 7 Wend. 569, 572 (N.Y. Ct. for the Correction of Errors

assignment of a loan on the calculation of the interest rate on the loan. The cases following this pattern involve with two separate transactions—a loan and a discounted sale or pledge of the note from the initial loan. When a note is sold at a discount from face, the discount can be treated as imputed pre-paid interest.[272] The issue in these cases is whether the whether the interest imputed by the discounting (transaction #2) should be added to the interest rate on the face of the note (transaction #1) for the purpose of determining whether the note is itself usurious. This situation has nothing to do with the question of which jurisdiction's usury law applies. Instead, it is a question of how to calculate the interest rate for usury purposes.

The two 19th century Supreme Court cases generally cited as the basis for the valid-when-made doctrine's historical pedigree, *Gaither v. Farmers' & Mechanics' Bank of Georgetown*,[273] and *Nichols v. Fearson*,[274] both fall into this "discounted assignment" pattern. *Gaither* involved a non-usurious note that was pledged by the payee as collateral for an unrelated, usurious loan.[275] The Supreme Court observed that "the rule cannot be doubted, that if the note be free from usury, in its origin, no *subsequent usurious transactions respecting it*, can affect it with the taint of usury."[276] The key point to note here is that *Gaither* is not does not say "no subsequent transactions," but no "subsequent *usurious* transactions."

*Gaither* involved a situation in which there were *two* credit transactions—the making of a non-usurious note and the making of a usurious loan. The issue was whether the usurious interest from the second transaction could be imputed to the first transaction. In

---

1831) ("The principle is too well settled to be questioned, that a bill free from usury in its concoction may be sold at a discount; because, as it was free from usury between the original parties to it, no subsequent transaction with another person can, as it respects those parties, invalidate it.").

[272] Nat'l Bank of Gloversville v. Johnson, 104 U.S. 271, 276-277 (1881); Evans v. Nat'l Bank of Savannah, 251 U.S. 108, 114 (1919). Section 85 of the National Bank Act covers not only interest on loans, but also interest on discounts. 12 U.S.C. § 85. The idea of a discount being treated as imputed interest is still regularly applied today in the tax and bankruptcy law, where "original issue discount" on bonds is treated as imputed interest. *See, e.g.*, Treas. Reg. § 1.61-7(c); In re Chateaugay Corp., 961 F.2d 378 (2d Cir. 1992); Matter of Pengo Indus. Inc., 962 F.2d 543 (5th Cir. 1992). Under tax and bankruptcy law, secondary market discounts are not treated as imputed interest, however, only discounts at issuance.

[273] 26 U.S. (1 Pet.) 37 (1828).

[274] 32 U.S. (7 Pet.) 103 (1833).

[275] 26 U.S. at 41.

[276] *Id.* at 43 (emphasis added).

© 2021, Adam J. Levitin

contrast, the "valid-when-made" situation deals with a *single* loan that is assigned. There is no "subsequent usurious transaction" to speak of in the "valid-when-made" context. *Gaither* did not involve an assignment and says nothing about the "valid-when-made" situation.

Nor is the valid-when-made doctrine supported by the other 19th century Supreme Court case, *Nichols v. Fearson*. *Nichols* involved a discounted sale of a note indorsed by the defendant.[277] When the defendant in *Nichols* indorsed the note, the defendant became jointly liable for the full face amount of the note, just as if it were the maker of the note.[278] The defendant then attempted to wriggle out of its obligation by raising a defense of usury on the basis that the stated interest rate on the note plus the additional implied interest rate from the discounting made the note usurious. The Supreme Court held that the usurious discounting did not void the original note,[279] observing that among the "cardinal rules of the doctrine of usury…[is] that a contract which in its inception is unaffected by usury can never be invalidated by any *subsequent usurious transaction.*"[280]

Again, the key point to note is that the Supreme Court did not use the phrase "any subsequent transaction," but "any subsequent *usurious* transaction." As with *Gaither*, *Nichols* involved a situation in which there were *two* credit transactions—the making of a non-usurious note and a usurious discounting (effectively a second loan). All *Nichols* holds is that the interest from the second transaction (the discounting) may not be imputed to the first transaction (the note). *Nichols* has nothing to do with the question of whether a nation bank can transfer its statutory interest rate exportation privilege to an assignee to allow the assignee to purchase and enforce a loan that the assignee could not legally make itself.

The second set of historical cases involve a "payment option" pattern. These cases deal with the effect of the exercise of a payment option by the borrower on the calculation of the interest rate on a

---

[277] 32 U.S. 103 (1833).

[278] Cf. UCC § 3-415(a) (modern statutory analog).

[279] 32 U.S. at 110, 112,

[280] *Id.* at 109 (emphasis added). *See also id.* at 106 ("the rule of law is everywhere acknowledged that a contract free from usury in its inception shall not be invalidated by any *subsequent usurious transactions upon it.*") (emphasis added).

© 2021, Adam J. Levitin

loan.[281] The option might be an option to pay in a different form of consideration or to pay late or to prepay. These cases do not even necessarily involve an assignment of the loan, underscoring that they are not about a valid-when-made issue whatsoever.

Finally, there is a set of cases involving a "cleansing assignment" pattern. These cases deal with the effect of a valid assignment on a usurious loan. This pattern is the reverse transaction of what is at stake with valid-when-made.[282] These "*invalid*-when-made" cases are all dealing with the reverse of the valid-when-made situation. As such, they tell us nothing about the existence of a valid-when-made doctrine.

### D.  The Absence of "Valid-When-Made" in Historical Treatises

If the "valid-when-made" doctrine were a "cardinal rule" of banking law, founded on Supreme Court opinions, one would expect it to regularly appear in 19th and 20th century usury and banking law treatises. Yet the doctrine is entirely unknown to historical treatise writers. No prior reference to "valid-when-made" can be found in *any*

---

[281] *See, e.g.*, Tate v. Wellings, 100 Eng. Rep. 716, 721 (K.B. 1790) (Buller, J. seriatim) (effect on the usury calculation of a loan of stock that was repayable in stock or cash at the borrower's option); Unity Plan Finance Co. v. Green 155 So. 900, 905 (La. 1934) (effect on the calculation of the interest from the acceleration of a debt that the debtor had failed to repay on time); FDIC v. Tito Castro Constr., 548 F. Supp. 1224, 1227 (D.P.R. 1982) ("it was only as a consequence of defendant's election to delay in repaying the principal amount of those [demand] notes that an effective rate of interest in excess of the Puerto Rico statutory ceiling may have resulted."); Rangen, Inc. v. Valley Trout Farms, Inc., 658 P.2d 955, 959 (Id. 1983) (effect on usury calculation of a fee for late payment option); Southwest Concrete Products. v. Gosh Construction Corp., 51 Cal.3d 701, 708 (Cal. 1990) ("a transaction that was not usurious at its inception cannot become usurious by virtue the debtor's voluntary default."); Zang v. Schumann, 262 Wis. 570, 577-579 (Wisc. 1952) (borrower's exercise of an option to pay an extra premium to be relieved from a lease was not to be considered in the calculation of the interest rate); Saul v. Midlantic Nat'l Bank, 572 A.2d 650, 658 (N.J. App. Div. 1990) (whether the value of a non-optional discounted stock sale accompanying the loan should be included in the interest for the loan); Hoffman v. Key Federal Sav. and Loan Ass'n, 416 A.2d 1265, 1269 (Md. 1979) (whether an optional prepayment should affect the calculation of the interest rate) ("[t]he virtually universal rule is that a contract legal at its inception will not be rendered usurious by voluntary prepayment.").

[282] Highway Equip. & Supply Co. v. Jones, 153 N.W.2d 859, 863 (Neb. 1967) (addressing whether usury in the initial transaction was purged by an assignment; Coral Gables First Nat'l Bank v. Constructors of Fla., Inc., 119 So. 2d 741, 746 (Fla. Dist. Ct. App. 1960) (addressing effect of renewal of a usurious loan on non-usurious terms); Waggener v. Holt Chew Motor Co., 274 P.2d 968, 971 (Colo. 1954) (addressing whether lender's acquisition of a required license after making loan at rate above that allowed for unlicensed lenders cured the usury violation.)

© 2021, Adam J. Levitin

19th or 20th century banking or usury treatise.[283] Instead, what is found in treatises are restatements of the discounted assignment pattern.[284] There is nothing else even remotely related to the doctrine to be found in any 19th or early 20th century American usury or banking treatise.

### E. The Erroneous Basis of Modern "Valid-When-Made" Decisions

The first case to fit within the "valid-when-made" doctrine is a 1979 California appellate decision, *Strike v. Trans-West Discount Corp*, involving an assignment of a loan from a bank (exempt from California usury law by the California constitution) to a nonbank that was normally subject to California usury law.[285] The California Court of Appeals held that the transfer of the loan did not change its status vis-à-vis the usury laws, but suggested that the outcome would be different if the loan had been intended for assignment *ab initio*.[286] This is a

---

[283] To be sure, proponents of the doctrine cite to language from an 1838 edition of Blackstone's *Commentaries on the Laws of England* for support: "'[t]he usury must be part of the contract in its inception' for a contract to be deemed usurious." FDIC/OCC Amici Brief at 10 (citing BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND). But the quoted language does not appear in Blackstone's original treatise. Instead, it is from a later annotator's footnote. Nor does it actually provide much support the "valid-when-made" doctrine. The footnote cites two English cases. The first, *Lowes v. Mazzaredo*, 1 Stark 385 (Assizes at Nisi Prius 1816), dealt with usurious discounting of a non-usurious bill of exchange, which was held not to affect the validity of the bill of exchange. *Mazzaredo* is squarely within the discounted assignment pattern (pattern 2). The second case, *Lowe v. Waller*, 2 Dougl. 736 (King's Bench 1781), dealt with whether a good faith assignee of a usurious bill of exchange is subject to the defense of usury (pattern 3). This case fits neatly in the cleansing assignment pattern. Both cases are uninformative about the "valid-when-made" doctrine.

[284] JOSEPH CHITTY, *A PRACTICAL TREATISE ON BILLS OF EXCHANGE, CHECKS, ON BANKERS, PROMISSORY NOTES, BANKERS' CASH NOTES, AND BANK NOTES* * 106 (5th Ed. 1821) ("In general, a *subsequent* illegal contract or consideration of any description, taking place in a second indorsement or transfer of a bill, and not in its inception, nor in a transfer through which the holder must make title, will not invalidate the same, in the hands of a bona fide holder.") (emphasis original). *See also* SIR ROBERT BUCKLEY COMYN, *A TREATISE ON THE LAW OF USURY* 187 (1817) ("As a security or contract which is usurious in its inception must always retain its unsoundness; so on the other hand, where the security or contract has been originally valid, no subsequent taking of, or contract to take, illegal interest will invalidate it; although by such taking the party absolute incur the penalty of the statute."); JAMES AVERY WEBB, *A TREATISE ON THE LAW OF USURY, AND INCIDENTALLY, OF INTEREST* 344 (1899) ("A contract, free from usury at its execution, cannot be rendered invalid by any subsequent usurious agreement between the same or other persons. A subsequent agreement may be usurious in itself and thereby become either wholly or partly nugatory; but its fate cannot be visited upon the original valid contract.").

[285] 92 Cal.App.3d 735, 745 (Cal. Ct. App. 4th Dist. 1979).

[286] *Id.* (citing *Calimpco, Inc. v. Warden*, 100 Cal. App. 2d 429, 446-447 (Cal. Ct. App. 1st

---

© 2021, Adam J. Levitin

sensible articulation on an anti-evasion position that ensures the liquidity of bank loans, but also prevents abuse of federal preemption through rent-a-bank arrangements and the like. The court in *Strike* expressed no awareness of a valid-when-made doctrine.

After *Strike*, only a handful of late 20th century or 21st century cases are consistent with the "valid-when-made" doctrine. As with *Strike*, none of these cases express any awareness of the doctrine, and all stand on a chain of cases misreading the Supreme Court's 1833 decision in *Nichols v. Fearson*.[287] Thus, *Munoz v. Pipestone Financial, LLC*[288] contains no original analysis, but instead, relies on a citation to *Phipps v. FDIC*.[289] *Phipps* too has no original analysis, but relies on a citation to *Krispin v. May Department Stores Co.*[290] *Krispin* is actually a true lender case based on the corporation affiliation between relationship between a bank and nonbank department store,[291] but it supports its determination with a citation to *FDIC v. Lattimore Land Corporation*, a 1981 case not actually dealing with a valid-when-made situation.[292] In *Lattimore*, however, the Fifth Circuit stated, "The non-usurious character of a note should not change when the note changes hands."[293] This proposition is given

---

Dist. 1950) ("If [an assignee cannot be held liable for accepting usurious interest], the statutes on usury might as well be abolished. All a lender would have to do would be to obtain a contract from a borrower providing for usurious interests…and then assign his contract and the contract would no longer be usurious."). *See also Miller v. Tiffany*, 68 U.S. at 308 (contractual choice of law provisions for usury are enforceable, but when done with intent to evade the law, law of the contract location applies).

[287] 32 U.S. (7 Pet.) 103 (1833).

[288] 513 F.Supp.2d 1076 (D. Minn. 2007).

[289] 417 F.3d 1006 (8th Cir. 2005).

[290] 218 F.3d 919 (8th Cir. 2000).

[291] *Id.* at 924 ("the store's purchase of the bank's receivables does not diminish the fact that it is now the bank, and not the store, that issues credit, processes and services customer accounts, and sets such terms as interest and late fees. Thus, although we recognize that the NBA governs only national banks…in these circumstances we agree with the district court that it makes sense to look to the originating entity (the bank), and not the ongoing assignee (the store), in determining whether the NBA applies.…Accordingly, for purposes of deciding the legality of the late fees charged to appellants' credit accounts, we find that the real party in interest is the bank, not the store.").

[292] 656 F.2d 139, (5th Cir. 1981). *Lattimore* dealt with a choice of law question regarding what state's law applied to the bank assignee of a loan made by a nonbank. *Id.* at 148-49. *Lattimore* also made clear that its analysis would have been different if there had been an allegation that the assignee was the true lender. *Id.* at 148, n. 15 ("The present case differs from *Daniels* in that here the obligors assumed that the allegedly usurious instrument called for non-usurious interest when held by the initial obligee and the obligors have never claimed that Hamilton National Bank was the lender in fact.").

[293] *Id.* at 148-49.

without any analysis, but is supported by a footnote that is worth examining in detail. The footnote that reads:

> This Court long ago observed that: "If, in its inception, the contract which that instrument purported to evidence was unaffected by usury, it was not invalidated by a subsequent transaction." *Huntsman v. Longwell*, 4 F.2d 105, 106 (5th Cir. 1925). This proposition was articulated by the Supreme Court as one of the "cardinal rules in the doctrine of usury." *Nichols v. Fearson*, 32 U.S. 103, 109-11 (1833).[294]

Yet we have already seen that *Nichols v. Fearson* had nothing to do with valid-when-made. The same is true of *Huntsman v. Longwell*, which like *Nichols* deals with the issue of whether interest from a second transaction can be imputed to the original transaction for purposes of calculating whether the first transaction violated the usury statute. In *Huntsman,* he borrower raised a usury defense to a loan that on its face was in compliance with the usury cap based on a claim that the day after the loan agreement was made, he had agreed in a separate contract to assume certain debts of the lender as part of the consideration of the loan, the effect of which was to make the real interest rate on the loan usurious.[295]

*Huntsman* correctly cites to *Nichols* as supporting the idea that imputed interest from transaction #2 cannot be bundled with interest from transaction #1 to result in a combined interest rate that violates the usury cap.[296] *Huntsman* cites *Nichols* for the proposition that:

> If, in its inception, the contract which that instrument purported to evidence was unaffected by usury, it was not invalidated by a subsequent transaction.[297]

This paraphrasing, however, omitted a critical word from *Nichols* (underlined below), which actually made a more limited claim:

> a contract which in its inception is unaffected by usury can never be invalidated by any subsequent <u>usurious</u> transaction.[298]

---

[294] *Id.* at 149, n.17.
[295] 4 F.2d 105, 106 (5th Cir. 1925). The issue before the court in *Huntsman* related to the admissibility of evidence regarding the second contract. *Id.*
[296] *Id.* at 106.
[297] *Id.* at 106.
[298] 32 U.S. at 109 (emphasis added)

© 2021, Adam J. Levitin

In *Huntsman* itself, that omission was of no consequence because it followed the same broad pattern as *Nichols*. *Lattimore*, however, failed to understand that *Huntsman* and *Nichols* stood for a very limited point, and nearly all of the subsequent cases 21st century valid-when-made cases rely on *Lattimore*'s misreading as their foundational authority.

The only major modern "valid-when-made" case that does not stand on this misreading of *Nichols* is the 7th Circuit's decision in *Olvera v. Blitt & Gaines, P.C.*[299] *Olvera*, however, does not actually embrace valid-when-made, but instead arrives at a similar result through a common law of assignment theory, namely that because the assign of a contract takes all of the assignor's rights under that contract, a nonbank assignee accedes to the bank assignor's usury exception for a loan.

This argument, echoed by other valid-when-made proponents,[300] reflects a fundamental misunderstanding of the common law of assignments. The common law of assignments relates solely to the assignment of rights under a contract or property rights. An assignee takes all of the rights of the assignor *under the contract*.[301] An assignee does not, however, assume the assignor's other rights extraneous to the contract, such as rights under licenses or from status. For example, if I sell my car, the buyer gets whatever rights are appurtenant to the car, but does not also get my driver's license or the benefits of my American Automobile Association membership, much less my parental or spousal rights. Similarly, if a credit union sells a loan, the buyer does not assume the credit union's statutory tax-exempt status. The assignee "steps into the shoes" of the assignor. It does not step into the assignor's "feet". Thus, the common law of assignment has no bearing on regarding a transfer of federal statutory status or privileges, as those are neither contract nor property rights.

Banks' exemptions from state usury laws, whether under the NBA or FDIA are statutory rights; they are not contractual terms in a loan agreement. These exemptions are not alienable property rights. Neither are they characteristics of the loan that travels with the note;

---

[299] 431 F.3d 285 (7th Cir. 2005) (Posner, J.).

[300] FDIC/OCC Amicus Brief, *supra* note 211, at 14-16; 84 Fed. Reg. 66848 (Dec. 6, 2019).

[301] *See* Restatement (2d) of the Law, Contracts, § 317(2) ("A *contractual* right can be assigned....") (emphasis added); 29 WILLISTON ON CONTRACTS § 74:10 (4th ed.) ("Generally, all *contract* rights may be assigned….") (emphasis added).

they are nowhere to be found in the loan documents. Instead, NBA and FDIA preemption is a personal and non-transferrable privilege that are part of a legal scheme that applies only to banks. Indeed, NBA and FDIA preemption does not void state usury laws—state usury laws remain valid and in effect for nonbanks, and in the case of FDIA, states even retain the right to opt-out of the provision.[302] Instead, NBA and FDIA "preemption" are not true preemption. They merely allow banks to export the usury cap of their home state into other states.

Because the exemption from state usury laws is essence a personal privilege, not a property right, it is no more assignable than a medical license or a tax-exempt status or FDIC insurance or Federal Reserve System discount window access. Indeed, if these privileges were freely assignable, there would be no point in having a bank licensing regime because regulators would not exercise control over who ultimately gained the privileges attached to the license. Accordingly, the common law of assignments has nothing whatsoever to do with the assignability of exemptions from usury laws.

### F.   *"Valid-When-Made" Doctrine's Irrelevance for Bank Liquidity*

The preceding sections have shown that "valid-when-made" is not a historical doctrine. It is a modern invention read back into the record through selective, decontextualized quotations of historical cases. The doctrine's lack of historicity is important because it undercuts the major policy claim made in support of doctrine, namely that it is necessary for the smooth functioning of bank credit markets.

In particular, proponents of the doctrine claim that the doctrine is economically necessary because without it banks could not sell loans in the secondary market.[303] Without the doctrine, they claim, banks could find themselves illiquid, and there would be uncertainty over the validity of sale transactions that would result in reduced sale prices for banks and confusion in secondary markets.[304] Thus, Judge Posner,

---

[302] 12 U.S.C. 1831d note (DIDMCA § 525, not codified).

[303] FDIC/OCC Amicus Brief, *supra* note 211, at 17 (any other position would be "uneconomic" and "disastrous in terms of bank operations"); Rent-Rite SuperKegs W., Ltd. v. World Bus. Lenders, LLC (In re Rent-Rite SuperKegs W., Ltd.), 603 B.R. 41, 66 (Bankr. D. Colo. 2019) ("Any contrary legal standard would interfere with the proper functioning of state banks.").

[304] *See, e.g.*, Marvin, *supra* note at 43 at 1839-40.

© 2021, Adam J. Levitin

when confronted with the issue, noted that the only effect of applying usury law to "assignees would be to make the credit market operate less efficiently."[305]

Yet it is hard to see how the doctrine is essential to the banking system given that the system has operated successfully for centuries without it. "Valid-when-made" would imbue nonbank transferees with a liquidity-enhancing status like holder-in-due-course doctrine for negotiable instruments.[306] But even holders-in-due-course of negotiable instruments are still subject to a defense of usury on the underlying note if the usury would invalidate the note.[307] Moreover, a careful look at the modern banking system shows that valid-when-made would actually do little work to protect bank liquidity.

First, since 1913, when banks are truly pressed for liquidity, they do not rely on loan sales. Instead, they turn to the Federal Reserve's discount window, where they are able to obtain liquidity by borrowing against illiquid assets like loans.

Second, the principal secondary market in loans is the market for mortgages. State usury laws are specifically preempted for most mortgages, regardless of the entity that holds them.[308] Indeed, the broad express preemption for mortgages suggests that Congress did not intend such broad preemption for other types of loans.

Third, there are over 5,000 FDIC insured banks, all of which benefit from National Bank Act or FDIA preemption.[309] Banks can and do sell loans to each other. Even without a "valid-when-made" doctrine, there is a sizeable potential secondary market for non-mortgage loans that is unaffected by state usury laws.

Fourth, most bank loans are made at non-usurious rates. "Valid-when-made" is not necessary for a secondary market in non-usurious loans, and indeed, nonbanks regularly sell their non-usurious loans without incident even in jurisdiction that have rejected valid-when-made. This holds true of the securitization market. State usury caps do

---

[305] Olvera v. Blitt & Gaines, P.C., 431 F.3d 285, 288 (7th Cir. 2005).

[306] *See* Edward J. Janger, *The Costs of Liquidity Enhancement: Transparency Cost, Risk Alteration, and Coordination Problems,* 4 BROOK. J. CORP. FIN. & COMM. L. 39, 40-42 (2009) (discussing the liquidity-enhancing effects of negotiability).

[307] UCC § 3-305(a).

[308] 12 U.S.C. §§ 1735f-7, 1735f-7a.

[309] FDIC, *Statistics at a Glance*, Sept. 30, 2020.

© 2021, Adam J. Levitin

not apply to the mortgages, which are the primary loan type sold in the securitization market, and only a very small minority of securitized non-mortgage loans are likely to exceed state usury caps.

The same is true of bank sales of defaulted loans, such as in the *Madden* case. Only a few states have usury laws sufficiently low that they are likely to cause conflicts with any loans originated by banks for their own books, as opposed to rent-a-bank arrangements. What's more, defaulted consumer loans already sell at such a substantial discount (often in the range of 2¢-3¢ on the dollar[310]), that the risk of a usury challenge is unlikely to materially affect the discount banks must accept upon sale.

At most, "valid-when-made" affects the price at which bank could sell *usurious* loans. The National Bank Act and FDIA, however, are not a price guaranty for banks' sale of usurious loans, any more than they guaranty a sale price for any bank loan. Some loans will always be inherently harder to sell than others. As the Second Circuit observed in *Madden*, application of state usury laws to the assignee of a national bank might "decrease the amount a national bank could charge for its consumer debt in certain states," but that possible outcome would not "significantly interfere with the exercise of a national bank power."[311]

Perhaps the best proof of the irrelevance of valid-when-made to banks' actual operations is the lack of evidence of *Madden* affecting bank operations in the Second Circuit. A pair of empirical studies have indicated that *Madden* did result in a contraction of marketplace lending in the Second Circuit,[312] but marketplace lending is a relatively small market that is, by definition, only a rent-a-bank or non-bank market. There is no suggestion, however, much less evidence, that *Madden* has materially affected any major consumer credit market or that it has materially affected banks other than in the rent-a-bank context. Indeed, the OCC and FDIC were unable to adduce any actual evidence in their valid-when-made rulemakings of *Madden* creating problems for banks other than in the rent-a-bank context,[313] and the FDIC even

---

[310] Adam J. Levitin, *Bankruptcy Markets: Making Sense of Claims Trading*, 4 Brook. J. Corp. Fin. & Comm. L. 67, 82 (2009).

[311] 786 F.3d at 251.

[312] *See supra* note 44.

[313] *See, e.g.*, 85 Fed. Reg. 33530, 33534 (June 2, 2020) (OCC) (claiming that post-*Madden* suits challenging the legality of interest collected by credit card securitization trusts is evidence

© 2021, Adam J. Levitin

admitted that it is "not aware of any widespread or significant negative effects on credit availability or securitization markets having occurred to this point as a result of the *Madden* decision."[314]

What we see then, is that not only does the valid-when-made doctrine not stand on solid historical grounds, but the claim that it is essential for protecting bank liquidity is dubious. Instead, valid-when-made is effectively a collateral attack on state usury laws in the guise of a historical claim. As the following Part explains, it is also an affirmatively bad policy position because it produces a regulatory vacuum.

## VI.   AVOIDING REGULATORY VACUUMS

### A.  *"Valid-When-Made" Produces a Regulatory Vacuum*

The danger the valid-when-made doctrine poses is the creation of a regulatory vacuum. NBA and FDIA preemption is part of a bundle of regulatory benefits and burdens specific to banks; allowing it to be assigned to a nonbank would result in a regulatory vacuum in which the nonbank would be exempt from state law, but also not subject to federal regulation.[315] That is precisely the effect of valid-when-made. It enables nonbanks to evade compliance with state usury laws as well as state licensure and supervision requirements without substituting any, much less an equivalent, federal regulatory regime. For this reason, valid-when-made should be rejected as a policy position. It is a poor way of addressing concerns over the restrictiveness of some states' usury laws or over the continuance of a state-based regulatory system that has proven more resilient against regulatory capture than federal banking regulators.[316]

### B.  *Benefits of the __Madden__ Rule*

Valid-when-made proponents are correct on one point, however. Uncertainty is not desirable in commercial markets because it impedes efficient business planning. Yet uncertainty can be resolved equally

---

of uncertainty, without showing that there has been any change in market practice, as opposed to merely litigation being filed); 85 Fed. Reg. 44146, 44151-52 (July 22, 2020).

[314] 85 Fed. Reg. 44146, 44156 (July 22, 2020).

[315] *See* Levitin, *Hydraulic Regulation*, *supra* note 40, at 188-89.

[316] *Id.* at 199-205 (noting that complete capture of all state attorneys general is much less likely that capture of federal regulators).

© 2021, Adam J. Levitin

well by either the valid-when-made rule or the *Madden* Rule. The *Madden* Rule is a better approach than the valid-when-made rule because it creates transactional certainty, but does not produce regulatory vacuums. The *Madden* Rule respects that clear statutory boundaries of federal banking law while effectuating state usury laws. Banking law is predicated upon there being a fundamental difference between banks and nonbanks. This is why banking law restricts entry into banking through the limited granting of charters, as opposed to state law free chartering of corporations. It is also why banks are subject to an extensive and detailed regime of regulation and why they have certain privileges that accompany that regulatory regime.

The *Madden* Rule captures this regulatory distinction between banks and nonbanks. It grants banks the full measure of their regulatory privilege, including interest rate exportation, but confines that privilege to the banks—the entities that are also subject to the concomitant regulatory burden. In other words, the *Madden* rule takes seriously the conceit that bank safety-and-soundness regulation is actually an adequate substitute for usury laws. Limiting banks' privileges to banks is the only way an entity-based regulatory system can in fact function. If banks can freely transfer their regulatory privileges to nonbanks, there would be no purpose to a banking charter. Rent-a-bank arrangements threaten the very concept of banks as special entities.

The *Madden* Rule also preserves state usury laws. The unspoken heart of the valid-when-made doctrine is a distaste for state usury laws. The financial services industry has never attacked state usury laws head-on, but instead has always chipped around the edges, carving out certain types of institutions and loans. Yet behind this approach rests a belief that state usury laws are outmoded restrictions on contract that unnecessarily restrain the financial services industry.[317] Valid-when-made is not an attack on the level of state usury caps, but on their very existence. Whatever one thinks of the merits of state usury laws, they are still the laws on the books and should be given effect as such. If they are misguided, they should be repealed, rather that evaded through regulatory arbitrage. The *Madden* Rule avoids a collateral attack on state usury laws.

---

[317] *See, e.g.*, Marvin, *supra* note at 43, at 1844.

© 2021, Adam J. Levitin

Finally, and it is no small matter, the *Madden* Rule also has the benefit of easy administrability and certainty. It is simple to apply because it merely inquires whether the entity holding the receivable on which interest is accrued (and not the "account" which is meaningless in a usury context) is a bank or not. If an entity is a bank, the applicable usury law is that of the bank's home state per section 85 of the NBA and section 1831d of the FDIA. If an entity is not a bank, then whatever state's usury law would normally apply to the contract (generally the law of the borrower's state) applies.

In contrast with the fact-specific inquiry required for "true lender" doctrine, the *Madden* Rule preserves state usury laws in a sensible and administrable fashion because it tracks institutional boundaries by looking at who actually owns the loan. No further inquiry about the transaction's details must be undertaken under the *Madden* Rule, so it creates more transactional certainty than true lender doctrine.

### C.  Disclosure Requirements to Prevent Evasion

While the *Madden* Rule represents the single best of the three doctrinal approaches to the application of usury laws to nonbank assignees of banks, it is incomplete. The *Madden* Rule's very administrability benefit also renders it susceptible to evasion because it is an entity-based rule, and entity boundaries can be blurred by contract.

For example, consider World Business Lenders loan purchases arrangements, Avant's purchases of receivables (but not the loan accounts), and Elevate Credit's participation purchase arrangements. Under the *Madden* Rule, the World Business Lenders, would be the lender because it purchased the loans themselves from the bank partner. Avant's treatment would be unclear because of the bank's retained interest in the loan account. While the account itself minimal economic value, at least two courts have held that in the context of credit card securitization it is sufficient grounds for not following *Madden*.[318] Thus, Avant might not be treated as the lender under *Madden*. Likewise, Elevate Credit would not be treated as the lender under *Madden* because it had not purchased the loans from the bank

---

[318] Cohen v. Capital One Funding, LLC, 2020 U.S. Dist. LEXIS 177221, *35-3 (E.D.N.Y. Sept. 28, 2020); Petersen v. Chase Card Funding, LLC, 2020 U.S. Dist. LEXIS 172413, *17-18, 2020 WL 5628935 (W.D.N.Y. Sept. 21, 2020).

© 2021, Adam J. Levitin

partner, only a derivative interest in them. The *Madden* Rule invites evasion both through sales of receivables not accounts and through contracts such as participation sales and credit derivatives.

Thus, the *Madden* Rule needs to be buttressed by the anti-evasion principle from historical usury doctrine. Courts have recognized that "[t]he ingenuity of lenders has devised many contrivances by which, under forms sanctioned by law, the [usury] statute may be evaded."[319] Thus, the Supreme Court noted that:

> if giving [credence to the] form to the contract will afford a cover which conceals it from judicial investigation, the [usury] statute would become a dead letter. Courts, therefore, perceived the necessity of disregarding the form, and examining into the real nature of the transaction.[320]

An anti-evasion principle effectively incorporates "true lender" doctrine, as it looks to the true economic nature of the relationship: which party has the economic risk and control regarding the loans?

An anti-evasion principle alone, however, is not enough to be effective. Instead, an anti-evasion principle needs to be coupled with a disclosure requirement. Banks seeking to enforce debt contracts should be required to disclose whether they transferred an economic interest in the contract to a nonbank. Without such a disclosure obligation, neither consumers nor regulators would be able to tell if the bank in fact remained the true party in interest on a loan or if the bank had merely rented out its charter to a nonbank.

The case of Elevate Credit, Inc., is again instructive in this regard. The only reason we know of Elevate's participation purchases this is because Elevate is a public reporting company.[321] Likewise, the dealings of World Business Lenders and Avant are visible only as the result of litigation. If Elevate were not a reporting company, its involvement in the Elastic and Rise credit products would be invisible to borrowers. As far as borrowers would be able to tell, the lender on their loans would be Elevate's bank partners. As a result, borrowers

---

[319] Scott v. Lloyd, 34 U.S. 418, 419 (1835).

[320] *Id.*

[321] The only reason we know the details of Think Finance's earlier rent-a-bank and rent-a-tribe dealings are because of litigation brought by the Commonwealth of Pennsylvania that took five years to get to summary judgment, and even then, the unsealing of documents had to be litigated.

© 2021, Adam J. Levitin

would not be able to vindicate their rights under state usury laws by bringing a true lender challenge to the relationship; they would have no idea that a true lender challenge would even be a possibility.

Banking regulators would, in theory, be able to learn of the participations, but it would take quite a bit of sleuthing for bank examiners to piece together the relationship of the various Elevate entities with one of its bank partners, not least because the contracts are all with different Elevate entities whose names do not always indicate an affiliation. The same is true for Avant's purchase of receivables.

To address the possibility of evasion through derivative contracts, including participations, the Consumer Financial Protection Bureau should require disclosure of the transfer of a material economic interest in all consumers loans. The CFPB has the power to prohibit deceptive and abusive acts and practices.[322] Failure to inform a consumer of the transfer of an economic interest in a loan is potentially deceptive because it omits a material fact regarding the consumer's legal rights make such a disclosure. Likewise, it is potentially "abusive" because "takes unreasonable advantage of …a lack of understanding on the part of the consumer of the material risks, costs, or conditions of the product or service," namely the consumer's lack of understanding that the loan is usurious under the applicable law. If a bank has disclosed that it parted with an economic interest in a loan, then in an action to enforce the loan, the consumer debtor should be able to seek discovery regarding the terms of such transfer in order to potentially raise a usury defense.

### D.  Bringing True Lender Doctrine Up-to-Date

Yet even with adequate disclosure, the anti-evasion principle might not be sufficient to address modern rent-a-bank arrangements for two reasons: disaggregation and clever legal counsel that masks substance with process.

---

[322] 12 U.S.C. §§ 5531, 5536 (2018). Such a requirement should also exist for business loans, but the ability to enact a parallel requirement for business loans, including small business loans, is more complicated, because federal banking regulators lack a general power to prohibit unfair and deceptive acts and practices. Interagency Guidance Regarding Unfair and Deceptive Credit Practices, FIL-44-2014, Aug. 22, 2014 (noting that the Dodd-Frank Act resulted in the repeal of federal banking regulators' authority to issue unfair and deceptive practices regulations).

© 2021, Adam J. Levitin

### 1.  *Disaggregation as Evasion*

First, disaggregated lending can make it difficult to identify a single party that is the "true lender." Instead, there are multiple parties that might contend for that role, but the traditional framing of "true lender" doctrine conceives there as being a single true lender.

Consider, for example, the difficulty in applying "true lender" doctrine to Avant, the nonbank marketplace lender that securitized without recourse the loan receivables generated through a rent-a-bank operation.[323] Clearly the bank that formally makes the loans is not the true lender in Avant's transactions. But is the true lender Avant or the securitization vehicle (or the securitization investors)?

The securitization vehicle (and indirectly the securitization investors) holds the predominant economic interest in the loans, but it does not exercise control over the lending. In contrast, Avant exercises control over the lending process and holds the predominant economic interest in the loans until they are securitized in a transaction it sponsors, but does not hold a direct economic interest thereafter. In short, neither one neatly fits the traditional bill of true lender: the economic interest is with the securitization vehicle, but the nerve center for the whole operation is with Avant, which has a substantial economic interest in the transaction, just not in the performance of the loans themselves after securitization.

In terms of effectuating the usury laws, it probably does not matter which party is ultimately deemed the true lender, so long as one is tagged with the liability. If the securitization vehicle or investors is liable, funding will dry up, which will have a similar effect to holding the nonbank liable as the true lender.

The danger, however, is that a court is unwilling to deem any party individually the true lender because neither conforms precisely to the older iterations of the doctrine. True lender doctrine should move past older articulations of the doctrine that were limited by the nature of the transactions before the courts and look to the party that is the lynchpin and nerve center of the lending transaction, namely the nonbank mastermind of the deal—here Avant.

---

[323] *See supra* section IV.C.2.

© 2021, Adam J. Levitin

### 2.   *Process as Evasion*

True lender doctrine also faces a second difficulty, however: transactions planned with evasion of true lender doctrine in mind. This is exactly what good legal counsel will advise in light of the current state of the law. For example, it is easy to muddy the waters by taking steps that make it look as if the bank exercises more control over the lending than it really does. This can be accomplished by having the bank undertake processes with predetermined conclusions where the predetermination cannot be readily proven. Thus, a bank might have a committee meet to evaluate the nonbank's proposed underwriting standards for the loans. Everyone involved understands that the committee will approve the underwriting standards without any material changes, but unless someone blunders by putting this in writing, it is difficult for a court to second guess. With good legal advice in transaction planning, the theater of process becomes part of evasion.

In the absence of conflicts of interest, courts are generally reluctant to second guess substantive decisions so long as there is adequate process; this is the essence of corporate law's famed business judgment rule. Yet when process itself becomes part of the evasion, courts must push further. The mere convening of a committee meeting should not alone suffice. Instead, courts should demand evidence about the nature of the committee's inquiries and deliberations and how the process compares to the process used for loan products where a nonbank partner is not involved or which have lower interest rates.

Put another way, when process becomes a tool of evasion, stricter scrutiny is necessary. That scrutiny should look at the bank's motivations for the transaction: is the bank able to articulate a credible reason for why it is engaged in the transaction in partnership with the nonbank? If the product idea emerged from the bank, and the bank sought out a nonbank partner with operational capabilities it lacked, then the bank's engagement in the product should be taken seriously in the true lender evaluation. But if the nonbank approached the bank with the product idea, and the product is not one that the bank would offer on its own, then the court should be skeptical of the substance of the bank's involvement and the nonbank should be presumptively treated as the true lender.

© 2021, Adam J. Levitin

### E.  The OCC and FDIC Rulemakings

In 2020, the OCC and FDIC both issued valid-when-made rulemakings,[324] and the OCC also issue a true lender rulemaking.[325] The finalized rules were promptly challenged by a number of state attorneys general as failing to comply with the Administrative Procedures Act and, in the case of the OCC, with the procedural requirements of the National Bank Act. These challenges remain pending as of the date of this Article, but even if the rules are upheld, they fail to actually resolve the uncertainty about the viability of bank partnership arrangements.[326]

First, the OCC and FDIC rules purport to address only interest rates, which has been the major focus of legal challenges to rent-a-bank arrangements. But that is not the only basis on which rent-a-bank arrangements can be challenged. In particular, rent-a-bank arrangements can be challenged on the basis of state licensing requirements for nonbank lenders, and potentially on state regulations dealing with contract terms other than interest rates. While the OCC's true lender rule deems a national bank that is the lender of record or funds a loan to be the true lender for purposes of interest rates, nothing prevents states from arguing that when a nonbank is the "true lender" that it must comply with state licensure and other requirements.

Second, even for usury laws, all that the rules do is shift the issue of the legitimacy of the rent-a-bank arrangements from the courts to the regulatory agencies. The OCC and FDIC have previously taken actions against the banks involved in rent-a-bank arrangements,[327] and could readily do so again with their existing authorities. The rulemakings immunizes the nonbank partners from state and private litigation regarding usury laws, but the banks and potentially the nonbanks[328] remain vulnerable to federal supervisory action. Even if

---

[324] 85 Fed. Reg. 33530, 33532 (June 2, 2020), *codified at* 12 C.F.R. §§ 7.4001, 160.110 (OCC); 85 Fed. Reg. 44146 (July 22, 2020), *codified at* 12 C.F.R. § 331.4(e) (FDIC).

[325] 85 Fed. Reg. 68742 (Oct. 30, 2020), *codified at* 12 U.S.C. § 7.1031.

[326] The FDIC has not proposed a true lender rule, as it does not believe it has statutory authority to do so. Alan S. Kaplinsky, *FDIC questions its authority to issue "true lender" rule*, CONSUMER FINANCE MONITOR, Dec. 9, 2020, https://bit.ly/2Ms2lWh. Accordingly, for state-chartered banks, true lender doctrine remains a possible basis for challenging rent-a-bank arrangements, even if the OCC True Lender rule is upheld.

[327] *See supra* notes 87, 90, 103.

[328] *See* 12 U.S.C. §§ 1464(d)(7), 1867(c)(1) (providing that providers of services to banks and thrifts shall be subject to regulation and examination by federal banking regulators the same as if the service were performed by the bank or thrift).

© 2021, Adam J. Levitin

the motivation for these supervisory actions is addressing the high interest rates in rent-a-bank arrangements, the supervisory actions are often couched in terms of safety-and-soundness, including reputational risk. These supervisory actions usually result in negotiated consent orders that often contain limited facts about the details of the arrangement at issue and thus provide little guidance about regulators' expectations.

Shifting the action from courts to federal regulators means is that the legality of rent-a-bank arrangements is likely to see-saw with changes of political control of the federal banking regulators. It also means that there will be more intense pressure from consumer advocates for the federal banking regulators to take supervisory actions against rent-a-bank arrangements.

Ultimately, this is the worst of all possible outcomes. Instead of allowing the judicial process to create certainty about what is and what is not legal in terms of bank partnership arrangements, the OCC and FDIC rulemakings have removed the issue from the judicial sphere and made regulation dependent upon informal regulatory whim that is likely to shift with election cycles. The OCC and FDIC rulemakings claim to be based on providing greater certainty for banks,[329] but the regulations fail to actually provide that, as they do not bind the regulators to the extent that they couch their objections to rent-a-bank arrangements in terms of safety-and-soundness, not violation of state usury laws. The rulemakings provide certainty regarding the courts, not regarding regulatory actions. They actually increase regulatory uncertainty. Put another way, even if the OCC and FDIC rulemakings are upheld, they are not the final word on rent-a-banking.

## CONCLUSION

The policy debate regarding regulation of bank partnership arrangements is a function of an entity-based bank regulatory system having failed to adapt to a fundamental market change, namely the disaggregation of consumer lending. Disaggregation has resulted in

---

[329] 85 Fed. Reg. 33530 (June 2, 2020) (OCC); 85 Fed. Reg. 44146, 44155 (July 22, 2020) (FDIC).

© 2021, Adam J. Levitin

transactions that involve a mosaic of entities—bank and nonbank—playing various roles in the lending process.

The entity-based regulatory system, however, insists of categorizing such transactions overall in a binary fashion. This binary treatment has left the system open to the kind of regulatory arbitrage that is the hallmark of "shadow banking"—the provision of banking-type services by nonbanks without bank regulation.[330] While shadow banking is mainly seen as a systemic risk concern, its regulatory arbitrage also threatens to undermine a long-standing set of state-law consumer protections. Consumer protections are best served by limiting the privileges of banks to the ambit of bank regulation, and not allowing them to be "rented" out by nonbanks that seek to operate in a regulatory vacuum.

---

[330] Normally the regulatory arbitrage of shadow banking has been to offer bank-type services without bank-type regulation. Here the arbitrage has been to offer bank-type lending services by nonbanks without compliance with the regulatory regime that applies to nonbanks themselves.

© 2021, Adam J. Levitin

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No. 19-cv-01552-RBJ
(Appeal from Bankruptcy Adversary Proceeding NO. 18-1099-TBM)

In Re: RENT-RITE SUPERKEGS WEST LTD,

Debtor.

---

RENT-RITE SUPERKEGS WEST LTD,

     Appellant,

v.

WORLD BUSINESS LENDERS, LLC,

     Appellee,

---

## ORDER ON BANKRUPTCY COURT'S DETERMINATION

     This matter is before the Court on Rent-Rite SuperKegs West Ltd. ("Rent-Rite")'s appeal, ECF No. 7, of the judgment of the U.S. Bankruptcy Court for the District of Colorado ("Bankruptcy Court") on May 20, 2019, ECF No. 1-2.  Judgment was entered for Appellee World Business Lenders, LLC ("WBL") and against Rent-Rite.  This Court exercises jurisdiction over the appeal pursuant to 28 U.S.C. § 1334(a) and 28 U.S.C. § 158(a)(1).  The Court has reviewed the record and the briefs of the parties, and it held a hearing on July 31, 2020.  For the reasons set forth below, the Bankruptcy Court's judgment is REVERSED in part and REMANDED.

## I. BACKGROUND

     Bank of Lake Mills is a Wisconsin state-chartered bank.  ECF No. 1-2 at 4.  On April 19,

2016 it loaned $550,000 to CMS Facilities Maintenance ("CMS"), a Colorado-based corporation. *Id.* CMS executed a promissory note promising to repay the balance within one year at "a remarkably high interest rate" of "0.331123287671% per day until paid in full," or 120.86% per year. *Id.* at 5. The promissory note dictates that federal law and Wisconsin law govern. *Id.* It also states that it "is accepted by [Bank of Lake Mills] in Wisconsin," and that payment shall be received in Wisconsin. *Id.* at 4–5.

For reasons unknown, a third party, Yosemite Management LLC ("Yosemite"), executed a deed of trust pledging its Colorado real property ("the property") as security on CMS's promissory note a few days later on April 21, 2016. *Id.* at 5. The deed of trust dictates that federal law and "the law of the jurisdiction in which the Property is located," i.e. Colorado law, govern. *Id.* at 6–7. The deed of trust also incorporates by reference the terms of the promissory note, including expressly identifying the high interest rate. *Id.* at 6.

On June 13, 2016 Bank of Lake assigned its rights under the promissory note and the deed of trust to WBL. *Id.* at 7. WBL is a non-bank entity registered as an LLC in New York with a principal place of business in New Jersey. *Id.* CMS defaulted on the promissory note by February 15, 2017. *Id.* at 8. On December 3, 2017 Yosemite sold its encumbered real property to Rent-Rite. *Id.* at 7. Rent-Rite knew about the default and received a purchase price discount based on the amount of debt secured by the property. *Id.* at 7–8. Yosemite and Rent-Rite have common management. *Id.* at 8.

Rent-Rite filed for Chapter 11 bankruptcy on December 11, 2017. *Id.* at 3. WBL filed a proof of claim in the bankruptcy proceedings, claiming an owed amount of $658,652.95 plus interest at the rate of 120.86% per year. *Id.* at 8–9. WBL asserted that the proof of claim was secured by the property. *Id.* at 9. The Bankruptcy Court noted that because Rent-Rite is not the

2

obligor on the promissory note, WBL's proof of claim sounded in rem in relation to the property. *Id*.

A few months later, Rent-Rite commenced adversary proceedings against WBL. *Id*. at 3. Rent-Rite asserted three causes of action: (1) declaratory judgment under Fed. R. Bankr. P. 7001(9); (2) claim disallowance under § 502 of the Bankruptcy Code; and (3) equitable subordination under § 510 of the Bankruptcy Code. *Id*. at 9. All three of Rent-Rite claims were premised on the theory that the interest rate in the promissory note is governed by Colorado law, and a 120.86% per year interest rate is usurious under Colorado law. ECF No. 7 at 4. WBL's answer asserted the following three affirmative defenses: (1) the parties to the promissory note agreed that Wisconsin law governed the interest rate; (2) Rent-Rite lacked standing to challenge the interest rate; and (3) Rent-Rite failed to join indispensable parties. ECF No. 6-1 at 14.

The parties agreed that the facts of the case were largely uncontested, and that the dispute was purely legal. Therefore, the parties filed a Joint Motion to Vacate Trial stating as such and requesting "a determination by the [Bankruptcy] Court on the legal principles at issue . . . without the need for trial." ECF No. 1-2 at 3. The parties proposed that they be permitted to submit stipulated facts, stipulated exhibits, and written closing arguments in lieu of trial. *Id*. The Bankruptcy Court granted the motion and received the parties' stipulations and written closing arguments. *Id*. at 3–4.

In its closing arguments, Rent-Rite asserted that the Bankruptcy Court must utilize Colorado conflict of law analysis, which applies Restatement § 187, under which the Wisconsin choice of law provision is unenforceable. *Id*. at 10. Alternatively, Rent-Rite argued that for choice-of-law purposes the Court should focus not on the promissory note but on the deed of trust, which is governed by Colorado law. *Id*. WBL responded that the Bankruptcy Court

3

should enforce the Wisconsin choice-of-law provision provided in the promissory note. Alternatively, if Colorado conflict of law analysis comes into play, WBL argued that it nevertheless also leads to Wisconsin substantive law.  *Id*.

After reviewing the closing arguments the Bankruptcy Court "concluded that additional legal briefing was necessary."  *Id*. at 11.  The Bankruptcy Court raised issues that the parties had not themselves identified.  ECF No. 7 at 7.  Those issues included (1) whether the Depository Institutions Deregulation and Monetary Control Act of 1980, 12 U.S.C. § 1831d ("DIDA § 1831d") governs the interest rate and (2) if DIDA § 1831d applies, whether it federally preempts any of Rent-Rite's claims.  *Id*.

In the requested supplemental briefing, Rent-Rite stuck with its original arguments: Colorado conflict of law analysis utilizes Restatement § 187, which leads to Colorado substantive law, under which the interest rate is invalid; and alternatively, the analysis should focus on the deed of trust.  ECF No. 1-2 at 11.  However, WBL modified its arguments in its supplemental brief.  It argued that DIDA § 1831d does apply, and DIDA § 1831d dictates application of Wisconsin substantive law.  *Id*.  Further, even if DIDA § 1831d does not apply and Colorado choice of law is considered, the proper Colorado choice of law framework is Colorado's Uniform Commercial Code ("UCC"), which leads to Wisconsin substantive law. Alternatively, WBL proffers its original arguments that (1) the parties agreed to Wisconsin substantive law and (2) even if Restatement § 187 applies, it still leads to Wisconsin substantive law.  *Id*.

On May 20, 2019 the Bankruptcy Court denied all of Rent-Rite's claims in favor of WBL.  *Id*. at 45.  The court found that DIDA § 1831d does apply; DIDA § 1831d dictates the application of Wisconsin law; and the interest rate is valid under Wisconsin law.  The court

further found that even if DIDA § 1831d did not apply, federal choice-of-law principles also dictate application of Wisconsin law.  For the sake of finality the court also conducted choice-of-law analyses pursuant to both Colorado statutory law under the Colorado UCC and Colorado common law under Restatement § 187.  It found that both analyses also dictated application of Wisconsin law.  Thus, no matter what choice-of-law analysis was correct, the Bankruptcy Court found that all roads led to Wisconsin substantive law.

Rent-Rite makes four arguments in the instant appeal.  First, it argues that DIDA § 1831d cannot apply because the note was assigned to WBL, a non-bank.  ECF No. 7 at 10.  Second, it argues that WBL waived federal preemption as an argument by failing to plead it as an affirmative defense.  *Id.* at 10–11.  Third, it argues that the Bankruptcy Court should have focused its choice-of-law analysis on the deed of trust, not on the promissory note.  *Id.* at 10.  Fourth, it argues that the Bankruptcy Court improperly weighed the factors in the Colorado common law choice-of-law analysis.  *Id.*

Two amici briefs were filed.  The Federal Deposit Insurance Corporation ("FDIC") and the Office of the Comptroller of the Currency filed an amicus brief in support of WBL.  ECF No. 11.  Professor Adam J. Levitin of Georgetown University Law Center filed an amicus brief in support of Rent-Rite.  ECF No. 16.  Both amici consider only whether DIDA § 1831d applies to non-banks upon assignment.

## II.  STANDARD OF REVIEW

This Court reviews the Bankruptcy Court's legal determinations de novo.  *See In re Baldwin*, 593 F.3d 1155, 1159 (10th Cir. 2010).  The Court also reviews de novo mixed questions of law and fact that primarily involve legal issues.  *See In re Wes Dor Inc.*, 996 F.2d 237 (10th Cir. 1993).  The Bankruptcy Court's factual findings are

reviewed for clear error.  *See In re Johnson*, 477 B.R. 156, 168 (10th Cir. BAP 2012).  If a "lower court's factual findings are premised on improper legal standards or on proper ones improperly applied, they are not entitled to the protection of the clearly erroneous standard but are subject to de novo review." *Id.*

### III.  ANALYSIS

#### A.  <u>Whether DIDA § 1831d Applies</u>

DIDA § 1831d provides that state banks may charge interest "at the rate allowed by the laws of the State . . . where the bank is located."  The parties do not dispute that the promissory note's interest rate was valid when made under DIDA § 1831d.  Bank of Lake Mills was located in Wisconsin, and the parties agree that the interest rate is valid under Wisconsin substantive law.  However, the parties dispute whether the promissory note's interest rate remained valid upon assignment to WBL, a non-bank entity.  There exists no precedent directly addressing whether DIDA § 1831d extends to loans that have been assigned from state banks to non-bank entities.  The parties' argument centers on two cases—*Meade v. Avant of Colorado, LLC*, 307 F. Supp. 3d 1134 (D. Colo. 2018), and *Madden v. Midland Funding, LLC*, 786 F.3d 246 (2d Cir. 2015)—and on two common law rules—the valid-when-made rule and the stand-in-the-shoes rule.

Briefly, in *Meade* a District of Colorado court considered whether DIDA § 1831d completely preempted a state usury claim against a non-bank.  *See* 307 F. Supp. 3d at 1142.  It found in the negative, stating that "the cause of action provided by § 1831d(b) does not on its face apply to actions against non-banks." *Id.* at 1145.  Although this language facially sounds compelling, *Meade* expressly notes that "[w]hether or not [§ 1831d] gives rise to a *defense* of preemption on the merits of Plaintiff's claims, it does not establish complete preemption or

permit *removal*," and it left that question to the state court on remand. *Id.* (emphasis in original). Indeed, the Tenth Circuit has distinguished complete preemption and defensive preemption. *See Schmeling v. NORDAM*, 97 F.3d 1336, 1339 (10th Cir. 1996) (describing complete preemption "not as a crude measure of the breadth of the preemption (in the ordinary sense) . . . , but rather as a description of the specific situation in which a federal law . . . substitutes a federal cause of action for the state cause of action, thereby manifesting Congress's intent to permit removal"). Thus, *Meade* is inconclusive for our purposes.

In *Madden v. Midland Funding, LLC*, 786 F.3d 246 (2d Cir. 2015), the Second Circuit considered whether § 85 of the National Bank Act ("NBA") defensively preempted state usury law when the collecting entity was a non-bank. The NBA is the mirror image of DIDA as applicable to federal banks, and federal courts routinely interpret and apply DIDA § 1831d in accordance with NBA §§ 85, 86. *See Mamot Feed Lot*, 539 F.3d at 902-03; *Discover Bank v. Vaden*, 489 F.3d 594, 604–06 (4th Cir. 2007) (noting that DIDA § 1831d "is to state-chartered banks" as the NBA "is to national banks"), *rev'd on other grounds* 129 S. Ct. 1262 (2009); *Stoorman*, 908 P.2d at 135 (giving the "same interpretation" to DIDA § 1831d and NBA § 85). Thus, the NBA "expressly permits national banks to 'charge on any loan . . . interest at the rate allowed by the laws of the State, Territory, or District where the bank is located.'" *Madden*, 786 F.3d at 250 (quoting 12 U.S.C. § 85). The Second Circuit held that NBA § 85 did not apply to defensively preempt New York state usury law when the collecting entity was a non-bank. *See id.* at 249. It found that extending the NBA to non-bank entities "would create an end-run around usury laws." *Id.* at 251–52.

However, the Bankruptcy Court, WBL, and the FDIC variously assert that *Madden* was both incorrectly decided and irrelevant to the case at hand. First, the FDIC argues that *Madden*

incorrectly determined that no conflict existed between the state usury law and the NBA.  ECF

No. 11 at 23.  The state usury law prohibited non-bank assignees from enforcing interest rates

exceeding 25% per year.  *See Madden*, 786 F.3d at 248.  *Madden* found that the state usury law

did not conflict with, and therefore could not be preempted by, the NBA because "applying state

usury laws to the third-party debt buyers would [not] significantly interfere with [a] national

bank's ability to exercise its powers under the NBA."  *Id.* at 251.  Rather, the ruling "'limit[s] . . .

only activities of the third party which are otherwise subject to state control,' and which are not

protected by federal banking law or subject to [Office of the Comptroller of the Currency]

oversight."  *Id.* (quoting *SPGGC, LLC v. Blumenthal,* 505 F.3d 183, 191 (2d Cir. 2007)).  Yet the

FDIC argues that prohibiting assignees from enforcing otherwise-usurious interest rates is in

practice a prohibition on banks from assigning those interest rates, which ultimately conflicts

with the NBA's provision that federal banks can charge interest rates as allowed by their

respective home states.

Second, the FDIC explains that *Madden* is irrelevant anyway because the Second Circuit

did not analyze the deciding factors in the instant case: the common law valid-when-made rule

and the common law stand-in-the-shoes rule, both of which are applied by both Colorado and

Wisconsin.  Indeed, the Bankruptcy Court premised its decision that DIDA § 1831d extends to

non-bank entities upon the valid-when-made rule.  The Bankruptcy Court defined the valid-

when-made rule as holding that if the interest rate in the original loan agreement was non-

usurious, the loan cannot become usurious upon assignment.  ECF No. 1-2 at 21.  The

Bankruptcy Court described the valid-when-made rule as "long-established," citing to several old

Supreme Court cases and a handful of more recent Court of Appeals cases.  *Id*. at 21–22.  So

long-standing, the Bankruptcy Court asserted, that it was inherently incorporated into both the

NBA and, later, the DIDA. *Id.* at 21. The FDIC further elaborates on this argument in its amicus brief. ECF No. 11 at 10–13.

Professor Levitin makes a compelling counterargument to the valid-when-made rule in his own amicus brief. He explains that the valid-when-made rule is a modern invention that could not have been incorporated into either the NBA or the DIDA. ECF No. 16 at 15–18. Alternatively, Professor Levitin requests that if I do apply the valid-when-made rule, I carve out an exception for loans intended for assignment from their inception. He cites to *Strike v. Trans-West Discount Corp.*, 92 Cal. App. 3d 735, 745 (Cal. Ct. App. 1979), which he describes as the only pre-DIDA case that has "anything remotely" to do with the valid-when-made rule as conceived by the Bankruptcy Court. In that case, a California state appellate court ruled that the California Constitution's exemption for banks from usury extended to assignees. *See id.* However, the court carved out an exception for loans intended for assignment from inception. *See id.*

Although I am convinced by Professor Levitin's academic analysis and by the Second Circuit's discussion, the Office of the Comptroller of the Currency ("OCC") in the U.S. Department of Treasury recently finalized a rule that upholds the valid-when-made rule in the instant context. *See Permissible Interest on Loans That Are Sold, Assigned, or Otherwise Transferred*, 85 Fed. Reg. 33,530, 33,530 (June 2, 2020) (to be codified at 12 C.F.R. pt. 7, 160). The rule clarifies that "when a bank transfers a loan, the interest permissible before the transfer continues to be permissible after the transfer." *Id.* The rule is expressly reactionary to "the legal uncertainty created by the *Madden* decision." *Id.* at 33,531. It was issued after the briefing and the decision by the Bankruptcy Court in this case.

The OCC cites the NBA as authority for this rule.  *See Permissible Interest on Loans*, 85 Fed. Reg. at 33,531.  As noted, the NBA and the DIDA are mirror images and are generally interpreted in accordance.  *See Mamot Feed Lot*, 539 F.3d at 902-03.  The rule explains that the NBA "clearly establishes that a national bank may (1) lend money, pursuant to a loan contract, with an interest term that is consistent with the laws of the state in which the bank is located and (2) subsequently transfer that loan and assign the loan contract."  *Permissible Interest on Loans*, 85 Fed. Reg. at 33,531.  Further, "[w]hen Congress enacted the NBA, it understood that loan transfers were a fundamental aspect of the business of banking and . . . the national banking system."  *Id.*

The rule addresses commentator concerns that the valid-when-made rule "would facilitate predatory lending by promoting rent-a-charter relationships that allow nonbanks to evade state law."  *Id.* at 33,534.  It emphasizes the OCC's "strong position" against predatory lending and points to its guidance on how to manage risk related to third-party relationships.  *See id.*  The rule also refutes the argument that it "would undermine state interest caps" by noting that the valid-when-made rule affects only which state law applies; not whether state law applies.  *See id.*  However, the rule states that it "does not address which entity is the true lender" for predatory lending purposes.  *Id.* at 33,535.

In accordance with this new OCC rule, I find that a promissory note with an interest rate that was valid when made under DIDA § 1831d remains valid upon assignment to a non-bank.  But, as noted below, the new OCC rule introduces another issue that is relevant in this case: was the nonbank the "true lender" in this instance.

### B.  Whether Preemption is an Affirmative Defense

Rent-Rite argues that even if DIDA § 1831d does apply to loans assigned to non-banks, the Bankruptcy Court erred in even considering DIDA § 1831d because WBL failed to plead federal preemption as an affirmative defense.  Here, the parties had agreed that the facts of the case were largely uncontested, agreed to forgo trial, and requested that the Bankruptcy Court rule on the remaining legal dispute.  After receiving the parties' final briefs, the Bankruptcy Court decided that additional legal disputes required briefing—including whether DIDA § 1831d applied.  Rent-Rite argues that it was error for the Bankruptcy Court to sua sponte raise federal preemption.  ECF No. 7 at 15.

The Bankruptcy Court addressed this concern in its order, explaining that whether federal preemption constitutes an affirmative defense that must be pled is not settled within the Tenth Circuit.  I tend to disagree with that conclusion.  The Tenth Circuit held in *Cook v. Rockwell Int'l Corp.*, 790 F.3d 1088, 1092 (10th Cir. 2015), that "potential preemption defenses, like most other affirmative defenses, are forfeited if not made."  Although the Bankruptcy Court is correct that *Cook* relies on the inapposite case of *Mauldin v. Worldcom, Inc.*, 263 F.3d 1205, 1211 (10th Cir. 2001) (finding that an argument had not been preserved for appeal because neither party had ever brought it up), that does not change *Cook*'s binding holding.  In *Devon Energy Prod. Co., L.P. v. Mosaic Potash Carlsbad, Inc.*, 693 F.3d 1195, 1203 n.4 (10th Cir. 2012), the Tenth Circuit noted that "[o]rdinary preemption may be invoked in both state and federal court as an affirmative defense to the allegations in a plaintiff's complaint."

In this case, however, the parties asked the Bankruptcy Court to make a ruling on the law. The court reasonably concluded that it needed to have the DIDA issue briefed before rendering a decision.  The purpose of requiring affirmative defenses to be pled is to "give the opposing party fair notice of the defense and the grounds upon which it rests."  *Hayne v. Green Ford Sales, Inc.*,

263 F.R.D. 647, 649 (D. Kan. 2009). By requesting supplemental briefing on a new legal question, the Bankruptcy Court provided Rent-Rite notice and opportunity to address it. Holding otherwise would prevent courts from requesting additional briefing as necessary to resolve a case.

That being said, the Bankruptcy Court's request for supplemental briefing on DIDA § 1831d unknowingly (because the OCC rule had not yet issued) raised a new and material factual dispute: whether WBL was the "true lender" on the loan. If the true lender is a non-bank assignee, then DIDA § 1831d cannot attach. *See Fed. Deposit Ins. Corp. v. Lattimore Land Corp.*, 656 F.2d 139, 147 (5th Cir. 1981) (citing *Daniel v. First National Bank*, 227 F.2d 353 (5th Cir. 1955)) (noting an exception to NBA § 85 where "what was nominally a discount was either in fact a disguised loan by the bank or a usurious loan originally which the bank by its close association to the original transaction knew was flawed"). The OCC's new valid-when-made rule incorporates this principle, noting that it "does not address which entity is the true lender." *Permissible Interest on Loans*, 85 Fed. Reg. at 33,535.

The addition of a new factual dispute is relevant here because the parties agreed to forgo discovery and trial expressly based on their understanding that there were no relevant factual disputes. They agreed that only legal disputes remained, specifically: whether the choice-of-law provision in the promissory note governed; whether and how to apply Colorado conflict of law analysis; and whether the promissory note or the deed of trust was the governing instrument for choice-of-law purposes. Thus, the fact that Rent-Rite had notice of the federal preemption argument at the supplemental briefing stage is insufficient here because it did not give Rent-Rite opportunity to conduct discovery on the factual question of whether WBL was the true lender. Indeed, at oral argument Rent-Rite alleged that evidence exists in this case indicating that WBL

was the true lender who engaged in a rent-a-bank scheme with Bank of Lake Mills.  For example, Rent-Rite noted the fact that a small Colorado lender obtained a subprime, high-interest loan from a Wisconsin community bank and the existence of alleged evidence that WBL was involved in negotiations over the original loan with CMS indicate that WBL may be the true lender.

### C.  <u>Conclusion</u>

I find that, per rule-based guidance from the OCC, a promissory note with an interest rate that was valid when made under DIDA § 1831d remains valid even upon assignment to a non-bank.  However, DIDA § 1831d cannot apply to a promissory note with a nonbank true lender.  Here, the parties did not have the opportunity to conduct discovery on the factual question of whether WBL was the true lender.  As such, I reverse and remand to the Bankruptcy Court so that the parties can conduct discovery on whether WBL was the true lender, and the Bankruptcy Court can then make an appropriate finding on the issue.

## ORDER

For the reasons described above, the May 20, 2019 Order of the Bankruptcy Court is REVERSED in part and REMANDED.

DATED this 12th day of August, 2020.

BY THE COURT:

_____
R. Brooke Jackson
United States District Judge




February 4, 2020


Federal Deposit Insurance Corporation
Attn: Robert E. Feldman
Executive Secretary
Attention: Comments
550 17th Street, NW
Washington, DC 20429

Re:   RIN 3064-AF21: Federal Interest Rate Authority (84 Fed. Reg. 66845 - December 6, 2019)

Dear Ladies and Gentlemen:

**Executive Summary**

The Structured Finance Association ("SFA")[1] and the Bank Policy Institute ("BPI")[2] appreciate the opportunity to comment on the notice of proposed rulemaking ("Proposed Rule") by the Federal Deposit Insurance Corporation ("FDIC") implementing Sections 24(j) and 27 of the Federal Deposit Insurance Act ("Section 24(j)"[3] and "Section 27", respectively).[4]  The Proposed Rule adds 12 C.F.R. Part 331 to addresses the erroneous ruling by the U.S. Court of Appeals for the Second Circuit in *Madden v. Midland Funding*, LLC, 786 F.3d 246 (2nd Cir. 2015), which held that a loan that is validly originated by a bank may, at a subsequent time, become usurious if that bank sells or assigns the loan to any person or entity that is not a bank.  In particular, Section 331.3(e) of the Proposed Rule clarifies that the permissibility of the interest rate on a loan made

---

[1] SFA is a member-based, trade industry advocacy group focused on improving and strengthening the broader structured finance and securitization market. SFA provides an inclusive network for securitization professionals to collaborate and, as industry leaders, drive necessary changes, be advocates for the securitization community, share best practices and innovative ideas, and educate industry members through conferences and other programs. Members of SFA represent all sectors of the securitization market including issuers, investors, financial intermediaries, law firms, accounting firms, technology firms, rating agencies, servicers, and trustees. Further information can be found at www.structuredfinance.org.

[2] BPI is a nonpartisan public policy, research, and advocacy group, representing the nation's leading banks. BPI's members include universal banks, regional banks, and major foreign banks doing business in the United States. Collectively, BPI members employ nearly two million Americans, make 72% of all loans, including nearly half of the nation's small business loans, and serve as an engine for financial innovation and economic growth.

[3] 12 U.S.C. § 1831a(j) (establishes parity between state banks and national banks regarding the application of state law to interstate branches).

[4] 12 U.S.C. § 1831d.

pursuant to Section 27 is not affected by any subsequent events or the sale, assignment, or transfer of the loan.

SFA, BPI, and their members have a substantial interest in the Proposed Rule. BPI's primary goal is to help its member banks function in a safe and sound manner, which includes enabling them to originate and sell or assign loans or participation interests in loans in an efficient and timely manner and serve their customers and communities. As of September 2019, insured depository institutions held over $10 trillion in outstanding loans. *See* FDIC, Statistics at a Glance (September 30, 2019).[5] SFA's core mission is to support a robust and liquid securitization market, recognizing that securitization is an essential source of core funding for the real economy. As of the end of 2018, securitization transactions were the source of more than $11.3 trillion in funding for the U.S. economy.[6] This amount represented more than 50% of aggregate outstanding U.S. household debt—including 69% of residential mortgage debt, 17% of automobile debt, 12% of student loan debt, and 14% of credit card debt.

Without the Proposed Rule, *Madden*, and the more recent complaints filed in the federal district courts in the Eastern and Western Districts of New York[7] against the credit card securitization programs of two large national banks, threaten to disrupt substantially the multi-trillion dollar U.S. origination, securitization, and secondary markets for loans.[8] These recent cases do not target payday or similar short-term high interest loans but rather credit cards, the most widely used form of U.S consumer credit. Specifically, these cases throw into doubt the enforceability of the interest rate terms of loan agreements following an insured depository institution's assignment of a loan to a non-bank and have overturned long-established legal principles. Government officials, Congress and industry groups have recognized the threat presented by *Madden* and have asked the Office of the Comptroller of the Currency ("OCC") and FDIC to help address this issue.[9] Accordingly, SFA and BPI strongly support the Proposed Rule.[10]

---

[5] https://www.fdic.gov/bank/statistical/stats/2019sep/industry.pdf

[6] *See* Sec. Indus. & Fin. Mkts. Ass'n, *US ABS Issuance and Outstanding* (July 1, 2019), https://www.sifma.org/resources/research/us-abs-issuance-and-outstanding/; Sec. Indus. & Fin. Mkts. Ass'n, *US Mortgage-Related Issuance and Outstanding* (July 1, 2019), https://www.sifma.org/resources/research/us-mortgage-related-issuance-and-outstanding/.

[7] *See Petersen, et al.* v. *Chase Card Funding, LLC*, et al., No. 1:19-cv-00741-LJV (W.D.N.Y. June 6, 2019); *Cohen, et al.* v. *Capital One Funding, LLC et al.*, No. 19-03479 (E.D.N.Y. June 12, 2019).

[8] *See* Claire Boston, "Usury Lawsuits Put Future of a $563 Billion Bond Market at Risk" (Bloomberg Sept. 17, 2019) (pair of lawsuits could threaten the future of the $563 billion market for debt backed by consumer obligations).

[9] For example, the Secretary of the U.S. Department of the Treasury recommended, in a July 2018 report to the President, that the Federal banking regulators should "use their available authorities to address challenges posed by *Madden*." *See* "A Financial System That Creates Economic Opportunities: Nonbank Financials, Fintech, and Innovation," July 31, 2018, at p. 93; *see also* Letter to Joseph Otting, Comptroller of the Currency from Members of Congress dated September 19, 2019 (requesting that the OCC take action to mitigate the consequences of the *Madden* decision).

[10] *See* SFA, BPI Letter to the OCC on Permissible Interest on Loans that are Sold, Assigned or Otherwise Transferred (Jan. 21, 2020) (discussing why the *Madden* decision was fundamentally incorrect and that the OCC's proposal, like that of the FDIC's, would reestablish the correct legal interpretation regarding the authority of national banks and federal savings associations to sell, assign, and securitize validly originated loans).

*First*, the Proposed Rule would fix the plainly erroneous ruling in *Madden* and its potential application to loans made pursuant to Section 27, which allows FDIC-insured state-chartered banks, insured branches of foreign banks and other insured depository institutions (collectively, "state banks") not only to make loans, but, as an essential part of making loans, to sell, assign, or securitize those loans or participation interests in those loans without state law intervention to change the interest rate.  This is especially true because, as explained below, Section 27 was enacted in the context of the already long-established, "cardinal rule" that a loan that is "valid-when-made" cannot subsequently become usurious simply because the loan is sold or assigned to another party.

*Second*, by restoring centuries-old fundamental market expectations, the Proposed Rule would enable state banks to support their customers and communities by extending credit to consumers and small businesses, without fear that these lenders will not be able to sell, assign, or securitize the loans or participation interests in those loans due to the concern that potential purchasers or assignees of the loans will have about the application of state interest rate restrictions to the loans post-purchase.  The clarity of authority will be of particular benefit for loans to borrowers with lower credit because a state bank will be more reluctant to make loans with higher credit risk if they must be held to maturity or are less salable. Allowing state banks to sell, assign, or securitize loans or participation interests in loans will also provide them with the additional capital flexibility they need to continue lending into the market.

*Third*, the Proposed Rule would increase the safety and soundness of the financial system by allowing state banks the opportunity to sell loans and increase liquidity in times of stress, such as an economic downturn, unusually high deposit withdrawal demands, or for unexpected liabilities. For state banks, the uncertainty regarding the enforceability of interest rate terms hinders and frustrates risk management activities such as securitization, loan sales, and sales of participation interests in loans, which are crucial to the safety and soundness of these institutions' operations. In normal times, securitization, loan sales, and the sale of participation interests in loans also enable state banks to meet increasing credit demand from borrowers. Without the ability to sell, assign, or securitize loans or participation interests in loans, a state bank's lending would be constrained by the size of its balance sheet.  State banks may also need to sell loans to avoid excessive concentrations in particular asset classes. Additionally, state banks may need to seek to sell non-performing loans in circumstances to improve overall asset quality or where it would be unduly costly to pursue collection strategies.

*Finally*, SFA and BPI have some comments to help strengthen the Proposed Rule.

**I.    The Proposed Rule would reestablish the correct legal interpretation—well understood for over 150 years—that a loan validly originated does not become usurious if the originator subsequently sells, assigns, or securitizes the loan.**

Section 27 provides state banks with the authority to charge interest at the rate allowed by the law of the state where the bank is located, or one percent more than the rate on ninety-day commercial paper, whichever is greater.  Exportation of interest rates under Section 27 allows state banks to operate uniform nationwide lending programs without regard to multiple and variable state limits on interest rates in the same manner as national banks.  Investors and secondary market purchasers of state bank loans also need to know that the terms of the loans, including the interest rate, will

remain permissible after the sale, assignment or transfer of the loan by the state bank.[11]   The Proposed Rule is consistent with the underlying purposes of Sections 24(j) and 27 and reduces uncertainty in the marketplace by providing that interest on a loan that is permissible under Section 27 is unaffected by the sale, assignment, or other transfer of the loan by the institution.[12]

The authority of state banks to sell, assign, and securitize those validly originated loans is clear for several reasons.

*First*, the Proposed Rule is not a departure from, but rather is consistent with and codifies, common law.   Well before the enactment of Section 27, the U.S. Supreme Court recognized the longstanding common law principle that a loan that is valid-when-made at origination cannot become usurious because it is sold or assigned to another party.[13]   Indeed, the Supreme Court called this principle the "cardinal rule[ ] in the doctrine of usury."[14]   Numerous state courts—some pre-dating the Supreme Court's decision—had also recognized the valid-when-made doctrine when considering whether a loan is usurious.[15]   This longstanding doctrine certainly applies to loans made by a state bank.[16]   Congress is presumed to have understood this long-standing doctrine and incorporated it into Section 27.[17]   Accordingly, a loan by a state bank made in compliance with Section 27 is not rendered usurious in the hands of the subsequent holder of the loan.

---

[11]   In this context, the term "investor" refers to investors in a securitization or similar investment vehicle, rather than an entity coming into a loan or credit facility at the time of origination.

[12]   Under the FDIA, the FDIC has the authority to "prescribe by its Board of Directors such rules and regulations as it may deem necessary to carry out the provisions of this Act or of any other law which it has the responsibility of administering or enforcing (except to the extent that authority to issue such rules and regulations has been expressly and exclusively granted to any other regulatory agency)." 12 U.S.C. § 1819(a)(Tenth). In addition, 12 U.S.C. § 1820(g), provides the FDIC with the authority to prescribe regulations carrying out the FDIA, and to define terms as necessary to carry out the FDI Act, except to the extent such authority is conferred on another Federal banking agency. No other agency has been granted the authority to issue rules to restate, implement, clarify, or otherwise carry out, either Section 24(j) or Section 27.

[13] *Nichols v. Fearson*, 32 U.S. (7 Pet. 103, 109 (1833).

[14] *Id.*

[15] *See, e.g., Munn v. Comm'n Co.*, 15 Johns. 44, 55 (N.Y. Sup. Ct. 1818) ("[A]s the bill was free from usury, between the immediate parties to it, no after transaction with another person can, as respects those parties, invalidate it."); *Tuttle v. Clark*, 4 Conn. 153, 157 (1822) (holding that "this note, free from the taint of usury, in its origin," did not become usurious by a subsequent sale); *Knights v. Putnam*, 20 Mass. (3 Pick.) 184, 185 (1825) ("It is a well established principle, that if a note or security is valid when made, no usurious transaction afterwards between the parties or privies will affect its validity.").

[16]   SFA and BPI understand that some commentators have erroneously contended that valid-when-made only applies to situations in which the originator of the loan sells the loan at a discount such that the new owner of the loan is effectively receiving a much higher rate of interest on the loan than the originator.  Not only do such contentions fly in the face of the clear language and logic of the valid when made doctrine, but we are unaware of those commentators identifying a single case prior to *Madden* where a loan became usurious simply because it was sold or assigned.

[17] *See Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 108 (1991) ("[W]here a common-law principle is well established, * * * the courts may take it as given that Congress has legislated with an expectation that the principle will apply 'except when a statutory purpose to the contrary is evident.'" (quoting *Isbrandtsen Co. v. Johnson*, 343 U.S. 779, 783 (1952)) (internal quotation marks and citations omitted)); see also *Lozano v. Montoya Alvarez*, 134 S. Ct. 1224, 1232 (2014) (citing *Astoria*, 501 U.S. at 108).

*Second,* the Proposed Rule is consistent with the Riegle-Neal Amendments Act of 1997, which provided state banks parity with interstate national banks by enacting Section 24(j).[18]  Under Section 24(j), the laws of a host state apply to branches of interstate state banks to the same extent such state laws apply to a branch of an interstate national bank. Section 331.3 of the Proposed Rule furthers this intent to create parity by providing that the laws of a host state apply to a branch of an out-of-state state bank only to the extent such laws apply to a branch of an out-of-state national bank in the host state. Thus, to the extent that host state law is preempted for out-of-state national banks, it is also preempted with respect to out-of-state state banks.

*Third*, the Proposed Rule aligns with the original purpose of Section 27. To promote competitive equality in the nation's banking system and reaffirm the principle that institutions offering similar products should be subject to similar rules, Congress incorporated language from 12 U.S.C. § 85 into the Depository Institutions Deregulation and Monetary Control Act of 1980 ("DIDMCA"). This granted all federally-insured financial institutions—state banks, savings associations, and credit unions—similar interest rate authority to that provided to national banks.[19]  This allowed state banks to engage in multi-state lending programs and operate in the same manner as national banks.

*Fourth*, the Proposed Rule is supported by the inherent power of a state bank to originate, sell, or assign contracts.  A state bank's power to make loans implicitly carries with it the power to assign loans.[20]  This is consistent with state banking laws, which typically grant state banks the power to sell or transfer loans, and more generally, to engage in banking activities similar to those listed in the National Bank Act and activities that are "incidental to banking."[21]  The National Bank Act specifically authorizes national banks to sell or transfer loan contracts. [22]  Thus, a state bank's statutory authority under Section 27 to make loans at particular rates necessarily includes the power to assign the loans at those rates.  Denying an assignee the right to enforce a loan's terms effectively would prohibit assignment and severely limit the power to make the loan at the rate provided by the statute.

As the Second Circuit conceded, under the *Madden* rule "it is possible that usury laws might decrease the amount a national bank could charge for its consumer debt in certain states."[23]  Actually, the application of *Madden* constitutes a direct infringement of the rights of a state bank

---

[18] Public Law 105–24, 111 Stat. 238 (July 3, 1997).

[19] Public Law 96–221, 94 Stat. 132, 164–168 (1980).

[20] *See Planters' Bank of Miss. v. Sharp*, 47 U.S. 301, 322–23 (1848).

[21] States' "wild card" or parity statutes typically grant state banks competitive equality with national banks under applicable federal statutory or regulatory authority. Such authority is provided either: (1) through state legislation or regulation; or (2) by authorization of the state banking supervisor. *See, e.g.,* N.Y Banking Law § 96 (granting New York-chartered banks the power to "discount, purchase and negotiate promissory notes, drafts, bills of exchange, other evidences of debt. . . .").

[22] *See* 12 U.S.C. 24(Seventh) (expressly authorizing national banks to carry on the business of banking by "discounting and negotiating promissory notes, drafts, bills of exchange, and other evidences of debt"); 12 C.F.R. § 7.4008 (national bank may make, sell, purchase, participate in, or otherwise deal in loans subject to terms, conditions, and limitations prescribed by the OCC and any applicable federal law).  *See also* SFA, BPI Comment Letter to the OCC, *supra* note 10.

[23] *Madden*, 786 F.3d at 251.

under Section 27 to set interest rates as the state bank deems appropriate, subject only to the law of the state bank's home state. *Madden* upsets the expectations of both parties to the loan contact. The consumer agreed to the rate of interest when the loan was made by the state bank and the disclosed terms (including rate of interest) and the other rights provided to the borrower should remain constant. If the interest rate on the loan was subject to change each time the loan was sold, transferred or assigned, it would create a significant amount of confusion for consumers and secondary market participants.

As to the fourth point, it is clear that effectively compelling state banks to forgo sales of loans or participation interests in loans or securitizations would, as explained above, significantly and improperly intrude on their statutorily granted powers.[24]   As to the second and third points, subjecting state banks to a patchwork of dozens of state-law interest rate limits would impose an extraordinary burden. For every loan that a state bank might want to, or needed to, sell or securitize at some point, it would have to forgo its rights under Section 27 and comply with the interest rate restrictions in each individual jurisdiction. Instead of employing standardized loan products and nationwide underwriting programs, state banks would be forced to establish different lending programs for each state. Further, the question of state interest rate caps is not limited to a simple analysis of a stated percentage rate (or, often, rates);[25] it also entails a detailed and complex analysis of what is deemed to constitute interest (*e.g.*, fees) for this purpose. Employing state-specific lending programs therefore would significantly increase the costs and administrative burdens of loan origination for the many state banks that make loans to borrowers in multiple states, and such increased cost would most certainly be passed on to borrowers in the form of higher interest rates.   Thus, applying state interest rate limits to securitized loans would significantly interfere with the lending powers of state banks, regardless of whether they seek to comply with those limits in order to continue securitization or forgo securitization to retain their rights under Section 27. As explained below, there is already evidence that, by threatening the ability of state banks to exercise validly these powers, *Madden* is causing interference in the lending and securitization markets.

## II.     The Proposed Rule will help avoid disruption to the lending and securitization markets.

*Madden*, if not fixed, will continue to negatively impact U.S. credit markets. Non-bank purchasers of loans will hesitate to purchase loans originated by state banks for fear that the act of selling the loan will trigger a change in the rate of interest that can be charged on the loan. State banks will hesitate to sell loans because of an increased risk of liability to the purchasers if the loans are later held to be usurious. Indeed, they may not be able to sell or securitize loans because they will not be able to make standard representations and warranties regarding the validity of the loan. To the extent that non-bank purchasers do purchase loans from state banks, those purchasers will need to

---

[24]  Courts have reached similar conclusions. *See, e.g.*, *Olvera v. Blitt & Gaines, P.C.*, 431 F.3d 285, 288–89 (7th Cir. 2005) (Posner, J.) (bank would be improperly "deprived" of power to transfer interest in loan if original interest rate could not be charged post-transfer); *Strike v. Trans-West Discount Corp.*, 155 Cal. Rptr. 132, 139 (Cal. Ct. App. 1979) (restriction of bank's ability to access secondary loan market "would be disastrous in terms of bank operations and not conformable to the public policy" of exempting banks from usury laws).

[25]  Many states establish multiple permissible rate levels for loans subject to the laws of the state depending, among other things, on the type of borrower, type or purpose of the loan, and/or the size of the loan.

engage in due diligence to understand the potentially relevant new rates, and then potentially discount the purchase price to reflect the differing rates, the increased litigation risk, and time and money spent on the due diligence.

If state banks are unable to sell or securitize loans, or are restricted in those transactions, they will be forced to reduce the amount of credit they extend and to increase the price for the reduced amount of credit they do extend. The resultant reduction in bank lending would adversely impact the economy in several ways. First, it would result in higher borrowing costs for those receiving credit. This would mean higher interest rates for consumers and small businesses obtaining credit. Second, fewer borrowers would be able to obtain credit from state banks, resulting in less credit for consumers and small businesses, especially those with lower credit scores or thin credit files. As scholars have long pointed out with respect to these types of loans, "restrictions in credit markets hurt highest-risk borrowers the most."[26]

Although *Madden*'s long-term effects on the credit markets are still being studied and analyzed, there already are indications of its adverse impact on certain types of loans and consumers located in Connecticut, New York and Vermont.[27]  Likewise, some financial institutions are reported to have imposed restrictions on credit facilities used to finance consumer lending, prohibiting loans to borrowers in the Second Circuit if those loans bear interest at rates higher than the state-permitted rates.[28]

These adverse effects inevitably will grow if *Madden* is not corrected, and this is especially so if *Madden* is followed in other circumstances and by courts in other Circuits. In the current low interest rate environment, many loans are made at rates that would not be deemed usurious under many states' laws. But, as interest rates rise, more loans will necessarily be made at rates that exceed those permitted by numerous states.[29]   In turn, banks and other lenders—as a result of *Madden*—likely will have to impose tighter restrictions on lending to ensure that the loans they make will not be subject to state interest rate limits if sold.

If adopted, the Proposed Rule would (i) alleviate these concerns, (ii) provide borrowers with greater access to credit, (iii) provide investors, state banks engaged in securitizations and secondary market purchasers of state bank loans and participation interests greater certainty around

---

[26]  William F. Baxter, Section 85 of the Nat'l Bank Act and Consumer Welfare, 1995 Utah L. Rev. 1009, 1023 (1995). Small businesses likely will be similarly affected because they lack access to the broader capital markets, and are more dependent on bank financing than large corporations. *See* Karen Gordon Mills & Brayden McCarthy, The State of Small Business Lending: Credit Access during the Recovery and How Tech. May Change the Game (Harvard Bus. Sch. Working Paper No. 15-004, 2014).

[27]  *See* Colleen Honigsberg, Robert Jackson and Richard Squire, "How Does Legal Enforceability Affect Consumer lending? Evidence from a Natural Experiment," Journal of Law and Economics, vol. 60 (November 2017); and Piotr Danisewicz and Ilaf Elard, "The Real Effects of Financial Technology: Marketplace Lending and Personal Bankruptcy" (July 5, 2018).

[28]  *See, e.g.,* Troubled Company Reporter, FREED ABS 2020-1: DBRS Assigns Prov. BB(low) Rating on C Notes (Jan. 26, 2020), 2020 WLNR 2563819 (noting that "[l]oans originated to borrowers in states with active litigation (Second Circuit (New York, Connecticut, Vermont), Colorado, and West Virginia) are excluded from the pool" for a recent securitization).

[29]  For example, the standard maximum permissible interest rate is 12% in Virginia, *see* Va. Code Ann. 6.2-303(A), and 17% in Arkansas, see Ark. Const. Amend. 89 § 3.

the enforceability of these loans, (iv) as discussed below, enhance safety and soundness,[30] and (v) alleviate concerns that courts outside the Second Circuit will adopt *Madden*'s flawed reasoning.[31]

## III.   The Proposed Rule will help the safety and soundness of the financial system.

State banks depend on the ability to sell, assign, or securitize the loans they originate to provide liquidity to support their lending operations and to foster their safety and soundness.  If these loans could not be sold or securitized, or the ability to do so was severely restricted, state banks would be required to reduce the amount of credit they extend to avoid carrying potentially too many illiquid loans and to increase the costs for the reduced amount of credit they do extend.

Indeed, the *Madden* decision greatly complicates all loan sales by forcing market participants to consider the following factors in originating, purchasing or securitizing loans that they did not have to consider before:

- How readily will the original lender, or a subsequent purchaser, be able to sell, or resell, the rights to the loan to another party?

- What state law will govern the rate (and definition) of interest collectible on the loan?

- Will the purchaser be able to collect based on the original loan terms?

- Will the assignee be subject to suit in the Second Circuit, or only a court that applies the traditional valid-when-made rule?

The multiple uncertainties will constrict the availability of liquidity in the credit markets, because secondary market participants will likely be less willing, indeed sometimes unwilling, to purchase loans, participation interests in loans or interests in securitizations of loans that may be subject to state law interest rate limits that are lower than the stated rate of the loan.  This is especially true given that some purchasers may even be subject to criminal sanctions in a number of states.[32]  And, to the extent market participants do purchase loans or participation interests in loans, they are likely to discount the value to reflect the risk they take of receiving lower rates of interest than allowed on the face of the loan, or even the voiding of the loan.

In addition, sales of loans or participation interests in loans usually include representations and warranties that the loan is collectible in accordance with its terms and that the sale does not violate any law.  However, in light of *Madden*, sellers in the Second Circuit may now be unable to make those representations and warranties, which could further depress the price of any loans sold by

---

[30]  Courts have generally recognized the preemptive authority of Section 27 and FDIC interpretations of Section 27 have received deference.  *See Discover Bank v. Vaden*, 489 F.3d 594 (4th Cir. 2007); *Griner v. Synovus Bank*, 818 F.Supp.2d 1338 (N.D. Ga. 2011).

[31]  Although beyond the scope of this comment letter, SFA believes that the FDIC's interpretation of Sections 24(j) and 27 as set forth in a final rule would be entitled to deference.

[32]  *See, e.g.*, Mich. Comp. Laws Ann. 438.41 (interest in excess of 25% is punishable by up to five years imprisonment and/or $10,000 fine); N.Y. Penal Law 190.40 (interest in excess of 25% is a felony punishable by up to four years imprisonment and/or $5,000 fine).

state banks or, at worst, render such sales infeasible. To the extent sellers make such representations and warranties and *Madden* is not fixed, the sellers could be subject to liability in private lawsuits.  Moreover, the impact of *Madden* is not limited to future loan sales.  Any entity that has purchased or sold loans in the past now faces the possibility that those prior transactions—entered into in reliance upon on the valid-when-made doctrine—may now become subject to disputes with, and potential liability to, purchasers seeking to recover for the loss in value of the loans they purchased.

By threatening to reduce the value and liquidity of the multi-trillion-dollar portfolio of loans that banks currently hold or have securitized, the decision could reduce the liquidity and capital of banks, and ultimately have implications for the safety and soundness of the banking system.

## IV.  Suggestions for clarifying the text of the Proposed Rule.

As noted, SFA and BPI are highly supportive of the FDIC's efforts to address the adverse effects of the *Madden* decision on the origination, secondary, and securitization markets via the Proposed Rule and would ask the FDIC to finalize the proposal as soon as possible to address the uncertainty in the market.

Although the Proposed Rule is not a joint rulemaking, we encourage the FDIC to work with the OCC to harmonize the text of the Proposed Rule with the proposed rule and existing rule issued by the OCC based on its comparable authority under 12 U.S.C. § 85 and 12 U.S.C. § 1463 with respect to national banks and federal savings associations.  Recognizing the value of uniformity in applicable interest laws amongst the various types of depository institutions, Congress extended the longstanding principles of Section 85 to federal savings associations and other state banks when it enacted DIDMCA.[33]

The FDIC historically has interpreted this interest rate authority provision in Section 27 in a consistent manner with Section 85 and OCC precedent.[34]  From the perspective of investors, secondary market purchasers of loans and participation interest in loans and depository institution lenders, it is important that there remains interest rate authority parity amongst depository institutions regardless of whether they may be a national bank, federally-licensed branch, federal savings association, or state-chartered insured depository institution.  Harmonizing the Proposed Rule with the OCC's proposed and existing rules will also help ensure that this parity amongst depository institutions continues and the effect on interest after a loan is sold, transferred or assigned will not vary depending upon whether the lender is a national bank, federal savings association or state bank.[35]

---

[33] *See* 12 U.S.C. § 1831d; 12 U.S.C. § 1463(g).

[34] *See Greenwood Trust Co. v. Mass.,* 971 F.2d 818, 827 (1st Cir. 1992) (Section 1831d borrows from Section 85 to achieve parity between national banks and their state-chartered counterparts.).  For this reason, courts have held that Section 85 and Section 1831d should be interpreted the same way. *Id.*

[35] For example, the FDIC's definition of interest in the Proposed Rule is comprehensive and helpful and follows the language in the OCC's current definition in 12 C.F.R. § 7.4001.  84 Fed. Reg. 66,853 (Dec. 6, 2019).

## V.    Conclusion

SFA and BPI appreciate the opportunity to provide the foregoing comments on the Proposed Rule. Should you wish to discuss any matters addressed in this comment letter further, please contact Kristi Leo of SFA at (202) 847-4556 or at kristi.leo@structuredfinance.org, or Naeha Prakash of BPI at (202) 589-2429 or at Naeha.Prakash@BPI.com.

Respectfully submitted,



Kristi Leo
President
Structured Finance Association



Naeha Prakash
Senior Vice President, Associate General Counsel
Bank Policy Institute



# GEORGETOWN LAW

**Adam J. Levitin**
*Agnes N. Williams Research Professor*
*& Professor of Law*

January 5, 2020

Robert E. Feldman, Executive Secretary
Attention: Comments
Federal Deposit Insurance Corporation
550 17th Street NW, Washington, DC 20429
*comments@fdic.gov*

RE: RIN 3064—AF21

Dear Sir/Madam:

I write to strongly object to the Notice of Proposed Rulemaking (the "Proposed Rule") issued by the Federal Deposit Insurance Corporation (FDIC) regarding "Federal Interest Rate Authority," RIN 3064—AF21.[1] My comments on the Proposed Rule are restricted to proposed 12 C.F.R. § 331.4(e) (the "interest rate assignment provision"), regarding the legality of interest charged by non-bank assignees of state-chartered banks and insured branches of foreign banks (collectively, "State Banks"). I express no position here on the other provisions of the Proposed Rule.

In regard to the proposed interest rate assignment provision the FDIC, without claiming any statutory ambiguity, seeks to overturn the decision of the Second Circuit Court of Appeals in *Madden v. Midland Funding*,[2] to allow non-bank assignees of State Banks to charge interest at the greater of the rate permitted by the state in which the State Bank is located or the 90-day commercial paper rate,[3] without regard to the usury laws of the borrower's state. The Proposed Rule would thus effectively preempt state usury laws in order to allow non-bank assignees to purchase loans with interest rates that exceed the rates allowed if the non-bank assigned had made the loans themselves. The Proposed Rule would allow non-banks to do indirectly what they are forbidden to do directly, and in so doing endangers the safety-and-soundness of State banks and undermines consumer protections. As I detail

---

[1] 84 Fed. Reg. 66845 (Dec. 6, 2019).
[2] 786 F.3d 246 (2nd Cir. 2015).
[3] 12 U.S.C. § 1831d.

600 New Jersey Avenue, NW, Washington, DC 20001-2075
Phone 202-662-9234 Fax 202-662-4030
adam.levitin@law.georgetown.edu

below, this provision of the Proposed Rule is both illegal and bad policy. The FDIC should retract at least this portion of the Proposed Rule.

## I.   <u>Qualifications</u>

By way of background, I am the Agnes N. Williams Research Professor and Professor of Law at Georgetown University Law Center, where I teach courses in Consumer Finance, Financial Regulation, Contracts, Commercial Law, Structured Finance, and Bankruptcy. I have also previously served as the Bruce W. Nichols Visiting Professor of Law at Harvard Law School and as faculty for the Federal Trade Commission's Division of Financial Practices training program, and am elected member of the American Law Institute, which awarded me its Young Scholars Medal in 2013. I have also previously served on the Consumer Financial Protection Bureau's Consumer Advisory Board and as an expert witness for the FDIC in a set of related rent-a-bank litigations.[4]

Among my publications is the first law school textbook on consumer finance, ADAM J. LEVITIN, CONSUMER FINANCE: MARKETS AND REGULATION (Wolters Kluwer 2018), which includes a chapter devoted to usury laws, as well as materials on rent-a-bank lending and securitization. I have also written several journalistic articles about the so-called "valid-when-made" doctrine, as well as submitted amicus briefs about the doctrine in four cases, including one in which the FDIC has also appeared as an amicus. The FDIC was served electronically (at its consent) with my amicus brief in that case. I have attached a copy of the brief, which details the spurious nature of the valid-when-made doctrine and the fallacious claim of the applicability of the common law of assignments to the question of what interest a non-bank may charge as an appendix.

## II.   <u>The Proposed Rule Is Illegal</u>

The interest rate assignment provision of Proposed Rule is illegal for two basic reasons. First, the FDIC is lacks statutory authority to undertake the rulemaking. The FDIC is authorized to undertake rulemakings only to carry out the provisions of the Federal Deposit Insurance Act, and the interest rate assignment provision is not carrying out a provision of the Federal Deposit Insurance Act. Even if it were, the FDIC is bound by the *Madden* decision under the Supreme Court's *Brand X* jurisprudence because section 27 of the Federal Deposit Insurance Act is unambiguous. Moreover, the FDIC's authority regarding interest rate assignment cannot exceed that of the Office of Comptroller of the Currency (OCC), and the provisions of the National Bank Act make clear that the OCC has no authority to undertake an interest rate assignment provision.

---

[4] FDIC v. Columbus Bank & Trust, Columbus, Georgia, FDIC-08-139b, FDIC-08-140k (2008); FDIC v. First Bank of Delaware, Wilmington Delaware, FDIC-07-256b, FDIC-07-257k (2007); FDIC v. First Bank & Trust, Brookings, South Dakota, FDIC-07-228b, FDIC-07-260k (2007); FDIC v. CompuCredit Corp., FDIC-08-033b, FDIC-08-034k (2008).

Second, the Proposed Rule is arbitrary and capricious and therefore in violation of the Administrative Procedures Act.[5] The Proposed Rule is arbitrary and capricious for four reasons: it lacks an evidentiary basis; it ignores key evidence; it patently misapplies common law; and its solution does not actually address key aspects of the supposed problem. This section elaborates on the legal problems with the interest rate assignment provision of the Proposed Rule.

### A. The Interest Rate Assignment Provision of the Proposed Rule Fails to Comply with the Administrative Procedures Act Because It Goes Beyond the Scope of Congressional Delegation to the FDIC

#### 1. The Interest Rate Assignment Provision of the Proposed Rule Goes Beyond the Scope of the FDIC's Statutory Authority Because the FDIC Has No Authority to Regulate Interest Charges by Non-banks

The interest rate assignment provision of the Proposed Rule is illegal because it does not comply with the Administrative Procedures Act because it exceeds the scope of the FDIC's statutory authority.[6]

The key question the interest rate assignment provision addresses is whether the interest allowed to State Banks under section 27 of the Federal Deposit Insurance Act is affected by "sale, assignment, or other transfer of the loan," that is, whether the interest allowed under section 27 is permitted to a non-bank assignee. Congress has not delegated to the FDIC the power to preempt state usury laws with respect to non-banks. A rulemaking with this effect goes beyond the delegation to the FDIC in section 10(g) of the Federal Deposit Insurance Act.[7]

Section 10(g)(1) authorizes the FDIC to "prescribe regulations to carry out this chapter [the Federal Deposit Insurance Act]".[8] Yet the Proposed Rule never identifies any provision in the Federal Deposit Insurance Act that it is seeking to carry out regarding its proposal that the interest allowed to non-bank assignees of State Banks under section 27 not affected by "sale, assignment, or other transfer of the loan." Nor can it. The FDIC's definition is not seeking to effectuate any provision of the Federal Deposit Insurance Act. Instead, it is seeking to effectuate State Banks' power to assign loans, but that power does not arise under the Federal Deposit Insurance Act. Instead, it arises from state banking power statutes or state common law, not the Federal Deposit Insurance Act. Thus, the FDIC is in the preposterous position of claiming to preempt one type of state law (state usury laws) to effectuate another type of state law (state banking power laws). Absent a *federal* power, the FDIC simply lacks any authority to preempt state laws.

To the extent that the FDIC believes that the Proposed Rule is effectuating section 27, but it is incorrect. The delegation in section 10(g) is limited by the statutory text of section 27, which refers only to the power of "state banks." Section 27 does not authorize

---

[5] 5 U.S.C. § 706(2)(A).
[6] 5 U.S.C. § 706(2)(C).
[7] 12 U.S.C. § 1820(g).
[8] *Id.* (emphasis added).

entities other than state banks—be they national banks, uninsured foreign banks, credit unions, or other non-banks—to do anything. There is no ambiguity about what "state bank" means is section 27. The scope of the FDIC's interpretive authority under section 27 is limited to interest *for State Banks*.

Indeed, the limited authority in section 27 is clear from comparison with other statutory provisions in title 12. Congress has itself acted to preempt state usury laws with respect to non-banks in a specific context, namely in regard to first lien mortgage loans.[9] Moreover, that same provision expressly preempts state law even in the event of an assignment.[10] That provision was enacted as part of the same statute, the Depository Institution Deregulation and Monetary Control Act of 1980, that added section 27 to the Federal Deposit Insurance Act. That Congress has acted to preempt state usury laws for assignees other than State Banks in another context implies a lack of authority for the FDIC to act more broadly under section 27.

The Proposed Rule incorrectly states that "Denying an assignee the right to enforce a loan's terms would effectively prohibit assignment and render the power to make the loan at the rate provided by the statute illusory."[11] First, the *Madden* decision only affects a subset of potential assignees. All insured depositories are unaffected, and banks frequently buy each other's loans. Second, as the Second Circuit noted in *Madden*, denying the assignee the right to collect usurious interest would merely result in a lower sale price—the assignee would obtain the same rate of return through discounting the loans from face—and thereby avoid any problem with state usury laws. Third, the FDIC is conflating two distinct powers. The power to make loans at a particular interest rate—arising section 27—is separate and distinct from the power to assign them—a power from state banking power laws. The possibility of a lower resale price does not render the ability to make a loan at the rates authorized under section 27 illusory.

Likewise, while the Proposed Rule makes noise about the importance to bank safety-and-soundness of being able assign loans without regard for state usury laws,[12] but this is a rationale that is unmoored to any statutory text, and if accepted would be an impermissibly unlimited delegation. The FDIC simply lacks authority to undertake the Proposed Rule insofar as it deals with the legality of interest charged by non-bank assignees of State Banks.

---

[9] 12 U.S.C. § 1735f-7a.

[10] 12 U.S.C. § 1735f-7a(a)(1)(C)(v).

[11] 84 Fed. Reg. 66848 (Dec. 6, 2019).

[12] *See, e.g.,* 84 Fed. Reg. 66845 (Dec. 6, 2019). *See also* 84 Fed. Reg. 66848 (Dec. 6, 2019) ("restrictions on assignees' abilities to enforce interest rate terms would result in extremely distressed market values for many loans, frustrating the purpose of the FDI Act.").

2.  *The FDIC Is Bound by* Madden v. Midland Funding, LLC *and Has No Authority to Undertake the Interest Rate Assignment Provision of the Proposed Rulemaking*

The Proposed Rule seeks to overturn the result of the Second Circuit's ruling in *Madden v. Midland Funding, LLC*.[13] The FDIC does not appear to realize that it is in fact bound by the Second Circuit's interpretation of the National Bank Act in *Madden* absent any contrary judicial authority. It does not matter that the FDIC was not a party to Madden; the question is not one of issue preclusion, but one of *Chevron* jurisprudence. The FDIC has authority to interpret the Federal Deposit Insurance Act, but only to the extent that the statute is ambiguous. If the statute is unambiguous and the FDIC must defer to prior judicial authority, irrespective of whether it was party to such prior case.[14]

Thus in *United States v. Home Concrete & Supply, LLC*, the Supreme Court held that a Treasury regulation did not supplant a prior judicial interpretation of the statute because the statute was unambiguous.[15] Likewise, in *National Cable & Telecommunications Association v. Brand X Internet Services*, the Supreme Court held that "A court's prior judicial construction of a statute trumps an agency construction otherwise entitled to *Chevron* deference only if the prior court decision holds that its construction follows from the unambiguous terms of the statute and thus leaves no room for agency discretion."[16]

Although the Supreme Court held that the statute in at issue in *Brand X* was ambiguous, the Circuit Court decision it reversed had applied a prior precedent against the challenged rulemaking even though the agency that promulgated the rule had not been a party to that prior litigation.[17] Subsequent Circuit Court opinions have made clear that when a statute is unambiguous, agencies are bound by prior judicial interpretation and that it is not necessary for the court to have expressly stated that the statute was unambiguous for the agency to be bound.[18]

---

[13] 786 F.3d 246 (2nd Cir. 2015).

[14] The idea that the OCC should get any *Chevron* deference is further undermined by the fact that the OCC filed a brief with the Supreme Court opposing certiorari in *Madden*. While that brief did note that the OCC disagreed with *Madden*'s holding, it argued that the case was an inappropriate vehicle to address the case. In other words, the OCC had an opportunity to litigate the *Madden* case and declined to do so. The OCC cannot oppose certiorari because it believes that a case it an inappropriate vehicle for the courts to address a case and then decide that *it* is the appropriate entity to address an unambiguous statute. This sort of gamesmanship is beyond anything allowed by administrative law.

[15] 566 U.S. 478, 486-487 (2012).

[16] 545 U.S. 967, 982 (2005). I noted, however, that under section 25b of the National Bank Act, the Office of Comptroller of the Currency's rulemaking would not be entitled to *Chevron* deference. 12 U.S.C. § 25b.

[17] 545 U.S. 967 (2005).

[18] *See, e.g.*, Texas v. Alabama-Coushatta Tribe of Texas 918 F.3d 440 (5th Cir. 2019); Patel v. Napolitano, 706 F.3d 370 (4th Cir. 2013).

In this instance, the Second Circuit ruled in *Madden* to interpret the unambiguous text of section 85 of the National Bank Act. Section 27 of the Federal Deposit Insurance Act is modeled on section 85 of the National Bank Act, such that the FDIC has itself argued that it is to be interpreted consistently with section 85.[19] The FDIC has not alleged any ambiguity about the statutory meaning of section 27; it has instead alleged there to be legal ambiguity for non-banks following *Madden*, but this sort of legal uncertainty is not the type of ambiguity that matters under *Brand X*. This means that the FDIC is bound under *Madden* regarding section 27 of the Federal Deposit Insurance Act, just as the OCC is bound regarding section 85 of the National Bank Act. The FDIC's policy preferences are irrelevant in this regard. Accordingly, the Proposed Rule goes beyond the scope of the Congressional delegation to the FDIC and is in violation of the Administrative Procedures Act.[20]

### 3. *The FDIC's Authority Cannot Exceed that of the OCC, and the OCC lacks Authority to Regulate the Interest Rates that Non-Bank Assignees May Charge or Collect*

As the FDIC recognizes, section 27 of the Federal Deposit Insurance Act must be read *in pari materia* with section 85 of the National Bank Act.[21] Thus, to the extent that section 85 does not authorize the OCC to regulate the interest rates that non-bank assignees of national banks may charge or collect, so too must the FDIC be limited in its authority to regulate the interest rates that non-bank assignees of State Banks may charge or collect.

I have separately submitted comments to the OCC regarding its proposed parallel rulemaking on interest rate assignment. My comments are attached to this submission. While I believe that the OCC lacks authority to undertake its proposed rule for a number of reasons, including some of the same as apply to the FDIC, there is one in particular that bears note here. Section 25b(b)-(c) of the National Bank Act makes clear that the OCC may not preempt state consumer financial protection laws unless it follows a particular procedure and meets a certain evidentiary threshold. While section 25b(f) of the National Bank Act cryptically preserves section 85, whatever section 25b(f) means, it does not provide that section 85 is exemption from the procedural requirements of section 25b.

More significantly for the purposes of the FDIC, Congress made clear in sections 25b(e) and 25b(h) of the National Bank Act that there is no preemption of state consumer financial protection laws for the affiliates, subsidiaries, and agents of national banks. It would be absurd for entities closely connected to national banks not to be able to shelter in section 85 of the National Bank Act, but for all manner of non-bank, including the affiliates, subsidiaries, and agents of State Banks to be able to shelter in section 27 of the Federal Deposit Insurance Act. National banks are "national favorites," such that their treatment is always equal to or better than that of State Banks.[22] Sections 25b(e) and 25b(h) of the

---

[19] 84 Fed. Reg. 66846-47, 66849 (Dec. 6, 2019) ("While *Madden* interpreted section 85, rather than the FDI Act, section 27 is patterned after section 85 and receives the same interpretation as section 85.").

[20] 5 U.S.C. § 706(2)(C).

[21] 84 Fed. Reg. 66846-47, 66849 (Dec. 6, 2019).

[22] Tiffany v. Nat'l Bank of Mo., 85 U.S. 409, 412-13 (1874).

National Bank Act indicate the limitation on the OCC's authority, which in turn indicates the limitation on the FDIC's authority.

### B. The Interest Rate Assignment Provision of the Proposed Rule Fails to Comply with the Administrative Procedures Act Because It Is Arbitrary and Capricious

#### 1. The Interest Rate Assignment Provision of the Proposed Rule Is Arbitrary and Capricious Because It Lacks Any Evidentiary Basis

On top of the FDIC's lack of authority for the rulemaking, the Proposed Rule fails to comply with the Administrative Procedures Act because it is arbitrary and capricious because it lacks an evidentiary basis.[23] The Proposed Rule claims that it is necessary to protect State Banks' ability to sell loans without any evidentiary basis of this in fact being a problem post-*Madden*. The FDIC has adduced no evidence that State Banks' in fact have difficulty selling loans post-*Madden*.

The FDIC concedes that it does not have the information regarding the number of small entities that have been directly affected by ambiguity resulting from *Madden*.[24] Just as the FDIC lacks this information on small banks, so too does it lack it on banks generally because the FDIC does not collect the relevant information from any banks. Indeed, the FDIC presents no data whatsoever on the frequency or scale of bank loan sales to non-banks or on the circumstances in which they occur, much less on the number of loans potentially affected by the *Madden* decision. The Proposed Rule cannot stand on naked assertions about the importance of asset sales to bank liquidity generally and on the further implicit assumption that banks rely on sales of loans with interest rates exceeding state usury caps as an important source of liquidity. There is no evidentiary basis whatsoever for either assertion. Accordingly, the rule is arbitrary and capricious.

More generally, the FDIC has presented no evidence that the sale of debt obligations with interest rates that exceed state usury caps is a material source of liquidity for any bank, much less for banks in general. Banks obtain liquidity primarily through the incurrence of liabilities—accepting deposits—and through borrowing via repurchase agreements (repos), correspondent bank lines, Federal Home Loan Bank advances, and the Federal Reserve's discount window. Banks do not generally rely on the sale of non-mortgage assets as a key liquidity source.

Similarly, the FDIC asserts that "The market for loan sales and securitization is a lower-cost source of funding for State banks, and the proposed rule would support State banks' access to this market."[25] No evidence whatsoever is presented that the market for loan

---

[23] 5 U.S.C. § 706(2)(A).

[24] 84 Fed. Reg. 66851 (Dec. 6, 2019). FDIC likewise concedes that it "is not aware of any widespread or significant negative effects on credit availability or securitization markets having occurred to this point as a result of the *Madden* decision. Thus, to the extent the proposed rule contributes to a return to the pre-*Madden* status quo regarding market participants' understanding of the applicability of State usury laws, immediate widespread effects on credit availability would not be expected." *Id.*

[25] 84 Fed. Reg. 66851 (Dec. 6, 2019).

sales and securitization is a lower-cost source of funding? Indeed, it is not even clear from the assertion what the point of comparison is. Loan sales and securitization are a "lower-cost source of funding" than what? Surely the FDIC is not asserting that it is lower cost than banks' primary source of funding—deposits—or than interbank borrowing at the Federal Funds rate.

The closest the FDIC comes to adducing any evidence is to quote a banking industry analyst's unproven claim about *Madden* creating uncertainty in the minds of unspecified market participants.[26] A rulemaking cannot stand on such bald speculation any more than it can stand on naked assertions about the importance of asset sales to bank liquidity, without a showing that State Banks materially rely on the sale of that subset of loans with interest rates exceeding state usury caps for liquidity.

### 2. The Interest Rate Assignment Provision of the Proposed Rule Is Arbitrary and Capricious Because It Ignores Key Contrary Evidence

Not only does the interest rate assignment provision of the Proposed Rule lack an evidentiary basis, but it entirely ignores some of the most obvious and contrary evidence. Accordingly, it is arbitrary and capricious and therefore in violation of the Administrative Procedures Act.[27]

While the Proposed Rule contends that it is necessary to protect bank liquidity, the idea that state usury laws actually constrain bank liquidity is preposterous. Banks may always sell loans to other banks. There are over 5,200 federally insured depositories, so there is a robust market for State bank loans simply from other State Banks and national banks, none of which are subject to state usury laws. Nowhere in the Proposed Rule is this enormous market for bank loans ever mentioned.

Additionally, the Proposed Rule ignores that state usury laws do not actually prevent the sale of bank loans to non-banks, even if the loans have interest rates that exceed state usury caps. The loan purchaser may always choose to forgo collecting interest that exceeds the state usury cap. If the purchaser does so, it is likely to discount what it will pay on the purchase price. As the Second Circuit noted in *Madden*, the fact that the sale price of the loans may be lower than otherwise is not a significant interference with banking powers. The Federal Deposit Insurance Act is not a retail price maintenance statute. There is a world of difference between ensuring that there is a market for bank loans and insisting that banks get the best possible price for their loans.

Because the Proposed rule ignores obvious contrary evidence—failing to give it any consideration whatsoever—it is arbitrary and capricious.

### 3. The Interest Rate Assignment Provision of the Proposed Rule Is Arbitrary and Capricious Because It Is Based on a Patent Misapplication of the Common Law

The FDIC claims that interest rate assignment provision of the Proposed Rule is based on the principles found in the common law of assignments and is consistent with the so-

---

[26] 84 Fed. Reg. 66850 (Dec. 6, 2019).
[27] 5 U.S.C. § 706(2)(A).

called "valid-when-made" doctrine.[28] This is incorrect on both counts. Neither the common law of assignments or the actual valid-when-made doctrine supports the Proposed Rule. A rule that is founded on a patent misrepresentation of the law is arbitrary and capricious and "otherwise not in accordance with law" and therefore violates the Administrative Procedures Act.[29]

### a.  The Proposed Rule Misapplies the Common Law of Contracts

The FDIC contends that interest rate assignment provision of the Proposed Rule is consistent with the common law of contract assignment, which generally allows an assignee to accede to all of the rights of the assignor under the contract.[30] While this is an accurate characterization of the law of contracts, it is a misapplication of the common law of contracts to the question of whether a State Bank's interest rate exportation power under section 27 of the Federal Deposit Insurance Act is assignable.

The common law of assignments relates solely to the assignment of rights under a contract or property rights. It has no bearing on whether federal statutory status or privileges may be assigned. A State Bank's power to export interest rates is a function of statute, not contract. Most favored lender status cannot arise from contract because contract cannot displace state usury statutes and other state regulations. Because essence a personal privilege, not a property right it is no more assignable than a medical license or a tax-exempt status or FDIC insurance or Federal Reserve System discount window access. If these privileges were freely assignable there would be no point in having a licensing regime like state bank chartering and FDIC insurance because regulators would not exercise control over who ultimately gained the privileges attached to the license. Accordingly, the common law of assignments has nothing whatsoever to do with the assignability of most favored lender status.[31]

### b.  The Proposed Rule Misapplies the So-Called "Valid-When-Made" Doctrine

The FDIC also claims that the Proposed Rule is consistent with the so-called "valid-when-made" doctrine.[32] The FDIC claims that this doctrine means that if a loan was valid when it was made for purposes of state usury law, it cannot thereafter cease to be valid by virtue of an assignment. The FDIC's claim is founded on a blatant misreading of historical cases. There has never been a valid-when-made doctrine such as the one the FDIC claims. Instead, to the extent that any sort of valid-when made doctrine exists, it is about the

---

[28] 84 Fed. Reg. 66848 (Dec. 6, 2019).

[29] 5 U.S.C. § 706(2)(A).

[30] *Id.*

[31] The Seventh Circuit simply erred in this regard in *Olvera v. Blitt & Gaines, P.C.*, 431 F.3d 285 (7th Cir. 2005). In any event, the Seventh Circuit was sitting in diversity jurisdiction and its pronouncements on state common law of contracts law are not controlling.

[32] 84 Fed. Reg. 66848 (Dec. 6, 2019).

*calculation* of the interest rate on a loan, not about what law determines the applicable usury rate.

In support of the Proposed Rule, the FDIC cites a pair of 19th century Supreme Court decisions, *Nichols v. Fearson*[33] and *Gaither v. Farmers & Mechs. Bank of Georgetown*,[34] as standing for a "cardinal rule[] in the doctrine of usury," namely that "if a loan is non-usurious at origination, the loan does not subsequently become usurious when assigned."[35] That is a blatant mischaracterization of these decisions. The Supreme Court held in both cases that the interest imputed from a discounted sale of a loan would not be added to the stated interest rate on the loan for the purpose of calculating whether *the assignor* violated state usury law. The cases had absolutely nothing to do with what interest rate the *assignee* could charge.

I have written at length previously about the ahistoricity of the valid-when-made doctrine as claimed by the FDIC. In particular, I refer the FDIC to an amicus brief I filed in a federal district court cased captioned *Rent-Rite Super Kegs West Ltd. v. World Business Lenders,* LLC, 1:19-cv-01552- REB (D.Colo.). FDIC also appeared as an amicus in this on-going litigation, and my brief was served on the FDIC electronically per the FDIC's consent. I have attached the brief as an appendix to these comments. It shows that the historical cases relied up for a "valid-when-made" doctrine have absolutely nothing to do with the ability of a non-bank assignees of a bank to shelter in the bank's ability to export interest rates under section 85. Instead, to the extent that such a doctrine has ever existed, it deals with three distinct issues related to the calculation of the interest rate, not the question of what usury law applied. I note here that in its amicus brief in the *Rent-Rite* litigation the FDIC engaged in more extensive selective and even misleading quotation from other cases, not one of which actually supports its position in the Proposed Rule.

Putting aside the doctrinal fabrication, the FDIC claims that a rule consistent with "valid-when-made" is necessary to have a "workable rule" to determine the timing of compliance with section 27. This is nonsense. The *Madden* Rule provides an elegantly workable and administrable rule for determining the timing of compliance with section 27: section 27 does not apply to non-banks, so they never need to concern themselves with it, while it always applies to banks, so they do not need to worry about compliance with state usury laws.

### 4.   *The Interest Rate Assignment Provision of the Proposed Rule Is Arbitrary and Capricious Because Its Solution Fails to Address an Important Aspect of the Problem*

Finally, the Proposed Rule is arbitrary and capricious and therefore violates the Administrative Procedures Act because its solution entirely fails to address an important aspect of the problem of market uncertainty regarding interest rate assignment—the "true

---

[33] 32 U.S. (7 Pet.) 103, 109 (1833).
[34] 26 U.S. (1 Pet.) 37, 43 (1828).
[35] 84 Fed. Reg. 66848 (Dec. 6, 2019).

lender" doctrine.[36] The FDIC notes the problem of uncertainty after the *Madden* decision, but the truth is that the uncertainty about what interest rate a non-bank assignee of a State Bank may charge did not begin with *Madden* in 2015. Instead, it began in 2004 with the inclusion of a "true lender" provision in the Georgia Payday Loan Act,[37] and subsequent litigation.[38] Since 2004, several courts have adopted a similar "true lender" doctrine as a matter of state common law,[39] and such a provision is also consistent with 19th and early 20th century federal common law to disregard sham transactions for usury purposes.[40]

True lender doctrine and the question of whether a non-bank assignee may shelter in section 27 are inextricably intertwined. The Proposed Rule explicitly states that it does not take a position on true lender issues.[41] Without addressing true lender doctrine, the rule fails to materially reduce any uncertainty about what interest rate is permissible on a loan assigned by a State Bank. As such, the proposed rule is arbitrary and capricious and therefore illegal under the Administrative Procedures Act because its solution does not address a key aspect of the problem it identifies.

---

[36] *See* Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co., 463 U.S. 29, 43 (1983) (noting that an agency rule is "arbitrary and capricious" if the rule "entirely failed to consider an important aspect of the problem"); *see also* Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971) (holding that, in assessing whether a rule is arbitrary and capricious, "the ultimate standard of review is a narrow one").

[37] OCGA § 16-17-1(c).

[38] Ga. Cash Am. v. Greene, 318 Ga. App. 355, 361-362 (Ga. Ct. App. 2012).

[39] Easter v. Am. West Fin., 381 F.3d 948, 957-959 (9th Cir. 2004) (applying true lender doctrine under Washington State law); Ubaldi v. SLM Corp., 852 F. Supp. 2d 1190, 1196 (N.D. Cal. 2012) (noting that, "where a plaintiff has alleged that a national bank is the lender in name only, courts have generally looked to the real nature of the loan to determine whether a non-bank entity is the de facto lender"); CashCall, Inc. v. Morrisey, 2014 W. Va. LEXIS 587, at* 43 2014 WL 2404300, at *14 (W.Va. May 30, 2014) (looking to form, not substance under West Virginia law); Pennsylvania v. Think Fin., Inc., 2016 U.S. Dist. LEXIS 4649, *30-33, 2016 WL 161597 (E.D. Pa. Jan. 14, 2016, upholding complaint based on true lender doctrine under Pennsylvania law); Consumer Fin. Prot. Bureau v. CashCall, Inc., 2016 U.S. Dist. LEXIS 130584, *15-16 (C.D. Cal. 2016) (form, not substance determines who is the true lender); Meade v. Avant of Colorado, LLC, 307 F. Supp. 3d 1134, 1150-1151 (D. Colo. 2018) (declining to dismiss a complaint predicated on true lender doctrine under Colorado law); Meade v. Marlette Funding LLC, 2018 U.S. Dist. LEXIS 46814, *8-9, 2018 WL 1417706 (D. Colo. Mar. 21, 2018) (same); CashCall, Inc. v. Md. Comm'r of Fin. Regulation, 448 Md. 412, 436, 139 A.3d 990, 1005, 2016 Md. LEXIS 371, *36 (Md. Ct. App. 2016) (holding a party that was the de facto lender was a "credit services business" subject to Maryland usury law).

[40] Miller v. Tiffany, 68 U.S. 298, 310 (1864); Seeman v. Phila. Warehouse Co., 274 U.S. 403 (1927).

[41] *See* 84 Fed. Reg. 66846 (Dec. 6, 2019).

III.  **The Proposed Rule Is Bad Policy**

The Proposed Rule is non-mandatory and it should be retracted because it is bad policy. The Proposed Rule is contrary to the FDIC's duties to ensure the safety and soundness of State Banks and consumer protection from predatory lending.

A.  *The Proposed Rule Does Not Actually Enhance State Banks' Liquidity*

The FDIC claims that the Proposed Rule helps protect and enhance State Banks' liquidity and risk management.[42] This is incorrect. The Proposed Rule does not materially enhance State Banks' liquidity or risk management capabilities, and the FDIC has adduced no evidence that it does. This is because a State Bank can already always sell loans—no matter the interest rate—to any of the more than 5,200 other State Banks and national banks in the United States. A potential market of over 5,200 buyers subject to the same or higher usury caps is not a constrained market, nor does the FDIC present any evidence that it is. The claim that limiting the market for usurious loans to over 5,200 banks impairs bank risk management is unsupported and frankly preposterous.

Moreover, State Banks can already always sell loans—no matter the interest rate—to any non-bank. *Madden* did not change this situation by one iota. The only catch is that because under *Madden* the non-bank cannot collect the usurious interest, it will discount the purchase price, but there is a difference between preserving liquidity and maintaining resale prices. The Second Circuit found in *Madden* that this would not be a "significant interference" with a national bank power.

The FDIC's Proposed Rule stands on an even thinner statutory basis than the OCC's parallel rulemaking because there is no federal banking power at issue for State Banks, whose powers (other than regarding interest rates under section 27 of the Federal Deposit Insurance Act) come from state law, not federal law, and FDIC has not claimed otherwise in the Proposed Rule.

Additionally, as noted above, the Proposed Rule presents no evidence that most banks in fact rely on the loan sale market to non-banks for liquidity. Only the very largest banks engage in securitization of any assets other than residential mortgage loans. While banks will sell charged off loans to non-bank debt buyers, this is not a material source of liquidity for banks, and only a few State Banks currently engage in rent-a-bank transactions. Instead, banks' primary sources of liquidity are deposits and wholesale funding markets, as well as Federal Home Loan Bank advances, and the GSE cash windows, with the Federal Reserve's discount window as a backup. To suggest that *Madden* has materially threatened State Bank liquidity is preposterous and unsupported by any evidence.

Moreover, if uncertainty about what usury cap applies to a non-bank assignee is the problem, the FDIC's Proposed Rule presents no solution, as discussed above, because it does not remove the uncertainty that comes from true lender doctrine.

B.  *The Proposed Rule Facilitates Rent-a-Bank Arrangements That Pose Pipeline and Reputational Risk for State Banks*

---

[42] 84 Fed. Reg. 66845 (Dec. 6, 2019).

600 New Jersey Avenue, NW Washington, DC 20001-2075
PHONE 202-662-9234  FAX 202-662-4030
adam.levitin@law.georgetown.edu

Rather than provide a material enhancement of bank liquidity, the Proposed Rule merely facilitates rent-a-bank lending arrangements, by which I mean arrangements where a bank agrees in advance to make loans according to a non-bank's specifications and to transfer a substantial economic interest in those loans to the non-bank (or its affiliate). Rent-a-bank arrangements are an inherent threat to the safety-and-soundness of State Banks because of the pipeline and reputational risks involved. If the non-bank fails to honor its commitment to purchase the economic interest in the loans, the State Bank will be stuck with the risk of a bunch of loans that by definition it would never have made for its own account. Moreover, because the sole reason for non-banks to engage in rent-a-bank lending is the evasion of state usury laws, there is reputational risk for State Banks because they will be associated with predatory lending, which may hurt their other lines of business.

### C.  The Proposed Rule Facilitates Predatory Lending and Is Contrary to the FDIC's Consumer Protection Mandate

Because the Proposed Rule facilitates rent-a-bank lending arrangements, it undermines state consumer protection laws. Rent-a-bank lending enables non-banks to make loans indirectly that they are forbidden to make directly. Whatever the FDIC may think of the wisdom of state usury laws and state laws restricting various types of loan fees, these laws are on the books and apply to non-banks, and it is not the FDIC's place to second-guess them or attempt to undermine them. The CFPB has brought enforcement actions for unfair and deceptive and abusive acts and practices for rent-a-tribe lending relationships. The FDIC, which enforces the same statute, should similarly discourage, rather than facilitate analogous rent-a-bank relationships. Indeed, historically the FDIC has done precisely that; I served as an expert witness for the FDIC in litigation in brought against a set of State Banks that engaged in a rent-a-bank relationship with CompuCredit, an early subprime "fintech" non-bank lender.

Incredibly, the FDIC argues in the Proposed Rule that "in the absence of the proposed rule, [consumers unable to obtain credit through marketplace lenders engaged in rent-a-bank relationships] might be unable to obtain credit from State banks and might instead borrow at higher interest rates from less-regulated lenders."[43] The absurdity of this statement is astonishing. The only effect the FDIC has been able to identify from the *Madden* decision was on marketplace lending. The whole nature of marketplace lending is that it is done through rent-a-bank arrangements in states with lower usury caps. In such arrangements, the loans are for all material purposes made by the less-regulated non-bank lenders. Indeed, this is true with rent-a-bank arrangements generally. The fact that rent-a-bank lenders do not use banks in states with higher usury caps shows that banks' involvement in the loans is just window dressing for the purpose of evading usury laws.

Instead of protecting consumers from "higher interest rates from less-regulated lenders," the Proposed Rule would effectively legalize exactly those lending relationships, as long as State Banks get paid a cut. The FDIC's stated concern about consumers ending up with loans from "higher interest rates from less-regulated lenders" is impossible to square with the Proposed Rule, which lacks any limitation on assignments undertaken for the

---

[43] 84 Fed. Reg. 66850 (Dec. 6, 2019).

purpose of evading state usury laws and thus greenlights rent-a-bank lending by unregulated, high-cost lenders.

### D. The Proposed Rule Would Create a Regulatory Vacuum

State Banks are allowed the privilege of interest rate exportation under section 27. That privilege, however, comes with being subject to a comprehensive federal regulatory regime, including regular federal examination by the FDIC or CFPB for compliance with consumer financial laws. Non-bank assignees of State Banks are not subject to such a regulatory regime. Unless they fall into certain enumerated types of institutions,[44] they are not subject to any sort of federal supervisory authority for compliance with consumer financial laws. Indeed, non-bank assignees of State Banks may not even be subject to *state* supervision, as they need not be state-licensed. For example, a State Bank might assign loans to an off-shore special purpose entity, such as a Cayman Islands trust, which would be entirely outside the scope of any US regulatory authority.[45]

Congress has allowed State Banks the privilege of interest rate exportation because it is confident that the FDIC's careful regulatory stewardship of State Banks will be an adequate substitute for any particular state's usury laws. Allowing unregulated non-banks to take advantage of State Banks' interest rate exportation undermines that trade-off and creates a regulatory vacuum in which there is no meaningful consumer protection.[46]

### E. The Proposed Rule Fails to Exclude Assignments Undertaken to Evade State Usury Laws

There are some loan sale transactions, such as securitizations, that do not raise inherent consumer protection consumers, even if they do not currently comply with state usury laws. But the Proposed Rule fails to differentiate between benign transactions and malignant ones. In particular, it fails to exclude transactions undertaken to evade state usury laws, even though the anti-evasion principle is core to usury jurisprudence.[47] Indeed, the FDIC notes that it takes no position on "true lender" doctrine, which is one mode of analyzing whether a transaction is undertaken to evade state usury laws.[48]

Remarkably, the FDIC notes that it "supports the position that it will view unfavorably entities that partner with a State bank with the sole goal of evading a lower

---

[44] 12 U.S.C. §§ 1867, 5514.

[45] Elevate Financial, a fintech that has rent-a-bank relationships with two insured state banks, uses a Cayman Islands special purpose vehicle to purchase loan participations from those banks. *See* Kadhim Shubber, *Why this subprime lender funds loans through the Cayman Islands*, FIN. TIMES, Jan. 29, 2016, https://ftalphaville.ft.com/2016/01/19/2150488/why-this-texas-subprime-lender-routes-loans-through-the-cayman-islands/.

[46] Adam J. Levitin, *Hydraulic Regulation: Regulating Credit Markets Upstream*, 26 YALE J. REG. 143, 176 (2009).

[47] *See e.g.*, Miller v. Tiffany, 68 U.S. 298, 310 (1864); Seeman v. Phila. Warehouse Co., 274 U.S. 403 (1927).

[48] *See* 84 Fed. Reg. 66846 (Dec. 6, 2019).

600 New Jersey Avenue, NW Washington, DC 20001-2075
PHONE 202-662-9234  FAX 202-662-4030
adam.levitin@law.georgetown.edu

interest rate established under the law of the entity's licensing State(s)."[49] Sadly, the FDIC's statement here is not credible.[50] First, without taking a position on true lender doctrine, it is difficult to implement any sort of anti-evasion policy position.

Second, the FDIC has long permitted a number of State Banks, including Republic Bank and Trust Company of Kentucky, FinWise Bank of Utah, and Bank of Lake Mills, Wisconsin, to rent out their charters to non-banks lenders for no purpose other than facilitation of the non-banks' evasion of state usury laws. That this is the sole reason for the banks' involvement in the transactions is clear from the fact that the non-banks do not partner with banks in states where their products do not face binding usury caps. Either the FDIC is unaware of the activities of its regulatory charges—despite media coverage thereof[51]—or the FDIC is blowing smoke. While the FDIC may claim to view these transactions "unfavorably," the FDIC's amicus brief in the *Rent-Rite Super Kegs West Ltd.* litigation in support of a rent-a-bank and its lack of action to shut down these rent-a-banks telegraph's a very different policy position.

I strongly urge the FDIC, if it persists in this ill-advised rulemaking, to include a provision that clearly excludes rent-a-bank arrangements and other assignments undertaken for the primary purpose of evading state usury laws. Doing so would not only be consistent with the FDIC's consumer protection mandate—for Congress has not yet generally preempted state usury laws, even for national banks, only allowed rate exportation—but also because it is the only position that is consistent with well-established Supreme Court precedent.

Conclusion

The interest rate assignment provision of the Proposed Rule, proposed 12 C.F.R. § 331.4(e), is illegal and misguided. I urge the FDIC to abandon this provision of the Proposed Rule and get back to its job of ensuring consumers protection and the safety-and-soundness of State Banks. The FDIC should not mistake the protection of profits at the handful of bad actor banks that engage in rent-a-bank arrangements with its job of husbanding the State

---

[49] *Id.*

[50] I also note the strange oblique phrasing—"the FDIC supports the position"—whose position? Is this not the FDIC's own position?

[51] *See, e.g.*, Grace Schneider, *'Rent-a-bank' scheme? Louisville bank accused of helping companies evade interest rate limits*, LOUISVILLE COURIER JOURNAL, Nov. 21, 2019, https://www.courier-journal.com/story/news/local/2019/11/20/republic-bank-louisville-bashed-over-lending-deal-elevate/4232537002/; David Dayen, *Trump's Bank Regulators Open the Door to More Predatory Lending*, AM. PROSPECT, Nov. 19, 2019, https://prospect.org/power/trump%E2%80%99s-bank-regulators-open-the-door-to-more-predatory-lend/.

Banking industry for the benefit of American consumers.[52] The FDIC should retract the interest rate assignment provision of the Proposed Rule.

Sincerely,

Adam J. Levitin

Attachments:

(1) Amicus Curiae Brief of Professor Adam J. Levitin in Support of Appellant, *Rent-Rite Super Kegs West, Ltd., v. World Business Lenders, LLC*, No. 1:19-cv-01552-REB (D. Colo. Sept. 19, 2019).
(2) Adam J. Levitin, *'Madden fix' bills are a recipe for predatory lending*, Am. Banker, Aug. 28, 2017, https://www.americanbanker.com/opinion/madden-fix-bills-are-a-recipe-for-predatory-lending.
(3) Adam J. Levitin, Comment Letter to the Office of Comptroller of the Currency Re: Docket No. OCC-2019-0027 (RIN 1557-AE73), January 5, 2020.

---

[52] As Sir Thomas More notes in Richard Bolt's *A Man for All Seasons*, "For Wales? Why Richard, it profit a man nothing to give his soul for the whole world. . . but for Wales!" So too, the FDIC is giving its soul for a handful of bad actor rent-a-banks.

600 New Jersey Avenue, NW Washington, DC 20001-2075
PHONE 202-662-9234 FAX 202-662-4030
adam.levitin@law.georgetown.edu

**Center for Responsible Lending**
**National Consumer Law Center (on behalf of its low income clients)**
**Americans for Financial Reform Education Fund**
**Consumer Action**
**Consumer Federation of America**
**The Leadership Conference on Civil and Human Rights**
**NAACP**
**National Association of Consumer Advocates**
**National Association for Latino Community Asset Builders**
**National Coalition for Asian Pacific American Community Development (National CAPACD)**
**U.S. PIRG**

**Comments to the Federal Deposit Insurance Corporation**
**Notice of Proposed Rulemaking**
**Federal Interest Rate Authority**
**12 CFR Part 331**
**RIN 3064-AF21**

**February 4, 2020**

*Submitted via email to comments@fdic.gov*

The **Center for Responsible Lending (CRL)** is a nonprofit, non-partisan research and policy organization dedicated to protecting homeownership and family wealth by working to eliminate abusive financial practices. CRL is an affiliate of Self-Help, one of the nation's largest nonprofit community development financial institutions. Over 37 years, Self-Help has provided over $7 billion in financing through 146,000 loans to homebuyers, small businesses, and nonprofits. It serves more than 145,000 mostly low-income members through 45 retail credit union locations in North Carolina, California, Florida, Greater Chicago, and Milwaukee.

Since 1969, the nonprofit **National Consumer Law Center® (NCLC®)** has used its expertise in consumer law and energy policy to work for consumer justice and economic security for low-income and other disadvantaged people, including older adults, in the United States. NCLC's expertise includes policy analysis and advocacy; consumer law and energy publications; litigation; expert witness services, and training and advice for advocates. NCLC works with nonprofit and legal services organizations, private attorneys, policymakers, and federal and state government and courts across the nation to stop exploitive practices, help financially stressed families build and retain wealth, and advance economic fairness.

**Americans for Financial Reform Education Fund (AFREF)** works in concert with a coalition of more than 200 consumer, investor, labor, civil rights, business, faith-based, and community groups to lay the foundation for a strong, stable, and ethical financial system. Through policy analysis, public education, and outreach, AFREF works for stronger consumer financial protections and against predatory practices.

**Consumer Action** has been a champion of underrepresented consumers since 1971. A national, nonprofit 501(c)3 organization, Consumer Action focuses on financial education that empowers low to moderate income and limited-English-speaking consumers to financially prosper. It also advocates for consumers in the media and before lawmakers and regulators to advance consumer rights and promote industry-wide change particularly in the fields of consumer protection, credit, banking, housing, privacy, insurance and utilities.

The **Consumer Federation of America** is a nonprofit association of more than 250 national, state and local consumer groups that was founded in 1968 to advance the consumer interest through research, advocacy, and education. For over 50 years CFA has been at the forefront of consumer protection with a broad portfolio of issues including product safety, banking, telecommunications, investor protection, energy, housing, insurance, privacy and saving. CFA's non-profit members range from large organizations such as Consumer Reports and AARP, to small state and local advocacy groups and include unions, co-ops, and public power companies.

**The Leadership Conference on Civil and Human Rights** is a coalition charged by its diverse membership of more than 200 national organizations to promote and protect the civil and human rights of all persons in the United States. Through advocacy and outreach to targeted constituencies, The Leadership Conference works toward the goal of a more open and just society - an America as good as its ideals. The Leadership Conference is a 501(c)(4) organization that engages in legislative advocacy. It was founded in 1950 and has coordinated national lobbying efforts on behalf of every major civil rights law since 1957.

Founded in 1909, the **National Association for the Advancement of Colored People (hereinafter NAACP**) is our nation's oldest, largest and most widely known grassroots civil rights organization. The principal objectives of NAACP are to ensure the political, educational, social and economic equality of all

citizens; to achieve equality of rights and eliminate racial prejudice among the citizens of the United States; to remove all barriers of racial discrimination through democratic processes; to seek enactment and enforcement of federal, state and local laws securing civil rights; to inform the public of the adverse effects of racial discrimination and to seek its elimination; to educate persons as to their constitutional rights and to take all lawful action to secure the exercise thereof.

The **National Association of Consumer Advocates (NACA)** is a national nonprofit association of private and public sector attorneys, legal service attorneys, law professors and law students committed to representing consumers' interests. NACA's mission is to promote justice for all consumers by maintaining a forum for information-sharing among advocates across the country and to serve as a voice for its members in its work to curb unfair and abusive business practices, including predatory lending and other conduct that adversely affect consumers.

**National Association for Latino Community Asset Builders (NALCAB)** represents and serves a geographically and ethnically diverse group of more than 120 non-profit community development and asset-building organizations that are anchor institutions in our nation's Latino communities. Members of the NALCAB Network are real estate developers, business lenders, economic development corporations, credit unions, and consumer counseling agencies, operating in 40 states and DC.

**National Coalition for Asian Pacific American Community Development** (**National CAPACD**) is a progressive coalition of local organizations that advocate for and organize in low-income AAPI communities and neighborhoods. We strengthen and mobilize our members to build power nationally and further our vision of economic and social justice for all. Our members include more than 100 community-based organizations in 21 states and the Pacific Islands. They implement innovative affordable housing, community development and community organizing strategies to improve the quality of life for low-income AAPI communities.

**U.S. PIRG**, the federation of state Public Interest Research Groups, is a consumer group that stands up to powerful interests whenever they threaten our health and safety, our financial security, or our right to fully participate in our democratic society. It is part of The Public Interest Network, which operates and supports organizations committed to a shared vision of a better world and a strategic approach to getting things done.

**TABLE OF CONTENTS**

I.    Introduction and Overview .................................................................................................. 6

II.   The FDIC lacks authority under Section 27 or 24(j) of the FDIA to establish permissible rates for non-banks. ................................................................................................................................ 8

    A.   FDIA Section 27 does not provide the FDIC the authority to establish permissible rates for non-banks. ............................................................................................................... 8

    B.   Section 27 does not incorporate a right of assignment that allows a bank to assign the bank's statutory rate exportation privileges to a non-bank. .......................................... 10

    C.   The oversimplification in the proposed rule highlights the FDIC's lack of authority. .................... 14

    D.   The FDIA's preemptive force is limited. ........................................................................ 16

    E.   Dodd-Frank limits on the OCC's authority reinforce the FDIC's lack of authority to regulate interest rates of non-banks. ................................................................................ 17

    F.   Section 24(j) is unambiguously limited to state banks, not non-banks, and does not extend to assignees. ........................................................................................................... 19

III.  The FDIC wholly fails to show that preempting state usury law is necessary for the stability or liquidity of loan markets or to avoid frustrating the purposes of the FDIA. .............................. 20

    A.   Introduction ................................................................................................................... 20

    B.   Sales to debt buyers ...................................................................................................... 22

    C.   Securitization of bank loans ......................................................................................... 23

    D.   Assignment to online lenders otherwise subject to state law ....................................... 25

IV.  The FDIC's claim that this proposal will benefit consumers through access to credit is both irrelevant to the FDIC's authority to regulate non-banks, and misguided and dangerous. ...................... 26

V.   The proposal usurps the States' historical and constitutional role in our federalist system. ............ 28

VI.  The proposal fails to consider the risk it poses to consumers and small businesses. ........................ 31

    A.   The proposal fails to consider that bad actors are already engaged in predatory rent-a-bank schemes, which the FDIC and OCC are not restraining. ......................................... 32

    B.   The FDIC is supporting predatory rent-a-bank lending in the small business area. ...................... 34

    C.   The proposal fails to consider payday lenders' explicit plans in California to broadly expand rent-a-bank schemes, as well as other potential schemes that the proposal would embolden. ...................... 38

    D.   The proposal fails to consider the impact of auto title lending through rent-a-bank schemes. ..... 42

    E.   The proposal's statement that it does not address "true lender" is cold comfort as the proposal effectively encourages, rather than guards against, evasion of state law through rent-a-bank schemes. ................................................................................................................................ 43

    F.   The proposal fails to consider that it could encourage short-term payday lenders to return to rent-a-bank lending. ............................................................................................................ 44

G.   The proposal fails to consider that high-cost lenders that are or will be engaged in rent-a-bank lending make loans that severely harm financially vulnerable consumers. ..........................................46

   1.   Harm in general.....................................................................................................................46

   2.   Particular harm to communities of color. ...................................................................60

H.   The proposal is inconsistent with the agency's obligations under the Community Reinvestment Act. ...............................................................................................................................................................62

VII.  The FDIC fails to consider the risks the proposal poses to the safety and soundness of State-chartered banks, despite having long acknowledged the risks of predatory lending. ..............................62

VIII.  The FDIC fails to consider the proposal's impact on market participants that comply with state law.....................................................................................................................................................65

IX.   Conclusion...........................................................................................................................................65

**Appendix A: NCLC Fact Sheet: Stop Payday Lenders' Rent-a-Bank Schemes**

**Appendix B: Individual Borrower Experiences with Payday and Car Title Loans (Short- and Longer-Term Loans)**

I.      Introduction and Overview

We, the consumer and civil rights groups named above, write to strongly oppose the Federal Deposit Insurance Corporation (FDIC)'s proposed rule on Federal Interest Rate Authority (proposal or proposed rule).[1] The proposed rule would allow predatory non-bank lenders to route their loans through banks to evade state interest rate caps. The proposal is outside the FDIC's statutory authority; it is not justified by any evidence of problematic impact on legitimate bank operations; and the FDIC has failed to consider the strong likelihood that the proposal will unleash a torrent of predatory lending. The proposal will take away powers that states have had since the time of the American Revolution to protect their residents.

Our concerns are not speculative. The FDIC has directly supported the claim that a predatory non-bank lender, World Business Lenders, can charge 120% APR on a $550,000 loan despite Colorado law to the contrary. In that context, the FDIC used the same Chicken Little claims and revisionist history it uses to justify this proposal. The FDIC failed to restrain FDIC-supervised Bank of Lake Mills from fronting for WBL on similarly abusive loans. In the consumer space, predatory rent-a-bank lending is happening through several FDIC-regulated banks: payday installment lending at rates of 99-160% APR, and auto title lending through one bank at rates up to 222% APR. More FDIC-supervised banks are likely to follow if this proposal is finalized.

Some online lenders are responsible market participants, complying with applicable law, not evading state interest rate limits, and succeeding through efficiencies in operations, customer acquisition, and underwriting. But others seek competitive advantage by avoiding state usury laws. Some flood the market with loans at interest rates and fees of 60% to 180% APR or higher that most states ban. State-regulated lenders are increasingly looking to federal bank regulators to help them avoid state laws against high-cost loans and predatory lending.

This proposal comes as non-bank lenders have been clamoring for ways to avoid state interest rate limits.[2] It follows on the heels of the OCC's attempt, which has failed to date, to allow non-bank lenders to evade state rate caps through a special purpose charter under the National Bank Act (NBA).[3] The OCC and FDIC are now offering non-bank lenders another approach to avoiding state law, namely the so-called "bank partnership model," which this proposal threatens to endorse by broadly validating a wide array of arrangements by which a non-bank might assert a bank's exemption from state usury law.

The loans this proposal would encourage by facilitating rent-a-bank schemes are among the most exorbitantly priced, irresponsible, ugly loans on the market. These include the loans currently being

---

[1] 84 Fed. Reg. 66845 (Dec. 6, 2019).

[2] *See, e.g.*, Jeremy T. Rosenblum, *FDIC seeks comment on small-dollar lending*, Ballard Spahr's Consumer Finance Monitor, Nov. 15, 2018, https://www.consumerfinancemonitor.com/2018/11/15/fdic-seeks-comments-on-small-dollar-lending/ (noting that the "most significant[]" outcome of the FDIC's 2018 Request for Information on Small Dollar Lending would be its explicit approval of non-bank/bank arrangements "despite 'true lender' and *Madden* arguments to the contrary"); Comments to FDIC on its Request for Information on Small Dollar Lending from the Online Lenders Alliance (Jan. 2019) ("The FDIC Should Address existing Legal Impediments to the Bank-Fintech Partnership Model in Order to Facilitate Small Dollar Lending").

[3] *See Lacewell v. Office of the Comptroller of the Currency* (No. 18-cv-8377) (ruling in favor of the NY Dept. of Financial Services in striking down the OCC's special purpose charter for "fintechs"). The OCC is appealing the decision.

peddled through these schemes: high-cost installment loans and lines of credit, typically directly accessing the borrower's checking account on payday; car title installment loans; subprime business loans; and mortgages masquerading as business loans. In addition, the proposal could bring back the rent-a-bank balloon-payment payday and car title loans that have not used rent-a-bank schemes since the mid-2000s but that used the same legal arguments and similar arrangements to justify their schemes. This risk is particularly great if the FDIC weakens or rescinds its 2005 and 2013 guidances addressing payday lending.

**Our comment makes the following points in turn:**

➢ The FDIC lacks authority under Section 27 or 24(j) the FDIA to establish permissible rates for non-banks.

➢ The FDIC wholly fails to show that preempting state usury law is necessary for the stability or liquidity of loan markets or to avoid frustrating the purpose of the FDIA.

➢ The FDIC's claim that the proposal will benefit consumers through access to credit is both irrelevant to the FDIC's authority to regulate non-banks, and misguided and dangerous.

➢ The proposal usurps the States' historical and constitutional role in our federalist system.

➢ The FDIC fails to consider the risks the proposal poses to consumers and small businesses:

  o Bad actors are already engaged in predatory rent-a-bank schemes, which the FDIC and OCC are not restraining.

  o The FDIC is supporting predatory rent-a-bank lending in the small business area.

  o Payday lenders in California have explicitly stated plans to broadly expand rent-a-bank schemes; the proposal would embolden these and other new schemes.

  o The proposal would embolden additional auto title lending through rent-a-bank schemes.

  o The proposal's statement that it does not address "true lender" is cold comfort, as the proposal effectively encourages, rather than guards against, evasion of state law through rent-a-bank schemes.

  o The proposal could encourage short-term payday lenders to return to rent-a-bank lending, especially if the FDIC weakens or rescinds its 2005 and 2013 guidances addressing payday lending.

  o The proposal fails to consider that high-cost lenders that are or will be engaged in rent-a-bank lending make loans that severely harm financially vulnerable consumers.

  o The proposal is inconsistent with the agency's obligations under the Community Reinvestment Act.

➢ The FDIC fails to consider the risks the proposal poses to the safety and soundness of state-chartered banks.

➢ The FDIC fails to consider the proposal's impact on market participants that comply with state law.

**II.     The FDIC lacks authority under Section 27 or 24(j) of the FDIA to establish permissible rates for non-banks.**

**A.   FDIA Section 27 does not provide the FDIC the authority to establish permissible rates for non-banks.**

Section 27 does not provide the FDIC the authority to establish permissible interest rates for non-banks. Rather, it unambiguously sets interest rates only for "State-chartered insured depository institutions, including insured savings banks, or insured branches of foreign banks."[4] It says nothing whatsoever about rates that any non-bank entity may charge or that the assignees of a bank may charge. As the interest rate that a State-chartered depository may charge is not at issue in the proposal, Section 27 provides no authority here. (Indeed, Section 27 does not even give the FDIC the authority to regulate the interest rates that banks may charge; the statute sets that rate based on two external measures over which the FDIC has no discretion: the state's home state rate or a federal benchmark.)

The Third Circuit and numerous other courts have observed that the application of Section 27 of the FDIA is limited to banks themselves in the context of rejecting arguments that the FDIA either completely preempts[5] or provides a substantive defense[6] to usury claims against non-bank assignees. Yet that is exactly what the FDIC is trying to achieve here: preemption of state usury claims against non-bank assignees.[7] Courts have rejected similar arguments that Section 85 of the NBA provides complete preemption or a substantive preemption defense of state law claims against non-bank assignees.[8] As the

---

[4] 12 U.S.C. § 1831d(a). *See also* 12 U.S.C. § 1463(g) (preempting state usury laws regarding the interest "a savings association may charge").

[5] *In re Community Bank*, 418 F.3d 277, 296 (3d Cir. 2005); *Community State Bank v. Knox*, 523 Fed. Appx. 925 (4th Cir. 2013) (no complete preemption where consumer asserts claims against parties other than the bank, here payday lenders who claimed to be agents of an out-of-state bank); *Flowers v. EZPawn Okla., Inc.,* 307 F. Supp. 2d 1191 (N.D. Okla. 2004) ("The question of whether plaintiff's state law claims would be preempted by DIDA if brought against County Bank, however, is not the issue before the Court . . . . The state action claims are asserted against EZPawn and EZCorp, neither of which is a state-chartered, federally insured (or national) bank.").

[6] *See BankWest, Inc. v. Baker*, 411 F.3d 1289 (11th Cir. 2005), *reh'g granted, op. vacated,* 433 F.3d 1344 (11th Cir. 2005), *op. vacated due to mootness,* 446 F.3d 1358 (11th Cir. 2006); *Commonwealth v. Think Fin., Inc.*, 2016 WL 183289 (E.D. Pa. Jan. 14, 2016).

[7] FDIC Proposal, 84 Fed. Reg. at 66849 ("Through the proposed regulations implementing section 27, the FDIC would reaffirm the enforceability of a loan's interest rate by an assignee of a State bank and reaffirm its position that the preemptive power of section 27 extends to such transactions.").

[8] *Colorado ex rel. Salazar v. ACE Cash Express, Inc.*, 188 F.Supp.2d 1281 (D. Colo. 2002) (no complete preemption because "the NBA 'regulates national banks and only national banks . . .'" (quoting *Weiner v. Bank of King of Prussia*, 358 F.Supp.684, 687 (E.D. Pa. 1973)); *Eul v. Transworld Sys.*, 2017 WL 1178537 (N.D. Ill. Mar. 30, 2017) (denying motion to dismiss; "it is not so clear that NBA preemption applies to assignees of loans originated by national banks . . . . The Court is not persuaded that NBA preemption applies here as a matter of law."); *Goleta*

Third Circuit stated: "Sections 85 and 86 of the NBA and Section 521 of the DIDA apply only to national and state chartered banks, not to non-bank purchasers of second mortgage loans."[9] Even where courts find preemption, it is because the facts show that the bank is the real party in interest.[10]

Further, in the very same legislation that created Section 27, Congress explicitly preempted state law for non-banks in the context of first lien mortgages, including when non-banks are assignees of bank loans.[11] Congress's specific action in this context indicates a lack of authority for the FDIC to act more broadly under Section 27. It also makes clear that, had Congress subsequently or otherwise intended to preempt state law for non-banks in other contexts, it would have. The NBA and FDIA have no such provision and there is no evidence that the purported "valid-when-made" theory, discussed below in section B, was incorporated into interest rate provisions that are strictly about banks.

Even to the extent that, as the FDIC proposal observes, Section 27 of FDIA "is patterned after and interpreted in the same manner as Section 85" of the NBA,[12] Section 85 of the NBA does not give the OCC the authority to regulate non-banks.[13] Likewise, Section 27 cannot confer upon the FDIC the authority to regulate non-banks.

That Section 85 does not extend to non-banks is reinforced by other statutory provisions. After federal preemption played a major role in creating the financial crisis of 2008, Congress amended the NBA to add 12 U.S.C. § 25b, which makes clear that Section 85 does not extend to bank affiliates, subsidiaries, or agents. It defies logic that Congress would have intended it to extend to unaffiliated non-banks.[14] While Section 25b does not alter or affect the authority of a "national bank" to make loans under Section 85, the section makes no reference to any authority of non-bank assignees to charge interest.[15] Indeed, the few courts that have found preemption of state usury laws in situations involving assignees

---

*National Bank v. Lingerfelt,* 211 F. Supp. 2d 711 (E.D.N.C. 2002) (granting motion to dismiss action by payday lender, who claimed to be bank agent, seeking to enjoin state enforcement action because "the NBA patently does not apply to non-national banks").

[9] *In re Community Bank*, 418 F.3d 277, 296 (3d Cir. 2005).

[10] *See Krispin v. May Department Store,* 218 F.3d 919 (8th Cir. 2000); *Discover Bank v. Vaden*, 489 F.3d 594, 601 (4th Cir. 2007) (finding bank is real party in interest, but if it is not, "the FDIA does not apply because [the named defendant] is not a bank"), *rev'd and remanded*, 556 U.S. 49 (2009); *see also CashCall, Inc. v. Morrisey*, 2014 WL 2404300 (W. Va. May 30, 2014) (noting that the parties agree that the claims against the purported bank agent would be preempted if the bank were the true lender but it was not).

[11] 12 U.S.C. § 1735f-7a(a)(1)(C)(v). *See also* S. REP. 96-368, 1980 U.S.C.C.A.N. 236, 254-55 (1980) ("It is the committee's intent that loans originated under this usury exemption will not be subject to claims of usury even if they are later sold to an investor who is not exempt under this section.").

[12] FDIC Proposal, 84 Fed. Reg. at 66845; *id.* at 66847 ("courts and the FDIC have consistently construed section 27 *in pari materia* with section 85.").

[13] *See* Comments of the undersigned groups to the OCC on its Notice of Proposed Rulemaking, Permissible Interest on Loans That Are Sold, Assigned, or Otherwise Transferred, Jan. 22, 2020, https://www.responsiblelending.org/sites/default/files/nodes/files/research-publication/comment_to_occ_on_rent_a_bank_plan_with_appendices.pdf.

[14] 12 U.S.C. § 25b(b)(2), (3), and (h)(2).

[15] 12 U.S.C. § 25b(f).

generally did so in a context where the assignee was related to the bank *and* before Congress overturned preemption for subsidiaries, affiliates and agents.[16] Thus, to the extent the FDIC looks to Section 85 as analogous, Section 85 is limited by Section 25b and does not support a broad interpretation of Section 27 to reach interest charges by non-banks.

Section 85 and Section 27 have nothing to do with non-banks. Further, federal preemption is part and parcel with the obligation to submit to federal supervision. Once a loan is assigned, there is no federal bank supervision of the assignee. The legislative drafters certainly did not contemplate non-banks as beneficiaries of interest rate preemption.

>  **B. Section 27 does not incorporate a right of assignment that allows a bank to assign the bank's statutory rate exportation privileges to a non-bank.**

The FDIC proposal seeks to write into Section 27 a right for banks to assign to non-banks the right to charge rates permitted State banks under that section. The FDIC makes a number of dramatic leaps in its reasoning that far outstretch the meaning of the statute and overstate the agency's authority.

First, the FDIC claims that the power to make loans "implicitly" carries with it the power to assign loans, "and thus, a State bank's statutory authority under Section 27 to make loans at particular rates necessarily includes the power to assign the loans at those rates."[17] But Section 27 has nothing to do with the right to assign loans or even the power to make loans; it is about what interest rates the *bank* can charge. State-chartered banks do have the power to assign loans, but it comes from their state charters, not from Section 27. The FDIC acknowledges as much, stating that the "inherent authority of State banks to assign loans that they make is consistent with State banking laws, which typically grant State banks the power to sell or transfer loans . . . ."[18] The FDIC seeks to transform power granted by state law into an "inherent authority" under an unrelated provision of federal law—and then to turn that power back on states by preempting their laws. The FDIC also cites the power of national banks under the National Bank Act, but that too has nothing to do with what Section 27 authorizes. The FDIC's resort to the "implicit" and "inherent" authority under Section 27 is essentially an admission that the authority does not reside in that section.

The FDIC claims that "[d]enying an assignee the right to enforce a loan's terms would effectively prohibit assignment and render the power to make the loan at the rate provided by the statute illusory."[19] Even if this were true, it would only prohibit assignment— a right not governed by Section 27— not the right to charge the rates authorized by Section 27. But the claim that limiting the rate that a non-bank assignee may charge would completely prevent assignment is absurd. Enforcing the state law to which the non-bank is subject may affect the price of the sale, but it would not "effectively prohibit" it, as discussed in section III.C below.

The FDIC then states that the "ability of a non-bank assignee to enforce interest-rate terms is also

---

[16] *See, e.g., Krispin v. May Department Stores*, 218 F.3d 919 (8th Cir. 2000).

[17] FDIC Proposal, 84 Fed. Reg. at 66848.

[18] *Id.*

[19] *Id.*

consistent with fundamental principles of contract law."[20] Again, even if this were true as applied to a situation where the assignee is subject to different laws, that does not mean that the common law of assignment is incorporated into Section 27. Nor do state contract law principles give the FDIC any authority to issue the proposed rule or to preempt state usury laws. The FDIC acknowledges as much, stating that the "FDIC's interpretation of Section 27 . . . is not based on the common law 'valid when made' rule . . . ."[21]

The FDIC's view of the so-called "valid-when-made" rule is thus irrelevant to this rulemaking or to the FDIC's authority. But to the extent the FDIC somehow relies on it, we will address the issue.

The proposal asserts that, since common law generally allows assignment of contract rights, common law provides banks the right to assign their *status* derived from a federal statute. This is not so. The common law governs only rights under the contract, not rights under the law that are outside the contract. The bank's status as a depository institution and its exemption from state law is not an assignable contract right. It is a privilege State-chartered banks enjoy, provided by Section 27 of the FDIA, because they are federally insured banks. OCC Comptroller Hawke described the nature of this privilege in 2002; though he was discussing national banks, his point applies to State-chartered banks as well—particularly in light of Section 27's being "patterned after and interpreted in the same manner as section 85"[22]:

> The benefit that national banks enjoy by reason of [preemption] cannot be treated as a piece of disposable property that a bank may rent out to a third party that is not a national bank. Preemption is not like excess space in a bank-owned office building. It is an inalienable right of the bank itself.[23]

Just because something is legal under a contract for one party does not mean that it is legal for an assignee:

- Banks may accept deposits, but they could not assign a deposit agreement to a non-bank and thereby give it the legal right to accept deposits and receive deposit insurance.
- A doctor may sell her medical practice in State A, but a doctor from State B would not be able to exercise his rights to the practice if he does not have a license in State A.
- Someone who is ineligible for or has failed to follow the requirements for a license to run a food service business cannot get into that business by purchasing a restaurant contract with a mall and arguing that the contract gives them the right to run the restaurant.
- State-licensed lenders typically have the authority to charge interest rates above the baseline usury rate, but that privilege may come with the requirement of state approval, due diligence vetting, bonding requirements, state supervision, and reporting requirements. States will not

---

[20] *Id.*

[21] *Id.*

[22] FDIC Proposal, 84 Fed. Reg. at 66845.

[23] Remarks by John D. Hawke, Jr., Comptroller of the Currency, Before the Women in Housing and Finance at 10 (Feb. 12, 2002), https://www.occ.treas.gov/news-issuances/speeches/2002/pub-speech-2002-10.pdf.

necessarily allow a licensed lender to simply originate and then assign a loan to an unlicensed entity that does not have authority to lend, collect or service loans in the state.[24]

And just because a contract has a term, and contracts are generally enforceable, does not mean that every contractual term is enforceable. Usury laws exist to protect borrowers from lenders' overreaching regardless of the rate at which the parties could otherwise contract.[25]

The cases that the FDIC cites in support of "valid-when-made" are interpreting state usury law, which the FDIC lacks the authority to interpret—not federal banking law. There is not the slightest bit of evidence that Congress incorporated those principles into the rate exportation provisions of the NBA or FDIA, which, as discussed above, are strictly limited to the rates that banks can charge. Indeed, the preemption caselaw mentioned above says the opposite: that the NBA and FDIA are limited to the interest rates that banks can charge, not their assignees.

Moreover, the purported valid-when-made cases the agency cites as support do not even stand for the principle that the FDIC claims. Two 19th Century Supreme Court cases interpreting state usury laws, *Nichols v. Fearson* and *Gaither v. Farmers & Mechs. Bank of Georgetown*, merely hold that the interest rate on a loan will not be *recalculated*—potentially resulting in a higher, usurious rate—based on subsequent transactions.[26] This means, for example, that a loan at a legal rate will not become usurious later if it is sold at a discount (so that the effective rate of return for the purchaser is higher than for the original lender) or if a note is pledged as security for a second, usurious transaction.[27]

Neither of those cases addresses the situation where the assignee is subject to a different set of laws—and whether that differential legal treatment can be assigned—much less whether a state-regulated lender governed by state usury law may be assigned a loan at the rate permitted only to the assignor. Indeed, this situation would have rarely existed prior to the enactment of the NBA and, in practice, did

---

[24] Indeed, in the OCC's proposal, it acknowledged three exceptions to this "normal" rule of assignability, one of which is where the contract involves "obligations of a personal nature." OCC Proposal, 84 Fed. Reg. at 64239 (citing Williston on Contracts § 74:10 (4th ed.). The other two exceptions noted are where the assignment would materially change the duty of the obligor or materially increase the obligor's burden or risk under the contract. *Id.* Though the bank's preemptive status is a right of the bank and not an obligation, the notion is informative. It is a right "personal" to the national bank derived exclusively from its status as a national bank, and it may not be assigned.

[25] Indeed, longstanding common law and usury jurisprudence holds that, in any event, contracts designed to evade state interest rate limits are unenforceable. *Miller v. Tiffany*, 68 U.S. 298, 307–10, 17 L. Ed. 540 (1863) (holding that while contractual choice of law provisions for usury are enforceable, when done with intent to evade the law, the law of the contract location applies). *See also Seeman v. Philadelphia Warehouse Co.*, 274 U.S. 403, 408, 47 S. Ct. 626, 628, 71 L. Ed. 1123 (1927) (echoing holding in *Miller v. Tiffany* that "the parties must act in good faith, and that the form of the transaction must not 'disguise its real character'"); *Stoddard v. Thomas*, 60 Pa. Super. 177, 181 (1915) (noting that in deciding choice of law provisions, "[a] person may contract to pay at the rate of interest of the place of the contract or the place of performance unless the place is fixed to escape the usury laws").

[26] FDIC Proposal, 84 Fed. Reg. 66848, n.35 (citing *Nichols v. Fearson*, 32 U.S. (7 Pet.) 103, 109 (1833) and *Gaither v. Farmers & Mechs. Bank of Georgetown,* 26 U.S. (1 Pet.) 37, 43 (1828)).

[27] For a longer discussion, see Amicus Curiae Brief of Professor Adam J. Levitin In Support Of Appellant, *Rent-Rite Super Kegs West., Ltd.*, No. 1:19-cv-01552-REB (D. Colo. Sept. 19, 2019).

not become an issue until the 1978 *Marquette* decision; before then, banks were subject to state interest rate laws in the states where they made loans.

Two more recent cases the FDIC cites in support of its "valid when made" proposal similarly shed no light on the ability to assign immunity from the law. *FDIC v. Lattimore Land Corp.*[28] dealt only with whether a choice of law provision in the contract becomes invalid as the result of a partial assignment of a note to a national bank. The court applied the "normal choice of law rules."[29]

The cited portion of *FDIC v. Tito Castro Constr. Co.* merely states that a borrower's voluntary action in delaying payment does not make the loan usurious.[30] The loan in *Tito* "was at all times below the Puerto Rico usury ceiling."[31] Another case the FDIC cites involving an assignee is an interpretation of one particular state law, not an interpretation of the NBA or FDIA, and does not support the FDIC's assertion of authority to preempt state usury law through the instant rule.[32]

Indeed, despite the hysteria over *Madden* supposedly overturning a cardinal rule of usury, the Second Circuit in *Madden* did not even address what state usury law permits or whether New York usury applied (as opposed to Delaware law, which does not limit interest rates, as specified in the contract).[33] Rather, it addressed whether, under *federal* law, national bank interest rate preemption applied to assignees (holding it does not) and whether the preemption standard that otherwise applies to national banks (NBA Section 25) was met in the context of debt buyers (holding it was not). The valid-when-made issue, on the other hand, is one of the interpretation of state law, not federal.[34]

---

[28] FDIC Proposal, 84 Fed. Reg. 66848, n.35 (citing *FDIC* v. *Lattimore Land Corp.,* 656 F.2d 139 (5th Cir. 1981)) ("a contract which in its inception is unaffected by usury can never be invalidated by any subsequent … transaction.").

[29] *Lattimore*, 656 F.2d at 148.

[30] FDIC Proposal, 84 Fed. Reg. 66848, n.35 (citing *FDIC* v. *Tito Castro Constr. Co.,* 548 F. Supp. 1224, 1226 (D.P.R. 1982)). The court states: "[I]t was only as a consequence of defendant's election to delay in repaying the principal amount of those [demand] notes that an effective rate of interest in excess of the Puerto Rico statutory ceiling may have resulted." *FDIC* v. *Tito Castro Constr. Co.,* 548 F. Supp. at 1226.

[31] *Id.*

[32] *Olvera v. Blitt & Gaines, P.C.,* 431 F.3d 285, 286, 289 (7th Cir. 2005) (interpreting Illinois law). In *Rent-Rite Super Kegs West. Ltd.,* 603 B.R. 31 (Bankr. D. Colo. 2019), the court, like the FDIC, relied on cases interpreting state laws; misinterpreted the older usury cases that do not address whether an assignee is subject to a different set of laws; cited pre-Dodd-Frank cases dealing with subsidiaries; and relied on other inapposite cases. In *Phipps v. F.D.I.C.,* 417 F.3d 1006 (8th Cir. 2005), the bank itself, and not the non-bank, was the entity that charged the interest. *FDIC v. Lattimore Land Corp.,* 656 F.2d 139 (5th Cir. 1981), held that state usury laws are not preempted when the bank is an assignee, not the originator.

[33] In *Madden*, after finding that the NBA did not preempt state usury laws as applied to debt buyers, the Second Circuit remanded to the district court to address the usury law issue of whether the account's choice of law provision (Delaware law) determined the relevant state usury cap or whether New York's criminal usury statute applied. 786 F.3d at 254. The Seventh Circuit allowed a debt buyer to charge the rates allowed for its assignor, but did so as a matter of Illinois law, not rate exportation. *See Olvera v. Blitt & Gaines, P.C.*, 431 F.3d 285 (7th Cir. 2005).

[34] The Second Circuit asked, first, does the NBA's preemption provision address the interest rates that non-bank assignees may charge? The answer under the NBA, and also under the FDIA, is clearly no. The court next,

Finally, the FDIC claims that it is filling a "statutory gap" because "Section 27 does not state at what point in time the permissibility of interest should be determined in order to assess whether a State bank is taking or receiving interest in compliance with section 27."[35] The FDIC notes that situations may arise after a contract has been made, such as a change of usury laws in the state in which the bank is located, or a change in the Federal commercial paper rate. This reasoning shows the extent to which the FDIC is grasping at straws. The U.S. Constitution prohibits states from impairing the obligation of contracts,[36] so a state could not reduce its usury rate and then apply the lower rate retroactively to existing contracts.

To the extent that the FDIC is merely addressing what rate a *bank* may charge under Section 27, it may look to the interpretation of state usury laws in coming up with a reasonable interpretation of Section 27 as to the bank.  But the only relevant statutory gap in Section 27 for purposes of this rulemaking is a complete gap in the FDIC's authority to set the rates for non-banks. Contrary to the FDIC's claim, it is quite clear under Section 27 at what point in time the Section 27 rate ceases to determine the permissible rate: once the bank is no longer charging the interest.

### C.  The oversimplification in the proposed rule highlights the FDIC's lack of authority.

As proposed, even the part of proposed 331.4(e) not addressing sale or assignment is an oversimplified and overbroad attempt to distill centuries of common law in a number of different contexts into a single sentence with a single conclusion: "Whether interest on a loan is permissible under section 27 of the Federal Deposit Insurance Act is determined as of the date the loan was made."

As proposed, the rule would seem to suggest that the interest rate is permissible even if the bank later raises it above the usury rate. But this should not be permitted. For example, in a low rate environment, a bank may peg a loan's adjustable interest rate to an index with no cap; if an increase in that index later raises the rate on the loan above the rate permitted under federal law, the bank should not be permitted to charge interest in excess of that usury limit.

Or, what if the bank later charged a fee that was determined, under the law of the bank's home state, to be "interest" and thus to push the rate above the state usury cap? Some of the so-called "valid-when-made" cases are really about whether a fee such as a late fee is interest. States may say it is not, and that a consumer's later choice to pay late does not make a loan, valid at its inception, usurious. But in some states, or in some situations—i.e., when a late fee is planned and is really an evasion[37]—a late fee

---

addressing the preemption standard that otherwise applies to national banks, asked if applying state usury laws to the non-bank assignees in *Madden* (debt buyers) would significantly interfere with the powers of a national bank. The answer is clearly no. As discussed below, there are even stronger grounds to extend preemption to a state-chartered bank as *Barnett Bank* preemption does not apply. Third, the Second Circuit asked what does state usury law and state choice-of-law law permit. Those are state law issues outside the FDIC's authority.

[35] FDIC Proposal, 84 Fed. Reg. at 66848.

[36] U.S. Const'n, Art. I, Section 10, Clause 1.

[37]  S.D. Dep't of Labor & Reg'n, Div. of Banking, *In the Matter of Dollar Loan Center of South Dakota*, LLC, Order No 2017-2, Cease and Desist and License Revocation Order (finding payday lender's late fee, which accounting for 90.22 percent of the income from the loans, to be interest violating the state's new usury cap), https://dlr.sd.gov/news/releases17/nr091317_dollar_loan_center_order.pdf; *Metro Hauling, Inc. v. Daffern*, 723 P.2d 32 (Wash. Ct. App. 1986) (addition of a default interest rate to a contract after the consumer has already

or some other type of fee charged later may in fact be interest that must fall under the usury cap. What if the contract says that the consumer has the option of paying a fee in the future—so that the fee is not deemed to be interest—but later facts show that the fee was really required?[38]

Case law provides real examples of loans that were found usurious due to subsequent events. For example, one court stated the general rule that "the contract must in its inception require a payment of usury or it will not be held a violation of the statute and it may not be judged after some default of the borrower, which default alone authorizes penalties or forfeitures which, if exacted in the beginning, would have been a violation of the statute."[39] But the court also noted that a later payment of accelerated interest "does not invalidate the note *unless* the clause is so used or abused as to make the charge for the use of the money greater than the rate of interest allowed by the statute."[40] That is, in some circumstances a later event or charge *can* make a loan usurious that was not usurious at inception.

Similarly, another court stated the general rule—one of the situations covered by the principle that later events do not make a loan usurious—that a contingent payment generally does not make a loan usurious even if a later contingent payment gives the creditor a higher rate than the usury rate.[41] But the court noted that because the contingency in the instant case—inflation—was likely, not remote, and because the inflationary charges did in fact push the rate above the usury rate, then an extra charge pegged to applying inflation to the loan principal was usurious: "Because the stated interest rate of the loan was the maximum allowed under the Pennsylvania usury law,… this extra charge was usurious."[42]

These are just a few of the myriad of situations that courts—when interpreting state usury laws— have grappled with. In many of those cases, courts have recited the principle that the FDIC labels "valid-when-made." But the result is not always to find that a loan is not usurious.

The FDIC does not have the authority to reduce all of these complicated scenarios under state law to a single federal rule that says that no matter what happens in the future, no matter what how the bank changes the rate or no matter what rates or fees it imposes in the future, there is never usury.

---

defaulted is usury if rate exceeds usury cap, as there is no contingency at that point); *Loigman v. Keim*, 594 A.2d 1364 (N.J. Super. Ct. Law Div. 1991) (dicta) (usury statute does not apply to interest on defaulted obligations, but that narrow exception does not apply where default is expected); *see also Souden v. Souden*, 844 N.W.2d 151 (Mich. Ct. App. 2013) (finding evidence insufficient to determine whether sporadically imposed charges were late charges or interest).

[38] *See, e.g.*, Penny Crosman, *A payday lender in disguise? New York investigates the Earnin app*, American Banker (April 3, 2019) (New York Department of Financial Services investigating Earnin for disclosing that it charges no fees or interest, while restricting users' credit limits when they do not pay "tips").

[39] *Unity Plan Fin. Co. v. Green*, 179 La. 1070, 1083, 155 So. 900, 905 (1934) (*quoting Sharp v. Mortgage Security Corporation of America*, 215 Cal. 287, 9 P.2d) 819, 820 (1932)).

[40] *Id.* at 1087 (emphasis added).

[41] *Olwine v. Torrens*, 2344 A.2d 665, 667 (Pa. 1975).

[42] *Id.*

Indeed, the proposed federal rule is especially overreaching given that state-chartered banks are governed by their *home state's usury laws,* not the FDIC's. The FDIC has no authority to preempt the home state's usury laws if those laws make subsequent events relevant in some situations.

### D.   The FDIA's preemptive force is limited.

The FDIA's regulation of federally insured state-chartered depositories is limited and has a narrow preemptive scope.[43] Federal regulation of state-chartered depositories is minimal.[44] The FDIA created the FDIC for the purpose of protecting consumers from failed banks by making deposit insurance available.[45] That purpose is unlikely to conflict with state law, and courts have been reluctant to find that the FDIA preempts state law because states retain primary authority over state banks and savings associations.[46]

Courts have also held that the FDIC's opinions on matters of preemption are not entitled to deference,[47] a conclusion that is all the more sound in light of Congress's decision to clarify that the OCC's preemption determinations are not entitled to deference. In discussing the FDIA's rate exportation provisions, a number of courts have discussed the limited nature of FDIA preemption in concluding that the FDIA does not completely preempt state law claims.[48]

---

[43] *Thomas v. US Bank*, 575 F.3d 794 (8th Cir. 2009) (finding "a close examination of the statutory language indicates Congress very clearly intended the preemptive scope of DIDA to be limited to particular circumstances"); *BankWest, Inc. v. Baker*, 411 F.3d 1289 (2005), *reh'g granted, op. vacated*, 433 F.3d 1344 (11th Cir. 2005), *op. vacated due to mootness*, 446 F.3d 1358 (11th Cir. 2006)*; see also* FDIC General Counsel Letter 02-06 (Dec. 19, 2002) (Michigan retail installment act was not preempted except for the interest rates), https://www.fdic.gov/regulations/laws/rules/4000-10180.html.

[44] *See, e.g.*, FDIC Senior Deputy General Counsel Letter (Sept. 12, 2003), *available online in supplemental materials to NCLC*, Consumer Credit Regulation (2d ed. 2015), *updated at www.nclc.org/library*, https://library.nclc.org/sites/default/files/FDIC-ltr-06.pdf ("The FDIC, however, does not routinely examine institutions for compliance with state laws, and the enforcement of state laws is not a primary focus of the FDIC's supervisory activities.").

[45] *BankWest, Inc. v. Baker*, 411 F.3d 1289, 1301-02 & n.22 (2005), *reh'g granted, op. vacated*, 433 F.3d 1344 (11th Cir. 2005), *op. vacated due to mootness*, 446 F.3d 1358 (11th Cir. 2006); *Griner v. Synovus Bank*, 818 F. Supp. 2d 1338 (N.D. Ga. 2011).

[46] *See, e.g.,* BankWest Inc., 411 F.3d at 1301-02 & n.22, *reh'g granted, op. vacated*, 433 F.3d 1344 (11th Cir. 2005), *op. vacated due to mootness*, 446 F.3d 1358 (11th Cir. 2006); *Griner*, 818 F. Supp. 2d at 1338.

[47] *BankWest, Inc.,* 411 F.3d at 1301-02 & n.22; *Griner,* 818 F. Supp. 2d at 1338.

[48] *Thomas v. US Bank*, 575 F.3d 794, 798-99 (8th Cir. 2009) (Missouri law claims involving fees on second mortgages charged by California-chartered bank not preempted; both the substantive and remedy provisions of DIDA "clearly indicate[] the limited nature of the federal statue's preemption of state law"); *Robinson v. First Hawaiian Bank*, 2017 WL 3641564 at *6 (D. Haw. Aug. 24, 2017) (no complete preemption of overdraft fee claims because under DIDA "state law is preempted *only if* and when a specific interest rate comparison test is met" (original emphasis)); *Griner v. Synovus Bank*, 818 F. Supp. 2d 1338 (N.D. Ga. 2011) (finding no complete preemption of claims involving overdraft fees where the language of DIDA "underscores the narrowness of the preemptive effect"), *appeal after remand*, 739 S.E.2d 504 (Ga. Ct. App. 2013)  (finding no substantive preemption). Complete preemption is a doctrine that converts a plaintiff's state law claim into one under federal law for purposes of federal court jurisdiction.

In addition, the FDIA's rate exportation provision applies only to interest rates and related fees, and not to licensing laws, loan terms unrelated to the interest rate, or most other state consumer credit laws.[49] Thus, federal authority to export rates "does not prevent states from enforcing consumer protection and lending laws other than interest-rate related limitations."[50] It is possible that a state's own usury laws may give a non-bank assignee of a state-chartered bank the right to charge the contract rate.[51] But the FDIC has no power to compel that result.

### E.   Dodd-Frank limits on the OCC's authority reinforce the FDIC's lack of authority to regulate interest rates of non-banks.

It is especially inappropriate for the FDIC to assert broad preemption powers—or to extend preemption to non-bank assignees—in light of Congress's rebuke in 2010 of the OCC's preemption activities, "which [Congress] believed planted the seeds 'for long-term trouble in the national banking system."[52] "[T]he simple failure of federal regulators to stop abusive lending"[53] had been "a major cause" of "a financial crisis that nearly crippled the U.S. economy."[54] In the years leading up to the crisis, the OCC continued to staunchly defend preemption while ignoring the writing on the wall, clear to so many others: that foreclosures on predatory, unaffordable mortgage loans would bring the economy to its knees.[55] States had been preempted from regulating *any* mortgage lender (bank or non-bank) on the very terms that made many mortgages dangerous: balloon payments, negative amortization, variable rates, and other nontraditional terms.[56] A total of over $700 billion in risky loans were made by entities that states could not touch. By enacting Section 25b, Congress aimed to "address an environment where abusive mortgage lending could flourish without State controls."[57]

---

[49] *See BankWest, Inc.,* 411 F.3d at 1289.

[50] FDIC Chairman Powell Letter to North Carolina Attorney General Roy Cooper (Apr. 27, 2005), *available online in supplemental materials to NCLC*, Consumer Credit Regulation (2d ed. 2015), *updated at www.nclc.org/library*, https://library.nclc.org/sites/default/files/fdic-payday-lending-042705.pdf.

[51] *See, e.g., Olvera v. Blitt & Gaines, P.C.*, 431 F.3d 285, 286, 289 (7th Cir. 2005).

[52] *Lusnak v. Bank of America*, 883 F.3d 1185, 1189 (9th Cir. 2018) (quoting S. Rep. No. 111-176, at 2 (2010)).

[53] *Lusnak*, 883 F.3d at 1189 (quoting The Creation of a Consumer Financial Protection Agency to Be the Cornerstone of America's New Economic Foundation: Hearing Before S. Comm. On Banking, Hous., and Urban Affairs, 111th Cong. 82 (2009) (Statement of Travis Plunkett, Legislative Director, Consumer Federation of America)).

[54] *Lusnak*, 883 F.3d at 1189 (quoting S. Rep. No. 111-176, at 2 (2010)). *See also* Testimony of Eric Stein, Center for Responsible Lending, Before the Senate Committee on Banking, Housing and Urban Affairs Hearing (2008), https://www.banking.senate.gov/imo/media/doc/STEINTestimony101608Final.pdf.

[55] Testimony of Martin Eakes, Center for Responsible Lending, Before the Senate Committee on Banking, Housing and Urban Affairs Hearing On The Office of the Comptroller of the Currency's Rules on National Bank Preemption and Visitorial Powers (2004), https://www.banking.senate.gov/imo/media/doc/eakes.pdf.

[56] *See* The Financial Crisis Inquiry Commission, The Financial Crisis Inquiry Report, pgs. xxiii, 111-113, 126.

[57] *Lusnak,* 833 F.3d at 1189 (quoting S. Rep. No. 111-176, at 17).

Section 25b provides that "[s]state consumer financial laws are preempted only if . . . [the law] prevents or significantly interferes with the exercise by the national bank of its powers."[58] It requires "substantial evidence" of that interference,[59] and imposes clear procedural requirements for reaching such conclusion.[60]

But it also makes clear that OCC preemption does not extend beyond national banks. Putting the matter beyond any conceivable doubt, Congress enshrined into statute, no fewer than three separate times, the principle that state laws, including state consumer laws governing the cost of credit, apply to bank *affiliates and subsidiaries*—except for those that are themselves chartered as banks—to the same extent they apply to any other non-bank entity. Congress made clear that this is true "notwithstanding" Section 85. For example, Section 25b(e) states:

> Notwithstanding any provision of [Title 62 of the Revised Statutes (which includes Section 85)]…a State consumer financial law shall apply to a subsidiary or affiliate of a national bank (other than a subsidiary or affiliate that is chartered as a national bank) to the same extent that the State consumer financial law applies to any person, corporation or other entity subject to such State law.

Section 25b(b)(2) is to similar effect:

> [Title 62]…[does] not preempt, annul, or affect the applicability of any State law to any subsidiary or affiliate of a national bank (other than a subsidiary or affiliate that is chartered as a national bank).

Section 25b(h) extends this same clarification to "agents" of national banks:

> Clarification of law applicable to nondepository institution subsidiaries and affiliates of national banks…
>
> No provision of [title 62]…shall be construed as preempting, annulling, or affecting the applicability of State law to any subsidiary, affiliate, or agent of a national bank (other than a subsidiary, affiliate, or agent that is chartered as a national bank).[61]

Three times Congress declared this rule, and three times it articulated its sole exception (for subsidiaries or affiliates chartered as national banks).

Had Congress intended to add an exception for assignees, it would have done so—as it did in another part of the FDIA, discussed above in section II.A.[62] The clear language of Section 25b forecloses the

---

[58] 12 U.S.C. § 25b(b)(1)(B) (emphasis added); *see also Lusnak*, 833 F.3d at 1191-92 (Dodd-Frank made clear that *Barnett* is the legal standard for NBA preemption).

[59] 12 U.S.C. § 25b(c) (emphasis added).

[60] 12 U.S.C. §§ 25b(b)(1)(B); 25b(b)(3).

[61] 12 U.S.C. § 25b(h)(2).

[62] As noted above, under the *same* legislation that enacted Section 27 of the FDIA, Congress *did* extend mortgage preemption to nonbank entities including assignees. 12 U.S.C. §§ 1735f-7, 1735f- a. In fact, Section 1735f-

OCC's, and the FDIC's, attempt to write into the statute an additional exception for assignees. This would produce the nonsensical result of privileging mere contractual counterparties of national banks—or State banks—over subsidiaries, affiliates and agents of national banks—even those that are wholly owned by a national bank. No reading of the NBA or FDIA, together or apart, would support this outcome.

Thus, while Section 85 exempts *banks* from state usury limits without such a showing under 25b, it does not exempt non-banks. Moreover, Section 25b makes clear that Congress does not intend preemption to extend to any entity other than a bank. Even assuming *arguendo* that the OCC could theoretically preempt state law for some aspects of the sale of loans, there is no basis for doing so in this context of usury laws. The OCC did not engage in the required procedural requirements, and the substantive evidence would not show substantial interference with a power necessary to the business of banking. The limits on the OCC's preemptive authority reinforce the FDIC's lack of authority to promulgate the proposed rule.

F. **Section 24(j) is unambiguously limited to state banks, not non-banks, and does not extend to assignees.**

In addition to citing Section 27 as authority for the proposed rule, the agency also cites Section 24(j) of the FDIA. To be sure, Section 24j does not provide the FDIC with any independent authority to preempt state law or issue the proposed rule. The OCC is the only agency with the authority (limited though it is) to determine what state laws are preempted by the NBA. If those laws regard community reinvestment, consumer protection, fair lending, or the establishment of intrastate branches are preempted, then out-of-state branches of state banks need not comply with them. But it is not within the FDIC's authority to promulgate a rule determining what laws are preempted as to national banks and thereby, by extension, to certain state bank branches.

No reading of the NBA and FDIA Section 24(j) support that the federal interest rate preemption or rate exportation should extend to non-bank assignees. Section 24(j), like Section 85 of the NBA, unambiguously does not apply to assignees, and its preemptive effect is limited by Section 25(b) just as Section 85 is.

Section 24(j)(1) provides the following, unambiguously limited to banks:

(1) Application of host State law

The laws of a host State, including laws regarding community reinvestment, consumer protection, fair lending, and establishment of intrastate branches, shall apply to any **branch** in the host State **of an out-of-State State bank** to the same extent as such State laws apply to a branch in the host State of an out-of-State national bank. To the extent host State law is

---

7a(a)(1)(C)(v) refers to the specific circumstance in which a mortgage loan is sold to a nonbank investor. *See also* S. REP. 96-368, 1980 U.S.C.C.A.N. 236, 254-55 (1980) ("It is the committee's intent that loans originated under this usury exemption will not be subject to claims of usury even if they are later sold to an investor who is not exempt under this section."). Congress knew how to preempt usury rates for nonbank assignees, and it chose not to do so in Section 1831d.

inapplicable to a **branch of an out-of-State State bank** in such host State pursuant to the preceding sentence, home State law shall apply to such **branch**.[63]

Congress does not address assignees in this provision, even while it did address assignees in the limited context of first lien mortgages, as discussed above. Moreover, any preemptive right a State bank derives from Section 24(j) is limited by Section 25(b)'s clarification that Section 85 does not extend to bank affiliates, subsidiaries, or agents—much less unrelated, non-bank assignees.

Finally, with respect to Section 24(j), to whatever extent the FDIC asserts that its authority to promulgate the proposed rule derives from the OCC's finalization of the OCC's proposal, the FDIC's proposal is premature.

### III. The FDIC wholly fails to show that preempting state usury law is necessary for the stability or liquidity of loan markets or to avoid frustrating the purposes of the FDIA.

#### A. Introduction

The FDIC makes an almost casual argument that "[r]estrictions on assignees' abilities to enforce interest rate terms would result in extremely distressed market values for many loans, frustrating the purpose of the FDI Act."[64] The FDIC's reference to "frustrating the purpose of the FDI Act" appears to be an attempt to make a preemption argument based on the FDIA.

Yet the FDIC does not cite to any section or purpose of the FDIA that would be frustrated. The only sections of the FDIA that it cites as authority for this rule are Sections 24(j) and 27, in addition to the general rulemaking authority of Section 10(g), 12 U.S.C. § 1820(g). But the FDIC's general rulemaking authority must be employed to implement a provision of the FDIA. It does not give the FDIC *carte blanche* to write rules untethered to the Act—much less to preempt state law. Yet the FDIC does not cite any such provision, nor does the agency produce any evidence that any purpose of the FDIA is actually being being frustrated by a state law. (The FDIC does not even cite any state law—it only focuses on the *Madden* decision, which was an interpretation of the NBA, not of a state law.)

The FDIC does have the authority to ensure the safety and soundness of the banks that it supervises and to protect the deposit fund and depositors. But the FDIC offers no remotely compelling case that the proposal or the preemption of state usury laws is necessary to protect safety and soundness.

The FDIC does not even produce any evidence of distressed markets for any loans. The FDIC's assertion that this proposal is necessary for bank operations is based on claims that are not only irrelevant to its authority but also either clearly erroneous or plainly unsupported.

The FDIC generally notes the importance of loan sales to State banks' operations, including liquidity and risk diversification.[65] It claims that "[u]ncertainty regarding the enforceability of interest rate terms may hinder or frustrate loan sales, which are crucial to the safety and soundness of State banks'

---

[63] 12 U.S.C. § 1831a(j) (emphasis added).

[64] FDIC Proposal, 84 Fed. Reg. at 66848.

[65] *Id.* at 66845.

operations."[66] Yet despite its claim that the proposal is needed to address this uncertainty,[67] and the nearly five years since the *Madden* decision, the proposal does not claim that the *Madden* decision has had any significant impact on banks' relationships with debt buyers or with any other market participants, let alone one that impacts safety and soundness. To the contrary, the FDIC states that it "is not aware of any widespread or significant negative effects on credit availability or securitization markets having occurred to this point as a result of the *Madden* decision."[68]

The proposal suggests that *Madden* has negatively impacted marketplace lending, but critically offers zero evidence that *Madden* has negatively impacted *banks* in the context of marketplace lending (or in any other context). The proposal notes that an analyst predicted that the Supreme Court's denial of the appeal of *Madden* would be "generally credit negative" for marketplace loans and related asset-backed securities because it would "extend uncertainty" about the applicability of state law to these platforms.[69] But this was merely a prediction made in 2016.

The proposal states that research has found reductions of marketplace credit to "higher risk borrowers," citing two studies.[70] One study showed a drop in marketplace lending for subprime borrowers by three lenders in the Second Circuit after the *Madden* decision, especially for those borrowers with FICO scores below 644. Again, that study does not suggest any impact on banks, as the FDIC's proposal already acknowledges no significant impact on securitization markets. Moreover, that finding was about a tiny part of the marketplace loan market; the study showed that these lenders offered only miniscule amounts of credit in the low FICO range even before the *Madden* decision.[71] To the extent that *Madden* made it harder to offer high-cost loans in the tens of thousands of dollar range typical of marketplace lenders to borrowers already overburdened with credit, that is probably a good result from a policy perspective. And it is certainly no evidence of an impact on bank safety and soundness or other legitimate FDIC grounds for preempting state law.

The second study the proposal cites also finds a drop in marketplace lending in New York and Connecticut post-Madden, and particularly to lower income borrowers, yet also finds no impact on banks.[72] Moreover, the study does not support its claimed showing of harm, bankruptcy or otherwise, as it suffers from clear methodological and interpretive errors. The study does not adjust for debt, which biases the analysis and findings, even as prior research makes clear the flaws of modeling the

---

[66] *Id.*

[67] *Id.* at 66849.

[68] *Id.* at 66850; see also *id.* at 66845 ("The FDIC is not aware of any broad effects on credit availability having occurred as a result of *Madden*.").

[69] *Id.* at 66850 (citing Moody's).

[70] *Id.* at 66850, n. 46.

[71] *See* Colleen Honigsberg, Robert Jackson and Richard Squire, *How Does Legal Enforceability Affect Consumer lending? Evidence from a Natural Experiment*, *Journal of Law and Economics,* vol. 60, Fig. 4 (Before and After Madden Charts) (Nov 2017).

[72] 84 Fed. Reg. at 66850, n.46 (citing Piotr Danisewicz and Ilaf Elard, *The Real Effects of Financial Technology: Marketplace Lending and Personal Bankruptcy* (July 5, 2018)).

bankruptcy decision without adjusting for debt, assets, and overall net-worth.[73] In addition, loan volume does not include mortgages, even as they relate to personal bankruptcy decisions, or other debts, despite prior marketplace loan studies finding that other debts play an important role in default.[74] Moreover, the study's use of raw numbers in the parallel trends comparisons (Figure 1) across geographic units with unequal population sizes is not suitable; per-capita measures are the appropriate unit of comparison.[75] In reality, credible research suggests that marketplace lending may deepen debt burden and lead to increased defaults on that or other debt, particularly for those who are already credit constrained.[76]

Particularly in light of the lack of evidence supporting any need for the proposal, it is extraordinarily broad. Without limitation as to the parties involved, the means by which the party came to possess the debt, the purposes and circumstances surrounding the party's acquisition of the debt, the outrageousness of the interest rate, or the impact on the bank, the proposal would exempt any holder of a bank-originated debt from otherwise applicable state law. An analysis of the potential impact on different markets, which the FDIC fails to conduct in any meaningful way, shows that state usury laws as to non-bank assignees do not create any safety or soundness problems or otherwise frustrate the purposes of the FDIA.

**B. Sales to debt buyers**

For all of the focus on the *Madden* case, the FDIC fails to discuss the case's specific context and finding. The Second Circuit directly addressed the impact on national banks of applying state usury laws to debt buyers. The court specifically found that "state usury laws would not prevent consumer debt sales by national banks to third parties," and although "it is possible that usury laws might decrease the amount a national bank could charge for its consumer debt in certain states (i.e., those with firm usury limits like New York), such an effect would not 'significantly interfere' with the exercise of a national bank power."[77]

The FDIC does not take issue with this finding. There is no evidence that the FDIC's proposal is necessary to sustain banks' business with debt buyers or their sales of debt as a liquidity and risk management

---

[73] *See* Fay, S., Hurst, E., and White, M., *The Household Bankruptcy Decision*, American Economic Review, 92 (3): 706-718, (2002).

[74] *See* Chava, S., Paradkar, N., & Zhang, Y., *Winners and Losers of Marketplace Lending: Evidence from Borrower Credit Dynamics* (2017); *see also* Wang, H., & Overby, E., *How Does Online Lending Influence Bankruptcy Filings? Evidence from a Natural Experiment*, Academy of Management Proceedings (1) : 15937 (2017).

[75] The paper suffers from additional methodological flaws, as well as inaccurate summation of findings. For example, it interprets post-*Madden* trends into the third year, but it includes no third year data.

[76] *See* Chava, S., Paradkar, N., & Zhang, Y., *Winners and Losers of Marketplace Lending: Evidence from Borrower Credit Dynamics* (2017) (finding that over time, borrowers from one large marketplace lender increased their risk of defaulting on consumer credit, and particularly so for credit constrained borrowers); *see also* Wang, H., & Overby, E., *How Does Online Lending Influence Bankruptcy Filings? Evidence from a Natural Experiment*, Academy of Management Proceedings (1) : 15937 (2017) (finding that state approval of one large marketplace lender leads to an increase in bankruptcy filings by leading some borrowers to overextend themselves financially, leading to increases in bankruptcy of 4-10%).

[77] *Madden v. Midland Funding, L.L.C.*, 786 F.3d 246, 251 (2d Cir. 2015).

tool, and certainly no evidence that limiting the interest that debt buyers can charge would impact the safety and soundness of state-chartered banks. And it is not even clear that the *Madden* ruling has meaningfully altered the price at which banks sell their defaulted debts, or even the price at which they can do so. Debt buyers already purchase at a steep discount, often not more than 10 cents on the dollar, based on a wide range of factors, most far more significant than the additional interest added to a principal that will never be collected in full. Indeed, the only impact of adding additional interest at high rates on top of already unaffordable debt is to bury struggling consumers under a load they may never escape. Thus, the FDIC's decision to attempt to overturn the Second Circuit's decision as to debt buyers lacks any support and is far outside the agency's authority.

### C. Securitization of bank loans

The FDIC discusses the benefits of banks' ability to securitize loans on the secondary market, including to comply with risk-based capital requirements and manage their liquidity.[78] Securitization of loans and revolving credit agreements can be a tool that banks use in the furtherance of their own legitimate bank lending programs that are not fronting for a third party. But securitization can also be an aspect of an operation that is designed to evade state usury law.

The questions that the FDIC has left unanswered are (1) whether the *Madden* decision is having any impact on legitimate, non-evasive bank securitization markets in a way that impacts the FDIC's authority over safety and soundness, and (2) even if there are safety and soundness concerns, whether those concerns justify a complete exemption from state usury laws for every securitization vehicle and every assigned loan, in every conceivable circumstance.

The FDIC quotes one law firm's *projection*, published the year *Madden* was decided, predicting that "[d]epository institutions will likely see a reduction in their ability to sell loans originated in the Second Circuit due to significant pricing adjustments in the secondary market."[79] But the proposal offers zero evidence that this has in fact occurred. Rather, as noted earlier, the FDIC states it "is not aware of any widespread or significant negative effects."[80] The OCC, as well, offered no evidence to the contrary.

In reality, the *Madden* ruling has had, and will likely have, limited if any impact,[81] and the proposed rule is not necessary for bank liquidity. The largest securitization market by far is the mortgage market. State usury laws are already preempted for almost all first mortgages. And there is no evidence of any impact on the market for second mortgages by banks. (Yet, as discussed in section VI below, the proposed rule could legitimize predatory rent-a-bank second mortgages of the sort made by non-bank World Business Lenders, which has used FDIC-supervised Bank of Lake Mills and Liberty Bank Inc. as a front and to make home-secured loans at rates of 73% APR or higher.)

The second largest securitization market is the auto loan market. Most auto loans are originated by dealers, not banks, and thus are subject to state usury laws. Auto loans originated by depositories

---

[78] FDIC Proposal, 84 Fed. Reg. at 66851.

[79] *Id.* at 66850, n.44 (citing "Madden v. Midland Funding: A Sea Change in Secondary Lending Markets," Robert Savoie, McGlinchey Stafford PLLC, p.3).

[80] *Id.* at 66850.

[81] We are aware of no evidence that *Madden* has negatively impacted any bank's stock price, for example.

generally are not securitized. To the extent they are or are otherwise sold on the secondary market, there is no evidence that *Madden* has impacted the health of any aspect of the auto loan market.

Some private student loans are securitized, but those loans are typically at low rates that do not exceed state usury caps. There is no evidence of any impact on the student loan market.

There are questions about the impact of *Madden* on the credit card securitization market in light of the recent suits filed alleging that the *Madden* decision requires the interest on credit cards to follow state law if the receivables are sold to a non-bank securitization trust. The FDIC appears to allude to these cases in its proposal.[82]

However, these are mere allegations early in a lawsuit with an uncertain impact—certainly insufficient to justify an overbroad rule that will have tremendous far reaching impacts and harms to consumers. There is no evidence of any broader impact to date on the credit card markets. Moreover, in one of these cases, a magistrate judge has now recommended that the court rule in favor of the securitization trust. While we have concerns about the breadth of the magistrate's reasoning,[83] the initial ruling for the bank does highlight that it is premature to broadly preempt centuries-old usury laws without any evidence that they are impacting banks.

We take no position here on whether or not state usury laws apply to credit cards once the receivables are assigned to a credit card securitization trust.[84] But even if state usury laws do apply to a specific securitization, the mere fact that a bank might have to restructure some securitization vehicles or consider other secondary market options does not mean that it would have a significant enough impact on the safety and soundness of state-chartered banks to give the FDIC the authority to preempt state usury laws. In addition to presenting no evidence that banks have been impacted by *Madden*, the proposal fails to consider that a significant option for State banks seeking liquidity and diversification of risk for high-cost loans is to securitize and sell them to other depository institutions that likewise benefit from their own interest rate-exportation privilege. The FDIC has adduced no evidence that this option is insufficient to avoid any safety and soundness impacts related to bank liquidity or risk diversification.

---

[82] FDIC Proposal, 84 Fed. Reg. at 66845 ("Moreover, the [*Madden*] decision continues to cause ripples with pending litigation challenging longstanding market practices.").

[83] *Petersen* v. *Chase Card Funding, LLC et al.*, Case 1:19-cv-00741-LJV-JJM, Report and Recommendation (Jan. 22, 2020) (W.D. N.Y. filed June 6, 2019).

[84] As discussed above, under the FDIC's interpretation of "valid-when-made," state usury laws would allow the initial contract rate to continue. Moreover, even if "valid-when-made" does not encompass the right to step into the legal shoes of an entity subject to different laws, courts might well view the bank as the true and continuing lender even after assignment of receivables to a passive securitization vehicle. That is, courts might conclude that the bank is continuing to charge the interest as either a matter of federal rate exportation or as a matter of exemptions for depositories under state law. In a far cry from the high-cost rent-a-bank market or even the marketplace loan market, the banks in the credit card cases appear to market, offer, take applications for, underwrite, approve, issue and set the terms of the credit and have a continuing interest in the credit by owning and servicing the accounts (and, likely, having a significant interest in the interest paid). No one of these factors is determinative; in some high-cost rent-a-bank schemes, as well, the bank may claim to "own" the account and "charge" the interest through its agent. But the credit card securitization trusts, unlike rent-a-bank lenders, are not independent lenders and do not appear to have a significant role or economic interest in the lending programs other than in securitizing the receivables. The banks that offer the credit cards already have the right to charge the rate permitted by their home state and have no need to create vehicles to evade usury laws.

### D.  Assignment to online lenders otherwise subject to state law

A third context to which the proposed rule would apply is lending programs in which a non-bank company that would otherwise be subject to state law has a significant role in the loan program but uses a bank to originate its loans. Typically the non-bank is involved both on the front end—designing the loan program, marketing the loans to consumers or small businesses, taking and processing applications—and on the back end, servicing and collecting the loans and owning or benefiting from the assigned loans or receivables. The bank nominally makes underwriting decisions, but often using criteria, software, or analysis primarily designed or provided by the non-bank company. In more recent incarnations, the bank may claim to retain ownership of the "loan" or "account" and only to sell receivables. The bank may retain a share of the receivables, but the non-bank company typically has the larger share of the economic interest in the program.

Sanitized as a "bank partnership model," these arrangements can be used by companies that charge rates that, while below 36%, are still high and may, for some loans, exceed what states allow, especially for larger loans. Or these models can be used by predatory lenders charging extraordinary rates.

Some of these models operate with brazen openness about the centrality of evasion of state usury laws. Publicly available documents, like a presentation by a prominent fintech law firm, eliminate any doubt as to how the "bank partnership" model works: the bank originates the loan; the loan acquires the bank's right to ignore usury laws in all states but the bank's home state; and the non-bank handles the marketing, consumer interactions, servicing and/or other tasks associated with the loan.[85]

One slide from the presentation provides:[86]
> *How Do Bank Partnerships Work?*

- Non-bank entity partners with a state FDIC-insured chartered bank or a federally chartered bank to help the bank originate the loan;
- Federal law gives the bank the ability to charge the interest rate permitted to it by its home state to people in every state ("rate exportation");
- Non-bank partner provides marketing and loan processing assistance up front, as well as purchasing, servicing, and collections activities on the back end.

Another states:[87]
> *How Do Bank Partnerships Work?*
> 1) A non-bank partner enters into a contractual relationship with a Bank.
> 2) Under the terms of the relationship, the Bank originates the loans, applying its own credit underwriting guidelines.
> 3) The non-bank partner, through its employees, may act as an agent for the bank in the states where the borrowers are located.

---

[85] *Bank Partnership and the Valid-When-Made Doctrine: an Update on Madden v. Midland*, Catherine M. Brennan, Meghan Musselman and Joseph Vitale, Hudson Cook, Thirteenth Annual Consumer Financial Services Conference (April 2016), https://catherinembrennan.files.wordpress.com/2016/04/madden-panel.pdf.

[86] *Id.*

[87] *Id.*

4) The non-bank partner may receive the borrower's loan application and forward it, usually by electronic means, to the Bank.
5) The Bank approves or rejects the application. If approved, the Bank funds the loan from its location.
6) After the Bank makes the loan, the non-bank partner who acted as the bank's agent for purposes of loan origination may purchase it. The purchase usually takes place within seconds of the loan being made and the entire transaction is usually handled electronically.
7) By agreement with the non-bank partner, the Bank often retains a small (perhaps 5%) participation interest in the loan or sells the whole loan.
8) By agreement, the non-bank lender often guarantees or indemnifies the bank for the risk it assumes in originating the loans.

Whatever the merits of the lending programs, these are programs predominantly run by non-bank companies that are and should be subject to state law. While the bank purportedly applies its own credit underwriting guidelines and approves lending decisions, in practice key decisions are led by the non-bank.[88]

It does not support the safety and soundness of state-chartered banks to prevent evasion of state law. (As discussed in section VII below, it *threatens* safety and soundness.) This is not a legitimate FDIA purpose protected by the Supremacy Clause or supported by any other federal law. These bank-partnership programs are not designed primarily to help banks with their liquidity or their own businesses. The FDIC has no authority to preempt state law in order to help banks monetize their rate exportation privileges. By no stretch is the safety and soundness of State-chartered banks impacted by an inability to engage in these schemes. And the FDIC has identified no other aspects of federal law under its authority that conflict with the application of state usury laws to a non-bank assignee when the bank's role in the lending program is minor compared to that of the non-bank entity.

The FDIC not only wholly fails to justify any need for its proposal. It also fails to consider the vast implications of its proposal—the impact on state laws, and the consequences for consumers and small businesses, State-chartered banks, and non-banks that operate in compliance with state law. We address these in turn in the following sections.

### IV.   The FDIC's claim that this proposal will benefit consumers through access to credit is both irrelevant to the FDIC's authority to regulate non-banks, and misguided and dangerous.

The proposal makes the following deeply troubling assertion in its discussion of the proposed rule's expected effects:

> Particularly in jurisdictions affected by *Madden,* to the extent the proposed rule results in the preemption of State usury laws, some consumers may benefit

---

[88] As but one indication of the lender's control over the business, note Elevate's discussion of its control over its products' APRs: "We aim to manage our business to achieve a long-term operating margin of 20%, and do not expect our operating margin to increase beyond that level, as we intend to pass on any improvements over our targeted margins to our customers in the form of lower APRs. We believe this is a critical component of our responsible lending platform and over time will also help us continue to attract new customers and retain existing customers." Press Release: 10Q, Elevate Credit, Inc. (Aug.10, 2018).

> from the improved availability of credit from State banks. For these consumers, this additional credit may be offered at a higher interest rate than otherwise provided by relevant State law. However, in the absence of the proposed rule, these consumers might be unable to obtain credit from State banks and might instead borrow at higher interest rates from less-regulated lenders.[89]

As an initial matter, even if this statement were true, it should not be mistaken, by the FDIC or others, as a basis of authority for the FDIC to preempt state law--much less usury laws, which are a core consumer protection law.

Moreover, this statement is grossly unfounded, and in fact runs counter to the trove of evidence showing that usury limits are the single greatest protection against predatory lending. We know of no compelling evidence showing that consumers in states with lower interest rate caps are worse off by not having access to higher-rate loans. As described below, the high-cost rent-a-bank lending that the proposal would encourage is deeply destructive to consumers. And evidence indicates that even other lending aimed at those with substantial credit card debt may ultimately harm, rather than improve, their financial health.[90]

At the same time, investors view this proposal as "a strong endorsement" of Enova and Elevate[91]—predatory high-cost lenders who are charging sky-high rates, several-to-many times higher than that state rate caps they are evading. The consumer complaints in section VI of these comments, along with over 150 borrower experiences in Appendix B, offer some evidence of the wrongheadedness of the FDIC's assertion here.

The FDIC's assertion, which essentially encourages off-balance sheet lending by banks, is particularly striking given the enactment of NBA Section 25b in the immediate aftermath of the financial crisis. The foreclosure crisis that gave rise to the broader financial collapse demonstrated that when banks hold loans on their balance sheets, they are less likely to put borrowers into loans that the borrowers ultimately will be unable to repay. Higher-cost loans are more likely to produce this outcome because borrowers who struggle to repay loans at lower interest rates generally find it even more difficult to cover higher costs. Originators tend to better assess borrower ability to repay when they plan to hold onto the loans themselves, than when they plan to off-load the loans to investors.

---

[89] FDIC Proposal, 84 Fed. Reg. at 66850.

[90] *See, e.g.,* Sudheer Chava et al, Winners and Losers of Marketplace Lending: Evidence from Borrower Credit Dynamics (September 30, 2017). Georgia Tech Scheller College of Business Research Paper No. 18-16, https://ssrn.com/abstract=3178322 or http://dx.doi.org/10.2139/ssrn.3178322 (finding that compared to comparable peers with unmet credit demand, marketplace loan borrowers initially improved their credit card balances and credit scores but in the next two years, they had higher indebtedness and higher default likelihood, with the effects more pronounced for constrained borrowers); AnnaMaria Andriotis, Wall Street Journal, "FICO Changes Could Lower Your Credit Score" (Jan. 23, 2020), https://www.wsj.com/articles/fico-changes-could-lower-your-credit-score-11579780800 (rising debt levels–i.e., access to more credit–could lead to lower credit scores),

[91] On file with National Consumer Law Center.

## V.    The proposal usurps the States' historical and constitutional role in our federalist system.

States have a long-standing, well-recognized interest in determining the policies best suited to prevailing conditions and priorities within state borders. As compared with the federal government, States are more familiar, accessible and accountable to their constituencies and can more nimbly develop policies to address the problems they face.[92] With good reason, the Constitution preserves the rights and role of States within our federalist republic. And as the Supreme Court made plain soon after the NBA's enactment, and reiterated many times since, banks are "governed in their daily course of business far more by the laws of the States than of the nation."[93]

The proposal fails to recognize States' historical and primary role in regulating and enforcing usury and the way that the proposal would undermine that role. The FDIC's authority is State-chartered banks, non-bank lenders. In our federalist system, states have always been the primary regulator of non-bank lenders. Yet the proposed rule threatens to deprive states of their historic power by allowing non-bank lenders to use banks as a fig leaf to avoid state consumer protection laws.

Interest rate limits are the simplest and most effective protection against predatory lending.[94] Since the time of the American Revolution, states have set interest rate caps to protect their residents from predatory lending.[95] In more recent years, a handful of states eliminated their rate caps, others carved out limited exceptions for short-term payday loans (some since reversed), and a combination of federal and state laws exempt most banks from interest rate limits.[96] But the vast majority of states retain interest rate caps for non-bank installment loans and lines of credit.[97]

---

[92] *See Gregory v. Ashcroft*, 501 U.S. 452, 458 (1991) (stating that federalism "assures a decentralized government that will be more sensitive to the diverse needs of a heterogenous society" and "allows for more innovation and experimentation in government").

[93] *National Bank v. Commonwealth*, 9 Wall. 353, 362 (1870) ("[National banks] are subject to the laws of the State, and are governed in their daily course of business far more by the laws of the State than of the nation. All their contracts are governed and construed by State laws. Their acquisition and transfer of property, their right to collect their debts, and their liability to be sued for debts, are all based on State law. It is only when the State law incapacitates the banks from discharging their duties to the government that it becomes unconstitutional."); *see also Davis v. Elmira Savings Bank*, 161 U.S. 275, 290 (1896) ("Nothing, of course, in this opinion is intended to deny the operation of general and undiscriminating state laws on the contracts of national banks, so long as such laws do not conflict with the letter or the general objects and purposes of Congressional legislation"); *First Nat. Bank in St. Louis v. Missouri*, 263 U.S. 640, 656 (1924) (national banks "are subject to the laws of a State in respect of their affairs unless such laws interfere with the purposes of their creation, tend to impair or destroy their efficiency as federal agencies or conflict with the paramount law of the United States"); *Atherton v. F.D.I.C.*, 519 U.S. 213, 223, 117 S. Ct. 666, 672, 136 L. Ed. 2d 656 (1997); *Watters v. Wachovia Bank, N.A.*, 550 U.S. 1, 11 (2007) ("Federally chartered banks are subject to state laws of general application in their daily business to the extent such laws do not conflict with the letter or the general purposes of the NBA."); *Epps v. JP Morgan Chase Bank, N.A.,* 675 F.3d 315, 320 (4th Cir. 2012).

[94] *See* NCLC, *Misaligned Incentives: Why High-Rate Installment Lenders Want Borrowers Who Will Default* (July 2016), https://www.nclc.org/issues/misaligned-incentives.html.

[95] James M. Ackerman, *Interest Rates and the Law: A History of Usury*, 1981 Ariz. St. L.J. 61 (1981).

[96] *See generally* NCLC, Consumer Credit Regulation (2d ed. 2015), updated at www.nclc.org/library.

[97] *Id.*

At least 43 states and the District of Columbia (DC) impose interest rate caps on some consumer loans. Among those that cap rates, the median annual rate including all fees is 36.5% for a $500, six-month loan, 31% for a $2000, two-year loan, and 25% for a $10,000, five-year loan.[98] While payday lenders are pushing hard at the state level to make high-cost long-term payday loans legal in more states, the large majority of state legislatures have rejected these efforts. In addition, sixteen states plus DC have interest rate caps that prevent short-term payday loans, a number that has grown by several over the last decade.

Notably, state laws often provide a comprehensive risk-based licensing and rate regime under which non-banks operate. For example, almost all states have a low usury limit at which even unlicensed, unsupervised lenders may lend, but permit a higher usury rate for licensed lenders. Essentially, in exchange for being allowed to charge a higher rate, the lender subjects itself to supervision and examination. As another example, as reflected in the prior paragraph, many states set lower rate limits on larger loans than they do on smaller loans, in light of the higher overall costs involved.

States are typically successful in enforcing their interest rates against the products to which interest rate caps apply.[99] But the FDIC's proposal risks undermining these regulatory landscapes and severely hamstringing states' ability to enforce rate caps.

High-cost lenders are notoriously relentless in their efforts to evade state usury laws (and any other law intended to rein them in) .[100] In the late 1990s and early 2000s, lenders attempted to evade the usury laws applying to balloon-payment payday loans through rent-a-bank schemes (see section VI.F below). The FDIC put an end to its supervisee-banks' involvement in these schemes, citing "inherent risks associated with payday lending activities" [101] and unsafe or unsound practices, as well as unfair or

---

[98] See Carolyn Carter et al., NCLC, P*redatory Installment Lending in 2017: States Battle to Restrain High-Cost Loans* (Aug. 2017), http://bit.ly/2vRZkEf; Carolyn Carter et al., NCLC, *A Larger and Longer Debt Trap? Analysis Of States' APR Caps For A $10,000 5-year Installment Loan* (Oct. 2018), overview http://bit.ly/2QOp6AG and full report, http://bit.ly/instloan18; *see also* NCLC, *State Annual Percentage Rate (APR) Caps for $500, $2,000, and $10,000 Installment Loans* (2019), https://www.nclc.org/images/pdf/high_cost_small_loans/fact-sheet-apr-caps-for-installment-loans.pdf.

[99] *See* Diane Standaert and Brandon Coleman, *Ending the Cycle of Evasion:  Effective State and Federal Payday Lending Enforcement* (2015), Center for Responsible Lending, http://www.responsiblelending.org/payday-lending/research-analysis/crl_payday_enforcement_brief_nov2015.pdf.

[100] For example, high-cost lenders evaded the 2006 federal Military Lending Act until its more comprehensive regulations in 2015, and they schemed to evade the CFPB's payday lending rule as it was being developed. For a fuller discussion of the myriad ways high-cost lenders have engaged in evasion, see Comments of CRL, NCLC, CFA, and additional consumer and civil rights groups to CFPB on its Proposed Rule on Payday, Vehicle Title, and Certain High-Cost Installment Loans, Oct. 7, 2016, at 35-40, https://www.responsiblelending.org/sites/default/files/nodes/files/research-publication/crl_payday_comment_oct2016.pdf.

[101] *See* Republic Bancorp, Inc., SEC Form 8-K (Feb. 24, 2006), *available at* https://www.sec.gov/Archives/edgar/data/921557/000110465906011951/a06-5812_18k.htm (where Republic Bancorp discloses that its Indiana bank has exited the payday loan arrangement after the FDIC cited "inherent risks associated with payday lending activities"); *see also* Robert Schoenberger, *Republic to Get Out of Payday Loans; FDIC Urged Bank to Exit Business*, The Courier-Journal, Mar. 3, 2006.

deceptive practices, involved in a supervisee's "rent-a-BIN" arrangement.[102] Other federal regulators ultimately shut down these schemes for payday loans as well.[103]

With that option foreclosed, payday and other high-cost lenders turned to a similar sham whereby they claimed that a Native American tribe, which they argued was not subject to state law, was the true lender.[104] Notably, one such lender was Think Finance and its CEO Ken Rees, who were sued by the State of Pennsylvania in 2014 for violating the state's usury law by peddling 448% APR loans through a sham partnership with a Native American tribe. In 2019, Think Finance settled that lawsuit by agreeing to pay 80,000 Pennsylvanians $130 million.[105] CFPB also sued Think Finance for pursuing payments and collecting on loans that violated state usury laws and were thus void under state law.[106]

Back in 2014, Think Finance spun off its loan portfolio to a new company, Elevate[107]—which, undeterred by the exposure of one ruse, quickly and brazenly entered into a rent-a-bank scheme with FDIC-supervised Republic Bank for its Elastic product, and later entered into a scheme for its Rise product as well, with FinWise Bank. The FDIC's proposal plays right into the hands of high-cost lenders and their unceasing efforts to evade interest rate and other consumer protection laws.

Maxine's story, which she shares in the documentary film *Let My People Go*, illustrates the relevance of state usury law in the lives of individuals and families:

> *I was like, "Collateral? Isn't my paychecks enough?" They said, "Sometimes, if you lose your job, we'll lose our money. So, we need something more." So, that's whenever my husband said, "Well, we have our vehicle." He was working, so my check paid for the loan and then we kind of lived off of his. So, I was a day late, 243.60, and I paid it anyways. I thought everything was okay, came up to Rapid to the celebration for Black Hills Powwow. My son . . . and his cousin were outside, and they said, "Mom, there's some men by the Suburban." And I said, "For what?" "I*

---

[102] *See In the Matter of First Bank of Delaware, and CompuCredit Corporation*, Notice of Charges for an Order to Cease and Desist and For Restitution, FDIC, FDIC-07-256b, FDIC-07-257k, *available at* https://www.fdic.gov/news/news/press/2008/FBD_Notice_of_Charges.pdf (finding that the bank had operated in violation of Section 5 of the FTC Act (addressing unfair or deceptive practices) and "without effective oversight" of third-party lending programs, and ordering the termination of the "rent-a-BIN" . . . arrangement).

[103] In 2000, the OCC and the Office of Thrift Supervision (OTS) issued guidance that by 2003 stopped national banks and federal thrifts from participating in these schemes. *See* OCC Advisory Letter No. AL 2000-10 (Nov. 27, 2000), https://occ.gov/news-issuances/advisory-letters/2000/advisory-letter-2000-10.pdf. *See also* Office of Thrift Supervision, Letter P-2000-4 (Feb. 3, 2000) (OTS will conduct examinations of the thrift's partner in payday lending to the same extent as it will of the thrift).

[104] *See Consumer Financial Protection Bureau v. CashCall, Inc.*, 2016 WL 4820635 (C.D. Cal. Aug. 31, 2016).

[105] *Pa. Attorney General Announces Payday Loan Relief Settlement*, KDKA 2CBS Pittsburgh, July 24, 2019, https://pittsburgh.cbslocal.com/2019/07/24/think-finance-payday-loan-settlement/.

[106] CFPB, *CFPB Sues Think Finance For Collecting On Debts That Consumers Did Not Legally Owe*, Nov. 15, 2017, https://www.consumerfinance.gov/about-us/newsroom/cfpb-sues-think-finance-collecting-debts-consumers-did-not-legally-owe/.

[107] *Think Finance Announces Business Restructuring and Spinoff of New Company, Elevate*, BusinessWire, May 1, 2014, https://www.businesswire.com/news/home/20140501006196/en/Finance-Announces-Business-Restructuring-Spinoff-New-Company.

> *don't know. They want to see you and dad." . . . . So, we went out there and, here it was, a tow truck, and they came and they said, "Your car is being repossessed." I said, "For what? I paid down." And the man said, "Apparently [] you didn't pay them." And I said, "But all of our things are here. My whole family, I brought my whole family," and he said, "That's not our problem. You people should pay your bills."*
>
> *Maxine's family witnessed around 30 vehicle repossessions at the powwow.*[108]

Maxine lives in South Dakota, which in 2016 voted to cap rates at 36%, and car title lenders left the state. The FDIC's proposal would embolden their return. The FDIC fails to consider the proposal's impact on millions of consumers like Maxine, residing not only in South Dakota, but in all states with interest rate caps aimed at high-cost lending, and in all states who might like to enact those caps in the future.

### VI.   The proposal fails to consider the risk it poses to consumers and small businesses.

The FDIC's proposal fails to consider the devastating impact it could have on consumers and small businesses, even as the risk is clear. Indeed, predatory lenders have long hoped for the banking regulators to issue this very proposal. After the proposal was released, one investment advisor wrote in its investment notes:

> "Enova received a strong endorsement from banking regulators in support of its bank partnership model, which is a key aspect of its California growth strategy moving forward (Elevate Credit [ELVT, MP] is also a beneficiary of these developments)."[109]

Similarly, when the FDIC issued its Request for Information on small dollar lending in late 2018, an attorney who represents payday lenders wrote:

> "[P]erhaps *most significantly*, this RFI could serve as a vehicle for the FDIC to confirm that, in a properly structured loan program between a bank and a non-bank marketing and servicing agent, the Federal Deposit Insurance Act authorizes state-chartered banks to charge the interest allowed by the law of the state where they are located, without regard to the law of any other state, despite "true lender" and *Madden* arguments to the contrary."[110]

High-cost products currently using rent-a-bank schemes are longer-term installment payday loans, lines of credit, vehicle title installment loans, subprime business loans, and mortgages masquerading as

---

[108] *Source: Let My People Go,* a 30-minute documentary from the Center for Responsible Lending and South Dakotans for Responsible Lending, illuminating the harms that payday and vehicle title borrowers experienced in South Dakota and the 2016 ballot initiative that led to these lenders' exit from the state. A full transcript of the documentary was submitted to the docket to the CFPB's proposed repeal of the ability-to-repay provisions of its Payday, Vehicle Title, and Certain High-Cost Installment Loans rule, ID CFPB-2019-0006-51897, https://www.regulations.gov/document?D=CFPB-2019-0006-51897; the documentary may be viewed here: https://www.captheratesd.com/let-my-people-go/.

[109] On file with National Consumer Law Center.

[110] Jeremy T. Rosenblum, *FDIC seeks comment on small-dollar lending*, Ballard Spahr's Consumer Finance Monitor, Nov. 15, 2018, https://www.consumerfinancemonitor.com/2018/11/15/fdic-seeks-comments-on-small-dollar-lending/ (emphasis added).

business loans. The proposal would also clearly embolden a return of short-term balloon-payment payday loans and balloon-payment vehicle title loans.

### A.   The proposal fails to consider that bad actors are already engaged in predatory rent-a-bank schemes, which the FDIC and OCC are not restraining.

The proposal fails to consider that rent-a-bank schemes are already underway with several FDIC-supervised banks, in addition to a predatory small business lender scheme with an OCC-supervised bank. In these comments, we focus on the most egregious examples of lenders making loans far in excess of 36%. But even 36% is a very high rate, and most states limit large loans well below that level. For example, the median rate cap in the states on a $10,000, 5-year loan is 25% APR, and New York limits loans over $25,000 to 16% APR. The limits on mortgage rates are often lower than that. Efforts to evade state usury caps are inappropriate even if the rates do not reach the triple digits.

With respect to consumer loans, we are aware of four FDIC-supervised banks engaging in rent-a-bank schemes that include high-cost payday installment loans, lines of credit, auto title loans, or auto repair loans.

FDIC-supervised **Republic Bank & Trust** (chartered in Kentucky) and **FinWise Bank** (chartered in Utah) are helping three high-cost lenders, **OppLoans**, **Elevate**, and **Enova**, make installment loans or lines of credit in excess of 100% APR in a total of at least 30 states and the District of Columbia (DC) that do not allow such high rates.[111]

OppLoans offers $500 to $4,000 installment loans through FinWise Bank at 160% APR in 24 states and the District of Columbia (DC) that do not allow that rate.[112] FinWise sells the receivables back to OppLoans or a related entity. OppLoans makes loans directly through a state license in states that allow high rates.

Elevate Credit uses FinWise Bank to originate **Rise** installment loans at 99% to 149% APR in 16 states and DC that do not allow those rates and in other states through a state license.[113] FinWise sells a 95% interest in the loans to an entity controlled by Elevate for which Elevate is the primary beneficiary.[114]

Elevate also offers a line of credit called **Elastic** that carries an effective APR of up to 109% in 14 states and DC that do not allow that rate on a line of credit.[115] Elevate uses Republic Bank & Trust of Kentucky

---

[111] For details on rent-a-bank lending, see NCLC, *Fact Sheet: Stop Payday Lenders' Rent-a Bank Schemes!* (Dec. 2019), http://bit.ly/StopRent-a-BankSchemes ("Rent-a-Bank Fact Sheet"), also attached as Appendix A, and NCLC, *Issue Brief: FDIC/OCC Proposal Would Encourage Rent-a-Bank Predatory Lending* (Dec. 2019) ("Rent-a-Bank Issue Brief"), http://bit.ly/FDICrent-a-bankproposal (providing links to lenders' websites).

[112] *See* https://www.opploans.com/rates-and-terms/.

[113] *See* https://www.risecredit.com/how-online-loans-work#WhatItCosts (select each state); Rent-a-Bank Issue Brief, *supra.*

[114] *See* Elevate Credit, Inc., Form 10-Q for the period ending Sept. 30, 2019, S.E.C. file no. 001-37680 at 22, 43, https://www.sec.gov/Archives/edgar/data/1651094/000165109419000048/elevate10-qxq22019.htm ("Elevate 10-Q").

[115] Elevate 10-Q at 46; Rent-a-Bank Issue Brief, *supra.*

to originate the Elastic product. Republic sells a 90% interest in the loans to an entity controlled by Elevate for which Elevate is the primary beneficiary.[116]

**Enova's NetCredit** brand recently began using Republic to fund $1,000 to $10,000 installment loans with APRs up to 99.99% in 22 states and DC that do not allow that rate.[117] Enova or a related entity likely purchases the loans or receivables shortly after origination.

FDIC-supervised **Capital Community Bank** (of Utah) is helping car title lender **LoanMart** evade state law in a number of states. LoanMart's loans range from 60-222% interest; a typical loan is $2,500, 18-month loan at 90%, totaling $2,136 in interest.[118]

In addition, we recently learned of a rent-a-bank arrangement between **EasyPay Finance** and FDIC-supervised **Transportation Alliance Bank, dba TAB Bank** (chartered in Utah)[119] to make predatory auto repair loans, including a $1,500 loan at a rate of 188.99%, with bi-weekly payments of $129 for 26 months. The marketing the mechanic provided the borrower was for EasyPay Finance. The loan documents indicate that EasyPay Finance is the "servicer" and refer to it as the "agent" of TAB Bank.

In the small business area, two other banks—FDIC-regulated **Bank of Lake Mills** in Wisconsin and OCC-regulated **Axos Bank**—have helped **World Business Lenders (WBL)** originate loans. For example, WBL used Bank of Lake Mills to originate a 120% APR $550,000 loan[120] and a 74% APR mortgage,[121] and WBL uses Axos Bank to originate a mortgage that exceeded 138% APR.[122] The loans appear to be resold to a WBL-related entity.

In summary, loans currently being made through rent-a-bank schemes include:

- 160% APR, $400 to $5,000 loans (OppLoans's product)
- 99% to 149% APR, $500 to $5,000 loans (Elevate's Rise product)
- Up to 109% effective APR, $500 to $4,500 lines of credit (Elevate's Elastic product)

---

[116] Elevate 10-Q at 21.

[117] See https://www.netcredit.com/ (bottom of page); https://www.netcredit.com/rates-and-terms.

[118] See https://www.800loanmart.com/ (accessed Jan. 20, 2020).

[119] See https://www.easypayfinance.com/privacy-policy/ ("Not available to customers in NY. Financing offered to residents in AL, AR, CO, CT, FL, GA, HI, IA, IN, LA, MA, MD, ME, MI, MN, MS, MT, NC, NE, NJ, OH, OK, RI, SC, SD, TN, TX, VT, WV, WY and District of Columbia is made by Transportation Alliance Bank, Inc., dba TAB Bank, which determines qualifications for and terms of credit. Financing in all other states is administered by EasyPay Finance.").

[120] See Rent-Rite Super Kegs West, Ltd., v. World Business Lenders, LLC, 603 B.R. 41 (Bk. Ct. D. Colo. 2019).

[121] See Complaint, Deramo et al. v. World Business Lenders, LLC, et. al, No. 8:17-cv-01435-RAL-MAP (Cir. Ct. of 12th Jud'l Cir., Sarasota Co., FL June 16, 2017), available at https://www.nclc.org/images/Deramov.WBL_.pdf.

[122] See Adoni, Harbor Park Realty, LLC v. World Business Lenders, LLC, Axos Bank f/k/a B-of-I Federal Bank, filed Oct. 17, 2019 in Supreme Court of the State of N.Y., County of Suffolk, removed to E.D.N.Y on Dec. 12, 2019 as No. 2:2019cv06971-JMA-GRB, available at https://www.nclc.org/images/Adoni-v.-World-Business-Lenders.pdf.

- Up to 99.99% APR, $2,500 to $10,000 loans (Enova's NetCredit product)[123]
- Up to 222% APR, $2,500 loans (LoanMart's auto title loan)
- Up to 188.9% APR, $1,500 loan (EasyPay Finance's auto repair loan)
- 75% to 139% APR and higher small business loans, including disguised personal mortgages at rates up to 139% that are resulting in foreclosure.

A review of the CFPB Consumer Complaints data on those predatory lenders currently using rent-a-bank scams find several recurring themes:

- consumers puzzled and distraught that their large bi-weekly or monthly payments are not reducing principal due to the loan's high interest rates;
- frequent inability to sustain the high payments;
- queries about how such loans can possibly be legal;
- distress caused by wage garnishment; and
- stress caused by relentless collection calls to a borrower's home or workplace.[124]

Having reviewed complaints about payday and other payday installment loans, these comment authors can attest that complaints about these loans are of the very same nature, replete with financial and emotional anguish at the hands of unaffordable high-cost loans. Dozens of examples of complaints about loans made by these lenders are provided in section G below, which discusses the harms of high-cost lending.

### B. The FDIC is supporting predatory rent-a-bank lending in the small business area.

The rent-a-bank lending currently going on in the consumer area, as far as we know, is entirely with FDIC-supervised banks. Theoretically, the FDIC's guidances that impact the use of third-party service providers could be used to put an end to these rent-a-bank schemes, and to prevent future ones. In 2016, the FDIC proposed a new Examination Guidance for Third-Party Lending but it has not been finalized.[125] That proposal does, however, incorporate and list a number of other FDIC guidances that are in effect, including those that cover third-party risk and safety and soundness standards.[126] The agency's 2007 affordable small loan guidelines, which advise that interest rates not exceed 36%, could

---

[123] *See* https://www.netcredit.com/rates-and-terms/california.

[124] Complaints related to Elevate, OppLoans, Enova (NetCredit), Curo (SpeedyCash), and LoanMart, 2015 to present; downloaded from CFPB's complaint database and on file with CRL.

[125] *See* FDIC Seeking Comment on Proposed Guidance for Third-Party Lending, FIL-50-2016 (July 29, 2016), https://www.fdic.gov/news/news/financial/2016/fil16050.html. NCLC, CRL, and others had (and continue to have) a number of concerns about that proposed guidance, particularly the extent to which it appeared to legitimize partnerships with third parties used for the purposes of evading state interest rate limits. *See* Comments of the National Consumer Law Center et al. (Oct. 27, 2016), https://www.nclc.org/images/pdf/rulemaking/comments-fdic-3rdparty-lending.pdf; Comments of the Center for Responsible Lending et al. (Oct. 27, 2016), https://www.responsiblelending.org/sites/default/files/nodes/files/research-publication/crl_comment_fdic_thirdpartyguidance_oct2016.pdf.

[126] *See* Proposed Guidance for Third-Party Lending, FIL-50-2016, at 14-15, https://www.fdic.gov/news/news/financial/2016/fil16050a.pdf.

also be used.

But the agency's will to use these guidances to prevent rent-a-bank schemes in recent years is uncertain at best. The FDIC has not stopped Republic Bank's long-time scheme with Elevate—highlighted in the 2016 comments of NCLC et al. on the proposed third-party lending guidance[127]—nor FinWise Bank's schemes with Elevate and OppLoans, or Capital Community Bank's scheme with auto title lender LoanMart.

In addition, the evidence from the small business area shows that the FDIC is currently actively supporting a predatory rent-a-bank scheme despite a truly shocking fact pattern. In July 2019, the FDIC filed an amicus brief supporting World Business Lenders (WBL) in a district court bankruptcy case, *Rent-Rite Super Kegs v. World Business Lenders.*[128] The FDIC is defending WBL's ability to charge 120% APR on a $550,000 loan despite Colorado's lower (but still hefty) 45% business interest rate cap because the loan was originated through a bank, FDIC-supervised Bank of Lake Mills (before the bank assigned the promissory note and the deed of trust to WBL).

Not one word of the FDIC's brief expresses any concern about the ridiculously predatory interest rate. The FDIC chose to side with a predatory lender in a case that is not at the appellate level, when the bank is not involved in the case, and where there is no argument that the bank would be impacted if WBL were limited to collecting 45% APR instead of 120% APR. The agency also supported this loan despite knowledge that Bank of Lake Mills has engaged in unfair and deceptive practices in recent years, the subject of an FDIC enforcement action involving harmed military servicemembers.[129]

In the *Rent-Rite* case, the FDIC made the same arguments in support of the non-bank WBL's right to charge 120% APR as it raises to justify this rulemaking. The FDIC did not raise the possibility that the bank might not be the true lender or qualify its support for WBL or the application of the "valid-when-made" doctrine to WBL in any way.

The FDIC's decision to support WBL in the *Rent-Rite* case shows exactly the kind of abusive lending that will flourish if this rulemaking is finalized. The *Rent-Rite* case is shocking enough, and dispels any hopes that the FDIC has concerns about the valid-when-made theory being misused. But it is particularly disturbing in light of other public information available about WBL's predatory business model and its

---

[127] *See* Comments of the National Consumer Law Center et al. at 2-3, 7-8, 10 (Oct. 27, 2016), https://www.nclc.org/images/pdf/rulemaking/comments-fdic-3rdparty-lending.pdf.

[128] *See Amicus Brief of the [FDIC] and the [OCC] in Support of Affirmance and Appellee, In Re: Rent-Rite Super Kegs West Ltd.*, https://www.consumerfinancemonitor.com/wp-content/uploads/sites/14/2019/09/Amicus_Brief.pdf (Sept. 10, 2019); *see also* Letter to the OCC and FDIC from NCLC, CRL, and additional groups opposing the agencies' support of a predatory small business lender using a rent-a-bank scheme (Oct. 24, 2019), https://www.nclc.org/issues/ltr-opp-rent-a-bank.html; Complaint, *Rent-Rite Super Kegs West Ltd. v. World Business Lenders* (Bankr. D. Colo) (filed March 14, 2018) *available at* https://www.nclc.org/images/Rent-Ritev.WBL_.pdf.

[129] *See* FDIC Press Release, *FDIC Announces Settlement with Bank of Lake Mills, Freedom Stores, Inc., and Military Credit Services, LLC, for Unfair and Deceptive Practices* (May 11, 2017) (The FDIC determined that Bank of Lake Mills and affiliates had violated federal law prohibiting unfair and deceptive practices by, among other things, charging interest on loans promoted as interest free).

use of an FDIC-supervised bank—information that was available prior to the agency's decision to support WBL in court.

Several cases filed in court against WBL strongly suggest that the *Rent-Rite* case is not an aberration. This is a company with a predatory business model of approaching struggling businesses and charging exorbitant rates, using a bank as a front to escape interest rate limits. The loans are secured by personal residences, making the high rates truly shocking, and in some cases the business aspect of the transaction appears to be trumped up to disguise that these are loans for personal purposes and are covered by consumer laws. The bank, which in the cases below, and currently, is OCC-supervised Axos Bank, formerly known as Bank Of Internet (BOFI),[130] has little if anything to do with the loans, and **in more than one case, WBL appears to have use of a power of attorney for the bank.**

The facts described below are taken from the complaints as alleged. There is a striking similarity among them.

In *Speer v. Danjon Capital et al.,* filed in Connecticut in late 2019, Elissa Speer is facing a civil action in Nevada and a foreclosure of a residential property in Connecticut after taking out a $30,000 loan alleged to be at 400% and a second loan of $20,000, alleged to be at 121% APR.[131] The loans were offered by Danjon Capital in collusion with World Business Lenders, but were purportedly on funds lent by Bank of Lake Mills. After executing the first note and mortgage, Danjon refused to release the funds unless Speer executed a lease agreement for "restaurant equipment" despite the fact that Speer was never in the restaurant business and she alleged that the equipment referenced, including two backpack leaf blowers, had no practical restaurant use. The complaint alleges that the defendants disguised residential mortgage loans made to consumers primarily for personal, family, or household uses, as commercial loans in order to avoid Connecticut's licensure and other laws.

In *Vincent Deramo Jr. et al. v. World Business Lenders, LLC*, filed in Florida in 2017, a general contractor and his wife allege that World Business Lenders contacted them, saying they were an agent for Bank of Lake Mills, and offered a $400,000 loan, secured by their home and later refinanced. Despite the promise of a 15% APR, they allege that WBL actually charged them 72-73% APR. The documents were prepared by WBL and were mailed to WBL and the plaintiffs had no contact with the bank. The mortgage was assigned from the bank to WBL through a signature of the vice president of WBL as power of attorney for the bank.[132]

In *B&S Medical Supply et al v. World Business Lenders et al.*, filed in New York in 2017, WBL solicited Boris Simon, the owner of B&S Medical Supply, for a $28,000 business loan at 73% APR, provided by Liberty Bank, that was secured by Simon's home. The business loan application contained both the business logo and contact information of WBL and Liberty. The loan was immediately assigned from

---

[130] *See* https://www.wbl.com/.

[131] Complaint, *Speer v. Danjon Capital et al.*, No. 3:19-cv-01778 (D. Conn. filed Nov. 12, 2019), *available at* https://www.nclc.org/images/Speerv.DanjonCapital.pdf.

[132] Complaint, *Vincent Deramo Jr. et al. v. World Business Lenders, LLC and WBL SPE II, LLC* (filed May 16 2017 in Cir. Ct., Sarasota, FL, removed to federal court June 16, 2017 as No, 8:17-cv-1435-RAL-MAP), *available at* https://www.nclc.org/images/Deramov.WBL_.pdf.

Liberty to WBL. WBL corresponded with Simon, referring to itself as the "Lender" and saying that it would service the loan and have the right to collect payments.[133]

In *Kaur et al. v. World Business Lenders et al.*, filed in Massachusetts in April 2019, a married couple was threatened with foreclosure after borrowing $175,000 at 92% APR from World Business Lenders for their business, New England Distributors, secured by a mortgage on their house.[134] The loan paperwork listed BOFI/Axos Bank as the lender, but the loan was presented by WBL, all the forms were WBL forms, and the application discussed WBL's role including ordering a valuation of the collateral. The mortgage was assigned from BOFI to WBL and that assignment by BOFI "was signed by World Business Lenders, LLC, as attorney-in-fact for BOFI Federal Bank."[135]

In *Adoni et al. v. World Business Lenders, LLC, Axos Bank and Circadian Funding,* filed in New York in October 2019, Jacob Adoni has been threatened with threats to foreclose on his home after receiving a $90,000 loan at 138% APR secured by his personal residence.[136] Adoni was contacted by Circadian Funding with an offer of a personal loan that would be funded by WBL and Axos Bank. He was told that the loan documents would be provided to him at 12:00 pm and he must execute them by 6:00 pm or the offer would no longer be valid. Adoni was told by Circadian that the loan was meant to be a personal loan to him but it was necessary for the loan documents to make reference to his business. The defendants "have inundated Mr. Adoni with multiple threats to foreclose on his home and on the mortgage."[137]

The FDIC's supervision of Bank of Lake Mills does not appear to be stopping the bank from letting itself be used—up to the point of handing over a power of attorney—by a predatory lender in order to evade state interest rate limits. The bank itself has been named in some of these lawsuits, so the bank's supervisors should surely know about them. These practices have been going on for some time. A 2014 article describes how WBL employs some of the worst actors and practices from the foreclosure crisis for its predatory lending practices towards small businesses.[138]

The FDIC's direct support for World Business Lenders on the same grounds used to justify the proposed rule shows exactly what should be expected to happen if the rule is finalized: predatory lending, which not only may leave people in financial ruin but jeopardizes their homes and businesses.

---

[133] Complaint, *B&S Medical Supply, Inc., N.Y. and Boris Simon v. World Business Lenders, LLC and Liberty Bank, Inc.*, No. 1:17-cv-03234 (S.D.N.Y. filed May 31, 2017), *available at* https://www.nclc.org/images/BandSMedSupplyv.WBL_.pdf.

[134] Complaint, *Kaur et al v. World Business Lenders et al.* (removed to D. Mass. June. 19, 2019 as 1:19-cv-11364), *available at* https://www.nclc.org/images/Kaurv.WBL_.pdf.

[135] *Id.* at 21.

[136] Complaint, *Adoni et al. v. World Business Lenders, LLC et al* (removed to E.D.N.Y. Dec. 12, 2019 as No. 2:19-cv-06971), https://www.nclc.org/images/Adoni-v.-World-Business-Lenders.pdf.

[137] *Id.* at 5.

[138] Zeke Faux, *Wall Street Finds New Subprime With 125% Business Loans*, Bloomberg (May 22, 2014), https://www.bloomberg.com/news/articles/2014-05-22/wall-street-finds-new-subprime-with-125-business-loans.

    **C.**  **The proposal fails to consider payday lenders' explicit plans in California to broadly expand rent-a-bank schemes, as well as other potential schemes that the proposal would embolden.**

The proposal also fails to consider the entirely foreseeable growth of rent-a-bank schemes expected to occur.

On October 10, 2019, California Governor Gavin Newsom signed into law AB 539, effective January 1, 2020, which targets long-term payday loans, limiting the interest rates on loans of $2,500 to $10,000 to 36% plus the federal funds rate. Before now, there has been no rate cap in California on loans over $2,500.

Three large high-cost lenders, which were charging from 135% to 199% APR on high-cost installment loans—rates illegal under the new law—indicated their plans to start or expand rent-a-bank arrangements into California, with the clear intent to evade the new interest rate cap. These lenders discussed with investors their plans even before it was enacted. These brazen declarations of their intentions make patently clear that the involved lenders would be forming these partnerships for the purpose of evading the law, and that the involved banks would be renting out their charters to these lenders. These lenders have been met with resistance,[139] and to our knowledge have not yet begun new schemes in California. But at least two of these lenders appear to be already making high-cost rent-a-bank loans elsewhere, and the FDIC's proposal would embolden these schemes—a fact the proposal fails to consider.

**Elevate Credit, Inc.** was offering high-cost installment loans in California through its **Rise** brand at rates of 60% to 225% APR for a $2,600 to $5,000 loan.[140] In other states, where that product would not be permitted by non-banks, Elevate currently uses FDIC-supervised **FinWise Bank** to originate its Rise loans at rates of 99-149% APR.

Elevate also uses FDIC-supervised **Republic Bank** to originate **Elastic**, an open-end line of credit with an effective APR of approximately 109%[141] in about 33 states, including in states that do not permit that rate by non-banks.[142]

---

[139] *See* Press Release, *Advocates Urge FDIC, OCC, Federal Reserve to Stop Banks from Helping Payday Lenders Evade State Interest Rate Limits* (Nov. 7, 2019) (discussing letters to the agencies from a coalition of 61 consumer, civil rights, and community groups, flagging the lenders' statements of intent to evade California law and urging the regulators to prevent rent-a-bank schemes in California and elsewhere), https://www.responsiblelending.org/media/advocates-urge-fdic-occ-federal-reserve-stop-banks-helping-payday-lenders-evade-state-interest. Those letters attached another letter from Californians for Economic Justice to the California Department t of Business Oversight, the California Attorney General, and the Governor, flagging the same concerns. *See also* Letter from Rep. Katie Porter of California to FDIC, Dec. 20, 2019 and Tweet: "High-cost lenders announced during their earnings calls that they planned to target CA borrowers with abusive loan terms banned in our state. Today, I'm forwarding transcripts of those calls to federal watchdogs. I won't stand by while bad actors try to skirt our laws." https://twitter.com/RepKatiePorter/status/1208039708095238145?s=20.

[140] https://www.risecredit.com/how-online-loans-work#WhatItCosts (select California).

[141] Elevate Sept. 2019 10-Q at 46.

[142] *See* NCLC, Rent-a-Bank Fact Sheet, *supra.*

In its July earnings call, Elevate discussed its plans to expand its Rise arrangement through a bank partner to evade the new California rate cap:

> "[Q:] So what does [the new California law] mean for Elevate? . . . [A:] [W]e expect to be able to continue to serve California consumers via bank sponsors that are not subject to the same proposed state level rate limitations. . . . [W]e are confident that we can make that transition . . . . And the effective yield that we are looking at on the product would be very similar to what we have on the market today. So we think the impact would be minimal and this transition would be pretty seamless."[143]

> "**Realistically, we will probably use a new bank to originate as we transition into California for Rise**. It will be [] probably different than FinWise. So that will add to the diversification."[144]

**Enova International, Inc.,** was offering two long-term high-cost loan products over $2,500 in California that are now outlawed by the new law, NetCredit (up to 155% APR) and CashNetUSA (up to 191% APR). Last summer, Enova discussed plans to evade the California law, while touting how relatively little lenders must give up in margin to purchase the bank's preemption rights:

> "[W]e will likely convert our near-prime product [NetCredit] to a bank-partner program, which will allow us to continue to operate in California at similar rates to what we charge today"[145] . . . ."There's no reason why we wouldn't be able to replace our California business with a bank program."[146]

When asked the following on the call: "Do you have a bank partner in place already? Just remind me, that will allow you to make higher rate loans that is, kind of, pass the product through their regulator?," the Enova spokesperson responded:

> "We do have a bank program. We do have a bank partner that does higher interest rate loans, and kind of, we'll have to do a couple of quick changes to our program with them to offer that in California, but we don't see any reason why we couldn't do that . . . . In terms of the conversion to a bank program, we give up a couple about percentages — a couple percent of margin to the bank partner, but other than that it's largely like-for-like."[147]

So far, Enova has not yet rolled out rent-a-bank products in California. But as discussed above, NetCredit uses a rent-a-bank operation with Republic Bank in other states. The proposed rule would only give Enova more confidence to move into California and other states.

---

[143] Elevate Credit Inc., Earnings Call, pp. 5-6 (July 29, 2019) at SeekingAlpha.com.

[144] *Id.* at 6.

[145] Enova International Inc., Earnings Call, p. 3 (July 25, 2019) at SeekingAlpha.com.

[146] *Id.* at 9.

[147] *Id.* at 9, 10.

**CURO Group Holdings Corp.** currently offers both short-term and long-term payday loans through its **SpeedyCash** brand. Its website gives an example of a $2,600 installment loan at 134% APR and a $5,000 loan at 131% APR.[148]

The following is an example of a SpeedyCash loan made in California before the new rate cap: $2,600 loan at 135% APR, repayable over 3.5 years with payments of $138 every two weeks, or approximately $276 monthly, totaling **$12,560** in total payments.[149]

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate | FINANCE CHARGE The dollar amount the credit will cost you | Amount Financed The amount of credit provided to you or on your behalf | Total of Payments The amount you will have paid after you have made all payments as scheduled |
|---|---|---|---|
| 135.211% | $9,960.35 | $2,600.00 | $12,560.35 |

**Your Payment Schedule will be:**

| Number of Payments | Amount of Payment | When Payment is Due |
|---|---|---|
| 90 | $138.09 | Every 14 days , beginning 28 Feb 2014 |

CURO discussed plans to evade the California law, noting discussions with the national bank **MetaBank**, while praising the economics of the bank partnerships:

> "In terms of regulation at the state level in California, we expect a new law . . . [to make] our current installment products no longer viable . . . . **"[W]e continue to talk to Meta[Bank] and we continue to talk to other banks about partnership opportunities"** . . . . "I think we feel very good about being able to find products and partnerships that will serve our, the customer base in California that wants this longer, longer term, larger installment loan or possibly as a line of credit product . . . . And I think from a margin standpoint [] the bank partnerships are great. You have to sacrifice a little bit of the economics there because you have a, you have a bank partner there that's going to need a good rev share . . . . And I think . . . with bank partnership opportunities [] we feel . . . we've got a good, a really good opportunity to do that."[150]

We note that in April 2018, CURO announced plans to offer a line of credit product "through a relationship with MetaBank" which would not contribute to its financial results until 2020,[151] and that in its November 2019 10Q, it announced that it had discontinued that agreement in September 2019.[152]

---

[148] https://db4nnybic3xty.cloudfront.net/pdf/SRC/2018/california/store/california.pdf (See "Installment Bank Line Loan Price Disclosure" at the bottom).

[149] Loan document on file with CRL.

[150] CURO Group Holdings Corp., Earnings Call, pp. 3, 7-8 (July 30, 2019) at SeekingAlpha.com.

[151] CURO 2018 10K at 46.

[152] CURO 10Q, Nov. 2019, at 44, https://fintel.io/doc/sec-curo-10q-curo-group-holdings-2019-november-04-18209. Notably, MetaBank has a history of working with payday lenders and helping third parties offer predatory products and evade the law. MetaBank issues prepaid cards sold by ACE Cash Express and other payday lenders, and those payday lender prepaid cards were the only major prepaid cards with overdraft fees until new rules from the

**LoanMart** has already disclosed that it in fact has begun making rent-a-bank loans in California. In January 2020, LoanMart added California to the list of states where it uses FDIC-supervised Capital Community Bank to originate loans. In December 2019, prior to the effective date of California's new law, California was not included among those states on LoanMart's website.[153]

In addition, **OppLoans**, which makes 160% APR long-term payday loans, was previously originating some loans in California through FDIC-supervised FinWise Bank and other loans directly through a California state license, and now appears to be lending entirely through FinWise Bank.[154]

These publicly disclosed rent-a-bank operations and expansions are most likely in addition to others that have not yet been revealed. Other state-regulated payday lenders that are not publicly traded may well be in talks to begin rent-a-bank schemes to evade the will of California's legislature.

The immediately pending threat of brazen expansion of rent-a-bank schemes in California—and the risk to other states that already had strong rate caps—should have been considered by the FDIC. Notably, FDIC Chairman McWilliams testified at a December 2019 Congressional hearing, <u>following</u> the issuance of both agencies' proposals, that she was unaware of these developments,[155] despite letters having been sent to her intended to alert her to these developments.[156]

---

Consumer Financial Protection Bureau went into effect. *See* NCLC, Payday Lender Prepaid Cards: Overdraft and Junk Fees Hit Cash-Strapped Families Coming and Going (2015), https://www.nclc.org/issues/payday-lender-prepaid-cards.html. And MetaBank now issues the "ACE Flare Account by MetaBank"—effectively a prepaid card sold by ACE and other payday lenders—which purports to be a bank account in order to evade the new prepaid rules and continue charging overdraft fees. *See* Press Release, National Consumer Law Center, "No Fooling! New Prepaid, Payroll, and Government Benefit Card Protections Take Effect April 1" (March 28, 2019), https://www.nclc.org/uncategorized/no-fooling-new-prepaid-payroll-and-government-benefit-card-protections-take-effect-april-1.html. MetaBank was also sanctioned in 2010, when under the supervision of the OTS, in connection with another prepaid card offered by a third party, iAdvance. The OTS shut down the line of credit offered on that prepaid card, finding that bank had engaged in unfair and deceptive practices in connection with it. Form 8-K filed by Meta Financial Group, Inc. with the Securities and Exchange Commission, October 6, 2010, *available at* http://www.sec.gov/Archives/edgar/data/907471/000110465910052100/a10-19319_18k.htm.

[153] "Loans **for certain California residents**, and residents of Delaware, District of Columbia, Florida, Illinois, Indiana, Kansas, Kentucky, Michigan, Mississippi, Oklahoma, Ohio, Oregon, South Dakota, Tennessee, Texas, and Washington residents are made by Capital Community Bank, a Utah chartered bank located in Provo, UT, Member FDIC. Loans made by Capital Community Bank will be governed by Utah law and serviced by LoanMart." https://www.800loanmart.com/ (accessed Jan. 20, 2020) (emphasis added). The authors accessed LoanMart's website on December 19, 2019, and California was not listed at that time; the other states were already listed.

[154] *See* https://www.opploans.com/rates-and-terms/#california.

[155] House Financial Services Committee hearing on Oversight of Prudential Regulators, Dec. 5, 2019:

  Rep. Porter: "[A]re you aware of statements made on earnings calls by lenders in California in the wake of California's new lending law, several payday lenders announced on their earnings calls that they plan to use rent-a-bank schemes to evade California's new law that outlaws 100 to 200 percent installment loans."

  Chairman McWilliams: "I'm not and I frankly don't listen to payday lender' investor calls. I just don't have the time."

[156] At the time of the hearing, and prior to the FDIC's proposed rule on "federal interest rate authority," two letters, both publicized through press releases, had been sent to Chairman McWilliams, with copies to her staff,

D.  **The proposal fails to consider the impact of auto title lending through rent-a-bank schemes.**

As noted above, one of the markets where rent-a-bank lending has started to happen is the auto title loan market. Yet the proposed rule fails to consider the impact of legitimizing a rent-a-bank model for this market plagued not only by unaffordable high-cost loans but also by the risk of losing the vehicle.

**LoanMart**, which lends under a state license in states that permit its high rates, is using FDIC-supervised **Capital Community Bank (of Utah)** to evade state law in a number of states. LoanMart's website now says at the bottom:

> Loans for certain California residents, and residents of Delaware, District of Columbia, Florida, Illinois, Indiana, Kansas, Kentucky, Michigan, Mississippi, Oklahoma, Ohio, Oregon, South Dakota, Tennessee, Texas, and Washington residents are made by Capital Community Bank, a Utah chartered bank located in Provo, UT, Member FDIC. Loans made by Capital Community Bank will be governed by Utah law and serviced by LoanMart.[157]

LoanMart's website directs borrowers from these states to a page for "ChoiceCa$h serviced by LoanMart," where the fine print indicates the loans are made Capital Community Bank.[158] That webpage indicates that loans are installment loans up to three years, and "The Annual Percentage Rate (APR) is 170% with a repayment period of 36 months. A loan example: a 3-year $3,000 loan with an APR of 170% has 36 scheduled monthly payments of $428.64," for a total cost of $15,431.04.[159]

The language indicating that for "certain California residents," loans are made through a bank, appeared for the first time in January 2020. That is when California's interest rate caps on loans up to $10,000 went into effect (as discussed in section C above). It is not clear which California residents receive loans originated by LoanMart; those may be loans of $300 or less, for which rates are not capped.

Most of the other states where LoanMart uses a bank to originate the loans are also ones that impose interest rate caps far lower than 170% APR on auto title loans or have other restrictions on auto title loans.[160] For example, in Florida, interest rates on auto title loans are capped at 30% per year on the first

---

notifying the agency of lenders' stated intentions to evade the new California law through rent-a-bank schemes: an Oct. 24 letter opposing the agencies' support of WBL in the Rent-Rite case (https://www.nclc.org/issues/ltr-opp-rent-a-bank.html), and a Nov.7 letter addressing the California statements in detail (https://www.responsiblelending.org/media/advocates-urge-fdic-occ-federal-reserve-stop-banks-helping-payday-lenders-evade-state-interest).

[157] https://www.800loanmart.com/ (last accessed Jan. 20, 2020).

[158] https://www.800loanmart.com/choicecash/.

[159] *Id.*  The website also indicates that the interest rate and monthly payment will drop each month if certain conditions are met.

[160] *See generally* National Consumer Law Center, Consumer Credit Regulation, Chapter 12 (2d ed. 2015), updated at www.nclc.org/library.

$2,000, 24% per year on the principal amount exceeding $2,000, and 18% per year on the remainder.[161] In Kentucky, interest rates on auto title loans are capped at 36% per year on amounts less than $3,000 and 24% per year on loan amounts greater than $3,000.[162] Some other jurisdictions, such as the District of Columbia and Washington State, do not have specific statutes governing auto title lending but generally cap interest rates at 36% or less.[163]

The dangers of allowing auto title lenders to charge otherwise usurious rates on loans originated by banks are especially great given the serious repercussions of losing one's car. For further discussion of the harm caused by auto title loans, see section G below.

> ### E. The proposal's statement that it does not address "true lender" is cold comfort as the proposal effectively encourages, rather than guards against, evasion of state law through rent-a-bank schemes.

The FDIC's discussion of its proposed rule notes that the agency is not addressing the question whether the bank is the real party in interest or the "true lender" on a loan.[164] It also states that it "will view unfavorably entities that partner with a State bank with the sole goal of evading" state interest rate caps.[165] While the proposal would be even farther outside the FDIC's authority if it purported to limit interest rates when the true lender that originates the loan is not a bank, this statement does little to mitigate the dangers of the proposed rule. This is particularly true when considered in the context of other recent and immediately relevant FDIC and OCC statements and actions. In fact, the agency's proposal has the effect of inviting, rather than guarding against, evasion of state law through rent-a-bank schemes.

First, the proposed rule would eliminate the clean line established by the *Madden* case that is simple to enforce and is consistent with the FDIC's limited authority): The rate exportation provisions of federal banking law only preempt state usury laws as applied to interest that the bank charges, not interest charged by a non-bank assignee. It is simple for state regulators, enforcement officials, and consumers to see what interest rate a non-bank is charging. The true lender doctrine, on the other hand, requires review of the totality of the circumstances and can require years of litigation and facts that are not immediately publicly available—such as what relative share of the economic interest the non-bank has or whether the non-bank is immunizing the bank for the risk. Forced arbitration clauses will block consumers from bringing true lender cases on a classwide basis. And consumers cannot count on states to bring these cases, as enforcement and regulator resources are limited and in some parts of the country the state officials do not have a strong track record on consumer protection. Indeed, in a number of states today, consumers are being harmed by ongoing rent-a-bank schemes. Thus, the true lender doctrine alone cannot be expected to provide adequate defense against evasion of state law through rent-a-bank schemes.

---

[161] Fla. Stat. § 537.011.

[162] Ky. Rev. Stat. Ann. § 286.4-530(1) (West).

[163] *See generally* National Consumer Law Center, Consumer Credit Regulation, Chapter 12 & Appx. D (2d ed. 2015), updated at www.nclc.org/library.

[164] FDIC Proposal, 84 Fed. Reg. at 66846.

[165] *Id.*

Second, the FDIC's unfavorable view of some rent-a-bank schemes appears to be toothless. It is clearly so narrow as to invite abuse. By limiting itself to cases were evasion is the "sole" purpose, it risks green-lighting schemes where evasion is one of the purposes—perhaps even the dominant purpose. Lenders can always concoct additional rationales for their arrangements with banks. Moreover, the FDIC has shown no indication that it "views unfavorably" the several rent-a-bank schemes ongoing under its nose, including the Republic Bank/Elevate scheme that has been going on for years and the WBL one the agency is actively supporting. Indeed, when pointed questions were directed at Chairman McWilliams at a December 2019 hearing, she had no real explanation for the agency's failure to act.[166]

Third, the FDIC has already directly demonstrated how the proposed rule should be expected to work: to support predatory rent-a-bank lenders like World Business Lenders. As noted above, the FDIC filed an amicus brief promoting the purported "valid-when-made" theory this proposal promotes *to defend the validity of a predatory loan made through a rent-a-bank scheme*, without even suggesting that the bank might not be the true lender.

The proposal was made in the context of ongoing rent-a-bank schemes, including one the agency explicitly supported, with no indication that the agency will crack down on future schemes beyond one toothless sentence. The proposal can only be read to invite these schemes. Predatory lenders will use the proposed rule to justify their arrangements and hope they are not challenged or that they can use forced arbitration clauses or other means to defeat challenges. As the rent-a-bank schemes become increasingly complex, courts, for their part, may find it easier to reject true lender challenges and instead simply enforce a rule that the assignee may charge whatever interest the bank can charge.

  **F. The proposal fails to consider that it could encourage short-term payday lenders to return to rent-a-bank lending.**

Some of the lenders that offer or are threatening to offer high-cost rent-a-bank installment loans also offer short-term payday loans. Enova's CashNetUSA offers both balloon-payment payday loans and long-term payday loans. CURO's SpeedyCash also offers short-term payday loans.

Currently, to our knowledge, rent-a-bank schemes are not being used to offer short-term loans, as they were 20 years ago. This is little consolation, however, as larger, longer high-cost loans are often an even bigger, deeper, more intractable debt trap than short-term loans.

---

[166] "Oversight of Prudential Regulators: Ensuring the Safety, Soundness, Diversity, and Accountability of Depository Institutions?," US House Committee on Financial Services, Dec. 4, 2019 https://financialservices.house.gov/calendar/eventsingle.aspx?EventID=404855 (See in particular Chairman McWilliams's exchanges with Rep. Tlaib, where Chairman McWilliams expresses no intent to address the FinWise Bank rent-a-bank scheme Tlaib raises; and with Rep. Porter, where Chairman McWilliams references a public enforcement action against one bank engaged in a rent-a-bank scheme. We believe Chairman McWilliams was referring to a 2018 action against Republic Bank & Trust that addressed a disclosure violation under the Truth In Lending Act in connection with Elevate's Elastic product, while in no way addressing the unsafe and unsound product itself (e.g., Elastic's default rates exceed 50% or revenues) or that Republic Bank is renting its charter to non-bank lender Elevate to enable evasion of state laws. The enforcement action is available here: https://www.bankersonline.com/sites/default/files/penalty-files/FDIC_RBT_CMP.pdf.)

Moreover, it is important to note that the arrangements between payday lenders and banks 20 years ago, and the arguments they made, were not that different from today's rent-a-bank lending. If the proposed rule is finalized, there is little other than the self-restraint of banks that would prevent short-term rent-a-bank lending from returning.

In 2000, the OCC itself described the older payday loan rent-a-bank arrangements in terms that are strikingly similar:

> [S]ome national banks have entered into arrangements with third parties in which the national bank funds payday loans originated through the third party. In these arrangements, national banks often rely on the third party to provide services that the bank would normally provide itself. These arrangements may also involve the sale to the third party of the loans or the servicing rights to the loans.[167]

In the older payday loan rent-a-bank schemes as in the newer ones, lenders argued that they were only the agent, service provider or assignee of the bank.[168] For example, as described in one case, Advance America was identified as "the fiscal agent and loan marketer/servicer." Advance America "procures the borrower and submits a loan application to BankWest. BankWest then approves (or denies) the application and advances all funds." The bank "used a separate third-party "loan processing agent" (an automated-consumer-information database that the payday lender itself used in other states) to electronically approve applications.[169]

As described by the OCC in 2000, decades ago the payday lenders not only performed services as an agent of the bank but also were assignees of loans that banks chose to sell to the secondary market: "BankWest 'owns' all the loans initially, but retains the right to sell a loan to any third party; Advance America, as the payday store has a right of first refusal on any loan the BankWest chooses to sell."[170] For

---

[167] OCC Advisory Letter No. AL 2000-10 (Nov. 27, 2000), https://occ.gov/news-issuances/advisory-letters/2000/advisory-letter-2000-10.pdf.

[168] *BankWest, Inc. v. Baker*, 411 F.3d 1289, 1295 (11th Cir. 2005) ("To avoid this direct prohibition, however, payday stores have entered into agency agreements whereby the stores procure such payday loans for out-of-state banks …"), *reh'g granted, op. vacated*, 433 F.3d 1344 (11th Cir. 2005), *op. vacated due to mootness*, 446 F.3d 1358 (11th Cir. 2006); *Flowers v. EZPawn Oklahoma, Inc.*, 307 F.Supp.2d 1191, 1196, 1205 (2004) ("Defendants assert that they acted as servicers for the loan made by County Bank… Defendants submit that County Bank developed the loan product at issue, approved and made the extension of the loan to the Plaintiff and all others similarly situated, funded the loan …"); *Colorado ex rel. Salazar v. Ace Cash Express*, 188 F.Supp.2d 1282 (D. Colo. 2002) ("Defendant admits that it is a 'loan arranger/agent.'"); *Commonwealth v. Think Finance, Inc.,* 2016 WL 183289 (E.D. Pa. Jan. 14, 2016).

[169] *BankWest, Inc. v. Baker*, 411 F.3d 1289 (11th Cir. 2005) ("To avoid this direct prohibition, however, payday stores have entered into agency agreements whereby the stores procure such payday loans for out-of-state banks …"), *reh'g granted, op. vacated*, 433 F.3d 1344 (11th Cir. 2005), *op. vacated due to mootness*, 446 F.3d 1358 (11th Cir. 2006).

[170] *BankWest*, 411 F.3d at 1295 n.6; *see* also People ex rel. Spitzer v. Cty. Bank of Rehoboth Beach, Del., 45 A.D.3d 1136, 1137, 846 N.Y.S.2d 436, 438 (2007) ("County Bank and TC [Telecash] entered into an agreement wherein County Bank agreed to make and TC agreed to market and service such payday loans….TC and CRA purchased a 95% participation interest in each and every loan made."); *Hudson v. ACE Cash Express,* 2002 WL 1205060, 2002 U.S.Dist. LEXIS 11226 (S.D.Ind. 2002) ("The Master Agreement provides that Goleta will sell an undivided

example, one lender made arguments reminiscent of the FDIC's that it stepped into the bank's shoes: "preemption applies to any challenge of interest or fees on a bank-issued loan … [and] preemption rights do not disappear when a loan is assigned or transferred from the bank."[171]

The FDIC has failed to consider the abuse of payday loan rent-a-bank arrangements of the past and the reputation risk to banks that eventually drove the bank regulators to shut them down. Yet the core of the FDIC's argument—that a bank has a right to sell loans, and that when it does the assignee steps into the bank's shoes—can be applied no matter what the interest rate or term of the loan.

The FDIC's 2005 and 2013 guidances addressing payday lending should guard against bank involvement in these short-term loans. The 2005 guidelines advise that borrowers should not be kept in payday loans for more than three months in a 12-month period. This guidance precipitated the end of FDIC banks' involvement in rent-a-bank schemes because payday lenders' model is built on trapping borrowers in more than six loans a year. The 2013 guidance advised that banks determine borrowers' ability to repay deposit advance (i.e., bank payday) loans. At the time, no FDIC-supervised banks were making deposit advance loans, but when the OCC issued the same guidance, its supervisee banks stopped making the loans, likely because the borrowers did not in fact have the ability to repay them.

Repeal of these guidances would be damaging to banks and consumers alike, and if coupled with this proposal, would amount to an open invitation for rent-a-bank schemes for short-term loans.[172]

For discussion of the harm consumers experience at the hands of short-term payday loans, see section G below.

> **G.  The proposal fails to consider that high-cost lenders that are or will be engaged in rent-a-bank lending make loans that severely harm financially vulnerable consumers.**
>
> **1.  Harm in general.**

In recent years, the harms of high-cost lending have been more comprehensively and thoroughly documented than ever before.[173] High-cost lending is a debt trap by design, exploiting the financially

---

participation interest in certain 'Bank Loans' to ACE [Cash Express]…. At the time of Goleta's loan to Hudson, ACE was required to purchase an undivided 95% participation interest in these loans.").

[171] *Think Finance*, 2016 WL 183289 at *13.

[172] Indeed, the OCC's repeal of its 2013 guidance addressing bank payday loans (aka "deposit advance products") leaves national banks with no guidance against these pernicious short-term loans. Although the OCC's excuse for repealing that guidance was that the CFPB had finalized a rule governing payday loans, the CFPB has proposed to repeal that rule and it is currently stayed by a court.

[173] *See* CFPB, Rule Addressing Payday, Vehicle Title, and Certain High-Cost Installment Loans, Final Rule, 82 Fed. Reg. 54472 (Nov. 17, 2017) (CFPB Payday Rule) and Docket No. CFPB-2016-0025 associated with that rule; *see* CRL and NCLC's comments to that docket, filed with additional consumer and civil rights groups, https://www.responsiblelending.org/sites/default/files/nodes/files/research-publication/crl_payday_comment_oct2016.pdf (CRL, NCLC, et al., Comments on CFPB Payday Rule); *see id.* at §2, pp. 17-40 (discussing harm to consumers).

distressed and leaving them worse off, leading to a host of financial consequences that include greater delinquency on other bills,[174] high checking account fees and closed accounts,[175] and bankruptcy.[176]

Across the board, borrowers of high-cost loans are already struggling to manage existing credit obligations. The credit scores of Elevate's borrowers typically range from 511 to 626.[177] Elevate's Elastic borrowers have a median income of $39,500.[178] Its Rise customers also have modest, if somewhat higher, incomes averaging $53,600,[179] but they are clearly struggling, as the stories described below attest. The profile of short-term payday loan and auto-title borrowers is even more dire: their median credit scores are deep subprime or subprime, averaging 525-530, with about 85% of borrowers with scores below 600.[180] They typically earn $25,000-$30,000 per year.[181]

A fundamental, perverse reality drives the high-cost loan market: Borrowers meeting this profile are not likely to have the ability to repay the loans high-cost lenders make to them; lenders know this and depend on it, as the interest rates are so high that they make money anyway. For short-term loans, borrowers cannot afford the large balloon payment without borrowing another loan to repay the first, and the long-term cycle of debt drives the business model for lenders. For longer-term loans, borrowers often cannot afford the still-large payments on payday, or, even if they make some payments, they cannot *sustain* those payments for the life of the loan and ultimately pay it off.[182] NCLC has shown how

---

[174] *See, e.g.*, B. Melzer, *The Real Costs of Credit Access: Evidence from the Payday Lending Market*, (2011), Oxford University Press, *available at* http://bit.ly/10M01tZ; Agarwal, S., Skiba, P. M., & Tobacman, J., *Payday loans and credit cards: New liquidity and credit scoring puzzles?* NBER Working Paper (2009), *available at* http://bit.ly/RtDsXx.

[175] CFPB Payday Rule, 82 Fed. Reg. 54564, 73; *see also* Dennis Campbell, Asis Martinez Jerez, & Peter Tufano, *Bouncing out of the Banking System: An Empirical Analysis of Involuntary Bank Account Closures,* Harvard Business School, 12/3/08, *available at* www.bostonfed.org/economic/cprc/conferences/2008/payment-choice/papers/campbell_jerez_tufano.pdf.

[176] Paige Marta Skiba and Jeremy Tobacman, *Do Payday Loans Cause Bankruptcy?,* Vanderbilt University and the University of Pennsylvania, 10/10/08, *available at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1266215.

[177] Elevate 10K, 2018, at 9.

[178] *Id.*

[179] *Id.*

[180] *See* CFPB Payday Rule, 82 Fed. Reg. at 54556-58.

[181] *Id.*

[182] Consider, for example, the debt burden of a member of Hope Credit Union, as reported in Hope's comments to this docket. This borrower of a high-cost loan made through a rent-a-bank arrangement in a Deep South state started the year with four outstanding consumer loans, including a high-cost rent-a-bank loan, which in total accounted for 32% of her take-home pay. By the end of the year, she was still paying on all four debts, plus two additional loans, with the six loans (none of which was an auto loan) consuming 60% of her take-home pay—before accounting for a housing payment or other basic living expenses. Comments of Hope Enterprise Corporation/Hope Credit Union (HOPE) to the FDIC on this docket (Feb. 3, 2020).

high interest rates on longer-term loans create misaligned incentives that lead lenders to want—and to profit off of—borrowers who will struggle and default at high rates.[183]

The dangers of high-cost, longer-term loans have become apparent, as payday lenders have increasingly shifted to these loans, or offered them alongside short-term balloon-payment payday loans. These loans include so-called "fintech" loans that attempt to portray themselves as better alternatives to payday loans, but which, in most significant respects, are not distinguishable from loans by traditional, "non-fintech" payday lenders. All of these longer-term loans typically still carry extremely high interest rates, are still tied to repayment on payday, and are still made with little regard for the borrower's ability to repay the loan while meeting other expenses.[184] These loans have the potential to inflict as much or more harm—creating a deeper, longer debt trap—for borrowers than two-week payday loans.[185]

Just like short-term payday loans that have very high rates of refinancing and default, the performance of longer-term high-cost loans reflects distress. The CFPB found that for online payday installment loans, (the channel for most new "fintech" loans) refinance rates were very high,[186] and a full 55% of loan sequences ended in default.[187]

Publicly available information about one high-cost lender already engaging in rent-a-bank schemes demonstrates this high-cost, high-default model. Elevate's entire book of business carries an average APR of 129%.[188] Elevate's nationwide charge-off rates as a percentage of outstanding loan volume in 2014 was over 50%.[189] Elevate's net charge-offs as a percentage of revenues is 52%,[190] a metric that Elevates states it does not intend to drive down.[191] Essentially, Elevate's is a high-rate, high-default model that profits while making unaffordable loans.

---

[183] Lauren Saunders et al., NCLC, *Misaligned Incentives: Why High-Rate Installment Lenders Want Borrowers Who Will Default* (July 2016), https://www.nclc.org/issues/misaligned-incentives.html.

[184] CRL, NCLC, et al., Comments on CFPB Payday Rule at § 2.5 (pp. 31-34) and § 10.1-10.3 (pp. 165-172). *See also* CFPB Proposed Rule on Payday, Vehicle Title, and Certain High-Cost Installment Loans, discussion of longer-term high-cost loans, 81 Fed. Reg. 47864, 47885-92 (July 11, 2016).

[185] *Id.*

[186] CFPB Supplemental Findings on payday, payday installment, and vehicle title loans (June 2, 2016) at 15 (35% for storefront, 22% for online).

[187] *Id.* at 22 (55% for online; 34% for storefront). On a per-loan basis, the default rate is 24%.

[188] Elevate Form 10K, 2018, at 78.

[189] As calculated by the CFPB, CFPB Proposed Payday Rule, 8c1 Fed Reg. 47886, n.246. CFPB's calculation is consistent with rates calculated by NCLC using California data. Lauren Saunders et al., NCLC, *Misaligned Incentives: Why High-Rate Installment Lenders Want Borrowers Who Will Default* (July 2016), https://www.nclc.org/issues/misaligned-incentives.html.

[190] Elevate Form 10K, 2018, at 78.

[191] *Id.* at 86.

Research CRL released recently documents the experience of focus group participants in Colorado, where high-cost longer-term payday loans averaging 129% APR often triggered significant additional financial hardships for borrowers.[192]

Auto title loans can be particularly devastating. In addition to inflicting the same harms caused by payday and other high-cost installment loans, auto title loans put borrowers at substantial risk of losing their car. Research has found that an astounding one in five auto title borrowers have their car repossessed.[193] The consequences of losing one's vehicle are dire—both the loss of a valuable asset and the serious disruption of a borrower's ability to get to work, earn income, and manage their lives.[194] More than a third of auto title borrowers have reported pledging the only working car in their household as security for their auto title loan.[195]

Mere statistics on the loan performance of high-cost loans, staggering as they are, do not do justice to the brutal financial, emotional, and physical turmoil these toxic products inflict. The distress can pervade every facet of a person's life, often extending to the borrower's family members as well. Growing research documents the links between high-cost loans and negative health impacts.[196]

---

[192] Center for Responsible Lending, *Sinking Feeling: Colorado Borrowers Describe Their Experiences With Payday Loans* (July 2018), https://www.responsiblelending.org/sites/default/files/nodes/files/research-publication/crl-sinking-feeling-jul2018.pdf.

[193] CFPB Single-Payment Vehicle Title Lending at 4 (2016). CRL estimates that approximately 340,000 auto title borrowers annually have their car repossessed, well exceeding the population of St. Louis. For calculation, *see* CRL, Public Citizen, NCLC et. al comments on CFPB's proposed repeal of the ability-to-repay provisions of the payday rule at 26, n.90 (May 15, 2019), https://www.responsiblelending.org/sites/default/files/nodes/files/research-publication/comment-cfpb-proposed-repeal-payday-rule-may2019.pdf.

[194] *See* CFPB Payday Rule, 82 Fed. Reg. at 54573, 93.

[195] *Id.*, n. 592 (internal citations omitted).

[196] One finds that access to payday loans substantially increased suicide risk—including by over 16% for those ages 25-44. Jaeyoon Lee, *Credit Access and Household Welfare: Evidence From Payday Lending* (SSRN Working Paper, 2017. Another finds that short-term loans, including payday loans, are associated with a range of negative health outcomes, even when controlling for potential confounders. Elizabeth Sweet et al., *Short-term lending: Payday loans as risk factors for anxiety, inflammation and poor health,* 5 SSM—Population Health, 114–121 (2018), *https://doi.org/10.1016/j.ssmph.2018.05.009.* These outcomes include symptoms of physical health, sexual health, and anxiety, as well as higher levels of C-reactive protein, which is an indicator of many long-term diseases, including cardiovascular disease, and an indicator of psychological stress. *Id.* Another study finds that restrictions on payday lending reduced liquor sales. Harold E. Cuffe & Christopher G. Gibbs, *The Effect of Payday Lending Restrictions on Liquor Sales,* 85(1) J. Banking & Fin. 132–45 (2017). In one study of qualitative data, respondents revealed symptoms of "allostatic load," a health psychology term that describes how compounding stress can lead to wear and tear on the body. Elizabeth Sweet et al., *Embodied Neoliberalism: Epidemiology and the Lived Experience of Consumer Debt,* 48(3) International Journal of Health Services (2018). The authors describe the respondents as having "embodied" their debt through idioms like "drowning in debt" and "keeping [their] head above water," which illustrated that the participants "experienced debt as a bodily sensation, not only a socioeconomic position or emotional stressor." *Id.* One payday borrower has reported that after being a "a pretty healthy young person," she "became physically sick, broke out in hives . . . [and] had to go to urgent care" as a result of her high-cost loan. Health Impact Partners and Missouri Faith Voices, *When Poverty Makes You Sick: The intersection of health and predatory lending in Missouri* (Feb. 2019), https://humanimpact.org/wp-

Below are narratives from the CFPB complaints database describing borrowers' experiences with high-cost installment loans by lenders currently engaging in rent-a-bank schemes (Elevate, OppLoans, Enova (NetCredit brand), and LoanMart), or who have stated that they intend to (CURO (SpeedyCash brand)). While many of these complaints so far do not involve rent-a-bank loans, they are illustrative of the type of loans these lenders make that they will bring to states that do not allow high-cost loans.

In addition, in light of the risk that the FDIC's proposal would promote growth of both short- and longer-term payday and car title loans through rent-a-bank schemes, attached at Appendix B are over 150 borrower experiences with short- and longer-term payday and car title loans from a variety of lenders.

Elevate

- I am a single mother who is living . . . below the poverty level. I have had my share of credit problems and have owed more than I make for quite some time. I was misled by Rise Credit to believe that they were unlike other predatory loan companies. By the time I understood what I had [signed], I had paid them thousands of dollars in interest. I have recently become temporarily unemployed and called them to ask for help during my time of financial hardship. They refused any solution and my account is headed to collections now . . . . [T]he total paid is far over the amount I initially borrowed from Rise . . . . This is robbery and all of the necessities I have for myself and my children are suffering because of it . . . . How is it that they can do this? I am asking for help for not only my family, but for all of the families targeted by these predatory loans meant to target those living in poverty and struggling to live paycheck to paycheck.[197]

- [T]hey are charging me over $6000.00 interest on a simple loan for only $2600.00 . . . . i did not forsee such an impact on my monthly income for so long ... that $500.00 is supposed to be the monies I have left over after bills and survive/live on after all my other bills. They have access to my bank account and automatically take it out . . . . I do not know how to stop this madness. How can they charge me over $8000.00 for a $2600.00 loan? Is this legal?[198]

- My [] mother was solicited by a predatory lender, RISE for a personal loan. She agreed to $1300.00 loan but was told the California law stated the minimum loan amount was $2600.00. Her interest rate is 125 %, how is this legal? She is on a fixed income and RISE has set up an auto pay with her checking account with a monthly payment of $470.00 . . . . This is elder abuse! Please shut this company down.[199]

- To date I have paid well over $6900.00, almost three times the principle. I still owe close to $3000.00. Prior to accepting the loan I did read the " fine print " but it was not easy to understand. It was not explicit[ly] stated that the monthly payments would be going to the interest and not to paying down the principle, making the loan impossible to pay off quickly. I called . . . and asked specifically for an amnesty on the remaining balance because I am having a

content/uploads/2019/02/HIP-MFV_PayDayLending_2019.02fin1.pdf. Another expressed feeling, "[i]f I died, my debt would die with me. At least I could give my family that." *Id.*

[197] #1487339 (California borrower)

[198] #1361463 (California borrower)

[199] #1584177 (California borrower)

hard time paying on this exorbitantly high interest loan for over 12 months. I also explained to her that to date I had paid almost three times the principle . . . . in the end, the total paid before it is satisfied will be over $9500.00! Paying $7500.00 in interest for a $2500.00 loan is outrageous and should be illegal.[200]

- I took a loan with rise credit . . . and I was unable to make timely payments. I expected to pay it once I received my tax return. However, it went to collections and then a lawyer and they added so many penalties and fees. Now I owe XXXX for a XXXX loan. Now, they are garnishing 25 percent of my paycheck and I 'm already struggling as it is.[201]

- I am a visually impaired person, with a monthly income of less than $900. I can surely say that I had no idea that the monthly installment would not be applied to the principal loan amount. After my aid read to me just a few days ago that I was not paying off the loan all of the money was going to interest and only {$19.00} was applies to the principal. But I do not have that kind of money. I am requesting that you cease deducting {$520.00} from my bank account . . . . I have struggled for the last five moths giving RISE most of my income, and I can not make the rent, utilities, or food.[202]

- I have a high interest installment loan through Rise. I pay $220.00 every 2 weeks with $16.00 of that going to the principal. I had a medical procedure done that kept me out of work for just a little more than a month. I did not receive a paycheck during that time. This has put me a few payments behind on my loan as they come due every 2 weeks. I am trying to get this all worked out so I can catch up with them over time as I just started back to work today. My issue is when I came back today I was told by my coworkers that this number called ( XXXX ) so many times a day that they turned off the phone in our office. . . . . I am willing to work something out with them but calling my work to harass me and doing multiple attempt debits to my bank account that has no money in it racking up a ton of fees. This is not helping their cause as I have to pay my bank now instead of putting that money towards catching up on my loan. They tried withdrawing twice within a few minutes during XXXX attempt which racked up an instant $70.00 more to my bank account fees like the money was going to instantly appear in there after the first attempt a few minutes earlier.[203]

- We originally signed up for a $3,000 [loan] with an interest rate of 208%. I have been paying $520.00 every month and paid a total of $5500.00 . . . . This has been a burden for me and my family. As an [redacted] military member, i have reached out to my chain of command regarding this issue. I have been advised by financial counselors that in accordance with Military Lending Act says that you can't be charged an interest rate higher than 36 % on most types of consumer loans and provides other significant rights. I am currently working with my local Judge Advocate General 's Office to get some help with legal issues.[204]

---

[200] #1962588 (California borrower)

[201] #2181870 (California borrower)

[202] #2202311 (California borrower)

[203] #2303749 (Missouri borrower)

[204] #2442651 (U.S. Armed Forces - Pacific borrower)

- I received a mail out stating that I was pre-approved for credit and to go online and apply. I did so and entered into a line of credit agreement in the amount of $2500 . . . . The payments are bi-weekly and the second one jumped to $240.00. My gross income is XXXX per month. I have XXXX child and simply can not afford this high of a payment. My father called . . . and tried to get the company to lower the payment. They said that they could do whatever they wanted to and refused to address my concerns. The APR on this loan was 199 %. I feel this company is operating on an unfair and deceitful basis.[205]

- Why are my payments not reducing my principal balance? My statement for month 1 states that my balance is $3800.00. It said I owed $430.00. I paid it. The next month my bill was $540.00 and I paid it. After that payment was applied (? ) my total balance owed wasn$3800.00. So I asked them why my balance was only reduced by $3.00 even though I had paid them almost $1000.00 . . . . please help me. This can not be right.[206]

- I have fallen on hard times . . . . I borrowed $1200.00 and have paid back $1100.00, however due to the interest rate being so high [I owe a] balance of over $1000.00 still. I was told when I took this loan that after a period of time I would be able to refinance the loan and lower my payments. This was not true, I have attempted to refinance and the APR is the same 291 %. I would like to cancel my account and come to an agreement that works for both of us. I am a single mother and paying $160.00 every time I get paid equaling to $260.00 per month is unbearable. I have also [made] large payments over the past few months hoping this would decrease the balance and it has not.[207]

- On XX/XX/17 I needed to pay for a major repair on my vehicle and had to refinance an existing loan I had with Rise credit to an amount of $2500.00. Since that date I have been making regular payments twice a month of $230.00 and it has all been interest. I have made 21 payments, so over $4000.00 in interest and my principal balance has not gone down at all. I am at a loss of what to do, because I was in a tight spot but had I known id be living this nightmare I never would have taken out this loan.[208]

- I would have rejected/not accepted the loan if I had realized it was a 238.36% interest rate. They set up ACH installment payments of $410.00 a month which I can not afford . . . . I am on Social Security XXXX (Fixed income ) with limited resources . . . . I can't believe that this is legal-this is more like loan sharking and preying on people who are not able to defend themselves. I am more than willing to pay the $2000.00 back at a reasonable interest rate and reasonable monthly payments of $200.00 a month ( ie ... a credit card rate for people with limited resources perhaps 25-28 %?)[.] [N]ot 238.36 %[. H]ow can this even be legal?[209]

---

[205] #2764858 (Kansas borrower)

[206] #2816269 (Tennessee borrower)

[207] #2858004 (Wisconsin borrower)

[208] #2942998 (North Dakota borrower)

[209] #3141291 (Wisconsin borrower)

OppLoans

- I am being contacted everyday, with the exception of Sunday, for a month. The[y] want the loan paid but, I am unemployed and a [] veteran. I have tried to explain this to the company. However, they continue to contact me. It's the same thing everyday.[210]

- I have been paying this loan for more than a year and the principal has not changed. I borrowed $2000.00 and have paid $4600.00 into this loan to date….[211]

- I contacted this firm opp loans several times . . . regarding the high interest[] rates being charged on my loan. I informed them that [we are] military spouses and famil[ies] . . . that we are protected against high interest rates. They informed me that they needed proof to review my interest rate. They then informed me that spouse loans are not covered under the military lending act and was notified by their legal department. My current interest rate is 159 % on short term installment loan. Please assist[212]

- This company calls me 6 times or more a day. I informed them . . . that I had lost my job and I would call them back when I start work again and get my finances back on track. They dont care they have been calling non stop. They have made it harder for my recovery.[213]

- I had a loan with this company for about $2000.00[,] now i went on short term [leave or disability] with my job and didn't get paid [and] called the company [and] explained why I couldn't make payment . . . . I really dont know what to do but i have arrangements with other companies after they knowingly understood my dilemma. Im upset that i have to pay all the fees and loan with no arrangement and still be a single mom and live. Now they are emailing and calling me saying they will garnish my bank account for 20 years and my check and so on. Im very afraid and dont want to be homeless or behind over 4500 dollars.[214]

- I work as an [] for my [daughter], who was in the Intensive care unit . . . . When my daughter is hospitalized I do not get paid. After being in the hospital for a month I signed an Opp loan for $2600.00 . . . . I have paid them over $3600.. Today they tell me that I owe them $2800.00 . . . .[215]

- I . . . took out the loan[.] I am not disputing the loan[.] I had a downfall in life and defaulted . . . . I . . . received a " Notice of Intent to Assign Wages[.]" I spoke to [a representative] who refused to assist. [H]er only option was for me to pay $560.00 now and make the original monthly payments. I stated to her I do not have that money[.] I really do not[.] I need help[.] [S]he

---

[210] #2812101 (Tennessee borrower) (appears to be a rent-a-bank loan)

[211] #3106431 (Maryland borrower)

[212] #3354050 (Michigan borrower) (appears to be a rent-a-bank loan)

[213] #3371847 (Arizona borrower) (appears to be a rent-a-bank loan)

[214] #3015405 (Illinois borrower)

[215] #3028087 (California borrower).

refused to offer me any solution. I currently have $100.00 in my checking account. I asked to speak to a supervisor and she refused to allow me to speak to a supervisor . . . . I think this company has no intentions to help anyone who is struggling.[216]

- I took a payday installment loan for the sake of building my credits . . . . I then told them I am not doing it through debit card anymore . . . . as per contract, it doesn't say I have to use my debit card as a routing number was a condition for approval. This week . . . they contacted my employer and decided to garnish my wage. This is unfair to me as I wasn't informed and it is not my fault, I never refused to pay or change my account. They didn't do their responsibility to deduct money while I gave my account information (confirmed today they still have ). This is unfair garnishment and punishment to me because of their fault ( or their systems ) . . . . I urge your help to assist me to remove this unfair garnishment on me and let the company comply with their promises. I also ask you to judge this and make Opploans repair my damaged credits that were caused by this unfair transaction. I am not delinquent to this transaction.[217]

- I emailed company . . . and then I also called and rescinded the wage assignment. I sent an email to the CEO office and also spoke to several representatives to try to reach a settlement for the principle amount of the loan. The amount when I asked for the settlement was XXXX. This would have had the company write off about 200 in interest only. There was a los[s] of income in my household. So to prevent a long term impact to my credit and finances, I asked to settle the account. I was informed that I had to be at least 61 days behind and that if I made a minimum payment of XXXX that I would stay in a positive balance. This did not make sense as this would also keep the account in a current status. This would also cause more interest to accrue over time. I wanted to settle the account, close the account and avoid negative impact on my credit, and more fees. The company refused to work with stating the contract was enforceable. This would benefit the company to continue to accrue more interest and fees over a period of time and impact the consumer in a negative light.[218]

Enova (NetCredit brand)

- On XX/XX/2016 I was approved for a personal loan with NetCredit. I was unaware of the future circumstances and took out a very high interest loan, 99 % interest on a $2000.00 [loan]. I have become a XXXX veteran and unemployed at the moment due to my condition. The total amount that I will be paying back on a $2000.00 loan is $7800.00. I have been paying on this loan since that date. [The complaint was filed on May 2, 2019.][219]

- Netcredit is a company that [is] not interest[ed] in listening to any complaint or trying to work with [] me to help because I can't pay the high amount of interest[,] and the very little amount going towards the principle [--] that is unfair and wrong for anybody to have to do. I am not trying to not pay them but I have a problem with them trying to lock me in a five year loan which they seek to collect three time the loan amount they gave me. I am a XXXX Veteran that

---

[216] #3027480 (Illinois borrower)

[217] #3190625 (Illinois borrower)

[218] #3407914 (Illinois borrower)

[219] 3229883 (South Carolina borrower)

gets a monthly check that all I have to live on[.] [F]or Netcredit to do this is shameful and disgraceful. PLEASE HELP!![220]

- At the time, I had been struggling financially because . . . I lost the father of my [] children. I lost more than half of our income and could not keep up on my salary alone. I became in over my head with debt to many people . . . . I took out the loan through NetCredit for the amount of $3700.00 . . . I was steadily making payments every two weeks on this loan for $230.00 . . . I am a XXXX employee who was out of work and without pay for the duration of the XXXX . . . NetCredit deferred my payments without question or hesitation giving me the peace of mind that everything was going to be okay . . . . [M]y intent was to pay the balance in full. What NetCredit failed to tell me was that the payments I had made toward the loan did not go to the principle whatsoever . . . . By the time the XXXX was over, they had tacked on over $1000.00 in interest to the loan. Despite almost paying the loan off, they still reported I owed $3700.00 plus accrued interest at that time. They told me that since I have been in non-pay status for so long . . . that if I didn't make a payment immediately they would send me to collections . . . . They have yet to close the account and are continuing to rack up interest and report the balance of the loan increasing every month. They are reporting that I owe 6600.00 . . . . I am a single mother of [] children who are not even old enough to be in school yet. I can not afford what they are putting on me and they are making it so I can not provide for my family by destroying my credit.[221]

- I got a loan in the amount of $2100.00. [D]ecided to login into my account to see how much principal was left on the loan and its $2100.00. Only $57.00 paid to principal in the last year. Ive made all my payments on time, $58.00 every 2 weeks. Something can not be right with this loan. I feel as though Ive been getting robbed for the past year. I do not understand. My [fiancé] has a loan with NetCredit as well within the same timeframe . . . Loan amount $3000.00 . . . principal is only down to $2900.00. Her payments are $78.00 every 2 weeks, never missed a payment. Please help![222]

- I was contacted by netcredit advising that I was pre approved for an installment loan. As I am a single mother of XXXX and have been . . . behind on HOA fees and other bills and decided to take out the loan . . . . I checked an account that I used and realized that they were taking out the XXXX every 2 weeks . . . . I told them I could not afford the XXXX coming out every 2 weeks as this is not what I [anticipated]. This has brought my checking account seriously negative and my bank is giving me a hard time as well . . . . I feel this is very deceptive, [an] installment loan is supposed to be a monthly payment[,] a payday loan is a bi weekly payment. I really need help with this. I can [make] [monthly] payments[,] I can not make bi weekly payments of XXXX[,] that is too much and it is really creating a hardship for my family.[223]

- I took out a loan in 2014 with NetCredit for $2600.00. I paid on the loan for 40 payments . . . . I ran into an inability to pay and wanted to work with Net Credit to settle the loan. I even hired a

[220] #3251851 (Georgia borrower)

[221] #3370736 (California borrower)

[222] #3393212 (Virginia borrower)

[223] #3053313 (Utah borrower)

firm to assist. Net Credit was not willing to work with the firm nor myself and an agreement was never reached. My fear is that they are holding back wanting to work with me while late fees and interest continue to accrue at an alarming rate.[224]

- I am disputing this loan based on that it is impossible to pay it off at 98.8 % . . . I will pay over $7000.00 for a $3900.00 loan at 98.8 % . . . . I have called and spoke with them about 10 times within the last 3 1/2 weeks. NETCREDIT WILL NOT WORK WITH ME OR DISCUSS ANY OPTIONS WITH ME. All I am asking for is to take the interest away from this loan and allow me to make monthly payments that I am able to handle. I understand my responsibility of the balance of the loan but they do not work with their consumers, instead make a profit with predatory lending practices.[225]

- I offered NetCredit a reasonable settlement amount which they dismissed and demand full payment which is completely insane. I had no idea after I paid $3000.00 on $3400.00 loan that I would have to pay an additional $4000.00 to pay it off or continue making the payment and by the time it was paid off I would have paid many thousands of dollars.[226]

- I took a loan from NetCredit in the amount of $1200.00. To date I have made 11 payments at the payment amount of $100.00 each for a total paid of $2000.00 plus a check payment of $100.00 which has not been cashed or applied to my account. NetCredit states I still have fourteen more payments of $100.00 each to make. For a $1200.00 loan, I will end up paying $3600.00, more than THREE TIMES the loan amount!![227]

- [I] [b]orrowed $1400.00 . . . Paid [x]payments of $110.00 = $1100.00 . . . balance is currently $1400.0 . . .  Was unable to keep up with payments due to XXXX income (was unemployed for 10 months- catching up on past debts and medical bills ). Several attempts were made to set up payment agreements with NETCREDIT . . . but Net Credit didn't agree . . . . I was NOT aware the interest on $1400.00 would be $1200.00 (almost the amount of the loan). I would have NEVER agreed to this loan. I am a veteran and XXXX civilian on a tight budget. This interest charged on the loan is hideous. I could have borrowed that amount from a local bank/lender and not have that much in interest. This is a horrible way to take advantage of those that are in need![228]

- NetCredit is a company that take advantage of people ... they approve your loan on line then hit you with 98 % interest . . . . I took a loan out for $6000.00 ... once I found out the loan was to be taken out of my checking account 2x a month [] I called and asked them to adjust to 1x a month ... they said they couldn't do ... this was the biggest mistake I have ever made to take a loan out [] with them ... I was unable to pay and got in touch to work something out ... they sent gave me minimal options and then sent a letter saying that I can pay off the balance which now is $7800.00 . . . . I had been paying the monthly for a year at least??? and now I owe XXXX

---

[224] #2418022 (California borrower)

[225] #2183667 (Virginia borrower)

[226] #3270880 (California borrower)

[227] #3324359 (South Carolina borrower)

[228] #2144831 (Virginia borrower)

more??? This is a company that the government should look into … they are sharks!!!! I would recommend that people stay away from this company!!![229]

LoanMart

- I have this loan and ... being a senior citizen the payment[s] are [too] high[.] I am [p]aying $420.00 each month[,] have not paid for this month[,] and they can take my car at anytime[.] I am trying to work with them[,] my health is now becoming poor as I can not sleep . . . .  I want to pay them and I will but I need the payment to be [up to] $320.00 per month[,] which would be a hardship but I could do that . . . . had I known I would not have take[n] this loan out and would have just gone homeless . . . .at least I would have had a car to sleep in and live not . . . on the street with no car or a place to live[.][230]

- I have been paying monthly, often times after . . .  my due date, but I get the payment in monthly. On two occasions I was given extensions, but I have paid way more than the $1500.00 loan amount and expected to be paid off . . . .  I was told because I was late many times, my loan has been extended for approx 20 more months, unless I can come up with the $1500.00 original loan amount plus $680.00 in late fees. Had I paid on time by the 11th if every month I would be paid off. When I told them that was ridiculous that it was still paid in the same month they told me too bad . . . . so now I have to pay another $4000.00 plus dollars ( {$210.00} x 20 ) on time . . . or it may take longer . . . . I [will] never get my title back or get this loan paid off … . I will be paying over $8000.00 on a $1500.00 loan.[231]

- My Loan charged off  . . . .  after i turned [in] the vehicle . . . . They auctioned off the vehicle and sent me a final charge off amount of $2600.00 . . . I received a payment settlement request in XXXX of XXXX for $1500.00 . . . As of today, they are reporting that i owe $7700.00 as the interest is still being charged on a loan they have been " charged off ''. They are . . . inflating the amount owed to well over 300 % of what the original loan was . . . . They already have my car, now they want to ruin my credit. They are predatory [and] overly punitive with high interest after the charge off.[232]

- I was in need of a loan to move and the television and radio were [inundated] with advertisements from "1-800- Loan-Mart XXXX[.]" I called and they offered me a " title loan '' for $10000.00 specific to my . . . Toyota Camry. The payment was and remains a staggering $850.00 per month. Also, my ex-husband bounced a check to me . . . which prevented making a payment so I called for an extension [but] they repossessed my car . . .  and charged me almost $2500.00 to get the car back . . . . I have been paying the $850.00 monthly for over two years and the principle balance or payoff remains just a [little] less than the original loan. What guidelines

---

[229] #1998233 (California borrower)

[230] #2894498 (California borrower)

[231] #3126449 (Wisconsin borrower)

[232] #1792457 (California borrower)

regulate the loan industry and why are they permitted to be rude, abusive and lend money like . . . loan sharks?[233]

- 1 800 Loan Mart has repeatedly called me 30 times a day for the last 7 months[,] also have incorrectly reported negative things on my credit report, also called and threatened me with imprisonment lawsuit . . . [A]fter I paid them $4000.00 and they took my vehicle[,] now they're saying I still owe them $5000.00[.] [T]he original amount of loan was $2500.00.[234]

- I needed money to pay for my moving expenses. I took a title max car loan. I 've tried to keep up with the payments but fall short so my payments are late and include a hefty penalty payment in addition to interest . . . . My plan is to pay the entire bill with large lump sum payments. The problem is the amount that is added to the principal balance makes it difficult to pay the loan off. My car was reposed this morning. In order to get my car back, I must pay them $900.00 which includes towing, paying for personal property left in the car and making a trip to the police department to obtain a [repossession] receipt. This is robbery.[235]

- I took out a loan in . . . 2014 for $5700.00. I've made payments of $450.00 since then [totaling] about $8000.00. I just recently got a payment history to see my balance due and almost none of my payments have applied to principal balance, almost all of it has gone towards interest! I spoke with a customer service rep today and they still want $7000.00 to close [the] account. I told them I no longer have a steady job or income and have been going through health/medical issues and have been in and out of the hospital. I just want to settle amount of another $1000.00 to close account. I 've already paid back the $5700.00 and interest of more than $2000.00 and still going to give $1000.00 to settle. I 'm trying to be honest with them and get a settlement and close my account.[236] (This complaint was submitted on August 12, 2016).

CURO (SpeedyCash brand)

- Speedy Cash took money from my . . . debit card without my authorization. I receive my social security SSI payments in the amount of $730.00 on this card . . . my card was debited by Speedy Cash for the amount of $520.00. When I called them they stated that my account was past due . . . and that it had gone into collections . . . . They also said that there was nothing they could do because the third party collector was involved . . . When I called [the third party], the representative told me that they were not involved in collecting on this account any longer because Speedy Cash had taken the loan back. I am confused by the back and forth. Now, I am in a horrible position. My account was basically drained which leaves me with no money for the entire month. No money for rent, utilities, doctor visit, or prescriptions. I . . . have no idea what I am going to do.[237]

---

[233] #1867122 (California borrower)

[234] #2356677 (California borrower)

[235] #2157776 (Nevada borrower)

[236] #2958482 (California borrower)

[237] #2657445 (Missouri borrower)

- I have paid $1600.00 on the account and all payments have gone towards the interest and late fees. I have given seven payments at $220.00 each month since the loan and I owe at this time $2800.00 at this rate the loan will cost more than I borrowed. I need help because this is a car title loan and I can't afford losing my car over this. I have called the corporate office and . . . they all say the same thing (--) there is nothing that can be done except keep making the payments . . . It's like I borrowed the monies from [someone] in a street alley.[238]

- I borrowed $750.00 . . . .First month repayment . . . $240.00 . . . . Remaining balance over $1000.00. Next installment $240.00 . . . remaining balance over $1000.00. Payments increase as does amounts owed. Decline in principal is offset by increase in fees or 'interest.' . . . . Never ending cycle.[239]

- [I] borrowed $1300.00 from speedy cash and the first payment was ok ($77.00) and after that they were $140.00 every other week and [I] am now unable to make these ridiculous payments [because] my hours have been cut at [work]. I notified them  . . . I am in default and [I] have sent emails . . . . [T]hey say to contact them if [you can't] make a payment and they will work with you. All they do is extend it 4-5 days out and [that don't] help either! I am desperate[, I] have called about filing bankruptcy and [I] may have to and [I don't know what else to do.[240]

- Speedy Cash stopped the payday loans and changed to the installment loans . . . . If your payment is due on a certain day they could move it up by 4 days but it [doesn't] help if that 4th day is not a payday. I have paid so many overdraft and bank fees until I feel ashame[d] and stupid. I needed the money but once you get it [it's] hard to get rid of it. I [don't] understand [what's] hard about reasonable payment arrangements. Your 4 day extension is not realistic to customers.[241]

- I currently have an installment loan in the amount of $2600.00 from Speedy Cash . . . . At the same time, I also have [x] $300.00 payday loans from [x] different storefronts in my neighborhood, including Speedy Cash. So basically, I have both a $300.00 payday loan from Speedy Cash and a $2600.00 installment loan. Is that legal? I am drowning in debt and I can't handle it anymore. I need some relief. This is very stressful and expensive for me, and I don't know what to do . . . . . I 've been paying about $140.00 every two weeks on the Speedy Cash installment loan, and I 've already paid $2200.00 . . . but my total balance is still $2600.00! How is this even possible? Are all my payments going toward interest only? I can't keep paying on all these loans. I need to prioritize my rent ($1100.00), car payment ($320.00), insurance ($180.00) and my other basic needs like food and utilities. After taxes, I only bring home about $1800.00 a month. So this is really hurting me and I 've reached my breaking point . . . . I don't want to default on the loan, but at this point I'm not seeing another alternative. I recently received XXXX

---

[238] #2792493 (California borrower)

[239] #2772146 (Utah borrower)

[240] #3046440 (Tennessee borrower)

[241] #2718087 (Mississippi borrower)

utility disconnection notices from my gas, water and light companies[.] To make matters worse, I'm also facing being laid off from work in the next few months. I need help.[242]

- I could not get Speedy Cash to stop taking payments out of by bank account using my debit card. I called them, I wrote them. I tried to set up payments. I told my bank to not authorize any more payments. Didn't help. Finally I had to shut down all my accounts at my bank and go to another bank. I could not believe it when I when, at my new bank, Speedy Cash withdrew $100.00, the next day $60.00. I have no idea what that amount is for. I'm disputing the charges Can you help me?[243]

### 2.    Particular harm to communities of color.

High-cost lending disproportionately harms communities of color, exploiting and perpetuating the racial wealth gap. A legacy of racial discrimination in housing, lending, banking, policing, employment, and otherwise, has produced dramatically inequitable outcomes that persist today. Communities of color, often largely segregated due to the history of redlining and other racially exclusionary housing policies, experience higher rates of poverty, lower wages, and higher cost burdens to pay for basic living expenses. Payday lenders peddling unaffordable loans cause particular harm to these communities,[244] which several of the undersigned groups represent.

Storefront lenders, which often offer both short-term and longer-term loans, target borrowers of color, in part by concentrating their locations in communities of color.[245] Indeed, the communities most affected by redlining are the same who are saturated by payday lenders today. Multiple studies have found that payday lenders are more likely to locate in more affluent communities of color than in less affluent white communities.[246] In light of this targeting, it is unsurprising that a disproportionate share of

---

[242] #1377341 (California borrower)

[243] #2158561 (Kansas borrower)

[244] *See* CFPB Payday Rule, 82 Fed. Reg. at 54556-57.

[245] *See, e.g.*, Delvin Davis, *et al.*, *Race Matters: The Concentration of Payday Lenders in African-American Communities in North Carolina*, Center for Responsible Lending (2005), http://www.responsiblelending.org/north-carolina/nc-payday/research-analysis/racematters/rr006-Race_Matters_Payday_in_NC-0305.pdf (finding that, even when controlling for a variety of other factors, African-American neighborhoods had three times as many payday lending stores per capita as white neighborhoods in North Carolina in 2005); Assaf Oron, *Easy Prey: Evidence for Race and Military Related Targeting in the Distribution of Payday Loan Branches in Washington State*, Department of Statistics, University of Washington (2006) (concluding based on a study of Washington State payday lenders that "payday businesses do intentionally target localities with a high percentage of African Americans.").

[246] Li, *et al.*, *Predatory Profiling: The Role of Race and Ethnicity in the Location of Payday Lenders in California*, Center for Responsible Lending (2009), http://www.responsiblelending.org/payday-lending/research-analysis/predatory-profiling.pdf; Brandon Coleman and Delvin Davis, *Perfect Storm: Payday Lenders Harm Florida Consumers Despite State Law*, Center for Responsible Lending at 7, Chart 2 (March 2016); Delvin Davis and Lisa Stifler, *Power Steering: Payday Lenders Targeting Vulnerable Michigan Communities*, Center for Responsible Lending (Aug. 2018), https://www.responsiblelending.org/research-publication/power-steering-payday-lenders-targeting-vulnerable-michigan-communities; Delvin Davis, *Mile High Money: Payday Stores Target Colorado Communities of Color*, Center for Responsible Lending (Aug. 2017; amended Feb. 2018),

payday borrowers come from communities of color, even after controlling for income.[247] The disparity in payday loans is especially significant given that African Americans and Latinos are much less likely to have checking accounts, typically a requirement for a payday loan, than whites.[248]

Online high-cost lenders may focus more on subprime credit score than geography. But the historical discrimination against communities of color is also reflected in credit scores.[249] Lenders that focus on subprime borrowers inevitably will disproportionately target borrowers of color. The algorithms and big data that "fintech" lenders use may also result in disparate impacts on these communities.[250]

Communities of color have historically been disproportionately left out of the traditional banking system, a disparity that persists today. About 17 percent of African American and 14 percent of Latino households are unbanked, compared to three percent of white households.[251] High-cost loans, with their high association with lost bank accounts,[252] drive borrowers out of the banking system and exacerbate this disparity. By sustaining and exacerbating an existing precarious financial situation, high-cost lending reinforces and magnifies existing income and wealth gaps—legacies of continuing discrimination—and perpetuates discrimination today.[253]

---

https://www.responsiblelending.org/research-publication/mile-high-money-payday-stores-target-colorado-communities-color.

[247] CFPB Payday Rule, 82 Fed. Reg. at 54556. African-Americans are payday borrowers at three times the rate, and Hispanics at twice the rate, of non-Hispanic whites. 82 Fed. Reg. at 54556-57 (citing 2015 FDIC National Survey of Unbanked and Underbanked Households (calculations using custom data tool)). Vehicle title borrowers are also disproportionately African-American and Hispanic. *Id.*

[248] 2017 FDIC National Survey of Unbanked and Underbanked Households, at 3, *available at* https://www.economicinclusion.gov/downloads/2017_FDIC_Unbanked_HH_Survey_Report.pdf.

[249] *See* Chi Chi Wu, *Past Imperfect: How Credit Scores and Other Analytics "Bake In" and Perpetuate Past Discrimination*, National Consumer Law Center (May 2016), https://www.nclc.org/images/pdf/credit_discrimination/Past_Imperfect050616.pdf.

[250] *See* Testimony of Chi Chi Wu, National Consumer Law Center, Before the U.S. House Committee on Financial Services Task Force on Financial Technology Regarding "Examining the Use of Alternative Data in Underwriting and Credit Scoring to Expand Access to Credit" (July 25, 2019); Carol A. Evans, *Keeping Fintech Fair: Thinking about Fair Lending and UDAP* Risks, Consumer Compliance Outlook (2017), https://consumercomplianceoutlook.org/2017/second-issue/keeping-fintech-fair-thinking-about-fair-lending-and-udap-risks/.

[251] 2017 FDIC National Survey of Unbanked and Underbanked Households, at 3, *available at* https://www.economicinclusion.gov/downloads/2017_FDIC_Unbanked_HH_Survey_Report.pdf.

[252] CFPB found that about half of borrowers with online payday loans paid a nonsufficient funds (NSF) or overdraft fee. These borrowers paid an average of $185 in such fees, while 10% paid at least $432. It further found that 36% of borrowers with a bounced payday payment later had their checking accounts closed involuntarily by the bank. CFPB Online Payday Loan Payments at 3-4, 22 (April 2016).

[253] For further on the undersigned groups' concerns about the harm payday and vehicle title loans cause communities of color, and the efforts we have long made to stop that harm, see the sampling of references cited here: http://stopthedebttrap.org/wp-content/uploads/2014/11/PayDay-loans.7-2016.pdf; http://stopthedebttrap.org/wp-content/uploads/2015/08/lcchr_resolution_payday_deposit_advance_lending_12dec2015.pdf; http://stopthedebttrap.org/wp-content/uploads/2015/08/naacp_letter_obama_payday_15december2014.pdf;

H.  **The proposal is inconsistent with the agency's obligations under the Community Reinvestment Act.**

The objective of the Community Reinvestment Act, which the FDIC implements as to the banks it supervises, is to ensure that financial institutions meet the banking needs of the communities they are chartered to serve, including low- and moderate-income neighborhoods and individuals.[254] This legal obligation is considered a *quid pro quo* for the valuable public benefits financial institutions receive, including federal deposit insurance and access to favorably priced borrowing through the Federal Reserve's discount window.[255]

In contradiction to this obligation, the FDIC now puts forth a proposal that would encourage banks to facilitate predatory lending. CRA requires that banks serve communities' credit needs.[256] But the data show that high-cost, unaffordable loans to financial distressed consumers do the opposite, leading to high-cost cycles of indebtedness that not only leave borrowers' needs unmet but leave them affirmatively worse off than before the lending began.

Through rent-a-bank schemes, banks rent out their privileges to entities that spread predatory lending to other communities far and wide. Indeed, through these schemes, banks are involved in scurrilous online lending that they would not do through their own channels or in their own communities. From what we can tell, FinWise Bank, Republic Bank & Trust, and Capital Community Bank are not offering the loans that we have described in these comments through their limited number of branches or on their own websites. Yet through rent-a-bank lending, banks can profit through the operations of third parties that do not have CRA responsibilities. The proposed rule would only exacerbate this irresponsible lending that is at the core of what the CRA is designed to prevent.

While the FDIC has proposed to revise the CRA regulations, the CRA proposal would not prevent this kind of predatory bank lending.

VII.  **The FDIC fails to consider the risks the proposal poses to the safety and soundness of State-chartered banks, despite having long acknowledged the risks of predatory lending.**

Even as the proposal claims that it will mitigate safety and soundness risks caused by potential impacts on liquidity, it does not so much as mention the clear risks the proposal poses—ignoring its historical

---

http://ourfinancialsecurity.org/2011/04/hilary-shelton-cfpb-testimony/;
http://www.responsiblelending.org/payday-lending/policy-legislation/states/Letter-JBond_Rendell-012306.pdf;
https://nalcab.org/nalcab-new-pay-day-rule-step-forward-latino-consumers-businesses/;
http://stopthedebttrap.org/blog/cfpb-payday-lending-rule-will-disrupt-abusive-lending-protect-families-financial-predators/.

[254] 12 U.S.C. 2901 *et seq.*

[255] Federal Reserve Board Chairman Ben S. Bernanke, "The Community Reinvestment Act: Its Evolution and New Challenges," Speech at the Community Affairs Research Conference, Washington, D.C. (March 30, 2007), *available at* http://www.federalreserve.gov/newsevents/speech/Bernanke20070330a.htm#f2.

[256] 12 U.S.C. 2901.

position that predatory lending poses "significant risks" for banks.[257] The current proposal and other recent agency actions, by encouraging bank involvement in high-cost, predatory lending, will undoubtedly increase safety and soundness risks for banks.

In the late 1990s and early 2000s, banks entered into agreements with payday lenders to help the payday lenders evade state interest rate caps. In 2005, the FDIC issued guidance addressing payday loans, emphasizing safety and soundness concerns. These included credit risk in light of limited analysis of ability-to-repay; transaction risk, should the non-bank misrepresent information; and reputation risk associated with facilitating loans with terms that a non-bank could not make directly. The guidance also expressed substantive concerns with the payday loan product, including that frequent renewals may indicate a lack of ability to repay. The guidance advised that borrowers not be kept in payday loans for more than 90 days within 12 months. And it cited the federal banking agencies' general guidance on subprime lending, which identifies lending to a borrower with "little or no ability to repay from sources other than the collateral pledged" as a characteristic of abusive lending.[258] The 2005 guidance also notes that the FDIC may examine the non-bank payday firms associated with state banks.[259]

The 2005 guidance had the impact of shutting down most FDIC-bank involvement in rent-a-bank schemes involving short-term payday loans. For those that remained, as noted above, the FDIC ended them through enforcement actions, citing "inherent risks associated with payday lending activities"[260] and unsafe or unsound practices, as well as unfair or deceptive practices, involved in a supervisee's "rent-a-BIN" arrangement.[261]

The risks highlighted by the FDIC in the early-to-mid 2000s remain today. In fact, the reputation risk by bank involvement in high-cost lending is likely only higher than it was in the early 2000s. Since then, as noted in section VI above, the harms of high-cost lending, both short-term loans and longer-term loans, have become more fully documented and known. Several states have had statewide ballot initiatives that capped interest rates at 36% APR or less. And direct bank involvement in payday lending by a handful of banks, until 2013 guidance that generally led to its end,[262] was met with sweeping public

---

[257] FDIC, 2005 Guidelines for Payday Lending (Revised Nov. 2015), https://www.fdic.gov/news/news/financial/2005/fil1405a.html.

[258] January 31, 2001, interagency Expanded Guidance for Subprime Lending Programs (FIL 9-2001).

[259] FDIC, 2005 Guidelines for Payday Lending at 2 (Revised Nov. 2015), https://www.fdic.gov/news/news/financial/2005/fil1405a.html.

[260] *See* SEC Form 8-K (Feb. 24, 2006), *available at* https://www.sec.gov/Archives/edgar/data/921557/000110465906011951/a06-5812_18k.htm (where Republic Bancorp discloses that its Indiana bank has exited the payday loan arrangement after the FDIC cited "inherent risks associated with payday lending activities"); *see also*, Robert Schoenberger, *Republic to Get Out of Payday Loans; FDIC Urged Bank to Exit Business*, The Courier-Journal, Mar. 3, 2006.

[261] *See In the Matter of First Bank of Delaware, and CompuCredit Corporation*, Notice of Charges for an Order to Cease and Desist and For Restitution, Federal Deposit Insurance Corporation, FDIC-07-256b, FDIC-07-257k, *available at* https://www.fdic.gov/news/news/press/2008/FBD_Notice_of_Charges.pdf (finding that the bank had operated in violation of Section 5 of the FTC Act (unfair or deceptive practices) and "without effective oversight" of third-party lending programs and ordering the termination of the "rent-a-BIN"  . . . arrangement).

[262] The OCC rescinded that guidance in 2017.

condemnation from virtually every sphere—the military community,[263] community organizations,[264] civil rights leaders,[265] faith leaders,[266] socially responsible investors,[267] state legislators,[268] and members of Congress.[269] Moreover, the rise of online and social media make it faster and easier to garner outrage at

---

[263] *See, e.g.*, Testimony of Steve Abbot, former President of the Navy-Marine Corps Relief Society, Before the U.S. Committee on Banking, Housing and Urban Affairs (Nov. 3, 2011) (noting bank payday loans among the "most egregious trends"); Comments of Michael Archer, Director of Military Legal Assistance, Marine Corps Installations East, to CFPB (April 4, 2012): "Most ominously, a few large banks have gotten into the business of payday loans through the artifice of calling the loans open ended credit," http://www.regulations.gov/#!documentDetail;D=CFPB-2012-0009-0056.

[264] Hundreds of groups urged the prudential regulators to stop banks from trapping borrowers in payday loans. Letters from approximately 250 groups to FDIC, OCC, FRB and CFPB, March 13, 2013 (http://ourfinancialsecurity.org/blogs/wp-content/ourfinancialsecurity.org/uploads/2013/03/Bank-Payday-Sign-On-Letter-3-13-13-Final.pdf) and February 22, 2012 (http://www.responsiblelending.org/payday-lending/policy-legislation/regulators/Dear-Regulators.pdf). Thousands of individuals and many community groups filed comments with the OCC urging that Wells Fargo's Community Reinvestment Act rating be negatively impacted because it makes payday loans, including CRL and NCLC (http://www.responsiblelending.org/payday-lending/policy-legislation/regulators/cra-comment_wells-nov-29-2012_final.pdf).

[265] *See, e.g.*, Letter from Benjamin Todd Jealous, President and Chief Executive Officer, NAACP, to FDIC, OCC, FRB, and CFPB opposing bank payday lending (Feb. 21, 2013), http://www.responsiblelending.org/payday-lending/policy-legislation/regulators/NAACP-redatory-Pay-Day-Loans-to-regulators-BTJ.pdf.

[266] *See, e.g.*, Elaina Ramsey, Faith Groups Take On Payday Lenders, Sojourners, https://sojo.net/magazine/stub/faith-groups-take-payday-lenders (discussing a National Day of Action among faith leaders in early 2013 to address payday lending). In connection with this National Day of Action, Rev. DeForest B. Soaries, jointly with other nationally prominent African American ministers, called for "an end to enslavement to both payday lenders and the banks now offering equally dangerous products" in *An Emancipation Proclamation from Payday Lending.* Center for Responsible Lending, *Bank Payday Lending: Overview of Media Coverage and Public Concerns*, CRL Issue Brief, March 7, 2013, http://www.responsiblelending.org/payday-lending/tools-resources/BPD-media-coverage-3-7-13.pdf

[267] For proxy year 2013, investors filed shareholder resolutions with the four largest banks making payday loans expressing concern about the product and requesting data, which none of the banks agreed to provide. Wells Fargo (https://trilliuminvest.com/shareholder-proposal/payday-lending-wells-fargo-2013/); Fifth Third Bank (http://www.trilliuminvest.com/resolutions/payday-lending-fifth-third-bancorp-2013/); U.S. Bank; (https://www.sec.gov/divisions/corpfin/cf-noaction/14a-8/2013/dominisocial012513-14a8.pdf); and Regions (https://www.sec.gov/divisions/corpfin/cf-noaction/14a-8/2013/congregationsisters011413-14a8.pdf).

[268] *See, e.g.*, "Legislative Black Caucus slams Regions Bank over payday-style loans," Raleigh News and Observer "Under the Dome," Oct. 11, 2012, http://www.cashcowadvances.com/paydayblog/legislative-black-caucus-slams-regions-bank-over-payday-style-loans.html (quoting letter from N.C. Senator Floyd McKissick, Jr., chairman of the N.C. Legislative Black Caucus, to Regions Bank, which stated: "We are deeply concerned about recent reports of Regions Bank offering its 'Ready Advance' payday loans in North Carolina . . . . High-cost, short-term balloon loans like these sharply increase the financial distress of families under economic strain"); Letter from Arizona Democratic Caucus to the prudential banking regulators, February 2012 (noting that Arizona "has spent countless state resources to study and understand the effects of [payday lending], and ultimately outlaw payday lending entirely" and calling on federal regulators to "take immediate action so that meaningful reforms taking place in Arizona and throughout the country in the name of consumer protection will not be undermined.").

[269] In January 2013, several Senators wrote the FRB, OCC, and FDIC urging action to address bank payday lending (http://www.blumenthal.senate.gov/newsroom/press/release/blumenthal-calls-on-regulators-to-act-to-stop-abusive-bank-payday-lending). In April 2013, House members did the same. For further documentation of

a bank that is facilitating predatory lending.

In addition, credit risk may be even greater today, as banks may retain some ongoing interest in the loans (though nowhere near the predominant one) as lenders try out more sophisticated schemes to skirt regulators or courts.

The signals the FDIC is sending, and the direct aid of the proposed rule, will pose safety risks to State-chartered banks that the FDIC has not acknowledged or considered.

### VIII. The FDIC fails to consider the proposal's impact on market participants that comply with state law.

The FDIC also has failed to analyze the proposed rule's impact on other market participants. Such analysis might reveal anti-competitive impacts on other non-bank lenders—those lenders that obtain state licenses and comply with state interest rate limits. Such lenders might face greater difficulty in raising capital if forced to compete for investors with growing numbers of non-bank lenders who can offer outsized returns by exceeding state interest rate limits. The FDIC has not analyzed the extent to which eliminating rent-a-bank lending would result in a more level playing field on which state-law compliant lenders could compete for investors to fund their loans, thereby increasing access to credit at non-usurious rates.

### IX. Conclusion

For all of the reasons discussed above, the undersigned groups urge the FDIC to withdraw its proposal. The FDIC lacks the authority to regulate the interest rates of non-banks, the proposal is unreasoned, and it is likely to open the floodgates to predatory lending, resulting in severe harm to consumers across the country. Thank you for your consideration.

**Attachments:**   **Appendix A: NCLC Fact Sheet: Stop Payday Lenders' Rent-a-Bank Schemes**

**Appendix B: Individual Borrower Experiences with Payday and Car Title Loans (Short- and Longer-Term Loans)**

(see next page for contacts)

---

opposition to bank payday lending, *see* Center for Responsible Lending, *Bank Payday Lending: Overview of Media Coverage and Public Concerns* at 10, CRL Issue Brief, March 7, 2013, http://www.responsiblelending.org/payday-lending/tools-resources/BPD-media-coverage-3-7-13.pdf.

Contacts:

Center for Responsible Lending                    National Consumer Law Center

Rebecca Borné                                     Lauren Saunders
Senior Policy Counsel                             Associate Director
(202) 349-1868                                    (202) 595-7845
rebeccabo@responsiblelending.org                  lsaunders@nclc.org

Ellen Harnick
Senior Policy Counsel / Western Office Director
(510) 379-5510
Ellen.harnick@responsiblelending.org

Will Corbett
Litigation Director
(919) 313-8544
will.corbett@responsiblelending.org

Mike Calhoun
President
(202) 349-1862
mike@responsiblelending.org

**Appendix A**

**Fact Sheet: *Stop Payday Lenders' Rent-a-Bank Schemes***
**National Consumer Law Center**



# STOP PAYDAY LENDERS' RENT-A-BANK SCHEMES!

Payday lenders are starting to make **usurious loans up to 160% in states where those rates are illegal** by using banks, which are not subject to state rate caps, as a fig leaf**.** Banks have little to do with the loans, which they immediately sell. Bank regulators shut down these schemes in the early 2000s, but two state-chartered banks, FinWise Bank and Republic Bank and Trust, both regulated by the FDIC, are again helping payday lenders evade the law in 28 states & DC.

## OppLoans + FinWise Bank = **160%** APR

OppLoans ignores the interest rate cap laws of 24 states & DC
(State rate caps are shown for $500, 9-month loan)



● **OppLoans uses a rent-a-bank scheme in 24 states and DC to evade state rate caps.**
○ States that allow OppLoans' 160% APR loans.
● OppLoans does not lend in these states, which have a history of enforcing rate caps.

## Rise (Elevate) + FinWise Bank = **99%-149%** APR

Rise ignores state interest rate caps in 18 states & DC
(State rate caps shown are for $2,000, 2-year loan)



## Elastic (Elevate) + Republic Bank & Trust = **109%**

Elastic uses a rent-a-bank scheme to offer lines of credit at rates above those allowed in many states. Elastic does not disclose an APR to consumers, but its SEC filing gives an example of a $2,500 advance with an effective **APR of 109%.** Actual APRs vary depending on the amount advanced and repayment schedule. The Elastic line of credit is offered in 14 states and DC where rate caps are far lower for lines of credit.

| Maximum APR (with fees) for $2,000 advance repaid over 2 years | | | |
|---|---|---|---|
| Alaska | 31% | Minnesota | 36% |
| Arizona | 41% | Montana | 36% |
| Arkansas | 17% | Nebraska | 30% |
| D.C. | 25% | Nevada | 42% |
| Florida | 34% | Oregon | 36% |
| Kentucky | 35% | South Dakota | 31% |
| Louisiana | 39% | Texas | 28% |
| Maryland | 33% | | |

## Coming soon to California

Speedy Cash (Curo), NetCredit (Enova), and Rise (Elevate) have announced plans to their investors to **use rent-a-bank schemes to evade a new California law** going into effect on January 1, 2020 that will ban their current loans above $2,500 that go up to 135%-191% APR.



**Federal and state legislators, regulators of both banks and payday lenders, and enforcement agencies must all do their part to stop payday lenders from evading state interest rate caps through rent-a-bank schemes.**

**November 2019**

**Appendix B**
**Individual Borrower Experiences with Payday and Car Title Loans**
**(Short- and Longer-Term Loans)**

<u>Introduction</u>

Consumers across the country are devastated by the impacts of payday, car title, and other high-cost loans.  The stories below highlight real customers' experiences with predatory lending and illustrate the harms associated with these loans.  Stories were collected from a variety of sources. The Center for Responsible Lending has an established relationship with some of the victims who recounted their stories.  Other stories were obtained by Freedom of Information Requests for complaints and original loan contracts that were sent to the consumer protection agencies of certain states.  Borrowers' experiences were also derived from news articles and other media sources.

<u>Coding</u>

Following each story, one or more code is applied, indicating the following:

*Type of harm experienced:*

"**1**"   Borrower endures long loan sequences, including frequent loan renewals, loan flipping, or long cycles of taking out one loan to pay another.

"**2**"   Borrower experiences delinquency and/or default, including lender and bank fees triggered by the loan itself, aggressive debt collection, and loss of a vehicle.

"**3**"   Borrower suffers collateral harms from making unaffordable payments, including defaulting on other major financial obligations or basic living expenses.

*Other loan features:*

"**LT**"   Long-term loan

"**CT**"   Car title loan

"**SL**"   Small loan with principal of $200 or less.

***Asterisks*** following an annual percentage rate (APR) indicate approximate APR as calculated by CRL staff, based on the information provided by the borrower.

<u>Borrower Experiences</u>

1. Arthur, a 69-year-old warehouse worker and grandfather of seven, started with a loan of $200 from Advance America. The loan eventually increased to $300. Every payday, rather than defaulting or coming up short on bill money, Arthur went into the Advance America store and paid a fee of $52.50 so Advance America would not deposit his check for the full loan amount. Advance America flipped the loan over a hundred times, until his total interest paid was an

1

estimated $5,000. The clerks knew him by name and often had his paperwork ready for him when he came in.  Payday lenders have a name for consumers they see every payday: "26ers"— because they pay up every two weeks, 26 times a year. In Arthur's case, they saw him once a month rather than every two weeks, but only because his repayment came from his monthly Social Security check.
Source: *Caught in the Trap: The real story from payday lending borrowers* – CRL Issue Brief, June 2010
(1, 3, SL)

2. Mary is a single mother who has owned her one-story brick house in New Castle, Delaware for nearly a decade. After falling behind on the mortgage payments, she applied for and received a 135% APR payday installment loan from California-based, LoanMe. Mary, who works part-time as a dietary aid and receives disability payments, immediately put the money toward the mortgage and repaid the loan in the first month to avoid paying high interest, she said. It still wasn't enough to make her current on the mortgage, so she applied for a second loan in the spring. This time, she was approved for $3,100 with an APR of 135%. She has up to 47 months to repay the loan – meaning that she will pay approximately $16,500 in principal, fees and interest if it takes her the entire time. "I make monthly payments to make sure they are not coming after me, but with interest that won't do much," she said. "Now I'm left with this bill, plus my mortgage. I'm in worse shape now."
Source: http://www.delawareonline.com/story/news/local/2016/08/26/lawmakers-eye-caps-changing-payday-lending-industry/87632062/
(1, 2, 3, LT)

3. In September 2011, Pauline, a 96-year old widow living on Social Security income and a small pension each month, received a $450 payday loan from Allied Cash Advance with an APR of 360%. To circumvent the Virginia's payday lending law, the company framed its product as an open-end credit agreement rather than a payday loan. Although she made payments to Allied totaling $597, her balance remained at $776.20. Company representatives threatened Pauline numerous times, telling her they would deal "harshly" with her for failure to pay and falsely asserting that failure to pay the loan constituted fraud and could result in jail time. Pauline believed the criminal threats were real and suffered significant distress and anxiety as a result.
Source: *Pauline Honey v. Allied Title Lending LLC*, 12-00045, Filed 9/14/12, United States District Court for the Western District of Virginia
(2, 3, LT, OE)

4. Virginia regulations for payday and car title loans. To avoid these regulations, payday lenders encouraged consumers to enter into open-end credit agreements. Allied Title Lending offers car title loans and open-end credit agreements at the same locations where the company (previously called Allied Cash) had operated as a payday lender. James and his wife, who live solely on their Social Security income, fell on difficult times financially and entered into a "Motor Vehicle Equity Line of Credit Agreement" with Allied Title Lending to assist with their struggles. James agreed to borrow $2,160 at an annual interest rate of 182.5%. Although James has never made a late payment in the five years that Allied Title Lending has continued to collect on the contract, the company has threatened James the entire time that if his payments were late, his vehicle would be repossessed. The company repeatedly tricked James into collecting much more than what was actually due under the contract by telling him he could pay off the loan more quickly if he paid more than the minimum payment each month. Allied Title Lending categorized

the loan as an open-end line of credit, but no money in excess of the original loan amount was ever made available to James, and he has paid back more than $16,000 on his $2,160 loan.
Source: *James F. Lam v. Allied Title Lending, LLC,* United States District Court for the Eastern District of Virginia
(1, 2, LT, OE)

5. Christopher received a $500 payday loan from CashNetUSA, with a total repayment of $625. He had to roll the loan over to the next month five subsequent times, meaning that he paid a $125 fee each time with none of the fee going toward paying off the principal. As a result, he paid $1250 total on his $625 loan. A few months later, CashNetUSA told Christopher they had increased his credit line to $1,500. He obtained the $1,500 loan with a total repayment of $1,875. When payment was due, Christopher did not have the money to repay the loan and contacted CashNetUSA prior to the due date to arrange a payment plan. The company debited a $375 rollover fee from his checking account and then took the entire $1,500 loan amount from his account anyway. Christopher did not have enough money in his account to pay the loan, so he accrued $934.82 in NSF fees from his bank and was unable to pay any of his other bills, including child support and rent. In order to prevent eviction, he took out another payday loan from CashNetUSA for $1,500 to pay his rent, further perpetuating the cycle of debt.
Source: Florida Attorney General's Office, 2007
(1, 2, 3)

6. Sandra, a successful professional, worked diligently to keep up with her bills. In a tough time, she turned to payday lending. After several rollovers, Sandra's first loan was due in full. She couldn't pay it off, so she took a loan from a second lender. Frantically trying to manage her bills, she eventually found herself with loans from six payday lenders including Advance America, Check Into Cash, Check 'n Go, Urgent Money Express and two on-line lenders. She paid over $600 per month in fees, none going to pay down her debt. After writing checks to payday lenders totaling $9,200, she was evicted and her car was repossessed. "At the time it seems like the way out, but this is not a quick fix. It's like a ton of bricks," said Sandra.
Source: *Caught in the Trap: The real story from payday lending borrowers* – CRL Issue Brief, June 2010
(2, 3)

7. Edith, an Asheville, North Carolina single mother, cut down on her family's groceries, stopped driving her car, and kept her lights off to save electricity as she scrambled to pay the fees on her payday loans. She took out her first $300 payday loan, and then a second and third, trying to repay the first. Edith borrowed a total of $900, received $765 in cash and paid $135 in interest ($45 x 3) at the time she borrowed. She continued to pay $270 in interest every month ($135 twice a month) for well over a year because she could not afford to repay the $900 principal owed. Though she only received cash advances totaling $765, during the next year, she paid over $3,500 in fees alone, and still owed the original $900.
Source: CRL website: *The Victims of Payday Lending*.
http://www.responsiblelending.org/issues/victims-payday.
(2, 3)

8. Vanessa obtained a $1,455 payday installment loan from The Cash Store. She was to make twelve payments over six months of $357 each, paying a total of $2,832 in finance charges, reflecting an APR of 581%. Although she certified that the payment on principal and interest did

not exceed 25% of her income, Vanessa could not keep up with her loan in addition to her ongoing monthly expenses. She paid $2,100 over four months for the loan but still owed $1,600—more than the original principal amount. She was forced to close her bank account after incurring too many overdraft fees, and she has worse credit than when she obtained the loan. She is still facing a legal debt collection action. Vanessa has testified before the Texas Legislature to tell her story, saying, "The short of it: I, like so many Texans who got payday loans, was sunk."
Source: Loan contract on file with CRL
(1, 2, 3, LT)

9.  Sherry was a struggling, working single mother who made 15 monthly payments totaling approximately $3,000 on the $1,000 payday installment loan she obtained from Western Sky. The loan required an automatic draft of 24 monthly payments of $198, which carried an APR of 233%. Sherry could not afford the payments, but continued to make them despite falling further behind on her mortgage and other bills and incurring overdraft fees from her bank. When she was offered a trial loan modification to resolve her mortgage delinquency, she attempted to stop the automatic electronic payments being made to Western Sky but was initially unsuccessful. As a result, her first trial payment on her mortgage modification was returned for insufficient funds and the mortgage company cancelled the modification. Although she initially took out the loan to improve her financial situation, it deepened her financial distress and even caused her to lose her initial chance to save her home from foreclosure.
Source: Loan contract on file with CRL
(1, 2, 3, LT)

10. Oscar Wellito took out a $100 loan American Cash Loans, LLC after he went bankrupt. He was supporting school-aged children while trying to service debt obligations with two other small loan companies. He earned about $9 an hour at a Safeway grocery store, which was not enough money to make ends meet, yet too much money to qualify for public assistance. "That's why," he testified, "I had no choice of getting these loans, to feed my kids, to live from one paycheck to another paycheck." He needed money for groceries, gas, laundry soap, and "whatever we need to survive from one payday to another payday." His loan carried a 1,147.14% APR and required repayment in twenty-six biweekly installments of $40.16 with a final payment of $55.34. Thus, the $100 loan carried a total finance charge of $999.71.
Source: *State ex rel. King v. B & B Investment Group, Inc.*, 2014-NMSC-024, 329 P.3d 658
(2, LT, SL)

11. Delores, a 78-year-old retiree, borrowed $730 at an APR of 300% from Wisconsin Auto Title Loans when she needed new tires for her 1992 Buick Park Avenue. The company required her to turn over the spare key and title to her vehicle. A month later on the due date, her loan had grown to $1,027 and she couldn't afford to pay it. The amount due was more than her entire Social Security check. Because she couldn't imagine giving up her vehicle, she began to borrow money from other sources just to pay the interest on the car title loan, never making a dent in the principal. She eventually sold her car for $1,000 to help pay the debt.
Source: Yeoman, Barry. "Sudden Debt." AARP Magazine September & October 2006: 108-113, 128. Print.
(2, 3, CT)

12. Jane, a 79-year-old woman, obtained a $380 payday loan from SpeedyCash with a 259% APR to help pay for her daughter's cancer medication. She earned $922 in social security benefits and paid a rent of $430, the lender did not ask her about her ability to repay the loan and simply required proof of income. Despite making 16 monthly payments of between $65 and $95, Jane still owes $500 on the loan. She has never made a late payment although she owes other bills because that would allow the lender to take the funds straight from her account. She reasons, "I would rather not pay my light bill than for the [payday loan company] to take all the money I need to pay my rent."
Source: Video on file with Texas Appleseed.
(3)

13. Lauren received a car title loan from TitleMax for $817.19, with an initial APR of 66.02%. She was charged monthly for automobile insurance coverage, which the company claimed was voluntary. However, TitleMax required certain stipulations if customers wanted to use their own auto insurance, including paying the policy through the maturity date of the transaction in advance, listing the company as a lien holder on the insurance policy, and carrying a deductible of no more than $500. Lauren could not afford to pay her insurance premium in advance, and as a result had to pay TitleMax monthly for auto insurance in addition to the loan principal and interest. As she could not afford to pay off her loan in full each month, Lauren was forced to refinance the loan 13 times. Each renewal resulted in an increase in the monthly auto insurance premium she was charged by TitleMax. She eventually surrendered her 2004 Chevy van to the company because she could not afford to repair it. At the time of surrender, her balance on the loan had ballooned to $3,883.35 and she had been charged $4,128.55 in fees and other charges over the course of the loan.
Source: Florida Office of Financial Regulation, 2014
(1, 2, 3, CT)

14. Fearing she and her family would soon lose their home, Jessica obtained a $1,900 car title loan from Instaloan in October of 2013. It was marketed as a no-credit-check collateral loan, but she did not understand what that meant. When she asked the company representative, he told her that it was a car title loan but he wasn't allowed to tell customers that. Jessica was told that she was required to purchase their auto insurance even though the contract terms indicated the insurance was voluntary. Over the next 13 months, she paid more than $4,000 for her $1,900 loan, and none of her payments have been applied toward the principal of her loan. Recently, she moved from Florida to Arizona. She called Instaloan to ask for their address so she could send her payment via mail and was told she could not mail a payment because the company needed to receive the payment and a signature on the loan renewal on the same day. Instaloan told her the only option was to contact another title loan company and have them buy out the loan at the payoff amount. The company representative recommended that she contact TitleMax, which she realized was the same company as Instaloan. No one from TitleMax has returned Jessica's phone calls, and she is worried that her vehicle will be taken.
Source: Florida Office of Financial Regulation, 2014
(1, 2, CT)

15. Shirley, an elderly woman on a fixed income, received a car title loan from TitleMax for $2,453.29. She did not understand that the loan had to be repaid in one lump sum or it would be flipped each month and she would accrue new finance charges. Because she was unable to pay the full amount of the loan at once, TitleMax flipped the loan six times. Despite the fact that

Shirley paid over twice the principal amount of the loan to the company, including $1326.01 for the company's auto insurance, TitleMax still repossessed her vehicle when she was unable to make a monthly payment.
Source: Florida Office of Financial Regulation, 2014
(1, 2, 3, CT)

16. James, a 67-year-old on a fixed income, obtained a $500 car title loan from TitleMax in May 2013. He had hoped to be able to pay the loan off in three months; however, he has paid $957 over the past year and still owes $603.98 – over $100 more than the original loan principal. His loan has been flipped 14 times, and he does not understand why he is also charged a monthly auto insurance premium. After paying almost twice the original principal amount, James is now in danger of losing his vehicle as TitleMax claims he is 15 days late in making a payment.
Source: Florida Office of Financial Regulation, 2014
(1, 2, CT)

17. Deborah received a $2,000 car title loan from TitleMax in July 2014. Her loan has been flipped ten times and despite paying over $4,000 to the company, she still owes $1,785.73 – almost as much as the original amount of her loan. Over the course of the year that she's been paying on her loan, the APR has ranged from 43.33% to 46.48% and she has been forced to pay for costly auto insurance that she does not want and did not understand she would have to pay at the time she signed the contract. Representatives from the company have called her place of employment several times a day, putting her job at risk. When she was late on her payment to TitleMax, they sent a tow truck to her place of employment to repossess her vehicle.
Source: Florida Office of Financial Regulation, 2014
(1, 2, CT)

18. Sam received a $604.31 car title loan from TitleMax in July 2013, which carried an APR of 78.7%. His loan was flipped three times and he was forced to pay for auto insurance that he did not need or want. Although the loan contract indicated that the company's auto insurance was voluntary, he was told that his existing car insurance did not meet the company's requirements. The loan contract stated that the policy through TitleMax does not insure the customer against liability for bodily injury or property damage caused to others and does not suffice under Florida's law requiring all resident motorists to have auto insurance for personal injury protection and property damage. As a result, Sam paid $246.17 over four months for TitleMax's car insurance, in addition to the coverage he paid for under his existing insurance policy. Due to the high interest rate and unwanted insurance products, over four months Sam paid a total of $1,186.00 for a $604 loan.
Source: Florida Office of Financial Regulation, 2014
(1, 2, CT)

19. Betty was 78 years old and drove very infrequently when she decided to pursue a car title loan for $2,217.29 from TitleMax. The company required her to buy their auto insurance unless her current policy met their criteria. After realizing that she had paid $348.48 over three months for their additional auto insurance that she did not want or need, she decided to decline TitleMax's insurance and use her current coverage with Geico instead. She believed her insurance met TitleMax's requirements, but she received a call from the company telling her that she had to list them as the payee within fifteen minutes or be forced to pay $175.00 per month for their

policy. She believed she was being taken advantage of by TitleMax because she was elderly and did not understand what she was signing.
Source: Florida Office of Financial Regulation, 2014
(1, 2, CT)

20. Derek received a car title loan from TitleMax for $1,541.06 in May 2014. After paying on his loan for three months, his fourth payment was late. As a result, the company required that he take out an auto insurance policy even though he already had full insurance coverage through another provider and had listed TitleMax as the payee on that policy. He gave them documented proof of his current insurance policy but was told that he must purchase TitleMax's additional insurance although the form he was required to sign stated that the insurance was voluntary. When he attempted to make his payment of $98.00, Derek was told that he owed an additional $141.82 for the additional insurance. Derek could not afford the increased monthly payment and TitleMax is now threatening to repossess his car.
Source: Florida Office of Financial Regulation, 2014
(1, 2, CT)

21. Diego received a car title loan from TitleMax for $654.77 with an APR of 76.4% in September 2013. Over the next year, his loan was flipped eleven times. During this time, he was charged $334.30 extra for auto insurance financed through the company. Although he had a current auto insurance policy, TitleMax required that his policy be current through and including the next payment date. However, Diego found that the company would not accept his insurance policy because he paid his insurance premium each month on the day after his loan payment was due and therefore could not provide proof of insurance until the next business day after he had already renewed the loan.
Source: Florida Office of Financial Regulation, 2014
(1, 2, CT)

22. Phyllis received a car title loan from TitleMax for $643.73 that carried an APR as high as 115.6%. She has paid $2,190 on the loan over 18 months and still owes $261.64. Despite paying over three times the principal amount of the loan, the company has repossessed her vehicle twice, forcing her to pay an additional $400 each time to receive access to her vehicle.
Source: Florida Office of Financial Regulation, 2014
(1, 2, CT)

23. Jane received a car title loan from TitleMax in November 2013 for $4,335.86. Despite having paid $3,245 over the past eight months, the company says she still owes $3,686.73. She has paid $272.50 for auto insurance through TitleMax even though she already possesses a current auto insurance policy.
Source: Florida Office of Financial Regulation, 2014
(2, CT)

24. After her husband passed away, Rachel was short on cash and decided to obtain a car title loan from TitleMax in August 2014 for $3,000. After paying on the loan for a year, including over $2,000 in auto insurance she did not need or want, she had to return to her previous residence in Wisconsin to handle an issue with her husband's estate. When she called TitleMax to let them know she'd be sending her payment by money order, she was told that she had to make all payments in person because she was also required to renew the loan at the time of payment. A

company representative even told her that TitleMax sends an employee to the hospital to obtain payment and a signature on the loan renewal if a customer is hospitalized during the time a payment is due. She called several times after that to again see if she could make a payment over the phone or have a relative make a payment in person, but the company refused. Because she could not return to Florida to make a payment, TitleMax is in the process of repossessing Rachel's vehicle.
Source: Florida Office of Financial Regulation, 2014
(1, 2, CT)

25. Dan received a car title loan from TitleMax in October 2014 for $1,500, with an APR ranging from 47.2% to 51.9%. Over the past year, he has paid a total of $2,371.54, yet he still owes $1,415.53—almost the entire original loan amount. Although Dan informed the company that he had AAA Plus coverage and did not want to purchase any additional towing services, he was told he must pay $12.50 per month for a "tow package." In addition, he has paid a total of $1,357.80 in car insurance to the company.
Source: Florida Office of Financial Regulation, 2014
(1, 2, CT)

26. Shortly after a heart attack forced her to retire, Sandra was short on cash. Her ex-husband had fallen behind on his alimony payments, and she didn't receive enough income from her monthly disability checks to cover all her bills. She received a payday loan for $150 from First Southern Cash Advance to pay her overdue telephone bill. The next month, her husband still had not paid the alimony, so she was unable to repay the loan. As a result, she borrowed money from another payday lender, then from a third and fourth just to attempt to pay off one loan and the interest. By the time she sought help from a legal aid attorney, Sandra was forced to give up her apartment and move into a trailer in her brother's backyard.
Source: Yeoman, Barry. "Sudden Debt." AARP Magazine September & October 2006: 108-113, 128. Print.
(2, 3, SL)

27. Amy Keaton of Spring Hill, MO said during a public comment session that desperation led her to take out a $200 payday loan a year ago.  "You get into that mindset when you are struggling that tomorrow will take care of tomorrow," Keaton said. "So I took out the loan, even though I knew that it wasn't a very good idea."  Keaton said the lenders expected a payment of $297, and in return she would receive $250 for her bills. The amount she actually ended up paying escalated. "I was paying almost $100 a month just to take my own paycheck home," she said.  Keaton will have her debt paid off this September with the help of Catholic Charities.
Source:  http://www.kansascity.com/news/business/article81380962.html
(1, 2, SL)

28. Terrence Wise, who supports tighter regulation of the industry, said a $150 payday loan ended up costing him $400. "They were calling my job and harassing me at work," Wise said. "My employer told me I could be disciplined if they didn't stop harassing me. I had papers brought to my home serving me to court. And all of these things, they make you feel degraded."
Source: http://kcur.org/post/hundreds-rally-downtown-public-hearing-proposed-payday-loan-rules#stream/0
(2, SL)

29. Maryann Olson's monthly Social Security check wasn't enough to cover the cost of orthopedic shoes that she desperately needed so she turned to a payday lender.  However, her $150 loan quickly turned into $1,900 in debt.
Source:http://www.oregonlive.com/opinion/index.ssf/2015/03/congress_must_crack_down_on_pa.html
(2, SL)

30. "We got a payday loan of about $200," Lara said. By the time payday came around the lender wanted $300. They were able to pay back the $300, but they came up short on their next payment. "So we took out another loan," Lara explained. And just like that, the trap door slammed down.  "It's just so easy to get. So easy! You just bring a paystub down and you tell them how much you need," Lara said.  "I kid you not, we did that dance for close to six months," Lara said. "It was horrible. Just unbelievably horrible." Finally, Lara had to beg her parents to help get them out of the cycle for good.
Source: http://www.tcdailyplanet.net/new-guidelines-nonprofits-help-curtail-predatory-payday-loans-in-minnesota/
(1, 2, SL)

31. Diana, a 71-year-old who lived on her Social Security income of $1,100 per month, took out a car title installment loan from Cash America for $1,533. The loan carried an APR of 98%, and she was required to make 13 payments of $195 each. $551 of the loan went to pay off an old lien. Diana subsequently obtained a Cash Plus 0% APR single-payment payday loan for $225 while her car title loan was outstanding. Cash Plus pursued criminal charges for "theft by check", which is essentially Texas's bad check law. There is now a warrant outstanding for Diana's arrest.
Source: Loan contracts on file with CRL
(2, 3, CT, LT)

32. John lived paycheck to paycheck. In December 2013, he took out a car title installment loan with Loan Max for $1,715, requiring 12 monthly payments of $391 each, totaling $2,969 (243% APR). John struggled to make the first two payments and was struggling to make the third. Two months later, in February 2014, he took out a $700 payday installment loan from Check N Go to stay current on his car title loan. The payday loan required 11 biweekly payments of $110 each (247% APR). Of the first payment of $110, only $14 went toward the loan principal. John defaulted on that loan after one payment and was incurring substantial overdraft fees as the bank threatened to close his account. He has no hope of keeping up with his loan payments, much less escaping the debt trap. The extreme stress prevents him from sleeping, and he likely will be forced into bankruptcy.
Source: Loan Max and Check N Go loan contracts on file with CRL
(1, 2, LT, CT)

33. In 2009, Pamela received a payday loan from Cash Transfer Centers for $960 on a two-week period, plus a finance charge of $259.20. The loan required payments of $160 in order to be paid off. Once Pamela saw that her monthly payments stayed the same while the interest on the loan continued to grow, she knew there was something wrong.
Source: Office of the Attorney General, Commonwealth of Kentucky, 2010
(2)

34. In 2010, Anne received a $1,000 payday loan, which required repayment every two weeks. However, her payments were doing very little to decrease the size of the loan, and eventually, she had paid $1,689 but still had an outstanding balance of $1,082. Moreover, because the bi-weekly payments were being drawn directly from her bank account, she began to incur overdraft fees from her bank and was forced to close her bank account to stop the overdraft fees.
Source: Office of the Attorney General, Commonwealth of Kentucky, 2010
(1, 2)

35. Mary received a $300 payday loan from Fast Cash Advance in late 2009. She repaid the $300 loan and upon learning that Kentucky had made internet payday lenders illegal in January of 2010, Mary closed her bank account in order to stop Fast Cash Advance from continuing to withdraw funds from her bank account. Fast Cash Advance sold her remaining debt to another company who then turned the account over to a collection agency.
Source: Office of the Attorney General, Commonwealth of Kentucky, 2010
(2)

36. Christine obtained a payday loan from US Fast Cash for $350 in May 2007. The contract stated that she would owe a total of $455, which reflects an APR of 496.73%. When Christine discovered that payday loans were illegal in Kentucky, she repeatedly contacted US Fast Cash to inform the company that she would instead pay a total of $411.61, the maximum amount allowed under State law for a $350 loan. However, US Fast Cash insisted that she owed $560 in payments and sent her a threatening and intimidating email accusing Christine of "unreasonable demands" and trying to "set the terms" of the loan and stating that no one "twisted [her] arm" to obtain the loan.
Source: Office of the Attorney General, Commonwealth of Kentucky, 2007
(2)

37. 500FastCash solicited Beverly via email to obtain a payday loan for $300, and she accepted. She had an agreement with 500FastCash to debit her bank account on Fridays as she is paid on those days. Instead, the company debited her account on Thursdays before she was paid, which resulted in extensive bank overdraft fees. Beverly's bank closed her checking account, and she has hired a bankruptcy attorney. Moreover, 500FastCash has put her employment in jeopardy. The company has harassed her at work, calling her office despite her numerous emails to the company stating that she is not allowed to receive personal calls during work hours.
Source: Office of the Attorney General, Commonwealth of Kentucky, 2010
(2, 3)

38. Kenneth obtained a $250 payday loan and paid a total of $389 on the loan. Shortly thereafter, he took out another $250 loan with an APR of 547.5%. He paid $75 toward the new loan, but combined with the overdraft fees he had already been charged on the first loan, he had paid a total of $500. Kenneth asked the company to mark his account paid in full as he had repaid the $500 total principal amount of the two loans, but the company refused and continued to call him even though he requested that all correspondence be in writing.
Source: Office of the Attorney General, Commonwealth of Kentucky, 2010
(1, 2)

39. Doris received a $350 payday loan from Ameriloan. She was disabled and living on Social Security, and made an arrangement with the company to debit her checking account four times on the days she received her payments. Instead, Ameriloan twice debited her account the day before she received her Social Security check and she incurred overdraft fees. Moreover, after taking out the four payments she and the company had agreed upon, Ameriloan told her she still owed $455.
Source: Office of the Attorney General, Commonwealth of Kentucky, 2010
(2, 3)

40. Carole received several payday loans in 2007 from different companies, including Ace Cash Express, Quik Cash, and Check 'N Go. She was on a fixed income consisting only of her disability payments, and she knew she could not afford to pay the balance of the loans. The companies never verified how many outstanding loans she had or whether she could actually pay the loans back. She notified each company that she wanted to pay the balance on her loans but could only pay $10 a month because she needed to have enough money to purchase her medication. Carole's son received a call from a person claiming to be a lawyer who told him that his mother was engaging in check fraud due to the outstanding payday loan. The caller instructed him to tell his mother to buy a prepaid card with $120 on it and to send her the routing number. She was collecting for a payday loan through Ace Express, which Carole could not to pay on, and the total loan price had ballooned up to $839.93. Carole could not afford to buy the prepaid card and was concerned that she would be sued by the company.
Source: Office of the Attorney General, Commonwealth of Kentucky, 2010
(2, 3)

41. Joseph received a $500 payday loan from Eastside Lenders with a $150 recurring payment every two weeks. After the company deducted $150 from his account three times for a total of $450, Joseph was told that he still owed $650. He sent Eastside Lenders an email to let them know that he was revoking his ACH agreement under the Federal Electronic Funds Transfer Act, but they continued to debit his account.
Source: Office of the Attorney General, Commonwealth of Kentucky, 2010
(2)

42. Dennis received a $300 payday loan, and was under the impression that he would owe a total of $390 on the loan. Every payday, $90 was debited from his bank account. The company continued to withdraw money, and by the time he was forced to close his bank account, he had paid a total of $990 on a $300 loan. After his account was closed, the payday lender began calling his place of employment despite Dennis's requests that all correspondence be in writing, and the company has threatened to sue him and garnish his wages.
Source: Office of the Attorney General, Commonwealth of Kentucky, 2010
(2)

43. In a 2012 court case initiated by the New Mexico Attorney General, Endow testified about her borrowing experience with FastBucks. She stated, "I didn't buy no TV. I didn't buy no jewelry. I didn't go on trips. It wasn't any joyous ride to go to the casino...It was basically to care of my family and put a roof over our head." She earned a mere $18,000-$19,000 a year, yet managers at FastBucks only asked for her pay stubs and bank statements rather than her expenses or other outstanding loans. Endow testified that eventually she had several outstanding loans and would use the proceeds of one to pay off the others. "I was starting to get stressed and

overwhelmed," she said, becoming tearful again on the witness stand. "What am I going to do? How am I going to make it? Is it ever possible to get out of this?" Nevertheless, Endow managed to pay back her loans without going into default until her last loan.
Source: *New Mexico Attorney General v. FastBucks*, 2012
(1, 2)

44. After Joe received a payday loan, he became unemployed. He owed CashNet one more payment of $332.22, so he explained the situation to a representative of the company. They said that they understood. He then received a call at his parents' home, stating that a collection agency needed to speak to him concerning check fraud. CashNet had sold his account to a third party without telling him, and the collection agency attempted to charge a bank account that had been closed. Although he had previously told CashNet he closed that bank account and would need to pay with a new debit card, the collections agency accused him of committing check fraud. The accusation of check fraud has caused unnecessary tension and stress between Joe and his parents.
Source: Alabama Attorney General's Office, 2011
(2, 3)

45. After receiving a $250 payday loan from EZ Money, Terri was contacted by the company at her place of employment. Despite the fact that she informed EZ Money she could not receive personal correspondence at work, the company sent a letter to her job informing her that she had an outstanding balance on her loan. The letter even included the name of Terri's supervisor, which Terri interpreted as a threat to contact her employer.
Source: Alabama Office of the Attorney General, Consumer Affairs Section, 2010
(2, 3)

46. Robyn received a payday loan from National Credit Consultants three years ago. After making three sizeable payments to the company, Robyn asked to have her due date pushed back just one day. The company refused, threatened to have her arrested, and insinuated that they would contact her place of employment. Robyn has been brought to tears several times and feels sick from the stress of the 4-5 calls she receives from National Credit Consultants each time a payment is due.
Source: Florida Attorney General's Office, 2011
(2, 3)

47. Justin received a payday loan for $450 from CashNet USA. Shortly thereafter, he noticed there was an additional $250 deposit in his bank account. He discovered that the credit was for a loan that he never applied for. He called the company and was told that CashNetUSA created a new loan on top of the one he already had because he had "shown interest." The company told him he should have declined the loan within three days if he did not want it, which he was unable to do because he had been out of town with no access to internet to check his bank account. Justin's bank account has been debited repeatedly for payments for the two loans; as a result, he has accrued $450 in bank overdraft fees and his bank has restricted the use of his debit card.
Source: Florida Attorney General's Office, 2008
(2)

48. A San Antonio family requested assistance from their church in developing a household budget and becoming financially independent. In the course of developing a budget, the church deacon

discovered that the family would be able to live within their means except for one item of debt that was dragging them down: a $700 payday loan they had taken out roughly four months earlier to help with a rent payment on their home. The terms of the loan: $200 every two weeks was automatically deducted from the husband's bank account and timed with the deposit of his paycheck. This $200 did not reduce the original amount of the loan. It merely allowed for the $700 principal to roll-over until the next pay-period. In the course of the four months the family had maintained this loan, they had rolled the principal over nine times—at a cost of $1,800. Now, as they approached the church again for help, they needed help to pay their rent or face eviction.
Source: http://www.christianitytoday.com/local-church/2016/july/texas-pastor-payday-loan-reform-isnt-distraction-its-christ.html
(1, 2, 3)

49. Dodie received a $500 payday loan from National Payday. The company now says that she owes over $1,200 on the loan but will not explain the extra fees. National Payday has called her employer, her family, and her husband's employer and has threatened to file criminal charges against Dodie. Her mother had a heart attack after one of the company's harassing phone calls. Dodie informed National Payday that she has filed bankruptcy, but the calls continue.
Source: Florida Attorney General's Office, 2006
(2, 3)

50. Over a 17-month time period, Lisa, a single mom living in North Carolina, received 35 payday loans from Urgent Money Service – roughly one loan every two weeks. She spent over $1200 in fees for a $255 cash loan that kept rolling over because she could never repay the loan within the two-week period. Each time, she would write a check for $300 and receive $255 back in cash. Urgent Money Service never took into account Lisa's income and expenses. Each of her biweekly paychecks amounted to only $600, so she was left with only $300 for her other bills and expenses until her next paycheck. The debt trap cycle continued as she couldn't afford to pay back the loan and couldn't stretch her remaining $300 to cover all her bills without obtaining yet another loan.  The only way she could stop the withdrawals from her bank account was to close her account. It took her two years to finally pay off the $255 loan.
Source: Commerce Committee meeting testimony, North Carolina General Assembly, 6/17/2003
(1, 2)

51. Lenny, who made about $600 a week, went to Advance America thinking a payday loan would help him catch up on an overdue bill. Over a year later, he had renewed his Advance America loan every two weeks, fallen deeper into debt, and taken a second payday loan to stay afloat. Lenny lost his apartment and ended up in a homeless shelter. While he lived there, Advance America continued to flip his loan, charging $20 per $100 every two weeks, 521% APR.
Source: *Caught in the Trap: The real story from payday lending borrowers* – CRL Issue Brief, June 2010
(1, 2, 3)

52. Mr. & Mrs. Anderson were unable to cure the default on their home loan because of their payday loans. A construction worker, Mr. Anderson had taken out payday loans from Advance America to help them through a bout of bad weather that slowed his work. They paid $200 every two weeks in fees to Advance America, for loans in both his and her names. This debt disqualified the couple for their loan modification.

Source: *Caught in the Trap: The real story from payday lending borrowers* – CRL Issue Brief, June 2010
(3)

53. Jason, a military service member who worked on a nuclear submarine in Kings Bay, Georgia, borrowed $300 from Advance America to make ends meet after being in a car accident. He soon found himself taking out loans from other payday lenders as he fell further and further behind. "In five months, I spent about $7,000 in interest, and didn't even pay on the principal $1,900. I was having marital problems because of money and didn't know what to do for Christmas for my kid," Jason told an AP reporter. The base emergency relief office finally helped Jason by paying off his triple-digit payday loans, some as high as 780% APR, and letting him repay the charity's interest-free loan over 18 months.
Source: *Caught in the Trap: The real story from payday lending borrowers* – CRL Issue Brief, June 2010
(1, 3)

54. Clarissa and her 15-year-old son put in more sweat equity hours than required on their Habitat for Humanity house, in joyful anticipation of living in their own home. Clarissa worked full time, but received no child support and struggled to manage her expenses, sometimes taking on a second job. When the company she worked for shut down, Clarissa borrowed from Advance America and Nationwide. Eventually, when she couldn't repay one of her loans, the payday company deposited the check they were holding as collateral. The check bounced and both her bank and the payday lender charged her additional fees for insufficient funds.
Source: *Caught in the Trap: The real story from payday lending borrowers* – CRL Issue Brief, June 2010
(2, 3)

55. Anita went to an Advance America store in hopes of finding a solution to a common problem -- how to delight her grandkids on Christmas. Unable to repay the loan, she had to renew her loan with Advance America every payday, paying $45 to keep the same $300 loan outstanding. She went to a second payday lender, Check 'n Go, to help repay Advance America. Anita could not afford the $820 it would take to pay off the two loans in full and get out of the trap. After just four months, she had paid almost $1,000 in fees, and still owed the $820. "I got a promotion and a raise, but I never saw any of that money," said Anita. She finally went to her church to get help paying the rent, and to a consumer credit counseling agency to get help negotiating a repayment plan. It took her nine more months to complete these payments.
Source: *Caught in the Trap: The real story from payday lending borrowers* – CRL Issue Brief, June 2010
(1, 2, 3)

56. Danny, a forklift operator from Kannapolis, was making $9.00 per hour. He got behind on his bills after being hospitalized from a heart attack and stroke. He went to his first payday lender in March 2000 and borrowed $300 for a 7-day term. This was about the same as his weekly pay, so he could not afford to pay back the loan, and got caught in the debt trap. Over the course of two years, Danny used eight different lenders including Advance America, Advance Internet, Check into Cash, and First Southern Cash Advance. He paid more than $5,000 in fees over the next two years, with over 170 check stubs for payments to these payday lenders.

14

Source: *Caught in the Trap: The real story from payday lending borrowers* – CRL Issue Brief, June 2010
(1, 2)

57. Stephanie paid her first payday loan back the first time when it was due on payday, but a few days later came up short again, so she took out another loan. "I was paying the fees, but still coming up short on bills. So I got a loan from another lender just to pay the fees on my other loans. I ended up with several loans from different payday lenders, struggling to pay the interest every two weeks so I wouldn't default, because if I did they would have passed my check to the bank." Stephanie had loans with Advance America, Check Into Cash, Check 'n Go and several others. Eventually she was paying $800 every month just in interest fees, without paying down any principal. "The payday lenders were not willing to work with me, even after I talked to them about my situation following the advice of my credit counselor," she said. One payday lender threatened to send her check to the magistrate's office, and to take her to court for writing a bad check.
Source: *Caught in the Trap: The real story from payday lending borrowers* – CRL Issue Brief, June 2010
(2)

58. Betty, a senior in Durham, took out a small $100 payday loan. She had no other debt at the time. When this loan came due a month later, she borrowed from a second payday lender to repay the first. And, then she did this four more times. Each time, it was slightly less expensive to flip a loan than to pay the bounced check fees if she defaulted. With six loans, she was paying over half of her $564 monthly Social Security income in payday fees, never paying down a penny of principal on these loans. She lost her phone and got one-time emergency help from social services to avoid eviction. We suspect Betty was later evicted when we could no longer reach her at her apartment.
Source: CRL Issue Brief: *Why We Must Keep Payday Lenders Out of NC: North Carolinians Caught in the Debt Trap*, April 2016
(2, 3, SL)

59. With retirement and disability income, Mary, a 62-year-old African American mother and grandmother, brought in about $1,000 per month. She took out her first payday loan because she needed "a little extra" money to go out of town. Like many borrowers, she had to take out a second loan to pay off the first. She ended up with loans from four payday lenders. "When I get a little extra money, I'm going to pay them off and I'm through with them," said Mary. "It's a rip off. There's nothing cute about it. I'm supposed to get some money, but I lose money." The fees Mary paid to keep from defaulting on her payday loans added up to over 40 percent of her monthly income.
Source: CRL Issue Brief: *Why We Must Keep Payday Lenders Out of NC: North Carolinians Caught in the Debt Trap*, April 2016
(2)

60. After her husband was laid off, Pamela borrowed $500 from a payday lender. But the Phoenix, Arizona, woman found that she, like many other borrowers, could not manage to repay the $588 she owed ($500 plus $88 in fees) when it was due in two weeks. She went to a second lender to pay the first, and a third to pay the second, getting in deeper until she had five loans of $500. She was paying $880 every month in payday fees, never paying down the principal owed.

By June of 2004, she had paid $10,560 in interest on these five loans. She was afraid of going to jail if she stopped paying the fees, and had no idea how to get out of the trap.
Source: CRL website: *The Victims of Payday Lending*.
http://www.responsiblelending.org/issues/victims-payday.
(1, 2)

61. Kym, a single mother working as a temp in the Triangle area, took out a payday loan when a friend told her about how she could borrow money until her next payday. She quickly fell into the debt trap, and had to pay a high fee every payday to renew the loan and avoid default. When she had trouble keeping up this cycle, she took out a second loan to pay fees on the first. She paid on both loans for about a year, finally convincing one of the lenders to let her pay off the loan in increments. It took Kym another eight months to shake free from the debt trap.
Source: CRL website: *The Victims of Payday Lending*.
http://www.responsiblelending.org/issues/victims-payday.
(1, 2)

62. As a grad student in North Carolina's Triangle area, Allen found it very difficult to pay off the four payday loans he had accumulated. When he did manage to pay off one or two of the loans, he soon found himself strapped for cash and forced to renew the loan. Allen finally sought help from a credit counselor. He sent letters to the payday lenders asking for a payment plan he could afford. But instead of helping him work out payments, one of the lenders deposited his check upon receiving his letter, and it bounced twice before he could cancel the check. Two other lenders were internet-based companies who automatically drafted his checking account. He had to close his account to stop them. When one of these lenders received Allen's payment plan letter, they called and threatened to send a sheriff to his house and serve him court papers. Allen now realizes he has technically repaid the debt several times over in rollover fees.
Source: CRL website: *The Victims of Payday Lending*.
http://www.responsiblelending.org/issues/victims-payday.
(2)

63. Rhonda and her two daughters experienced a financial crisis last summer that sent Rhonda looking for help from payday lenders. She found not the help she needed, but disaster. Rhonda fell into the payday lending debt trap - the terms of the loans she took out required her to either pay them off in less than two weeks or have $90 fees automatically debited from her bank account repeatedly. Those loans, at triple-digit APR, have cost her much more than the exorbitant fees. Her family's finances are in ruins and she is planning to file bankruptcy.
Source: CRL website: *The Victims of Payday Lending*.
http://www.responsiblelending.org/issues/victims-payday.
(1, 2, 3)

64. Like many borrowers, Janis went to one payday lender to get help paying the fees of another. She ended up borrowing from three different lenders. Since she could not pay the loans in installments, she paid the repeat fees until she got her tax returns. When she couldn't keep up with the fees one lender demanded, they called and left her a message saying that they would take her to court if her account was short. It was several months before Janis found her way out of the trap, and she needed help from social services during this time, once to pay her rent and twice to pay her light bill.

16

Source: CRL website: *The Victims of Payday Lending*.
http://www.responsiblelending.org/issues/victims-payday.
(1, 2, 3)

65. Sandy's first payday loan was for $100, with an $18 fee. She worked down the street from the payday shop, and since she was short on cash, she called to see what she needed to get a loan. All she needed was a source of income and a banking account, so she walked into the shop, and walked out 15 minutes later with the loan. Sandy got caught up in the payday lending debt trap, taking out multiple loans to pay the fees on each one as they became due. At one point, she was paying $300 every two weeks for four different loans. Over a six-month period, this added up to $3,600, but she was in the trap much longer, paying off one loan, then another, until she lost her job and could no longer keep up with the fees. She filed bankruptcy.
Source: CRL website: *The Victims of Payday Lending*.
http://www.responsiblelending.org/issues/victims-payday.
(1, 2, 3, SL)

66. Betty, a senior citizen in Durham, North Carolina, paid over half of her $564 monthly Social Security income in payday fees, never paying down her loans. She lost her phone and needed emergency help from social services to avoid eviction.
Source: CRL website: The Victims of Payday Lending.
http://www.responsiblelending.org/issues/victims-payday.
(2, 3)

67. Mr. R utilized payday loans for temporary help when he struggled to pay his bills. He ended up taking out at least 24 loans over the course of four years, becoming trapped in the payday debt cycle. His final loan was from a tribal payday lender who took $250 out of his bank account every two weeks. Only $50 of the payment applied to the principal of the loan, with the remaining $200 going towards fees. Eventually Mr. R was forced to close his credit union account, and even though he had repaid the principal several times over, he was harassed with round-the-clock phone calls from the payday lender.
Source: Brief of *Amici Curae* Nine Advocacy Organizations in Support of Defendants-Appellees Urging Confirmation, *The Otoe-Missouria Tribe of Indians v. New York State Department of Financial Services*, No. 13-3769 (2nd Cir. Nov. 13, 2013).
(1, 2)

68. Patricia paid half of her income every pay period to internet payday lenders. She obtained five internet payday loans, including one from a tribal lender, with a total of $2,000 to help pay her bills after incurring unanticipated medical expenses. The APRs on the loans ranged from 620% to 990%. The lenders took close to $600—half of her income—from her bank account every two weeks. After she had repaid more than the principal amounts of the loans, she closed her bank account to stop the lenders' debits.
Source: Brief of *Amici Curae* Nine Advocacy Organizations in Support of Defendants-Appellees Urging Confirmation, *The Otoe-Missouria Tribe of Indians v. New York State Department of Financial Services*, No. 13-3769 (2nd Cir. Nov. 13, 2013).
(1, 2)

69. Ms. B is a 71-year-old whose only income is her Social Security benefits and her pension. In November 2012, she received payday loans from three different lenders to help pay her bills.

Immediately, she struggled with the payments, which caused her to fall further behind on her rent and other bills. As a result, she took out another payday loan in January 2013. Fortunately, she was able to stop the lenders' withdrawals by closing her bank account, but they continue to harass her by phone and email, even threatening to sue her on the illegal loans.
Source: Brief of *Amici Curae* Nine Advocacy Organizations in Support of Defendants-Appellees Urging Confirmance, *The Otoe-Missouria Tribe of Indians v. New York State Department of Financial Services*, No. 13-3769 (2nd Cir. Nov. 13, 2013).
(2, 3)

70. Ivy, a retail worker from Brooklyn, took out six internet payday loans carrying APRs as high as 782%, to help pay her bills. The payday lenders continuously drained her bank account, often triggering overdraft fees. In a two-month period, the lenders tried to debit her account 55 times, and she was charged $1,500 in overdraft fees as a result. Because she was unable to pay the overdraft fees, her bank closed her account and reported her to ChexSystems, a consumer reporting agency, to prevent her from opening accounts at other banks.
Source: Brief of *Amici Curae* Nine Advocacy Organizations in Support of Defendants-Appellees Urging Confirmance, *The Otoe-Missouria Tribe of Indians v. New York State Department of Financial Services*, No. 13-3769 (2nd Cir. Nov. 13, 2013).
(1, 2, 3)

71. Subrina's exempt child support funds were seized by her bank after she took out three internet payday loans to help pay her bills. The lenders withdrew as much as $168 in fees from her bank account biweekly, while her bank charged her $800 in overdraft fees as a result of the repeated debits. Further, the bank illegally seized more than $600 in child support funds to cover the fees. The payday lenders refused to stop debiting her account. The bank eventually closed the account, but repeatedly called her to pay the overdraft fees and reported her to ChexSystems, a consumer reporting agency, to prevent her from opening accounts at other banks.
Source: Brief of *Amici Curae* Nine Advocacy Organizations in Support of Defendants-Appellees Urging Confirmance, *The Otoe-Missouria Tribe of Indians v. New York State Department of Financial Services*, No. 13-3769 (2nd Cir. Nov. 13, 2013).
(2, 3)

72. Cynthia, a New York City employee and single mother, borrowed eight payday loans over the course of several months when she fell behind on her rent. Soon, her entire paycheck was swallowed by the lenders. One company that debited money from her account never even made her a loan, but simply obtained personal and financial information from another lender and began electronically debiting her account. Cynthia's bank charged her $1,390 in overdraft fees, seized $721 in child support funds, closed her account, and reported her to ChexSystems so that she could not open an account at another bank. Two years later, debt collectors continue to harass Cynthia to repay the illegal loans.
Source: Brief of *Amici Curae* Nine Advocacy Organizations in Support of Defendants-Appellees Urging Confirmance, *The Otoe-Missouria Tribe of Indians v. New York State Department of Financial Services*, No. 13-3769 (2nd Cir. Nov. 13, 2013).
(2, 3)

73. Yesenia's mother was diagnosed with breast cancer and could no longer work, so Yesenia borrowed $510 (two loans of $255 each) to help pay the rent. She was trapped in a cycle of debt for 5 months, where she paid $90 every two weeks in fees alone. When she became late on a

payment to the payday lenders, they debited her bank account for the full amount of the loan, wiping out all of her funds and causing her to incur overdraft fees. A non-profit charity called Season of Sharing helped her pay one month's rent and she was finally able to pay back the loans. She paid $900 in fees to borrow $510.
Source: http://www.responsiblelending.org/issues/payday-loans-california-video
(2, 3)

74. George, an elderly man living in California, borrowed $1,020 (4 payday loans of $255 each). He was stuck in a debt trap for three years and paid $180 in fees every two weeks. Dolores Street Community Services helped him find his way out of the debt trap. He paid $12,960 in fees to borrow $1,020.
Source: http://www.responsiblelending.org/issues/payday-loans-california-video
(1, 2)

75. Michael borrowed approximately $1,530 (six payday loans of about $255). He has been stuck in the debt trap for more than two years and pays $270 per month in fees alone. Michael's monthly fees take a quarter of his Social Security benefits. He is working with a non-profit organization called Community Housing Works to help him get out of the debt trap. So far, he has paid more than $6,000 in fees to borrow $1,530.
Source: http://www.responsiblelending.org/issues/payday-loans-california-video
(1, 2)

76. Kimberly borrowed $1,550 from three different payday loan companies: one store front, one online, and one bank payday loan. She was stuck in a cycle of debt for nearly six months. She stopped paying her electric bill, went without power, and stopped buying groceries until she was able to pay back all her loans. She paid more than $2,800 to borrow $1,550.
Source: http://www.responsiblelending.org/issues/payday-loans-california-video
(1, 2, 3)

77. In June 2014, Dina took out a $4,570 installment loan from NetCredit. She was behind on her mortgage payments and other household bills and thought the loan could help her get back on track. The interest rate was advertised as 5% but in fact the loan carried an APR of 64%. The loan contract requires her to pay $135 every two weeks for three years, which means she will have paid more than $10,530 to borrow $4,560. Because she is paying $270 per month, she is having a hard time making her mortgage payments. Since obtaining the loan, Dina has been late on her mortgage every month and her credit score has dropped to 590. Instead of helping her get out of financial distress, the loan has put her in an even worse situation.
Source: CFPB complaint, NetCredit loan contract
(1, 2, 3, LT)

78. In May 2013, National Financial, LLC loaned $200 to Gloria James, a resident of Wilmington, Delaware. James worked in the housekeeping department at a hotel, earning $11.83 per hour. As a part-time employee, her hours varied. On average, after taxes, James took home approximately $1,100 per month. National described the loan product as a "Flex Pay Loan." In substance, it was a one-year, non-amortizing, unsecured cash advance. The terms of the loan called for James to make twenty-six, bi-weekly, interest-only payments of $60, followed by a twenty-seventh payment comprising both interest of $60 and the original principal of $200. The total repayments added up to $1,820, including $1,620 in fees. According to the loan document

that National provided to James, the APR for the loan was 838.45%. Before this loan, James had obtained five prior loans from National. For her first loan from National, James borrowed $100 on September 1, 2011. She repaid a total of $205 by making five payments over the course of two months. For her second loan, James borrowed $100 on August 22, 2012. She again repaid a total of $205, this time by making four payments over the course of two months. For her third loan, James borrowed $150 on October 31, 2012, less than two weeks after repaying her second loan. She repaid a total of $252 by making three payments over the course of two months. For her fourth loan, James borrowed $100 on December 20, 2012, one week after repaying her third loan. She repaid it the next day by making a single payment of $102. The prompt repayment suggests that James refinanced her loan through another provider. For her fifth loan, James borrowed $200 on December 27, 2012, less than one week after repaying her fourth loan. James failed to make the second payment, failed to make the fourth payment, and finally repaid the loan two months later. Her repayments totaled $393. Despite James' difficulty in repaying her fifth loan, National sent her text messages soliciting her interest in another loan. A text message on March 29, 2013, stated, "Loan Til [sic] Payday welcomes you with open arms. If you ever need a loan again we want to be your source! :)" A text message on April 5, 2013, stated, "Loan Til [sic] Payday misses you! Call NOW and receive $20 off your first payment."
Source: *James v. National Financial, LLC*, 132 A.3d 799, 805 (Del. Ch. 2016)
(1, 2, LT, SL)

79. Realizing that her next payday was two weeks away, Leticia Ortega worried about how she was going to get enough cash to pay overdue telephone and electric bills. Then Ortega, a cashier in San Antonio, Texas, spotted an advertisement by National Money Service in a local weekly newspaper. National Money Service charged her a $90 interest fee for a $300 loan, due by her next payday. This fee amounts to an APR of 780%. When the loan's due date arrived, Ortega did not have sufficient cash to repay the entire loan. Consequently, for almost a year, National Money Service debited Ortega's bank account every two weeks in the amount of $90 as interest to "roll over" the loan. Because none of the $90 interest payments counted as principal, Ortega still owed National Money Service $300 even though she had paid $1,800 in interest charges.
Source: Creola Johnson, *Payday Loans: Shrewd Business or Predatory Lending?*, 87 Minn. L. Rev. 1, 2–3 (2002)
(1, 2)

80. When her job sorting jeans at a garment factory didn't pay the bills, 47-year-old Patricia Turner went to E-Z Check Cashing of Cookeville, Tennessee. E-Z loaned her $300 for 30 days, and Turner secured the loan by writing a check for $405, $105 of which was for interest and "Other Charges." The APR on this loan was over 400%. At the end of the 30-day period, Turner was unable to repay the loan. She did not have enough money in the bank to cover the check or enough cash to pay the debt outright. She could have defaulted, but instead she chose to extend the loan by paying a cash extension fee of $105. After she extended the loan eight times, paying $840 over an eight-month period without reducing the principal of the loan, she was unable to pay either the balance of the loan or an additional extension fee. With full knowledge that there were insufficient funds in her account to cover it, E-Z then deposited Turner's eight-month-old check into its account. When the check bounced, Turner was forced to declare bankruptcy.
Source: Charles A. Bruch, *Taking the Pay Out of Payday Loans: Putting an End to the Usurious and Unconscionable Interest Rates Charged by Payday Lenders*, 69 U. Cin. L. Rev. 1257 (2001)
(1, 2, 3)

81. On a monthly basis from March 2005 through November 2007, Wilma A. Ruby entered into a total of 33 payday-loan agreements with Cashnet, Inc., d/b/a Cash Advance Centers. The amount of each loan increased over time, starting at $200 and reaching $500. Typically, Wilma would pay $575.00 in cash to Cashnet and would immediately enter into another payday loan agreement with Cashnet for $500. Wilma was to repay the $500.00 plus a 15% finance charge of $75.00 (for a total of $575.00) to Cashnet one month later. On the due date, Wilma would again pay $575.00 in cash to Cashnet and immediately enter into another loan with the company. This cycle continued until November 2, 2007, when Ruby entered into her final payday-loan agreement with Cashnet for $500. She could not repay this loan. With a fixed income of only $624.00 per month, Ruby could not afford to repay in full her loan with Cashnet and meet her monthly expenses. Thus, each time she repaid in full one loan, she immediately had to obtain another, usually for the same or a greater amount.
Source: *Ruby v. Cashnet, Inc.*, 281 Va. 604, 607, 708 S.E.2d 871 (2011)
(1, 2, SL)

82. On December 14, 2010, Timothy Williams obtained a short-term personal loan from Valued Services. The loan was for $550, and was due to be repaid approximately one month later. The APR was listed at 385.28%, with a total finance charge of $156.75. On January 10, 2011, the day the December loan was due, Williams obtained another loan from Valued Services to repay the December loan. The January loan was for $706, with APR of 246.51%, and a total finance charge of $1,241.40. It required Williams to repay the loan in 12 monthly payments, beginning February 9, 2011. Valued Services made high-interest loans to Williams despite the fact that Valued Services' files showed Williams' sole source of income was a monthly social security payment of $1,147. It also showed that in November 2010, Williams had an ending checking account balance of $8.32.
Source: Williams v. Valued Servs. of Wisconsin LLC, No. 2012AP2115, 2013 WL 4016941 (Wis. Ct. App. Aug. 8, 2013)
(1, 2, LT)

83. In March 2012, Rodella Smith obtained a loan for $5,000 from Western Sky Financial. The loan was subject to an APR of 116.73%, and the repayment term was set for a period of about seven years, resulting in a total payment of $41,172.61. She made payments of $480 for over two years, paying Western Sky approximately $13,000 in total—more than double the original loan amount. She then refused to make any more payments, and that's when the company began calling Smith's work and home phone numbers and emailing her, demanding ongoing payments and threatening to report Smith to credit reporting companies. The company has also called Smith's granddaughter four times accusing her of owing a debt and requesting Smith's contact information. Smith has suffered emotional and mental pain and anguish and damage to her credit as the result of reporting a debt that she does not owe.
Source: Civil Action Complaint, *Smith v. Western Sky Financial, LLC*, 168 F. Supp. 3d 778 (E.D. Pa. 2016), *appeal dismissed* (Apr. 19, 2016)
(1, 2, 3, LT)

84. In June 2008, Dominginho Powell obtained a car title loan from The Payday Loan Store of Illinois (PLS) using his 1972 Oldsmobile as collateral. He had been having financial difficulties and needed a loan to make ends meet. The loan was for $2,265 with an APR of 300% and called for two installments: one payment of $558.49 in July and a balloon payment of $2,842 in August.

The finance charge was listed as $1,135.60. PLS knew that Dominginho would not be able to make the balloon payment at the time of the loan but entered into the transaction anyway. When he went in to make the first payment in July, he was told that he had to refinance the loan. He went back to PLS in August to make his second payment, and PLS took a payment for the old loan and told Dominginho that he was required to refinance the remaining balance of $2,263, which was not yet due. PLS flipped his loan seven more times, each with terms more unfavorable than the last. Dominginho was told this is the "way loans work." When he was told he had to refinance for the seventh time, Dominginho realized that he had paid almost $5,000 in finance charges for a loan that was supposed to cost $1,135. He still owes $2,235—almost the original principal amount of the loan.
Source: Complaint, *Powell v. The Payday Loan Store of Illinois, Inc.*, No. 09 C 4146, 2010 WL 3893894, (N.D. Ill. Sept. 28, 2010)
(1, 2, CT)

85. Peter Alfeche entered into 23 payday loans with CashNet over a 10-month period, paying the company approximately $2,000 in fees. Being short on money an unable to meet all of his monthly expenses, Peter first obtained a loan from Cash America in November 2006. He agreed to borrow $250 for nine days for a fee of $62.50, representing an APR of 1,013.89%. Many of his subsequent 22 loans were obtained to pay off previous loans, as he often lacked enough money on the due date to pay off the loan and still pay his recurring expenses. Once Peter had established a personal account with CashNet, he also received email invitations to take out more payday loans from other internet payday lenders. Over the 10-month period in which Peter received the 23 loans from CashNet, he also obtained additional payday loans from some of these other lenders. In addition to paying $2,000 in fees to the payday lenders, he incurred hundreds of dollars per month in overdraft charges from his bank.
Source: Class Action Complaint, *Alfeche v. Cash America International, Inc.*, No. CIV.A. 09-0953, 2011 WL 3565078 (E.D. Pa. Aug. 12, 2011)
(1, 2)

86. Cynthia Williams and her husband were facing financial difficulties, so she decided to apply for and received a payday loan of $500 with an APR of 430% from Advance America. Over the next year, she was trapped in a cycle of debt with the company. Although the payday loans consumed over half of her monthly income, Advance America never considered Cynthia's ability to repay. As a result, she fell behind in her mortgage payments. Cynthia and her husband were only able to save their home with the help of a nonprofit foreclosure prevention group by taking on second jobs and increasing their workload by 70 hours per week.
Source: Plaintiffs' Second Amended Complaint, *Williams v. Advance Am., Cash Advance Centers of Missouri, Inc.*, No. 07-04187-CV-C-NKL, 2007 WL 3326899 (W.D. Mo. Nov. 6, 2007)
(1, 2, 3)

87. In order to evade the Arizona's voter mandate sunset of payday loans, the Ohio-based payday lender CheckSmart started making an open-end line of credit linked to a prepaid card in the months preceding the sunset's effect (and after CheckSmart unsuccessfully tried to push legislation in 2010 to repeal the voter's mandate).  While this product is no longer on the market, because it was shut down via regulatory action as an evasion of consumer protections, here is what happened to one Arizona borrower: A 71 year old gentlemen was given one of these open-end line of credit loans by CheckSmart one month before the payday loan sunset in 2010. He was told by CheckSmart that it was his only option. His only income was a monthly

Social Security check of $2,350. The line of credit was for approximately half of this amount: $1,402. The fees then were structured as the following – 36% annual percent interest rate, but a "convenience transfer fee" that were far in excess of the actual interest. Because it was an open-end line of credit, the contract only states a 36% APR, despite all of the additional fees that would add up to an effective triple-digit APR.
Source:  Contract on file with CRL
(1, LT, OE)

88. Check Into Cash, a Tennessee-based payday lender, makes open-end lines of credit to borrowers in Virginia. According to a legal services attorney in Virginia, here is one client's story: One woman, now aged 63 and whose source of income is comprised of disability plus a small pension, took out an open-end line of credit from Check into Cash in 2011. She is still paying it off today. She has paid over $3,000 in fees and interest alone on what has been less than $1,000 of credit over that time. This same borrower has another open-end line of credit from California-based payday lender– Allied Cash Advance. With this loan she has paid over $1,100 in fees after being stuck for more than a year in a $360 loan. As further evidence of payday lenders' disregard for the affordability of these loans, this same borrower is stuck also payday and car title loan as well. Because the monthly fees consume such a large amount of her monthly income, she forgoes purchases of the food and medicine she needs.
(1, 3, CT, LT, OE)

89. Single mother Malia Andrews lives in Tennessee, and obtained an open-end line of credit with a 279% APR. When she was short on cash, she took out one of these loans. Although it was touted as a better alternative to payday loans, it was not any better for Andrews. "I just about had a complete meltdown in the car," Andrews recalled, describing the moment she realized it would take years to pay off her flex loan. While approximately $300 of her monthly payment went to interest and fees, only about $20 actually paid down the principal of the loan. If she'd known how much the loan would end up costing her, she never would have taken it out.
Source: http://www.newschannel5.com/news/newschannel-5-investigates/consumer-alert/critics-call-279-loan-a-debt-trap-for-poor
(1, LT, OE)

90. Military veteran Joshua Hause had two existing loans for $925 that he said more than doubled after they were converted to a flex loan, an open-end line of credit carrying a 279% APR. Suddenly, his loan payment was over $2,000 when his original loan principal was less than half that amount. Due to the exorbitant interest and fees, Hause keeps getting farther behind. "If they're going to continue to get higher payments each month, I'll never get out of that hole," he lamented.
Source: http://www.newschannel5.com/news/newschannel-5-investigates/consumer-alert/critics-call-279-loan-a-debt-trap-for-poor
(1, LT, OE)

91. Jennifer Williams of Clarksdale, MS, teaches at a high school but remains in a debt trap due to payday lenders. She at one point owed thousands to nine different payday lenders in three separate towns. What started as a $100 loan when she had just began teaching in 2006 and needed a small amount of money due to her credit cards defaulting in college, had accrued to $4,000 in debt by 2009. She says, "It takes a toll on you, mentally. Those places are the devil. Once you get wrapped into it, it's hard to get out". After her son was born in 2011, she decided

to enroll in a 5-week financial boot camp, which was sponsored by the community bank, Southern Bancorp. As a result of completing the boot camp, she qualified for a savings account, as well as an affordable loan, with which she could refinance her debt. Credit counselor Charlestien Harris from Southern Bancorp states that Jennifer's situation is not uncommon.
Source: http://www.csmonitor.com/Business/2016/0903/Payday-loans-a-scourge-but-still-a-need
(2, SL)

92. Don Miller of HopeLink, a center that assists low-income families and people in Nevada, says that most seniors who he works with are living on $700-900 per month for utilities and rent. Some may take out $150 in payday loans to afford food in a crisis, not realizing that it will take them at least a year or two to pay off. Miller states that many of the seniors go into debt, with at least half of them having taken out payday loans. He also states that they often default on their loans and receive an influx of phone calls from the lenders, who usually threaten to send a lawyer to their homes.
Source: http://www.reviewjournal.com/view/seniors-often-pay-hefty-price-relying-payday-loan
(2, SL)

93. A man confided in pastor Wes Helm about his financial hardship with payday loans. Helm looked through the man's budget and discovered one major monthly expense: a payday loan fee three times more than the loan itself. When the church conducted a further investigation, they found that dozens other families at the church had been victimized by payday lenders as well, sometimes even losing their vehicles and homes.
Source: http://www.npr.org/2016/06/16/481558398/with-payday-loans-burying-borrowers-community-tries-alternatives
(2, 3)

94. Candice Byrd was a payday loan borrower in 2011, when she took out a $500 loan for a car payment. She was working in sales at the time. It was due in six weeks; however, three weeks after she took out the loan, she was advised to take out a new loan. She was told, "You're a good customer. This would be helpful for you." That second loan spurred a two-year cycle of paying off her debt. She eventually lost her car and apartment. She now only pays in cash. She said, "These places want you to keep borrowing. They don't want you to climb out of the hole."
Source: http://www.nytimes.com/2016/06/02/business/dealbook/payday-borrowings-debt-spiral-to-be-curtailed.html?
(2, 3, LT)

95. J.F. from Fresno, California, stated, "About two years ago I used a payday loan to assist with monthly expenses. I thought it would be easy to pay off but then I noticed I could not afford to pay the loan without securing another! The lenders provide little to no other option to pay back the loan which lets you know they aren't concerned with helping you get through the hard spot they are more concerned with keeping you in the endless cycle to pad their pockets! Payday loans are BAD business!!!"
Source: Collected by the California Reinvestment Coalition and quote reprinted verbatim from https://calreinvest.wordpress.com/2016/06/01/california-payday-loan-consumers-share-their-experiences/
(1)

96. S.F. from Oakland, California, shared, "In 2006 I was working full-time but when my boyfriend moved out I had to pay the entire rent myself and had trouble making ends meet. I started to use the payday loans and soon found myself in an endless cycle of debt, having to pay off two or more in cash every two weeks in order to get two more to cover my bills. The loan rates were outrageous and some of these franchises require you pay in cash instead of depositing your personal check. It took me a couple of years to get out of this cycle of debt and it kills me to think of all the money I lost on fees over those years. I will never use those services again. These companies are absolutely predatory and should be fully regulated and restricted since they profit from the people who can least spare the financial fleecing. Thank you."
Source: Collected by the California Reinvestment Coalition and quote reprinted verbatim from https://calreinvest.wordpress.com/2016/06/01/california-payday-loan-consumers-share-their-experiences/
(1, 2)

97. J.J. from Lamont, California, stated that he had "[n]o work, needed money to keep afloat and the lender made it too easy to get loan, a car title loan and it has been a nightmare, do yourself a big favor don't ever get a title loan!"
Source: Collected by the California Reinvestment Coalition and quote reprinted verbatim from https://calreinvest.wordpress.com/2016/06/01/california-payday-loan-consumers-share-their-experiences/
(CT)

98. M. from San Diego, California, lamented, "I have been caught up in payday loan for over a year now it's taking all of my money and I don't know how to get out help."
Source: Collected by the California Reinvestment Coalition and quote reprinted verbatim from https://calreinvest.wordpress.com/2016/06/01/california-payday-loan-consumers-share-their-experiences/
(1)

99. D. D. from Los Angeles shared his story, explaining, "I was in a difficult financial time in my business and needed a $2,500 loan to cover my rent that was due. I had exhausted all my other options and wasn't expecting any checks for a few weeks. I own my car and decided to go to Loanmart to get a loan. I called them up, told them what I needed and what kind of car they had. They approved me for $3,000, even though I asked them for only $2,500. Considering I was desperate for money, I went ahead with it, not knowing about the interest cap over $2,500. Which I am sure they were well aware of and is why they urged me to get a higher loan. So, after 2 years of paying, I have now given them over $4,500, that's $1,500 more than the original loan. They say I still owe them $3,000. For a total of $7,500 due on a $3000 loan. It's highway robbery. These people are awful, they harass me all the time, lie to me about payment due dates and even on one occasion sent me to collections on a missed payment even though I had already paid it for that month from their 3rd party payment site (moneygram). I went and checked and the payment never went through. Which is very suspicious. Now they are threatening to repo my vehicle. I don't know what to do, this whole experience has been horrible. I am self-employed and struggle enough getting by. I hope someone can sue them for these shady business practices. I will be more than happy to testify against them."
Source: Collected by the California Reinvestment Coalition and quote reprinted verbatim from https://calreinvest.wordpress.com/2016/06/01/california-payday-loan-consumers-share-their-experiences/

(2, CT)

100. An anonymous borrower reported the following story to the Pew Charitable Trusts, who shared the story with the LA Wave: "I had to come up with money [when] my husband was out of work, and I actually was up to $900 [in storefront payday loan debt]. … My entire check was gone the next two weeks, so that's when I went to the online ones. … And then after I did the online ones, and got in that loop, and got stuck in there, I went back to the store again, and, yeah, it got bad. And my [checking] account ended up pretty negative. I had to close it out totally."
Source: http://wavenewspapers.com/payday-lenders-may-face-new-regulations/
(1, 3)

101. Raymond Chaney, now 66, is a veteran who became homeless after he took out a payday loan and spiraled into the debt trap. He needed $400 to repair his broken-down car. Soon enough, he owed mounds of money on several loans to many different lenders. He also owed overdraft fees to banks while paying rent. The payday lenders had full access to his account and eventually took all of his Social Security money. Chaney lost his apartment as a result. The $400 loan led to $3,000 in additional loans, which later accumulated to $12,000 of debt. "I'm not dumb, but I did a dumb thing," he said. He now lives in a rescue mission located in Boise, and is working with the Idaho Consumer Finance Bureau to pay off his debt. His advice to anyone considering taking out a payday loan is as follows: "I had a friend who had back surgery, and it was so painful...If the choice is between back surgery and dying, consider dying. Well, I give people the same advice about payday loans. If the alternative to a payday loan is dying, think long and hard about dying."
Source: http://www.nbcnews.com/feature/in-plain-sight/drug-payday-loan-users-hooked-quick-cash-cycle-v18088751
(2, 3)

102. Ann Baddour, Director of Fair Financial Services Project, spoke on behalf of an anonymous borrower at the United Way Leadership Breakfast. She said that the senior citizen, who was living on Social Security, had taken an auto title loan at a value of $2,000 three years prior. She still owed the lender $1,900 after paying off $9,200 on the $2,000 loan.
Source: http://www.tdtnews.com/news/article_fa7d0ea0-7f8f-11e6-9006-afc9a2e7f963.html
(2, CT)

103. As reported by the American Forces Press Service, one military borrower took out a $300 loan when he was desperate for money to help him afford expenses necessary for his three children. He got trapped into the cycle of jumping from lender to lender in order to afford the original loan. The $300 loan soon cost him $15,000.
Source: http://www.military.com/money/personal-finance/credit-debt-management/pay-day-loans-big-business-for-them-headache-for-you.html
(2)

104. Joylynn M. Jossel from Columbus, OH, took out a loan of a couple hundred dollars. She could not pay off the first loan, so she took out a new loan from another payday lender, eventually owing money to four different lenders. Soon she was paying $1,800 each month on payday loans alone. At one point, she had to let a $600 loan she had taken out bounce to avoid dire circumstances. "It was either that or not pay my rent that month," she says. "It was horrifying. They tell you any and everything to get you to come in and pay for the check that didn't clear.

They'll tell you, 'You're a criminal, you wrote a bad check. That's against the law, it's a felony, you're going to jail.' They call all of your references and your job. It's horrifying. I felt so suffocated. It felt as if I was in this black hole that I just couldn't get out of." Soon enough, the other three loans bounced as well, as she had to afford basic living expenses as well. She faced embarrassment at work when the lender called her at work and the receptionist would say who the caller was in front of the office before turning the call over to Joylynn. "Every time the phone rang, I'd jump like I was the next one in a horror movie to be taken out. I'd fear they'd come to my house because I'd known them to go to people's houses before. I felt guilty just putting gas in my tank. I felt guilty buying food. I felt as though any money I got should be going to the payday lenders and collection agencies to get them off my back." Eventually, she was able to repay her loans after winning a civil lawsuit not affiliated with her payday loans.
Source: http://www.aol.com/article/2010/11/02/payday-loans-how-one-woman-got-caught-in-a-vicious-cycle/19674757/
(2, 3)

105. Donald Garrett got behind on his bills, so he took out a $100 loan from Advance Till Payday and repaid them $200. "And I said, 'I appreciate you loaning me the $100. I'm sorry that I was in this bind but you helped me and I appreciate it and you won't see me anymore.' And I thought that was the end of it." Later on, he was receiving a dialysis treatment when he received another phone call from the company. "And he told me that I had a balance of $260 outstanding because of the $80 a month membership fee. Where did that come from? Nobody mentioned that when they gave me the $100."
Source: http://wvtf.org/post/federal-lawsuit-reveals-dark-underworld-payday-loans-virginia#stream/0
(2, SL)

106. Roger Tillman, 64, took out a $500 payday loan from The Money Center when he was tight on cash and needed to pay his bills. He was earning $9.00 an hour working as a late-night security guard. The Money Center's website states that they charge an APR of 650%, amounting to about $150 in interest and fees on a 2-week loan.  He could not pay the loan back before the first two weeks, and renewed it as the costs accrued. He took a loan out from another payday store, falling into a debt trap. He soon lost his job. He tried to contact The Money Store two days later, and got no response. The manager finally reached out to Tillman. He recalls of the manager, "His statement was that 'I hope you don't get stopped by the police, because I'm filing a theft by check charge against you.' I didn't say anything. I was floored, because I was expecting to work out a payment plan."  The Money Center filed a criminal complaint against him in November of 2009. The district attorney told Tillman that he must pay Marpast of Texas, the company through which The Money Center operates, $1,020 within 10 days, in addition to lawyers' fees of $140 and $90 in merchant fees. Otherwise, he would face 2 to 20 years in jail and would be fined as much as $10,000. This shocked him, leaving him scared - too scared to even attend his daughter's graduation from Lackland Air Force Base in San Antonio, fearing that there could be a warrant out to arrest him. "I'm innocent here," he said, "other than losing my job and an inability to pay. I tried to get on a payment plan. If my intention was to duck and dodge, why would I even call them?" He continued to avoid his jail by writing letters to the DA, the state Office of the Consumer Credit Commissioner, and Marpast. He mentioned that the Texas Office of Credit Commissioner submitted his debt to the DA for "collection purposes".
Source: https://www.texasobserver.org/cash-fast-how-taking-out-a-payday-loan-could-land-you-in-jail/

27

(2, 3)

107. Christina McHam took out a $200 loan from Cash Biz, near Houston, but was unable to repay it. She was arrested in November 2012 and charged an additional $305 for court costs and other fines. She "paid off" her debt with one night in jail.
Source: https://www.texasobserver.org/cash-fast-how-taking-out-a-payday-loan-could-land-you-in-jail/
(2, 3, SL)

108. An anonymous man, a veteran who had served in the military for 23 years, was being charged by the Potter County Attorney for a payday loan he could not repay. His wife wrote to the state Office of Consumer Credit Commissioner, "My husband is a good man! He has never done anything wrong, he fought for this country for 23 years … and now the Potty [sic] County Attorney wants to prosecute him for a payday loan."
Source: https://www.texasobserver.org/cash-fast-how-taking-out-a-payday-loan-could-land-you-in-jail/
(2, 3)

109. An anonymous borrower repaid $800 on his $400 payday loan after 70 days. However, he was still in dire need of money, and took out another $500 loan the following day. Again, the next day he took out a $1,000 loan, as he was still struggling to afford his basic living expenses. He paid $2,051 back on that loan 70 days later. He took out another $1,000 loan, and a $600 loan from another store. By this time, he had paid $3,000 interest on these loans, in addition to the $2,500 principal amount.
Source: http://www.standard.net/Guest-Commentary/2016/08/07/paydaylenders-Ponzischeme-fraud-loans-column-Winward
(1, 2)

110. "Perry Green, 30, took out a $300 payday loan that soon cost him $1,000 in interest and other fees. By taking out this one loan, he fell into a three-year debt trap. He took out multiple loans after the initial $300 loan. Originally, he needed the loan to afford his rent, thinking a payday loan was the only option."
Source: http://www.miunited.org/payday-loans-target-those-with-no-cash/
(1, 2)

111. Leonard Abbot, a 53-year-old security officer at the Department of Public Safety at the Texas State Capitol, had been warned of the dangers of payday loans. But after he owed some unexpected medical bills, he felt his only choice was to take out a $500 loan from a payday store. He says, "One thing that I didn't realize is, it doesn't matter how many payday loans you have, you still qualify for more." He adds, "I've always been against those things, the payday loans. I knew about them ahead of time and I knew it's easy to get caught up in their trap, but again, at the time I just felt like I didn't have any other alternative options." By May 2016, he had taken out four different payday loans totaling $2,500 and costing him $450 per month. He eventually converted his loans through the Predatory Loan Conversion Program, led by the Society of St. Vincent de Paul in Austin. "My favorite part about working at the Capitol is seeing the representatives coming in, and also just to see Texas law working at its best," he said. "I am hoping and will be praying that they will look at legislation to regulate this."

28

Source: https://www.texastribune.org/2016/06/18/federal-rules-could-tame-wild-west-texas-payday-le/
(2)

112. An anonymous veteran reported, "I took out a loan for thirty-four hundred bucks. I was gonna pay it back as soon as I got my paycheck. But when I realized I'd have to take out another loan to pay my living expenses, I let it ride. Even though I was paying more than $700 a month on the loan, with the high interest rate, it took forever to pay it off, and I ended up having to pay nearly double what I had borrowed." He got caught in a debt trap for several years, taking out new loans to pay off previous loans.
Source: http://www.vietnow.com/veteran-buyout-plans-and-other-bad-ideas/
(1, 2)

113. Jon Gomez of Hialeah, FL, received a $400 payday loan at a Money Superstore location, due in 14 days and a $41 service charge. "I paid back the $441, but the next day, I took out another $400 payday loan because I needed the money," Gomez told VICE. "I was in this vicious cycle for three months." Eventually, he didn't have enough money to cover one of his payday loan checks, and it bounced.
Source: http://www.vice.com/read/inside-the-battle-over-floridas-racially-charged-payday-loan-racket
(1, 2)

114. "In 2014, hunger drove Michelle Warne, a retiree in Green Bay, Wisconsin, to take out a loan from a local Check 'n Go. 'I had no food in the house at all,' she said. 'I just couldn't take any more.' It took her two years to pay off that loan. Then she took out a second loan, which she has not paid off completely. Caught in a debt trap, she borrowed another $401, plus $338 to pay off the outstanding balance. According to her truth-in-lending statement, paying off this $740 will cost Warne $983 in interest and fees over 18 months. Warne's APR on her so-called installment loan was 143%. 'We need better laws,' said Warne, 73. 'Because when they have something like this, they will take advantage of anybody who is poor.' Warne never applied for a standard personal loan from a bank or credit union, which offer loans at a fraction of the interest rate she paid. She was positive a bank would not lend to her, she said, because her only income is her Social Security retirement. For now, Warne said she has no way to pay off her loan. She has made one payment of $101, but does not know how she will pay off the remainder of her debt, which with principal, interest, and fees will cost her $1,723. Warne's only income is a monthly $763 Social Security check. Warne said she would "never" borrow from a payday lender again, adding, "I wish I would have read the fine print."
Source: http://wisconsinwatch.org/2016/06/no-relief-from-wisconsins-565-percent-payday-loan-interest-under-new-rules/
(2, LT)

115. Ronnette Souza-Kaawa, 46, lives in Waianae, HI and works in administrative services at an elementary school. Her family faced financial difficulty when her teenage daughter had a baby, so she simply went down the road to Easy Cash Solutions to take out a payday loan. Souza-Kaawa says she has taken out roughly a dozen payday loans in the past two years, ranging from $150 to $400. She says she'd always strive to pay them off before her next paycheck, but wasn't always able to do so. "If I borrowed a high (amount), I'd pay some off and re-borrow only a little," she says. Today, Souza-Kaawa owes roughly $1,470 from two recent loans. She is learning

budgeting and financial management strategies from a nonprofit called Hawaiian Community Assets. Today, Souza-Kaawa views payday lenders as a last-ditch option for many families. "It's there when you need it," she says, adding that thanks to financial counseling, she's become savvy to what she now describes as their "hideous" interest rates. "If don't need it, don't take out a loan," she says. "Don't go borrowing $500, just because you can."
Source: http://www.hawaiibusiness.com/payday-lenders/
(1, 2, SL)

116. Toniette Brown from Alabama needed her first payday loan to afford prescription medicine for her daughter. Working as a part-time librarian, she did not have health insurance coverage to cover her family, or even herself. The payday lender gave her a $275 loan without any credit check. When she couldn't repay her loan by the next payday two weeks later, she took out another. This accrued to 12 loans across 4 different lenders, both in Alabama and online. She frequently had 3 to 5 loans at once. She was eventually in $4,288.96 worth of debt. "I couldn't pay them because I was already living on an income that was paycheck to paycheck," she said. When the interest and fees began to grow several times the amount of the original loan, she sought help from Gateway Financial Freedom and landed a full-time job. She has since almost fully paid back her loans, interest and fees, and says that she will never make the same mistake again
Source: http://www.al.com/news/index.ssf/2015/03/lifeline_or_financial_anchor_u.html
(1, 2)

117. Yolanda Roth, of Robbinsdale, Minnesota, took out a payday loan when she lost her job. She had to accept a lower-paying job and needed some extra money to afford her rent. "My check wasn't quite enough to pay it off and still live, and I ended up racking up a lot of debt because of fees and so on," Roth said. "I eventually paid it off, but it took a very long time." Her original loan was for a couple hundred dollars, but ended up costing her a total of $1,500 over the next six months. She describes this experience as "very unpleasant" and "extraordinarily stressful." However, she understands that there is risk associated with taking out these types of loans. "I felt like I understood what was expected and I could definitely do it," she said. "I was just in a desperate situation, or what I thought was a desperate situation."
Source: http://post.mnsun.com/2015/10/12/faith-leaders-protest-payday-loan-practices-in-robbinsdale/
(1, 2)

118. Reverend Stevie Wakes, a Baptist minister in Kansas City, Kansas, received a payday loan of $500 that he thought he could pay back in two weeks. "We thought it was short-term," he said. He thought he would get a higher-paying job soon enough, but wasn't able to. He kept returning to the store to take out more loans every two weeks, and four months later had accumulated $1,250 in debt. He says that he renewed his loans about ten times, with an APR of about 450%. As soon as he realized how quickly his debt he was racking up, he managed to save the money to pay off his debt. "I'd like to see them cap the rate so that no one has to experience that kind of robbery, which is why I support the campaign [for a 36% interest rate cap] 100 percent," he says of payday lenders. "It's a debt trap."
Source: http://www.kansascity.com/news/local/article300576/Alternative-arises-as-payday-loan-industry-comes-under-scrutiny.html
(1, 2)

119. "Michael" of Verona, WI, had taken out payday loans from a dozen stores. He began taking out payday loans after a company mailed him an offer to take out a loan for no charge, directly after he had repaid his car title loan. Soon enough, his debt grew as he continued to take out loans to repay previous ones. He says he felt like a "gerbil on a treadmill". The payday lenders began aggressively calling his personal references, which he provided when he applied for the loans, causing him even deeper feelings of shame and desperation. "It got to be where I felt like my hair was on fire," he says. He eventually declared bankruptcy, halting the fees on the loans.
Source:  http://host.madison.com/ct/news/local/govt_and_politics/wisconsin-is-one-of-few-states-with-no-ceiling-on/article_4e3585bc-cda8-5be9-8bf0-7d6b6a02dfdf.html
(1, 2, 3, CT)


120. Janet is a part-time security officer. She took out a $300 payday loan to afford diabetes medicine, as well as her rent. She found herself in a debt cycle. She recalls, "I called and tried to set up a repayment plan with them. I was not aware that I could do that and when I found out that I could, I did talk with them. And the amount that they said I owe is $425, and they said that I could repay in 2 payments which was over $200. I asked them if they could stretch it out 2 more payments; something that would be a lot smaller. The lady told me that they could only stretch it out 4 for 4 payments, which a little over $100 per payment, which is a payment I still cannot afford to pay at this time." She was still in debt 6 weeks later. "It's very frustrating because it's like I'm more on interest than the actual loan itself... it's like I'm actually paying double."
Source: Texas Fair Lending Alliance, https://www.youtube.com/watch?v=HCOwaudHr3g
(1, 2)

121. Trudy Robideau from California received an $800 loan from a payday loan store. She wasn't able to repay her loan right away, and renewed it for a fee. "Ka-ching," Robideau said. "You're hooked. You can feel the hook right in your mouth. And you don't know it at the time, but it gets deeper and deeper." She soon turned to other payday lenders, racking up fees totaling thousands of dollars. "I was having to get one to pay another," she said. "It's a real nightmare."
Source: http://www.npr.org/2015/03/26/395421117/payday-loans-and-endless-cycles-of-debt-targeted-by-federal-watchdog
(1, 2)

122. Elise Robillard, a teacher and single mother, said she fell into a cycle several years ago of taking short-term, high-interest loans that ultimately played a role in her decision to file for bankruptcy. "I spent the better part of 15 years stuck in a cycle of debt because of the initial payday loan that I took out," Robillard said.
Source: http://www.koat.com/news/nm-supreme-court-exorbitant-payday-loans-violate-state-law/26688316
(2, 3)

123. In 2008, Joy Young and her newly immigrated husband were making only $30,000, in Woonsocket, RI. She and her husband stretched their income to cover their living expenses and their monthly payments on a home equity loan that paid for house repairs and a used vehicle. She received $450 from Advance America, which had to be paid back in two weeks, plus a fee of $45. Two weeks later, she paid her $495 debt, but was forced to borrow again to meet her

monthly expenses. She was now caught in the debt trap, borrowing a third and fourth loan. Every two weeks, Young spent two hours on a Friday afternoon waiting in line to pay off her loans and borrow again. Advance America pocketed $360 in fees each month from her alone. "Every time I got another loan, I thought it would help me in the short term," Young says. "But there was no way out. I felt like I was in prison. Any time I would talk about my story I would start to cry. It has been a horrible, horrible last few years." She was weeks away from foreclosure when she received a loan from Capital Good Fund, a microfinance institution that began extending small loans at 30% interest for a twelve-month term. She was able to pay off three of her payday loans with their help and is slowly paying off the fourth.
Source: http://www.rimonthly.com/Rhode-Island-Monthly/October-2014/Reporter-Breaking-the-Payday-Loan-Cycle/
(1, 2, 3)

124. Christina Sarno in Warren, OH borrowed just $200 from a payday lender, but she quickly realized she could not pay back the principal or the interest. "After receiving constant calls and having the store manager show up at my house to try to collect the money I owed, I gave up. At this point I had developed a lot of interest on the loan and owed more than I could possibly pay back on my income," she said during a meeting at the Warren YWCA. She lost her car, but the Beatitude House of Warren helped her with housing and education to avoid falling into the payday lending trap again.
Source: Reprinted verbatim from http://www.vindy.com/news/2016/jun/28/women-tell-of-troubles-with-payday-lendi/
(2, 3, SL)

125. Tiffany Richardson, a resident of Houston, Texas, received a $5,000 car title loan, using the title to the 2005 Nissan Altima she bought for her mother as collateral. She fell behind on repaying the loan. She took out another car title loan for $2,400 using her 1999 Toyota 4Runner as collateral this time. The amount she owed skyrocketed to several times the original principal amount. "You're like a hamster on a wheel," Ms. Richardson, 43, said of repaying her ballooning debt, adding that she was "looking out the window every night" to make sure her cars had not been repossessed. One night, however, Ms. Richardson woke to see both cars being towed away.
Source: http://www.nytimes.com/2014/08/24/us/thousands-in-texas-lose-cars-amid-calls-for-loan-restrictions.html?_r=0
(1, 2, 3, CT)

126. Maranda Brooks, a records coordinator at a Cleveland college in OH, took out a $500 loan to help pay an electricity bill. Two weeks later, the full amount of the loan plus a $50 fee were deducted from her usual $800 paycheck. To cover expenses for herself and her four children, she took out another loan, falling into a debt trap that lasted almost a year. "It was a nightmare of going around and around," said Brooks.
Source: http://www.chicagotribune.com/chi-payday-loans-rules-20150202-story.html
(1, 2)

127. According to her social worker, Sandra, is an illiterate 33-year old single mother in Missouri with a third-grade education. Sandra received a payday loans from King of Kash.  Her only income was her Social Security disability check. Sandra took out a loan for $300 at an APR of 342%, which cost her $1,080 to pay off.

32

Source: https://www.youtube.com/watch?v=2enmyz-7CQo
(2, LT)

128. After his daughter returned from serving in Iraq and asked for financial help to relocate her family, Preston White, 63, took out a title loan on his pickup truck from a store in Killeen, Texas. The 30-day, $4,000 loan carried a 375% APR. White had already spent his life savings on paying for treatment for his wife's pancreatic cancer and soon realized that his fixed income left him only enough money to cover the fees, not the principal. He recognized the cycle of debt: "In four months, I could have paid more than what I went to the store for in the first place, and still owe the original loan amount," he said. "Never in my wildest imagination did I think that such a loan product could even exist. You assume the system will have usury laws and protect you from such things…Everybody's got to make a profit but there should be no place for usury in the 21st century." He was ultimately able to retire the debt by taking out a loan at 16% APR through a credit union.
Source: Gogoi, P. (2010). "Costly cash: How a retiree wound up with a 375% loan." *Daily Finance.* Available at http://aol.it/16TVtof (viewed 5/24/13).
(1, 2, CT)

129. Alicia and Clinton Lummus of Conyers, Georgia, took out a $525 car title loan after injuries forced them both to stop working. Over eight months, they made payments totaling $1,056—more than twice the amount borrowed—but ultimately fell behind on payments. The lender repossessed the vehicle, worth $14,000—and was able to keep any excess money from the sale of the vehicle, since Georgia law allows the lender to do so.
Source: Kirchhoff, S. (2006). "Some consumers run into big problems with auto title lending." *USA Today*. Available at http://usat.ly/124EbDR (viewed 5/25/13).
(2, CT)

130. Shanell White of Elk Grove, California, needed money to pay for rent after her expenses increased when she began to care for her neice. She took out a $3,900 installment title loan using her car—worth $12,000—as collateral. After having paid nearly $10,500 over three years, she was told she still owed the full principal that she had borrowed. The lender repossessed and sold the car yet still sent her a bill for the loan after. "To me, it's just modern-day loan sharking. People are being taken advantage of," she concluded.
Source: Said, Carolyn. (2013). "'Car-title loans' a road to deep debt: Legislators weight capping high-interest 'car-title loans.'" *San Francisco Chronicle*. Available at http://bit.ly/ZgEx6D (viewed 5/30/13).
(1, 2, CT)

131. Sean received a $1,500 car title loan, which he renewed over 40 times—paying over $11,500 in interest—before receiving help from family to pay off the principal. He said, "I was too embarrassed to ask my parents for the initial loan money, [but] ended up borrowing money from them to make some of the payments and ultimately had to ask them to pay off the whole loan, after losing tons of money along the way."
Source: Martin, N. & Adams, O. (2012). "Grand theft auto: Repossession and demographic realities in title lending." *Missouri Law Review*. Available at http://bit.ly/Z12wSX.
(1, 2, CT)

132. Caroline O'Connor, a 30-year-old hospital lab technician, was in need of $1,000 to cover her rent and electricity bills. When she saw a television commercial advertising how to get cash from your car in the form of a short-term loan, she believed she had found relief. The loan carried a 171% APR.  Two years of being stuck in the debt cycle, the lender seized her car. ""These companies put people in a hole that they can't get out of," Ms. O'Connor said.
Source: http://dealbook.nytimes.com/2014/12/25/dipping-into-auto-equity-devastates-many-borrowers/
(2, CT)

133. Ken Chicosky, a 39-year-old Army veteran, received a $4,000 car title loan from Cash America, a in his Austin, Texas, neighborhood. The loan came with an APR of 98.3%. He says he knew the loan was a bad decision when he received his first bill detailing that he would have to pay a total of $9,346 on the $4,000 loan over 24 months. Even though the City of Austin limits loan terms to three months, according to the New York Times investigation, Cash America made the 24-month loan term by having Mr. Chicosky filled out the paper work and pick up his loan check from a store in a nearby town.  Chicosky, a college student, said the loan has sunk his credit score and he uses some of his financial aid money to pay his title-loan bill.
Source: http://dealbook.nytimes.com/2014/12/25/dipping-into-auto-equity-devastates-many-borrowers/
(2, CT)

134. Derek Drewery was caught in the debt trap beginning in 1996, when he was stationed at Wright-Patterson Air Force Base in Ohio. He received a payday loan of a few hundred dollars at a payday lender near the base. When he returned to the store to repay the loan, he realized that with interest and fees, he owed a lot more than he had borrowed. "I had to borrow again to pay that back, and had to borrow again to pay that back," Drewery says of getting trapped in the debt cycle. "I got into the real churning situation to borrow this week to pay for last week." To help pay off the loan, Drewery cut back on food, even sharing his last box of Cheerios with his Jack Russell terrier until his father found out and sent him grocery store gift cards. He now works as an electrician and is the pastor of a church which has joined a coalition of Christians to oppose predatory lending.
Source: http://www.nytimes.com/2016/06/11/us/full-faith-and-credit-christian-groups-unite-against-predatory-lending.html
(1, 2, 3)

135. Mr. Sanchez, a veteran who served in Iraq as an infantryman in 2004, returned home to his wife and two daughters but suffers from Post-Traumatic Stress Disorder. When he needed a bit more cash to make ends meet, he took out a car title loan to pay for his family's monthly bills. He had already taken out a $2,500 car title loan earlier in the year, paying $350 per month on the loan. After 10 months of paying a total of $3,500 in fees, he could no longer afford the loan and sold his family's second vehicle in order to continue paying on the original title loan. Unfortunately, a few months later the Sanchez family was in a similar situation, unable to make the regular monthly payment of $350 in interest-only payments while still owing the original $2,500 principal. He couldn't lose his second car to the predatory lenders as it was the only way his wife could get to her job. Desperate for a solution, Mr. Sanchez turned to Helping Hands Ministry, a Texas social service organization that provides opportunities for financial empowerment to veterans and working class families. The organization was able to help the Sanchez family pay off their debt.

Source: https://medium.com/@stoppaydaypreds/payday-lenders-target-veterans-fcfe91b92c86#.wl764nkqu
(1, 2, CT)

136. Susan Fronczak, a 60-year-old woman from Florence, Arizona, secured a $2,000 car title loan using her 2007 Nissan as collateral. Fronczak had six months to pay off the loan, at an APR of 182%. Her loan contract provided for 11 interest-only payments followed by a balloon payment of $2,100, for a total repayment amount of $3,860. By month five, she had paid pack $1,920 and the lender said she still owed the full $2,000. When Fronczak could no longer afford the monthly interest-only payments, her car was repossessed. Getting it back cost her $1, 100. Fronczak continued to struggle after refinancing the loan, and it is estimated that she had paid close to $5,000 on the $2,000 loan by the time she got help. Not only had she paid over double the original loan amount, but she was still facing threats of repossession from the lender. The company returned Fronczak's car title and released her from the debt only after she filed a complaint with the Consumer Financial Protection Bureau.
Source: http://www.azcentral.com/story/news/local/mesa/2014/06/20/auto-title-lenders-give-additional-high-risk-option/11061451/
(2, 3, CT, LT)

137. Elaine is 74 years old and lives independently in a small, one-bedroom apartment. She receives social security and a small monthly pension totaling $1,278. She was struggling with her bills. Elaine came to one of the Catholic Charities of Northeastern Kansas' Emergency Assistance Center (EAC) for help with an electric bill. During her meeting she shared that she had payday loans totaling $1,725. She had these payday loans for years and, unfortunately, her low income just would not cover the loans to be paid off while still trying to take care of her daily living expenses and housing. Because of the high rate, Elaine was paying $275 per month just in interest on all of her payday loans. Elaine shared that she had not told her grown children because she was ashamed to let them know she had gotten into this situation in the first place. Catholic Charities was able to assist Elaine through its Kansas Loan Pool Project (KLPP). By converting her high-interest payday loan into a new, low-interest fixed loan, Elaine now has a manageable payment with an actual payoff date. Elaine participates in monthly financial coaching through the KLPP program. Her bills are now up to date and she has set some realistic financial goals. Elaine has newfound hope through the help of Catholic Charities and the KLPP program. "It's a relief to know that I now have enough money to pay my bills AND go to the grocery store." Elaine shared.
Source: Catholic Charities of Northeastern Kansas
(1)

138. Tiemeyer White, a 33-year-old Navy veteran from Texas, full-time electrical engineering college student, and father, took out a car title loan more than a year ago. When the federal government shut down due to a budget impasse in October 2013, White didn't get his Post-9/11 benefits or work-study pay for his Department of Veterans Affairs job for almost two months. As a result, he fell behind on his bills, and the car title lender began calling him several times a day both at work and at home, demanding loan payments. "I tell them, I understand you're doing your job, but I also understand that your job – you make your living off of making my life worse," White says. "That's how I felt that moment." Two weeks later, his 2003 Dodge pickup truck was repossessed from his school's parking lot.

Source: https://www.nerdwallet.com/blog/banking/banking-news/car-title-payday-loans-trap-unwary-veterans/
(2, CT, LT)

139. Homeless veteran Mel Hair hitchhiked to Sioux Falls, South Dakota, from Minnesota a few years ago. He stayed at a shelter to get back on his feet. When Hair and his girlfriend were able to get their own apartment, he received a car title loan for $200. One title loan turned into three loans amounting to more than $2,000. He has been making monthly payments of $430 per month for the past two years.
Source: http://www.keloland.com/news/article/featured-stories/the-high-price-for-small-loans-
(1, 2, CT, SL)

140. Kim Brust of South Dakota started taking out payday loans three years ago. At the time, her social security and disability checks were not enough to cover her monthly expenses for the children and other family members who had moved in with her. She fell into a cycle of debt, taking out a total of eight loans from four different lenders in Sioux Falls. The interest rates range from 247 percent to as much as 608 percent over the course of a year. "I fell into that same trap and I know better. I'm not stupid, but I was stressing about money. I was wondering sometimes where the next meal was coming from," Brust said. "It just sneaks up on you and one day I just laid out all the papers and I go, 'Oh, my Lord what have I done.'"
Source: http://www.keloland.com/news/article/featured-stories/the-high-price-for-small-loans-
(1, 2)

141. Eddie Dorman of Duval County, Florida, has been caught in a vicious debt trap for years. He uses one payday loan to pay for another, and is currently fighting with a car title loan company in Gainesville that is trying to repossess his truck. "I would never do it again, if I ever get out from under this one." Dorman said. "Everyone has problems. I got behind on a payment, the next thing you know there is a wrecker in the front yard at 3 in the morning." With his truck title loan, the company made him take out a $700 insurance policy to cover the company. "It covers them and yet it does not cover you," Dorman explained.
Source: http://www.news4jax.com/news/borrower-beware-title-payday-lenders-are-back
(1, 2, CT)

142. Lara was a young mother who stayed home to raise three children while her military husband worked full time. She worked jobs when she could, but the family still found themselves strapped for cash. They reluctantly took out a payday loan of $200 to manage the bills until their next paycheck. When payday arrived, the lender wanted $300. They paid the $300 but came up short on their next payment, so they took out another loan and quickly found themselves caught in the debt trap. "I kid you not, we did that dance for close to six months," Lara said. "It was horrible. Just unbelievably horrible." Ultimately, Lara had to beg her parents to help get them out of the cycle, but she knows not everyone has a safety net to fall back on.
Source: http://www.tcdailyplanet.net/new-guidelines-nonprofits-help-curtail-predatory-payday-loans-in-minnesota/
(2, SL)

143. Gordon Martinez: "About 8 years ago, I was struggling financially. I had a family and was starting out a new job in sales, transitioning from being a band director. I used my most prized possession, a tuba valued at $8,000, as a security against a $500 pawn loan to help make ends

meet. I made payments faithfully every 2 weeks, fighting Friday rush hour traffic, trying to stay afloat. I could only ever cover interest fees, none of my payments hit the principal. In the midst of making those payments, I took out another loan from another payday storefront, and even went online to several payday loan [stores] trying to cover my bills. Avoiding pending eviction and keeping my family's finances afloat, I felt hopeless, and that I was failing to uphold my responsibilities. I was trying to do what was best for my family, only to be taken deeper and deeper into a financial mess created by products that were advertised to help. Ultimately, all of the loans and fees took too much of my paycheck and I couldn't keep up. I defaulted on the loans. We lost our residence, I lost my prized tuba, and the strain led to the loss of my marriage, destroying our family. I found myself answering an online ad to rent a couch in a one room studio apartment with all of my worldly possessions housed in two plastic storage tubs. I have never felt so low in my life. I felt isolated, ashamed and lonely. I did what I had to do to survive, but I never imagined I would hit such a low. Thankfully, in the midst of this, I found my church and they helped me get back on my feet. I started sharing my story and exposing what I feel are predatory lending practices that run counter to our faith. I felt powerless while I was trapped in payday loans, but now I work with Faith in Texas to help organize other borrowers to help them so that what happened to me, doesn't happen to them. And to advocate for an end to the debt trap I found myself in. My experience is not uncommon. In a recent Faith for Just Lending survey with Clergy and Congregations, 86% said payday loan products were more harmful than helpful. Common themes raised in interviews with Congregations included a cycle of debt, and loss of a major asset such as a home, family, stress and shame. All of which I lived."
Source: https://vimeo.com/167331364
(1, 2, 3)

144. Diana LaCroix, a 63-year-old widow living off of her husband's Social Security survivor's benefits, received a $300 payday loan. It took her three or four months to pay off the small $300 loan. Then, she found herself caught in the debt trap, borrowing $50, $75, or $100 at a time. She is still borrowing money to make up for the loan payments that are eating into her fixed monthly budget, explaining, "I'll probably have to borrow a little more next month to get caught up on bills."
Source: http://www.omaha.com/money/days-of-the-payday-loan-could-be-numbered-with-new/article_0565b988-8356-5fb5-acf9-d3a076e250a0.html
(2)

145. John Miller, an attorney in Missouri, tells the story of his friend who had been struggling financially and turned to a payday loan store as a last resort before taking his own life.
Source: https://www.youtube.com/watch?v=t2-UIIrs95A
(3)

146. Richard Kitterman, a retired Master Sergeant and former Chief of Consumer Affairs Office, tells the story of a solider: "I remember one particular story, I'll never forget it.  She was a young soldier, and she was a good solider. She was a single mother, she was doing her best to meet her obligations to the Army, and to raise her child. But she was facing in some cases, some nearly insurmountable obstacles: she had to have daycare, she had to have babysitting for her kids when she worked late. And she found herself getting her first payday loan and then another, and then another... and it got down to where on payday, her entire check disappeared. It was gone to pay back payday loans. And so her payday was spent standing in line at several different payday

loan offices to get new loans or to renew existing loans. And each time paying healthy loan fees to get that money. And she eventually…and she was a responsible solider. Most of the soldiers that get involved in this are really good, decent soldiers, good people who want to pay their bills, understand their obligations, but they just have more month left at the end of a paycheck. So they just see this as a quick fix; something they only have to do once, and that was the case with this young lady. She just got in over her head. And I remember after she got straightened out and things were going good and she continued to work to pay off those loans, even though she could have walked away and there wasn't really much the payday lender could have done, but that's not the kind of person she was. And I remember her telling me, 'Sergeant Kitterman, I felt like I was in a black hole. Every morning I woke up, every night I went to sleep, I was sick to my stomach over what am I going to do? How am I going to work this out?'"
Source: https://vimeo.com/143323466
(1, 2)

147. Paula, who lives in Texas with her husband and 3 children, took out some payday loans through lenders on the Internet after her husband lost his job. After he started working again, they were never able to get out of the debt trap due to excessive rollover fees. At one point, $800 a month of the family's money was going towards payday loans.
Source: Fact Sheet: *The Victims of Payday Lending*,
http://www.responsiblelending.org/issues/victims-payday
(2)

148. Tennessee resident Natalie has paid over $4,000 in fees for $800 worth of loans. Each time that she thinks she is has paid down the principal, the lender informs her of more fees that have been piled onto her already steep debt. Additional fees are added every time that she pays late.
Source: Fact Sheet: *The Victims of Payday Lending*,
http://www.responsiblelending.org/issues/victims-payday
(1, 2)

149. Maria took out one payday loan three years ago. Now, she is struggling to handle five payday loans and is over $3,000 in debt. Most of her budget goes to paying fees to rollover her loans, leaving little money for her to live on the rest of the month. She cannot afford to pay them off.
Source: Fact Sheet: *The Victims of Payday Lending*,
http://www.responsiblelending.org/issues/victims-payday
(1, 2)

150.  According to a 2013 *New York Times* investigation, "Johanna Pimentel said she and both of her brothers had taken out multiple title loans. They are everywhere, like liquor stores," she said. Ms. Pimentel, 32, had moved her family out of Ferguson, Mo., to a higher-priced suburb of St. Louis that promised better schools. But after a divorce, her former husband moved out, and she had trouble paying her rent. Ms. Pimentel took out a $3,461 title loan using her 2002 Suburban as collateral. After falling behind, she woke up one morning last March to find that the car had been repossessed. Without it, she could not continue to run her day care business."
Source: http://dealbook.nytimes.com/2014/12/25/dipping-into-auto-equity-devastates-many-borrowers/

(2, CT)

151. Knoye Jackson of Goodyear, Arizona received a $700 car title loan, which then ballooned to $7,000 in three years due to the high interest rate and additional fees. The $80 Jackson was paying each week was only paying the interest she was accruing—none of it went toward paying down the principal. Ultimately, Jackson's car was repossessed and she filed for bankruptcy. She wishes she had just called the utility company she owed money to and arranged a payment plan directly with them rather than taking out a loan. Of her experiences, Ms. Jackson says, "I think they trap you because they make it seem like, come and get this good money so you can get caught up on your bills, but you never get caught up. They're getting richer by charging you all of this money.  We're getting poorer." Those loans don't bring you out of debt, they put you in debt.
    Source: http://www.abc15.com/news/state/woman-caught-in-flex-loan-cycle-speaks-out
    (1, 2, 3, LT)

152. A single mother in Georgia took out a $450 loan from Atlanta Title Loans to help make her utility payments. After making four monthly interest-only payments of $112.50, she was unable to keep up with the payments and found the firm had repossessed her car in the middle of the night. Without access to her vehicle, she could no longer get to work.
    Source: http://usa.streetsblog.org/2010/11/10/driven-to-the-poorhouse-how-car-title-lenders-prey-on-americans/
    (2, 3, CT)

153. Jamela Lott, a single mother of five, was falling behind on her rent and borrowed $900 from Loan Max in Akron, Ohio. She used her 2001 Oldsmobile as collateral for the loan. After paying $938 on the original $900 loan, she was unable to keep up. Lott was told she still owed more than $1,600 or had to face repossession of her car.  Shortly thereafter, she and her children became homeless and entered the program of Family Promise of Summit County, which provides temporary shelter to homeless families and offers assistance. Harry McKeen, a local attorney, accepted Lott's case via Legal Aid, and settled with LoanMax to write off Lott's debt. Meanwhile, readers donated more than $1,160 to help Lott get into a rental house in West Akron.
    Source: http://www.ohio.com/business/taking-action-akron-woman-works-through-financial-situation-involving-lender-1.470027
    (2, 3, CT)

154. Norma Poalson, 68, of Akron, Ohio, took out a $600 car title loan from LoanMax for a now-deceased friend who needed money for a chair lift. When she fell behind on her payments, the company rolled over her loan for the same amount. Poalson says she has paid about $2,200 on the loan and still owes another $1,690 or faces repossession.
    Source: http://www.ohio.com/business/taking-action-akron-woman-works-through-financial-situation-involving-lender-1.470027

155. Rasheeda Jackson of Akron, Ohio, took out a $600 car title loan. She fell behind on the payments, and her car was repossessed a few months later. To get her car back, Jackson had to pay $890, including $600 to a repossession company. The company charged her storage fees and tried to ask for money to get things out of her car if she didn't pay the full fees.
    Source: http://www.ohio.com/business/taking-action-akron-woman-works-through-financial-situation-involving-lender-1.470027

156. Tony Williams of South Carolina was strapped for cash and took out a $715 car title loan. He says it was easy and he was desperate. "They just ask what your income is, and whatever you tell them is what they go by," said Tony. However, there is a catch. The annual percentage rate on his loan is 360%. So, of the $715 dollars he and his wife borrowed, they'll end up paying back nearly four times that amount, unless they're able to pay it off sooner. If they don't, their car gets repossessed. "It's like you're caught in a revolving door and you can't get out," said Tony. At Max Cash Title Loan in Spartanburg, the max APR was listed as up to 396%. At North American Title Loans, it was 372%.
Source: http://wspa.com/2014/05/01/driven-to-debt/
(2, CT)

157. Roger Irby of North Akron, Ohio, faced financial difficulty when he broke a bone in his neck which hindered his ability to work full time. He turned to Loan Max for a $500 car title loan, using his 13-year-old truck as collateral. Loan Max required him to pay the loan back in 30 days, along with $200 in interest. A month later, the only way he could pay the loan off in time and have enough money to pay his family's bills was to take out another loan—this time, for $1,000. The loan is due in 30 days, plus $295 in interest. Irby has paid almost $500 to borrow $1,500 for two months.  "They are modern day loan sharks," Irby said. "Me and my wife are trying to pay this bill off and we don't ever want to mess with them again. Ever."
Source: http://www.ohio.com/news/local/need-emergency-cash-cuyahoga-falls-group-considering-an-alternative-to-payday-lenders-1.505993
(2, CT)

158. In July 2010, Army Staff Sergeant Jason Cox of Columbus, Georgia, faced a family emergency. He obtained a $3,000 loan with his car title as collateral from Alabama Title Loans in Phenix City, Alabama. The loan carried an APR of 146% and was required to be paid off in 30 days, or Cox would have to pay the interest portion and renew the loan to set the due date back another 30 days. Unable to pay what eventually grew to approximately $4,500, Cox paid between $330 and $417 each month. After nearly a year of monthly payments, Cox could no longer afford to pay the monthly fee, none of which went to pay down the principal of the loan. He stopped making payments and his vehicle was repossessed at his home on the Fort Benning military base. That's when Cox felt something was amiss, and visited Columbus attorney Kyle Fischer of the law firm Day Crowley. As a former JAG lieutenant in the Army, Fischer knew many of the laws pertaining to military active duty personnel and soon realized that it appeared Cox's loan was in violation of the 2007 Military Lending Act, implemented by Congress to protect active duty personnel from predatory lending. Barnes and Bevis agreed with Fischer, and in November, they filed a class-action lawsuit against Community Loans of America and Alabama Title Loans. "I definitely feel like I was taken advantage of," said Cox, who has served three tours in Iraq during his 11 years of service and earned the Purple Heart for a foot injury he received during enemy gunfire. "I had no clue this law was in place, and nothing was explained to me."
Source: http://www.barneslawgroup.com/Portals/0/Veteran%20challenges%20title%20loan%20company%20in%20courtmdj.pdf
(2, 3, CT)

159. In 2012, Tammy in Colorado received a payday loan from Speedy Cash, after seeing a commercial and facing trouble paying rent.  She now says, "I would be better off if I never had

one." She had a job and thought she could pay the loan back with no problem. She was approved for the loan in less than 10 minutes and given $500 based on her income. The fee did not seem too bad added on top of the $500 loan, and the payback terms seemed okay, until it was time to make her first installment payment. She was going to be $50 short. She called Speedy Cash to tell them to not send her check to the bank because the total amount was not in her account. She made the request for them not to send the check for another 7 days, but the check was sent anyway. She was charged an NSF Fee from Speedy Cash and a Retun Check Charge from the bank, and her bank account went into the negative. Tammy recounts, "This became my downward spiral. I then went to another payday lending company to obtain another loan and was granted." With the second payday loan, she paid the $125 installment plus $35 NSF from the first payday loan. She said, "However, the next payday from my job came around and I was still in the same position again. I was short now on both payday loans and I could not figure out how to settle it, then I got my third payday loan from another payday store. These loans happened all in a timeframe of less than 90 days. Then the awful phone calls began and I stated to dodge all the calls. Letters began and I did not try to address them because I knew that I am now unable to pay any of them due to the all the fees applied from all the payday lending sources. The end result to my story was that since I met payday lenders my life resulted in filing Chapter 7 bankruptcy. I lost my home, car and became homeless and also my credit was damaged. Even today through my email I am now getting threats to garnish my income, and now that I am disabled I cannot afford them to be able to do this to me. This is all because the first payday lender would not honor my request to hold off for a week so I could get the 50.00 and not have to seek other lenders to rob peter to pay Paul. Even today this is a nightmare!"
Source: Story on file with CRL
(2, 3)

SHERROD BROWN
OHIO

COMMITTEES:
AGRICULTURE, NUTRITION,
AND FORESTRY

BANKING, HOUSING,
AND URBAN AFFAIRS

FINANCE

VETERANS' AFFAIRS

# United States Senate

WASHINGTON, DC 20510 - 3505

November 21, 2019

The Honorable Joseph M. Otting
Comptroller
Office of the Comptroller of the Currency
400 7th St., SW
Washington, D.C. 20219

The Honorable Jelena McWilliams
Chairman
Federal Deposit Insurance Corporation
550 17th St., NW
Washington, D.C. 20429

Dear Comptroller Otting and Chairman McWilliams:

We write to express our strong opposition to rules proposed by the Office of the Comptroller of the Currency (OCC) and the Federal Deposit Insurance Corporation (FDIC) that could eviscerate state laws that limit the interest rates on loans and allow **unregulated** predatory lending across the nation.[1]

The proposed rules could allow payday and other non-bank lenders to launder their loans through banks so that they can charge whatever interest rate federally-regulated banks may charge, threatening federalism's careful balance and overturning more than two centuries of state regulation of lending activity. Since our nation's founding, states have enacted laws to provide for limits and regulation over the amount of interest that lenders can charge.[2] In the early 20th century, 34 states capped interest rates between 36 and 42 percent.[3] Currently, a supermajority of states and the District of Columbia limit the amount of interest that lenders can charge on many loans. For example, 43 states and the District of Columbia have capped the interest rate for loans of up to $500, six-month loans, and 42 states and the District of Columbia have capped the interest rate for $2,000, two-year loans.[4] The clear trend in the states is toward more protections for consumers and small business borrowers, with new bipartisan laws capping interest rates on payday and other personal loans in Montana in 2010, South Dakota in 2017, Ohio in 2019, and going into effect in California in 2020.[5]

---

[1] https://www.occ.gov/news-issuances/news-releases/2019/nr-occ-2019-132.html;
https://www.fdic.gov/news/news/press/2019/pr19107.html.
[2] James M. Ackerman, Interest Rates and the Law:  A History of Usury, 1981, Arizona St. L.J.61 (1981).
[3] Elisabeth Anderson, Experts, Ideas, and Policy Change: The Russell Sage Foundation and Small Loan Reform, 1910–1940, at 2 (Mar. 8, 2006), *available at* http://www.yale.edu/scr/andersen.doc.
[4] National Consumer Law Center, State Annual Percentage Rate (APR) Caps for $500, $2,000 and $10,000 Installment Loans, *available at* https://www.nclc.org/images/pdf/high_cost_small_loans/fact-sheet-apr-caps-for-installment-loans.pdf .
[5] *See* https://www.ksfy.com/content/news/South-Dakota-voters-approve-interest-rate-cap-on-payday-loans-400489561.html; https://www.cincinnati.com/story/money/2019/04/26/ohio-payday-loan-law-what-it-means-what-changes/3585952002/; https://www.cnbc.com/2019/09/13/california-passes-new-rules-that-cap-payday-loan-interest-at-36percent.html.

The proposed rules would gut state laws by encouraging payday and other non-bank lenders to try to evade state interest limits by funneling payday and other loans through federally-regulated banks, which are not subject to these state laws.[6] In these "rent-a-bank" arrangements, the bank plays a nominal role as the formal lender of the loan.[7] The non-bank lender, by contrast, does all the work and bears all or nearly all of the economic risk: it markets and advertises the loan, conducts the underwriting (or licenses its underwriting software to the bank), collects payments from consumers, services the loan, and is either the assignee of or purchases a derivative interest in the loan.[8] Consumers have no relationship with the bank; they apply to and deal with the non-bank lender, which arranges and collects payments on the loan.[9]

During President George W. Bush's administration, the OCC and FDIC cracked down on these rent-a-bank schemes. In 2001, the OCC issued guidance making clear that it may be an "abuse of the national bank charter" for banks to enable non-bank lenders to make loans that violate state law.[10] In 2003, then OCC Comptroller John D. Hawkes, Jr. explained:

> We have been greatly concerned with arrangements in which national banks essentially **rent out their charters** to third parties who want to evade state and local consumer protection laws. The preemption privileges of national banks derive from the Constitution and are not a commodity that can be transferred for a fee to nonbank lenders.[11]

---

[6] National banks are subject to state usury limits. But under the "exportation doctrine," the Supreme Court held that nationally-chartered banks can "export" the interest rate of the state in which they are located to other states. *Marquette Nat'l Bank of Minneapolis v. First of Oma Serv. Corp.*, 439 U.S. 299 (1978).

[7] *See CFPB v. CashCall, Inc.*, 2016 WL 4820635 (C.D. Cal. Aug. 31, 2016) (payday lender indemnified bank and had a contractual obligation to purchase the loans funded by the bank that were underwritten based on the payday lender's guidelines).

[8] *See, e.g.*, Elevate, Inc. 2018 10-K at 17, (Mar. 8, 2019) (non-bank lender conducts marketing and licenses its website, technology platform, proprietary credit and fraud scoring models to bank to originate loans), *available at* http://www.snl.com/Cache/c397055303.html.

[9] For example, FinWise Bank, one of the banks that rents its charter to non-bank lenders, does not offer small dollar loans directly to consumers. Instead, the bank's website includes links to non-bank lenders' websites, like Opploans, where consumers can "learn more" about these "[p]artner offers." *See* https://www.finwisebank.com/lending/.

[10] OCC Bulletin 2001-47, available at https://ithandbook.ffiec.gov/media/resources/3557/occ-bul_2001_47_third_party_relationships.pdf.

[11] https://www.occ.gov/news-issuances/news-releases/2003/nr-occ-2003-6.html (emphasis added); *see also* Remarks by Comptroller John D. Hawke, Jr., Before the Women in Housing and Finance, (Feb. 12, 2012) (same), *available at* https://www.occ.gov/news-issuances/speeches/2002/pub-speech-2002-10.pdf.

In the following years, the OCC brought several enforcement actions to end these arrangements.[12] The FDIC issued guidelines in 2005[13] and brought enforcement actions to end payday lenders' rent-a-bank arrangements with banks.[14]

Despite the troubling history of misuse of these rent-a-bank schemes, and prior clear steps from the OCC and FDIC to shut down these arrangements, we have seen a recent comeback. Opploans, for example, is an online non-bank lender that makes loans with a 160 percent annual percentage rate (APR), which are illegal in 22 states and the District of Columbia, through a rent-a-bank arrangement with FinWise Bank, regulated by the FDIC.[15] Elevate Credit, Inc. (Elevate), another online non-bank lender, makes loans (branded as Rise loans) with a 99 to 149 percent APR that are illegal in at least 15 states, also through a rent-a-bank arrangement with FinWise Bank.[16] Elevate also offers another loan product (branded as Elastic lines of credit) in 40 states at rates that can reach 109 percent APR through a rent-a-bank arrangement with Republic Bank, also regulated by the FDIC.[17]

The Trump administration's well-known support of payday lenders has only emboldened payday and other unscrupulous lenders to pursue rent-a-bank arrangements. Some of these non-bank lenders are openly discussing their efforts to evade the California state interest rate caps that are set to go into effect on January 1, 2020. The CEO of Elevate, Inc., for example, stated during a July 29, 2019 earnings call with investors:

> As you know, in California a piece of legislation . . . would limit the amount of interest that can be charged loans from $2,500 to $10,000. So what does this mean for Elevate? As you know, . . . similar to our recent experience in Ohio, we expect

---

[12] *See, e.g., In re Eagle National Bank*, No. 2001-104 (Dec. 18, 2001), available at https://www.occ.gov/static/enforcement-actions/ea2001-104.pdf; *In the Matter of Peoples National Bank*, No. 2003-02, *available at* https://www.occ.gov/static/enforcement-actions/ea2003-2.pdf.

[13] FDIC Guidelines for Payday Lending (Nov. 2015), available at https://www.fdic.gov/news/news/financial/2005/fil1405a.html.

[14] *In re CompuCredit Corp.*, Case Nos. FDIC-08-139b, FDIC-08-140k, FDIC-07-256b, FDIC-07-257k, FDIC-07-228b, FDIC-07-260k (Dec. 19, 2018), *available at* https://www.fdic.gov/news/news/press/2008/pr08142a.pdf.

[15] *See* https://www.opploans.com/licenses/ (listing Alaska, Arizona, California, District of Columbia, Florida, Hawaii, Indiana, Kansas, Kentucky, Louisiana, Maine, Michigan, Minnesota, Montana, Nebraska, North Dakota, Ohio, Oklahoma, Oregon, South Dakota, Tennessee, Virginia, Washington, and Wyoming). *See* National Consumer Law Center, Issue Brief: Stop Payday Lenders' Rent-a-Bank Schemes (Nov. 2019), *available at* https://www.nclc.org/issues/issue-brief-stop-payday-lenders-rent-a-bank-schemes-november-2019.html. The 160 percent APR on loans exceeds the interest rate caps in these states. *Id.*

[16] Elevate 2018 10-K at 15-16. Elevate also appears to be evading interest rate caps in Ohio and Texas by "brokering" the loan as a credit service organization (CSO). *Id.* at 7, 15-16. Under this scheme, a third-party lender finances the loan at the legal interest rate, but has no relationship with the borrower. Elevate, as the CSO, charges fees to arrange, collect, and guarantee the loan, which result in an effective APR of 60 percent to 299 percent. *Id.* at 15 *See also* CRL Issue Brief, "Payday Lenders Pose as Brokers to Evade Interest Rate Caps," (Jul. 2010), *available at* https://www.responsiblelending.org/payday-lending/policy-legislation/states/CRL-CSO-Issue-Brief-FINAL.pdf.

[17] Elevate Form 10-Q at 46 (for period ending June 20, 2019).

to be able to continue to serve California consumers **via bank sponsors** that are **not subject to the same proposed state level rate limitations.**[18]

Several other online payday lenders have also informed investors that they would be pursuing a rent-a-bank strategy to evade the new California law.[19]

Given the OCC's and FDIC's prior efforts to eradicate rent-a-bank arrangements, it is disturbing to see the agencies now reverse course and propose rules that could actively enable these predatory lending schemes. The OCC and FDIC's stated justification for enabling the return of rent-a-bank arrangements is to "clarify" the applicability of the "valid-when-made" doctrine. This doctrine purports to hold that a non-bank lender can ignore state usury laws for loans it purchases from a bank that is exempt from those laws.

But, like rent-a-banks arrangements, the valid-when-made doctrine is a legal fiction. As Professor Adam Levitin of Georgetown University Law Center explained: "With one exception, it cannot be found in case law predating the relevant statute, much less in treatises, or scholarly articles, and the Second Circuit rejected the doctrine in 2015 in *Madden v. Midland Funding, LLC* . . . ."[20] The OCC and FDIC are also wrong that the banks' preemption can be treated like property and assigned to a non-bank lender. Preemption is instead "a privilege personal to a bank that comes as part of a bundle of a detailed regulatory regime,"[21] which non-bank lenders are not subject to. Finally, the OCC and FDIC are wrong to seek to overturn the Second Circuit's *Madden* decision through a rulemaking. As evidenced by legislation introduced in the House and Senate, it is the role of Congress, not the executive branch, to address any disagreements with the Second Circuit's *Madden* decision.

The OCC's and FDIC's proposed rulemakings represent a disturbing return to their pre-financial crisis role in broadly applying federal preemption to undermine state consumer protection laws. For over two centuries, states have taken the lead in addressing interest rates within their borders. Now is not the time to overturn this system. We urge you to reverse course on this path, which

---

[18] *See* https://seekingalpha.com/article/4278838-elevate-credit-inc-elvt-ceo-ken-rees-q2-2019-results-earnings-call-transcript (emphasis added).
[19] *See* National Consumer Law Center, Issue Brief: Payday Lenders Plan to Evade California's New Interest Rate Cap through Rent-a-Bank Partnership, (Oct. 2019) (providing transcripts of earnings calls in which the CEOs of Curo Holdings Corp. (d/b/a Speedy Cash), Elevate Credit Inc., and Enova (d/b/a NetCredit, CashNetUSA) discuss plans to evade California's state law interest rate caps through rent-a-bank arrangements), *available at* https://www.nclc.org/issues/ib-rent-a-bank.html.
[20] *Rent-Rite Super Kegs West, Ltd. v. World Business Lenders, LLC*, Case No. 1:19-cv-01552 (D. Col.), Mot. for Leave to File *Amicus Curiae* Brief of Professor Adam J. Levitin in Support of Appellant, at 4,  and Amicus Curiae Brief of Professor Adam J. Levitin in Support of Appellant, 10-12, *available at* https://www.creditslips.org/files/levitin-amicus-brief-rent-rite-super-kegs-west-ltd-v-world-business-lenders-llc.pdf.
[21] Levitin Amicus Brief at 12.

enabled predatory lending practices and led to the financial crisis from which the country is still emerging.

Sincerely,



Sherrod Brown
United States Senator

Jeffrey A. Merkley
United States Senator

Elizabeth Warren
United States Senator

Chris Van Hollen
United States Senator

Brian Schatz
United States Senator

Jack Reed
United States Senator



601 E Street, NW  |  Washington, DC 20049
202-434-2277  |  1-888-OUR-AARP  |  1-888-687-2277  |  TTY: 1-877-434-7598
www.aarp.org  |  twitter: @aarp  |  facebook.com/aarp  |  youtube.com/aarp

January 31, 2020

Robert E. Feldman
Executive Secretary
Attention: Comments
Federal Deposit Insurance Corporation
550 17th Street NW
Washington, DC 20429

**RE:**   **Federal Interest Rate Authority, RIN 3064-AF21**

Dear Mr. Feldman:

AARP, on behalf of our nearly 38 million members and all older Americans nationwide, thanks
you for the opportunity to comment on the Federal Deposit Insurance Corporation's (FDIC)
proposed rule governing federal interest rate authority.

The FDIC's guidance notes that the agency "recognizes that the use of third parties can assist
management in attaining strategic objectives."[1] There are certainly many reasons for banks to
enter into partnerships with third parties in order to provide new products and services. However,
AARP has concerns the proposed rule is overly broad with respect to bank-nonbank partnerships
and, as a result, lacks sufficient guardrails to prevent consumer harm to older adults. More
specifically, the proposed rule is likely to permit the growth of high-cost lending practices – such
as payday loans, auto title loans, and installment loans – in states where they are presently
restricted. As a result, the proposed rule would undermine efforts by states – and in some cases
by their individual citizens at the ballot box – to address harmful and deeply unpopular lending
practices within their communities.

Older adults face increasing financial challenges and often have less capacity to recover from
financial shortfalls. At the median spending level, nearly 80 percent of dollars spent by those age
65 and older simply fill their basic needs of housing, healthcare, food, clothing, and

---

[1] Federal Deposit Insurance Corporation, "Guidance for Managing Third-Party Risk," FIL-44-2008, June 6,
2008, available at https://www.fdic.gov/news/news/financial/2008/fil08044a.html

Alabama | Alaska | Arizona | Arkansas | California | Colorado | Connecticut | Delaware | District of Columbia | Florida | Georgia | Hawaii | Idaho | Illinois | Indiana
Iowa | Kansas | Kentucky | Louisiana | Maine | Maryland | Massachusetts | Michigan | Minnesota | Mississippi | Missouri | Montana | Nebraska | Nevada
New Hampshire | New Jersey | New Mexico | New York | North Carolina | North Dakota | Ohio | Oklahoma | Oregon | Pennsylvania | Puerto Rico
Rhode Island | South Carolina | South Dakota | Tennessee | Texas | Utah | Vermont | Virgin Islands | Virginia | Washington | West Virginia | Wisconsin | Wyoming

transportation.[2] Meanwhile, fixed, regular payments such as Social Security and pension income make older adults attractive targets for lenders. In Florida, for instance, the fastest-growing demographic of payday loan borrowers between 2005 and 2015 was age 65 and older. In California, payday loan usage tripled among those age 62 and older from 2015 to 2016 alone.[3] In addition to payday loans, the high-cost lending market has diversified to include installment loans that contain similar pitfalls for borrowers, albeit with a longer repayment period.[4] AARP is concerned that older borrowers who fall into a cycle of debt from high-cost lending have even fewer options to return to a solid financial footing, such as returning to work or taking on more hours.

The proposed rule, which codifies an extension of banks' interest rate authority to nonbanks, opens the door more widely for high-interest nonbank lenders to operate in ways that contravene state protections for borrowers. For example, the vast majority of states place a rate cap on a $2,000 installment loan, with 33 states and the District of Columbia limiting the annual percentage rate to an already exorbitant 36 percent or less, inclusive of all fees.[5] However, nonbank lenders have already expressed interest in using out-of-state bank partnerships to evade rate caps, as we have seen in efforts to evade California's new interest rate cap on installment loans between $2,500 and $10,000 that went into effect this year.[6]

If the proposed rule officially sanctions these types of partnerships and extends banks' interest rate authority to nonbanks, it will additionally subvert the will of voters in states where rate caps limiting high-cost lending resulted from broadly supported ballot initiatives. This includes 72 percent of Montana voters selecting to cap rates on payday loans in 2010, more than 76 percent of South Dakota voters approving an interest rate cap in 2016, and more than 75 percent of Colorado voters approving a rate cap in 2018.[7] Even when voters needed to successfully navigate competing ballot provisions, they overwhelmingly chose to restrict high-cost lending practices.

---

[2] Steven A. Sass, "Will the Financial Fragility of Retirees Increase?" Center for Retirement Research at Boston College, February 2018, available at https://crr.bc.edu/briefs/will-the-financial-fragility-of-retirees-increase/.

[3] Alessandra Malito, "Lax payday loan regulations could hit older Americans especially hard," *MarketWatch*, February 9, 2019, available at https://www.marketwatch.com/story/lax-payday-loan-regulations-could-hit-older-americans-especially-hard-2019-02-08.

[4] Diane Standaert and Peter Smith, "Payday and Car Title Lenders' Migration to Unsafe Installment Loans," Center for Responsible Lending, October 2015, available at https://www.responsiblelending.org/other-consumer-loans/car-title-loans/research-analysis/crl_brief_cartitle_lenders_migrate_to_installmentloans.pdf.

[5] Carolyn Carter, Lauren Saunders, and Margot Saunders, "Predatory Installment Lending in 2017: States Battle to Restrain High-Cost Loans," National Consumer Law Center, August 2017, available at https://www.nclc.org/images/pdf/pr-reports/installment-loans/report-installment-loans.pdf.

[6] Kevin Wack, "High-cost lenders already seeking ways around crackdown in California," *American Banker*, October 15, 2019, available at https://www.americanbanker.com/news/high-cost-lenders-already-seeking-ways-around-crackdown-in-california.

[7] Erin Madison, "Debate over I-164 rages as high-rate lenders prepare to close," *Great Falls Tribune*, November 7, 2010; Dana Ferguson, "Payday lenders flee South Dakota after rate cap," *Argus Leader*, January 6, 2017, available at https://www.argusleader.com/story/news/politics/2017/01/06/payday-lenders-flee-sd-after-rate-cap/96103624/; Joe Robino, "Colorado Proposition 111: Payday loan interest limit wins big," *The Denver Post*, November 6, 2018, available at https://www.denverpost.com/2018/11/06/colorado-proposition-111-payday-wins/.

The proposed rule is also inconsistent with prior actions of the FDIC to limit risky bank-nonbank relationships. With regard to payday lending, the FDIC's 2005 guidance explicitly states the following: "The combination of the borrower's limited financial capacity, the unsecured nature of the credit, and the limited underwriting analysis of the borrower's ability to repay pose substantial credit risk for insured depository institutions… institutions face increased reputation risks when they enter into certain arrangements with payday lenders, including arrangements to originate loans on terms that could not be offered directly by the payday lender."[8] Many of these same characteristics remain true with regard to high-cost installment loans prevalent today. The FDIC clearly recognizes the potential risks involved in these partnerships—as noted in its statement that "it will view unfavorably entities that partner with a State bank with the sole goal of evading a lower interest rate."[9] And yet the proposed rule fails to make this statement actionable in any way. Moreover, the statement's focus on a "sole goal" of evasion does not adequately anticipate that a third party could identify multiple rationales for ostensibly entering into such a partnership to the detriment of consumers. We urge the FDIC to reject a rule that fails to take these well-known and historic risks into account with regard to high-cost lending.

AARP submits that the FDIC should reconsider its proposed rule in light of the potential for consumer harm to older adults and reduced confidence in the oversight of abusive practices. Millions of Americans strongly oppose high-cost lending and the cycle of debt it can foster. They expect their federal and state governments to work together to provide robust oversight of lending practices to protect vulnerable consumers.

Once again, AARP appreciates the opportunity to address our concerns with the FDIC's proposed rule regarding Federal Interest Rate Authority. If you have any questions, please feel free to contact Tom Nicholls of our Government Affairs staff at 202-434-3765 or by email at TNicholls@aarp.org.

Sincerely,

David Certner
Legislative Counsel and Legislative Policy Director
Government Affairs

---

[8] Federal Deposit Insurance Corporation, "Guidelines for Payday Lending (Revised November 2015)," FIL-52-2015, November 16, 2015, available at https://www.fdic.gov/news/news/financial/2005/fil1405a.html.
[9] 84 FR 66846.