ROBYN SMITH (SBN 165446)
Of Counsel
National Consumer Law Center
7 Winthrop Square, #4
Boston, MA 02110
Phone: (213) 840-6264
Fax: (617) 542-8028
Email: rsmith@nclc.org

Attorney for Center for Responsible Lending, National Consumer Law Center, and
National Coalition for Asian Pacific American Community Development

[See signature page for the complete list of
parties represented. Civ. L.R. 3-4(a)(1).]

## IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **PEOPLE OF THE STATE OF CALIFORNIA, et al.** | Case. No. 4:20-cv-05860-JSW |
| Plaintiffs, | **BRIEF OF AMICI CURIAE CENTER FOR RESPONSIBLE LENDING, NATIONAL CONSUMER LAW CENTER, AND NATIONAL COALITION FOR ASIAN PACIFIC AMERICAN COMMUNITY DEVELOPMENT IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| **THE FEDERAL DEPOSIT INSURANCE CORPORATION,** | |
| Defendant. | |

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................. iii

INTEREST OF *AMICI CURIAE* ........................................................................1

ARGUMENT ......................................................................................................1

I.   Introduction and Summary .................................................................1

II.  Predatory Lenders, Pushing Exceedingly Harmful Loans, Have Long Sought to Evade State Interest Rate Limits Through Rent-a-Bank Schemes with Banks. ............................................................3

   A.   Rent-a-bank schemes first began with short-term payday lenders as part of a long line of usury evasions. .....................3

   B.   Courts, including circuit courts, rejected preemption defenses to payday rent-a-bank schemes, illustrating the FDIC's lack of authority to issue the rule ...............................5

   C.   FDIC-supervised banks are currently laundering loans for numerous predatory lenders. ...................................................8

   D.   Evasions by high-cost lenders place consumers at risk of grave harm, particularly in communities of color. ..............12

III. The FDIC's Rule is Arbitrary and Capricious Because it Ignores the Severe Impact on Consumers without a Plausible Explanation that the Rule is Necessary to Protect the Safety and Soundness of Banks. ......................................................................16

   A.   The Rule facilitates "rent-a-bank" usury evasions. ..............16

   B.   The Rule improperly preempts state limits on interest charged by debt buyers, limits that protect important policy interests against exploding debt. ...............................19

i

C.   The rule is not necessary to protect legitimate bank
programs or securitization markets.......................................21

IV.   The FDIC's Consumer Protection Oversight Has Not and Will
Not Prevent Predatory Rent-a-Bank Schemes. ...............................23

CONCLUSION ....................................................................................25

# <u>TABLE OF AUTHORITIES</u>

CASES:

*BankWest, Inc. v. Baker*,
    411 F.3d 1289 (11th Cir. 2005), *reh'g granted, op. vacated,*
    433 F.3d 1344 (11th Cir. 2005), *op. vacated due to mootness,*
    446 F.3d 1358 (11th Cir. 2006). .............................................................. 6-7

*CashCall v. Morrisey*,
    No. 12–1274, 2014 WL 2404300 (W. Va. May 30, 2014) ......................14

*Cohen v. Capital One Funding, LLC*,
    No. 19-CV-3479(KAM)(RLM), 2020 WL 5763766
    (E.D.N.Y. Sept. 28, 2020) ...........................................................................22

*Colorado ex rel. Salazar v. ACE Cash Express, Inc.*,
    188 F. Supp. 2d (D. Colo. 2002) .................................................................7

*Commonwealth v. Think Fin., Inc.*,
    2016 WL 183289 (E.D. Pa. Jan. 14, 2016)...................................................7

*Community State Bank v. Knox*,
    523 Fed. App'x 925 (4th Cir. 2013) ............................................................6

*Eul v. Transworld Sys.*,
    2017 WL 1178537 (N.D. Ill. Mar. 30, 2017) .............................................7

*Goleta National Bank v. Lingerfelt*,
    211 F. Supp. 2d 711 (E.D.N.C. 2002) ........................................................7

*Hollins v. Capital Solutions Investments I, Inc.*,
    477 S.W.3d 19 (Mo. Ct. App. 2015) .........................................................20

*In re Community Bank*,
    418 F.3d 277 (3d Cir. 2005) ........................................................................6

*In re Rent-Rite Superkegs West Ltd.*,
    623 B.R. 335 (D. Colo. 2020)..............................................................18

*Krispin v. May Department Store*,
    218 F.3d 919 (8th Cir. 2000) .......................................................7

*Lusnak v. Bank of America, N.A.,*
    883 F.3d 1185 (9th Cir. 2018) .................................................23

*Madden v. Midland Funding*,
    786 F.3d 246 (2d Cir. 2015) ............................................ *passim*

*McShannock v. JP Morgan Chase Bank*,
    976 F.3d 881 (9th Cir. 2020) .................................................23

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983)..................................................................16

*Peterson v. Chase Card Funding, LLC*,
    No. 19-CV-00741-LJV-JJM, 2020 WL 5628935
    (W.D.N.Y. Sept. 21, 2020) .....................................................22

*Scott v. Lloyd*,
    34 U.S. 418 (1835)..............................................................4, 19

*Sims v. Opportunity Financial, LLC*,
    2021 WL 1391565 (N.D. Cal. Apr. 13, 2021)................... 17-18

*Weiner v. Bank of King of Prussia*,
    358 F.Supp. 684 (E.D. Pa. 1973)...............................................7

**STATUTES:**

12 U.S.C. § 25b(b)(2)..............................................................8
12 U.S.C. § 25b(e) ..................................................................8
12 U.S.C. § 25b(h) ..................................................................8
12 U.S.C. § 1463(g) .................................................................5
12 U.S.C. § 1735f-7a(a)(1)(C)(v) ............................................5

iv

12 U.S.C. § 1831d(a) .......................................................................5

Ariz. Rev. Stat. §§ 6-632, 6-635 ...................................................10

