Barbara Katron (DC Bar #387970)
Erik Bond (NY Bar Reg. #4316030)
Andrew Dober (CA Bar #229657)
Minodora D. Vancea (DC Bar #492335)

FEDERAL DEPOSIT INSURANCE CORPORATION
3501 N. Fairfax Drive, D-7026
Arlington, VA 22226
Telephone: (703) 562-6461
Fax: (703) 562-2477
erbond@fdic.gov
adober@fdic.gov

Attorneys for Defendant

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PEOPLE OF THE STATE OF CALIFORNIA, *et al*., <br><br> Plaintiffs, <br><br> v. <br><br> FEDERAL DEPOSIT INSURANCE CORPORATION, <br><br> Defendant. | Case No. 4:20-5860-JSW <br><br> **DEFENDANT'S NOTICE OF MOTION FOR SUMMARY JUDGMENT, MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF, AND OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** <br><br> Date: August 6, 2021 <br> Time: 9:00 a.m. <br> Place: Oakland Courthouse, Courtroom 5 <br> Before: Judge Jeffrey S. White |

1

**TABLE OF CONTENTS**

2

TABLE OF AUTHORITIES ............................................................................................ ii

NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT .................................. vi

SUMMARY OF ARGUMENT ...................................................................................... vii

BACKGROUND ........................................................................................................ 1

Statutory Background................................................................................................. 1

The FDIC's Final Rule ............................................................................................... 2

LEGAL STANDARD .................................................................................................. 4

ARGUMENT ............................................................................................................ 4

I.   The Final Rule Represents A Reasonable Interpretation of § 1831d And
     Should Be Upheld ............................................................................................ 4

     A.   The Final Rule—Including Plaintiffs' "Statutory Authority" Challenges—Is
          Analyzed Under The Two-Step *Chevron* Framework .................................... 4

     B.   The FDIC's Final Rule Satisfies *Chevron* Step One............................................ 6

          a.   The Text of § 1831d Does Not Unambiguously Preclude The FDIC's
               Interpretation ...................................................................................... 7

          b.   The Other Tools Of Statutory Construction Do Not Preclude The FDIC's
               Interpretation, But Rather Highlight Its Permissibility .................................... 10

               1.   *Purpose*: Courts Interpreting Similar Statutes Have Rejected
                    Readings Such As Plaintiffs' As Contrary To The Statutory Purpose ..... 11

               2.   *Context*: Plaintiffs' Interpretation Fails To Construe The Statutory
                    Terms In Context................................................................................ 11

               3.   *Other Statutes*: The FDIC's Interpretation of § 1831d Is Buttressed
                    (And Certainly Not Precluded) By A Simultaneously Drafted Statute..... 12

          c.   Plaintiffs' Challenges To The FDIC's Authority Are Meritless ........................ 14

               1.   The Final Rule Does Not Regulate Non-Banks Or Otherwise
                    Assign Preemptive Powers to Non-Banks ................................................ 15

               2.   The Final Rule Interprets § 1831d—A Federal Statute—Not State
                    Law.................................................................................................. 16

               3.   The Final Rule Interprets The Substantive Meaning of § 1831d,
                    Not Its Preemptive Effect.................................................................... 18

     C.   The Final Rule Represents A Permissible Interpretation Of The Statute And
          Thus Should Be Upheld Under *Chevron*'s Deferential Step Two ............................ 18

II.  Plaintiffs' *State Farm* Arguments Are Unavailing ............................................ 21

# TABLE OF AUTHORITIES

**CASES**

*Agape Church, Inc. v. FCC*,
    738 F.3d 397 (D.C. Cir. 2013) ............................................................................. 21

*Beneficial Nat'l Bank v. Anderson*,
    539 U.S. 1 (2003). ................................................................................................ 17

*Bob Jones Univ. v. U.S.*,
    461 U.S. 574 (1983). ............................................................................................ 11

*Catskill Mountains Chapter of Trout Unlimited, Inc. v. EPA*,
    846 F.3d 492 (2d Cir. 2017) ................................................................................ 21

*Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
    511 U.S. 164 (1994) ............................................................................................. 14

*Cheney R. Co., Inc. v. ICC*,
    902 F.2d 66 (D.C. Cir. 1990). .............................................................................. 13

*Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*,
    467 U.S. 837 (1984) ..................................................................................... passim

*City of Arlington v. FCC*,
    569 U.S. 290 (2013). .............................................................................................. 6

*Clarke v. Securities Industry Assn.*,
    479 U.S. 388 (1987) ............................................................................................... 5

*Entergy Corp. v. Riverkeeper, Inc.*,
    556 U.S. 208 (2009) ............................................................................................. 21

*Evans v. National Bank of Savannah*,
    251 U.S. 108 (1919) ....................................................................................... 12, 17

*Fahey v. Mallonee*,
    332 U.S. 245 (1947) ............................................................................................... 4

*FCC v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009) ............................................................................................. 23

*FERC v. Elec. Power Supply Ass'n,*
   136 S.Ct. 760 (2016) ................................................................................................ 16

*Gavey Properties/762 v. First Fin. Sav. & Loan,*
   845 F.2d 519 (5th Cir.1988) .................................................................................... 1, 2

*Greenwood Trust Co. v. Com.of Mass.,*
   971 F.2d 818 (1st Cir.1992). .................................................................................... 1

*Harkonen v. DOJ,*
   800 F.3d 1143 (9th Cir. 2015) ................................................................................. 21

*In Def. of Animals, Dreamcatcher Wild Horse & Burro Sanctuary v. U.S. Dep't of Interior,*
   751 F.3d 1054 (9th Cir. 2014) ................................................................................. 14

*In re Cmty. Bank of N. Va.,*
   418 F.3d 277 (3d Cir. 2005) .................................................................................... 16

*Judulang v. Holder,*
   132 S.Ct. 476 (2011) .............................................................................................. 21

*Madden v. Midland Funding, LLC,*
   786 F.3d 246 (2d Cir. 2015) ............................................................................... 23, 24

*Marquette Natl Bank of Minneapolis v. First of Omaha Service Corp.,*
   439 U.S. 299 (1978) ............................................................................................... 18

*Mayo Found. for Med. Educ. & Research v. United States,*
   562 U.S. 44 (2011) ............................................................................................. 5, 19

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
   463 U.S. 29 (1983) ............................................................................................ 21, 22

*National R.R. Passenger Corp. v. Boston and Maine Corp.,*
   503 U.S. 407 (1992). ............................................................................................... 4

*NationsBank of North Carolina, N.A. v. Variable Annuity Life Ins. Co.,*
   513 U.S. 251 (1995) ............................................................................................. 5, 6

*Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv.,*
   475 F.3d 1136 (9th Cir. 2007) ................................................................................. 19

*Olvera v. Blitt & Gaines*, P.C.,
   431 F.3d 285 (7th Cir. 2005)...................................................................... 10, 11, 20

*Owner-Operator Indep. Drivers Ass'n, Inc. v. Fed. Motor Carrier Safety Admin.*,
   494 F.3d 188 (D.C. Cir. 2007). .............................................................................. 23

*Peck v. Thomas*,
   697 F.3d 767 (9th Cir. 2012); .................................................................................. 24

*Planters' Bank of Miss. v. Sharp*,
   47 U.S. 301 (1848)...................................................................................... *passim*

*Regions Hosp. v. Shalala*,
   522 U.S. 448 (1998) ................................................................................................ 8

*Robinson v. Nat'l. Collegiate Student Loan Trust 2006-2*,
   2021 WL 1293707 (D. Mass. Apr. 7, 2021) ............................................................ 23

*RTC v. Diamond*,
   45 F.3d 665, 671 (2d Cir. 1995).............................................................................. 16

*Smiley v. Citibank (S.D.), N.A.*,
   517 U.S. 735 (1996)..................................................................................... 5, 12, 17, 18

*Stilwell v. OTS*,
   569 F.3d 514 (D.C. Cir. 2009); ............................................................................... 24

*Strike v. Trans-W. Disc. Corp.*,
   92 Cal. App. 3d 735 (Cal. Ct. App. 1979) ...................................................... 10, 11, 20

*Taylor v. FAA*,
   895 F.3d 56 (D.C. Cir. 2018) .................................................................................. 23

*Ubaldi v. SLM Corp.*,
   852 F. Supp. 2d 1190 (N.D. Cal. 2012) ................................................................... 16

*United States v. Home Concrete & Supply, LLC*,
   566 U.S. 478 (2012)................................................................................................ 7

*Verizon Commc'ns Inc. v. FCC*,
   535 U.S. 467 (2002)................................................................................................ 21

iv

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**STATUTES**

5 U.S.C. § 706 ..................................................................................................... 21

12 U.S.C. § 1735f–5(b) ....................................................................................... 13

12 U.S.C. § 1735f-7a ........................................................................... 11, 12, 13, 14

12 U.S.C. § 1819(a) ............................................................................................... 5

12 U.S.C. § 1831d ........................................................................................ *passim*

12 U.S.C. § 85 ............................................................................................. *passim*

15 U.S.C. § 1602 ................................................................................................. 13

**OTHER AUTHORITIES**

6 Am. Jur. 2d Assignments § 108 ......................................................................... 8

Depository Institutions Deregulation and Monetary Control Act of 1980 ("DIDA")
   12 U.S.C. § 1831d ........................................................................................... 1

