1  Barbara Katron (DC Bar #387970)
   Erik Bond (NY Bar Reg. #4316030)
2  Andrew Dober (CA Bar #229657)
   Minodora D. Vancea (DC Bar #492335)
3
4  FEDERAL DEPOSIT INSURANCE CORPORATION
   3501 N. Fairfax Drive, D-7026
5  Arlington, VA 22226
   Telephone: (703) 562-6461
6  Fax: (703) 562-2477
7  erbond@fdic.gov
   adober@fdic.gov
8
   Attorneys for Defendant
9

10                    UNITED STATES DISTRICT COURT

11                  NORTHERN DISTRICT OF CALIFORNIA

12

13   PEOPLE OF THE STATE OF CALIFORNIA,        Case No. 4:20-5860-JSW
     *et al*.,
14                                             **DEFENDANT'S REPLY IN SUPPORT OF**
             Plaintiffs,                       **DEFENDANT'S MOTION FOR**
15                                             **SUMMARY JUDGMENT**
16           v.

17   FEDERAL DEPOSIT INSURANCE                 Date: August 6, 2021
     CORPORATION,                              Time: 9:00 a.m.
18                                             Place: Oakland Courthouse, Courtroom 5
             Defendant.                        Before: Judge Jeffrey S. White
19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................ i

TABLE OF AUTHORITIES ..................................................................................... ii

SUMMARY OF ARGUMENT .................................................................................. v

REPLY ARGUMENT ............................................................................................... 1

I.   The Final Rule Represents A Reasonable Interpretation of § 1831d And
     Should Be Upheld .......................................................................................... 1

     A.   The FDIC's Final Rule Satisfies *Chevron* Step One Because It Addresses
          Two Statutory Gaps in § 1831d .............................................................. 1

     B.   The Final Rule Represents A Permissible Interpretation Of The Statute And
          Thus Should Be Upheld Under *Chevron*'s Deferential Step Two ............ 8

II.  Plaintiffs' *State Farm* Arguments Are Unavailing ................................. 13

     A.   The FDIC Complied With The Procedural Requirements Imposed
          By The APA .......................................................................................... 14

     B.   *State Farm* Does Not Apply To An Agency's First Interpretation Of A
          Statute, And The Final Rule Is Not Inconsistent With Any Prior
          Interpretation ....................................................................................... 15

     C.   Even If *State Farm* Applied, The Final Rule Is Not
          Arbitrary and Capricious ..................................................................... 16

CONCLUSION ....................................................................................................... 19

i

Def.'s Reply in support of Mot. for Summ. J. (20-5860-JSW)

# TABLE OF AUTHORITIES

**CASES**

*Agape Church, Inc. v. FCC,*
   738 F.3d 397 (D.C. Cir. 2013) ............................................................................................. 13

*Altera Corp. & Subsidiaries v. CIR,*
   926 F.3d 1061 (9th Cir. 2019), ........................................................................................... 16

*Barnhart v. Sigmon Coal Co., Inc.,*
   534 U.S. 438 (2002) ............................................................................................................ 7

*Catskill Mountains Chapter of Trout Unlimited, Inc. v. EPA,*
   846 F.3d 492 (2d Cir. 2017) ........................................................................................ 15, 16

*Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,*
   467 U.S. 837 (1984) ...................................................................................................*passim*

*Cuomo v. Clearing House Ass'n, L.L.C.,*
   557 U.S. 519 (2009) .................................................................................................... 12, 13

*DaimlerChrysler Servs. N.Am., LLC v. Comm'r of Revenue Servs.,*
   875 A.2d 28 (Conn. 2005)) ............................................................................................ 3, 4

*Encino Motorcars, LLC v. Navarro,*
   136 S. Ct. 2117 (2016). .................................................................................................... 16

*Entergy Corp. v. Riverkeeper, Inc.,*
   556 U.S. 208 (2009) ........................................................................................................ 12

*FCC v. Fox Television Stations, Inc.,*
   556 U.S. 502 (2009) ........................................................................................................ 17

*FDIC v. Newhart,*
   892 F.2d 47 (8th Cir. 1989) ............................................................................................... 4

*Gavey Properties/762 v. First Fin. Sav. & Loan,*
   845 F.2d 519 (5th Cir.1988) ......................................................................................... 9, 10

*Greenwood Trust Co. v. Com.of Mass.,*
   971 F.2d 818 (1st Cir.1992). .............................................................................................. 9

*Harkonen v. DOJ,*
    800 F.3d 1143 (9th Cir. 2015) ............................................................................ 13

*Judulang v. Holder,*
    132 S.Ct. 476 (2011) ............................................................................................ 13

*Long Island Care at Home, Ltd. v. Coke,*
    551 U.S. 158 (2007) ............................................................................................. 15

*Madden v. Midland Funding, LLC,*
    786 F.3d 246 (2d Cir. 2015) ..................................................................... 17, 18, 19

*Mayo Found. for Med. Educ. & Research v. United States,*
    562 U.S. 44 (2011) ..................................................................................... 8, 13, 16

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983) ................................................................................ 13, 14, 15, 16

*National Enterprises, Inc. v. Smith,*
    114 F.3d 561 (6th Cir. 1997) ................................................................................ 3, 4

*Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv.,*
    475 F.3d 1136 (9th Cir. 2007) ................................................................................. 8

*Olvera v. Blitt & Gaines*, P.C.,
    431 F.3d 285 (7th Cir. 2005) ...................................................................... 4, 5, 7, 12

*Peck v. Thomas,*
    697 F.3d 767 (9th Cir. 2012); ............................................................................... 18

*Planters' Bank of Miss. v. Sharp,*
    47 U.S. 301 (1848) ........................................................................................... 9, 11

*Smiley v. Citibank (S.D.), N.A.,*
    517 U.S. 735 (1996) ........................................................................................ 12, 16

*Strike v. Trans-W. Disc. Corp.,*
    92 Cal. App. 3d 735 (Cal. Ct. App. 1979) .................................................. 4, 5, 7, 12

*Taylor v. FAA,*
    895 F.3d 56 (D.C. Cir. 2018) ................................................................................ 17

iii

Def.'s Reply in support of Mot. for Summ. J. (20-5860-JSW)

*Tivoli Ventures, Inc. v. Bumann*
  870 P.2d 1244 (Colo. 1994)) ................................................................................ 4

*United States v. Allegheny-Ludlum Steel Corp.*,
  406 U. S. 742 (1972) ........................................................................................... 14

*Vermont Yankee Nuclear Power Corp. v. NRDC*
  435 U.S. 519 (1978) ............................................................................................ 14

*Verizon Commc'ns Inc. v. FCC*,
  535 U.S. 467 (2002) ............................................................................................ 15

