1
2
3
4

UNITED STATES DISTRICT COURT

5

NORTHERN DISTRICT OF CALIFORNIA

6

7   PEOPLE OF THE STATE OF
    CALIFORNIA, et al.,

Case No.  20-cv-05860-JSW

8                        Plaintiffs,

**ORDER RESOLVING CROSS-
MOTIONS FOR SUMMARY
JUDGMENT**

9       v.

10   FEDERAL DEPOSIT INSURANCE
     CORPORATION,

Re: Dkt. Nos. 47, 56

11
                         Defendant.
12
13
14
15        In this case, Plaintiffs[1] allege that Defendant, the Federal Deposit Insurance Corporation

16   ("FDIC"), violated the Administrative Procedure Act ("APA") when it promulgated a portion of a

17   final rule entitled *Federal Interest Rate Authority Rule.  See* 85 Fed. Reg. 44,146 (July 22, 2020)

18   ("FDIC Rule").  Currently before the Court are the parties' cross-motions for summary judgment.

19   The Court has considered the parties' papers, the amicus briefs, the administrative record (Dkt.

20   Nos. 44-1 through 44-3), and relevant legal authority.[2]  The Court HEREBY DENIES Plaintiffs'

21   motion and GRANTS the FDIC's cross-motion.

22   //

23   ─────────────────────

24   [1]      Plaintiffs are the States of California, Illinois, Minnesota, New Jersey, New York, and
     North Carolina, the Commonwealth of Massachusetts, and the District of Columbia.

25   [2]      The Court has considered amicus briefs in support of Plaintiffs' motion filed by: Professor
     Adam J. Levitin; and the Center for Responsible Lending, the National Coalition for Asian Pacific
26   American Community Development, and the National Consumer Law Center.  (Dkt. Nos. 50, 55.)
     It also has considered amicus briefs in support of the FDIC's motion filed by: the American
27   Fintech Council; and the Bank Policy Institute, the Structured Finance Association, the American
     Bankers Association, the Consumers Bankers Association, and the United States Chamber of
28   Commerce.  (Dkt. Nos. 70-71.)

# BACKGROUND

The FDIC has primary regulatory and supervisory responsibility over federally insured state-chartered banks ("FDIC Banks"). *See* 12 U.S.C. §§ 1811, 1819(a)(Tenth). Plaintiffs, and at least 38 other states, have placed caps on interest rates that lenders can charge on consumer loans as a means to combat predatory lending. *See, e.g.,* Cal. Fin. Code §§ 22303-22306; N.Y. Gen. Oblig. Law §§ 5-501, 5-11; N.Y. Banking Law § 14-a.

National banks are not subject to those state interest-rate caps; as a result, they can "export" their home state's interest rate to states where their borrowers live. *See, e.g., Marquette Nat. Bank of Minneapolis v. First of Omaha Serv. Corp.*, 439 U.S. 299, 301 (1978). Congress later gave FDIC Banks that same privilege in Section 27 of the Federal Deposit Insurance Act ("FDIA"), which was enacted as part of the Depository Institutional Deregulation and Monetary Control Act of 1980 ("DIDMCA"). *See, e.g., Greenwood Trust Co. v. Massachusetts*, 971 F.2d 818, 827 (1st Cir. 1992) ("The historical record clearly requires a court to read the parallel provisions of [DIDMCA] and the [National] Bank Act *in pari materia*."). Section 27 provides, in relevant part, that:

> [i]n order to prevent discrimination against [FDIC Banks] with respect to interest rates, if the applicable rate prescribed in this subsection exceeds the rate such [FDIC Bank] would be permitted to charge in the absence of this subsection, such [FDIC Bank] may, notwithstanding any State constitution or statute which is hereby preempted for the purposes of this section, take, receive, reserve, and charge on any loan or discount made, or upon any note, bill of exchange, or other evidence of debt, interest at a rate of not more than 1 per centum in excess of the discount rate on ninety-day commercial paper in effect at the Federal Reserve bank in the Federal Reserve district where such [FDIC Bank] is located or at the rate allowed by the laws of the State, territory, or district where the [FDIC Bank] is located, whichever may be greater.