**OTHER AUTHORITIES:**

Jackie Borchardt, *Ohio's new payday loan law starts Saturday. What's changing and what it means for you*, Cincinnati Enquirer (Apr. 26, 2019) ............................................................................9

Calif. Dep't of Business Oversight, Press Release, *DBO Launches Investigation Into Possible Evasion of California's New Interest Rate Caps By Prominent Auto Title Lender, LoanMart* (September 3, 2020) ..........................................................................10

CFPB, *Online Payday Loan Payments* (April 2016)..........................15

CFPB, *Proposed Rule, Payday, Vehicle Title, and Certain High-Cost Installment Loans*, 81 Fed. Reg. 47864 (July 11, 2016) ...........13

Brandon Coleman and Delvin Davis, *Perfect Storm: Payday Lenders Harm Florida Consumers Despite State Law*, Center for Responsible Lending (March 2016) .....................................................15

Comments of CRL, NCLC, et al. on FDIC's proposed Federal Interest Rate Authority Rule, RIN 3064-AF21 (Feb. 4, 2020) ......................... 13, 21, 23

Piotr Danisewicz and Ilaf Elard, *The Real Effects of Financial Technology: Marketplace Lending and Personal Bankruptcy* (July 5, 2018) ..............23

Complaint, *Ryan Derosier v. Applied Data Financial LLC, d/b/a Personify Financial*, No. CACE-20-008496 (17th Cir. Ct., Broward Co., FL filed May 22, 2020) .................................................11

Elevate Credit, Inc. (ELVT), Q2 2019 Results - Earnings Call Transcript, Seeking Alpha (July 29, 2019) .................................................9

Elevate Credit, Inc., Form 10-K, 2019 (Feb. 14, 2020)......................15

v

Elevate Credit, Inc., Form 10-K, 2020 (Fed. 26, 2021)......................................11

Defendant Elevate Credit Inc.'s Memorandum of Points and Authorities in
    Opposition to Plaintiff's Motion to Remand, *DC v. Elevate Credit,
    Inc.*, No. 1:20-cv-01809-EGA, (D.D.C. filed Sept. 2, 2020) ...................17

Zeke Faux, *Wall Street Finds New Subprime With 125% Business Loans*,
    Bloomberg (May 22, 2014) ......................................................24

Amicus Brief of the FDIC and the OCC in Support of Affirmance and
    Appellee, *In Re: Rent-Rite Super Kegs West Ltd.*, No. 1:29-CV-
    015520REB (D. Colo. Sept. 10, 2019)......................................24

FDIC, Proposed Rule, Federal Interest Rate Authority, 84 Fed. Reg. 66845,
    66850 (Dec. 6, 2019) ........................................................ *passim*

FDIC, Final Rule, Federal Interest Rate Authority, 85 Fed. Reg. 44146 (Jul.
    22, 2020) .................................................................. *passim*

Colleen Honigsberg *et al.*, *The Effects of Usury Laws on Higher-Risk
    Borrowers*, Columbia Business School Research Paper No. 16-38
    (Dec. 2 2016) ..............................................................23

NCLC, Consumer Credit Regulation (3d ed. 2020) ................................. 4, 5, 18

NCLC, *A Larger and Longer Debt Trap? Analysis of States' APR Caps for
    A $10,000 5-year Installment Loan* (Oct. 2018)......................................3-4

NCLC, *High-Cost Rent-a-Bank Loan Watch List* ................................................8

NCLC, *Misaligned Incentives: Why High-Rate Installment Lenders Want
    Borrowers Who Will Default* (July 2016)........................................... 14, 25

NCLC, *Payday Lenders Plan to Evade California's New Interest Rate Cap
    Law Through Rent-A-Bank Schemes* (Oct. 2019)........................................9

NCLC, *State Rate Caps for $500 and $2,000 Loans* (Mar. 2021) ........................3

vi

NCLC, *Testimony of Lauren Saunders before the U.S. House Financial
    Services Committee on Rent-a-Bank Schemes and New Debt Traps*
    (Feb. 5, 2020).......................................................................................4, 24

Office of the Attorney General of the District of Columbia, Press Release,
    *AG Racine Sues Predatory Online Lender For Illegal High-Interest
    Loans* (June 5, 2020)..................................................................................17

Office of the Attorney General for the District of Columbia, Press Release,
    *AG Racine Sues Online Lender for Making Predatory and Deceptive
    Loans to 4,000+ District Consumers* (Apr. 6, 2021) ...............................17

Defendants Opportunity Financial, LLC and Finwise Bank's Notice of
    Motion and Motion to Dismiss First Amended Complaint, *Sims v.
    Opportunity Financial, LLC,* No. 4:20-cv-04730-PJH (N.D. Cal. filed
    Sept. 23, 2020) ........................................................................................18

S. REP. 96-368, 1980 U.S.C.C.A.N. 236 (1980)...................................................5

Stop the Debt Trap, *Congress Must Protect Consumers from Predatory
    Lending* .....................................................................................................14

Chi Chi Wu, NCLC, *Past Imperfect: How Credit Scores and Other
    Analytics "Bake In" and Perpetuate Past Discrimination* (May
    2016) .........................................................................................................15

vii

## INTEREST OF *AMICI CURIAE*

The **Center for Responsible Lending** ("CRL") and **the National Consumer Law Center** ("NCLC") are nonprofit organizations dedicated to ensuring consumers have access to fair financial products. Our organizations have extensive experience in consumer protection legal issues, including supporting strong state and federal consumer protections. **National Coalition for Asian Pacific American Community Development** ("National CAPACD") is a coalition of local organizations working to improve the quality of life for low-income Asian American and Pacific Islander communities.[1]

## ARGUMENT

### I.    Introduction and Summary

Since the American Revolution, states have limited interest rates to protect consumers. Evasions of usury laws are as old as the laws themselves. The Federal

---

[1] *Amici curiae* certify that neither party's counsel authored any portion of this brief, that neither party or party's counsel contributed money that was intended to fund preparing or submitting the brief, and that no persons, other than *amici curiae*, its members, or its counsel, contributed money that was intended to fund preparing or submitting the brief. CRL, a non-profit organization under section 501(c)(3) of the Internal Revenue Code, is a supporting organization of the Center for Community Self-Help, also a non-profit organization. Neither CRL nor the Center for Community Self-Help has issued shares or securities. NCLC and National CAPACD are non-profit organizations under section 501(c)(3) of the Internal Revenue Code and have not issued shares or securities.