FDIC, Credit Card Securitization Manual, Introduction (2007)
   https://www.fdic.gov/regulations/examinations/credit_card_securitization/ch1.html ............. 20

Federal Interest Rate Authority, 85 Fed. Reg. 44,146 (July 22, 2020) ("Final Rule") ................. vi

S. REP. 96-368, 1980 U.S.C.C.A.N. 236 (1980). ................................................... 12, 13

1

2

### NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

3
4
5
6
7
8
9
10
11
12
13
14

PLEASE TAKE NOTICE that on August 6, 2021, at 9:00 a.m. in Courtroom 5, 2d Floor, of the United States Courthouse, 1301 Clay Street, Oakland, California, before the Honorable Jeffrey S. White, Defendant the Federal Deposit Insurance Corporation ("FDIC") will respectfully move this Court for an order granting summary judgment to the FDIC, pursuant to Federal Rule of Civil Procedure 56.  As demonstrated in the accompanying memorandum of points and authorities, and the Administrative Record ("AR"), the FDIC's rule on the Federal Interest Rate Authority, 85 Fed. Reg. 44,146 (July 22, 2020) ("Final Rule") represents a reasonable interpretation of 12 U.S.C. § 1831d, and should be upheld under *Chevron*'s familiar two-step framework. The Final Rule is neither arbitrary or capricious, nor contrary to law, is consistent with the FDIC's authority, and in compliance with applicable procedural requirements. The FDIC asks the Court to grant Defendants' Motion for Summary Judgment and deny Plaintiffs' Cross-Motion for Summary Judgment.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Def.'s Notice of Mot. for Summ. J., Mem. of Points & Authorities, and Opp. to Pls.' Mot. (20-5860-JSW)

**SUMMARY OF ARGUMENT**

12 U.S.C. § 1831d allows state banks to make loans charging either the federal discount rate, or the interest rate allowed by their home states. But § 1831d does not address at what time the validity of a loan's interest rate should be determined, nor what happens to the validity of a loan's interest rate upon transfer. The FDIC's Final Rule reasonably filled these two statutory gaps by concluding that the validity under § 1831d of the interest-rate term of a loan is determined at the time when the loan is made, and is not affected by subsequent events, such as a change in the law or the loan's transfer. The rule, which enjoys widespread support from the banking industry, represents a reasonable interpretation of § 1831d, and should be upheld under *Chevron's* familiar two-step framework. *First*, Congress has not spoken to the two questions at issue. *Second*, the FDIC sensibly concluded that its reading would best effectuate the terms and purpose of the statute. Specifically, the FDIC's interpretation (1) carries out the purpose of the statute, whereas Plaintiffs' contrary interpretation would frustrate it, (2) interprets statutory terms in accordance with their common industry understanding and within their proper historical and legal context, whereas Plaintiffs' interpretation ignores that context, (3) is buttressed by Congress's views regarding the application of another federal statute providing exemptions from usury law, (4) is consistent with well-established principles of contract law regarding the assignment of contracts, whereas Plaintiffs' interpretation would require the untenable conclusion that Congress made an extreme departure from those principles through mere silence, and (5) provides a workable rule that is consistent with the parties' expectations at the time the loan was made. The reasonableness of the FDIC's interpretation is further underscored by court decisions adopting a similar interpretation of other statutes providing exemptions from usury law.

Plaintiffs fail to present a credible challenge to the rulemaking. They fail to cite, much less apply, *Chevron*'s requisite analytical framework. And their challenges to the FDIC's authority do not help them escape that framework. Those challenges also fail because they misconstrue the Final Rule. The Final Rule does not regulate non-banks, does not interpret state law, and does not preempt state law. Rather, it regulates banks, interprets only a federal statute, and interprets only that statute's substantive meaning. Plaintiffs' *State Farm* arguments are equally unavailing.

**BACKGROUND**

*Statutory Background*.  Section 27 of the Federal Deposit Insurance Act, codified at 12 U.S.C. § 1831d (hereinafter referred to interchangeably as "section 27" or "§ 1831d"), allows federally-insured state banks to charge interest at the highest of (1) a federal rate tied to the discount rate on 90-day commercial paper (the "federal discount rate"), or (2) "the rate allowed by the laws of the State … where the bank is located."  12 U.S.C. § 1831d.  Section 1831d borrowed its language from the earlier-enacted 12 U.S.C. § 85, which allows national banks to charge these same rates.  *Greenwood Trust Co. v. Massachusetts*, 971 F.2d 818, 826–27 (1st Cir. 1992).  Because § 1831d was patterned after § 85, courts and the FDIC have consistently construed § 1831d in *pari materia* with § 85.  *Id*. at 827 ("[t]he historical record clearly requires a court to read the parallel provisions of DIDA and [§ 85] *in pari materia*"); *see also* AR 211.

Congress patterned § 1831d after § 85 in order to achieve "parity" and "competitive equality" between state and national banks in the interest-rate area.  *Greenwood*, 971 F.2d at 826–27.  Ensuring competitive equality through § 1831d was key to resolving the credit crunch and the troubles prevalent in the state banking sector at the time of § 1831d's enactment in 1980.  "As the 1970s wound down, the Nation was caught in the throes of a devastating credit crunch.  Interest rates soared." *Id*.  "[S]tate lending institutions were constrained in the interest they could charge by state usury laws which often made loans economically unfeasible from a lender's coign of vantage." *Id*.  Unable to make loans at the low rates required by state usury laws, state banks could not serve their customers' demand for credit and were thus "being battered by competition from national banks that were allowed to charge higher rates of interest by federal law."  *Gavey Properties/762 v. First Fin. Sav. & Loan*, 845 F.2d 519, 521 (5th Cir. 1988).  Specifically, national banks enjoyed a competitive advantage under § 85 because they could charge the high federal discount rates prevailing then.  If located in states with relaxed usury ceilings, they could also export the higher interest rates of their home states to transactions with out-of-state borrowers.  The state banks' inability to make loans charging the rates permitted to national banks further deepened the credit crunch and reduced borrowers' access to credit.  Congress therefore passed the Depository Institutions Deregulation and Monetary Control Act of 1980 ("DIDA"), which

1

added § 1831d, in order to level the playing field between state and national banks, and to "assure that borrowers could obtain credit in states with low usury limits." *Gavey*, 845 F.2d at 521.

*The FDIC's Final Rule.* On December 6, 2019, the FDIC published a notice of proposed rulemaking (NPR) to issue regulations implementing § 1831d. AR 214. Through the proposed regulations, the FDIC sought to clarify the application of § 1831d and "reaffirm State banks' ability to assign enforceable rights in the loans they made" under the authority of § 1831d. *Id.* The FDIC received a total of 59 comment letters from a variety of individuals and entities, including trade associations, insured depository institutions, and consumer and public interest groups and other entities aligned with such groups. The comments received indicated that the Final Rule enjoyed widespread support in the banking industry. *Id.* These commenters agreed that the FDIC had authority to address this issue by regulation and that the agency's proposed rule reflected a permissible interpretation of federal banking laws. *Id.* These commenters welcomed the legal certainty with respect to the two gaps addressed by the regulation, arguing that proposed rule would "reaffirm longstanding views regarding the enforceability of interest rate terms on loans that are sold, transferred, or otherwise assigned" and "reaffirm state banks' ability to engage in activities such as securitizations, loan sales, and sales of participation interests in loans, that are crucial to the safety and soundness of these banks' operations." *Id.* Consumer advocates, however, opposed the rule, raising concerns regarding the FDIC's authority to issue the rule given the statutory silence on loan transfers, and regarding policy issues implicated by the rule, such as potential abuses of banks' § 1831d lending authority through so-called rent-a-bank schemes. *Id.*

In developing the Final Rule, the FDIC "considered all of the comments that it received in response to the NPR." AR 214. The FDIC explained that the statute's silence on loan transfers does not preclude the FDIC's authority to issue the Final Rule. To the contrary, the "silence . . . reinforces the FDIC's authority to issue interpreting regulations to clarify an aspect of the statute that Congress left open." AR 214. The FDIC explained that under *Chevron*, "[a]gencies are permitted to issue regulations filling statutory gaps and routinely do so," and the rule addresses two such gaps. *Id.* First, § 1831d "does not state at what point in time the validity of the interest rate should be determined to assess whether a State bank is taking or receiving interest" in compliance

2

with § 1831d.  AR 210.  Situations may arise where the permissible home-state usury rate (or the federal discount rate) changes after a loan is made, "and a loan's rate may be non-usurious under the old law but usurious under the new law." *Id*.; AR 212.  "To fill this statutory gap and carry out the purposes of section 27, the FDIC conclude[d] that the validity and enforceability under section 27 of the interest-rate term of a loan must be determined [at the time] when the loan is made, not when a particular interest payment is 'taken' or 'received.'" AR 212-13.  And because the validity and enforceability of the interest rate term of a loan is determined at the inception of the loan, the FDIC reasonably concluded that it is unaffected by subsequent events, such as the loan's transfer.  *Id*.  "This interpretation protects the parties' expectations and reliance interests at the time when a loan is made, and provides a logical and fair rule that is easy to apply." AR 213.