**STATUTES**

5 U.S.C. § 553 ................................................................................................. 14, 15

12 U.S.C. § 1735f-7a ........................................................................................... 5, 6

12 U.S.C. § 1831d .......................................................................................... *passim*

12 U.S.C. § 1831d(b) ................................................................................................ 5

12 U.S.C. § 85 ........................................................................................................... 5

**OTHER AUTHORITIES**

6 Am. Jur. 2d Assignments § 108 ............................................................................. 3

FDIC, Credit Card Securitization Manual, Introduction (2007)
  https://www.fdic.gov/regulations/examinations/credit_card_securitization/ch1.html ............... 9

Federal Interest Rate Authority, 85 Fed. Reg. 44,146 (July 22, 2020) ("Final Rule") .......... *passim*

iv

Def.'s Reply in support of Mot. for Summ. J. (20-5860-JSW)

## SUMMARY OF ARGUMENT

12 U.S.C. § 1831d allows state banks to make loans charging either the federal commercial paper discount rate, or the interest rate allowed by their home states. But § 1831d does not address at what time the validity of a loan's interest rate should be determined, nor what happens to the validity of a loan's interest rate upon transfer. The FDIC's Final Rule reasonably filled these two statutory gaps by concluding that the validity under § 1831d of the interest-rate term of a loan is determined at the time when the loan is made, and is not affected by subsequent events, such as a change in the law or the loan's transfer. The rule, which enjoys widespread support from the banking industry, represents a reasonable interpretation of § 1831d, and should be upheld under *Chevron's* familiar two-step framework. *First*, Congress has not spoken to the two questions at issue. *Second*, the FDIC sensibly concluded that its reading would best effectuate the terms and purpose of the statute, and would provide a workable rule that is consistent with the parties' expectations at the time the loan was made. The reasonableness of the FDIC's interpretation is further underscored by court decisions adopting a similar interpretation of other statutes providing exemptions from usury law.

Plaintiffs fail to present a credible challenge to the rulemaking. Plaintiffs argue that there is no statutory gap because the text and purpose of the statute conclusively answer the interpretive question at hand. According to them, the text and purpose of the statute show that § 1831d applies *only* to banks. But even accepting Plaintiffs' premise that § 1831d is addressed *only* to banks, that still does not answer the transfer question: just because statutory rights are granted to specific entities such as banks, that does not mean that such rights cannot be transferred where, as here, they are incident to a contract (and in fact incorporated into a contractual term). Plaintiffs point to nothing in the text or purpose of the statute prohibiting such transfer. Rather, Plaintiffs support their argument with two inapposite cases, which they misread as standing for the broad proposition that statutory rights granted to specific entities "may not be sold, transferred, or assigned.'" But those cases do not stand for that proposition, and that proposition is wrong in any event. Plaintiffs' other arguments fail as well. The Final Rule does not regulate non-banks, does not interpret state law, and does not preempt state law. Rather, it regulates banks, interprets only

v

a federal statute, and interprets only that statute's substantive meaning. Plaintiffs' *State Farm* arguments are equally unavailing.

**REPLY ARGUMENT**

## I. The Final Rule Represents A Reasonable Interpretation of § 1831d And Should Be Upheld

The FDIC's interpretation of §1831d is analyzed under the familiar two-step framework of *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). The first step involves "the question whether Congress has directly spoken to the precise question at issue." 467 U.S. at 842-43. "[I]f the statute is silent or ambiguous with respect to the specific issue," the Court proceeds to the second step, where "the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id*. at 843. If it is, the court defers to the agency's interpretation. *Id*. As the FDIC's initial brief showed, the Final Rule satisfies *Chevron* Step One because it addresses two statutory gaps in § 1831d, and Step Two because it fills these gaps in a reasonable way. None of Plaintiffs' responses have merit.

### A. The FDIC's Final Rule Satisfies Chevron Step One Because It Addresses Two Statutory Gaps In § 1831d

*Timing gap*. The first statutory gap addressed by the Final Rule is the timing gap. As the Final Rule explains, § 1831d "does not state at what point in time the validity of the interest rate should be determined to assess whether a State bank is taking or receiving interest in accordance with [§ 1831d]." AR 210. Situations may arise where a loan is made in reliance on either the federal commercial rate or the home-state interest rate, and such rate changes after the loan is made. *Id*. The statute does not answer whether a bank's compliance with § 1831d is determined at the time the loan is made (under the old rate), or at the time that the bank "takes" or "receives" the interest (under the new rate). To fill this statutory gap, the FDIC concluded "that the validity and enforceability under [§ 1831d] of the interest-rate term of a loan must be determined [at the time] when the loan is made, not when a particular interest payment is 'taken' or 'received.'" AR 213. "This interpretation protects the parties' expectations and reliance interests at the time when a loan is made, and provides a logical and fair rule that is easy to apply." *Id*.

Plaintiffs argue that there is no gap because the case law is clear that "changes in state law generally do not retroactively alter contractual obligations." Opp. 14. But this argument completely ignores changes in federal commercial paper rates. Under § 1831d, a bank is permitted to

1

make a loan charging the federal commercial paper rate, which rate is not imposed by state law. Rather, the federal commercial paper rate is a market-driven rate published by the Federal Reserve. AR 203. Because changes in the federal commercial paper rate occur by reason of market fluctuations, and do not arise from a change in state law, the principle against retroactive application of state law has no application to such changes. Plaintiffs' proposition that changes in state law do not apply retroactively therefore does not answer what happens when federal commercial paper rates change: should the bank's compliance be assessed under the old rate published by the Federal Reserve on the day the bank made the loan, or under the new rate applying at the time the bank takes or receives interest? Thus, a statutory gap remains.

Moreover, the presumption against retroactivity does not eliminate the statutory ambiguity even with respect to the effect of a change in state law. For instance, under Plaintiffs' view that § 1831d applies to Banks, not to loans, and that it merely allows Banks to "take, receive, reserve, and charge" certain interest rates (Opp. 11), there would be no retroactivity concerns from determining compliance based on the interest rate in effect at the time the bank actually takes or receives the interest payment because the bank's conduct (the taking or receiving of interest) would occur *after* the enactment of the statutory change in interest rates. As Plaintiffs explain, the presumption against retroactivity means that statutes affecting substantive rights should not apply to "conduct arising before their enactment" (Opp. 15); here, the bank's taking or receiving of interest would occur after enactment, and thus there would be no retroactivity concerns from determining compliance based on the rates in effect at the time the bank takes or receives interest.