12 U.S.C. § 1831d(a).

States may opt out of Section 27, and the FDIC Rule does not eliminate that option. *See* 12 U.S.C. § 1831d, note; 85 Fed. Reg., at 44,153.[3] "[I]f a State opts out of section 27, [FDIC

---

[3]      Massachusetts and North Carolina previously opted out but "either rescinded their respective opt-out statutes or allowed them to expire." FDIC Rule at 44,148 n.18.

United States District Court
Northern District of California

United States District Court
Northern District of California

1  Banks] making loans in that State could not charge interest at a rate exceeding the limit set by the

2  State's laws, even if the law of the State where the [FDIC Bank] is located would permit a higher

3  rate." *Id.*

4  　　According to Plaintiffs "some non-bank lenders have formed sham 'rent-a-bank'

5  partnerships designed to evade state rate caps." (Mot. at 4:4-6.)  In this situation, a third party will

6  partner with an FDIC Bank to originate the loan in question.  The FDIC Bank then transfers the

7  loan to the third party, which continues to charge the FDIC Bank's interest rate, even if it exceeds

8  the interest rate cap in the state where that third party is located.  (*See e.g.*, AR 361, 543, 844, 903-

9  05.)

10  　　In 2015, the Second Circuit held that a plaintiff's usury claims against non-bank debt-

11  collectors, which had been assigned a debt originated by a national bank, were not preempted by

12  the NBA.  *Madden v. Midland Funding*, LLC, 786 F.3d 246 (2d Cir. 2015).  Although the court

13  recognized that in some circumstances, "NBA preemption can be extended to non-national bank

14  entities," it determined the defendants were not acting as the national bank's agent and were not its

15  subsidiaries.  The court also determined that the originating bank no longer had any interest in or

16  control over the debt.  *Id.* at 249-52.  Instead, the debt collectors were acting "solely on their own

17  behalves, as the owners of the debt." *Id.* at 251.  On those facts, the court reasoned that applying

18  state usury laws would not significantly interfere with the national bank's activities and "would

19  limit only activities of the third party which are otherwise subject to state control, and which are

20  not protected by federal banking law or subject to OCC oversight." *Id.* (internal quotations,

21  citations, and brackets omitted).[4]

22  　　The FDIC asserts that Section 27 contains two gaps: (1) the time at which the validity of

23  the interest rate should be assessed; and (2) the components of the right to make loans at rates

24  permitted by an FDIC Bank's home state, including the impact of transfer on the validity of

25

26

27  ───────────────

[4]　Legislative efforts to overturn *Madden* were not fruitful.  *See, e.g.*, S. 1642, 115th Cong.
(2017-18), https://www.congress.gov/bill/115-congress/senate-bill/1642; H.R. 3299, 115th
28  Cong. (2017-18), https://www.congress.gov/bill/115-congress/house-bill/3299.

interest rates.  FDIC Rule, 85 Fed. Reg. at 44,416.[5]  It also concluded that the "*Madden* decision

… created uncertainty as to the ability of an assignee to enforce the interest rate provisions of a

loan originated by a bank."  *Id.* at 44,156; *see also id.* at 44,416 (stating *Madden* "highlighted the

need to issue clarifying regulations addressing the legal ambiguity in" Section 27.)  Accordingly,

it began rule-making proceedings to address those issues.  *Id.*; *see also Federal Interest Rate*

*Authority*, 84 Fed. Reg. 66,845 (Dec. 6, 2019) (notice of proposed rulemaking).

Plaintiffs only challenge the following portion of the FDIC Rule, which the Court refers to

as the "Interest Provision":

> Determination of interest permissible under [Section 1831d].
> Whether interest on a loan is permissible under [Section 1831d] is
> determined as of the date the loan was made.  Interest on a loan that
> is permissible under [Section 1831d] shall not be affected by … the
> sale, assignment, or other transfer of the loan, in whole or in part.