1

Deposit Insurance Corp.'s (FDIC) Final Rule, Federal Interest Rate Authority, 85 Fed. Reg. 44146 (Jul. 22, 2020) ("Rule"), protects a growing form of usury evasions: rent-a-bank lending.

Two decades ago, payday lenders first started using banks to originate loans that the payday lenders then collected. But when these and similar schemes were challenged, courts, including circuit courts, rejected payday lenders' attempts to raise federal banking laws as a preemption defense. The decision in *Madden v. Midland Funding*, 786 F.3d 246 (2d Cir. 2015), is far from an outlier; it is consistent with numerous other decisions holding that federal banking laws only preempt usury claims against banks, not claims against non-banks.

Today, high-cost, non-bank lenders are again trying to hide behind banks to evade usury laws that forbid rates that can reach an annual percentage rate (APR) of 225%. Payday lenders have even openly boasted on public calls to investors that they can evade newly enacted laws aimed at their predatory installment loans by moving to rent-a-bank models.

These usurious loans pose severe harm to consumers, especially in communities of color, creating a debt trap by design and exploiting the financially distressed. High-cost installment loans often inflict as much or more harm as two-week payday loans—creating a bigger, deeper, longer debt trap.

2

The FDIC's Rule is arbitrary and capricious because it fails to adequately consider the way it protects and invites destructive lending. Predatory rent-a-bank lenders are already using the Rule to defend themselves. In addition to enabling usury evasions, the FDIC offers no justification for preventing states from limiting exploding interest on charged-off debt sold to debt buyers. These actual, concrete harms far outweigh the FDIC's vague, unsubstantiated claims that the rule is necessary as a "proactive" measure to protect banks' safety and soundness, to address the "potential for future disruption" or to resolve "uncertainty."

Enforcement of federal law, which lacks interest rate caps, is no substitute for state usury laws. Nor is the FDIC's weak oversight, which is not stopping predatory lending now.

## II.     Predatory Lenders, Pushing Exceedingly Harmful Loans, Have Long Sought to Evade State Interest Rate Limits Through Rent-a-Bank Schemes with Banks.

### A.     Rent-a-bank schemes first began with short-term payday lenders as part of a long line of usury evasions.

At least 45 states and the District of Columbia (D.C.) cap interest rates on consumer loans. Among those that cap rates, the median annual rate including fees for a $2,000, two-year installment loan is 32%. Larger loans have a lower median cap of 25%, while $500 loans carry a median cap of 38.5%. *See* NCLC, *State Rate Caps for $500 and $2,000 Loans* (Mar. 2021), http://bit.ly/state-rate-caps; NCLC,

3

*A Larger and Longer Debt Trap? Analysis of States' APR Caps for A $10,000 5-year Installment Loan* 1 (Oct. 2018), http://bit.ly/instloan18.

But the "ingenuity of lenders has devised many contrivances, by which . . . the [usury] statute may be evaded." *Scott v. Lloyd*, 34 U.S. 418, 446-47 (1835) (Marshall, C.J.). The latest contrivance is rent-a-bank lending, which takes advantage of the fact that, due to a combination of state and federal laws, most banks are not subject to *any* interest rate cap. *See generally* NCLC, Consumer Credit Regulation § 3.5.4 (3d ed. 2020), updated at www.nclc.org/library.

In a rent-a-bank scheme, a non-bank lender typically designs and markets the loan, takes and processes applications, and then a bank nominally approves and originates the loan. The bank then sells the loan (or the bulk of the receivables or participation interests) back to the non-bank lender (or a related entity), which charges interest, collects payments, and reaps the bulk of the profits. Non-banks claim that the loans are bank loans immune from state rate caps. *See* NCLC, *Testimony of Lauren Saunders before the U.S. House Financial Services Committee on Rent-a-Bank Schemes and New Debt Traps* (Feb. 5, 2020) (Saunders Testimony), http://bit.ly/debt-trap-schemes.

Twenty years ago, payday lenders making short-term loans up to 400% APR first used rent-a-bank schemes. Payday lenders paid a bank to be the nominal

4

lender but immediately sold the loans to the payday lender. These evasive schemes were shut down through a combination of actions by states and by the federal bank regulators, including the FDIC. *See* Consumer Credit Regulation § 3.5.4.

> **B.** **Courts, including circuit courts, rejected preemption defenses to payday rent-a-bank schemes, illustrating the FDIC's lack of authority to issue the rule.**

As states combatted rent-a-bank schemes, payday lenders asserted preemption by the Federal Deposit Insurance Act (FDIA) or related provisions under the National Bank Act (NBA). But courts rejected FDIA and NBA preemption defenses by payday lenders and other non-bank entities, confirming that the FDIC lacks authority to establish permissible rates for non-banks.