The FDIC determined that this interpretation best addressed a second statutory gap as well. Specifically, § 1831d is silent with respect to what happens, upon loan transfer, to the validity of the interest-rate terms of loans made under its authority.  AR 213.  To fill this gap, the FDIC reasonably read the banks' power to make loans under § 1831d within its "proper historical and legal context."  AR 214.  That context showed that a bank's power to make loans was commonly understood as *implicitly* carrying with it the power to transfer those loans.  AR 214-15 (citing *Planters' Bank of Miss. v. Sharp*, 47 U.S. 301, 322-23 (1848)).  The FDIC reasoned that reading "the power to assign as an indispensable component of the power to make loans" would also best effectuate the statute's purpose, because "[t]he power to assign is indispensable in modern commercial transactions, and even more so in banking: State banks need the ability to sell loans in order to properly maintain their capital and liquidity."  AR 215.  "Absent the power to assign loans made under section 27, reliance on the statute could ultimately hurt State banks (instead of benefiting them) should they later face a liquidity crisis or other financial stresses."  *Id*.  The FDIC's interpretation helps "prevent such unintended results."  *Id*.

The FDIC further explained that "[l]eft unaddressed, the two statutory gaps could create legal uncertainty for State banks and confusion for the courts."  AR 210.  The FDIC also explained why none of the policy arguments raised by consumer advocates would preclude the FDIC's interpretation of the statute.  AR 214-18.  In particular, with respect to the commenters'

3

concerns about potential abuses of banks' § 1831d lending authority through so-called rent-a-bank schemes, the FDIC explained that the Final Rule would not protect rent-a-bank schemes. To the contrary, the rule would only apply if the bank, not a non-bank partner, actually made the loan, and the Rule "is not intended to foreclose remedies available under State law" against rent-a-bank schemes, such as true lender defenses. AR 217. The Final Rule condemned abuses of § 1831d's lending authority and reiterated "continue[d]" adherence to its position that FDIC "view[s] unfavorably entities that partner with a State bank with the sole goal of evading a lower interest rate established under the law of the entity's licensing State(s)." AR 210-11. The FDIC's responses to these and other comments are discussed more fully below.

## LEGAL STANDARD

In this APA challenge to the FDIC's rulemaking, the normal Rule 56 summary judgment standard does not apply. Instead, the FDIC's interpretation of §1831d is analyzed under the familiar two-step framework of *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U. S. 837 (1984). The first step involves "the question whether Congress has directly spoken to the precise question at issue." 467 U.S. at 842-43. "[I]f the statute is silent or ambiguous with respect to the specific issue," the Court proceeds to the second step, where "the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843. If it is, the court defers to the agency's interpretation. *Id.*

## ARGUMENT

**I.    The Final Rule Represents A Reasonable Interpretation of § 1831d And Should Be Upheld**

**A.    The Final Rule—Including Plaintiffs' "Statutory Authority" Challenges—Is Analyzed Under The Two-Step *Chevron* Framework**

"Judicial deference to reasonable interpretations by an agency of a statute that it administers is a dominant, well-settled principle of federal law." *Nat'l R.R. Passenger Corp. v. Boston and Maine Corp.*, 503 U.S. 407, 417 (1992). Deference is particularly appropriate in the banking context. "Banking is one of the longest regulated and most closely supervised of public callings." *Fahey v. Mallonee*, 332 U.S. 245, 250 (1947). The Supreme Court has repeatedly deferred, under *Chevron*, to regulations interpreting the federal banking laws, including those interpreting § 85—

4

§1831d's national-bank counterpart.  *See Smiley v. Citibank (S.D.), N.A.*, 517 U.S. 735, 739 (1996) (deferring to the OCC's interpretation of § 85); *NationsBank of North Carolina, N.A. v. Variable Annuity Life Ins. Co.,* 513 U.S. 251, 256-57 (1995) (deferring to OCC's interpretation); *Clarke v. Securities Indus. Assn*., 479 U. S. 388, 403-404 (1987) (same).

In 12 U.S.C. § 1819(a), Congress gave the FDIC statutory authority to prescribe ''such rules and regulations as it may deem necessary to carry out the provisions of this chapter,'' name-ly Chapter 16 of Title 12 of the U.S. Code.  § 1831d of Chapter 16, is a provision of ''this chap-ter.''  The FDIC's Final Rule interpreting § 1831d was issued under this authority.  Although Plaintiffs devote significant energies to arguing that § 1819(a) merely provides "general" rule-making power (Pls.' Mem. of  Points & Authorities ("Br.") at 15-16), the law is clear that *Chevron* applies with the same force regardless of whether regulations are adopted under general or specific rulemaking authority.  *Mayo Found. for Med. Educ. & Research v. United States,* 562 U.S. 44, 57 (2011).  In *Mayo*, the Supreme Court rejected pre-*Chevron* decisions suggesting that less deference is due when rules are adopted under an agency's general rulemaking authority, and held that the application of *Chevron* "does not turn on whether Congress's delegation of authority was general or specific."  *Id*. (applying *Chevron*'s two-step framework to uphold regulation is-sued under Treasury's general rulemaking authority).

Under *Mayo*, because the FDIC has general rulemaking authority and the Final Rule was adopted through notice-and-comment rulemaking, it is reviewed using the two-step framework outlined in *Chevron.  Id.  Chevron* Step One involves "the question whether Congress has directly spoken to the precise question at issue.  If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed in-tent of Congress."  *Chevron*, 467 U.S. at 842-43.  The court employs "traditional tools of statuto-ry construction" to ascertain whether "Congress had an intention on the precise question."  *Id*. at 843 n.9.  "[I]f the statute is silent or ambiguous with respect to the specific issue," the Court pro-ceeds to Step 2, where "the question for the court is whether the agency's answer is based on a permissible construction of the statute."  *Id*. at 843.  The agency's construction need not be the only possible permissible interpretation of the statute, nor must it be "even the reading the court

5

would have reached if the question initially had arisen in a judicial proceeding." *Id*. at 843 n.11. Rather, if the agency's interpretation is reasonable or permissible, it is upheld, and the court will not substitute its judgment for that of the agency.  *Id*.

Plaintiffs studiously avoid the *Chevron* framework, failing to mention *Chevron*'s two-step standard, and failing to provide even a citation to *Chevron* in their brief or table of authorities. Although Plaintiffs style their arguments as going to the FDIC's alleged lack of statutory authority to issue the regulations, Plaintiffs' talismanic invocation of the term "authority" does not help them escape the *Chevron* framework.  Supreme Court precedent is clear that *Chevron* applies regardless of whether the question is "framed as going to the scope of the [agency's] delegated authority" or as going to the agency's interpretation of the statute.  *City of Arlington v. FCC*, 569 U.S. 290, 300 (2013).  All questions related to an agency's interpretation of a statute can "be reframed as questions about the scope of agencies' regulatory jurisdiction—and they are all questions to which the *Chevron* framework applies."  *Id*.

The Final Rule should be sustained under the *Chevron* framework.  As shown below, the Final Rule satisfies *Chevron* Step One because it addresses two statutory gaps in § 1831d.  *See Chevron*, 467 U.S. at 843 (agencies have authority to make rules to "fill any [statutory] gap left, implicitly or explicitly, by Congress").  The rule also satisfies *Chevron* Step Two because it fills the statutory gaps in a reasonable way.  "If the [agency's] reading fills a gap or defines a term in a way that is reasonable," courts give the agency's "judgment 'controlling weight."  *NationsBank,* 513 U.S. at 257 (citing *Chevron*, 467 U.S. at 844).  The Final Rule should therefore be upheld.

## B. The FDIC's Final Rule Satisfies *Chevron* Step One

The FDIC's Final Rule passes *Chevron* Step One because Congress has not spoken to the precise questions at issue.  Nothing in § 1831d addresses at what point in time the validity of the loan's interest rate should be determined for purposes of assessing compliance with § 1831d, nor does it address what happens to the validity of the loan's interest rate upon transfer  Thus, nothing in § 1831d precludes the FDIC's interpretation that the validity under § 1831d of the interest-rate term of a loan must be determined at the time when the loan is made, and is therefore not affected by subsequent events, such as a change in the law or the loan's transfer.  Nor do any of the other

6

traditional tools of statutory construction compel the conclusion that Congress intended to preclude the FDIC's interpretation; to the contrary, they highlight the permissibility of the FDIC's interpretation.  Therefore, the Final Rule survives *Chevron* Step One.