To be sure, Plaintiffs are correct that looking at the rates in effect at the time interest is taken or received would retroactively alter contractual loan obligations (Opp. 14), but their correct view on retroactivity is inconsistent with their proposed interpretation that § 1831d does not apply to loans, but to banks because "[l]oans do not 'take, receive, reserve and charge interest; banks do." Opp. 11. Thus, an ambiguity still remains on whether the permissibility of the interest rate should be determined consistent with Plaintiffs' statutory interpretation argument, at the time of *the bank's* conduct (*i.e.*, when the bank takes or receives interest), or consistent with their retroactivity argument, at the time *the loan* is made. And Plaintiffs do not explain why, if the va-

2

lidity and enforceability of the interest rate term of a loan is determined at the inception of the loan so as to avoid retroactivity concerns (Opp. 14), the validity of that rate could nevertheless be affected by subsequent events, such as the loan's transfer. As Plaintiffs concede, "contract and property rights . . . require predictability and stability." Opp. 15. Altering contractual rights upon transfer does not serve predictability and stability, and is inconsistent with fundamental principles of contract law under which a transfer does not change contractual rights. *See, e.g.*, 6 Am. Jur. 2d Assignments § 108 (an assignee of a contract "stands in the shoes of the assignor" and can assert all rights under the contract to the same extent as the assignor).

*Transfer Gap*. Plaintiffs incorrectly argue that the Final Rule does not satisfy *Chevron* Step One because "the text of § 1831d itself answers the interpretive question at hand" and precludes the FDIC's interpretation because "only FDIC Banks—not their loan buyers or other entities—may charge interest at the rates permitted by § 1831d." Opp. 8. But this argument fails because Plaintiffs' conclusion does not follow from their premise: while it is true that the statute states that FDIC banks may charge the interest rates permitted by § 1831d, it is not true that the statute provides that the banks' "loan buyers" may not charge those rates. The statute simply does not address what happens upon the bank's transfer of a loan charging the rates permitted by § 1831d (the transfer gap).

Plaintiffs point to nothing in the *text* of the statute indicating that banks cannot transfer to loan buyers enforceable rights in the loans' interest rate terms. Rather, Plaintiffs support their argument with two inapposite cases, which they misread as standing for the broad proposition that statutory rights granted to specific entities "may not be sold, transferred, or assigned.'" Opp. 17 (citing *Nat'l Enterprises, Inc. v. Smith*, 114 F.3d 561 (6th Cir. 1997) and *DaimlerChrysler Servs. N.Am., LLC v. Comm'r of Revenue Servs.*, 875 A.2d 28, 38, 39 (Conn. 2005)). But those cases do not actually stand for that proposition. *Smith* did not hold that statutory rights in general may not be transferred; rather, it held that a *jurisdictional* right—there, the RTC's right to sue in federal court—could not be transferred. *Smith* acknowledged that numerous decisions had found that statutory rights incident to a contract may be transferred, and held merely that jurisdictional rights are different. 114 F.3d at 564 (explaining that "courts have extended to the FDIC's assignees the

3

same rights as the FDIC possesses . . . . even though the literal language of section 1823(e)," the statute conferring the FDIC's rights at issue, applied solely to the FDIC and did not extend to assignees who acquire loans from FDIC) (citing, *e.g.*, *FDIC v. Newhart*, 892 F.2d 47, 50 (8th Cir. 1989)); *see also, e.g., Tivoli Ventures, Inc. v. Bumann*, 870 P.2d 1244, 1246-47 (Colo. 1994) (allowing FDIC to transfer the FDIC's federal statutory right in a longer limitations period and citing numerous cases for this proposition). *DaimlerChrysler* does not aid Plaintiffs either. That case acknowledged that statutory rights incident to a contract may be assigned, but found that the rights there were not incident to a contract. 875 A.2d at 38, 39-40.

Even if *Smith* or *DaimlerChrysler* stood for the broad proposition that statutory rights granted to specific entities may not be transferred, that proposition is inapposite because the issue here is not the transfer of statutory rights in general, but the transfer of a term of a loan contract, specifically the right to charge and receive interest. Unlike the RTC's right to sue in federal court at issue in *Smith*, which was not part of the underlying loan contract between the lender and the borrower, the interest rate charged in a loan is a key contractual term incorporated in the loan contract, which is a transferable instrument. Courts addressing the transfer of contractual loan terms incorporating statutory rights to charge certain interest rates agree that such terms can transfer to a loan buyer. *Strike v. Trans-W. Disc. Corp.*, 92 Cal. App. 3d 735, 745 (Cal. Ct. App. 1979) (concluding that the assignee of a bank loan could continue to receive the usury-exempt rate the assigning bank charged, even if the assignee was not expressly exempted by the statute); *Olvera v. Blitt & Gaines*, P.C., 431 F.3d 285, 286, 289 (7th Cir. 2005) (unlicensed assignee can charge rate that statute allows licensed assignor to charge).

Plaintiffs' related argument—that FDIC conflates statutory rights with contract rights, and that unlike contract rights, statutory rights are non-transferable—fails for the same reasons. Opp. 21. First, it is Plaintiffs who fail to recognize that this case does not involve the mere transfer of statutory rights, but the transfer of rights that, as the statute intended, have become a part of a loan contract between the lender and the borrower, and are thus contractual in nature. Second, Plaintiffs are also wrong that statutory rights are non-transferable. As seen, Plaintiffs' two cases do not stand for that categorical proposition. To be sure, certain statutory rights could not be trans-

4

Def.'s Reply in support of Mot. for Summ. J. (20-5860-JSW)

ferred.  FDIC does not contend, for example, that a party could transfer the party's refugee status granted by statute.  But Plaintiffs' proposed rule that *no* statutory rights granted to specific entities may be transferred to others is contradicted by the numerous cases upholding such transfers when incident to a loan contract, particularly when those statutory rights establish the terms of a contract between a lender and a borrower, such as here and in *Olvera* and *Strike*.  And while Plaintiffs attempt to distinguish *Olvera* and *Strike* as involving state statutes, so did *DaimlerChrysler* on which Plaintiffs rely.  Those cases are relevant because they rebut Plaintiffs' proposition that statutory rights cannot be transferred.

In short, the statute does not address what happens upon the bank's transfer of a loan charging the rates permitted by § 1831d (the transfer gap), and there is no merit to Plaintiffs' argument that statutory rights cannot be transferred.

*Statutory Purpose.*  Contrary to Plaintiffs' assertions, the statutory purpose does not unambiguously answer the interpretive question at hand in Plaintiffs' favor.  To the contrary, it highlights the permissibility of FDIC's interpretation, and so do the other tools of construction. *See also* I.B., *infra*.