12 C.F.R. § 331.4(e).[6]

On June 20, 2020, the Office of the Comptroller of the Currency ("OCC") issued a similar

rule, *Permissible Interest on Loans That Are Sold, Assigned, or Otherwise Transferred* ("OCC

Rule"), 85 Fed. Reg. 33,530 (June 2, 2020), which has been challenged by some of the Plaintiffs

here.  *See California v. OCC*, No. 20-cv-5000-JSW.  The parties in that case also filed cross-

motions for summary judgment and have raised arguments that are similar to the arguments raised

in those motions.  The Court has addressed the arguments in the OCC case in a separate order.  *Id.*,

Dkt. No. 80 ("OCC Order").  As appropriate, the Court will incorporate by reference its analysis

from the OCC Order in this Order.

//

//

//

---

[5]     For ease of reference only, the Court shall refer to these as the "timing gap" and the "transfer gap."

[6]     The FDIC Rule also provides that the interest that is permissible under Section 1831d "shall not be affected by a change in State law" or by a "change in the relevant commercial paper rate after the loan was made[.]"

United States District Court
Northern District of California

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**ANALYSIS**

**A.    Standard of Review.**

Under the APA, a court shall "hold unlawful and set aside agency action, findings, and conclusions found to be-- (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; … (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or] (D) without observance of procedure required by law[.]"  5 U.S.C. §§ 706(2)(A), (C) (D).[7]  A court's "review of an agency's procedural compliance is exacting, yet limited."  *Kern Cty. Farm Bureau v. Allen*, 450 F.3d 1072, 1076 (9th Cir. 2006).  In contrast, "[t]he scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency.  Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  *Motor Vehicle Mfr. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1989) (internal quotations omitted) ("*State Farm*"); *see also Chevron U.S.A. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984) ("We have long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer ....").

**B.    The Court Upholds the Interest Provision.**

As a threshold issue, the Court addresses Plaintiffs' arguments that the FDIC exceeded its statutory authority when it promulgated the Interest Provision.  They argue the Interest Provision (1) permits the FDIC to impermissibly regulate the conduct of non-FDIC banks; and (2) the effect of the Interest Provision is to impermissibly preempt state law.  Unlike the OCC Rule, the FDIC's Final Rule is not contained in a section of the regulations relating to preemption.  Yet, unlike Section 85, Section 1831d expressly states that contrary state laws are preempted.

Congress granted the FDIC, through its Board of Directors, the power "to prescribe …

---

[7]      In the context of the APA, the Court does not follow the traditional summary judgment analysis set forth in Federal Rule of Civil Procedure 56.  That is because "there are no disputed facts that the district court must resolve."  *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769 (9th Cir. 1985).  Instead, the Court "determines whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did."  *Id.*

such rules and regulations as it may deem necessary to carry out the provisions of this chapter or of any other law which it has the responsibility of administering or enforcing (except to the extent that authority to issue such rules and regulations has been expressly and exclusively granted to any other regulatory agency)." 12 U.S.C. § 1819a(Tenth).  The Interest Provision does not purport to regulate either the transferee's conduct or any changes to the interest rate once a transaction is consummated.

Accordingly, the Court turns to the *Chevron* analysis.

### 1.    *Chevron* – Step One.

The first step in the *Chevron* analysis requires the Court to consider whether "Congress has directly spoken to the precise question at issue."  *Id.* at 842.  "If it has, Congress' resolution of the issue controls and the agency is not free to adopt an interpretation at odds with the plain language of the statute."  *Baldwin v. United States*, 921 F.3d 836, 842 (9th Cir. 2019).  "On the other hand, where Congress expressly or implicitly confers authority to fill in a gap in the enacted law or resolve a statutory ambiguity, [a court accords] the agency's ensuing decision considerable deference."  *Chevron*, 467 U.S. at 842 (citing *United States v. Mead Corp.*, 533 U.S. 218, 229 (2001)).  The Court uses "traditional tools of statutory construction" to conduct the step one analysis.  *Chevron*, 467 U.S. at 843 n.9.