Section 27 of the FDIA sets interest rates *only* for "State-chartered insured depository institutions, including insured savings banks, or insured branches of foreign banks." 12 U.S.C. § 1831d(a); *see also id.* § 1463(g) (preempting state usury laws regarding the interest "a savings association may charge"). The FDIA says nothing about rates that any non-bank entity or assignee may charge. Further, in the very same legislation that created Section 27, Congress explicitly intended to preempt state usury laws as applied to non-bank assignees of first mortgages.[2]

---

[2] 12 U.S.C. § 1735f-7a(a)(1)(C)(v); *see also* S. Rep. 96-368, 1980 U.S.C.C.A.N. 236, 254-55 (1980) ("It is the committee's intent that loans originated under this

5

Congress's specific action to address assignees in this one, limited context indicates a lack of authority for the FDIC to act more broadly under Section 27.

The Third, Fourth, and Eleventh Circuits and numerous lower courts have found that the rate exportation provisions of the FDIA and NBA are limited to banks, not non-banks. Courts have rejected arguments that the FDIA completely preempts usury claims against non-banks.[3] *In re Community Bank*, 418 F.3d 277, 296 (3d Cir. 2005) ("Sections 85 and 86 of the NBA and Section 521 of the DIDA [12 U.S.C. § 1831d] apply only to national and state-chartered banks, not to non-bank purchasers of second mortgage loans such as RFC"); *Community State Bank v. Knox*, 523 Fed. App'x 925 (4th Cir. 2013) (finding the claims "are substantively aimed at [First American Cash Advance] to the exclusion of [the bank]. Thus, the claims have no connection to an out-of-state state-chartered bank, and the FDIA cannot apply."). Similarly, courts have rejected arguments that the FDIA provides a substantive defense to usury claims against non-banks collecting loans originated by banks. *See BankWest, Inc. v. Baker*, 411 F.3d 1289, 1304 (11th Cir. 2005) ("The language of § 27(a) refers only to state banks, and does not address non-

_____

usury exemption will not be subject to claims of usury even if they are later sold to an investor who is not exempt under this section.").

[3] While complete preemption is a jurisdictional issue, courts rejected complete preemption on the grounds that the federal statutes did not regulate interest charged by non-bank entities.

6

bank businesses, such as payday stores, at all."), *reh'g granted, op. vacated,* 433 F.3d 1344 (11th Cir. 2005), *op. vacated due to mootness,* 446 F.3d 1358 (11th Cir. 2006); *Commonwealth v. Think Fin., Inc*., 2016 WL 183289 (E.D. Pa. Jan. 14, 2016).

Courts also rejected claims that the NBA provides complete preemption or a substantive preemption defense to claims against non-banks. *Madden* is just one of those cases. *See, e.g., Colorado ex rel. Salazar v. ACE Cash Express, Inc.*, 188 F.Supp.2d 1281 (D. Colo. 2002) ("the NBA 'regulates national banks and only national banks . . . '") (quoting *Weiner v. Bank of King of Prussia*, 358 F. Supp. 684, 687 (E.D. Pa. 1973)); *Eul v. Transworld Sys.,* 2017 WL 1178537 (N.D. Ill. Mar. 30, 2017) ("it is not so clear that NBA preemption applies to assignees of loans originated by national banks . . . . The Court is not persuaded that NBA preemption applies here as a matter of law."); *Goleta Nat'l Bank v. Lingerfelt,* 211 F. Supp. 2d 711 (E.D.N.C. 2002) ("the NBA patently does not apply to non-national banks"). Even where courts have found preemption in a case involving a nonbank entity, it is because the facts show that the bank is the one charging the interest. *See Krispin v. May Dep't Store,* 218 F.3d 919 (8th Cir. 2000).

The caselaw limiting the preemptive force of the FDIA and NBA to interest charged by banks was reinforced in 2010. In the wake of the financial crisis,

7

Congress limited the preemptive effect of the NBA (which is broader than that of the FDIA) to banks themselves and explicitly excluded even bank subsidiaries, affiliates, and agents. 12 U.S.C. §§ 25b(b)(2), 25b(e), 25b(h). The NBA and the FDIA govern only the interest rates charged by banks, and the FDIC lacks the authority for a rule regulating the interest charged by non-banks.

### C.     FDIC-supervised banks are currently laundering loans for numerous predatory lenders.

History is repeating itself. The FDIC's Rule, if upheld, will be exploited by a new generation of rent-a-bank schemes, this time primarily for longer-term loans. Some of these schemes pre-date the Rule, but the Rule is inconsistent with caselaw that can be used to attack the schemes, and as consumers and state attorneys general challenge the schemes, rent-a-bank lenders are already using the Rule as a defense, as discussed in Sections II.B and III.

A growing list of high-cost, non-bank lenders are using obscure FDIC-supervised banks to enable loans at 99% to 225% APR in states that do not permit their high rates. *See* NCLC, *High-Cost Rent-a-Bank Loan Watch List* ("NCLC Watch List"), https://bit.ly/2JCGf2c.

Illustrating the evasive scheme, most high-cost lenders only use bank "partnerships" in states where their loan products exceed state interest rate limits. In other states, they lend directly. *See* NCLC Watch List. For example, Elevate's

8

Rise product, discussed below, uses rent-a-bank schemes to evade interest rates in several states, but operates directly under a state license in others. *See id.*; https://www.risecredit.com/how-online-loans-work#WhatItCosts. After Ohio reformed its lending laws to reduce rates on longer term loans,[4] Elevate switched to a rent-a-bank model, and threatened to do the same as a California law progressed. *See* NCLC, *Payday Lenders Plan to Evade California's New Interest Rate Cap Law Through Rent-A-Bank Schemes* (Oct. 2019) ("Calif. Evasions"), http://bit.ly/rent-a-bank-ib ("[S]imilar to our recent experience in Ohio, we expect to be able to continue to serve California consumers via bank sponsors that are not subject to the same proposed state level rate limitations.") (quoting Elevate Credit, Inc. (ELVT), Q2 2019 Results - Earnings Call Transcript, Seeking Alpha (July 29, 2019)).