### a.  The Text of § 1831d Does Not Unambiguously Preclude The FDIC's Interpretation

The Final Rule addresses two statutory gaps in § 1831d.  Given § 1831d's silence on the two identified issues, Congress has not unambiguously spoken on the questions at issue. *United States v. Home Concrete & Supply,* 566 U.S. 478, 488 (2012) ("A statute's silence or ambiguity as to a particular issue means that Congress has not 'directly addressed the precise question at issue' (thus likely delegating gap-filling power to the agency)").  Plaintiffs do not show that the statute unambiguously addresses either of those gaps.

*Timing*.  The first statutory gap addressed by the Final Rule is the timing gap.  As the Final Rule explains, § 1831d "does not state at what point in time the validity of the interest rate should be determined to assess whether a State bank is taking or receiving interest in accordance with [§ 1831d]." AR 210.  "Situations may arise when the usury laws of the State where the bank is located change after a loan is made (but before the loan has been paid in full), and a loan's rate may be non-usurious under the old law but usurious under the new law." *Id*.  To fill this statutory gap, the FDIC concluded "that the validity and enforceability under [§ 1831d] of the interest-rate term of a loan must be determined [at the time] when the loan is made, not when a particular interest payment is 'taken' or 'received.'" AR 213.

Plaintiffs contend that "there is no ambiguity or statutory gap as to when the validity of a loan's interest rate should be assessed." Br.11.  But Plaintiffs do not deny that § 1831d does not state when the validity of the interest rate should be determined.  *Id*.  Instead, Plaintiffs appear to take issue with the reasonableness of the FDIC's interpretation, arguing that "the solution [FDIC] has come up with" to resolve the gap the FDIC identified is impermissible because "1831d does not apply to certain *loans*; rather, it applies to certain *entities*—FDIC Banks." *Id*.  But an argument that the agency's solution to a statutory gap is inconsistent with the statute is an argument that the agency's construction fails under *Chevron* Step Two.  Such argument does not show that a statutory gap does not exist.  Only a showing that the statute addresses "at what point in time

7

the validity of the interest rate should be determined" would show that there is no statutory gap. Plaintiffs have conspicuously failed to make such a showing. Given § 1831d's silence, § 1831d does not unambiguously solve the issue, and the FDIC's Final Rule passes *Chevron* Step One.

In any event, Plaintiffs' interpretation—that "§ 1831d does not apply to certain loans; rather, it applies to certain entities—FDIC Banks"—is not unambiguously compelled by the statutory language. To the contrary, § 1831d plainly applies to certain loans (namely, to loans made by FDIC banks), expressly stating that FDIC banks are allowed to charge the home state rate or the federal discount rate "on any *loan* or discount made, or upon any note, bill of exchange, *or other evidence of debt*." 12 U.S.C. § 1831d (emphases added). Given this express language, § 1831d is susceptible of FDIC's interpretation that it applies to loans made by FDIC banks. Plaintiffs cannot defeat an agency's interpretation at *Chevron* Step One when the plaintiffs' interpretation is "not the 'only possible interpretation.'" *Regions Hosp. v. Shalala*, 522 U.S. 448, 460 (1998).

*Transfer*. A second statutory gap is also present because § 1831d is silent regarding what happens, upon transfer, to the validity of the interest-rate terms of bank-made loans. AR 213. Just as before, Plaintiffs do not deny that on its face, the text of § 1831d does not address this issue. Rather, they argue that § 1831d precludes the FDIC's interpretation because, in their view, § 1831d provides a personal privilege to banks to charge certain interest rates, and that privilege is not "transferrable." Br.12-13. This argument fails for at least four reasons.

First, nowhere in the statute does Congress say that banks are granted a "privilege" or "exemption" from usury law. Rather, the statute merely states that banks may charge certain rates in their loans or other debt instruments. 12 U.S.C. § 1831d. Nor does the statute say anything about a non-transferable privilege. To clarify, Plaintiffs do not mean non-transferable solely in the modest sense reflected in the unobjectionable proposition that a bank cannot transfer its right to *make* loans under § 1831d. Rather, they mean it in the broader sense that a bank also cannot transfer to the buyer of a bank-made loan enforceable rights in the interest-rate term of the transferred loan (*see* Br.12), notwithstanding well-settled law and historical practice permitting such transfer. *See, e.g.*, 6 Am. Jur. 2d Assignments § 108 (an assignee of a contract "stands in the shoes of the assignor" and can assert all rights under the contract to the same extent as the assign-

8

1   or).  Plaintiffs' proposed interpretation would require the Court to accept that Congress made this

2   dramatic departure from historical practice and fundamental principles of contract law regarding

3   assignments by choosing statutory language that is *silent* on assignment and is also *silent* on the

4   purported personal "privilege" that Plaintiffs advocate.  The statutory silence cannot support,

5   much less compel, Plaintiffs' extraordinary interpretation.

6       Second, the fact that § 1831d is addressed to *banks* and it allows *banks* to charge certain

7   interest rates does not necessarily confer on banks a personal privilege that is non-transferable in

8   the sense urged by Plaintiffs.  The statutory language must be viewed in context.  Banks do not

9   charge interest rates in the ether; rather, they charge interest on *loans* and other debt instruments,

10  as confirmed by the statute's express language that banks may charge those rates "on any loan or

11  discount made."  12 U.S.C. § 1831d.  As the statute reflects, the interest rate charged pursuant to

12  the statute is not a stand-alone item, but a term incorporated in a transferrable legal instrument: a

13  loan agreement.  By referring to interest charged on "on any loan[s]," which were commonly un-

14  derstood as *transferable* under legal precedent and historical practice (*see*, *e.g.*, *Planters*), Con-

15  gress could have hardly intended to create a *non-transferable* privilege in the sense used by Plain-

16  tiffs.  Plaintiffs' interpretation therefore does not follow naturally from the statutory language.

17  Plaintiffs' driver-license example is inapposite.  Unlike statutes addressing a license to drive,

18  which is given independently of car ownership or of any contracts, § 1831d regulates the very

19  terms of a loan contract—the interest rate that can be charged in that contract.  Because contracts,

20  including loan contracts, are transferrable, logic and common sense suggest that Congress could

21  not have intended to depart from well-settled principles that an assignor can transfer enforceable

22  rights in its contracts—or at least not without an explicit statement showing that it was doing so,

23  which it did not provide here.

24      Third, even if the statutory language had used the term "privilege," and had further speci-

25  fied that such privilege is "non-transferable," it would still be unclear whether Congress used the

26  term "non-transferable" in the narrow sense that banks cannot transfer their right to *make* loans

27  (which is fully consistent with the FDIC's Final Rule), or in the out-of-the-ordinary sense that

28  Plaintiffs propose—that banks cannot transfer enforceable rights in their loans when they sell

9

1   those loans.  Given this ambiguity, the Final Rule would still satisfy *Chevron*'s first step.

2          Fourth, courts have held that even statutes that are closer to granting a personal privi-

3   lege—because they talk in terms of exemptions of certain entities from usury law—do not pro-

4   vide a non-transferable privilege in the sense used by Plaintiffs.  These courts have construed

5   such statutes just as the FDIC construed § 1831d here: as *implicitly* allowing the exempted enti-

6   ties to transfer enforceable rights in the loans they make.  As Judge Posner concluded, "the as-

7   signee of a debt [agreement] . . . is free to charge the same interest rate that the assignor . . .

8   charged the debtor," even if, unlike the assignor, "the assignee does not have a license that ex-

9   pressly permits the charging of a higher rate."  *Olvera v. Blitt & Gaines*, P.C., 431 F.3d 285, 286,

10  289 (7th Cir. 2005); *see also Strike v. Trans-W. Disc. Corp.*, 92 Cal. App. 3d 735, 745 (Cal. Ct.

11  App. 1979) (concluding that the assignee of a bank note could continue to receive the rate the as-

12  signing bank could, even if the assignee was not expressly exempted by the statute).  These cases

13  confirm that such statutes' grant of a privilege entails the modest proposition that no other entity

14  can *make* loans under that privilege.  It does not entail Plaintiffs' extraordinary proposition that a

15  bank cannot transfer enforceable rights in the loan agreements the bank made.  Accordingly, these

16  cases, which adopt similar constructions to that adopted by the FDIC, show that the statute is sus-

17  ceptible of FDIC's interpretation.  Thus, the Final Rule passes *Chevron* Step One.

18      **b.  The Other Tools Of Statutory Construction Do Not Preclude The FDIC's
19          Interpretation, But Rather Highlight Its Permissibility**

20         The other tools of statutory construction do not preclude the FDIC's interpretation, but ra-

21  ther highlight its permissibility.  *First*, as confirmed by decisions interpreting similar statutes,

22  Plaintiffs' interpretation would frustrate § 1831d's purpose and lead to "unreasonable" and

23  "senseless" results that Congress would have hardly intended.  *Second*, Supreme Court decisions

24  interpreting § 85 confirm that it is permissible—and indeed required—to interpret terms in §§ 85

25  and 1831d in accordance with historical precedent and their common understanding in the bank-

26  ing industry, even if that understanding is not explicitly stated in statutory language.  As these

27  decisions show, interpreting terms in a statute in accordance with their implicit meaning does not

28  impermissibly rewrite the statute.  *Third*, the FDIC's interpretation of § 1831d is buttressed by

Congress's views regarding § 1735f-7a, which show that Congress understood that a loan buyer—"an investor who is not exempt under this section [§ 1735f-7a]"—can enforce the interest rates in a validly-originated loan, even if § 1735f-7a, like § 1831d, is silent on assignment.