Plaintiffs claim that the express purpose of § 1831d is simply to establish competitive equality between state banks and national banks, which in their view shows that § 1831d applies *only* to banks.  But even accepting Plaintiffs' oversimplification of the statutory purpose, that purpose still does not answer the transfer question at hand:  just because statutory rights are granted to specific entities such as banks, that does not mean that such rights cannot be transferred where, as here, they are incident to a contract (and in fact incorporated into a contractual term).  Thus, this is just another variant of Plaintiffs' flawed argument that statutory rights granted to specific entities cannot be transferred, and it fails for the same reasons.

In addition, Plaintiffs' oversimplification of the statutory purpose is reductive and wrong.  To be sure, the statute is targeted to ensuring competitive equality, but the way through which Congress ensured competitive equality between state and national banks was by patterning § 1831d after § 85, and allowing state banks to make loans charging the same rates under § 1831d as national banks were allowed to charge under § 85.

5

1    *Other Statutes*.   Plaintiffs incorrectly assert that two other statutes (§ 1735f-7a and

2    § 1831d(b)) also unambiguously compel their interpretation of §1831d.  Neither does.

3         Plaintiffs argue that § 1831d(b), which provides certain remedies for violations of

4    § 1831d, demonstrates that the Final Rule "creates a potential loophole that Congress could not

5    have intended" because it would "allow[] non-bank loan buyers to enjoy § 1831d preemption

6    without facing liability for violating the statute."  Opp. at 5.  According to Plaintiffs, this would

7    happen when "an FDIC Bank originates a loan with an interest rate that violates § 1831d and sells

8    that loan to a non-bank that continues to charge that rate," because § 1831d (b) does not apply to

9    non-banks and thus non-banks would not face liability for violating the statute.  This argument

10   misstates the operation of the Final Rule.  The Final Rule does not permit buyers to charge a rate

11   that violates 1831d, and the buyers would not "enjoy" any protections under either § 1831d or the

12   Final Rule; to the contrary, if a rate violates § 1831d when the loan is originated by the bank, loan

13   buyers cannot charge that rate under the Final Rule because the validity of the interest is deter-

14   mined "when the loan is made" (AR 213).  Thus, there is no loophole created by the Final Rule.

15        Plaintiffs' arguments with respect to § 1735f-7a are equally incorrect.  Plaintiffs argue that

16   Congress provided that § 1831d "applies to certain entities, which it expressly gave the right to

17   'take, receive, reserve, and charge' specified interest rates," and by contrast, Congress provided

18   that § 1735f-7a "applies to certain mortgage loans, using the passive phrase '[state rate caps]

19   which may be charged, taken, received, or reserved shall not apply to any loan,' because the focus

20   is on the loan, not the entity charging or taking interest."  Opp. 6.  But Plaintiffs read too much

21   into any semantic distinction between the employment of the active voice in one statute and the

22   passive voice in the other.  The usage of a passive phrase in §1735f-7a does not necessarily show

23   Congress intended to focus "on the loan" as Plaintiffs claim.  But ultimately, the distinction does

24   not matter.

25        Plaintiffs distort the language and operation of the two statutes by arguing that "the struc-

26   ture of § 1735f-7a's text makes clear that its *preemption applies to certain loans* (which, Plain-

27   tiffs agree, are made by specified entities), whereas the structure of § 1831d's text makes clear

28   that its *preemption applies to FDIC Banks* (with respect to loans they make)."  Opp. 7.  Preemp-

6

tion does not "apply" to either loans or banks—rather, it applies to state statutes or laws: it is state statutes that are preempted, more precisely state statutes imposing interest rate caps. And such state interest caps are preempted by the two federal statutes, not by loans or by banks. Specifically, § 1831d preempts the application of all state rate caps other than those of the bank home's state to loans made by state banks, and § 1735f-7 preempts the application of all state caps to certain mortgage loans made by banks and other statutorily-specified entities.

To be sure, § 1831d accomplishes its result by stating that *banks* may charge certain rates "on any loan or discount made." But the banks versus loans distinction does not bear the weight Plaintiffs ascribe to it. The banks' right to charge is not separate and apart from loans: banks do not charge interest rates in the ether. Rather, they charge interest on *loans* and other debt instruments, as confirmed by the statute's express language that banks may charge those rates "on any loan or discount made." 12 U.S.C. § 1831d. Thus, the effect of both statutes is that state rate caps do not apply to loans made by specified entities: FDIC banks (§ 1831d) and banks and other statutorily-specified entities (§ 1735f-7). *See* FDIC Br. 13 (describing entities to which § 1735f-7 applies). Plaintiffs' arguments under *Barnhart v. Sigmon Coal Co., Inc.*, 534 U.S. 438 (2002), premised on their insupportable distinction between the operation of the two statutes, fail as well.

Finally, Plaintiffs also argue more generally that the Final Rule does not satisfy Step One because the statutory silence on transfer does not create a gap on that issue, but indicates that Congress did not intend to allow banks to transfer loans made under the authority of § 1831d. But that cannot be the case because, as explained, courts routinely allow the transfer of statutory rights even where such statutes are silent on transfer. If, as Plaintiffs claim, silence were tantamount to a Congressional prohibition on transfer, none of these cases could have reached the result they reached. *See, e.g.*, *Olvera*, 431 F.3d at 286, 289 (the assignee of a debt [agreement] . . . is free to charge the same interest rate that the assignor . . . charged the debtor," even if, unlike the assignor, "the assignee does not have a license that expressly permits the charging of a higher rate"); *see also Strike.*, 92 Cal. App. 3d at 745 (concluding that the assignee of a bank note could continue to receive the rate the assigning bank could, even if the assignee was not expressly exempted by the statute from usury law). Thus, the Final Rule passes *Chevron* Step One.

7

### B. The Final Rule Represents A Permissible Interpretation Of The Statute And Thus Should Be Upheld Under *Chevron*'s Deferential Step Two

"[T]he second step of *Chevron* . . . asks whether the [agency's] rule is a 'reasonable interpretation'" of the statute. *Mayo Found. for Med. Educ. & Research v. United States*, 562 U.S. 44, 58 (2011). Accordingly, "[a]n agency interpretation that enjoys *Chevron* status must be upheld if it is based on a reasonable construction of the statute." *Nw. Ecosystem All. v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136, 1143 (9th Cir. 2007). The FDIC's construction of the statute is reasonable, and thus should be upheld. As the Final Rule explained, "[t]he FDIC used its banking expertise to fill the gaps in section 27, and its interpretation is grounded in the *terms* and *purpose* of the statute, read within their proper historical and legal *context*." AR 214 (emphases added). Specifically, as demonstrated in the FDIC's opening brief, the FDIC's interpretation: carries out the purpose of the statute, whereas Plaintiffs' contrary interpretation would frustrate it; interprets statutory terms in accordance with their common industry understanding and their proper historical and legal context, whereas Plaintiffs' interpretation ignores that context; is consistent with well-established principles of contract law regarding the assignment of contracts, whereas Plaintiffs' interpretation would require the untenable conclusion that Congress made an extreme departure from those principles through mere silence; and provides a workable rule that is consistent with the parties' expectations at the time the loan was made. FDIC Br. 10-20.