The FDIC argues that it promulgated the rule to address the timing gap and the transfer gap.  Plaintiffs argue that there are no gaps to fill because Section 1831d unambiguously applies to entities, *i.e.* FDIC Banks.[8]  Applying the familiar tools of statutory construction, the Court begins with the language of the statute.  *See Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997).  Section 1831d provides, in part, that an FDIC Bank "may, notwithstanding any State constitution or statute which is hereby preempted for the purposes of this section, take, receive, reserve, and charge on any loan or discount made, or upon any note, bill of exchange, or other evidence of debt, interest at a rate of not more than 1 per centum in excess of the discount rate on ninety-day commercial paper in effect at the Federal Reserve bank in the Federal Reserve district where such [FDIC

---

[8]    Plaintiffs also argue that the FDIC lacks the authority to interpret state law.

6

United States District Court
Northern District of California

1    Bank] is located."

2          There is nothing in the text of Section 1831d that speaks to either of the issues the FDIC

3    addressed in the Interest Provision.  Plaintiffs repeat arguments the Court considered in connection

4    with the OCC Rule, including the fact that Section 1735f-7a speaks to interest rates on loans,

5    rather than entities.  The parties agree that Section 1831d was modeled on Section 85 and, as a

6    result, the two statutes have been construed *in pari materia*.  *See* 85 Fed. Reg. at 44,147;

7    *Greenwood Trust Co. v. Com. of Mass.*, 971 F.2d 818, 827 (1st Cir. 1992).  For reasons set forth in

8    the OCC Order, the Court finds those arguments unpersuasive.  *See* OCC Order at 12:9-13:9.

9          The text of Section 1831d also speaks to its purpose: "to prevent discrimination against

10   [FDIC Banks] with respect to interest rates[.]"  Plaintiffs argue this purpose "is effectuated by

11   allowing FDIC Banks to charge and receive interest at specified rates on the loans they hold…"

12   but is not served by extending Section 1831d's interest-rate privilege to non-banks.  (Plaintiffs'

13   Opp. & Reply at 3:22-25.)  This argument is a variation on Plaintiffs' theme that the FDIC

14   exceeded its statutory authority when it promulgated the Interest Provision.  For the reasons set

15   forth above, the Court does not find the argument persuasive.  Further, Plaintiffs neither dispute

16   that FDIC Banks are authorized to transfer or to sell loans nor dispute that "a contractual interest-

17   rate term might be transferred under the principles of contract law[.]"  (*Id.* at 17:3.)  For the

18   reasons set forth above and for reasons set forth in the OCC Order, the Court also is not persuaded

19   by Plaintiffs' argument that the Interest Provision is transferring the privilege of preemption.  *See*

20   OCC Order at 8:14-23; *see also id.* at 14:4-15:7.

21         The Court concludes Section 1831 does not address the issues at hand and proceeds to the

22   second step of the *Chevron* analysis.

23         **2.      *Chevron* – Step 2.**

24         Under the second step of the *Chevron* analysis, the Court defers to the FDIC's

25   interpretation of Section 1831d "so long as it 'is based on a permissible construction of the

26   statute.' … A permissible construction is one that is not 'arbitrary, capricious, or manifestly

27   contrary to the statute.'"  *Altera Corp. & Subs. v. Comm'r of Internal Revenue*, 926 F.3d 1061,

28   1075 (9th Cir. 2019) (quoting *Chevron*, 467 U.S. at 843-44).

United States District Court
Northern District of California

> This is a generous standard, requiring deference "even if the agency's reading differs from what the court believes is the best statutory interpretation." [*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980 (2005) ("*Brand X*")]. To determine whether [an agency's] interpretation is reasonable, "[a court looks] to the plain and sensible meaning of the statute, the statutory provision in the context of the whole statute and case law, and to the legislative purpose and intent." *Nat. Res. Def. Council v. U.S. Envtl. Prot. Agency*, 526 F.3d 591, 605 (9th Cir. 2008) (citation omitted).