Several payday lenders use rent-a-bank schemes for installment loans in states that do not allow high rates. Enova (CashNetUSA), through the NetCredit brand, uses Republic Bank & Trust to make $1,000 to $10,000 loans up to 99.9%

---

[4] *See* Jackie Borchardt, *Ohio's new payday loan law starts Saturday. What's changing and what it means for you*, Cincinnati Enquirer (Apr. 26, 2019), https://www.cincinnati.com/story/money/2019/04/26/ohio-payday-loan-law-what-it-means-what-changes/3585952002/.

APR in 22 states[5] and lends directly in other states. Axcess Financial (Check 'n Go and Allied Cash Advance) offers Xact loans through Capital Community Bank (CC Bank)[6] from $1,000 to $5,000 at 145% to 225% APR in several states,[7] but directly in other states.[8] Check Into Cash offers loans through CC Connect, a division of CCBank. A poster in Arizona gives an example of a $1,100, 12-month loan at 224.99% APR, http://bit.ly/CCConnectLoan, far higher than the legal Arizona rate. *See* Ariz. Rev. Stat. §§ 6-632, 6-635. LoanMart started making auto title loans under the ChoiceCash brand (through CCBank) after California lowered its rates, but stopped after the regulator launched an investigation.[9] LoanMart still offers rent-a-bank loans in several states.[10]

Other high-cost rent-a-bank loans are offered by online "fintech" lenders that emphasize their technology. Elevate Credit uses FinWise Bank and Capital

---

[5] *See* https://www.netcredit.com/ (bottom of page); https://www.netcredit.com/rates-and-terms (last visited April 6, 2021).

[6] https://www.xact.com/ (last visited April 7, 2021).

[7] *Id.*; https://www.xact.com/how-it-works (last visited April 7, 2021).

[8] https://www.checkngo.com/ (last visited April 7, 2021).

[9] Press Release, Calif. Dep't of Business Oversight, *DBO Launches Investigation Into Possible Evasion of California's New Interest Rate Caps By Prominent Auto Title Lender, LoanMart* (September 3, 2020), https://bit.ly/3lwMn9g.

[10] https://www2.choicecash.com/application/application (last visited April 22, 2021).

Brief of Amici Curiae Center for Responsible Lending, National Consumer Law Center, and National Coalition for Asian Pacific American Community Development in Support of Plaintiffs' Motion for Summary Judgment

Community Bank to originate Rise installment loans at 99% to 149% APR in several states and in other states directly through a state license.[11] FinWise sells a 96% interest in the loans to an entity controlled by Elevate for which Elevate is the primary beneficiary.[12] Elevate also offers a line of credit called Elastic that carries an effective APR of up to 109%.[13] Elevate uses Republic Bank & Trust of Kentucky to originate the Elastic product. Republic sells a 90% interest in the loans to an entity controlled by Elevate for which Elevate is the primary beneficiary.[14] Another self-styled fintech, OppLoans, offers $500 to $4,000 installment loans through FinWise Bank at 160% APR in numerous states and directly in others.[15]

Personify Financial was sued for violating Florida usury law through a rent-a-bank scheme.[16] Personify uses First Electronic Bank for loans of $1,000 to

---

[11] *See* https://www.risecredit.com/ (bottom of page) (last visited April 7, 2021).

[12] Elevate Credit, Form 10K, 2020, at 65 (Feb. 26, 2021), https://sec.report/Document/0001651094-21-000016.

[13] *Id.* at 68.

[14] *Id.* at 78.

[15] *See* https://www.opploans.com/rates-and-terms/ (last visited April 7, 2021).

[16] Complaint, *Ryan Derosier v. Applied Data Financial LLC, d/b/a Personify Financial*, No. CACE-20-008496 (17th Cir. Ct., Broward Co., FL filed May 22, 2020), http://bit.ly/Derosier.

$10,000 up to 179.99% APR.[17] The bank plays only a middleman role; Personify offers the loans through its own website, and the complaint alleges that Personify uses entirely its own platforms to receive payment on, service, and collect on the loans.

EasyPay Finance uses Transportation Alliance Bank, dba TAB Bank, to evade state rate caps on loans for furniture, appliances, pets, auto repairs, and other products.[18] For example, TAB helped EasyPay make a $1,500 loan for a car repair at a rate of 188.99% to a consumer in Michigan, where the legal interest rate is well below that rate.[19]

Finally, in the small business area, FDIC-supervised Bank of Lake Mills (Wisconsin-chartered) was helping World Business Lenders (WBL) originate outrageously usurious loans. *See* Section V.

### D. Evasions by high-cost lenders place consumers at risk of grave harm, particularly in communities of color.

The usury evasions that the FDIC's Rule protects are not mere technical violations. These high-cost loans impose severe harm on consumers. A review of complaints to the Consumer Financial Protection Bureau (CFPB) about the lenders

---

[17] https://www.personifyfinancial.com/ (last visited April 7, 2021).

[18] https://www.easypayfinance.com/privacy-policy/ (last visited April 7, 2021).

[19] Contract on file with NCLC.

12

using rent-a-bank scams find several recurring themes: bewilderment and distress that large bi-weekly or monthly payments are not reducing principal due to the loan's high interest rates; inability to sustain the high payments; queries about how such loans can possibly be legal; distress caused by wage garnishment; and stress caused by relentless collection calls to the home or workplace. Comments of CRL, NCLC, et al. on FDIC's proposed Federal Interest Rate Authority Rule, RIN 3064-AF21, at 51-60 (Feb. 4, 2020) ("CRL Comments"), https://bit.ly/3qKvtb1. High-cost lending is a debt trap by design, exploiting the financially distressed, and leaving them unable to pay other bills and facing high checking account fees, closed bank accounts, and bankruptcy. *Id.* These toxic products inflict turmoil pervading every aspect of a person's life.