### 1. *Purpose*: Courts Interpreting Similar Statutes Have Rejected Readings Such As Plaintiffs' As Contrary To The Statutory Purpose

The statutory purpose—a common tool of statutory construction—counsels against Plaintiffs' interpretation. It is a "well-established canon of statutory construction" that courts avoid an interpretation that would "defeat [the] plain purpose" of a statute. *See Bob Jones Univ. v. U.S.*, 461 U.S. 574, 586 (1983). Applying this principle in construing similar statutes, courts have rejected an interpretation just like that proposed by Plaintiffs here, finding it "not conformable to" the statutory purpose. *Strike*, 92 Cal. App. 3d at 745; *see also Olvera*, 431 F.3d at 289. The purpose of statutes allowing banks or other entities to make loans charging rates exempt from usury law is to provide banks a meaningful right to make such loans. If banks cannot transfer enforceable rights in the loan's interest-rate terms (and assignees cannot enforce them), loans sales to the "secondary market" would be "uneconomic." *Strike*, 92 Cal. App. 3d at 745. In other words, given this significant drawback to the loan's resale value and liquidity, banks would not have a meaningful right to make loans, which would frustrate the statutory purpose. *Id*. The "unreasonable consequences" of an interpretation under which assignees cannot charge the interest rate contained in a loan "weigh heavily against it, even as a matter of interpretation." *Olvera*, 431 F.3d at 289; *id*. at 287 (preventing assignees from enforcing the loan's interest rate would produce "senseless results"). Thus, such interpretation is "not compelled" by the statutory language. *Id.* at 288.

### 2. *Context*: Plaintiffs' Interpretation Fails To Construe The Statutory Terms In Context

Plaintiffs complain that the Final Rule impermissibly rewrote the statute and added words to it by addressing transfer. Br.10. Plaintiffs' argument is easily refuted by the Supreme Court's decision in *Planters*, where the Supreme Court did precisely what the FDIC did here: it interpreted the banks' power to make loans as implicitly incorporating the power to transfer loans, even if the power to transfer was nowhere mentioned in the statute. 47 U.S. at 322-23. The fallacy in

11

Plaintiffs' argument is further underscored by *Evans v. National Bank of Savannah*, where the Supreme Court interpreted the term "discount" in § 85 to *implicitly* allow banks to reserve interest in advance, even if the statute did not explicitly address the bank's authority to reserve interest. 251 U.S. 108, 114 (1919) ("[t]o discount . . . implies" the authority to "reserve[e] interest").  In reaching this interpretation, the court relied on the term's common understanding in the banking industry and historical precedent—*i.e.*, on context.  *Id.*  Similarly, in *Smiley*, the Supreme Court accepted an interpretation of "interest" in § 85 as including late-payment fees, even if § 85 did not mention late-payment fees.  517 U.S. at 739.  The Supreme Court did not add words to § 85 in these decisions; instead, it read statutory terms in accordance with their common meaning in the banking industry or historical practice.  The FDIC did the same with respect to § 1831d.  By contrast, Plaintiffs' interpretation fails to construe the statutory terms in context, and is inconsistent with these decisions and with the accepted principles of statutory construction they applied.

### 3.  *Other Statutes*: The FDIC's Interpretation of § 1831d Is Buttressed (And Certainly Not Precluded) By A Simultaneously Drafted Statute

Plaintiffs argue that unlike § 1831d, § 1735f-7a is not silent regarding loan transfers, and that Congress's purported allowance of transfer in § 1735f-7a suggests that § 1831d's comparative silence should be read to mean that "Congress deliberately chose not to" allow transfer in § 1831d.  Br.14.  This argument fails for three reasons: (1) § 1735f-7a and its legislative history actually support the FDIC's interpretation; (2) Plaintiffs' premise that § 1735f-7a expressly applies to loan transfers is incorrect; and (3) even if Plaintiffs' premise were correct, § 1735f-7a does not *unambiguously* suggest an answer to the question here.

1. The FDIC's interpretation of § 1831d is buttressed (and certainly not precluded) by § 1735f-7a, which exempts from usury laws certain first-lien loans.  Just like § 1831d, § 1735f-7a is silent concerning what happens upon the transfer of loans originated under that statute.  AR 215.  Despite §1735f-7a's silence regarding transfer, it is widely agreed that § 1735f-7a applies to transferred loans, and indeed its legislative history confirms this, stating that "loans originated under this usury exemption will not be subject to claims of usury even if they are later sold to an investor who is not exempt under this section."  S. REP. 96-368, 1980 U.S.C.C.A.N. 236, 254-55

12

1    (1980).  Thus, § 1735f-7a supports the FDIC's interpretation of § 1831d because it shows that

2    Congress understood that usury exemptions implicitly continue to apply after the loan's transfer

3    despite the absence of any explicit language in the statute addressing transfer.

4         2.  Plaintiffs counter that § 1735f-7a is not silent regarding transfer because, in their view,

5    § 1735f-7a exempts classes of *loans* from state usury laws, and "[b]y granting preemptive status

6    to *loans*, rather than *specific entities* holding them (as it did in § 1831d), Congress made clear [in

7    § 1735f-7a] . . . that transfer would not subject the [buyers] of these . . . loans to state rate caps."

8    Br.14 (emphasis added).  This argument fails because Plaintiffs' premise that § 1735f-7a applies

9    to classes of loans, not to loans made by specified entities, is contrary to the plain text of § 1735f-

10   7a, which states that it only applies to loans "described in section 527(b) of the National Housing

11   Act," which section, in turn, applies to loans made by *specific entities*.  More precisely, section

12   527(b) states that it applies to four categories of loans, two of which are loans made by *specific*

13   *entities*, namely loans that are "made in whole or in part" by banks or other federally-regulated

14   lenders (*see* § 1735f–5(b)(2)(A)), or by "creditors" as defined in 15 U.S.C. § 1602 (*see* § 1735f–

15   5(b)(2)(D)).  Thus, just like §1831d, § 1735f-7a applies to loans made by specified entities, and

16   just like §1831d, § 1735f-7a is entirely silent as to what happens when a loan made by one of

17   those specified entities is sold to an investor who is not among the specified entities, such as a

18   securitization trust that is not a creditor under 15 U.S.C. § 1602.  The legislative history of

19   § 1735f-7a further reinforces that section's application to loans made by specific entities, because

20   Congress discussed whether *specific entities*—such as investors—were "exempt under this sec-

21   tion." S. REP. 96-368, 1980 U.S.C.C.A.N. 236, 254-55 (1980) (the statute's exemption from usu-

22   ry endures after the loan's transfer "to an investor who is not exempt under this section").

23        3.  Even if § 1735f-7a expressly applied to loan transfers, that provision would still not

24   unambiguously show that Congress precluded § 1831d from applying to loan transfers.  The law

25   is clear that the contrast between affirmative language in one statute (*e.g.*, § 1735f-7a) and statu-

26   tory silence in another (*e.g.*, §§ 85 and 1831d) "can rarely if ever be the 'direct[]' [and unambigu-

27   ous] congressional answer required by *Chevron*" so as to invalidate the agency's rulemaking at

28   *Chevron* step one.  *Cheney R. Co., Inc. v. ICC*, 902 F.2d 66, 69 (D.C. Cir. 1990).  To the contrary,

13

"the contrast between Congress's mandate in one context with its silence in another suggests not a prohibition but simply a decision not to mandate any solution in the second context, *i.e.*, to leave the question to agency discretion." *Id*. In short, silence in one context coupled with affirmative language in another indicates the presence of a gap that Congress wished the agency to fill: "'[s]ilence … may signal permission rather than proscription,' and can suggest that Congress has left a 'question to agency discretion.'" *In Def. of Animals, Dreamcatcher Wild Horse & Burro Sanctuary v. Dep't of Interior*, 751 F.3d 1054, 1066 n.10 (9th Cir. 2014).

Moreover, there is an obvious reasons why Congress would have expressly mentioned transfer in § 1735f-7a, but not in § 1831d, while intending for both statutes to apply to loan transfers. There was no need for Congress to explicitly mention transfer in § 1831d since, after *Planters*, it was commonly understood that a bank's right to make loans implicitly included the right to transfer the loans. Unlike § 1831d, § 1735f-7a is not limited to loans made by banks. Thus, the contrast between the two statutes does not unambiguously show that Congress intended for § 1831d to not apply to loan transfers. Rather, it is equally possible that Congress concluded that there was no need to be explicit about transfer in § 1831d because transfer was implicit under Supreme Court precedent, whereas no such precedent existed with respect to all classes of creditors making loans under § 1735f-7a (*Planters* was limited to banks), suggesting a need to be explicit in § 1735f-7a.