The Final Rule sensibly explained why the FDIC's interpretation best comports with the statute's purpose to allow banks to make loans charging the rates permitted by the statute. AR 215. Relying on its expertise, the FDIC reasonably concluded that "[a]bsent the power to assign loans made under section 27, reliance on the statute could ultimately hurt State banks (instead of benefiting them) should they later face a liquidity crisis or other financial stresses. The FDIC's interpretation of the statute helps prevent such unintended results." *Id*. This is because "[t]he power to assign is indispensable in modern commercial transactions, and even more so in banking: State banks need the ability to sell loans in order to properly maintain their capital and liquidity." *Id*. As the Supreme Court explained almost two centuries ago, "in managing its property in legitimate banking business, [a bank] must be able to assign or sell those notes when necessary

8

and proper, as, for instance, to procure more [liquidity] in an emergency, or return an unusual amount of deposits withdrawn, or pay large debts." *Id.* (citing *Planters*). These principles apply with added force in modern times. Loan sales and securitizations provide banks with a key "funding, capital, and risk management tool" by allowing banks "to obtain lower cost funding, diversify [their] funding sources, . . . and increase [their] ability to manage interest rate risk." FDIC, Credit Card Securitization Manual, Introduction (2007), https://www.fdic.gov/regulations/examinations/credit_card_securitization/ch1.html. Loan sales also help banks maintain safe asset concentration levels. *Id.* In light of these concerns, the FDIC reasonably concluded that Congress could not have intended to give banks a right to make loans hampered by significant impairments to the loans' resale value and liquidity such as would occur if a bank could not transfer enforceable rights in the loans they made.

Plaintiffs respond that the FDIC is wrong about the statute's text and purpose. Opp. 21, 3-4. According to Plaintiffs, the statute was not intended to allow banks to make loans charging the interest rates permitted by § 1831d. Opp. 21, 3-4, 9. Rather, the statute's purpose was to provide competitive equality. *Id.* at 3-4. In their view, "FDIC reads into § 1831d a power to make loans that does not exist in the statute" because Congress "did not grant FDIC Banks the power to make loans in § 1831d or anywhere else." *Id.* at 9. As shown, Plaintiffs' oversimplification of the statutory purpose is incorrect. The statute undoubtedly seeks to ensure competitive equality between state and national banks, but the way through which Congress ensured competitive equality was by patterning § 1831d after § 85, and allowing state banks to make loans charging the same rates under § 1831d as national banks were allowed to charge under § 85. Moreover, the statute's history confirms that § 1831d was designed to enable state banks to *make* loans so as to alleviate the credit crunch prevalent in the state banking sector at the time of § 1831d's enactment in 1980, and to "assure that borrowers could obtain credit in states with low usury limits" (*Gavey Properties/762 v. First Fin. Sav. & Loan*, 845 F.2d 519, 521 (5th Cir. 1988)). "As the 1970s wound down, the Nation was caught in the throes of a devastating credit crunch. Interest rates soared." *Greenwood Trust Co. v. Massachusetts*, 971 F.2d 818, 826–27 (1st Cir. 1992). Unable to make loans at the low rates required by state usury laws, state banks could not

9

serve their customers' demand for credit and were thus "being battered by competition from national banks that were allowed to charge higher rates of interest by federal law." *Gavey*, 845 F.2d at 521. The state banks' inability to make loans charging the rates permitted to national banks further deepened the credit crunch and reduced borrowers' access to credit. Congress therefore enacted § 1831d in order to level the playing field between state and national banks, and to "assure that borrowers could obtain credit in states with low usury limits." *Id.* Thus, there is no merit to the argument that the statute was not intended to allow banks to make loans at the rates permitted by § 1831d and § 85.

Plaintiffs' related argument that state banks' *only* power to make loans derives from state law, not § 1831d, is similarly flawed. Opp. 9. § 1831d allows banks to charge the federal commercial paper rates, which can exceed the rates allowed by the bank's home state. In such circumstances, state law would not allow banks to make such loans, but § 1831d would allow it, thus showing that the power to make loans charging the rates permitted by § 1831d is derived from § 1831d itself, not state law. And because the Final Rule is construing § 1831d, a federal statute, and the right to make loans charging the rates permitted by § 1831d is granted by the federal statute itself, not by state law, the Final Rule is not construing state law. As the Supreme Court stressed in interpreting § 85 and its predecessor, federal law—not state law—determines whether a bank-made loan is in compliance with the federal statute and therefore not usurious: "federal law . . . completely defines what constitutes the taking of usury by a national bank, referring to the state law only to determine the maximum permitted rate." *Evans v. National Bank of Savannah*, 251 U.S. 108, 114 (1919); *Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 10 (2003). Plaintiffs' remark that *Evans* involved a national bank misses the mark: the law is clear that the two statutes must be interpreted in *pari materia* because § 1831d was patterned after § 85.

Moreover, as Plaintiffs concede, the statute gives banks the right "to charge and receive interest at specified rates on the loans they hold." Opp. 3. As explained, the banks' right to charge interest is not separate and apart from the loans: banks do not charge interest rates in the ether. Rather, they charge interest on loans and other debt instruments, as confirmed by the statute's express language that banks may charge those rates "on any loan or discount made." 12

10

Def.'s Reply in support of Mot. for Summ. J. (20-5860-JSW)

U.S.C. § 1831d. Thus, by giving banks the right to charge certain rates "on any loan or discount made," the statute necessarily gives them the right to make such loans in the first place, and not merely to hold them. It is actually Plaintiffs who add words not in the statute by arguing that the statute gives banks a right to charge certain rates "on the loans they *hold*" (Opp. 3) when the statute actually says the bank can charge such rates "on any loan or discount *made*" by the bank.