*Or. Rest. and Lodging Ass'n v. Perez*, 816 F.3d 1080, 1089 (9th Cir. 2016); *see also Brand X*, 545 U.S. at 980 ("[A] ambiguities in statutes within an agency's jurisdiction to administer are delegations of authority to the agency to fill the statutory gap in reasonable fashion. Filling these gaps … involves difficult policy choices that agencies are better equipped to make than courts.").

For the reasons set forth above, the Court concludes that the FDIC's interpretation of Section 1831d is not manifestly contrary to the statute and concludes the Interest Provision is neither arbitrary nor capricious. Because Plaintiffs' challenge focuses on the Interest Provision, they do not address the other portions of the Final Rule. Those sections provide that the interest rate at the time a loan is made will be valid notwithstanding subsequent changes to the "relevant commercial paper rate" or to a change in state law. Looking at the Interest Provision in that larger context, the Court concludes it was not unreasonable for the FDIC to conclude its interpretation of Section 1831d would "protect[] the parties' expectations and reliance interests at the time when a loan is made[.]" 85 Fed. Reg. at 44,146.

The FDIC also cited to the fact that the ability to sell or transfer loans would assist FDIC Banks in "properly maintain[ing] their capital and liquidity." *Id.* at 44,151. As in his comments to the FDIC, Professor Levitin criticizes the FDIC's conclusion and argues that the Interest Provision simply impacts the size of a secondary market. (*See* Levitin Amicus Brief at 19:12-25:23.) The FDIC acknowledged that "available evidence suggested that *Madden's* effect on loan sales and availability of credit were generally limited to the Second Circuit states in which the decision applied[.]" 85 Fed. Reg. at 44,152. However, the FDIC also stated that it believed "there would be benefits to addressing the legal ambiguity in [Section 1831d] before these effects become more

1   widespread and pronounced." *Id.*  The Court concludes that it was not unreasonable for the FDIC

2   to determine that having greater certainty about when the validity of an interest rate should be

3   determined, including when a loan is subsequently transferred, would assist FDIC Banks to

4   properly maintain capital and liquidity.

5          The FDIC also noted that its interpretation was "consistent with" the "valid-when-made"

6   and "stand-in-the-shoes" principles.  85 Fed. Reg., at 44,149 (citing, *inter alia*, *Nichols v. Fearson*,

7   32 U.S. (7 Pet.) 103, 109 (1833); *Gaither v. Farmers' & Mechs.' Bank of Georgetown*, 26 U.S. (1

8   Pet.) 37, 43 (1828); *see also In re Rent-Rite Superkegs W., Ltd.*, 603 B.R. 41, 66 (Bankr. D. Colo.

9   2019), *reversed in part on other grounds and remanded by In re Rent-Rite Superkegs W., Ltd.*, 623

10  B.R. 335 (D. Colo. 2020).  Plaintiffs argue that the cases cited by the FDIC arose in different

11  factual circumstances or are inapposite because they involved national banks.

12         Although Plaintiffs' argument regarding the "valid-when-made" doctrine is persuasive, as

13  is Professor Levitin's analysis of it, the Court concludes the FDIC's determination that its

14  interpretation of Section 1831d is "consistent" with that doctrine does not render its interpretation

15  unreasonable.  As noted, the FDIC also stated that its interpretation was consistent with the

16  principle that an assignee steps into the shoes of an assignor.  Plaintiffs do not dispute that general

17  principle of law.  Instead, they again argue that the statutory right of preemption cannot be

18  assigned.  That argument, however, is based on the Plaintiffs' position that the Interest Provision

19  preempts state law, a position that the Court finds unpersuasive.

20         Accordingly, the Court concludes that the FDIC's interpretation of Section 1831d is not

21  unreasonable under *Chevron*.

22  **C.    The Interest Provision is Not Arbitrary or Capricious**

23         In addition to their arguments about why the FDIC's promulgation of the Interest Provision

24  is an unreasonable interpretation of Section 1831d, Plaintiffs argue the FDIC's decision was

25  arbitrary and capricious under *State Farm*.[9]  *See Altera*, 926 F.3d at 1075 (noting that *Chevron* and

---

[9]     To the extent these arguments are more properly considered in Step 2 of the *Chevron* analysis, the Court incorporates its analysis here into the analysis above as further support for its conclusion that the FDIC's interpretation of Section 1831d is not unreasonable.