High-cost lenders claim the loans are better alternatives to short-term payday loans. But many of these longer-term loans still carry extremely high interest rates, are often tied to repayment on payday (making the lender first in line for repayment), and are made with little regard for the borrower's ability to repay the loan while meeting other expenses. These loans often cause as much or more harm as two-week payday loans—creating a deeper, longer debt trap. CFPB, *Proposed Rule on Payday, Vehicle Title, and Certain High-Cost Installment Loans*, 81 Fed. Reg. 47864, 47885-92 (July 11, 2016) ("CFPB Proposed Payday Loan Rule").

Brief of Amici Curiae Center for Responsible Lending, National Consumer Law Center, and National Coalition for Asian Pacific American Community Development in Support of Plaintiffs' Motion for Summary Judgment

High rates can turn responsible lending incentives on their head, so that lenders can succeed even when borrowers fail. *See* NCLC, *Misaligned Incentives: Why High-Rate Installment Lenders Want Borrowers Who Will Default* (July 2016), https://bit.ly/39xF12Q. High rates slow down repayment of principal so that for months or even years progress can be negligible, even after repaying hundreds or thousands of dollars. One high-cost installment lender, CashCall, which has tried rent-a-bank schemes, *see CashCall v. Morrisey*, No. 12–1274, 2014 WL 2404300 (W. Va. May 30, 2014), could make a profit after only 14 months of payments on a 47-month, 139% APR loan—even if the borrower then defaulted. CashCall planned for very few of its loans to pay to full term.[20]

But profits for the lender are devastation for borrowers. Multiple borrower complaints about the high-cost installment lenders who operate through rent-a-bank schemes describe the anguish of realizing that most of their payments are going to interest and doing little to reduce the principal.[21]

Even though masked by refinances, defaults on high-cost loans are extraordinarily high. Elevate has net charge-offs as a percentage of revenues of

---

[20] This chart shows real CashCall loans. *See* NCLC, *Misaligned Incentives* at 15.

[21] *See* Stop the Debt Trap, *Congress Must Protect Consumers from Predatory Lending*, https://consumerfed.org/wp-content/uploads/2021/03/Rent-A-Bank-Stories_By-State-2021.pdf (collecting stories from Consumer Financial Protection Bureau Complaint Database search March 19, 2021).

50%, yet apparently is comfortable with this business model as the company does not intend to drive down its charge-off rates. Elevate Credit, Inc., Form 10-K, 2019, at 75, 81 (Feb. 14, 2020), https://bit.ly/33wPnwn.

Car title lenders like LoanMart inflict a special kind of pain. An astounding one in five borrowers has their car repossessed, disrupting the borrower's ability to get to work, earn income, and manage their lives. *See* CFPB Proposed Payday Loan Rule, 81 Fed. Reg. at 47883.

High-cost lenders cause particular harm to communities of color. Payday lenders have long targeted these communities, with more stores in more affluent communities of color than in comparatively less affluent white communities. *See*, *e.g.*, Brandon Coleman & Delvin Davis, Center for Responsible Lending, *Perfect Storm: Payday Lenders Harm Florida Consumers Despite State Law* at 7, Chart 2 (March 2016). Online high-cost lenders may focus more on subprime credit scores than geography, but historical discrimination is reflected in credit scores. *See* Chi Chi Wu, NCLC, *Past Imperfect: How Credit Scores and Other Analytics "Bake In" and Perpetuate Past Discrimination* (May 2016), https://bit.ly/3mnyc7I. High-cost loans do not promote financial inclusion; they drive borrowers out of the banking system and exacerbate existing disparities. CFPB, *Online Payday Loan Payments* at 3-4, 22 (April 2016), https://bit.ly/3gGvo3G.

15

**III.    The FDIC's Rule is Arbitrary and Capricious Because it Ignores the Severe Impact on Consumers without a Plausible Explanation that the Rule is Necessary to Protect the Safety and Soundness of Banks.**

Under the Administrative Procedure Act, agency action is arbitrary and capricious if the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The FDIC's Rule is arbitrary and capricious because it fails to adequately consider the devastating impact on consumers while proffering a justification based on mere speculation.

**A.    The Rule facilitates "rent-a-bank" usury evasions.**

The Second Circuit in *Madden* correctly predicted that "extending [bank rate exportation] protections to third parties would create an end-run around usury laws for non-national bank entities . . . ." 786 F.3d at 252. The explosion of predatory rent-a-bank evasions is exactly what the Rule protects.

The FDIC cavalierly dismissed concerns that the Rule would encourage predatory lending by inaccurately stating that the concerns arise from "perceived abuses of longstanding statutory authority rather than the proposed rule." 85 Fed.

16

Reg. at 44153. But to the contrary, as discussed above, the Rule overrides longstanding authority rejecting the preemption claims of rent-a-bank lenders.

The rent-a-bank lenders profiled above are already using the Rule to defend themselves against usury claims. Elevate has been sued by D.C. over loans charging 99% to 251% APR, laundered through a bank, despite DC's 6% to 24% usury cap. Press Release, Office of the Attorney General of D.C., *AG Racine Sues Predatory Online Lender For Illegal High-Interest Loans* (June 5, 2020), https://bit.ly/3lZ2Q6s. Elevate cited the FDIC's Rule in arguing that federal banking laws completely preempt DC's usury claims. *See* Defendant Elevate Credit Inc.'s Memorandum of Points and Authorities in Opposition to Plaintiff's Motion to Remand at 15-16, No. 1:20-cv-01809-EGA, *DC v. Elevate Credit, Inc.* (D.D.C. filed Sept. 2, 2020).