Plaintiffs' reliance on congressional inaction relating to legislative proposals with arguably similar effects to the Final Rule is likewise misplaced. Br.5-6. Congressional inaction "lacks persuasive significance." *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 187 (1994). "[S]everal equally tenable inferences may be drawn from such inaction, including the inference that the existing legislation already incorporated the offered change." *Id*.

### c. Plaintiffs' Challenges To The FDIC's Authority Are Meritless

As shown, neither the text of § 1831d nor any of the other traditional tools of statutory construction compel the conclusion that Congress unambiguously precluded the FDIC's interpretation. Consequently, Plaintiffs direct their efforts to challenging the FDIC's authority to issue the Final Rule. Specifically, Plaintiffs argue (1) that the FDIC lacks authority to regulate

14

non-banks; (2) that the FDIC lacks authority to interpret state law, and (3) that the FDIC lacks authority to preempt state laws.  All three contentions fail, however, as they misconstrue the FDIC's interpretation of § 1831d, as set forth in the Final Rule.

### 1. The Final Rule Does Not Regulate Non-Banks Or Otherwise Assign Preemptive Powers to Non-Banks

Plaintiffs wrongly assert that the FDIC lacks authority to issue the Final Rule because the Final Rule governs the conduct of "non-banks," and the FDIC does not have authority to regulate non-banks.  Br.14-16.  This argument fails because (1) the Final Rule regulates the conduct and rights of *banks*, not non-banks; (2) any indirect effects the rule has on non-banks do not place the rule outside the agency's authority; and (3) Plaintiffs non-bank cases are inapposite.

The Final Rule does not regulate non-banks, much less assign preemptive powers to non-banks.  Rather, the Final Rule regulates the conduct and rights of *banks* when they sell, assign, or transfer loans.  As the Final Rule explains, "[t]he FDIC would not regulate non-banks through the proposed rule; rather, the proposed rule would clarify the application of section 27 to State banks' loans" by providing that "that the permissibility of interest on a loan under section 27 would be determined as of the date the loan was made" by the *bank*.  AR 214.  "[T]his interpretation of section 27 is necessary to establish a workable rule to determine the timing of compliance with the statute"—an issue on which the statute is silent.  *Id*.  That the rule is not directed at non-banks is also underscored by the fact that the rule would apply to loans made by State *banks* regardless of whether such loans are held by the bank to maturity, or are "subsequently assigned to another bank or to a non-bank." *Id.*

Plaintiffs argue that the rule nevertheless regulates non-banks because one of its effects is that "[a]n assignee can enforce [a] loan's interest-rate terms to the same extent as the assignor." Br.16.  But as the FDIC explained, any indirect effects the rule has on non-banks do not place the rule outside the agency's authority.  AR 214.  The rule explains that to the extent an assignee "would be permitted to charge the contractual interest rate, that is because a State bank's statutory authority . . . to make loans at particular rates necessarily includes the power to assign the loans at those rates."  AR 214. The regulation is directed at banks, and "would not become a regulation of

15

[non-bank] assignees simply because it would have an indirect effect on [non-bank] assignees." *Id*. Given the interconnected nature of transactions and markets, the Supreme Court made clear that a regulation directed at market participants within the agency's authority does not overstep the agency's authority simply because it has substantial effects on market participants outside the agency's authority. *See FERC v. Elec. Power Supply Ass'n*, 136 S. Ct. 760, 776 (2016) (where federal statute limited agency jurisdiction to the wholesale market and reserved regulatory authority over retail sales to the States, a regulation directed at wholesale transactions was not outside the agency's authority and did not intrude on the States' authority, even if the regulation had substantial indirect effects on retail transactions). Therefore, any indirect effects the rule has on non-banks do not place the rule outside the agency's authority.

Plaintiffs' "non-bank" cases are inapposite and do not compel the result they urge. Plaintiffs misstate the fundamental import of these cases: they deal with situations where the bank had not originated the loan in the first instance. *See* Br.8-9. None of these cases considered the circumstances to which the Final Rule applies—where the bank validly originated a loan with an interest rate term permitted under § 1831d and then sold or transferred the loan to a third party. *See, e.g.*, *In re Cmty. Bank of N. Va.*, 418 F.3d 277, 297 (3d Cir. 2005) (observing that the loans at issue "were, in fact, made and serviced by . . . a non-depository institution"); *Ubaldi v. SLM Corp.*, 852 F. Supp. 2d 1190, 1203 (N.D. Cal. 2012) (addressing "claims against a loan servicer that is alleged to have actually 'made' the loan, rather than the bank").

### 2.   The Final Rule Interprets § 1831d—A Federal Statute—Not State Law

Plaintiffs also incorrectly argue that the Final Rule interprets state law and the FDIC lacks authority to do so. Br.17. The Final Rule does not interpret state law: the Rule interprets the terms of Section 1831d, a federal statute, including ambiguities therein. Construing the terms of a federal statute "is, and always has been, a matter of federal law." *RTC v. Diamond*, 45 F.3d 665, 671 (2d Cir. 1995) (rejecting application of state law to interpret the terms of a federal banking statute). As the Supreme Court stressed in interpreting § 1831d's national-bank counterpart, federal law—not state law—determines whether a bank-made loan is in compliance with the federal statute and therefore not usurious: "federal law . . . completely defines what constitutes the taking

16

1    of usury by a national bank, referring to the state law only to determine the maximum permitted

2    rate." *Evans*, 251 U.S. at 114; *Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 10 (2003).

3          In other words, state law merely provides a numerical benchmark—the "maximum per-

4    mitted rate" that banks may charge, not the meaning of terms in the federal statute. *Evans,* 251

5    U.S. at 114. *Evans* is illustrative. There, the bank's home state (Georgia) deemed usurious the

6    practice of reserving interest in advance with respect to discounted notes even if the interest re-

7    served did not exceed the maximum permissible Georgia rate. *Id*. at 112. The Supreme Court

8    held that the bank's practice was legal under the federal law, because the federal statute (a prede-

9    cessor of § 85) allowed the bank to discount notes, and "[t]o discount . . . *implies* reservation of

10   interest in advance." *Id*. at 114 (emphasis added). The Court reasoned that Georgia law provides

11   the permissible rate of interest, but not the meaning of the word "discount" used in the federal

12   statute, which is a matter of federal law. So too here, state law provides the permissible *rate* of

13   interest, but not the meaning of § 1831d's authorization of banks to make loans that "take, re-

14   ceive, reserve, and charge" interest at the home-state rate. The FDIC's conclusion that a bank's

15   statutory authority to make loans that "take, receive, reserve, and charge" interest at the home-

16   state implies the authority to transfer those loans is no less a matter of federal statutory interpreta-

17   tion than the Supreme Court's conclusion that the authority "[t]o discount . . . implies" the author-

18   ity to "reserve[e] interest." Plaintiffs' suggestion that by interpreting a federal statute, the FDIC

19   engaged in an interpretation of state law is therefore belied by Supreme Court precedent.

20         If there were any lingering doubt after *Evans* that the meaning of statutory terms in §§ 85

21   and 1831d is a matter of federal law, it was removed by the Supreme Court's decision in *Smiley*,

22   517 U.S. at 739. At the time *Smiley* was decided, state laws differed as to whether the term "in-

23   terest" can be construed to include late-payment fees. For example, late-payment fees were not a

24   component of interest under Texas law, but they were under North Carolina law. In *Smiley*, the

25   Supreme Court interpreted the term "interest" in § 85 as a matter of federal law (not home state

26   law), just like it did with the term "discount" in *Evans*. Specifically, the Court upheld an OCC

27   regulation that defined the term "interest" in § 85 to include late-payment fees, without regard to

28   whether the bank's home state's law would have included such late fees in the definition of inter-

17

est. 517 U.S. at 739. *Smiley* confirms that home state law provides the permissible *rate* of interest (a numerical benchmark), but not the meaning of the word "interest" in § 85, which was defined in the OCC regulation as a matter of *federal* law.

### 3. The Final Rule Interprets The Substantive Meaning of § 1831d, Not Its Preemptive Effect

Plaintiffs incorrectly argue that the FDIC exceeded its authority because, in their view, the Final Rule impermissibly preempts state law, and because the Rule allegedly violates the presumption against preemption. Br.16. Plaintiffs mischaracterize the Final Rule: the Rule merely interprets the substantive meaning of § 1831d, it does not itself preempt state law. It is § 1831d that preempts state law by expressly providing for preemption of any contrary state law. As the Supreme Court explained, an agency's interpretation of the substantive scope and meaning of a preemptive statute does not itself preempt state law (rather, the statute does), and therefore does not trigger the presumption against preemption. *Smiley*, 517 U.S. at 744. In *Smiley*, the Supreme Court held that the presumption against preemption did not apply to an OCC regulation interpreting the term "interest" in § 85 to include late-payment fees because "the question of the substantive (as opposed to pre-emptive) meaning of a statute" is distinct from "the question of whether a statute is pre-emptive," and the OCC's regulation did not "deal with pre-emption" but with the substantive meaning of the term "interest" in § 85. *Id.* The Court reaffirmed that under its prior holdings, "there is no doubt that § 85 pre-empts state law." *Id.* Thus, any preemption arises from the statute itself, not from the agency's interpretation of the substantive meaning of the statute. *See also Marquette Nat'l Bank of Minneapolis v. First of Omaha Service Corp.,* 439 U.S. 299, 318 (1978) (recognizing that any impact on state usury laws that results from an interpretation of § 85 "has always been implicit in the structure of the National Bank Act").