Because § 1831d gives banks the right to make loans charging the permitted rates, the FDIC's interpretation of § 1831d is also consistent with the "proper historical and legal context" of such power. AR 214. That context showed that a bank's power to make loans (there, by discounting notes) was commonly understood as *implicitly* carrying with it the power to transfer those loans. AR 214-15 (citing *Planters' Bank of Miss. v. Sharp*, 47 U.S. 301, 322-23 (1848) ("in managing its property in legitimate banking business, [a bank] must be able to assign or sell those notes . . . as, for instance, to procure more [liquidity] in an emergency, or return an unusual amount of deposits withdrawn, or pay large debts")). Plaintiffs argue that *Planters* is distinguishable because the bank in *Planters* had an express right to "alien or dispose" of chattels and other goods. Opp. 10. But the Supreme Court decision announced broader principles. As the Court explained, "what is necessary and proper to be done to carry into effect express [statutory] grants, and which is nowhere forbidden, may in most cases be lawful." *Planters*, 47 U.S. 301, 322-23. "Hence a [bank's] power to dispose of its notes, as well as other property, may well be regarded as an *incident* to its business as a bank to discount notes, which are required to be in their terms assignable, as well as an *incident* to its right of holding them and other property, when no express limitation is imposed on the authority to transfer them." *Id*. (emphases added); *see also id*. (explaining that the bank's "necessarily implied authority" to transfer notes arising from its business as a bank to discount notes strengthens the "correctness of the conclusion" the Court reached based on the bank's express right to "alien or dispose" of property).

The reasonableness of the FDIC's interpretation is further underscored by court decisions adopting a similar interpretation of other statutes that granted rights to charge usury-exempt interest rates to specific entities only. Those courts allowed transfer in order to avoid frustrating the purpose of such statutes. In *Strike*, the court interpreted a statute that is silent on transfer to im-

11

plicitly allow banks to transfer enforceable rights in the loan's interest-rate terms, because loans sales to the "secondary market" would be "uneconomic" if assignees could not enforce those rates. 92 Cal. App. 3d at 745. In *Olvera*, the Seventh Circuit also interpreted a statute that is silent on transfer to allow assignees to enforce the rates of validly-made loans, as a contrary interpretation would produce "senseless" results that could not have been intended by the legislature. 431 F.3d at 287. These cases confirm that the FDIC's interpretation best comports with the purpose of the statute. But even if the FDIC's interpretation were not the best interpretation of the statute, the Court should still defer to the agency's judgment. Because the standard of review is highly deferential, the agency's view need not be "the only possible interpretation, nor even the interpretation deemed *most* reasonable by the courts." *Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208, 218, (2009) (emphasis in original).

Plaintiffs claim that the Final Rule does not provide a permissible interpretation because it expands preemption to non-banks. Opp. 20. But the rule does no such thing. Rather, the Final Rule regulates the conduct and rights of banks when they sell, assign, or transfer loans. *See* FDIC Br. 15-16. They also claim that the FDIC's interpretation is unreasonable because it fails to take into account the presumption against preemption. Opp. 20. But the presumption against preemption does not apply here. As the FDIC showed, the Supreme Court held in *Smiley* that the presumption does not apply to a rule that as here merely interprets the substantive scope of a statute, as opposed to addressing the question of whether the statute is preemptive. *Smiley v. Citibank (South Dakota), N.A.*, 517 U.S. 735, 744 (1996) (the argument invoking the presumption "confuses the question of the substantive (as opposed to pre-emptive) meaning of a statute with the question of whether a statute is pre-emptive. . . . [The latter question] is not the question at issue here; there is no doubt that § 85 pre-empts state law"). *Cuomo* is not to the contrary. Plaintiffs contend that in *Cuomo*, "[t]he Supreme Court has squarely rejected the claim that rules 'merely interpret[ing]' a statute's meaning are not preemptive." Opp. 21. But the Supreme Court did not agree that the regulation at issue there merely interpreted the statue's substantive scope. The dissent claimed that the regulation merely interpreted the statute's substantive meaning, but the Supreme Court did not accept the dissent's claim, explaining that the "regulation *is contained within a sub-*

12

Def.'s Reply in support of Mot. for Summ. J. (20-5860-JSW)

*part* of the Comptroller's regulations on Bank Activities and Operations *that is entitled "Preemption." Cuomo v. Clearing House Ass'n, L.L.C.*, 557 U.S. 519, 535 (2009). Plaintiffs also fail to disclose that the regulation at issue in *Cuomo* established that "[s]tate officials may not … prosecut[e] enforcement actions" against national banks. *Id*. Thus, far from being a "mere interpretation," the very language of the rule at issue affirmatively prohibited state officials from engaging in certain actions authorized under state law. By contrast, the Final Rule here imposes no such prohibition, is not contained in a subpart entitled Preemption, and only interprets the substantive meaning of the statute.

## II. Plaintiffs' *State Farm* Arguments Are Unavailing

As shown above, the Final Rule satisfies *Chevron* because it is reasonable. And because the rule is reasonable, it is by definition not arbitrary or capricious. *Harkonen v. DOJ*, 800 F.3d 1143, 1150 (9th Cir. 2015) ("the highly deferential standard of review at Step Two of the *Chevron* analysis . . . . leads to the conclusion [that the agency's interpretation] was not arbitrary and capricious"). The analysis is "the same" under either *State Farm* or *Chevron* Step Two "because under *Chevron* step two, we ask whether an agency interpretation is 'arbitrary or capricious in substance.'" *Judulang v. Holder,* 132 S.Ct. 476, 483 n.7 (2011). And because *Chevron* Step Two and the arbitrary and capricious standard overlap, courts routinely uphold regulations under *Chevron* Step Two without further analyzing whether the regulation is arbitrary and capricious under the *State Farm* factors. *See, e.g.*, *Harkonen*, 800 F.3d at 1150; *Mayo,* 562 U.S. at 57. "The same points that address [Plaintiffs'] *Chevron* Step Two claim also make it clear that their arbitrary and capricious claim fails." *Agape Church, Inc. v. FCC*, 738 F.3d 397, 410 (D.C. Cir. 2013).

Plaintiffs concede the overlap between the *State Farm* factors and *Chevron* Step Two (Opp. 23), but claim that the overlap only goes to substantive factors, and that a regulation can fail as procedurally inadequate under *State Farm* even if it is substantively worthy of deference under *Chevron* (Opp. 22-23). As shown below, Plaintiffs' argument fails for three reasons. First, whether a regulation can fail as procedurally inadequate under *State Farm* has nothing to do with this case because FDIC complied with the procedural requirements imposed by the APA. Plaintiffs attack the substance of the FDIC's reasoning, not the FDIC's compliance with the APA's

13

procedural requirements. Second, Plaintiffs' reliance on *State Farm* is also misplaced because *State Farm* involved an agency's change in position, not an agency's first interpretation of a statute as here. Moreover, *State Farm* involved an agency's rescission of an evidence-based safety standard for automobiles not the agency's interpretation of a statute and thus provides a poor fit for analyzing rules such as here that interpret the meaning of a statutory provision. Third, even if *State Farm* applies, Plaintiffs have not shown an APA violation.