9

1    *State Farm* "provide for related but distinct standards for reviewing rules promulgated by

2    administrative agencies").  "[T]he touchstone of 'arbitrary and capricious' review under the APA

3    is 'reasoned decisionmaking.'"  *Id.* at 1080 (quoting *State Farm*, 463 U.S. at 52).

4          Under *State Farm*, a rule would be arbitrary and capricious if an agency "entirely failed to

5    consider an important aspect of the problem[.]"  *State Farm*, 463 U.S. at 43; *see also Or. Nat. Res.*

6    *Council v. Thomas*, 92 F.3d 792, 798 (9th Cir. 1996) ("[w]hether an agency has overlooked 'an

7    important aspect of the problem' ... turns on what a relevant substantive statute makes

8    'important'").  Plaintiffs argue the FDIC failed to consider the impact of the Interest Provision on

9    "rent-a-bank schemes" and the related question of how the "true lender" doctrine will apply to the

10   Interest Provision, issues that were raised during the rulemaking proceedings.  (*See, e.g.*, AR at

11   343-44, 561-63, 634-35, 843-47.)

12         The FDIC acknowledged those comments.  With respect to the "true-lender" issues, the

13   FDIC concurred that the true-lender issue and the effect of a loan transfer "ultimately affect the

14   interest rate that may be charged to the borrower[.]"  85 Fed. Reg., at 44,152.  However, the FDIC

15   reached the conclusion that the issues were "not so intertwined that they must be addressed

16   simultaneously by rulemaking" because, in some instances, "there may not even be a non-bank

17   involved in making the loan."  *Id.*; *see also id.* at 44,153 (acknowledging that policy issues

18   warranted consideration of the issue but in "separate" rulemaking proceedings).  With respect to

19   the concerns about rent-a-bank schemes, the FDIC also reiterated that "if States have concerns that

20   nonbank lenders are using partnerships with out-of-State banks to circumvent State law interest

21   rate limits, States are expressly authorized to opt-out of" Section 1831d.  *Id.*  That option is not

22   impacted by the Interest Provision.

23         Plaintiffs also argue the FDIC failed to consider that the Interest Provision creates a

24   regulatory vacuum because it effectively grants non-FDIC banks the most favored lender status

25   afforded to FDIC and will permit them to "ignore" state rate caps.  As discussed above in Sections

26   B and B.1, the Court does not find Plaintiffs' argument on that point persuasive, and, again, the

27   FDIC did not alter any state's ability to opt-out of Section 1831d's coverage.

28         The Court concludes that the record does not demonstrate that the FDIC "entirely failed to

United States District Court
Northern District of California

10

consider" an important aspect of the problem.

Agency action also will be considered arbitrary and capricious if the "explanation for its decision runs counter to the evidence before the agency." *State Farm*, 463 U.S. at 43.  The FDIC did state that it "was not aware of any widespread of significant negative effects on credit availability or securitization markets having occurred to this point as a result of the Madden decision." FDIC Proposed Rule, 84 Fed. Reg. at 66,850.  However, the AR also provides support for the FDIC's view that *Madden* did create uncertainty for those within the industry and that its proposal would alleviate that uncertainty.  (*See, e.g.*, AR 345-46, 506-08, 556-58; *cf.* 524-26) Based on those comments, the Court cannot say the FDIC's decision ran counter to the evidence before it.

Accordingly, the Court concludes that the Interest Provision is not arbitrary and capricious based on the standards set forth in *State Farm*.

## CONCLUSION

For the reasons set forth in this Order, the Court DENIES Plaintiffs' motion for summary judgment and GRANTS the FDIC's cross-motion.  The Court will enter a separate judgment, and the Clerk shall close the file.

**IT IS SO ORDERED**.

Dated: February 8, 2022

_____
JEFFREY S. WHITE
United States District Judge

United States District Court
Northern District of California

11