OppLoans cited the Rule to defend a usurious rent-a-bank scheme charging 160% in California despite the new rate cap of about 36%. Defendants Opportunity Financial, LLC and Finwise Bank's Notice of Motion and Motion to Dismiss First Amended Complaint at 1, 9-13, *Sims v. Opportunity Financial, LLC,* No. 4:20-cv-04730-PJH (N.D. Cal. filed Sept. 23, 2020).[22] The D.C. Attorney General recently

---

[22] The court dismissed the complaint on state law grounds without addressing the preemption defense or the impact of the FDIC rule. *See Sims v. Opportunity Fin.,*

17

sued OppLoans, and OppLoans will likely again cite the rule as a defense. *See* Press Release, Office of the Attorney General for D.C., *AG Racine Sues Online Lender for Making Predatory and Deceptive Loans to 4,000+ District Consumers* (Apr. 6, 2021), https://oag.dc.gov/release/ag-racine-sues-online-lender-making-predatory-and.

A district court also felt compelled, reluctantly, by the OCC's parallel rule – before the FDIC's was finalized – to uphold the right of a non-bank assignee to charge 120% APR on a $550,000 loan despite Colorado's 45% usury law. The court was "convinced" by the reasoning of *Madden* and by an academic critique of the FDIC's "valid-when-made" theory. *In re Rent-Rite Superkegs West Ltd.*, 623 B.R. 335, 340-41 (D. Colo. 2020). But the debtor did not challenge the OCC rule (which was finalized after briefing), and the court upheld the right of the assignee to charge the outrageously usurious rate, while remanding to the bankruptcy court for an assessment of whether the bank was the true lender.[23]

---

*LLC*, No. 20-cv-04730-PJH, 2021 WL 1391565 (N.D. Cal. Apr. 13, 2021). The court's focus on form over substance is an outlier contradicted by numerous cases across the country. *See* Consumer Credit Regulation §§ 3.5.4.3.1, 3.9.

[23] While the debtor in that case was able to proceed to discovery on a true lender claim, in other cases, as noted above, non-bank lenders are using the Rule to seek dismissal of complaints at the pleading stage. Given the FDIC's lack of authority over the interest rates of non-bank assignees regardless of whether the bank is the true lender, forcing plaintiffs to attempt to delve into the ever-changing details of

18

There is a grave risk that the FDIC's Rule will be used to defend a lending model that will eviscerate state usury laws and turn them into a "dead letter."

**B.      The Rule improperly preempts state limits on interest charged by debt buyers, limits that protect important policy interests against exploding debt.**

Beyond the impact on rent-a-bank lending, the FDIC's Rule also overrules *Madden's* direct holding that federal banking rate exportation laws do not preempt state usury laws that limit the interest debt buyers add to defaulted credit card debt. That result further illustrates both the harms of the Rule and the FDIC's lack of justification for it.

Consumers often default on loans because the loans are unaffordable. Piling on additional interest at high rates causes debts to balloon astronomically, making the debts impossible to escape. That can happen even at credit card interest rates: a $3,000 debt at 25% interest grows to over $9,000 in five years. When rates are high—as with the rent-a-bank lenders we have described—debts skyrocket exponentially. For example, in one case, 200% interest on defaulted payday loans resulted in these shocking results: A $100 loan led to a $705.18 judgment that

---

partnerships between banks and non-banks would not mitigate the impacts of the Rule. *See Scott v. Lloyd*, 34 U.S. 418, 446, 447 (1835) ("The ingenuity of lenders has devised many contrivances, by which, under forms sanctioned by law, the [usury] statute may be evaded . . . those circumstances are almost infinitely varied . . . .").

continued to collect interest; the creditor then collected $3,174.81 and a balance of $4,105.77 remained. An $80 loan led to a $2,137.68 judgment, on which interest was accruing; $5,346.41 had been collected and a balance of $19,643.48 remained. *Hollins v. Capital Sols. Invs. I, Inc.*, 477 S.W.3d 19, 27 (Mo. Ct. App. 2015) (Dowd, J., concurring). States have an interest in preventing outrageous results like these and high interest that accrues indefinitely.

The FDIC did not rebut the finding in *Madden* that "state usury laws would not prevent consumer debt sales by national banks to third parties . . . . [and] would not 'significantly interfere' with the exercise of a national bank power."[24] 786 F.3d at 251. The FDIC merely starts with one commentator's speculation – *five years before the FDIC cites it* – that the impact "will be significant" and "will likely" reduce banks' ability to sell loans, and then stretches to predict "uncertainty" that has the "potential" to chill willingness to make loans. 85 Fed. Reg. at 44155.

If states lose their long-standing power to limit non-bank interest rates, loans at 160% APR could balloon indefinitely despite states' efforts to protect their residents. The FDIC lacks the authority to take this power away from states.

_____

[24] Moreover, the "prevent or significantly interfere" Supremacy Clause preemption standard applied in *Madden* and codified in the National Bank Act does not apply to state-chartered banks, whose powers arise from state, not federal law.

### C.     The Rule is not necessary to protect legitimate bank programs or securitization markets.

The FDIC has argued that a rule is necessary to alleviate "uncertainty" in securitization markets created by *Madden*. But six years since the *Madden* decision, there is no evidence of any notable impact on securitization markets or banks' ability to manage liquidity. Even if application of state usury laws to assigned loans might theoretically pose safety and soundness concerns in other contexts,[25] nothing has been raised to justify the FDIC's overbroad Rule that completely preempts usury laws for non-bank assignees in every conceivable circumstance.

The FDIC candidly stated that it "is not aware of any widespread or significant negative effects on credit availability or securitization markets having occurred to this point as a result of the *Madden* decision." 84 Fed. Reg. at 66850. *Madden* has little, if any, impact on the biggest securitization markets: those for mortgages, auto loans, or student loans. *See* CRL Comments at 23-24. The FDIC instead only offers speculation to "mitigate the *potential for future disruption* to the markets for loan sales and securitizations." 85 Fed. Reg. at 44155 (emphasis

---

[25] The FDIC belatedly raised potential impact on the insurance fund if a large bank failed and was forced to sell loans at a large discount. 85 Fed. Reg. at 44149. But the FDIC invariably sells bank assets to another bank also entitled to ignore state rate caps. It could also promulgate a narrower rule applicable to this rare scenario.