Like the rule at issue in *Smiley*, the Final Rule only answers a question about the substantive meaning of § 1831d's terms, and does not itself preempt any state law, nor trigger the presumption against preemption.

### C. The Final Rule Represents A Permissible Interpretation Of The Statute And Thus Should Be Upheld Under *Chevron*'s Deferential Step Two

18

1    The question for the reviewing court at *Chevron* Step Two is "whether the agency's an-

2    swer [to the interpretive question] is based on a permissible construction of the statute." *Mayo*,

3    562 U.S. at 54.  A court will not disturb a rule at *Chevron* Step Two unless it is "arbitrary or ca-

4    pricious in substance, or manifestly contrary to the statute." *Id*. at 53.  Generally, an agency inter-

5    pretation is not "arbitrary, capricious, or manifestly contrary to the statute" if it is "reasonable."

6    *Id*. at 58 ("[T]he second step of *Chevron* . . . asks whether the [agency's] rule is a 'reasonable in-

7    terpretation' of the enacted text.").  Accordingly, "[a]n agency interpretation that enjoys *Chevron*

8    status must be upheld if it is based on a reasonable construction of the statute."  *Nw. Ecosystem*

9    *All. v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136, 1143 (9th Cir. 2007).

10    The FDIC's construction of the statute is reasonable, and thus should be upheld.  As the

11    Final Rule explained, that "[t]he FDIC used its banking expertise to fill the gaps in section 27,

12    and its interpretation is grounded in the *terms* and *purpose* of the statute, read within their proper

13    historical and legal *context*." AR 214 (emphases added).  Specifically, as discussed, the FDIC's

14    interpretation (1) carries out the purpose of the statute, whereas Plaintiffs' contrary interpretation

15    would frustrate it, (2) interprets statutory terms in accordance with their common industry under-

16    standing and their proper historical and legal context, whereas Plaintiffs' interpretation ignores

17    that context, (3) is buttressed by Congress's views regarding the application of another federal

18    statute providing exemptions from usury law, (4) is consistent with well-established principles of

19    contract law regarding the assignment of contracts, whereas Plaintiffs' interpretation would re-

20    quire the untenable conclusion that Congress made an extreme departure from those principles

21    through mere silence, and (5) provides a workable rule that is consistent with the parties' expecta-

22    tions at the time the loan was made.

23    The Final Rule provided a reasonable explanation why, when viewed in context, the statu-

24    tory terms granting banks the power to make loans charging certain rates are best understood as

25    necessarily including the power to transfer enforceable rights in those loans.  The historical and

26    legal context, such as the Supreme Court's decision in *Planters*, shows that "[t]he power to assign

27    loans has been traditionally understood as a component of the power to make loans."  AR 214.

28

Def.'s Notice of Mot. for Summ. J., Mem. of Points & Authorities, and Opp. to Pls.' Mot. (20-5860-JSW)

1    The Final Rule also sensibly explained why the FDIC's interpretation best comports with

2    the statute's purpose.  AR 215.  Relying on its expertise, the FDIC reasonably concluded that

3    "[a]bsent the power to assign loans made under section 27, reliance on the statute could ultimate-

4    ly hurt State banks (instead of benefiting them) should they later face a liquidity crisis or other

5    financial stresses.  The FDIC's interpretation of the statute helps prevent such unintended re-

6    sults." *Id*.  This is because "[t]he power to assign is indispensable in modern commercial transac-

7    tions, and even more so in banking: State banks need the ability to sell loans in order to properly

8    maintain their capital and liquidity." *Id*.  As the Supreme Court explained almost two centuries

9    ago, "in managing its property in legitimate banking business, [a bank] must be able to assign or

10   sell those notes when necessary and proper, as, for instance, to procure more [liquidity] in an

11   emergency, or return an unusual amount of deposits withdrawn, or pay large debts." *Id*. (citing

12   *Planters*).  These principles apply with added force in modern times.  Loan sales and securitiza-

13   tions provide banks with a key "funding, capital, and risk management tool" by allowing banks

14   "to obtain lower cost funding, diversify [their] funding sources, . . . and increase [their] ability to

15   manage interest rate risk."  FDIC, Credit Card Securitization Manual, Introduction (2007),

16   https://www.fdic.gov/regulations/examinations/credit_card_securitization/ch1.html.  Loan sales

17   also help banks maintain safe asset concentration levels.  *Id*.  In light of these concerns, the FDIC

18   reasonably concluded that Congress could not have intended to give banks a right to make loans

19   hampered by significant impairments to the loans' resale value and liquidity such as would occur

20   if a bank could not transfer enforceable rights in the loans they made.

21   The reasonableness of the FDIC's interpretation is further underscored by court decisions

22   adopting a similar interpretation of other statutes.  In *Strike*, the court interpreted a statute silent

23   on transfer to implicitly allow banks to transfer enforceable rights in the loan's interest-rate terms,

24   because loans sales to the "secondary market" would be "uneconomic" if assignees could not en-

25   force those rates.  92 Cal. App. 3d at 745.  In *Olvera*, the Seventh Circuit also interpreted a statute

26   silent on transfer to allow assignees to enforce the rates of validly-made loans, as a contrary inter-

27   pretation would produce "senseless" results that could not have been intended by the legislature.

28   431 F.3d at 287.  These cases confirm that the FDIC's interpretation best comports with the pur-

20

pose of the statute. But the Court should defer to the agency's judgment even if the FDIC's interpretation were not the best interpretation of the statute. Because the standard of review is highly deferential, the agency's view need not be "the only possible interpretation, nor even the interpretation deemed *most* reasonable by the courts." *Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208, 218, (2009) (emphasis in original).

## II. Plaintiffs' *State Farm* Arguments Are Unavailing

Plaintiffs also assail the Final Rule as arbitrary and capricious under 5 U.S.C. § 706(2)(A) and *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983), but those arguments fail for three reasons. First, "[t]he same points that address [Plaintiffs'] *Chevron* Step Two claim also make it clear that their arbitrary and capricious claim fails." *Agape Church, Inc. v. FCC*, 738 F.3d 397, 410 (D.C. Cir. 2013); *Judulang v. Holder,* 132 S.Ct, 476, 483 n.7 (2011) (stating that, under either standard, the "analysis would be the same, because under *Chevron* step two, we ask whether an agency interpretation is 'arbitrary or capricious in substance'"). Accordingly, the Court can stop its inquiry here. Because the FDIC's interpretation is reasonable under *Chevron* Step Two, it is not arbitrary and capricious. *See also Harkonen v. DOJ*, 800 F.3d 1143, 1150 (9th Cir. 2015) (holding that "the highly deferential standard of review at Step Two of the *Chevron* analysis applies," and that "analysis leads to the conclusion [that the agency's interpretation] was not arbitrary and capricious, or manifestly contrary to the statute").

Second, to the extent that *State Farm* can be read as imposing a more stringent standard than *Chevron* Step Two, *State Farm* does not apply to an agency regulation addressing an issue of statutory interpretation for the first time, as here. The Supreme Court has cautioned that *State Farm* is "inapposite to the extent that it may be read as prescribing more searching judicial review" in a case involving an agency's "first interpretation" of a statute. *Verizon Commc'ns Inc. v. FCC*, 535 U.S. 467, 502 n.20 (2002). Therefore, a challenge to a regulation involving an agency's first interpretation of an ambiguous statute "is properly analyzed under the *Chevron* framework, which does not incorporate the *State Farm* standard." *Catskill Mountains Chapter of Trout Unlimited, Inc. v. EPA*, 846 F.3d 492, 523-24 (2d Cir. 2017). As the Second Circuit explained in applying the *Chevron* framework instead of *State Farm*, certain aspects of *State Farm* that focus

21

on a rational connection between the facts found and the agency's conclusion, are incongruent with Supreme Court decisions holding that "agencies are not obligated to conduct detailed fact-finding or cost-benefit analyses when *interpreting* a statute." *Id*. at 523 (emphasis added). "*State Farm* review may be appropriate in a case involving a non-interpretive rule or a rule setting forth a changed interpretation of a statute; but that is not so in the case before us." *Id*. at 521.