## A. The FDIC Complied With The Procedural Requirements Imposed By The APA

The FDIC complied with the three procedural requirements imposed by the APA, which are found in 5 U.S.C. § 553: (1) it published a notice of proposed rulemaking that included "a statement of the time, place, and nature of public rule making proceedings; reference to the legal authority under which the rule is proposed; and either the terms or substance of the proposed rule or a description of the subjects and issues involved" (§ 553(b)) (see AR 50-51, 43-44; 222); (2) it gave interested persons "an opportunity to participate in the rule making through submission of written data, views, or arguments" (§ 553(c)) (see AR 214-218), and (3) it incorporated in the Final Rule a reasonable explanation for the rule that complies with (and exceeds) the APA's requirement that the agency provide "a concise general statement of [the rule's] basis and purpose" (§ 553(c)) (see AR 210-211; 213-218). The APA requires nothing more in terms of rulemaking procedures. *United States v. Allegheny-Ludlum Steel Corp.*, 406 U. S. 742, 758 (1972). Nothing in Plaintiffs' briefs attacks the rulemaking as failing to meet any one of these procedural requirements. Therefore, Plaintiffs' attempt to avoid *Chevron* on procedural grounds is baseless.

*State Farm* does not impose additional procedural requirements beyond those imposed by § 553 of the APA. *Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 524 (1978) (listing the three procedural requirements in § 553 as "establish[ing] the maximum procedural requirements which Congress was willing to have the courts impose upon agencies in conducting rulemaking procedures."). Indeed, the *State Farm* factors on which Plaintiffs rely are not procedural. Rather, Plaintiffs attack the agency's substantive reasoning. Plaintiffs claim that FDIC failed to consider what they deem to be important aspects of the problem (true lender and rent-a-

14

bank issues); that FDIC's analysis is inadequate; and that FDIC reversed its position. Opp.24. But as FDIC's opening brief showed, FDIC considered and answered the comments raising true lender and rent-a-bank issues issue—Plaintiffs simply disagree on the merits with FDIC's responses to those comments (see FDIC Br. 22-23, AR 216-17). Such *substantive* disagreements with the agency's reasoning do not establish procedural inadequacy. Whether or not the *State Farm* factors on which Plaintiffs rely may be procedural in other contexts, they are certainly not procedural here.

Similarly, Plaintiffs' argument that FDIC's analysis is inadequate attacks the substance of FDIC's reasoning, not the agency's compliance with § 553's procedural requirements. Indeed, one cannot decide whether FDIC's explanation is adequate without exercising substantive judgment about the merits of that explanation, which is already done as part of the *Chevron* reasonableness inquiry. *See, e.g., Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 175-76 (2007) (rejecting argument that the agency's explanation was procedurally inadequate because it failed to take proper account of one issue by pointing out that this argument "repeats in different form arguments that we have already considered and rejected" as part of the *Chevron* statutory interpretation analysis discussed earlier in the opinion). Finally, FDIC did not change its interpretation in the Final Rule, and in any event, that is not a procedural issue either. Accordingly, Plaintiffs' "procedural" arguments are a red herring because Plaintiffs challenge the agency's substantive reasoning, not its compliance with the APA's procedural requirements.

**B. *State Farm* Does Not Apply To An Agency's First Interpretation Of A Statute, And The Final Rule Is Not Inconsistent With Any Prior Interpretation**

Plaintiffs' reliance on *State Farm* is also misplaced because that decision addressed an agency's change in position, not an agency's first interpretation of a statute as here. *Catskill Mountains Chapter of Trout Unlimited, Inc. v. EPA*, 846 F.3d 492, 521, 523-24 (2d Cir. 2017). While the Ninth Circuit has not previously addressed this specific issue, Plaintiffs provide no reason why the Ninth Circuit would depart from *Catskill Mountains*' conclusion that "*State Farm* review may be appropriate in a case involving a non-interpretive rule or a rule setting forth a changed interpretation of a statute," but not in a case involving an agency's first interpretation of

15

Def.'s Reply in support of Mot. for Summ. J. (20-5860-JSW)

a statute. *Id*. at 521. That conclusion is well-reasoned and supported by Supreme Court precedent. *Id*. at 521-24. The Supreme Court cautioned that *State Farm* is "inapposite to the extent that it may be read as prescribing more searching judicial review" in a case involving an agency's "first interpretation" of a statute. *Verizon Commc'ns Inc. v. FCC*, 535 U.S. 467, 502 n.20 (2002). Consistent with *Catskill Mountains*, the Supreme Court has upheld regulations under *Chevron* without considering the *State Farm* factors. *Smiley*, 517 U.S. at 739; *Mayo,* 562 U.S. at 57. *Altera Corp. & Subsidiaries v. CIR*, 926 F.3d 1061 (9th Cir. 2019), is not to the contrary because it did not involve an agency's first interpretation of a statute, and *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117 (2016) similarly involved the distinguishable situation of an agency that changed its position.

Moreover, the *State Farm* factors provide a poor fit for rulemakings that concern pure issues of statutory interpretation as here. The *State Farm* factors are a better fit for data-driven rulemakings concerning rates or safety standards; indeed, the agency in *State Farm* was tasked with setting safety standards based on findings supported by "substantial evidence on the record." 463 U.S. at 44. The agency in *State Farm* did not engage in statutory interpretation; rather, it revoked a safety standard because it was no longer able to find that such standard "would produce significant safety benefits." 463 U.S at 38. By contrast, the FDIC's Final Rule is concerned with ascertaining the meaning of the statute, not with finding evidence of safety benefits.

Plaintiffs nevertheless attempt to salvage their *State Farm* argument by claiming that FDIC took inconsistent positions. That argument is utterly meritless. The FDIC has never taken a position inconsistent with the rule's conclusion that the validity of a loan's interest rate is determined at the loan's inception: FDIC has never addressed this issue before. Therefore, there is no prior interpretation with which the Final Rule conflicts.

### C. Even If *State Farm* Applied, The Final Rule Is Not Arbitrary And Capricious

But even if *State Farm* applied, Plaintiffs' arguments that FDIC does not meet that standard are incorrect. Plaintiffs incorrectly argue that the Final Rule failed to consider comments raising rent-a-bank and true lender concerns. But as FDIC's opening brief showed, FDIC considered and answered the comments raising true lender and rent-a-bank issues issue—Plaintiffs simply

16

disagree on the merits with FDIC's responses to those comments (FDIC Br. 22-23, AR 216-17). Contrary to Plaintiffs' suggestions, the FDIC's responses were adequate. As the Final Rule explained, it is designed to address the statutory ambiguity on the timing and transfer gaps, and to protect the banks' ability to engage in legitimate transactions such as securitizations and other loan transfers that do not implicate rent-a-bank or true lender issues. AR 216 (noting that "many" transfer transactions do not implicate rent-a-bank or true lender issues, including that in *Madden v. Midland Funding*, LLC, 786 F.3d 246 (2d Cir. 2015), where the bank validly made the loan and did not sell it to a non-bank debt collector "until three years after the consumer opened the account"). The Final Rule also explained that given the many transfer transactions not implicating rent-a-bank or true lender concerns, those two concerns are "not so intertwined" with the rulemaking "that they must be addressed simultaneously by rulemaking." AR 216. The rule also explained why it was entirely permissible for the FDIC to make the transfer issue a priority. Agencies have discretion on how to handle related, yet discrete, issues in terms of priorities and need not solve every problem before them in the same proceeding. *Taylor v. FAA*, 895 F.3d 56, 68 (D.C. Cir. 2018); *see also FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 522 (2009) ("[n]othing prohibits federal agencies from moving in an incremental manner" to address regulatory problems).