21

added). Not once does the Rule or its proposal present any actual evidence of a chilling effect or disruption to the markets.

The FDIC asserted that *Madden* "continues to cause ripples with pending litigation challenging longstanding market practices." 84 Fed. Reg. at 66845. The FDIC was likely referring to two recent credit card securitization cases that have since been dismissed with the courts *relying on Madden*, confirming that *Madden* does not threaten banks that are not fronting for predatory lenders. *See Peterson v. Chase Card Funding, LLC*, No. 19-CV-00741-LJV-JJM, 2020 WL 5628935, at *2, *6 (W.D.N.Y. Sept. 21, 2020) (finding that the usury claims "are expressly preempted by the NBA" and were preempted "[e]ven before the OCC issued its rule . . . ." (citing *Madden*)); *Cohen v. Capital One Funding, LLC*, No. 19-CV-3479(KAM)(RLM), 2020 WL 5763766 at *15 (E.D.N.Y. Sept. 28, 2020) (declining to consider valid-when-made but finding that the bank was the "real party-in-interest" and "*Madden* is therefore not only distinguishable, it supports this court's conclusion that the NBA preempts Plaintiffs' usury claim.")

*Madden* critics point to a study showing a drop in the Second Circuit states in lending by three non-bank marketplace lenders to deep subprime borrowers. However, those lenders offered only miniscule amounts of subprime credit even

22

before *Madden*.[26] Another study asserts a link between *Madden* and increased

bankruptcies but suffers from clear methodological and interpretive errors.[27] Most

importantly, neither study found impact on banks. Non-bank lenders, even

mainstream ones, have no right to use banks to avoid state laws that apply to them.

## IV.   The FDIC's Consumer Protection Oversight Has Not and Will Not Prevent Predatory Rent-a-Bank Schemes.

The FDIC states that it "views unfavorably a State bank's partnership with a

non-bank entity for the sole purpose of evading a lower interest rate established

under the law of the entity's licensing State(s)." 85 Fed. Reg. at 44155. That

"view" is cold comfort in light of the inaction of the FDIC in the face of exploding

predatory rent-a-bank lending and predatory lenders hiding under the Rule.

---

[26] Colleen Honigsberg *et al.*, *The Effects of Usury Laws on Higher-Risk Borrowers*, Columbia Business School Research Paper No. 16-38 at 44 (Before *Madden* and After *Madden* charts) (Dec. 2 2016), https://bit.ly/3mEL4Gw. Dicta in one case cited the study to argue that applying state laws to assigned loans would impede securitization. *McShannock v. JP Morgan Chase Bank*, 976 F.3d 881, 892 (9th Cir. 2020). But an earlier Ninth Circuit decision found that the same laws did not significantly interfere with national bank powers. *Lusnak v. Bank of America*, N.A., 883 F.3d 1185 (9th Cir. 2018). Both cases also involved the OCC's broader preemption powers.

[27] Piotr Danisewicz and Ilaf Elard, *The Real Effects of Financial Technology: Marketplace Lending and Personal Bankruptcy* (July 5, 2018); *see* CRL, NCLC, Non-Bank Interest Rule Comments at 21-22.

23

Even if the FDIC were committed to preventing abuses, federal law lacks interest rate caps. Enforcement of federal law is no substitute for clear, specific state interest rate limits—the most effective protection against predatory lending.

But the FDIC has clearly failed to address the predatory rent-a-bank lending schemes discussed above. The FDIC even took the unusual step of defending the right of WBL, a non-bank, to charge 120% APR on an assigned loan despite Colorado's 45% usury cap *See* Amicus Brief of the FDIC and the OCC in Support of Affirmance and Appellee, *In Re: Rent-Rite Super Kegs West Ltd.*, No. 1:19-CV-01552-REB (D. Colo. Sept. 10, 2019), https://bit.ly/3fQDwx6. FDIC expressed no concern over the gross interest rate, or the well-documented history of WBL's predatory business model that even endangers owners' homes. See NCLC, Testimony of Lauren Saunders, *supra* (describing lawsuits); Zeke Faux, *Wall Street Finds New Subprime With 125% Business Loans*, Bloomberg (May 22, 2014), https://bloom.bg/2WLWRYG.

Moreover, the FDIC does not supervise the non-bank entity that designs, prices, markets, processes, services, collects and handles virtually all the other aspects of the loan program. Once a loan is sold and the bank is out of the picture, the FDIC's supervision is even more irrelevant. The FDIC will not supervise the assignee, including their default rates, complaints, or collection practices, even

24

though high-rate loans (which these, by definition, will be) inevitably lead to aggressive and often abusive refinancing and collection activity. *See* NCLC, *Misaligned Incentives, supra.* This muddled result emphasizes why it is wholly inappropriate to extend bank preemption rights to non-bank entities.

## CONCLUSION

The FDIC's Rule places our nation's most vulnerable consumers at risk of financial devastation and is outside of the agency's authority.

Respectfully submitted,

/s/ Robyn Smith
ROBYN SMITH (SBN 165446)
Of Counsel
National Consumer Law Center
7 Winthrop Square, #4
Boston, MA 02110
Phone: (213) 840-6264
Fax: (617) 542-8028
Email: rsmith@nclc.org
Attorney for Amici Curiae

Lauren Saunders
National Consumer Law Center
1001 Connecticut Avenue NW, Suite 501
Washington, DC 20036
Attorney for Amici Curiae

Rebecca K. Borné
Center for Responsible Lending
910 17th Street NW, Suite 500
Washington, DC 20006
Attorney for Amici Curiae

25

1

2       William R. Corbett
        Center for Responsible Lending
3       302 West Main Street
        Durham, NC 27609
4       Attorney for Amici Curiae

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28