Third, even if *State Farm* applied, Plaintiffs' arguments that the Final Rule does not meet that standard are meritless. Plaintiffs incorrectly assert that the Final Rule "is inconsistent with the FDIC's stated position against rent-a-bank schemes" because the Rule would facilitate such schemes. Br. 23-24. The Final Rule is fully consistent with the FDIC's position because the rule would not protect rent-a-bank schemes; to the contrary, the rule would only apply if a bank actually made the loan. AR 217. The Final Rule does not apply where a non-bank partner is deemed to have made the loan under a true lender analysis, and it expressly states that it "is not intended to foreclose remedies available under State law" against rent-a-bank schemes, such as true lender defenses. *Id*. Far from being inconsistent with the FDIC's prior positions, the Final Rule condemned abuses and reiterated "continue[d]" adherence to its position that FDIC "view[s] unfavorably entities that partner with a State bank with the sole goal of evading a lower interest rate established under the law of the entity's licensing State(s)." AR 210-11. Plaintiffs' argument also fails because it relies on cases addressing a change in an agency's interpretation of a statute. *See* Br.23. Those cases are entirely inapposite because the FDIC has never taken a position inconsistent with the rule's conclusion that the permissibility of a loan's interest rate is determined at the loan's inception; the FDIC has never addressed this issue before. Therefore, there is no prior interpretation with which the Final Rule conflicts.

Plaintiffs also assail the Final Rule for failing to address "the application of the true lender doctrine." Br.19-21. The record demonstrates that the FDIC specifically considered whether the Final Rule needed to address this issue, and that it reasonably determined that it did not, because while both the true lender question and the question addressed by the current rulemaking "ultimately affect the interest rate that may be charged to the borrower, the FDIC believes that they are not so intertwined that they must be addressed simultaneously by rulemaking." AR 216. As

22

Def.'s Notice of Mot. for Summ. J., Mem. of Points & Authorities, and Opp. to Pls.' Mot. (20-5860-JSW)

the Final Rule explained, the two questions are separable because "in many cases . . . there may not even be a non-bank involved in making the loan," and thus the true lender question would not even arise.  The Second Circuit's decision in *Madden v. Midland Funding, LLC*, 786 F.3d 246 (2d Cir. 2015) was such a case where the bank validly made the loan and did not sell it to a non-bank debt collector "until three years after the consumer opened the account."  AR 216.  A recent case provides another example: there, the debtor challenged a student loan charging 9% interest as usurious simply because of its transfer to a securitization trust, a common vehicle that helps banks manage their funding and liquidity. *Robinson v. Nat'l. Collegiate Student Loan Trust*, *2006-2*, 2021 WL 1293707 (D. Mass. Apr. 7, 2021) (rejecting debtor's claim under the OCC's recent regulation).  In sum, Plaintiffs' proposed interpretation places at risk countless validly-made loans charging relatively low rates and not implicating true lender issues.  In light of such concerns, it was entirely permissible for the FDIC to make the transfer issue a priority.  Agencies have discretion on how to handle related, yet discrete, issues in terms of priorities and need not solve every problem before them in the same proceeding. *Taylor v. FAA*, 895 F.3d 56, 68 (D.C. Cir. 2018); *see also FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 522 (2009) ("[n]othing prohibits federal agencies from moving in an incremental manner" to address regulatory problems).  And while the Final Rule does not address the true lender analysis, it does not prohibit its application: the Final Rule expressly states that "is not intended to foreclose remedies available under State law" against rent-a-bank schemes, such as true lender defenses.  AR 217.  The availability of these remedies also answers Plaintiffs' related comment regarding the existence of a purported "vacuum" of remedies against non-banks.  Br.21.

Thus, the FDIC acknowledged and considered the purported problems Plaintiffs raise, but in balancing the policy considerations, the FDIC concluded it was reasonable to issue the Final Rule.  Plaintiffs "may disagree with this policy balance, but it does not reflect a failure to consider relevant factors" under the APA.  *Owner-Operator Indep. Drivers Ass'n, Inc. v. Fed. Motor Carrier Safety Admin.*, 494 F.3d 188, 211 (D.C. Cir. 2007).

Plaintiffs also erroneously assert that the Final Rule's interpretation of the statute should be rejected because the FDIC failed to provide empirical evidence or studies.  Br.22.  But this

23

misstates the FDIC's obligations under the APA.  Rather, as the Ninth Circuit has held, an agency is not required under the APA to develop and rely on empirical evidence as part of the rulemaking process.  Instead, so long as an agency provides a reasoned explanation for a rule it promulgates—as the FDIC has done here—it "is entitled to invoke its experience as a justification for" that rule.  *Peck v. Thomas*, 697 F.3d 767, 775-76 (9th Cir. 2012); *see also Stilwell v. OTS*, 569 F.3d 514, 519 (D.C. Cir. 2009) ("[t]he APA imposes no general obligation on agencies to produce empirical evidence.  Rather, an agency has to justify its rule with a reasoned explanation.").  As discussed in Part I.C. above, the FDIC has provided such reasoned explanation.

As a fallback, Plaintiffs argue that the rule is allegedly contrary to evidence in the record because the FDIC stated in the NPR that it "is not aware of any widespread or significant negative effects" as a result of the *Madden* decision, and "[t]his lack of expected cause-and-effect between the Provision and the problem it purports to address underscores that the FDIC has not shown a rational connection between the facts found and the choice made."  Br.22.  But there is no such contrary evidence: Plaintiffs' argument mischaracterizes both the FDIC's remark in the NPR, and the problem addressed by the rulemaking.  First, as the Final Rule explained, the NPR remark simply meant that there were no *widespread* negative effects because the "available evidence suggested that *Madden*'s effects on loan sales and availability of credit were *generally limited to the Second Circuit* states in which the decision applied."  AR 216 (emphasis added).  Second, Plaintiffs misstate the problem addressed by the Final Rule: the rule addresses the two statutory gaps, not the *Madden* decision.  AR 210, 212.  Those gaps—and the resulting ambiguity—exist independent of *Madden*.  *Madden* merely "highlight[s]" the ambiguity and "the need to issue clarifying regulations."  AR 210.

At bottom, Plaintiffs' "cause-and-effect" argument suggests that an agency may not engage in a rulemaking that interprets a statutory gap without providing evidence that widespread negative effects would occur (or have occurred) absent the regulation.  This view does not comport with the APA, which, as shown, does not require empirical evidence to justify the need for a rule.  Before issuing a rule, an agency need not find that problems that need solving exist *in the industry*.  Rather, the agency can decide that the problem is the gap or ambiguity *in the statute*.

24

1   This is what the FDIC has done here.  *See, e.g.*, AR 210 (explaining "[l]eft unaddressed, the two

2   statutory gaps could create legal uncertainty for State banks and confusion for the courts."). There

3   is a rational connection between the problem the FDIC identified (the statutory gaps or ambiguity

4   as to when validity is determined and what happens upon transfer) and the FDIC's solution (an

5   interpretation clarifying that validity is determined at the loan's inception, and is not affected by

6   the loan's transfer).  The FDIC solved the ambiguity through its interpretation.

7          Plaintiffs also make a terse, one-sentence contention that the record contains "evidence"

8   that contradicts the FDIC's "premise that state rate caps constrain bank liquidity or that selling

9   loans with interest rates that exceed state rate caps is a material source of bank liquidity."  Br.22.

10   But Plaintiffs do not tell the Court what that "evidence" is; what the FDIC's responses were to the

11   comment providing that "evidence"; and why they should prevail notwithstanding those respons-

12   es.  Plaintiffs' one-sentence contention therefore fails for lack of adequate briefing.  It also fails

13   because it responds to a straw man "premise" that both misconstrues and oversimplifies the

14   FDIC's reasoning. The FDIC does not argue that "rate caps constrain bank liquidity"—it argues

15   that banks' inability to transfer enforceable rights in the loans they made constrains the loans'

16   value and liquidity.  *See* I.C., *supra*.  The FDIC does not argue that selling loans with "rates that

17   exceed state rate caps is a material source of bank liquidity"—it argues that Congress intended to

18   provide banks a *meaningful right* to make loans under §1831, not a right to make loans with im-

19   paired value and liquidity resulting from the banks' inability to transfer enforceable rights in the

20   loans they made.  *Id*.  Given this purpose and the historical context showing that the banks' power

21   to make loans was traditionally understood to implicitly contain the power to transfer them, the

22   FDIC concluded that § 1831d's purpose would not be best served by an interpretation under

23   which Congress provided banks the authority to make loans under that section, but envisioned the

24   banks as being restricted from doing with those loans what banks regularly and traditionally do

25   with loans, such as selling them and transferring enforceable rights in them upon sale.

26                                          **CONCLUSION**

27          For these reasons, this Court should grant FDIC's Motion for Summary Judgment and de-

28   ny Plaintiffs' Cross-Motion for Summary Judgment.

                                              25

1    Dated:  May 20, 2021

2                                                       FEDERAL DEPOSIT INSURANCE CORPORATION
                                                        Barbara Katron (DC Bar #387970)
3                                                       Senior Counsel, Corporate Litigation Unit

4

5                                                       By:      /s/ Erik Bond
6                                                       Erik Bond (NY Bar Reg. #4316030)
                                                        Andrew Dober (CA Bar #229657)
7                                                       Counsel, Corporate Litigation Unit
                                                        Minodora D. Vancea (DC Bar #492335)
8                                                       Counsel, Appellate Litigation Unit

9                                                       3501 N. Fairfax Drive, D-7026
                                                        Arlington, VA 22226
10                                                      Telephone: (703) 562-6461
                                                        Fax: (703) 562-2477
11                                                      erbond@fdic.gov
                                                        adober@fdic.gov
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

26