Plaintiffs' related contention that the Final Rule is inconsistent with the FDIC's position on rent-a-bank schemes (and that the rule does not address that inconsistency) is meritless. There is no inconsistency. To be sure, FDIC has previously stated that it does not condone rent-a-bank schemes. But it has continuously reaffirmed that position, including in the Final Rule. Plaintiffs' suggestion that the rule nevertheless conflicts with FDIC's position on rent-a-bank schemes because some banks could abuse the rule to facilitate such schemes also fails. There is no conflict because the FDIC has never taken a position on how to balance the policy considerations that may arise in connection with the rule: the FDIC never suggested that rent-a-bank concerns trump the FDIC's concerns with protecting banks' rights in legitimate transfer transactions such as securitizations and other transfers that do not involve rent-a-bank or true lender issues that are placed at risk by the statutory ambiguity. In balancing the various policy considerations, the FDIC con-

17

Def.'s Reply in support of Mot. for Summ. J. (20-5860-JSW)

cluded it was reasonable to issue the Final Rule. That policy balancing is precisely the type of agency determination to which courts defer under either *Chevron* or *State Farm*. Moreover, as the Final Rule explained in addressing true lender and rent-a-bank concerns, "[a]gencies have discretion in how to handle related, yet discrete, issues in terms of priorities and need not solve every problem before them in the same proceeding." AR 216 n.59 (citing cases).

Plaintiffs also contend that the rule "ignore[d] evidence that contradicts the agency's premise that the inability to transfer preemption of state rate caps constrains bank liquidity." Opp. at 25. But the evidence does not contradict the agency's premise, because the premise described by Plaintiffs is not the FDIC's premise: it is a straw man of Plaintiffs' own creation. As the FDIC explained, "the FDIC does not argue that 'rate caps constrain bank liquidity'—it argues that banks' inability to transfer enforceable rights in the loans they made constrains the loans' value and liquidity." FDIC Br. 25. Moreover, as the FDIC explained, Plaintiffs' opening brief merely made a terse, one-sentence contention that the record contains "evidence" that contradicts the FDIC's "premise that state rate caps constrain bank liquidity. *Id*. "But Plaintiffs do not tell the Court what that 'evidence' is; what the FDIC's responses were to the comment providing that 'evidence'; and why they should prevail notwithstanding those responses. Plaintiffs' one-sentence contention therefore fails for lack of adequate briefing." *Id*. But even if Plaintiffs' contention were not waived, it fails because, as discussed, Plaintiffs' "evidence" responds to the wrong premise.

Plaintiffs also argue that the FDIC may not "rely on speculation about *Madden's* negative effects" to issue the Final Rule. Opp. at 25. But the FDIC did no such thing. The FDIC did not rely on speculation, but grounded the rule on accepted tools of statutory construction coupled with the agency's own banking expertise. As the Final Rule explained, "[t]he FDIC used its banking expertise to fill the gaps in section 27, and its interpretation is grounded in the *terms* and *purpose* of the statute, read within their proper historical and legal *context*." AR 214 (emphases added). An agency "is entitled to invoke its experience as a justification for" its rule. *Peck v. Thomas*, 697 F.3d 767, 775-76 (9th Cir. 2012). Moreover, as the FDIC already explained, the rule was not targeted to address "*Madden's* negative effects," but the two statutory gaps in the

18

statute, which exist independent of *Madden*. FDIC Br. at 24 (citing AR 210, 212). Thus, the FDIC's basis for the rule has nothing to do with any "speculation about *Madden's* negative effects." Plaintiffs' related argument—that the rule is allegedly contrary to evidence in the record, namely the FDIC's statement in the NPR that it "is not aware of any widespread or significant negative effects" as a result of the *Madden* decision—is equally flawed. Opp. 25. Plaintiffs have not identified any statement in the Final Rule that is contradicted by the remark in the NPR, and thus the NPR remark cannot be described as "evidence" that is contrary to the rule. To the extent Plaintiffs merely meant to refer to their initial argument that the NPR remark shows a "lack of expected cause-and-effect between the Provision and the problem it purports to address" (Br. 22), this argument fails as well because Plaintiffs misstate the problem addressed by the Final Rule: the rule addresses the two statutory gaps, not the *Madden* decision. AR 210, 212. Moreover, Plaintiffs read the remark out of context. As the Final Rule explained, the NPR remark simply meant that there were no widespread negative effects from the *Madden* decision because the effects were "generally limited to the Second Circuit states in which the decision applied." AR 216. Plaintiffs' cause-and-effect argument also fails because it implies that an agency may not engage in a rulemaking that interprets a statutory gap without providing evidence that widespread negative effects would occur (or have occurred) absent the regulation. But this is not the law. Before issuing a rule, an agency need not find that problems that need solving exist in the industry. Rather, the agency can decide that the problem it will address is the gap or ambiguity in the statute. The FDIC filled that gap in a reasonable way, and its rule should therefore be upheld.

## CONCLUSION

For these reasons, this Court should grant FDIC's Motion for Summary Judgment and deny Plaintiffs' Cross-Motion for Summary Judgment.

Dated:  July 15, 2021

FEDERAL DEPOSIT INSURANCE CORPORATION
Barbara Katron (DC Bar #387970)
Senior Counsel, Corporate Litigation Unit


By:      /s/ Erik Bond
Erik Bond (NY Bar Reg. #4316030)
Andrew Dober (CA Bar #229657)
Counsel, Corporate Litigation Unit
Minodora D. Vancea (DC Bar #492335)
Counsel, Appellate Litigation Unit

3501 N. Fairfax Drive, D-7026
Arlington, VA 22226
Telephone: (703) 562-6461
Fax: (703) 562-2477
erbond@fdic.gov
adober@fdic.gov

20

Def.'s Reply in support of Mot. for Summ. J. (20-5860-JSW)